RECEIVED

2005 NOV 14  IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CONFERENCE AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO.: 2:05CV1088F |
| | ) | |
| CONEXANT SYSTEMS, INC., | ) | **JURY TRIAL** |
| | ) | **DEMANDED** |
| Defendant. | ) | |

## VERIFIED COMPLAINT

Plaintiff Conference America, Inc. ("Conference America") hereby files its Verified Complaint against Defendant Conexant Systems, Inc. ("Conexant") as follows:

## Introduction

1.    This is an action for breach of contract arising from Conexant's refusal to pay for conference-calling services provided to it by Conference America. Conexant's breach of contract has damaged Conference America in the amount of $195,979.79 in unpaid charges for conference-calling services rendered from July 11-31, 2005, as well interest on that amount and attorney's fees incurred in collecting that amount.  Conference America is therefore entitled to recover compensatory damages from Conexant, as well as interest, costs of suit, and attorney's fees.

### Parties, Jurisdiction, and Venue

#### The Parties

2.      Conference America is an Alabama corporation with its principal place of business in Montgomery, Alabama.

3.      From its Montgomery office, Conference America provides a variety of telephonic and internet-based conference and communications services for companies and individuals around the world.

4.      Conexant Systems, Inc. is a Delaware corporation with its principal place of business located in Newport Beach, California. Conexant does business in Alabama, and may be served through its registered agent, CSC Lawyers Incorporating Svc., Inc., 150 South Perry Street, Montgomery, Alabama 36104.

5.      "Conexant is a worldwide leader in semiconductor solutions for broadband communications, enterprise networks and the digital home."[1] "Enabling a worldwide access network for its personal access and digital home networking products, Conexant also builds a complete line of central office (CO) solutions, which are utilized by service providers worldwide to deliver broadband data, voice, and video over copper telephone lines."[2]

---

[1] (http://www.conexant.com.)
[2] (http://www.conexant.com/company/about.html.)

## Federal Jurisdiction

6.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Conference America and Conexant, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.00.

## Venue

7.    As discussed below, Conference America and Conexant engaged in two "Price Protection Program Agreements" under which Conference America provided conference-calling services to Conexant.  When these Price Protection Program Agreements were terminated, Conexant used Conference America's services under contractual terms and conditions set forth on Conference America's website.

8.    All of Conexant's conference calls administered by Conference America, and all parties to those calls, were connected through Conference America's operators and bridging facilities in Montgomery, Alabama.  This occurred regardless of the physical location of the call participants.

9.    All support for all of Conference America and Conexant's calls and contracts, including contract administration, customer service, sales administration,

account provisioning, billing, collections, and call operation, were performed in Alabama.

10.    As part of one of the parties' Price Protection Program Agreements—a Data Conferencing Services Contract for data collaboration services (the "Data Contract," which is discussed below)—Conference America provided extensive on-line training to Conexant personnel from its Montgomery, Alabama facility. Subsequent to this initial training, Conference America provided support and training to new and existing Conexant users during the remainder of the contract.

11.    Conexant's former Telecom Manager, Robert Montour, who was responsible for administering to Conexant's contracts with Conference America and negotiating one of the Price Protection Program Agreements and subsequent amendments, made three site visits to Conference America's Montgomery, Alabama headquarters to review Conference America's facility and to administer to the parties' contractual relationship.

12.    Conference America provided, from Montgomery, Alabama, all account administration and billing for the parties' contracts.

13.     Venue for this action is therefore proper in the Middle District of Ala-
bama, Northern Division, pursuant to 28 U.S.C. § 1391.[3]

## **Factual Allegations**

### Conference America's Service Rates

14.     As stated above, Conference America provides a variety of telephonic
and internet-based teleconferencing services to individuals and companies.  Con-
ference America provides these services at certain rates, selected ones of which are
posted on its website, http://www.yourcall.com, under the link "Services Terms &
Conditions."[4]

15.     Under normal circumstances, a customer wishing to use Conference
America's services simply contacts Conference America, uses the necessary ser-
vices, and pays for those services according to the terms and conditions set forth
on Conference America's website.[5]  Before using Conference America's services
in such a manner, the customer must contractually agree to abide by the "Services
Terms & Conditions" appearing on the website, including the pricing provisions
appearing therein.[6]

---

[3] See also Communication Equip & Contracting Co. v. Mun. of Anchorage, Alaska, 498 F. Supp. 632, 634-36 (M.D. Ala. 1980).

