IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CONFERENCE AMERICA, INC., | ) |
| Plaintiff, | ) ) ) ) |
| vs. | ) ) ) CASE NO. 2:05 cv 1088-WKW |
| CONEXANT SYSTEMS, INC., | ) ) ) ) |
| Defendant. | ) ) |

**MOTION FOR SUMMARY JUDGMENT IN BEHALF OF
DEFENDANT CONEXANT SYSTEMS, INC.**

COMES NOW the defendant, CONEXANT SYSTEMS, INC., who pursuant to Federal Rule of Civil Procedure 56 moves for summary judgment in its favor, as there is no genuine issue of material fact and it is entitled to judgment in its favor as a matter of law. In support of this motion, Conexant states the following:

**I. FACTS.**

This is a simple breach of contract action. The plaintiff, Conference America, Inc. and Conexant entered into several agreements during the course of their relationship, which has now ended. The original written agreement, entered into on August 1, 1999, is a Price Protection Program Agreement (also known as the Audio Conferencing Contract). It was amended twice during the relationship between Conference America and Conexant. (See Exhibits B, C and D to the Complaint). In summary, by contract, Conference America agreed to provide Conexant with telephonic conference call services (and other services not pertinent to the lawsuit), at an agreed upon rate. As will be

discussed in more detail below, several "merger clauses" or "entire agreement" clauses were contained within the written agreements between the parties.

Conference America terminated the Price Protection Program Agreement dated August 1, 1999, and as last amended on December 1, 2003, by way of a letter from Mr. Robert M. Pirnie, President of Conference America, dated June 24, 2005.  (See Exhibit K to Complaint).  Mr. Pirnie referred Conexant to Conference America's "Services Terms and Conditions" available on Conference America's website for any "services used or requested after termination[.]"  Subsequently, Conexant sent two clear instructions for Conference America to cancel and/or disconnect all of Conexant's conferencing accounts with Conference America as of July 31, 2005.  (See Exhibits M and S to the Complaint).  Conexant specifically stated that, because of the cancellation of the contract by Conference America, Conexant would no longer use Conference America's services.  (See Exhibit S to the Complaint).  Conexant also made it clear that it had <u>not</u> reviewed the terms and conditions on Conference America's website and "does not agree to any new terms governing our relationship."  Conexant likewise confirmed that it continued to operate under "the agreed upon terms and conditions in the contract dated August 1, 1999 and amended as of December 1, 2003[.]"  (See Exhibit V to Complaint).

Conference America did indeed deactivate 1,778 conferencing accounts, and attempted to impose a "deactivation fee" of $74.95 per account upon Conexant.  This had never been agreed to, or contemplated by, Conexant.  (See attached Exhibits 1 and 2, affidavits of Thomas Noonan and Paul Edge).  Conexant expressed that the deactivation fees sought by Conference America, which are approximately $146,000.00, came "out of

the blue." (See Exhibit AA to Complaint). Conexant attempted to pay Conference America for the <u>services</u> it used, exclusive of the deactivation fees, but that amount was rejected by Conference America. (See Exhibits EE and GG to Complaint).

The Price Protection Program Agreement and its amendments did <u>not</u> contain any deactivation fee, and constituted the "entire agreement" between the parties relative to the accounts in question. Conference America agrees and admits that the 1,778 accounts for which the deactivation fee is sought were created pursuant to the written agreement of the parties, and <u>not</u> pursuant to the website maintained by Conference America. (See Deposition of Bob Pirnie, attached as Exhibit 3, pages 160.14-161.13 and 115.3-115.17). In its Complaint, Conference America confirms that it is not seeking recovery for any breach of contract under the Price Protection Program Agreement, or any <u>written</u> agreement. Rather, Conference America states that it "instead seeks damages for Conexant's breach of the contractual terms set forth in Conference America's website Terms and Conditions – Contractual terms that governed Conexant's request for and payment of Conference America's services from July 11-31, 2005." (See Complaint, ¶45, page 19). Thus, Conference America's <u>only</u> claim is that Conexant somehow "breached" terms purportedly set forth on Conference America's website. Paradoxically, however, Conference America admits that <u>none</u> of the 1,778 accounts in question was created pursuant to the website. (See Exhibit 3, Deposition of Bob Pirnie, pages 115.3-115.17 and 160.14-161.13).