[4] (See Conference Am. Inc., "Services Terms and Conditions," printed from its website, http://www.yourcall.com, July 25, 2005, a true and correct copy of which is attached as Ex. A.)

[5] (See id.)

[6] (Id.)

16.    Sometimes, however, Conference America offers lower rates to customers that frequently use its services.  In exchange for extensive usage by these customers, Conference America enters into "Price Protection Program Agreements" with them, under which it offers them reduced rates.

17.    Conexant was one of Conference America's preferred customers. Conference America and Conexant thus entered into two separate Price Protection Program Agreements.

The Audio Conferencing and Data Contracts

18.    The parties' first Price Protection Program Agreement was a September 1, 1999 Audio Conferencing Contract (the "Audio Conferencing Contract").[7] The parties agreed, in this contract, that Conference America would provide various services to Conexant from September 1, 1999, through September 1, 2002.[8] Either party had the right to cancel the Audio Conferencing Contract at any time, with or without cause, with the cancellation to go into effect 15 days after notice of cancellation.[9]

---

[7] (See Aug. 1, 1999 Price Protection Program, a true and correct copy of which is attached as Ex. B.)
[8] (Id.)
[9] (Id.)

19.    The parties amended the Audio Conferencing Contract twice.    The first amendment extended its duration to July 31, 2005.[10]    The second amendment extended it to November 1, 2005.[11]

20.    The parties' second Price Protection Program Agreement was a June 10, 2002 Data Conferencing Services Contract (the "Data Contract").[12]    Under this contract, the parties agreed that Conference America would provide data conferencing services to Conexant until June 2005.[13]    Either party had the option to terminate the Data Contract by providing appropriate notice.[14]

<u>Termination of the Audio Conferencing and Data Contracts</u>

21.    In May 2005, Conexant terminated the Data Contract.[15]

22.    On June 10, Conference America informed Conexant that, in accordance with the Data Contract's terms, Conference America would continue to provide service to Conexant under the Data Contract until June 30, 2005.[16]    By email,

---

[10] (See July 23, 2001 Amendment, a true and correct copy of which is attached as Ex. C.)

[11] (See Dec. 1, 2003 Amendment, a true and correct copy of which is attached as Ex. D.)

[12] (See June 10, 2002 Price Protection Program (For Data Conferencing Services Only), a true and correct copy of which is attached as Ex. E.)

[13] (See id. at 2.)

[14] (Id. at 6.)

[15] (See Letter from Tom Noonan, Director, Strategic Sourcing, Conexant Sys., Inc., to Rob Pirnie, Vice President of Sales, Conference Am., Inc. (May 9, 2005) (a true and correct copy of which is attached as Ex. F); E-mail from Ron Stroh, Client Service Manager – Majors, WebEx Communications, Inc., to Rob Pirnie (May 11, 2005, 5:24 p.m.) (a true and correct copy of which is attached as Ex. G).)

[16] (E-mail from Rob Pirnie to Tom Noonan (June 10, 2005, 2:54 p.m.) (a true and correct copy of which is attached as Ex. H); see also Ex. E, "Subscription Terms and Conditions" ¶ 5 ("Either party may terminate this Agreement at the end of any (Initial or Renewal) Term by providing the other party written notice of termination at least 30 days prior to the end of such period.")

Conexant accepted the June 30, 2005 termination date.[17]  On June 24, Conference America again informed Conexant that Conference America would continue to provide service under the contract until June 30, 2005.[18]

23.    Also on June 24, Conference America terminated—by letter delivered by confirmed FedEx delivery—the Audio Conferencing Contract, with the termination to be effective on July 10.[19]  In its June 24 letter, Conference America informed Conexant that "[a]ny services used or requested by Conexant **after termination** will be made available only on and subject to Conference America's standard terms, conditions and prices effective at the time the services are rendered. Conference America's Services Terms & Conditions is available at www.yourcall.com."[20]  Thus, after July 10, Conexant was obligated to pay for all Conference America services that it used in accordance with Conference America's standard prices, selected ones of which were listed on Conference America's website.  These standard prices were higher than the prices in the Audio Conferencing Contract.[21]

---

[17] (See e-mail from Tom Noonan to Rob Pirnie (June 14, 2005, 12:52 p.m.) (a true and correct copy of which is attached as Ex. I).)

[18] (E-mail from Rob Pirnie to Tom Noonan (June 24, 2005, 4:44 p.m.) (a true and correct copy of which is attached as Ex. J).)