## II. CONEXANT IS ENTITLED TO SUMMARY JUDGMENT, AS THE "ENTIRE AGREEMENT" CLAUSES CONFIRMED THE ONLY AGREEMENT BETWEEN THE PARTIES CONCERNING THE 1,778 ACCOUNTS, AND THERE WAS NO MUTUALITY OF ASSENT REGARDING THE CLAIMS IN THE LAWSUIT.

### A. Admissible Evidence.

Again, Conference America claims that a breach of contract occurred by referring Conexant to Conference America's website. (The printout of the July 25, 2005 version of the website is Exhibit A to the Complaint.) It is useful to note the following admissions by Conference America concerning its claim:

1. Conference America admits that there is no written agreement signed by the parties that governs the issue of deactivation fees. (See Conference America's Answer to Conexant's Interrogatory #13, attached hereto as Exhibit 4).

2. Conference America has no evidence that Conexant ever reviewed the Terms and Conditions on the Conference America website before an account application was submitted, as required by the website. (See Conference America's Answer to Conexant's Interrogatory #11, attached hereto as Exhibit 4).

3. Conference America has no evidence that Conexant, or anyone in Conexant's behalf, ever clicked on the "I agree" button on the Conference America website, as required by the website. (See Conference America's Answer to Conexant's Interrogatory #12, attached hereto as Exhibit 4).

4. As mentioned above, Conference America agrees and admits that the 1,778 accounts in question were in fact <u>not</u> created pursuant to the website, but were already in place and subject to the written agreement of the parties. (See Exhibit 3, Deposition of Bob Pirnie, pages 115.3-115.17; 160.14-161.13). Mr. Bob Pirnie, President of Conference America, testified as follows in this regard:

Q: The 1,778 accounts we are talking about came into existence during the terms of the written agreement, correct?

A: Some may have existed prior to that with Rockwell Semiconductor.

Q: With that qualification – which I don't dispute because I don't know. But with that qualification, those accounts came into existence during the term of the written audioconferencing contract, correct?

> A: With that possible exception, I believe that is accurate.
>
> . . .
>
> Q: The account with Conexant was not created by somebody going to that website and clicking I Agree and proceeding, correct?
>
> A: That's accurate, yes.
>
> Q: But your reference to Conexant that we discussed earlier was a reference to the terms and conditions on the website?
>
> A: In my letters, yes.
>
> Q: But none of the accounts for which the deactivation fees are being imposed upon were created through that website, correct?
>
> A: Those are not accounts that would be created through the website. There is only one account that would be created through the website, and that is an overall account for the entire entity.
>
> Q: But that account was not created through the website, correct?
>
> A: That's correct. It pre-dates the website.

<u>Id</u>.

The written agreement and amendments which <u>had</u> allowed the creation of the 1,778 accounts in question contained merger clauses, as follows:

> This Agreement constitutes the entire agreement of the parties hereto concerning the subject matter hereof and supersedes any prior oral or written agreements pertaining to the subject matter of this Agreement. This Agreement shall not be amended or modified except by a writing signed by Conference America and the Customer.

(Exhibit B to Complaint, last page).

. . .

> **Integration**. This Agreement and Amendment, (including Attachments A, B, D & E), contain the entire agreement and

5

{B0604706}

> understanding concerning the subject matter hereof between the Parties hereto.

(Exhibit D to Complaint, page 4, ¶15).

. . .