[19] (Letter from Bob Pirnie to Tom Noonan (June 24, 2005) (a true and correct copy of which is attached as Ex. K).)

[20] (Id.)

[21] (Compare Ex. A ¶ 5, with Ex. B, Attach. A.)

24.    On July 7, 2005, Conference America informed Conexant that, although its Audio Conferencing Contract with Conexant was terminated, there would be no interruption of its audio conferencing services to Conexant, that Conexant's leaders' accounts would remain active, and that new leader accounts would be established as requested by Conexant personnel.[22]  Thus, if Conexant wished to use Conference America's services—despite the termination of the contracts—Conference America would provide those services at the rates and under the Terms and Conditions established on its website.

Conexant's Acknowledgment of Termination

25.    In a July 15 letter, Conexant acknowledged Conference America's termination of the Audio Conferencing Contract in accordance with Conference America's contractual right to do so.[23]  Conexant incorrectly stated, however, that Conference America was obligated to continue to abide by the contract for 15 **business** days; the contract makes clear that either party had the right to cancel the contract on 15 total days' notice—not 15 business days.[24]  In its letter, Conexant also (1) requested that Conference America cease creating any new accounts on Conexant's behalf; (2) advised Conference America that it intended to cancel all

---

[22] (E-mail from Zach Vogelgesang, Sales Administrator, Conference Am., Inc., to Tom Noonan (July 7, 2005, 5:59 p.m.) (a true and correct copy of which is attached as Ex. L).)

[23] (Letter from Tom Noonan to Bob Pirnie (July 15, 2005) (a true and correct copy of which is attached as Ex. M).)

[24] (Compare Ex. M with Ex. B.)

accounts as of July 31, 2005, and that all services for those accounts were to be made inactive as of that date; and (3) informed Conference America that, after Monday, August 1, 2005, Conexant would no longer take any responsibility for any services provided by Conference America.[25]

26.    On July 19, 2005, Conexant acknowledged by email that Conference America had terminated the Audio Conferencing Contract, thus raising the service prices.[26] Conexant also disputed its bills from Conference America, claiming that it was confused about the parties' pricing arrangement.[27]

27.    On July 19, Conference America informed Conexant that that the Audio Conferencing Contract had terminated effective July 10, and that the prices of any of Conference America's services provided to Conexant after that date could be found on Conference America's website.[28] Conference America also offered to answer any specific pricing questions that Conexant might have.[29]

---

[25] (Ex. M.)

[26] (See E-mail from Paul Edge, Program Manager, IT Ops, Conexant Sys., Inc., to Melissa Spence; Brigette McNair; Rob Pirnie; Jason Shanks, Sales Administrator, Conference Am., Inc.; Tom Noonan; and Bob Pirnie (July 19, 2005, 3:13 p.m.) (a true and correct copy of which is attached as Ex. N).)

[27] (Id.)

[28] (See E-mail from Rob Pirnie to Paul Edge, Melissa Spence, Brigette McNair, Jason Shanks, Tom Noonan, Bob Pirnie, and Robert P. Williams II, Counsel for Conference Am., Inc. (July 19, 2005, 5:51 p.m.) (a true and correct copy of which is attached as Ex. O).)

[29] (Id.)

Conexant's Acknowledgment of (1) The Post-Termination Price Change and (2)
Its Obligation to Pay Conference America Accordingly

28.    On July 20, Conexant acknowledged that Conference America had
answered its pricing question, thus resolving any dispute about the money that
Conexant owed Conference America on bills for June and July.[30]  Conexant agreed
to take its bills from Conference America out of dispute, and to pay Conference
America.[31]  It further acknowledged that the change from the Audio Conferencing
Contract pricing to the higher rates on Conference America's website had occurred
on July 10.[32]

Conexant's Request That Conference America Terminate All Accounts

29.    Also on July 20, Conexant requested by email that Conference Amer-
ica disconnect all of Conexant's accounts on July 31, and that Conference America
create no new accounts for Conexant.[33]  Additionally, Conexant confirmed, by in-

---

[30] (See e-mail from Paul Edge to Rob Pirnie, Melissa Spence, Brigette McNair, Jason Shanks, Tom Noonan, Bob Pirnie, and Robert P. Williams II, Esq., (July 20, 2005, 12:20 a.m.) (a true and correct copy of which is attached as Ex. P).)

[31] (Id.)

[32] (Id.)