> This Agreement, including all Attachments, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. No amendment to or modification of this Agreement will be binding unless in writing and signed by a duly authorized representative of both parties.

(Exhibit E to Complaint, page 8, ¶13a).

The Terms and Conditions information within Conference America's website was <u>never</u> incorporated into any of the written agreements or amendments thereto. The written agreement, which was the "entire agreement" relative to the 1,778 accounts in question, did not contain any provision for a deactivation fee, and Conference America admits this. (See Exhibit 3, Deposition of Bob Pirnie, pages 74.6-74.12; 77.11-79.2; 115.18-116.2). After terminating the written agreement, Conference America merely referred Conexant to the Conference America website for any future services. Mr. Bob Pirnie, the President of Conference America, testified as follows regarding this important issue:

> Q: In this case with Conexant, did you personally do anything to satisfy yourself that Conexant understood that there was going to be a $74.95 deactivation fee associated with always on accounts and operated assisted events?
>
> A: I think that I advised Conexant repeatedly that subsequent to the termination of our Price Protection Agreement that the basis under which we would do business was different and advised them where

6

> they could find the information and encouraged them to look. So, in that context, I believe I advised them.
>
> Q: By referring them to the website?
>
> A: I think that yes, the website. That is correct.
>
> Q: Here's what I want to know. Did you have any specific verbal communication with anyone from Conexant wherein you told them we have X number of operator assisted events with you that have occurred in the past that we intend to apply this deactivation fee to? Did you have that specific conversation with anyone?
>
> A: No, I did not.
>
> Q: Same question applicable to the always on accounts?
>
> A: No, I had no conversation.
>
> Q: It was your feeling that Conexant knew and understood that there would be deactivation fees of $74.95 applied to every single operator assisted event which had occurred in the past?
>
> A: I don't know what Conexant knew.
>
> Q: Same question for the always on accounts.
>
> A: I don't know what they knew.
>
> Q: What did you do to find out what they did know about that?
>
> A: I made no inquiries about what they did or did not know. I told them where to look for the information or where to find it and the basis under which we'd do business.

(Exhibit 3, Deposition of Bob Pirnie, pages 55.2-57.6).

There was <u>never</u> any agreement as to any new terms which would govern the "old" 1,778 accounts, which had been created pursuant to the written agreement, and <u>not</u> pursuant to the website. (See Exhibit 8, Conexant's Answers to Conference America's Interrogatories #2 and #3; Exhibit 2, Affidavit of Paul Edge; Exhibit 1, Affidavit of

7

{B0604706}

Thomas Noonan). Simply put, the <u>only</u> agreement ever reached between the parties concerning the 1,778 accounts in question was the <u>written</u> agreement. (See Exhibit 5, Deposition of Thomas Noonan, pages 29.10-29.20; 36.10-36.17; Exhibit 6, Deposition of Paul Edge, pages 30.9-30.18; 32.3-32.20; 33.24-34.12). Conexant acknowledges that the website information in existence at the time of termination would apply, but <u>only</u> for <u>new</u> accounts which were created pursuant to the website <u>after</u> termination of the written agreement. (See Exhibit 5, Deposition of Thomas Noonan, page 106.8-106.17). That was not the case regarding these 1,778 accounts, which had already been created pursuant to the written agreements, which were the "entire agreements" between the parties. These written agreements did <u>not</u> contain any deactivation fee. Again, as mentioned above, Conference America admits that the written agreement and its amendments did <u>not</u> specifically "enumerate" such a deactivation fee for any accounts created pursuant to the written agreement. (See Exhibit 3, Deposition of Bob Pirnie, page 74.6-74.12).