[33] (See e-mail from Paul Edge to Rob Pirnie, Jason Shanks, Will McQueen, Bob Pirnie, Robert P. Williams II, Esq., Greg Folkes, Reed Karle, and Jeff Reid (July 20, 2005, 2:11 p.m.) (a true and correct copy of which is attached as Ex. Q); e-mail from Paul Edge to Tom Noonan and Rob Pirnie (July 20, 2005, 2:23 p.m.) (a true and correct copy of which is attached as Ex. R); e-mail from Paul Edge to himself, Rob Pirnie, Jason Shanks, Will McQueen, Bob Pirnie, Robert P. Williams II, Esq., Greg Folkes, Reed Karle, Jeff Reid, and Tom Noonan (July 20, 2005, 4:21 p.m.) (a true and correct copy of which is attached as Ex. S).)

ternal email, that it intended to terminate all of its Conference America accounts as of July 31.[34]

30.   As stated on its website, Conference America charges a $74.95 service fee for each customer account that it deactivates.[35]

31.   In a July 26, 2005 letter (by confirmed FedEx delivery), Conference America again informed Conexant that the Audio Conferencing Contract had been terminated according to its terms, with the termination effective July 10.[36] Conference America reminded Conexant that any Conference America services that Conexant had or would use after that date would be covered by the Services Terms and Conditions on Conference America's website.[37]   Conference America also reminded Conexant that, although Conexant was free to stop using Conference America's services at any time, Conexant would still be responsible for paying for any further services that it decided to use.[38] Conference America further agreed, per Conexant's request, to deactivate all of Conexant's conferencing accounts, ef-

---

[34] (E-mail from Paul Edge to Melissa Spence, Rob Pirnie, and Tom Noonan (July 20, 2005, 4:28 p.m.) (a true and correct copy of which is attached as Ex. T).)
[35] (Ex. A ¶ 5.)
[36] (Letter from Bob Pirnie to Paul Edge and Tom Noonan (July 26, 2005) (a true and correct copy of which is attached as Ex. U).)
[37] (Id.)
[38] (Id.)

fective August 1, 2005.[39] As Conference America's website made clear, this deactivation service cost $74.95 per deactivated account.[40]

32.    In a July 28 letter, Conexant informed Conference America that, despite Conference America's termination of the Audio Conferencing Contract, effective July 10, Conexant intended to continue to operate under the contract's terms until August 1, 2005.[41] Conexant did not cite any contractual basis for this position.[42] It further stated that it intended to pay Conference America for all services rendered through August 1, 2005.[43]

### Conexant's Refusal to Pay Conference America

33.    On August 16, 2005, Conexant informed Conference America that it refused to pay Conference America's June or July bills.[44] The June bill, Invoice 117479, was for $39,793.01.[45]    The July bill, Invoice 119266, was for $201,346.32.[46]

34.    Conexant's service charges for July 1-10—the period prior to the termination of the Audio Conferencing Contract—were set forth in Conference

---

[39] (Id.)
[40] (Ex. A ¶ 5.)
[41] (Letter from Tom Noonan to Bob Pirnie (July 28, 2005) (a true and correct copy of which is attached as Ex. V).)
[42] (Id.)
[43] (Id.)
[44] (See e-mail from Audria Carr, Fin. Dep't, Conference Am., Inc., to Bob Pirnie (Sept. 8, 2005, 10:18 a.m.) (a true and correct copy of which is attached as Ex. W).)
[45] (See id.)
[46] (See id.)

America's Invoice No. 119266, and detailed in Invoice No. 119266**A**.[47]  Conexant's service charges for July 11-31 were set forth in Conference America's Invoice No. 119266, and detailed in Invoice No. 119266**B**.[48]

Conexant's First Attempt to Pay Conference America

35.    On September 7, 2005, Conexant sent Conference America a letter and accompanying check in the amount of $5,366.53 for the service charges that Conexant had incurred from July 1-10, 2005, detailed in Invoice No. 119266A.[49] Despite Conference America's previous explanations concerning the fee structure, and Conexant's July 20 email acknowledging that it understood the fee structure for Invoice No. 119266, Conexant did not pay the service charges that it owed to Conference America for June (a total of $39,793.01) or for the services that Conference America provided after the Audio Conferencing Contract was terminated on July 10 (a remaining total of $195,979.79).[50]  Conexant based its refusal on its

---

[47] (See Conference Am., Inc. Invoice No. 119266, Aug. 2, 2005, with detailed billing for July 2005, a true and correct copy of which is attached as Ex. X; Invoice No. 119266A Detailed Billing Spreadsheet, Calls Under Contractual Terms July 1-10, 2005, a true and correct copy of which is attached as Ex. Y.)