It should be mentioned that numerous Conexant conference calling accounts had been canceled/turned off/deactivated over the life of the written agreements, with <u>no</u> deactivation fee ever being charged. (See Exhibit 3, Deposition of Bob Pirnie, pages 57.20-57.23; 61.12-62.14; 83.10-83.17; Exhibit 2, affidavit of Paul Edge). Conexant expected that there would be <u>no</u> such deactivation fee, as there had never been one. (See Exhibit 5, Deposition of Thomas Noonan, pages 85.18-86.3; 91.9; 95.25). Conference America had <u>never</u> affirmatively raised this issue of a deactivation fee. Rather, Conference America simply referred Conexant to Conference America's website for future business. Conference America admits that the attempt to impose deactivation fees

8

here involves a charge that had never been made before. (See Exhibit 3, Deposition of Bob Pirnie, pages 58.10-59.12; 83.18-84.1). Indeed, this would all be consistent with the "entire agreement" of the parties concerning these 1,778 accounts. The written agreements in question contained absolutely <u>no</u> language enumerating any fee that might be applied to deactivating or turning off Conexant's conference calling accounts which had been created pursuant to the written agreement. Conference America admits that it does not know if anyone at Conexant understood or knew about, much less agreed to, the deactivation fee before the bill for such fee was sent. (See Exhibit 3, Deposition of Bob Pirnie, page 138.7-138.18).

    B. **<u>Legal Analysis and Applicable Case Law</u>**.

The merger clause issue will be addressed first, followed by applicable case law requiring mutual assent. Courts in Alabama have shown a strong presumption of honoring "entire agreement" clauses within contracts. *See Ex Parte Conference America, Inc.*, 713 So. 2d 953 (Ala. 1998). In *Ex Parte Conference America*, the parties entered into two agreements. The first contract was entered into in February of 1996, and included an arbitration clause, but did <u>not</u> include an "entire agreement" clause. The second contract was entered into two months later, in April of 1996. It was separate and distinct from the February contract and did not include an arbitration clause, but <u>did</u> include an "entire agreement" clause. Just as it did here, Conference America in that case filed suit alleging breach of contract (and fraud). *Id*. at 955. The defendant attempted to enforce the arbitration clause contained within the February contract because the subject matter of Conference America's claims were "related to" that contract. *Id*. Since the

9

April contract contained an "entire agreement" clause, the court enforced the plain meaning of those words by treating the April contract as the entire agreement between the parties, which negated the effect of the arbitration clause in the earlier February contract. *Id*. at 956. The Alabama Supreme Court held that the parties did not agree to arbitrate claims arising out of the April contract. The court pointed out that the parties "did not expressly or by implication incorporate the February contract and its arbitration clause into the April contract." Instead, the parties agreed that the later April contract was the "entire agreement." *Id*. Likewise, in the present case, the written agreement in question, which was the "entire agreement," contains no language regarding a recoverable deactivation fee.

Another applicable case is *Ex Parte Palm Harbor Homes, Inc.*, 798 So. 2d 656 (Ala. 2001). In *Palm Harbor*, the plaintiff purchased a mobile home manufactured by the defendants. Three documents were executed during the transaction. One of these documents was a retail installment contract which contained an "entire agreement" clause. *Id*. at 658. The Alabama Supreme Court held that the parol-evidence rule barred consideration of the free-standing documents which did <u>not</u> contain an "entire agreement" clause. Thus, the agreement which contained that clause was honored. *Id*. at 661. The court noted that merger clauses create a presumption that the contract represents the final and complete agreement of the parties. *Id*. at 660. The court noted the following general rule:

> When parties reduce a contract to writing and intend that writing to be the complete contract, no extrinsic evidence of

> prior or contemporaneous agreements will be admissible to change, alter, or contradict the contractual writing.