[48] (See Ex. X; Invoice No. 119266B Detailed Billing Spreadsheet, Calls Under "Website Events Terms & Conditions," July 11-31, 2005, a true and correct copy of which is attached as Ex. Z.)

[49] (Letter from Tom Noonan to Bob Pirnie (Sept. 7, 2005) (a true and correct copy of which is attached as Ex. AA).)

[50] (Id.; Conference Am., Inc. Invoice No. 117479, July 6, 2005, with detailed billing for June 2005, a true and correct copy of which is attached as Ex. BB; Invoice No. 117479 Detailed Billing Spreadsheet, a true and correct copy of which is attached as Ex. CC; Ex. X; Ex. Y; Ex. Z; Deactivation Fee Detail, a true and correct copy of which is attached as Ex. DD.)

professed inability to understand the fee structure that the charges were based upon and on the manner in which the charges were calculated.[51]

### Conexant's Second Attempt to Pay Conference America, and Its Representation That It Paid Its June Bill

36.    On October 5, 2005, Conexant informed Conference America by letter that it had further analyzed its usage from July 1-10, 2005.[52]  Conexant opined that, during that period, it had used Conference America's services for 141,205 minutes which, when multiplied by a rate of $0.05 per minute, amounted to $7,060.25 in service charges.[53]  Conexant enclosed a check for $7,060.00 with its letter, and stated that all other charges in Conference America's invoice were erroneous.[54]

37.    On October 7, Conexant informed Conference America of its belief that all of Conexant's bills from Conference America had been paid.[55]

38.    On October 21, 2005, Conference America responded to Conexant's October 5 letter, and demanded payment for its services, as well as interest.[56]  Conference America again reminded Conexant that, following the July 10 effective ter-

---

[51] (Ex. AA.)
[52] (See letter from Tom Noonan to Bob Pirnie (Oct. 5, 2005) (a true and correct copy of which is attached as Ex. EE).)
[53] (Id.)
[54] (Id.)
[55] (E-mail from Tom Noonan to Bob Pirnie and Paul Edge (Oct. 7, 2005, 7:37 p.m.) (a true and correct copy of which is attached as Ex. FF).)
[56] (Letter from Bob Pirnie to Tom Noonan (Oct. 21, 2005) (a true and correct copy of which is attached as Ex. GG).)

mination date of the Audio Conferencing Contract, Conexant's rates were no longer the reduced rates appearing in the Audio Conferencing Contract, but were instead the standard rates appearing on Conference America's website.[57] Conference America also informed Conexant that it would not cash the $5,366.53 check or the $7,060.25 check that Conexant had attempted to tender to Conference America, unless Conexant first confirmed that the checks were intended as partial payments, and not as a release.[58] (Although Conference America has possession of both checks, and does not dispute that Conexant has indeed paid for services rendered from July 1-10, Conexant has never made the requested confirmation, thus preventing Conference America from cashing those checks.) Conference America further informed Conexant that it owed Conference America for services rendered in June and July 2005, with interest accruing on these amounts at 1.5% per month.[59] Finally, Conference America reminded Conexant of its obligation to pay Conference America's attorney's fees and costs in the event that collection by litigation became necessary.[60]

39. On November 3, Conexant informed Conference America that, despite Conference America's termination of the Audio Conferencing Contract, Con-

---

[57] (Id.)
[58] (Id.)
[59] (Id.)
[60] (Id.; Ex. A ¶ 5.)

exant still had a right, after termination, to pay for conferencing services at the rates set forth in that contract.[61]  Again, Conexant cited no contractual basis for this position: it essentially declared that the entire July invoice somehow fell under the Audio Conferencing Contract's rates, even though Conference America had terminated the contract, effective July 10, and even though Conexant had acknowledged twice in writing that the termination effected a rate increase.

40.    On November 7, Conexant finally paid its June bill to Conference America.[62]

41.    To date, Conexant has not paid the money that it owes to Conference America for the services that it used during July 11-31, 2005.  This is so despite the following facts:

a. Conference America has diligently performed, in accordance with the parties' contracts, including the Terms and Conditions set forth on its website, all services for which payment by Conexant is due;

b. Conference America has demanded payment[63];

c. Conexant has no contractual basis for refusing payment;

---

[61] (Letter from Tom Noonan to Bob Pirnie (Nov. 3, 2005) (a true and correct copy of which is attached as Ex. HH).)