*Id*. There can be no question, pursuant to the above applicable case law, that the Price Protection Program Agreement in question here contained the "entire agreement" between the parties concerning the 1,778 accounts in question. That agreement was <u>silent</u> as to any fee that might be associated with deactivating or canceling such accounts. Consistent with that silence in the agreement, and as noted above, numerous accounts had in fact been deactivated over the life of the written agreement, with no deactivation fee being applied. Thus, the deactivation fees sought here came "out of the blue." (See Exhibit AA to Complaint). Conference America now seeks to go <u>outside</u> the "entire agreement" of the parties, and unilaterally attempt to enforce an alleged website statement concerning a deactivation fee which was <u>not</u> contained within the written agreement of the parties that <u>did</u> govern the creation and maintenance of 1,778 accounts in question. Under *Ex Parte Palm Harbor*, any such parol evidence cannot be considered concerning those accounts. The website can have <u>no</u> application to the "entire agreement" reached concerning the 1,778 accounts.

It is also useful here to note the paradoxical nature of Conference America's request for damages, the bulk of which are approximately $146,000.00 in deactivation fees. Conference America makes it clear in its Complaint that it is <u>not</u> seeking damages for breach of the Price Protection Program Agreement in question. (See ¶45 of Complaint). Rather, Conference America states that it is only seeking damages for alleged breach of contract under the terms and conditions contained on the website. The

11

{B0604706}

problem with this theory is apparent: the Price Protection Program Agreement was in fact the "entire agreement" between the parties concerning the 1,778 accounts in question. None of those accounts was created through the website. As noted above, Conference America has admitted in numerous discovery responses that the accounts in question were in fact not created pursuant to the website, and it does not claim that they were. Thus, Conference America seeks damages for alleged breach of a unilateral reference to terms and conditions on a website, when that website information had no application to the 1,778 accounts in question. Those accounts had already been created pursuant to the written agreement, which was the "entire agreement" between the parties.

Under these circumstances, it is abundantly clear that there was never any mutuality of assent concerning any new terms and conditions governing the 1,778 accounts in question. It is axiomatic that, in order to establish breach of contract in Alabama, the plaintiff must prove "(1) the existence of a valid contract binding the parties in the action, (2) [the claimant's] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Ex Parte Steadman*, 812 So. 2d 290, 293 (Ala. 2001). Mutuality of assent is necessary to form a contract in Alabama. See Id.; *Med Center Cars, Inc. v. Smith*, 727 So. 2d 9, 14 (Ala. 1998). Furthermore, the plaintiff is required to present "substantial evidence" regarding each element of the claim. See Alabama Code § 12-21-12.

Conexant sent two instructions for the accounts in question to be disconnected. These were (1) Thomas Noonan's July 15, 2005 letter to Mr. Robert M. Pirnie to cancel all accounts and (2) Paul Edge's July 20, 2005 e-mail instructing Conference America to

12

{B0604706}

disconnect all the conferencing accounts. (See Exhibits M and S to the Complaint.) Temporarily setting aside the dispositive argument based on the "entire agreement" of the parties, in order for Conference America to maintain a breach of contract action based on an alleged "breach" of the website terms and corresponding damages in the form of unpaid deactivation fees, it must first present substantial evidence that the deactivation fee language was in fact on the website on June 24, 2005, when the termination letter was sent, and July 15, 2005 and July 20, 2005, when Conexant gave the disconnect instructions. This just stands to reason – there couldn't possibly be a "breach" of a unilateral reference to a website term that wasn't there.

Conference America has produced no information, much less the required substantial evidence required by Alabama Code § 12-21-12, that the deactivation fee language was even on the website on these dates. The version of the website Terms and Conditions attached to the Complaint as Exhibit A is dated July 25, 2005, five days after the second and final disconnect order, and over a month after the termination letter of June 24, 2005. Mr. Bob Pirnie, as President of Conference America, testified that he does not know when the deactivation fee language was first placed on Conference America's website, and does not know if it was there on June 24, 2005 when he sent his termination letter. (See Exhibit 3, Deposition of Bob Pirnie, p. 117.16 – 118.21). He further testified that he does not know if the deactivation fee language was present on the website as of July 20, 2005. (See Exhibit 3, Deposition of Bob Pirnie, p. 127.16 – 127.23).