[62] (Nov. 2, 2002 check, in the amount of $39,793.01, from Conexant, via Cass Info. Sys., to Conference Am., attached as Ex. II.)

[63] (Ex. GG.)

d.  Conexant has conceded that it owes the balance of the July bill to Conference America[64]; and

e.  Conexant has admitted that it understood the pre- and post-contract termination pricing agreements between the parties.[65]

## Count I - Breach of Contract

42.    Conference America realleges and incorporates paragraphs 1 through 41 of its Complaint as if fully restated herein.

43.    As set forth above, Conference America and Conexant entered into valid, binding contracts with each other:  the Audio Conferencing Contract, the Data Contract, and the "Services – Terms and Conditions" contract appearing on Conference America's website, the last of which applied to all services provided by Conference America to Conexant following the termination of the Audio Conferencing and Data Contracts.  Under these contracts, Conference America agreed to provide services to Conexant in exchange for Conexant's payment for those services in accordance with the prices set forth in the contracts.

44.    Conference America fully performed under all of the parties' contracts by providing teleconferencing and other services to Conexant in accordance with Conexant's requests.

---

[64] (See Ex. P.)
[65] (See Exs. N, P.)

45.    Conexant has breached the contractual terms of the Terms and Conditions set forth on Conference America's website by failing to perform its obligations under them—specifically by refusing to pay the bill for services that Conference America rendered to it for the period July 11-31, 2005. Conference America is making no claims under the Audio Conferencing or Data Contracts; it instead seeks damages for Conexant's breach of the contractual terms set forth in Conference America's website Terms and Conditions—contractual terms that governed Conexant's request for and payment of Conference America's services from July 11-31, 2005.

46.    As a direct and proximate result of Conexant's breach of contract, Conference America has been damaged by Conexant in the amount of $195,979.79 (the amount that Conexant owes Conference America for services rendered from July 11-31, 2005, under Conference America's website Terms and Conditions).

47.    Additionally, under the contractual terms set forth in Conference America's website Terms and Conditions, Conexant owes Conference America interest of 1.5% per month on the unpaid sum of $195,979.79, accruing from August 22, 2005, the date that the bill was due.[66] Specifically, interest is accruing on this

---

[66] (Ex. A ¶ 5.)

sum at $97.99 per day. Conexant also owes Conference America attorney's fees incurred in collecting the above unpaid sum of money, and costs of suit.[67]

WHEREFORE, Conference America respectfully makes its DEMAND FOR A JURY TRIAL on all issues so triable and respectfully requests that the Court enter judgment in its favor and against Conexant on all Counts contained in Conference America's Verified Complaint as follows:

a.    awarding Conference America damages for Conexant's breach of contract, including $195,979.79 (the amount that Conexant owes Conference America for services rendered from July 11-31, 2005);

b.    awarding Conference America interest of 1.5% per month on the above unpaid sum of money, accruing from August 22, the date that the bill for services rendered from July 11-31, 2005, was due;

c.    awarding Conference America reasonable attorneys' fees and costs of suit incurred in this action;

d.    awarding Conference America pre- and post-judgment interest; and

---

[67] (Id.)

e.    awarding Conference America such other and further relief as the

Court deems just and equitable.

This 14th day of November 2005.

TROUTMAN SANDERS LLP

Thomas E. Borton IV (BOR011)

5200 Bank of America Plaza          Attorney for Plaintiff Conference
600 Peachtree Street, N.E.          America, Inc.
Atlanta, GA  30308-2216
(404) 885-3000
(404) 962-6664 (fax)

## VERIFICATION

PERSONALLY APPEARED BEFORE ME the undersigned officer duly authorized to administer oaths, ROBERT M. PIRNIE, being duly sworn, who deposes and states that the information contained in Plaintiff Conference America, Inc.'s Verified Complaint is true and correct to the best of his personal knowledge, information, and belief.

This __10__ day of November, 2005.

ROBERT M. PIRNIE

Sworn to and
subscribed before me:

NOTARY PUBLIC
My Commission expires _____.

SHEILA SCHMIDT
NOTARY
EXPIRES
GEORGIA
NOV. 18, 2006
PUBLIC
COBB COUNTY

1565591-4                                    22