{B0604706}

Undersigned counsel for Conexant recently deposed Mr. Paine Bone, as the designated Conference America Rule 30(b)(6) representative concerning Conference America's website and the terms & conditions contained therein. He offered similar lack of knowledge and lack of proof. Mr. Bone testified that, in behalf of Conference America, he <u>cannot</u> produce a copy of the terms and conditions that existed on the Conference America website as of July 15, 2005 and July 20, 2005, when the instructions were sent to cancel/disconnect the accounts. He admitted that he does not know if the deactivation fee language was present on the Conference America website on those dates. (See Exhibit 7, Deposition of Paine Bone, pp. 29.13 – 30.2). Furthermore, Mr. Bone confirmed, as the designated Conference America representative, that he cannot say when the deactivation fee language was first placed on the Conference America website. (See Exhibit 7, Deposition of Paine Bone, pp. 26.22 – 28.21). The Conference America computer system cannot provide this information. (See Exhibit 7, Deposition of Paine Bone, p. 26.16). Conference America has no documents which indicate when the deactivation fee was first inserted into the terms and conditions section of the website. (See Exhibit 7, Deposition of Paine Bone, pp. 26.3 – 26.15). Thus, the situation we are left with is a claim by Conference America for breach of contract in relation to a unilateral reference to a website, but with absolutely no proof, and certainly not substantial evidence, of what was on the website at the time of the alleged breach.

The <u>only</u> mutuality of assent here is found within the "entire agreement" of the parties, which was silent as to any deactivation fees, and addressed the agreed upon pricing and other terms and conditions concerning the 1,778 accounts in question.

Conexant acknowledges that Conference America did in fact legally terminate the written agreement in question, by way of Mr. Bob Pirnie's letter of June 24, 2005. (See Exhibit K to Complaint). Mr. Pirnie's reference to the Conference America website in the second paragraph of that letter, however, is nothing more than a new offer for the future creation of accounts between the two parties – accounts which would not be subject to an already existing written and binding agreement. Such a reference in a unilateral severance of a written contract could never somehow overcome the binding "entire agreement" of the parties, as reflected in the written agreement which was being terminated.

This termination letter included a unilateral offer for some new accounts to possibly be created between the parties, pursuant to the then existing and applicable terms and conditions on Conference America's website. According to the website, the customer would have to click "I Agree" in order to be bound. Conference America admits that never occurred here. Such acceptance never occurred for any new accounts, and certainly did not occur in reference to the written "entire agreement" between the parties governing the 1,778 accounts in question. To the contrary, Conexant made it very clear, in numerous items of correspondence, that it did not agree to any new terms and conditions governing the relationship of the parties. (See Exhibits Q, R, S, V, AA and HH to Complaint).

Conexant has made a *prima facie* showing that there was no mutuality of assent, and therefore no agreement, for any deactivation fee applicable to the 1,778 accounts in question, or even any new pricing for use of those old accounts. (See Exhibits 1 and 2, Affidavits of Thomas Noonan and Paul Edge). The burden now shifts to Conference

15

America to present substantial evidence in support of its claim. *Gollotte v. Peterbilt of Mobile, Inc.*, 582 So. 2d 459, 461 (Ala. 1991). The *Gollotte* Court affirmed summary judgment in a breach of contract action when the plaintiff failed to present substantial evidence that the contract existed. *Id.* at 462. In the present case, Conference America cannot even provide <u>any</u> information to suggest that the deactivation fee was present on the website on the dates in question. Obviously, if there is no evidence to support the existence of a contract which has been allegedly breached, "there could be no recovery for a breach thereof." *Mid-State Homes, Inc. v. Berry*, 359 So. 2d 401, 403 (Ala. Civ. App. 1978). *See also Mann v. Bank of Tallassee*, 694 So. 2d 1375, 1380 (Ala. Civ. App. 1996) (plaintiff is required to present substantial evidence of every element of a breach of contract action).

Simply put, Conference America is attempting to enforce charges, including $146,000.00 in deactivation fees, that were never addressed or agreed to concerning these 1,778 accounts. At the time the written agreement in question was terminated, all of those accounts were in place, and subject to the "entire agreement" between Conference America and Conexant, which said <u>nothing</u> about deactivation fees, and set the agreed upon pricing for use of the accounts. Conexant never "accepted" in any way Conference America's invitation to review the terms and conditions on Conference America's website, and somehow be bound to such terms and conditions relative to the 1,778 accounts already created pursuant to the written agreement. This logically leads to only one conclusion: there simply was <u>no</u> mutuality of assent concerning any deactivation fees or new prices regarding the accounts already created and in place pursuant to the

16

"entire agreement" of the parties, as reflected in the written contract and its amendments. There was no breach of contract, because there was no new contract that governed new pricing and deactivation fees. Conference America's claim runs counter to pertinent and binding case law concerning merger clauses and mutuality at assent, as discussed above.

### III. CONCLUSION

Conference America has provided <u>no</u> evidence, and certainly not the substantial evidence required by Al. Code § 12-21-12, that Conexant somehow agreed to anything <u>other</u> than what was contained in the "entire agreement" of the parties relative to the 1,778 accounts in question. Conexant has confirmed that it never agreed to any terms and conditions other than those reflected in the "entire" written agreement. Due to the "entire agreement" clauses and complete absence of mutuality of assent regarding deactivation fees and new pricing, Conference America's claim for breach of contract necessarily fails. This was nothing more than a termination of the contract by Conference America, with a new "offer" for Conexant to visit Conference America's website for creation of any <u>new</u> accounts. A simple referral to a website like this *might* serve as an offer which could be accepted concerning the creation of new accounts, but only if the potential customer complied with all of the requirements contained on the website. That is certainly not the case here. Conference America has admitted that it has no evidence that Conexant ever went through the required steps on the website to create any new accounts and thus be bound by the website terms. Rather, Conference America claims that governance of the "old" 1,778 accounts is now somehow pursuant to the terms and conditions on the website, which were <u>not</u> incorporated into the "entire

17

agreement" of the parties, and when the website information refers to accounts that must be created through the website. (See Exhibit A to Complaint). Thus, Conference America makes this paradoxical claim seeking recovery for "breach" of terms and conditions on a website which was never agreed to for any new or old account, and certainly not in reference to the 1,778 accounts in question which were governed by the written "entire agreement."

WHEREFORE, PREMISES CONSIDERED, the defendant Conexant Systems, Inc. seeks an Order granting summary judgment in its favor as to the single breach of contract claim in the Complaint, as there is no genuine issue of material fact regarding mutuality of assent, and because the "entire agreement" between the parties contained no new terms and conditions which were ever agreed to, but which are sought in this lawsuit.

> s/Joseph S. Miller
> Joseph S. Miller
> Attorney for Defendant
> ID #:  asb-4242-m60j
> STARNES & ATCHISON, LLP
> Post Office Box 598512
> Birmingham, AL  35259-8512
> Telephone:(205) 868-6049
> Facsimile: (205)868-6099
> E-mail:jsm@starneslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20th, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to he following:

Thomas Ernest Borton, IV, Esquire
TROUTMAN SANDERS, L.L.P.
600 Peachtree Street, NE
5200 Bank of America Plaza
Atlanta, GA  30308-2216

                    Respectfully submitted,

                    **s/Joseph S. Miller**
                    Joseph S. Miller
                    Attorney for Defendant
                    ID #:  asb-4242-m60j
                    STARNES & ATCHISON, LLP
                    Post Office Box 598512
                    Birmingham, AL  35259-8512
                    Telephone:(205) 868-6049
                    Facsimile: (205)868-6099
                    E-mail:jsm@starneslaw.com