# EXHIBIT "3"

23024

# FREEDOM COURT REPORTING

| Page 1 | Page 3 |
|---|---|
| 1  IN THE UNITED STATES DISTRICT COURT | 1  any objections except as to form or |
| 2    FOR THE MIDDLE DISTRICT OF ALABAMA | 2  leading questions, and that counsel for |
| 3      NORTHERN DIVISION | 3  the parties may make objections and assign |
| 4  CASE NUMBER:  2:05 cv 1088-WKW | 4  grounds at the time of the trial, or at |
| 5  CONFERENCE AMERICA, INC., | 5  the time said deposition is offered in |
| 6      Plaintiff, | 6  evidence, or prior thereto. |
| 7      vs. | 7        IT IS FURTHER STIPULATED AND |
| 8  CONEXANT SYSTEMS, INC., | 8  AGREED that the notice of filing of the |
| 9      Defendant. | 9  deposition by the Commissioner is waived. |
| 10 | 10 |
| 11  DEPOSITION OF ROBERT MITCHEL PIRNIE, III | 11 |
| 12      In accordance with Rule 5(d) of | 12 |
| 13  The Alabama Rules of Civil Procedure as | 13 |
| 14  Amended, effective May 15, 1988, I, | 14 |
| 15  VIRGINIA DENESE BARRETT, am hereby | 15 |
| 16  delivering to Mr. Joseph S. Miller, the | 16 |
| 17  original transcript of the oral testimony | 17 |
| 18  taken on the 9th day of May, 2006, along | 18 |
| 19  with exhibits. | 19 |
| 20      Please be advised that this is | 20 |
| 21  the same and not retained by the Court | 21 |
| 22  Reporter, nor filed with the Court. | 22 |
| 23 | 23 |

| Page 2 | Page 4 |
|---|---|
| 1  IN THE UNITED STATES DISTRICT COURT | 1        INDEX |
| 2    FOR THE MIDDLE DISTRICT OF ALABAMA | 2  EXAMINATION BY:        PAGE NUMBER: |
| 3      NORTHERN DIVISION | 3  Mr. Miller        8 |
| 4 | 4 |
| 5  CASE NUMBER:  2:05 cv 1088-WKW | 5 |
| 6  CONFERENCE AMERICA, INC., | 6 |
| 7      Plaintiff, | 7 |
| 8      vs. | 8 |
| 9  CONEXANT SYSTEMS, INC., | 9 |
| 10      Defendant. | 10 |
| 11 | 11 |
| 12      S T I P U L A T I O N | 12 |
| 13      IT IS STIPULATED AND AGREED by | 13 |
| 14  and between the parties through their | 14 |
| 15  respective counsel, that the deposition of | 15 |
| 16  ROBERT MITCHEL PIRNIE, III, may be taken | 16 |
| 17  before Virginia Denese Barrett, | 17 |
| 18  Commissioner, at the offices of Maynard, | 18 |
| 19  Cooper & Gale, PC, The RSA Tower, 201 | 19  EXHIBIT |
| 20  Monroe Street, Suite 1650, Montgomery, | 20  "3" |
| 21  Alabama, on the 9th day of May, 2006. | 21 |
| 22      IT IS FURTHER STIPULATED AND | 22 |
| 23  AGREED that it shall not be necessary for | 23 |

1 (Pages 1 to 4)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 5 | Page 7 |
|---|---|
| 1 IN THE UNITED STATES DISTRICT COURT | 1 MR. PIRNIE: I'd like to review |
| 2 FOR THE MIDDLE DISTRICT OF ALABAMA | 2 the deposition with the |
| 3 NORTHERN DIVISION | 3 exhibits. |
| 4 | 4 MR. BORTON: Let's articulate |
| 5 CASE NUMBER: 2:05 cv 1088-WKW | 5 stipulations. I don't know |
| 6 CONFERENCE AMERICA, INC., | 6 which ones you usually use |
| 7 Plaintiff, | 7 over here. |
| 8 vs. | 8 MR. MILLER: Normally in Alabama |
| 9 CONEXANT SYSTEMS, INC., | 9 the usual stipulation means |
| 10 Defendant. | 10 we reserve all objections |
| 11 | 11 except to the form and |
| 12 BEFORE: | 12 leading. If you want to do |
| 13 VIRGINIA DENESE BARRETT, Commissioner | 13 something different, I'll |
| 14 APPEARANCES: | 14 listen. |
| 15 TROUTMAN SANDERS, L.L.P., by | 15 MR. BORTON: Okay. That's fine. |
| 16 Mr. Thomas Ernest Borton, IV, 600 | 16 That's fine. |
| 17 Peachtree Street NE, 5200 Bank of America | 17 MR. MILLER: And, Mr. Pirnie, |
| 18 Plaza, Atlanta, Georgia 30308, appearing | 18 you said you would like to |
| 19 on behalf of the Plaintiff. | 19 read and sign, correct? |
| 20 STARNES & ATCHISON, LLP, by | 20 THE WITNESS: That's correct. |
| 21 Mr. Joseph S. Miller, Seventh Floor, 100 | 21 MR. MILLER: Okay. That's fine. |
| 22 Brookwood Place, Birmingham, Alabama, | 22 We can do that. |
| 23 35259, appearing on behalf of the | 23 MR. BORTON: All right. |

| Page 6 | Page 8 |
|---|---|
| 1 Defendant. | 1 ROBERT MITCHEL PIRNIE, III |
| 2 CONEXANT SYSTEMS, INC., by | 2 The witness, having been first |
| 3 Mr. Harshad R. Vaidya, 100 Schultz Drive, | 3 duly sworn or affirmed to speak the truth, |
| 4 Red Bank, New Jersey 07701, appearing on | 4 the whole truth, and nothing but the |
| 5 behalf of the Defendant. | 5 truth, testified as follows: |
| 6 | 6 EXAMINATION |
| 7 | 7 BY MR. MILLER: |
| 8 | 8 Q. Give me your full name, |
| 9 | 9 please. |
| 10 | 10 A. I'm Robert Mitchel, one L, |
| 11 | 11 Pirnie, III. |
| 12 | 12 Q. And give me your residence |
| 13 | 13 address. |
| 14 | 14 A. It's 587 Timberlane Road, |
| 15 | 15 Pike Road, Alabama 36064. |
| 16 | 16 Q. Is that in Montgomery County? |
| 17 | 17 A. Certainly. |
| 18 | 18 Q. Who resides there with you? |
| 19 | 19 A. My wife. |
| 20 | 20 Q. And what is her name? |
| 21 | 21 A. Leslie O'Gwen Pirnie. |
| 22 | 22 Q. I know you have at least one |
| 23 | 23 child, correct? |

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1    A.    I have two children.
2    Q.    Give me their names, and if
3 they reside in the greater Montgomery
4 area, tell me their residence, to the best
5 you can.
6    A.    My son lives here in
7 Montgomery. He's Robert Mitchel Pirnie,
8 IV, actually. I don't know the address,
9 but it's Boykin Place, Montgomery, 36117.
10 I don't remember the street address. My
11 daughter lives in Philadelphia and is
12 there with her husband. Her name is
13 Margaret Graham Pirnie Kammerud,
14 K-A-M-M-E-R-U-D.
15    Q.    And your son goes by Rob?
16    A.    That's correct.
17    Q.    And is Rob married?
18    A.    Yes.
19    Q.    What's his wife's name?
20    A.    Natalie Maddox Pirnie.
21    Q.    Does she work?
22    A.    No, she does not. Well, I
23 shouldn't say it like that. She has two

Page 10

1 young daughters, so I'm sure they keep her
2 very busy. But she does not have
3 outside-the-home employment.
4    Q.    Are your granddaughters
5 school age?
6    A.    One is four and will be in
7 kindergarten next year and the other one
8 is three. They go to church school, but
9 they are not full-time students. Not in
10 elementary school.
11    Q.    And I'm not trying to pry
12 into your personal history. And your
13 lawyer may have told you. I just need to
14 get some information as to family members
15 you have in the various counties --
16    A.    Right.
17    Q.    -- that the jury will be
18 drawn from in the case.
19    A.    I understand.
20    Q.    Other than your son and his
21 family and your wife, do you have any
22 family by blood or marriage who live in
23 Montgomery County or the several counties

Page 11

1 surrounding Montgomery County?
2    A.    No. Actually, I do not.
3    Q.    Have you ever been married to
4 anyone else?
5    A.    Yes.
6    Q.    How many times?
7    A.    One.
8    Q.    Does that person reside in
9 Montgomery County or any of the
10 surrounding counties?
11    A.    Yes, she does.
12    Q.    What is her name?
13    A.    Karen Worley, W-O-R-L-E-Y,
14 Pirnie.
15    Q.    Did you and she have any
16 children?
17    A.    Yes, my two children.
18    Q.    Okay. No children with your
19 current wife?
20    A.    That's correct.
21    Q.    Okay. Does either your
22 ex-wife or your current wife, do they have
23 family in Montgomery County or the

Page 12

1 surrounding counties that you haven't
2 already told me about?
3    A.    Karen does not. Gwen has one
4 nephew who is in Montgomery County. His
5 name is Curtis Brown.
6    Q.    Do you know where he works?
7    A.    Conference America.
8    Q.    Any other relatives come to
9 mind?
10    A.    Oh, yes. Gwen does have a
11 sister. Well, she doesn't live in
12 Montgomery County. She lives in Wetumpka.
13 So I guess -- I don't know if that
14 matters.
15    Q.    I think that would be one of
16 the counties that the jury may be drawn
17 from. So tell me as much as you can about
18 that person.
19    A.    Her name is Jane Brown Reid.
20 I believe it's R-E-I-D.
21    Q.    Does she work?
22    A.    Yes. She works with the
23 County here in Montgomery County.

3  (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

```
1    Q.    In what capacity?
2    A.    She's a 911 coordinator.
3    Q.    What about her husband?
4  What's his name and where does he work?
5    A.    His name is Edward Reid, and
6  he works with the Alabama Securities
7  Commission. He's an attorney with them.
8    Q.    Give me your background,
9  where you grew up and take me through
10  college and then your employment history
11  to the present. And you can break it down
12  any way you want.
13    A.    I was born in Kansas City,
14  Missouri. I lived there for the first
15  years of my life. We moved from there to
16  Tampa, Florida. Then we moved to Union
17  Springs, Alabama. Then we moved back to
18  Kansas City. Then we moved to Chicago
19  where I graduated from high school.
20  Actually, La Grange, Illinois. I went to
21  school at Stanford, graduated from
22  Stanford. I came back to Montgomery and
23  worked initially with Roper Industries.
```

Page 14

```
1  And then in 1992 I was one of the founders
2  of Conference America and I've been with
3  Conference America since 1992.
4    Q.    What initially brought you to
5  the Montgomery area?
6    A.    My family was here.
7    Q.    Family meaning whom?
8    A.    Mother and father.
9    Q.    Were they from Montgomery
10  initially?
11    A.    No. They were actually from
12  the Midwest. Kansas.
13    Q.    How did they end up in
14  Montgomery?
15    A.    They had business holdings
16  here is what it came from.
17    Q.    Are they still living?
18    A.    My mother is still living.
19  My father is deceased.
20    Q.    Does your mother live in this
21  area?
22    A.    Oh, I left her off the list.
23  You're correct. I apologize.
```

Page 15

```
1    Q.    And it's close to Mother's
2  Day, too.
3    A.    That's true. Her name is
4  Billie Pirnie, B-I-L-L-I-E, Pirnie.
5  Excuse me.
6    Q.    That's all right. What part
7  of town does she live in?
8    A.    She lives on Old Farm Road.
9    Q.    What were the business
10  interests that your parents had in the
11  Montgomery area?
12    A.    They were in Union Springs
13  with cable television and the telephone
14  company.
15    Q.    Was that the reason you had
16  an occasion to live in Union Springs at
17  one point?
18    A.    Yes, in the early days.
19  That's correct.
20    Q.    What is your date of birth?
21    A.    May 24th, 1946.
22    Q.    And tell me again where you
23  graduated college.
```

Page 16

```
1    A.    Stanford.
2    Q.    What year?
3    A.    '68.
4    Q.    Degree in what?
5    A.    Bachelor of Science.
6    Q.    Any degrees above that or
7  since then?
8    A.    No.
9    Q.    Came to Montgomery and got
10  involved in forming Conference America in
11  1992?
12    A.    That's correct.
13    Q.    Who were the other principals
14  at that time in the forming of Conference
15  America?
16    A.    There were four of us. I was
17  there. Gwen Brown, my current wife; Oscar
18  Reak, R-E-A-K; and Mike Griswold,
19  G-R-I-S-W-O-L-D.
20    Q.    Who are the present
21  principals or owners of Conference
22  America?
23    A.    Gwen Brown Pirnie, myself and
```

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 17

1  Oscar Reak.
2      Q.  That means one of those
3  initial four is no longer involved?
4      A.  Yes. Mike Griswold is no
5  longer involved.
6      Q.  Does he live in this area, to
7  your knowledge?
8      A.  Yes, he does.
9      Q.  When did his association with
10  Conference America end?
11      A.  Late 2004 or early 2000 -- I
12  believe it was early 2000 -- well, I'm not
13  sure. I think it was early 2005 like in
14  January.
15      Q.  Have there been any other
16  principals or owners of Conference America
17  since its inception in 1992 other than the
18  ones we've just listed?
19      A.  No.
20      Q.  What was the reason that the
21  last gentleman left?
22      A.  He told us he wanted to
23  retire.

Page 18

1      Q.  Obviously, we're going to get
2  to the meat of what this lawsuit is about.
3      A.  Uh-huh.
4      Q.  But I know you have
5  involvement in it and your son --
6      A.  Uh-huh.
7      Q.  -- in regard to principals or
8  owners of Conference America, correct?
9      A.  That's correct.
10      Q.  Do any of the other
11  principals or owners of Conference America
12  have any involvement in the matters that
13  are at issue in the lawsuit?
14      A.  I don't believe they really
15  have involvement. They're aware of the
16  issues, obviously, but I don't believe
17  they really have any involvement. The
18  decisions and the issues and the actions
19  were focused upon me.
20      Q.  Let's get that straight now,
21  which will possibly shorten this. The
22  matters that are at issue in the lawsuit
23  involve some decisions that Conference

Page 19

1  America made relative to my client,
2  Conexant. Did you make the decisions that
3  are at issue in the lawsuit?
4      A.  Well, I didn't make all the
5  decisions, but I think I made a lot of the
6  decisions. I know I made a lot of the
7  decisions.
8      Q.  Other than something your
9  attorneys may have instructed you to write
10  down, do you have any writings of any sort
11  such as a diary or have you maintained any
12  notes concerning the matters at issue in
13  the lawsuit?
14      A.  No, I have not.
15      Q.  Have you made any such notes
16  or writings at the instruction of your
17  attorneys?
18      A.  I have provided a lot of
19  information to my attorneys, yes.
20      Q.  I guess what I'm asking --
21      MR. MILLER:  And, Tom, you may
22          be able to tell me.
23      Q.  -- are there any

Page 20

1  communications or where you've written
2  down your version of events or a diary or
3  anything like that that you have provided
4  to your attorneys?
5      MR. BORTON:  I'll speak to that,
6          Joe. I have gotten some
7          correspondence whether it's
8          E-mail or maybe a letter
9          from my client. Obviously,
10          we claim privilege with
11          that. But we have got a --
12          we've had some back and
13          forth on the issues in this
14          lawsuit.
15      MR. MILLER:  Sure.
16      Q.  But if I'm hearing you right,
17  Mr. Pirnie, independent of some
18  communications that you may have had with
19  your attorneys about this lawsuit, you
20  didn't ever sit down and write your own
21  version of events or anything like that?
22      A.  I provided to my counsel a
23  summary and a chronology of what I was

5  (Pages 17 to 20)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 21

1  able to determine were the things that had
2  gone on.
3      Q.   At their request?
4      A.   Yes.
5      Q.   Are there any, for instance,
6  phone notations that you made concerning
7  any telephone calls that you may have had
8  with someone from Conexant concerning the
9  matters at issue in the lawsuit?
10     A.   I don't believe so.
11     Q.   Does your company have a
12 custom or habit of maintaining phone pad
13 notes?
14     A.   No.
15     Q.   How is Conference America
16 organized legally speaking?
17     A.   We are a C Corporation.
18 That's an Alabama corporation.
19     Q.   And the shareholders are the
20 people we've already listed?
21     A.   Well, actually I have a
22 family limited partnership and Oscar has a
23 family limited partnership. But we are

Page 22

1  the managing partners, so we both own
2  shares. Gwen holds her shares
3  individually.
4      Q.   What about your son?
5      A.   He has an interest as a
6  limited partner in my family limited
7  partnership.
8      Q.   But all of the shares of
9  Conference America are actually owned by
10 you and Oscar and your respective limited
11 partnerships?
12     A.   To be absolutely accurate,
13 both Oscar's and my interests are held in
14 their entirety in these limited
15 partnerships, and we are the managing
16 partners. He has his, and I have mine.
17     Q.   Is it a fifty/fifty thing?
18     A.   No.
19     Q.   What's the breakdown?
20     A.   I don't know exactly. All of
21 us are minority shareholders. No one has
22 more than fifty percent.
23     Q.   If there's ever a

Page 23

1  disagreement, who decides what decision
2  gets made?
3      A.   Well, interestingly, we have
4  not gotten to that stage, which I
5  understand that's unusual. But we have
6  not had that situation. We've been able
7  to agree upon courses of action.
8      Q.   There's no majority owner who
9  could impose his or her decision on the
10 others?
11     A.   Any two of the three could
12 impose their decision on the others.
13     Q.   No one could do that alone?
14     A.   That's correct.
15     Q.   How many employees are there
16 of Conference America?
17     A.   There's about eighty or
18 eighty-five.
19     Q.   How many of those are local?
20     A.   About seventy-five.
21     Q.   About seventy-five or so who
22 actually live and work in the Montgomery
23 area?

Page 24

1      A.   In this metropolitan area.
2      Q.   Do all of them work at your
3  office?
4      A.   That's correct.
5      Q.   Is it just the one office
6  here in Montgomery?
7      A.   That's correct.
8      Q.   What do the other ten or so
9  do and where are they located?
10     A.   They're field salespeople
11 that are spread around the country and
12 they work out of home offices.
13     Q.   Do you do business throughout
14 the United States?
15     A.   We try to.
16     Q.   I mean, give me some feeling
17 for on any given week, are you going to
18 touch through your business all fifty
19 states in the country?
20     A.   I don't know.
21     Q.   Can you give me some judgment
22 about how prevalent Conference America's
23 business is throughout the country?

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1    A.   I don't really know how to
2  answer that. I mean, we provide services
3  worldwide. It's not limited to the United
4  States.
5    Q.   And that's all I'm trying to
6  learn is does Conference America do
7  business literally around the world in
8  every country of the world, or can you
9  give me some judgment?
10    A.   I'm sure we don't do business
11  in every country, but we have the ability
12  to provide services wherever our customers
13  require them.
14    Q.   Does Conference America
15  advertise, for lack of a better term,
16  throughout the world?
17    A.   No.
18    Q.   Where do you advertise?
19    A.   We actually do very little
20  advertisement. We don't do any print
21  advertising. We don't do any media
22  advertising. We have a web site. I mean,
23  we do a web site. Advertising is not a

Page 26

1  big part of our business. Most of our
2  advertising budget goes for sales
3  collateral.
4    Q.   Would it be unusual, though,
5  during any given week for Conference
6  America to do business all around the
7  world?
8    A.   We do some international
9  business every week. I do not know how
10  much.
11    Q.   Is a record of any of that
12  kept?
13    A.   Not as an identification of
14  international business, no. But, I mean,
15  we charge for the calls. So we have bills
16  that we render for the calls. But no, not
17  as a specific identification of where we
18  do business.
19    Q.   How would you describe what
20  Conference America does to someone who'd
21  never heard of the company?
22    A.   We provide conference calling
23  services inclusive of the voice connection

Page 27

1  where people can talk and hear and web
2  connections where they can actually share
3  data or share applications or make
4  presentations.
5    Q.   Basically two types of
6  services?
7    A.   Well, there's a lot more than
8  two services, but those are the categories
9  of services.
10    Q.   The two categories would be
11  WebEx type services and conference calling
12  services, basically?
13    A.   Generally, that's accurate,
14  yes.
15    Q.   This case, the complaint and
16  the dispute involves just the conferencing
17  aspect of the relationship between
18  Conference America and Conexant; is that
19  correct?
20    A.   It involves the audio
21  conferencing section, yes.
22    Q.   It does not involve the WebEx
23  agreements that were in place between the

Page 28

1  two companies; is that correct?
2    A.   I believe that's correct,
3  yes.
4    Q.   Are there any subsidiaries of
5  Conference America?
6    A.   No.
7    Q.   Are there any parent
8  corporations of any sort?
9    A.   No.
10    Q.   It's a local Alabama
11  corporation that's registered here in the
12  state of Alabama?
13    A.   Yes. That's what I said.
14  It's an Alabama corporation.
15    Q.   Have you ever given a
16  deposition before?
17    A.   Yes.
18    Q.   How many?
19    A.   I'm sorry. I don't know.
20    Q.   More than ten?
21    A.   Over all the years I've been
22  in business, I believe that, yes. I don't
23  know, but I believe it's more than ten.

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1    Q.   Are you a member of any local
2  service or social clubs or organizations
3  of any sort?
4    A.   I'm a member of Montgomery
5  Country Club.
6    Q.   Kiwanis Club or anything like
7  that?
8    A.   No.
9    Q.   This lawsuit –
10    A.   Well, I should say this. We
11  contribute to the Montgomery Ballet, so I
12  don't know if that matters, if that
13  answers your question. But we sponsor the
14  Nut Cracker each year.
15    Q.   You personally or Conference
16  America?
17    A.   Actually, I do it personally.
18    Q.   Does Conference America
19  sponsor any event like that?
20    A.   Not currently.
21    Q.   Do you agree that this
22  lawsuit and the damages sought do not
23  involve any type of allegation that

Page 30

1  Conference America has lost revenue other
2  than the amount in dispute in the lawsuit?
3    A.   I don't believe that there's
4  anything, but I'm not absolutely sure. I
5  think this lawsuit is for billings that we
6  made to Conexant that haven't been paid.
7    Q.   And that's what I'm seeking
8  your agreement on to know whether I need
9  to ask any additional questions. And let
10  me try again this way. Is there any claim
11  in the lawsuit that the matters at issue
12  in the lawsuit have reduced Conference
13  America's ability to generate income in
14  the future or anything of that nature, or
15  is it just restricted to the billing to
16  Conexant in question?
17    A.   I don't know if there's
18  any – any legal issues beyond the billing
19  in question.
20    Q.   You stand by the verified
21  complaint and the allegations contained
22  therein and the damages sought therein?
23    A.   I believe they're right. I

Page 31

1  mean, they were prepared by our counsel.
2  I didn't write them.
3    Q.   But have you --
4    A.   But I believe they're
5  correct.
6    Q.   If I'm hearing you right now,
7  you're not saying that you're claiming
8  Conference America has been harmed in its
9  ability to do its business by the
10  allegations in the lawsuit?
11    A.   I don't believe that is a
12  current allegation. I mean, the documents
13  show what it says, but I don't think
14  that's a current --
15    Q.   I agree. And I'm not trying
16  to be difficult. Because it does say very
17  precisely what the lawsuit is about. And
18  you verified and swore to it.
19    A.   Yeah.
20    Q.   And I'm just asking this is
21  what it's about is what these pages in the
22  lawsuit say?
23    A.   Yes. I believe that is

Page 32

1  accurate.
2    Q.   Is there anything in the
3  verified complaint that you disagree with?
4    A.   Not that I know of.
5    Q.   What have you reviewed to get
6  ready for this deposition?
7    A.   I tried to look at the
8  documents associated with the period of
9  time we're talking about here.
10    Q.   Have you looked at all of the
11  exhibits that were attached to the
12  verified complaint?
13    A.   I don't know if I looked at
14  all of them. I looked at many of them.
15    Q.   Have you looked at the
16  documents that Conexant produced in the
17  litigation?
18    A.   I don't remember.
19    Q.   Have you looked at the
20  documents that Conference America's
21  attorneys produced to me in the
22  litigation?
23    A.   I believe I've seen the

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1 documents that we produced.
2    Q. When is the last time you
3 actually reviewed the complaint?
4    A. The complaint itself?
5    Q. Yes.
6    A. I looked at it yesterday and
7 I looked at it this morning.
8    Q. Let me ask you some questions
9 about some terminology and make sure we're
10 on the same page. Your letter of June 24,
11 2005, which we're going to get to in more
12 detail later, terminates the price
13 protection program agreement. Is that the
14 same thing as the audio conferencing
15 contract when that term is used?
16    A. That was an audio
17 conferencing contract, yes.
18    Q. In this deposition if I use
19 the price protection program agreement,
20 will you understand that I'm talking about
21 the contract that was in place at the time
22 which was terminated?
23    A. We can define it like that

Page 34

1 because there's a couple of amendments.
2 If that's your definition, that's fine.
3    Q. I just want your agreement
4 that we can interchangeably use price
5 protection program agreement or audio
6 conferencing contract when we're talking
7 about the agreement that you terminated
8 via your June 24, 2005 letter.
9    A. That sounds fine.
10    MR. BORTON: This will include
11       the amendments and
12       everything?
13    MR. MILLER: Yes.
14    MR. BORTON: Okay. This is
15       dated 1999. August 1 of
16       '99.
17    MR. MILLER: Correct.
18    Q. Mr. Pirnie, the first time
19 this agreement was entered into which is
20 Exhibit B to the complaint was August 1,
21 1999; is that correct?
22    A. May I see that?
23    Q. Sure.

Page 35

1    A. Which one are we looking at
2 here?
3    Q. Exhibit B.
4    A. Okay. Yes. I signed it on
5 August 1, 1999.
6    Q. What was the reason that this
7 agreement was entered into?
8    A. Conexant wanted a special
9 program for Conference America services.
10    Q. And you agreed to provide
11 that?
12    A. Yeah. We were delighted to
13 provide it.
14    Q. Who is Ms. Flora Fuller who
15 signed that contract for Conexant?
16    A. She shows her title as
17 purchasing manager.
18    Q. Do you remember any verbal
19 communications with anybody about entering
20 into this agreement?
21    A. I talked to Bob Montour. He
22 was I think probably the lead person at
23 Conexant that I dealt with. I may have

Page 36

1 talked to Flora. I do not recall talking
2 to her. I've talked to her since then,
3 but I don't recall talking to her at this
4 point in time.
5    Q. What do you remember about
6 any discussions with Bob Montour
7 concerning this agreement?
8    A. Generally, we were providing
9 service to Rockwell International. And
10 Conexant is a company that was spun off
11 from Rockwell and was the old Rockwell
12 semiconductor company. As part of that
13 spinoff, it became an independent
14 organization, separate corporation and
15 actually is NASDAQ listed. They wanted to
16 establish an independent agreement with us
17 so that the services they were obtaining
18 as Rockwell's semiconductor could continue
19 as Conexant Systems. And that's --
20 that -- the genesis was they were a
21 spinoff as a different company. And when
22 that spinoff occurred, they wanted to
23 continue in their continuity in the

9 (Pages 33 to 36)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 37

1 services they were already enjoying with
2 Conference America.
3 Q. Rockwell already had a
4 relationship with Conference America?
5 A. Yes.
6 Q. Was it in writing?
7 A. Yes.
8 Q. After it was spun off,
9 Conexant desired to have the same or
10 similar agreement?
11 A. I don't know how the
12 agreements compare. I don't remember
13 that.
14 Q. And I'm not asking you to
15 swear to that. But it sounds to me like
16 they wanted something at least similar,
17 and that was the reason this got started?
18 A. Well, they wanted the
19 pricing. I know they wanted the price
20 because they were enjoying reduced prices
21 due to the fact that the Rockwell
22 organization was a pretty good size
23 organization. They had some volume.

Page 38

1 Q. But do you remember any
2 specific conversations with Bob Montour
3 about it?
4 A. Well, I mean, we talked more
5 than once, and I actually saw him at least
6 once in California. So I -- no, I do not
7 recall specific conversations in 1999.
8 Q. Who on the Conference America
9 end was involved in actually drafting the
10 language of the agreement?
11 A. I don't remember.
12 Q. Were there attorneys involved
13 in that?
14 A. I don't remember.
15 MR. MILLER: Tom, with your
16 agreement, what I'd like to
17 do, rather than having a
18 whole stack of exhibits, is
19 just refer to the verified
20 complaint by exhibit number
21 and just have an agreement
22 that I'll mark as
23 Defendant's Exhibit Number

Page 39

1 1 the entire binder I
2 brought but that I'll
3 retain it. And I'll
4 represent to you I'm not
5 going to write on it or
6 anything like that. I just
7 think it's unnecessary to
8 create two to three inches
9 of exhibits to keep
10 marking. Is that all right
11 with you?
12 MR. BORTON: This binder
13 includes the verified
14 complaint and all the
15 exhibits and nothing else?
16 MR. MILLER: Correct.
17 MR. BORTON: Okay.
18 MR. MILLER: And if either of us
19 later determines that
20 there's a page or something
21 missing that didn't run
22 through the copier, we can
23 address that later. I'm

Page 40

1 just looking for a simple
2 way to refer to documents
3 so we'll all know what
4 we're talking about without
5 just creating a huge amount
6 of exhibits.
7 MR. BORTON: Okay. If it's the
8 same as the complaint, we
9 have no problem with that.
10 MR. MILLER: Okay.
11 Q. I'm just going to stick a
12 sticker on the outside of this binder to
13 indicate that it's Exhibit Number 1 to
14 your deposition, Mr. Pirnie, which says
15 verified complaint.
16 A. It's misspelled.
17 Q. Is it misspelled? It is
18 misspelled.
19 MR. BORTON: We'll overlook
20 that. We can live with
21 that.
22 Q. In any event, as indicated in
23 Exhibit B, you signed the agreement, the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  initial one on August 1, 1999 on behalf of
2  Conference America, correct?
3      A.   Yes.  I did sign.
4      Q.   And at that time, the last
5  page also indicates and also signed by you
6  on August 1, 1999 that the written
7  agreement was the entire agreement between
8  the parties, correct?
9      A.   That's correct.
10     Q.   Exhibit C of the verified
11  complaint is an amendment that was reached
12  on July 23rd, 2001, correct?
13     A.   I signed it on July 23rd,
14  2001, and Conexant signed it on August
15  8th, 2001.
16     Q.   What was the reason for this
17  amendment?
18     A.   I believe that it was a
19  change in some of the pricing.  I'm not
20  sure if it included anything else.
21     Q.   Other than the specific
22  language in the agreement, do you remember
23  any other reason for it?

Page 42

1      A.   I don't today.  There may
2  have been something.  I just don't
3  remember it.
4      Q.   Exhibit D is yet another
5  amendment to the price protection program
6  agreement, correct?
7      A.   Yes.
8      Q.   You signed it on November 21,
9  2003 and Tom Noonan signed it on November
10  24, 2003, correct?
11     A.   Yes.
12     Q.   Was this amendment in place
13  at the time that you terminated the audio
14  conferencing contract by way of your
15  letter dated June 24, 2005?
16     A.   May I see the -- what is the
17  exhibit number on my letter?
18     Q.   D.
19     A.   All right.  No.  It can't be
20  D.  This is D.
21     Q.   That's what I'm asking you
22  about.
23     A.   I know.  May I see my letter?

Page 43

1      Q.   Oh, sure.  Sure.  It is
2  Exhibit K.
3      A.   Yes.
4      Q.   Let me ask you about one
5  specific page on this which is attachment
6  A to Exhibit D.  At the bottom of the page
7  it says A1.  At the top of the page it
8  says attachment A.  All of this on this
9  page was a part of the amendment which is
10  Exhibit D and therefore became part of the
11  audio conferencing contract, correct?
12     A.   I believe so, yes.
13     Q.   Now, it says cancellation fee
14  none.  Do you remember any aspect of that
15  particular part of it?
16     A.   Yes, I do.
17     Q.   What do you remember about
18  that?
19     A.   That's for operator handled
20  calls, scheduled calls that are cancelled.
21     Q.   How are we to know from
22  looking at any of the agreement or
23  amendments that it is to be applied only

Page 44

1  to operator handled calls?
2      A.   I mean, that's the way it was
3  done in the industry.  Many people charge
4  for operator handled call cancellations or
5  reschedules.  We did not.
6      Q.   Okay.  I mean, I hear you
7  saying that to me now.  But what I'm
8  asking you is point me to any language in
9  the initial audio conferencing contract or
10  amendments that says that cancellation fee
11  applies only to operator assisted calls.
12     A.   I think it -- I think it says
13  it.  It says no cancellation fee.
14     Q.   Show me anywhere in the audio
15  conferencing contract or the various
16  amendments where it says that cancellation
17  fee applies only to operator assisted
18  calls.
19     A.   It says cancellation fee.
20  That's what it says.
21     Q.   It doesn't say cancellation
22  fee none applicable only to operator
23  assisted calls, does it?

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 45

1  A. It says exactly what it says
2  it says, cancellation fee none.
3  Q. And you cannot refer me to
4  any language in the written agreement, the
5  price protection program agreement or the
6  amendments that would specifically say
7  that that cancellation fee applied only to
8  operator assisted calls?
9  A. I don't see anything that
10  references that. That's correct.
11  Q. Do you recall that being
12  considered on the Conference America end
13  at the time whether any language needed to
14  be inserted in the written agreement or
15  the attachments to address exactly what
16  that cancellation fee of none would and
17  would not apply to?
18  A. I don't believe that anybody
19  had any confusion about it. I mean, it
20  was universally recognized from an
21  industry point of view.
22  Q. What do you base that on?
23  A. I've been in the business a

Page 46

1  long time.
2  Q. You had never applied a
3  cancellation fee to an operator assisted
4  call?
5  A. I don't believe we ever have.
6  Q. Were any of the deactivation
7  fees in this case applied to the
8  cancellation of operator assisted calls?
9  A. The deactivation fees?
10  Q. Yes.
11  A. Yes.
12  Q. Why?
13  A. Because deactivation is not
14  the same as cancelling a scheduled call.
15  Q. You're saying this
16  cancellation fee would apply only to an
17  operator assisted call that was cancelled?
18  A. Yes.
19  Q. How do operator assisted
20  calls work?
21  A. On operator assisted calls,
22  someone actually calls our reservation
23  center and says they'd like to run a call

Page 47

1  at a certain time and date. The call is
2  scheduled. They get their password. They
3  get their dial-in number. And we then man
4  that with operators to be able to answer
5  the call when the incoming, as we call it,
6  bells arrive in our system.
7  Q. Are you saying that this
8  cancellation fee would not apply. There
9  would be no cancellation fee if a call
10  that was arranged like that then did not
11  take place?
12  A. That's correct.
13  Q. How would you be notified of
14  any cancellation?
15  A. Most people call us and tell
16  us that the call has been either
17  rescheduled or cancelled.
18  Q. Operator assisted calls are
19  just a single call that is set up?
20  A. It's a single event.
21  Q. And if even the same
22  participants wanted to arrange a different
23  but similar event, it would be another

Page 48

1  procedure as you described where they
2  would have to call in to the operator and
3  it would all be set up for that single
4  event?
5  A. I'm sorry. I don't
6  understand your question.
7  Q. If somebody wants to set up
8  and then conducts an operator assisted
9  call, it's just a single event?
10  A. The call is a single event.
11  We set up a profile for that leader, for.
12  that user. And that profile is how they
13  want their call run. Then they schedule
14  the specific time that the event, that the
15  call is to take place, date and time and
16  how many people will be there and all the
17  specifics of it.
18  Q. But there's no account set up
19  in that situation, is there?
20  A. Oh, yes. There's an account
21  set up before you can schedule a call.
22  Q. What type of account?
23  A. It's a conferencing account

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  that's for that leader. It's what we call
2  a profile.
3      Q.  Why do you use the
4  terminology profile for such an
5  arrangement?
6      A.  That's what we named it.
7      Q.  And is that the same thing as
8  a leader account?
9      A.  It relates to a specific
10  leader and a specific call. Some leaders
11  have more than one profile.
12      Q.  But is a profile the same
13  thing as a leader account?
14      A.  It would be a leader account,
15  yes.
16      Q.  Do you have any documentation
17  that you provide to customers which
18  explains that a profile associated with an
19  operator assisted event falls under the
20  category of leader account?
21      A.  I don't know.
22      Q.  Why don't you know the answer
23  to that?

Page 50

1      MR. BORTON: Object to the form.
2      A.  I just don't know.
3      Q.  Do you know what documents
4  are provided to initiators of operator
5  assisted calls that your company sets up a
6  profile on?
7      A.  I know some of them.
8      Q.  What are those?
9      A.  One thing that's consistently
10  provided is a confirmation of the call
11  that they receive by fax or E-mail, their
12  choice.
13      Q.  What does it say?
14      A.  It says generally that at
15  this time on this dialing number, you've
16  scheduled a call with this person as the
17  leader. There will be this many
18  participants and these special
19  enhancements to be provided with the call.
20      Q.  Does it address the fees
21  associated with the call?
22      A.  What do you mean?
23      Q.  Does it address how much the

Page 51

1  person is going to be charged for the
2  call?
3      A.  Well, no.
4      Q.  When is that addressed?
5      A.  When you're rendered the
6  bill.
7      Q.  Does the bill contain any
8  information to indicate to the initiator
9  of an operator assisted call that they may
10  later incur a deactivation fee of
11  seventy-four dollars and ninety-five
12  cents?
13      A.  Does the bill say that?
14      Q.  Yes.
15      A.  On a regular call?
16      Q.  Yes.
17      A.  No.
18      Q.  Why not?
19      A.  It doesn't say that.
20      Q.  I'm asking you why it doesn't
21  say that.
22      A.  It's irrelevant.
23      Q.  Why is it irrelevant?

Page 52

1      A.  The bill for a call shows the
2  number of minutes and the number of
3  participants and it's billed on a per
4  minute basis for the actual services that
5  are provided.
6      Q.  Do you normally charge a
7  deactivation fee of seventy-four dollars
8  and ninety-five cents to every operator
9  assisted event which results in a profile
10  being created at Conference America?
11      A.  No.
12      Q.  Why not?
13      A.  We don't deactivate accounts
14  for everyone.
15      Q.  What prompts an account being
16  deactivated?
17      A.  A deactivation occurs when a
18  customer chooses to terminate our services
19  and wants us to shut off everything for
20  all of their accounts at a specific time.
21      Q.  If someone sets up an
22  operator assisted event which occurs, they
23  get billed for that event. But as far as

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 53

1 Conference America is concerned, is there
2 an account which is going to remain open
3 unless Conference America gets a specific
4 instruction for it to be deactivated?
5     A.   Yes.  It would stay open.
6     Q.   And if you get a specific
7 instruction from a customer to deactivate
8 a single operator assisted call which
9 results with a profile, that customer
10 would get a deactivation fee of
11 seventy-four dollars and ninety-five
12 cents?
13     A.   I don't believe we normally
14 bill the deactivation fee.  We don't do a
15 a real deactivation except at the end of a
16 relationship.  If someone says we want all
17 of our accounts terminated as of a date,
18 that's when we do a deactivation.
19     Q.   But absent that type of
20 specific instruction, there's no
21 deactivation fee associated with operator
22 assisted events?
23     A.   We may be entitled to bill

Page 54

1 that.  I don't know.  I'm not absolutely
2 certain.  But we may be entitled to bill
3 it, but we have not traditionally billed
4 that service except at the end of a
5 relationship when everything is to be
6 turned off.
7     Q.   That depends on the specific
8 communication back and forth with the
9 customer about what the customer wants?
10     A.   Well, the customer ultimately
11 gets to decide.
12     Q.   But Conference America either
13 deactivates or doesn't deactivate based on
14 what the customer says to you verbally or
15 in writing or in both?
16     A.   We try to --
17     MR. BORTON:  Object to the form.
18     THE WITNESS:  Excuse me.
19     MR. BORTON:  I'm just objecting
20     to the form.  You can go
21     ahead and answer it.
22     A.   We try to comply with our
23 customers' requests as they are

Page 55

1 reasonable.
2     Q.   In this case with Conexant,
3 did you personally do anything to satisfy
4 yourself that Conexant understood that
5 there was going to be a seventy-four
6 dollar and ninety-five cent deactivation
7 fee associated with always on accounts and
8 operator assisted events?
9     A.   I think that I advised
10 Conexant repeatedly that subsequent to the
11 termination of our price protection
12 agreement that the basis under which we
13 would do business was different and
14 advised them where they could find the
15 information and encouraged them to look.
16 So in that context, yes, I believe I
17 advised them.
18     Q.   By referring them to the web
19 site?
20     A.   I think that, yes, the web
21 site.  That is correct.
22     Q.   Here's what I want to know.
23 Did you have any specific verbal

Page 56

1 communication with anyone from Conexant
2 wherein you told them we have X number of
3 operator assisted events with you that
4 have occurred in the past that we intend
5 to apply this deactivation fee to?  Did
6 you have that specific conversation with
7 anyone?
8     A.   No, I did not.
9     Q.   Same question applicable to
10 the always on accounts?
11     A.   No.  I had no conversation.
12     Q.   It was your feeling that
13 Conexant knew and understood that there
14 would be deactivation fees of seventy-four
15 dollars and ninety-five cents applied to
16 every single operator assisted event which
17 had occurred in the past?
18     A.   I don't know what Conexant
19 knew.
20     Q.   Same question for the always
21 on accounts.
22     A.   I don't know what they knew.
23     Q.   What did you do to find out

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  what they did know about that?
2      A.   I made no inquiries about
3  what they did or did not know. I told
4  them where to look for the information or
5  where to find it and the basis under which
6  we'd do business.
7      Q.   But as far as Bob Pirnie is
8  concerned, you simply referred them to the
9  web site and suggested that they visit
10  that and that the web site would tell
11  Conexant how the relationship was going to
12  work from that point forward?
13      MR. BORTON: Object to the form.
14      Calls for speculation.
15      A.   I referenced Conexant
16  repeatedly to the web site and told them
17  very explicitly that that was the basis
18  under which we were going to continue to
19  provide services.
20      Q.   Had you ever billed Conexant
21  before this period of time for any
22  deactivation fees?
23      A.   I don't believe so.

Page 58

1      Q.   Did you consider at the time
2  you were having these communications with
3  Conexant about ending the relationship
4  that perhaps you should discuss the
5  deactivation fees with them rather than
6  simply referring them to the web site?
7      A.   May I hear that one more
8  time?
9      Q.   Yes. Did you consider at the
10  time you were having these communications
11  with Conexant about ending the
12  relationship actually raising the topic of
13  deactivation fees that were going to be
14  applied to all of their accounts rather
15  than simply referring them to the web
16  site?
17      A.   I didn't have any discussions
18  with Conexant during that period.
19      Q.   I understand that. My
20  question is a little more precise. Did
21  you think about having a discussion with
22  anyone from Conexant wherein you were
23  going to affirmatively raise the issue of

Page 59

1  deactivation fees and see if they knew or
2  understood that?
3      A.   I don't recall.
4      Q.   You know you didn't do that?
5      A.   I don't recall.
6      Q.   You know you didn't have such
7  a discussion, correct?
8      A.   I did not talk to anybody at
9  Conexant.
10      Q.   About that subject?
11      A.   I don't think about any
12  subject during this period.
13      Q.   At some point you stopped
14  returning their phone calls?
15      A.   I did not have any
16  discussions with them via telephone.
17      Q.   I understand that. My
18  question is at some point did you stop
19  returning their phone calls?
20      A.   I responded to their queries
21  in writing.
22      Q.   Let me ask you one more time
23  and see if you can answer. Did you stop

Page 60

1  returning their phone calls?
2      MR. BORTON: I'm going to object
3      to the form.
4      A.   Well, I think I answered
5  their phone calls by sending them written
6  responses, but I did not call them back.
7  I had no conversations with them as we've
8  already discussed.
9      Q.   Is there any particular
10  reason that you decided to cease verbal
11  communication with Conexant?
12      A.   I thought it was prudent to
13  utilize the written communication mode in
14  order to make sure nothing was unclear.
15      Q.   Before the termination of the
16  agreement occurred, had Conexant cancelled
17  or deactivated or disconnected or whatever
18  term you want to use either always on
19  accounts or operator assisted events?
20      A.   I'm not sure about operator
21  assisted accounts. I do believe that we
22  had turned off always on accounts.
23      Q.   Do you remember seeing in the

15  (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 61

1  documents that we produced in the
2  litigation that there were a number of
3  instructions from Conexant to cancel or
4  turn off or disconnect always on accounts
5  from time to time?
6      A.  I believe that's correct.
7      Q.  Those instructions went, I
8  believe, most of the time to Jason Shanks;
9  is that right?
10     A.  I'm not sure, but I would —
11 I just don't know.
12     Q.  You do agree, though, that
13 periodically Conexant would advise someone
14 at Conference America that they wanted
15 certain always on accounts to be turned
16 off or cancelled?
17     A.  Uh-huh.
18     Q.  Or deactivated or whatever
19 term they used?
20     A.  I think they wanted them to
21 be turned off.  And I believe we did that.
22     Q.  Were any deactivation fees
23 ever sent for turning off those accounts?

## Page 62

1      A.  I don't believe so.
2      Q.  Why not?
3      A.  Well, they weren't really
4  deactivated in the way that we did the
5  deactivation at the end of the
6  relationship.
7      Q.  Tell me how they differed.
8      A.  We have a category that we
9  mark accounts with in our system that we
10 call DNU for do not use.  And those
11 accounts were marked with a DNU and were
12 turned off in the bridges so that if
13 someone were using the pass codes, they
14 would not work.
15     Q.  That they were disabled?
16     A.  Yes.  They were disabled.
17     Q.  What would it have taken to
18 reactivate those accounts?
19     A.  A phone call from the user or
20 from instructions from the telecom people.
21     Q.  All right.  Now, explain to
22 me how placing those accounts in a DNU
23 category is different than the end of the

## Page 63

1  relationship.
2      A.  We have instances where an
3  active leader has some of their profiles
4  that are marked DNU.  And they have other
5  profiles that are still active and still
6  running calls, running events.  So it's
7  turning off a specific account rather than
8  completely turning off the entire
9  business.  It's a different status with
10 us, if you will.
11     Q.  When you were going to turn
12 off the entire business such as occurred
13 here, were those DNU accounts formally
14 deactivated?
15     A.  I believe so, but I'm not
16 absolutely certain.  I don't know.  The
17 right answer is I don't know.
18     Q.  Who would know the answer to
19 that?
20     A.  Don't know.
21     Q.  Internally, who would handle
22 placing accounts in the DNU category?
23     A.  Most of that would be done in

## Page 64

1  customer service.
2      Q.  Who's in charge there?
3      A.  Greg Folkes.
4      Q.  Internally speaking, who
5  handled turning off the business, to use
6  your term, of all the Conference America
7  accounts with Conexant?
8      A.  The deactivation?
9      Q.  Yes.
10     A.  Greg was involved in it.  I
11 think Jason Shanks worked on it.  I'm sure
12 other people in customer service did.  I
13 don't know exactly who the individual
14 account reps would be, you know, that are
15 customer service agents.  But I'm sure
16 other people did.  Greg didn't do all the
17 work.
18     Q.  Who gave the instruction to
19 the customer service people, Greg and
20 Jason or whoever, to deactivate or end the
21 business or however it was related, the
22 relationship between Conference America
23 and Conexant?

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1    A.    I believe I did.
2    Q.    What did you tell the
3    customer service people?
4    A.    I don't remember. Look, I'm
5    sure I told them to deactivate all the
6    accounts, but I don't recall the exact
7    thing I said.
8    Q.    Did you commit it to writing,
9    to your knowledge?
10   A.    I don't remember.
11   Q.    Do you think you said
12   anything other than deactivate all
13   Conexant accounts?
14   A.    I don't know.
15   Q.    Do you know what is involved
16   in taking a DNU account and going ahead
17   and deactivating it?
18   A.    Well, you have to go into the
19   system on every one of our profiles. You
20   have to specifically mark it as —
21   actually, it's marked with an acronym,
22   DACR, deactivated at customer request.
23   And then you have to ensure if it is an

Page 66

1    automated account or always on account
2    that it's also been removed from the
3    conference bridges. And then you have to
4    turn the information in to billing since
5    it's a billed item. There's a number of
6    steps that you go through in different
7    departments and different pieces. I guess
8    the first thing, you have to figure out
9    what all the accounts are.
10   Q.    To address that here — and
11   Tom recently provided this to me — we
12   have a couple of lists where it was
13   determined that there were six hundred and
14   thirty-eight always on accounts and one
15   thousand one hundred and forty operator
16   handled accounts.
17   A.    Uh-huh.
18   Q.    Is that correct?
19   A.    I don't know. I believe it,
20   but I don't know. Is that what the totals
21   are in that report?
22   Q.    Well, I'm looking at a letter
23   from Tom. What I'm seeking your agreement

Page 67

1    on is this. Regardless of how it was
2    done, your company settled on the number
3    that there were one thousand seven hundred
4    seventy-eight total accounts that needed
5    to be deactivated; is that correct?
6    A.    Without looking at the
7    documents, I don't know. But it sounds
8    about right. Yes. I'm not disputing the
9    number. I just don't know exactly the
10   number.
11   Q.    Who did you give the
12   instruction to determine how many accounts
13   there are?
14   A.    I don't remember who I gave
15   the instruction to. I believe Jason
16   Shanks worked on it. I know Greg Folkes
17   worked on it.
18   Q.    What was Jason Shanks'
19   position?
20   A.    He worked in sales
21   administration.
22   Q.    Is he still with your
23   company?

Page 68

1    A.    No, he's not.
2    Q.    When did he leave?
3    A.    Probably about August or
4    September of 2005. August, September time
5    frame. I'm not sure of the exact date.
6    Q.    Is Greg Folkes still with the
7    company?
8    A.    Yes, he is.
9    Q.    How long has Greg been with
10   the company?
11   A.    More than five years.
12   Q.    And what's his title?
13   A.    He's customer service
14   manager.
15   Q.    You said Jason Shanks was in
16   sales administration?
17   A.    That's correct.
18   Q.    Was he basically the contact
19   person with Conexant?
20   A.    He dealt with a lot of
21   Conexant issues.
22   Q.    What was the reason he left
23   Conference America?

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1    A.    I don't know all the issues
2  that were involved. I know he had a lot
3  of turmoil in his personal life. He was
4  in the midst of a divorce.
5    Q.    I guess what I want to ask,
6  was there any bad reason that he left the
7  company in terms of his job performance
8  and that kind of thing?
9    A.    He was having difficulties
10  separating his personal problems from his
11  business responsibilities, and they were
12  negatively affecting his performance at
13  the company.
14    Q.    In what way?
15    A.    He wasn't getting things done
16  or wasn't getting them done accurately.
17    Q.    Was he ever reprimanded or
18  disciplined?
19    A.    I don't know.
20    Q.    Does he have a personnel file
21  at Conference America?
22    A.    I'm sure he does.
23    Q.    Supposed to have one on him?

Page 70

1    A.    I'm sure we have a personnel
2  file on him.
3    Q.    But did he voluntarily quit,
4  or was he fired?
5    A.    He resigned. We did not fire
6  him.
7    Q.    Did the company have any
8  plans to fire him?
9    A.    I don't believe so. No. I
10  did not.
11    Q.    Did his departure from the
12  company have anything to do with Conexant?
13    A.    Not to my knowledge.
14    Q.    Where is he now?
15    A.    I don't know exactly, but I
16  have been told that he is working for a
17  bank.
18    Q.    Did you ever have any
19  conversations with him that you can
20  remember concerning Conference America's
21  relationship with Conexant?
22    A.    I don't recall.
23    Q.    And I know you've told me you

Page 71

1  may have given him an instruction in some
2  form to be involved in deactivating the
3  accounts. But what I'm hearing you say is
4  you don't remember specifically?
5    A.    Today I don't.
6    Q.    Are you aware of whether
7  Jason Shanks was given any specific
8  instructions by anyone at your company
9  relative to the relationship ending
10  between Conference America and Conexant?
11    A.    Well, I'm sure he knew the
12  relationship was ending. He was involved
13  in sales admin. I mean, all of us knew
14  that.
15    Q.    What I'm asking, though, is
16  are you aware of whether he was personally
17  given any instruction by anyone at your
18  company concerning documentation of the
19  relationship with Conexant?
20    A.    Well, I testified earlier
21  that I thought he was involved in getting
22  the list together of active accounts, but
23  I'm not absolutely sure. I think he was

Page 72

1  involved in it, but I don't remember
2  exactly.
3    Q.    And what I'm asking you is
4  are you aware, though, of any instruction
5  that may have been given to him by someone
6  else other than yourself concerning
7  Conexant's folder or account with
8  Conference America?
9    A.    No. I'm not aware of
10  anything else.
11    Q.    One of these exhibits -- I
12  think it's Exhibit L -- makes reference to
13  a Conexant folder. Is there a Conexant
14  folder or file maintained at Conference
15  America?
16    A.    I don't know. May I -- what
17  are you looking at?
18    Q.    Exhibit L. It's an E-mail
19  from Zach. How do you say Zach's last
20  name?
21    A.    Vogelgesang.
22    Q.    V-O-G-E-L-G-E-S-A-N-G. Do
23  you see where he makes reference to a

18 (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

```
1    Conexant folder?
2        A.   Okay.  It's probably the
3    contract file.  I'm not sure.
4        Q.   Is there a contract file?
5        A.   Yes.
6        Q.   Does it have documents in it
7    other than the written agreements?
8        A.   Well, it looks like it does
9    if a copy of this were put in it.
10       Q.   Have you looked at that
11   folder?
12       A.   Have I looked at it
13   personally?
14       Q.   Yes.
15       A.   No.
16       Q.   Who would maintain the
17   Conexant folder?
18       A.   Well, Zach has the
19   responsibility now.  He keeps those files.
20       Q.   How long has Zach been with
21   the company?
22       A.   I don't remember.
23       Q.   What is his position?
```

Page 74

```
1        A.   He works in sales
2    administration.
3        MR. MILLER:  Off the record.
4        (Off-the-record discussion)
5        (Brief recess)
6        Q.   Back to the audio
7    conferencing contract which is Exhibit B,
8    that contract and the amendments to it did
9    not contain any provision for a
10   deactivation fee; is that correct?
11       A.   Doesn't enumerate a
12   deactivation fee.
13       Q.   Does it enumerate or address
14   anything of that nature?
15       A.   May I ask for a
16   clarification?
17       Q.   Yes.
18       A.   Are you talking about all of
19   these including the last amendment?
20       Q.   Yes.
21       A.   Or were you talking about
22   only this one?
23       Q.   No.  I'm sorry.  I thought my
```

Page 75

```
1    previous question was clear.  The audio
2    conferencing contract itself and the
3    various amendments that were in place at
4    the time the contract was terminated --
5    are you with me so far?
6        A.   Yes.
7        Q.   And that includes all the
8    amendments that are attached to the
9    verified complaint; is that correct?
10       A.   That's your tabs B, C and D,
11   I believe.
12       Q.   What about tab E?  And that
13   may not be an amendment.
14       A.   No.  I believe tab E is not
15   part of that.
16       Q.   Tab E is not?
17       A.   No.  Right.
18       Q.   What is tab E?
19       A.   Tab E is the WebEx data
20   conferencing contract, I believe.  Yes.
21   That's what it looks like.
22       Q.   And just to crystallize this,
23   Exhibit E is the WebEx agreement between
```

Page 76

```
1    Conference America and Conexant which is
2    really not part of the lawsuit?
3        A.   To my knowledge, that's
4    correct, yes.
5        Q.   All right.  Back to the audio
6    conferencing contract and the various
7    amendments, that being Exhibit B which is
8    the agreement itself and then Exhibit C, D
9    and E to the verified complaint which are
10   the amendments that were reached.
11       MR. BORTON:  Did we agree that E
12       was the WebEx contract?
13       MR. MILLER:  Yes.
14       Q.   So Exhibits B, C and D to the
15   verified complaint represent the audio
16   conferencing contract in question in the
17   lawsuit and amendments to it that were
18   active at the time the agreement was
19   terminated by you?
20       MR. BORTON:  Object to the form.
21       A.   This -- these three pieces
22   make up the audio conferencing agreement.
23   The active agreement at the time that it
```

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1  was terminated was your tab number D like
2  dog. That was the active amendment.
3      Q.   Are you saying that the only
4  active written agreement between Conexant
5  and Conference America at the time of the
6  termination in June of 2005 is Exhibit D
7  to the exclusion of Exhibits B and C?
8      A.   I don't know the legal status
9  of it, but that -- the last one we signed
10 was the amendment which is tab number D.
11     Q.   Here's what I want to ask.
12 Between tabs B, C and D, regardless of
13 which were active at the time of the
14 termination, none of them address a
15 deactivation fee that would be applied to
16 conferencing accounts, correct?
17     A.   On the pricing attachments
18 they don't show a deactivation fee.
19 That's accurate.
20     Q.   I didn't see one either.
21 That's the only reason I'm asking. But
22 you would agree that the audio
23 conferencing contract and the attachments

Page 78

1  -- and we're talking about Exhibits B, C
2  and D to the verified complaint -- do not
3  contain any language addressing a
4  deactivation fee?
5      MR. BORTON:  Object to the form.
6      Calls for a legal
7      conclusion.
8      A.   The pricing is on attachment
9  A, and I don't believe -- let me look at
10 the last one. Deactivation fees are not
11 spelled out on the attachment A to exhibit
12 whatever it is, tab B, C or D.
13     Q.   Do you agree that the written
14 agreement in place between Conference
15 America and Conexant which was terminated
16 by way of your letter dated June 24, 2005
17 did not contain a contractual provision
18 regarding deactivation fees?
19     MR. BORTON:  Object to the form.
20     Speculation.
21     A.   I don't know about the legal
22 requirements. It doesn't enumerate, does
23 not list specifically on the pricing which

Page 79

1  is attachment A on any of those the
2  deactivation fee.
3      Q.   Your position is that after
4  the contract was terminated, then any
5  disconnecting or cancelling of
6  conferencing accounts that Conexant had
7  would be subject to the terms and
8  conditions on the web site?
9      A.   After the contract was
10 terminated?
11     Q.   Yes.
12     A.   I believe that's correct. I
13 think after the contract is terminated
14 that we relied upon the web site.
15     Q.   Since no deactivation fee has
16 been contained in the written agreement
17 between Conference America and Conexant,
18 do you agree that the deactivation fee
19 found on the web site which Conference
20 America is seeking to impose was something
21 new to the relationship between Conference
22 America and Conexant?
23     MR. BORTON:  Object to the form.

Page 80

1      A.   No.
2      Q.   Why not?
3      A.   We've had the deactivation
4  fee for some time, and we provide services
5  that are not listed specifically on the
6  pricing attachments which are designated
7  attachment A.
8      Q.   Let me make sure I
9  understand. Are you saying that
10 Conference America and Conexant had
11 dealings with each other while the written
12 agreement was in place that are not
13 addressed by the written agreement?
14     A.   No.
15     Q.   All of the dealings
16 Conference America and Conexant had while
17 the written agreement was in place were
18 pursuant to the written agreement,
19 correct?
20     A.   We tried to do it pursuant to
21 the agreement.
22     Q.   And the written agreement
23 contains no deactivation fee?

20 (Pages 77 to 80)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 81

1    A.    That's not what I said.
2    Q.    What did you say?
3    A.    I said that it isn't listed
4  explicitly on attachment A.
5    Q.    Is it listed unexplicitly?
6    A.    I think so.
7    Q.    Where?
8    A.    Exhibit D, attachment A, page
9  three.
10    Q.    Tell me what you're talking
11  about.
12    A.    Additional services.
13  Additional services are available at
14  Conference America standard prices
15  effective at the time services are
16  rendered.
17    Q.    Are you saying that addresses
18  deactivation fees?
19    A.    It would, yes.
20    Q.    How so?
21    A.    It's a service that we
22  provide, that could be provided.  And if
23  it is, then we would bill for it at our

Page 82

1  standard price.
2    Q.    But that would be outside
3  specific enumeration in the written
4  agreement, correct?
5    A.    Yeah.  This is for something
6  that's not addressed in attachment A.
7    Q.    What other additional
8  services would that language apply to?
9    A.    Whatever else is not listed
10  here that we might provide.
11    Q.    Can you think of anything
12  other than deactivation fees that you say
13  would fit into that category?
14    A.    Sure.
15    Q.    What?
16    A.    We do recordings on CD's and
17  MP3's.  We do full-time operator
18  monitoring and lots of special things for
19  customers.  When we do those, we get paid
20  for it.
21    Q.    Do you know whether or not
22  Conexant knew and understood that this
23  language you have just referenced

Page 83

1  regarding additional services would in any
2  way incorporate or apply to deactivation
3  fees?
4      MR. BORTON:  Object to the form.
5    A.    I don't know what Conexant
6  knew.
7    Q.    Did you ever discuss that
8  with them?
9    A.    I don't recall.
10    Q.    Regardless of what they knew
11  or understood -- and I think we talked
12  about this earlier -- Conference America
13  had never sought to charge a deactivation
14  fee to Conexant while the written
15  agreement was in place; is that correct?
16    A.    I believe that is correct,
17  yes.
18    Q.    And if that is true, then the
19  deactivation fee found on the web site
20  would be a type of billing that Conference
21  America had never sought to impose on
22  Conexant?
23    A.    I don't believe we had billed

Page 84

1  it prior to that.
2    Q.    If the appropriate people at
3  Conexant say we had been charged a
4  deactivation fee by Conference America
5  before, you wouldn't dispute that?
6    A.    I don't know about every
7  transaction, but I am not aware of any
8  charges that we made.  There may be some,
9  but I am not aware of it.
10    Q.    Who would be aware if any
11  deactivation fees had been charged to
12  Conexant prior to the ones that are at
13  issue in this lawsuit?
14    A.    I don't know.
15    Q.    Who is the billing person who
16  would do that?
17    A.    We've got a group of people
18  who do billing.  And over the years of
19  this contract, we probably had half a
20  dozen different people that have actually
21  done billing.
22    Q.    Was Jason Shanks involved in
23  seeing the Conference America billing to

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  Conexant while he was employed at
2  Conference America?
3      A.  He may have seen the billing.
4  He was involved in sales admin.  He would
5  at least know the total dollars that were
6  billed.  I don't know if he'd have the
7  detail.
8      Q.  But just to move on to make
9  sure I understand this, your position is
10 that page A3 under Exhibit D to the
11 verified complaint incorporates
12 deactivation fees when it says additional
13 services are available at Conference
14 America, standard prices effective at the
15 time services are rendered; is that
16 correct?
17     A.  I believe if we provided
18 deactivation, that that would apply, yes.
19     Q.  To deactivation fees?
20     A.  I think it applies to all the
21 non-enumerated services we provide.  It's
22 not limited.
23     Q.  All right.  Look at Exhibit K

Page 86

1  which is your termination letter dated
2  June 24, 2005.  You are familiar with that
3  document, obviously?
4      A.  Yes.
5      Q.  Who at Conference America was
6  involved in the decision to terminate the
7  audio conferencing contract with Conexant?
8      A.  Well, primarily it was me.
9  My son Rob Pirnie would have been aware of
10 the decision, but it was not his decision.
11 It was my decision.  So, I mean, it really
12 falls to me.
13     Q.  Why did you make that
14 decision?
15     A.  I felt it was a prudent
16 business decision to make on behalf of
17 Conference America's interests.  And it
18 was the right time to do it, so we did.
19     Q.  What did you feel was prudent
20 about it?
21     A.  It seemed to me that this was
22 a relationship that was not going
23 anywhere.

Page 87

1      Q.  What do you mean by that?
2      A.  That it did not have a
3  long-term future.  That had been removed
4  from the relationship.
5      Q.  How had that been removed
6  from the relationship?
7      A.  There were a number of
8  factors.  The WebEx services that
9  Conference America had provided to
10 Conexant had been moved to a competitor of
11 ours, InterCall, for a higher price than
12 we actually offered it to Conexant.  Same
13 services, same everything.  Pay them more
14 money.  We had a situation where we were
15 asked to get a toll free number in India
16 which was to be used for audio conference
17 calling.  They gave us a price that they
18 wanted us to get.  We went to substantial
19 trouble to get the number, and they moved
20 the business apparently to one of our
21 competitors.  And I believe it went to
22 InterCall.  When I looked at that as kind
23 of an ongoing look at the relationship, it

Page 88

1  looked to me like it was short term.
2      Q.  So you chose to terminate it?
3      A.  Yes.
4      Q.  Did you think at the time
5  that Conexant was going to terminate the
6  relationship if you didn't?
7      A.  I didn't know what Conexant
8  would or wouldn't do.
9      Q.  You thought that was a
10 possibility?
11     A.  It's always a possibility.
12     Q.  Had you personally had any
13 discussions with anyone from Conexant
14 about the fact that Conexant was seeking
15 services in the Far East, primarily India,
16 that perhaps your company could not
17 provide?
18     A.  I don't recall.
19     Q.  Are you aware of anyone from
20 your company having had such discussions
21 with anyone from Conexant?
22     A.  I believe that my son, Rob,
23 talked in detail with Mr. Edge of

22 (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1 Conexant, Paul Edge, on the India issue.
2 I'm not sure what else they talked about.
3 Q. Did Rob relate to you the
4 content of those discussions with Paul
5 Edge?
6 A. I'm sure we talked about it.
7 Q. I'm sure you did, too. What
8 I'm asking you is do you remember those
9 discussions so you can tell me about them
10 now?
11 A. No, I don't. Not -- I
12 remember India as a specific area in which
13 services were to be provided. We got the
14 service established, and the business was
15 moved to another conferencing company.
16 Q. Do you remember anything to
17 the effect that the type of service you
18 were offering in India was not what
19 Conexant was asking Rob for?
20 A. No. We met specifically the
21 price point that had been requested and
22 got the service up and running. We did
23 what they asked.

Page 90

1 Q. Do you remember, though, a
2 distinction between the specific type of
3 service you were offering -- and I'm not
4 talking about price. I'm talking about
5 how it was going to be done -- and whether
6 that fit with exactly what Conexant
7 wanted?
8 A. I don't recall.
9 Q. What you were offering was a
10 1-800 number in India?
11 A. We offered what they asked us
12 to provide which was a toll free number
13 back to the United States, as I understand
14 it. I didn't do that, but that's my
15 understanding.
16 Q. Would Rob be in a better
17 position to comment on exactly what was
18 told to him about what Conexant
19 specifically wanted in that regard?
20 MR. BORTON: Object to the form.
21 Calls for speculation.
22 A. He had the conversations.
23 Q. He went out to California and

Page 91

1 sat down with someone at Conexant
2 concerning this?
3 A. Actually, I think he met with
4 Mindspeed on some other issues, but he may
5 have also talked to Conexant. I'm not
6 sure. I'll just say I'm not sure.
7 Q. When you sent this letter on
8 June 24, 2005 overnight, did you know that
9 Tom Noonan and Paul Edge were on vacation
10 and were not going to see it for some
11 number of days?
12 MR. BORTON: Object to the form.
13 Q. Let me finish the question.
14 Did you know when you sent this letter on
15 June 24, 2005 overnight that Tom Noonan
16 and Paul Edge were both on vacation and
17 were not going to be physically present to
18 see this letter terminating the contract
19 for some number of days?
20 A. No.
21 MR. BORTON: Object to the form.
22 A. No. Excuse me.
23 MR. BORTON: That's okay.

Page 92

1 Q. You deny that?
2 A. That I knew that?
3 Q. Yes.
4 A. I don't believe I knew that.
5 Q. Did you have any discussions
6 with Jason Shanks about sending this very
7 letter at this very time because those two
8 men were going to be on vacation and not
9 available physically in their office to
10 receive it the next day?
11 MR. BORTON: Object to the form.
12 A. I don't recall.
13 Q. Is it possible that you did
14 have such a discussion with Jason?
15 A. I just don't recall.
16 Q. Possible that you did?
17 A. No speculation.
18 Q. Have you sought to discuss
19 this matter at all with Jason Shanks since
20 he left Conference America's employment?
21 A. No.
22 Q. Is there any internal
23 paperwork at Conference America reflecting

23 (Pages 89 to 92)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  the decision to send this letter on June
2  24, 2005 terminating the written
3  agreement?
4      A.  Is there any what, now?
5      Q.  Internal paperwork such as
6  memos between you and your son or anyone
7  else or E-mails concerning this decision?
8      A.  I don't believe so.
9      Q.  I know you signed the letter
10  on June 24th, 2005 and sent it overnight.
11  When did you actually make the decision to
12  terminate the agreement and write this
13  letter?
14      A.  It was prior to that date.
15      Q.  Can you give me some judgment
16  as to whether it was one day or one week
17  before?
18      A.  I don't know.
19      Q.  But the only paperwork we
20  have relative to the decision is this
21  letter itself terminating the
22  relationship?
23      A.  Concurrent -- occurring at

Page 94

1  the same time?  Is that what you're
2  asking?
3      Q.  Well, I want to be precise.
4  Does Conference America maintain any
5  documentation concerning the decision
6  which is reflected in this letter of June
7  24, 2005?
8      A.  I don't believe so, no.
9      Q.  Do you recall when you first
10  learned that Conexant was, in fact,
11  looking around for another provider of
12  these services?
13      MR. BORTON:  Object to the form.
14      A.  I don't know.
15      Q.  Do you recall learning that
16  at some point before you decided to
17  terminate the contract?
18      A.  Well, I knew that before I
19  made the decision, yes.
20      Q.  When you learned about that
21  -- and I'm specifically referring to the
22  fact that Conexant was looking to possibly
23  move to another provider of these services

Page 95

1  -- what was your reaction to that?
2      A.  I don't recall the specific
3  point in time when that occurred, so I
4  don't remember what my specific feelings
5  were at that point in time.  But I'm very
6  certain I would have been disappointed
7  because we'd done business for many years.
8  But I never learned absolutely they were
9  moving to another vendor.  I learned that
10  they had moved to another vendor with the
11  WebEx services and that we had done other
12  things associated with India on toll free,
13  but I did not know absolutely.  We never
14  received any notification that they were
15  going to move to someone else.
16      Q.  I mean, what happened instead
17  was you terminated the agreement yourself?
18      A.  Yes.  I made the decision.
19      Q.  But before you terminated the
20  agreement, you had never received any
21  official notification that Conexant was
22  going to end that relationship, correct?
23      A.  Well, we'd received a

Page 96

1  notification they were going to end WebEx.
2      Q.  Let me be more precise.  When
3  you terminated the agreement on June 24,
4  2005, you did not have any notification
5  that Conexant was going to discontinue the
6  audio conferencing contract.
7      A.  I did not.
8      Q.  You knew that Conexant had
9  made the decision to move to another
10  provider for the WebEx services?
11      A.  Uh-huh.
12      Q.  Correct?
13      A.  That is correct.
14      Q.  Did you have some feeling
15  that Conexant was getting ready to do the
16  same thing with reference to the audio
17  conferencing contract services?
18      A.  I don't -- I did not know
19  what they were or were not going to do.  I
20  only really knew what they had done to
21  that point in time.
22      Q.  Which consisted of moving to
23  another WebEx provider, correct?

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1    A.   For more money.
2    Q.   Okay.  But it consisted of
3  that?
4    A.   That was one.
5    Q.   That's my next question.
6  What are the other things you're referring
7  to, if anything, that they had already
8  done?
9    A.   Well, I have a clear
10  recollection of the India toll free number
11  back to the United States.
12    Q.   And if I hear you right, your
13  feeling was that they were looking around
14  for another provider for the Far East
15  including India?
16    A.   Conexant was always looking
17  at other providers.  That's not something
18  new at any point in time.
19    Q.   If they were always looking
20  for other providers throughout the entire
21  contract, why did you choose this period
22  of time, specifically June 24, 2005, to
23  terminate the contract as a prudent

Page 98

1  business decision?
2    A.   I just felt like there was no
3  longer a long-term business opportunity,
4  and we try to do business where there's a
5  long-term opportunity.
6    Q.   Had you felt before that
7  despite the fact they may always be
8  looking for another provider, that you
9  still had what was going to be a long-term
10  relationship?
11    A.   I think I did, yes.
12    Q.   Was it this issue about the
13  India service that caused you to conclude
14  perhaps this was not going to be a
15  long-term relationship?
16    MR. BORTON:  Object to the form.
17    A.   That was one of the elements.
18    Q.   What other elements were
19  there?
20    A.   Well, I've already testified
21  the WebEx removal was an issue.
22    Q.   Any other elements?
23    A.   Not that I recall right now.

Page 99

1    Q.   Why would it have not been a
2  prudent business decision to continue this
3  relationship and see if it might improve
4  and continue?
5    MR. BORTON:  Object to the form.
6    Calls for speculation.
7    A.   I just didn't feel like it
8  was leading in the right direction, and I
9  thought our time and energies could be
10  spent in other areas.
11    Q.   And did you discuss that with
12  any of the other principals at Conference
13  America?
14    A.   I may have.
15    Q.   You don't remember one way or
16  the other right now?
17    A.   I have no recollection of a
18  specific discussion.
19    Q.   Was there any personal anger
20  involved in this decision by you to
21  terminate the agreement at this particular
22  time?
23    A.   I don't recall anger.  I was

Page 100

1  disappointed in the way we'd been dealt
2  with, but I don't recall anger.
3    Q.   What was it that disappointed
4  you about it?
5    A.   Well, business relationships
6  we'd had for some time they were moving.
7  And when we were doing things they asked
8  specifically, after we did them and spent
9  time and energy providing the service, it
10  wasn't used.
11    Q.   That being the 1-800 number
12  for India?
13    A.   The toll free access.  I
14  don't think they dial -- I don't know what
15  they dialed, but it was toll free.
16    Q.   We're talking about the same
17  thing.
18    A.   I hope so.
19    Q.   We are.  But let's make it
20  clear.  You were disappointed because you
21  felt Conference America had investigated
22  and spent resources and provided Conexant
23  with an option that Conexant was seeking

25 (Pages 97 to 100)

## FREEDOM COURT REPORTING

Page 101

1 concerning India but Conexant then chose
2 potentially to use somebody else for that?
3    A.   Yes.  As I understand it,
4 they did use somebody else for that.
5    Q.   But that's the origin of your
6 personal disappointment?
7    A.   Well, along with -- I
8 remember those two issues very
9 specifically.
10    Q.   The WebEx issue and the India
11 issue?
12    A.   Those are specific issues,
13 yes.
14    Q.   As we sit here today, you
15 don't remember any other specific issues
16 that caused you to be disappointed and
17 figure into your decision to terminate the
18 relationship?
19    A.   I just did not feel it was
20 long term.
21    Q.   And I've heard you on that.
22 I'm just sort of asking for a list of why
23 you felt that way.  And you've told me the

Page 102

1 WebEx issue and the India issue.  And I'm
2 asking you are there any other elements or
3 issues on that list that cause you to have
4 disappointment and feel like this was not
5 going to be long term anymore?
6    A.   Actually, I did have one
7 other issue --
8    Q.   What is it?
9    A.   -- that I just think of now.
10 I'm a shareholder of Conexant, and I was
11 concerned about the long-term viability of
12 the company.
13    Q.   Is that another reason that
14 you chose to discontinue the relationship
15 and terminate the contract at the time
16 that you did that?
17    A.   No, not specifically.  But it
18 was a concern.
19    Q.   Do you still own stock in
20 Conexant?
21    A.   Yes, I do.
22    Q.   Have you increased or
23 decreased your holdings since this

Page 103

1 agreement with Conexant was terminated?
2    A.   No.
3    Q.   Same number of shares?
4    A.   Uh-huh.  Yes.
5    Q.   Did you ever express to
6 anyone your concern about Conexant's
7 long-term viability or whatever you
8 described it as a minute ago?
9    A.   I don't recall.
10    Q.   Before you sent this letter
11 of June 24, 2005 overnight to Tom Noonan,
12 did you pick up the phone and try to reach
13 anyone at Conexant to let them know this
14 letter was coming?
15    A.   No.
16    Q.   When had you last spoken
17 personally with somebody at Conexant
18 verbally, either face to face or on the
19 phone, before you sent this letter?
20    A.   I don't remember.
21    Q.   Did you think Conexant would
22 be surprised that you were terminating the
23 relationship?

Page 104

1    A.   I don't know.
2    Q.   Is there any reason you
3 didn't pick up the phone and call someone
4 at Conexant including Tom Noonan to
5 verbally let them know you were sending a
6 letter terminating the audio conferencing
7 contract?
8    A.   It wasn't necessary.  The
9 letter is what was spelled out in the
10 contract, and we tried to comply with
11 that.
12    Q.   This letter served to
13 terminate the audio conferencing contract
14 how many days later?
15    A.   Fifteen days.
16    Q.   When that occurred and the
17 fifteen days expired and the contract was
18 therefore terminated, why did that not
19 also deactivate all the various Conexant
20 conferencing accounts that were in
21 existence at that time on that date that
22 the termination actually occurred?
23    A.   We received requests from

26 (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 105

1  Conexant people to specifically ensure
2  that service was not interrupted
3  subsequent to that.
4      Q.   Did you ever notify Conexant
5  when you got that notice how many accounts
6  were considered to be active by Conference
7  America?
8      A.   No, not that I know of.
9      Q.   And as I read this
10 correspondence, the request was made to
11 keep accounts available until July 31,
12 2005. Is that the way you read it?
13     A.   Which one are we talking
14 about?
15     Q.   Look at Exhibit M which is
16 Tom Noonan's letter of July 15, 2005 to
17 you via overnight delivery.
18     A.   Okay. I've read the letter.
19     Q.   And does this notation in the
20 upper right-hand corner indicate that you
21 received it on July 18, 2005?
22     A.   That's correct.
23     Q.   Do you remember as we sit

Page 106

1  here today when you got this letter?
2      A.   July 18th, 2005 is what I
3  wrote on it, so I believe that's when I
4  got it.
5      Q.   And I'm not disputing that.
6  What I'm asking is as we sit here today,
7  do you remember getting it and reading it
8  and your reaction to it?
9      A.   No.
10     Q.   As far as you can remember,
11 was this the first response back to you
12 from Conexant concerning your June 24,
13 2005 letter?
14     A.   I'm sure the documents will
15 show that. It seems like it may be, but I
16 don't know.
17     Q.   And that's the way I read it,
18 too.
19     A.   Okay.
20     Q.   Do you know anything to
21 suggest otherwise?
22     A.   If you don't have the
23 documents, then this is the first one. At

Page 107

1  least that's a written letter to me.
2  There may be E-mails or something else,
3  but I don't -- I don't recall.
4      Q.   I don't think there are, but
5  I could be wrong.
6      A.   Okay. That's fine. I just
7  don't know every piece of paper.
8      Q.   What does the content of this
9  letter mean to you? What did it mean to
10 you then?
11     A.   Well, I was disappointed in
12 Mr. Noonan's reference to fifteen business
13 days. He was playing games. Contract
14 says fifteen days, not fifteen business
15 days. So that was disappointing. Other
16 than that, it was clear he wanted services
17 through the end of July.
18     Q.   And he's also clear that
19 services for those accounts are to be made
20 inactive slash unavailable on that date,
21 correct?
22     A.   That's his request.
23     Q.   Did you consider this letter

Page 108

1  to request services independent of the
2  written contract?
3      A.   Yes, I believe it is.
4      Q.   Why?
5      A.   Because the
6  cancellation/termination was effective on
7  July 10th. He's asking for services
8  through July 31.
9      Q.   If the cancellation was
10 effective July 10, 2005, then this letter
11 was written five days after that, right?
12     A.   I don't know when it was
13 written. I received it on the 18th.
14     Q.   Well, assuming that date of
15 July 15, 2005 is true and correct, this
16 letter would have been written five days
17 after termination of the contract had
18 occurred, correct?
19     A.   It would be on the fifth day,
20 I believe.
21     Q.   After termination had already
22 occurred, correct?
23     A.   I'm not trying to split

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  hairs. But I think the contract was
2  terminated as of close of business on the
3  10th. So the 11th, 12th, 13th and 14th is
4  four days. So it would be after four days
5  on the fifth day.
6     Q.  Okay. And I'm not splitting
7  hairs with you on that either.
8     A.  Okay.
9     Q.  But here's my point. This
10 letter was written by Tom Noonan after the
11 contract had, in fact, already terminated
12 due to your letter of June 24, 2005,
13 correct?
14    A.  Yes.
15    Q.  And this is the first
16 communication as far as we know back to
17 you after that termination had already
18 occurred, correct?
19    A.  I believe that it is. I'm
20 not absolutely certain, but I believe that
21 it is.
22    Q.  And if that is so, then this
23 request to provide services until July 31,

Page 110

1  2005 came after the contract had already
2  been terminated, correct?
3     A.  I believe that's correct.
4     Q.  And this is the first notice
5  to you and Conference America that
6  Conexant would like services to continue
7  as they had been provided for another
8  couple of weeks or so?
9     A.  It's the first notice from
10 purchasing. I mean, the people who are
11 employees of Conexant continued to make
12 requests that we provide services and
13 continued to use our services.
14    Q.  Well, who are those people?
15    A.  The leaders, the actual event
16 leaders.
17    Q.  You're talking about people
18 who called in?
19    A.  Either that or used services
20 that are automated services that were
21 existing for them.
22    Q.  Okay. I want to go back to
23 the question I had a few minutes ago,

Page 111

1  though. You sent the letter on June 24th,
2  2005 terminating the contract. It
3  therefore terminated as of July 10, 2005,
4  correct?
5     A.  I believe that's correct,
6  yes.
7     Q.  Why did that in and of
8  itself, the ending of the contract on July
9  10, 2005, not deactivate and end all
10 accounts that Conference America had with
11 Conexant as of that date?
12    A.  Well, my letter also says
13 that we'll continue providing services or
14 something like that under our standard
15 terms and conditions. I don't recall
16 exactly what it says, but it says
17 something about that. Services will still
18 be available under the standard terms.
19    Q.  You're talking about the
20 second paragraph of your letter?
21    A.  Yes.
22    Q.  All right. But I want to
23 make sure you understand the question

Page 112

1  before you answer it. Your letter
2  terminated the contract as of July 10,
3  2005, correct?
4     A.  I believe that's correct,
5  yes.
6     Q.  And when July 10, 2005 came
7  around, these one thousand seven hundred
8  and seventy-eight accounts were in place,
9  were they not?
10    A.  Yes, they were.
11    Q.  Then why were they not
12 necessarily cancelled, discontinued,
13 deactivated, turned off, whatever term you
14 want to use, when the contract terminated
15 by operation on July 10, 2005?
16    A.  We were still willing to
17 provide services and Conexant was still
18 interested in having those services from
19 us. And there was no request that we
20 terminate those services.
21    Q.  What notification did you
22 have before Tom Noonan's letter of July
23 15, 2005 that Conexant was still

28 (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1  interested, to use your term, in your
2  services?
3     A.   They continued to use our
4  services.
5     Q.   Not one thousand seven
6  hundred and seventy-eight accounts,
7  though, correct?
8     A.   I don't know how many
9  accounts used our services.
10    Q.   I'm going to ask this one
11 more time to see if you have an answer,
12 and if you don't, that's fine. But when
13 July 10, 2005 came around and the
14 termination of the contract necessarily
15 occurred by operation of your letter of
16 June 24, 2005 and the contract itself, why
17 were these one thousand seven hundred and
18 seventy-eight accounts not by operation of
19 the contract disconnected and deactivated
20 at that time?
21    A.   The contract does not address
22 that they have to be deactivated at that
23 time. The contract says you get these

Page 114

1  special considerations under this contract
2  during this period. If the contract is
3  terminated, at the end of the notice
4  period what becomes operable are our
5  standard terms and conditions as I advised
6  Conexant in this letter of June 24th, your
7  Exhibit K.
8     Q.   So your position is that
9  although the audio conferencing contract
10 was terminated as of July 10, 2005, any
11 disconnecting or deactivating that
12 occurred after that date necessarily
13 incurred the seventy-four dollar and
14 ninety-five cent deactivation fee even
15 though that's a fee that had not been
16 specifically contemplated in the written
17 contract?
18       MR. BORTON: Object to the form.
19          Mischaracterizes the
20          contract.
21    A.   I'm sorry. I don't know what
22 you want.
23    Q.   Do you understand the

Page 115

1  question?
2     A.   No.
3     Q.   Let me try again. The one
4  thousand seven hundred and seventy-eight
5  accounts we're talking about came into
6  existence during the terms of the written
7  agreement, correct?
8     A.   Some may have existed prior
9  to that with Rockwell Semiconductor.
10    Q.   With that qualification --
11 which I don't dispute because I don't
12 know. But with that qualification, those
13 accounts came into existence during the
14 term of the written audio conferencing
15 contract, correct?
16    A.   With that possible exception,
17 I believe that is accurate.
18    Q.   And as we've already
19 discussed, the audio conferencing contract
20 itself does not specifically enumerate
21 deactivation fees?
22    A.   It doesn't have it listed as
23 a line item on Exhibit A. We can agree

Page 116

1  upon that. Attachment A. Excuse me.
2  Let's get it right.
3     Q.   That is not contemplated
4  specifically in the contract itself and
5  the various attachments which were in
6  existence at the time which are Exhibits
7  B, C and D to the complaint?
8        MR. BORTON: I object to that.
9           We've been over this.
10    A.   I -- all right. Let me make
11 sure I'm clear. It's not enumerated in
12 attachment A as a specific line item for
13 which special pricing applies. It is
14 enumerated in attachment A on page three
15 as an additional service that would be
16 billed at our standard pricing. That's
17 the umbrella that it falls under.
18    Q.   And we've been through that?
19    A.   That's where we are.
20    Q.   But when July 10, 2005 came
21 around, the contract ended?
22    A.   It was terminated, yes.
23    Q.   Your position is that any

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1  instruction from that point forward to
2  deactivate or cancel or turn off accounts
3  would necessarily incur the seventy-four
4  dollar and ninety-five cent charge?
5      A.   Subsequent to July 10,
6  instructions would incur that cost.
7      Q.   Did you affirmatively
8  communicate that to Conexant?
9      MR. BORTON: Object to the form.
10     A.   Well, as I've already said, I
11  believe that I told them exactly where to
12  look with our web site in our services,
13  terms and conditions on several occasions.
14  That wasn't done once. It was done
15  repeatedly.
16     Q.   When did the deactivation fee
17  of seventy-four dollars and ninety-five
18  cents first appear on the Conference
19  America web site?
20     A.   I don't know.
21     Q.   Do you know with one hundred
22  percent certainty that it was on there
23  when you sent that letter on June 24,

Page 118

1  2005?
2      A.   I don't know.
3      Q.   It's possible that it was not
4  there at that time, correct?
5      A.   I just don't know.
6      Q.   Who would know the answer to
7  that?
8      A.   I don't know who would know
9  that. Our web site is updated regularly.
10     Q.   Let me make sure we
11  understand each other on this. You did
12  not know when the language addressing a
13  deactivation/maintenance fee of
14  seventy-four dollars and ninety-five cents
15  per leader account was placed on your
16  company's web site?
17     A.   No, I do not.
18     Q.   Have you asked anyone that
19  question before you came for this
20  deposition today?
21     A.   No.
22     Q.   Who in your company maintains
23  the web site?

Page 119

1      A.   Several people work on it
2  that are engineers.
3      Q.   Who?
4      A.   David Lee works on the web
5  site. Paine Bone.
6      Q.   How does he spell his name?
7      A.   B-O-N-E.
8      Q.   P-A-I-N-E?
9      A.   Oh, yes.
10     Q.   Does your company maintain
11  any documentation which would answer the
12  question as to when the deactivation fee
13  was first inserted on the web site?
14     A.   I don't believe so.
15     Q.   Is it possible that it was
16  inserted on the web site after your letter
17  of June 24, 2005 was sent?
18     A.   I just don't know.
19     Q.   When you sent your letter of
20  June 24th, 2005 and referenced the terms
21  and conditions on the web site and the
22  fees associated with those, did you
23  specifically have in mind the deactivation

Page 120

1  fee?
2      A.   I don't believe so.
3      Q.   Why not?
4      A.   I was trying to set out what
5  we were going to have as the basis for
6  doing business.
7      Q.   Let me ask you this. If the
8  deactivation fee, in fact, was not on the
9  web site when you sent your letter on June
10  24, 2005, then you would agree that
11  Conexant wouldn't be expected to pay the
12  deactivation fees sought in this lawsuit?
13     A.   No.
14     Q.   Why not?
15     A.   We were very -- I think I was
16  very clear that everything was going to be
17  subject to the services, terms and
18  conditions and our standard pricing
19  effective at the time the service was
20  rendered. Whether it's listed or not, I
21  mean, there's a few prices that are listed
22  on our web site, but the majority of ours
23  are not listed on the web site.

30  (Pages 117 to 120)

# FREEDOM COURT REPORTING

| Page 121 | Page 123 |
|---|---|
| 1    Q.    Well, how do you expect<br>2 somebody to know about them if they're not<br>3 listed on the web site?<br>4    A.    As I believe I encouraged in<br>5 at least one of our correspondence all<br>6 they have to do is ask.<br>7    Q.    Well, they called Conference<br>8 America numerous times, did they not?<br>9    A.    We asked that they ask in<br>10 writing.<br>11    Q.    When did you ask Conexant to<br>12 submit any questions in writing?<br>13    A.    I don't recall, but I think<br>14 it is in here some place.<br>15    Q.    That's later on in the<br>16 sequence, isn't it?<br>17    A.    I don't recall when. I'm<br>18 sure the documents show it, though.<br>19    Q.    But you —<br>20    A.    Excuse me. I'm losing my<br>21 voice here.<br>22    Q.    That's all right. Your first<br>23 reference to Conexant to the terms and | 1    A.    I just don't remember.<br>2    Q.    Did you have any input as to<br>3 what was on the web site?<br>4    A.    I worked on this with counsel<br>5 and continued to. I mean, it's not — our<br>6 web site is very dynamic. It changes<br>7 probably several times a month.<br>8    Q.    Do you think Paine Bone would<br>9 be able to tell me when the deactivation<br>10 fee language was first inserted on the web<br>11 site?<br>12    A.    No.<br>13    Q.    Why not?<br>14    A.    We don't keep historical<br>15 copies of the changes.<br>16    Q.    It's maintained on a<br>17 computer, isn't it?<br>18    A.    No. I don't think so. We<br>19 just changed it.<br>20    Q.    Do you really know how it is<br>21 retained computerized?<br>22    A.    Well, I'm not the guy who<br>23 does it, but I don't think we keep any |

| Page 122 | Page 124 |
|---|---|
| 1 conditions on the web site is your letter<br>2 of June 24, 2005, correct?<br>3    A.    I believe that's correct.<br>4    Q.    And you just can't remember<br>5 and don't know whether the deactivation<br>6 fee was on the web site at that time or<br>7 not?<br>8    A.    I do not know.<br>9    Q.    Was the web site altered in<br>10 any way after your letter of June 24, 2005<br>11 and before Paul Edge's instruction on July<br>12 20, 2005 to disconnect all the Conexant<br>13 conferencing accounts?<br>14    A.    I don't know what happened<br>15 when.<br>16    Q.    As we sit here today, you<br>17 don't know whether the terms and<br>18 conditions on the web site was altered in<br>19 any way between your letter of June 24,<br>20 2005 and Paul Edge's E-mail of July 20,<br>21 2005 which is Exhibit Q to the complaint<br>22 requesting that all Conexant conferencing<br>23 accounts be disconnected? | 1 copies of the past. I just don't think we<br>2 keep it.<br>3    Q.    I'm not asking about written<br>4 copies.<br>5    A.    I'm talking about electronic<br>6 copies.<br>7    Q.    Do you really know whether<br>8 the computer system at Conference America<br>9 can tell me when the deactivation fee was<br>10 first inserted on the web site?<br>11    A.    I don't know absolutely, but<br>12 I don't believe we can.<br>13    Q.    Was there ever any<br>14 instruction given, to your knowledge, to<br>15 anyone at Conference America to backdate<br>16 any documents relative to Conexant that<br>17 may have some involvement in this lawsuit?<br>18    A.    Not to my knowledge.<br>19    Q.    Is backdating of documents<br>20 something that you would personally<br>21 approve of?<br>22    A.    No.<br>23    Q.    You agree that would be |

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 125

1  dishonest?
2      A.   I agree it's not an
3  appropriate business practice.
4      Q.   And you would agree that you
5  certainly should not impose to hold
6  another company liable based on a document
7  that has been backdated at the instruction
8  of someone at Conference America?
9      MR. BORTON:  Object to the form.
10          Calls for speculation.
11     A.   I just don't know how to
12  answer that.  That's a legal question.
13     Q.   In any event, that's not
14  something that you would participate in or
15  approve of?
16     A.   No.  I don't approve of that.
17     Q.   Look at Exhibit Q, please,
18  which is Paul Edge's E-mail of July 20,
19  2005 to your son, Rob Pirnie, and Jason
20  Shanks and others.  And you were copied on
21  it as well, correct?
22     A.   No.
23     Q.   They've got your name spelled

Page 126

1  wrong?
2      A.   Didn't ever come to me.  I
3  ultimately received a copy of it, but I
4  did not get it from Mr. Edge.
5      Q.   Do you know when you got a
6  copy of it?
7      A.   No.
8      Q.   And Robert Williams is copied
9  as well?
10     A.   That's correct.
11     Q.   And who is he?
12     A.   He's our counsel at Troutman
13  Sanders.
14     Q.   Do you know why he's listed
15  on here?
16     A.   I do not know.
17     Q.   Here's what I want to ask you
18  about this.  Is this the instruction from
19  Conexant that you say served as the
20  directive to deactivate any and all kinds
21  of Conexant's accounts with Conference
22  America?
23     A.   I think we've got more than

Page 127

1  one, but I think this does serve that
2  purpose.  But the date is wrong.  I think
3  Mr. Edge sends multiple E-mails associated
4  with this until he finally gets back to
5  the 31st.
6      Q.   Exhibit R is when he sends
7  one to Tom Noonan saying to Tom basically
8  I forgot to copy you on this, correct?
9      A.   Yes.
10     Q.   Exhibit S is when he E-mails
11  Rob again correcting the date, correct?
12     A.   That's correct.
13     Q.   And all of those were sent on
14  July 20, 2005, correct?
15     A.   That's what it appears, yes.
16     Q.   Do you know whether the
17  deactivation fee of seventy-four dollars
18  and ninety-five cents was on the web site
19  of Conference America at the time Paul
20  Edge sent those E-mails?
21     A.   I don't know when it was on
22  the web site.  Don't know a specific date.
23  Put it that way.

Page 128

1      Q.   Do you know of anyone who can
2  tell me a specific date as of when the
3  terms and conditions on the web site had
4  the language concerning the deactivation
5  fee of seventy-four dollars and
6  ninety-five cents inserted?
7      A.   Currently I do not.
8      Q.   Have you ever known the
9  answer to that question?
10     A.   I don't know.
11     Q.   Look at Exhibit M which you
12  were looking at a little while ago which
13  is Tom Noonan's letter of July 15, 2005.
14  Did you in any way interpret that letter
15  as an instruction to deactivate all of
16  Conexant's conferencing calls with
17  Conference America?
18     A.   I don't know what I thought
19  about that at that point in time.  I
20  focused upon the fifteen business days.
21     Q.   And here's what I'd like to
22  know.  I've identified for you the two
23  that could possibly have some bearing on

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1  this question. Which of these documents
2  that are attached to the complaint did you
3  consider to be the instruction from
4  Conexant to deactivate all the Conference
5  America accounts that you felt this
6  instruction is now governed by the terms
7  and conditions on the web site?
8       A.   I believe there was some
9  additional correspondence back and forth
10  during this time. At least there are some
11  things that I sent to them asking for
12  what — I think what it really was was a
13  statement that if we continued providing
14  services, we would expect to be paid for
15  them. I think that does exist in here.
16  And I believe that initially I thought
17  that there was some opportunity past the
18  July 31st date, but in the midst of all
19  the other correspondence back and forth,
20  whether by letter or by E-mail, at some
21  point during that time I was satisfied
22  that they did not want to continue doing
23  business and they wanted everything

Page 130

1  deactivated. But I don't know the exact
2  day that that came about.
3       Q.   What I'm asking you to do is
4  to identify for me the document that you
5  satisfied yourself this is an instruction
6  from Conexant to deactivate all our
7  accounts.
8       A.   Right now I don't know which
9  specific document that would be.
10       Q.   I'm asking for you to look
11  through there and tell me.
12       A.   All right. Okay.
13       Q.   I've indicated to you the
14  only two that I think it would be, but you
15  can look through anything you'd like to
16  answer the question.
17       A.   I don't know the exact date
18  or the document that caused that. I do
19  know it occurred before July 26th.
20       Q.   And you are referring to your
21  letter of July 26, 2005 which is Exhibit U
22  to the complaint, correct?
23       A.   Yes.

Page 131

1       Q.   And you agree that based on
2  what you've just reviewed that it could
3  have been Tom Noonan's July 15, 2005
4  letter which says that Conexant also
5  advises Conference America that it is
6  cancelling all accounts as of Sunday, July
7  31, 2005 and that all services for these
8  accounts are to be made inactive slash
9  unavailable on that date?
10       A.   No. I don't think so. I
11  don't think that was the conclusion I drew
12  at that time.
13       Q.   That language to you does not
14  say turn off all of our accounts?
15       A.   I still had a hope that we
16  would be able to do business subsequent to
17  July 31st.
18       Q.   Despite that hope, did that
19  language not say to you that Tom Noonan
20  was giving a very clear instruction to
21  turn off all the accounts?
22       A.   I did not take that as an
23  instruction to deactivate everything as of

Page 132

1  the 31st from his letter of July 15th.
2       Q.   How did you take that
3  language in the second paragraph of that
4  letter?
5       A.   Which exhibit is this?
6       Q.   M.
7       A.   M.
8       Q.   And I want to be precise with
9  the question. What did you think when you
10  read the language that Conexant also
11  advises Conference America that it is
12  cancelling all accounts as of Sunday, July
13  31, 2005, and all services for these
14  accounts are to be made inactive slash
15  unavailable on that date?
16       A.   I took that as an instruction
17  from Mr. Noonan in purchasing
18  organization.
19       Q.   To do what?
20       A.   That was his desire of what
21  happened.
22       Q.   Isn't that a very clear
23  instruction to turn off all the accounts?

33 (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1    A.   The nature of the business
2   that we have, we receive instructions
3   occasionally of this type from customers
4   and staff positions that the users do not
5   agree with.
6    Q.   Users being whom?
7    A.   The call leaders. And they
8   continue doing business with us even
9   though the staff person or the purchasing
10  or telecom is trying to get them to move
11  to another vendor.
12   Q.   Well, did you ignore that
13  language?
14   A.   No. I recognized it as what
15  Mr. Noonan wanted to occur.
16   Q.   Did you call him about it?
17   A.   No.
18   Q.   Did you call anybody at
19  Conexant about it?
20   A.   Well, I've already testified
21  I did not talk to anybody during July at
22  Conexant.
23   Q.   But before we move on, you

Page 134

1   did not take that as a very clear
2   instruction to turn off all of the
3   accounts as of July 31st, 2005, correct?
4    A.   I think that was a clear
5   desire on his part. That's what he wanted
6   us to do.
7    Q.   Did you do it?
8    A.   Ultimately we did it, yes.
9   Actually, I think it was August 1, but
10  yes.
11   Q.   And do you know whether the
12  terms and conditions on the web site
13  contained the language concerning the
14  deactivation fee on July 15, 2005 when
15  Mr. Noonan sent that letter overnight to
16  you?
17   A.   I think I've already
18  testified I do not know.
19   Q.   Look at Exhibit Q which is
20  Paul Edge's -- actually, just flip to the
21  one where he clarified the date which is
22  Exhibit S. Are you with me?
23   A.   Yes.

Page 135

1    Q.   He says in the first
2   paragraph of the original E-mail sent at
3   twelve eleven p.m. on July 20, 2005 to
4   your son and others, Conexant is
5   requesting that all Conexant conferencing
6   accounts be disconnected. When you later
7   reviewed this E-mail, how did you take
8   that language?
9    A.   I think at this time I took
10  it as they wanted them all deactivated.
11  But it was -- again, I don't know exactly
12  when I got it.
13   Q.   We know that it was before
14  July 26th, 2005 when you sent your letter?
15   A.   I believe that it was. Yes.
16   Q.   And you are agreeing that by
17  July 26, 2005, you had gleaned from
18  whatever E-mails that Conference America
19  was to turn off all the Conexant
20  conferencing accounts?
21   A.   Yes. That was my belief.
22   Q.   When you sent your letter on
23  July 26th, 2005, did you know whether or

Page 136

1   not anyone at Conexant had actually
2   reviewed the terms and conditions on
3   Conference America's web site?
4    A.   No. I don't know that.
5    Q.   You didn't know one way or
6   the other when you sent that letter?
7    A.   I just don't recall. I don't
8   know.
9    Q.   Did Conference America abide
10  by Conexant's instructions that no new
11  accounts be created after Tom Noonan's
12  letter of July 15, 2005?
13   A.   I hope we did, but I don't
14  know absolutely.
15   Q.   Who can answer that question
16  for me?
17   A.   I don't know.
18   Q.   I don't mean to be ugly about
19  this, but you're in charge of the company
20  and you can't tell me who can answer that
21  question?
22   A.   I don't know where you'd look
23  for the answer is the problem. That's why

34 (Pages 133 to 136)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 137

1  I don't know how you would get that
2  answer.
3      Q.   But you can't give me the
4  name of somebody who might be able to
5  answer it?
6      A.   Greg Folkes may be able to
7  answer it because he would be in charge of
8  the department which was providing these
9  services meaning interphasing with the
10  customer. But I believe the majority,
11  almost all the accounts that we set up
12  toward the end of the relationship were
13  sent in to our sales administration by
14  Mr. Edge. But I'm not sure of that. So
15  it might be Mr. Vogelsgang or it might be
16  Jason Shanks. I don't -- that's just
17  speculation. I don't know is a good
18  answer.
19      Q.   As long as it's true, that's
20  all I need to know. I just wanted to make
21  sure that --
22      A.   I just don't know where you'd
23  look for it.

Page 138

1      Q.   Before the deactivation fee
2  bill was sent, if I remember correctly, it
3  includes about a hundred and forty-six
4  thousand dollars' worth of deactivation
5  fee. Is that generally correct?
6      A.   I believe that's correct.
7      Q.   Before that bill was sent,
8  did you have any indication from anyone at
9  Conexant verbally or in writing that
10  Conexant knew about and understood and
11  agreed to the deactivation fee that was
12  going to be applied?
13      A.   I don't know what the people
14  at Concxant knew.
15      Q.   You never personally sought
16  to confirm one way or the other?
17      A.   Didn't talk to them. I've
18  testified to that.
19      Q.   Go to your letter of July 26,
20  2005, which is Exhibit U. The first
21  paragraph you say that some of your
22  correspondence takes conflicting
23  positions. Some of it threatens unlawful

Page 139

1  action and some of it is simply
2  incomprehensible. What did you mean
3  there?
4      A.   Well, there's a lot of
5  subjects that were being discussed in this
6  correspondence. Everything from the
7  fifteen day termination clause, whether it
8  was fifteen days or fifteen business days,
9  to them not paying their bills, putting on
10  hold bills, from them telling us that they
11  would pay the bills and then not paying
12  the bills. Mr. Edge and Mr. Noonan did
13  not seem to agree on a fair number of
14  issues.
15      Q.   Which ones are you talking
16  about? Which issues?
17      A.   Whether they agreed to
18  proceed under our standard terms and
19  conditions, what the effective date was,
20  the things I just talked about.
21      Q.   The effective date part,
22  there was some early disagreement on,
23  right?

Page 140

1      A.   Well, it was clear Mr. Noonan
2  was trying to do something differently.
3      Q.   I mean, he can answer about
4  that. But he initially thought it was ten
5  business days and you said, No, it's ten
6  days, period, right?
7      A.   No.
8      Q.   Where am I wrong on that?
9      A.   I said it was fifteen days.
10      Q.   I'm sorry. I'm sorry. Hang
11  on. I'm confused now. You said it's
12  fifteen days, period. He initially said
13  it was fifteen business days, right?
14      A.   I believe that's correct,
15  yes. Actually, I think he said fifteen
16  business days, and I subsequently said
17  it's fifteen calendar days. I believe
18  that's the way it actually played out.
19      Q.   What are you saying that Paul
20  Edge and Tom Noonan appeared to disagree
21  about between themselves?
22      A.   Well, if you look at their
23  correspondence, they're disagreeing about

35 (Pages 137 to 140)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1 what's supposed to happen when. They're
2 disagreeing about whether they're going to
3 get paid. Mr. Noonan is disagreeing with
4 what the effective date of the termination
5 is. I mean, it's -- there's a lot of
6 things that are shown in this
7 correspondence. They're disagreeing about
8 whether they're actually releasing
9 payments to us or not. They're telling us
10 they're going to pay things and then they
11 don't pay them. There's a lot of things
12 that went on during this month. And it's
13 shown in the correspondence. You can see
14 it.
15     Q.   And, I mean, I can read the
16 correspondence. What I want to know is
17 why you said it takes conflicting
18 positions, for starters.
19     A.   Well, I'll give you one
20 example that is clear in my mind.
21 Mr. Edge starts off and says he wants it
22 on the 22nd. Then he wants it on the
23 31st. Mr. Noonan says he wants everything

Page 142

1 turned off as of the 31st. That's a
2 specific conflict right there.
3     Q.   Okay. Any others you can
4 remember?
5     A.   Not right off.
6     Q.   What about the reference to
7 threatening unlawful action? What was
8 that in reference to?
9     A.   Not paying their bills.
10     Q.   The contract, though, did
11 have a provision where a bill could be
12 disputed, did it not?
13     A.   I believe it did.
14     Q.   You just didn't feel this was
15 a legitimate dispute, correct?
16         MR. BORTON: Object to the form.
17     A.   I believe that the monies
18 were due and a lot of them subsequently
19 paid.
20     Q.   A lot of them were
21 subsequently paid?
22     A.   As an example, the June
23 invoice that they were withholding.

Page 143

1     Q.   What did you mean when you
2 said some of it in reference to
3 correspondence is simply incomprehensible?
4     A.   To me, it's just
5 incomprehensible that people try to play
6 games. I felt like Mr. Noonan was trying
7 to play games.
8     Q.   Why did you feel that way?
9     A.   The contract says fifteen
10 days, not fifteen business days.
11     Q.   Is that the only issue to
12 which you applied the term
13 incomprehensible is the issue about
14 fifteen days?
15     A.   Telling us you're going to
16 pay bills and not paying bills, telling us
17 you're going to release things for payment
18 and not releasing them for payment, I find
19 that incomprehensible from a business
20 perspective.
21     Q.   Is there anything else that
22 you were referring to when you used the
23 term incomprehensible?

Page 144

1     A.   Not that I recall right now.
2     Q.   You've given this a lot of
3 thought, though, haven't you?
4     A.   I have thought about it.
5     Q.   Do you know whether the web
6 site terms and conditions contained the
7 seventy-four dollar and ninety-five cent
8 deactivation fee when you sent this letter
9 of July 26, 2005?
10     A.   I don't know.
11     Q.   What we do know is that one
12 attached to the complaint was printed out
13 the day before that. Are you aware of
14 that?
15         MR. BORTON: Excuse me, Joe.
16         The day before what?
17     A.   Which one are we talking
18 about? What's the tab?
19     Q.   The terms and conditions
20 version that is attached to the
21 complaint --
22         MR. BORTON: I believe it's A.
23         I could be wrong.

36 (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 145

1    Q.   -- Exhibit A, was printed out
2  the day before you sent that letter of
3  July 26, 2005. Are you aware of that
4  without even having to look in the
5  lawsuit?
6    A.   I think I printed it out.
7  Didn't I include that somewhere?
8  Somewhere another I sent a copy of our
9  terms and conditions to them, I believe.
10  But I don't know when I did it. I don't
11  recall the exact date, but I think
12  somewhere I sent them a copy. It may be
13  after the fact. I don't know.
14    Q.   In any event, you agree that
15  the one attached to the complaint was
16  printed up the day before you sent that
17  letter? Down there in the bottom
18  right-hand corner where it says 7/25/2005?
19    A.   Yeah. It looks like it was
20  printed on 7/25.
21    Q.   Do you know who printed that?
22    A.   Not right off. I may have,
23  but I'm not sure.

Page 146

1    Q.   And you don't know when the
2  web site had last been altered before that
3  date?
4    A.   No.
5    Q.   You say in the last sentence
6  in paragraph two of your letter --
7    A.   Which one are we on?
8    Q.   Your July 26, 2005 letter.
9    A.   Which exhibit?
10    Q.   Exhibit U.
11    A.   U. Okay.
12    Q.   You say I would encourage
13  you, again, to review this document. Why
14  did you use that language?
15    A.   I think at this point in time
16  that we were consulting with counsel. I
17  know we were consulting with counsel.
18  They may have added that to it.
19    Q.   Two paragraphs down you say,
20  In view of your instructions to deactivate
21  all Conexant conferencing accounts
22  effective August 1, 2005, I wanted to
23  confirm that this is a service we offer

Page 147

1  and we will comply with your instructions.
2  As we sit here today, you cannot
3  specifically identify for me what you were
4  referring to when you use the term your
5  instructions; is that correct?
6    A.   Well, I think there's a lot
7  of different pieces that made it up. You
8  asked me, I believe, when I believed they
9  wanted us to deactivate them, and I said I
10  knew it was before this letter.
11    Q.   We went through this a few
12  minutes ago, and I'm not trying to rehash
13  it. But I identified the two
14  communications that appeared to give that
15  instruction.
16    A.   Uh-huh. I understand. I
17  think -- I mean, this is immediately after
18  Mr. Edge's instructions, whatever that is
19  on the --
20    Q.   That was July 20.
21    A.   And then whenever I got it
22  which is subsequent to when he sent it. I
23  don't know exactly when I got it. So

Page 148

1  somewhere between the 20th and the 26th is
2  when I think that was, what was my
3  understanding.
4    Q.   Is there any specific reason
5  you did not address the deactivation fee
6  in this correspondence?
7    MR. BORTON: Object to the form.
8    A.   Nothing specifically comes to
9  mind.
10    MR. MILLER: Off the record.
11    (Off-the-record discussion)
12    (Lunch recess)
13    Q.   Other than Conexant, have any
14  of your customers disputed payment of
15  deactivation fees?
16    A.   Mindspeed has. It has
17  disputed that.
18    Q.   Is that resolved?
19    A.   Not currently.
20    Q.   Has litigation been filed
21  over that?
22    A.   No.
23    Q.   What is the basis of the

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1  dispute by Mindspeed regarding the
2  deactivation fees?
3      A.   I don't know. We haven't
4  really talked about it. They just said
5  they wouldn't pay them.
6      Q.   Are you going to drop it
7  there with them?
8      A.   We haven't determined that.
9      Q.   Have you ever waived
10 deactivation fees that have been disputed?
11     A.   I don't believe so.
12     Q.   Are the deactivation fees a
13 significant part of your company's income?
14     A.   It's a material amount of
15 money. In this instance it's about a
16 hundred and fifty thousand dollars. So it
17 is material, but it's not a -- that
18 doesn't end our business. It's -- we pay
19 attention to a hundred and fifty thousand
20 dollars.
21     Q.   In the overall scheme of
22 things, I know you get paid for the
23 services that are used. What I'm trying

Page 150

1  to get some feel for is at the end of the
2  year, will deactivation fees that have
3  been paid constitute any significant part
4  of the overall income of Conference
5  America?
6      A.   It will be a part of the
7  income. I don't know whether you'd
8  categorize it as significant or not. But
9  it's a part of the income of our business.
10     Q.   I mean, can you quantify it
11 for me at all? Ten percent, five percent,
12 thirty percent?
13     A.   I'm not really -- it mostly
14 depends upon what amounts we collect.
15     Q.   Have the terms and conditions
16 on the web site been altered any because
17 of this dispute with Conference America?
18     A.   With Conexant?
19     Q.   I'm sorry. Let me reask it.
20 I'm sorry. Have the terms and conditions
21 on the web site been altered in any matter
22 because of this dispute between Conference
23 America and Conexant?

Page 151

1      A.   We put in one change that did
2  relate to this litigation.
3      Q.   What change is that?
4      A.   Tried to -- we actually
5  changed the way the terms and conditions
6  work for new customers and for people who
7  would just review the event terms and
8  conditions -- excuse me -- services, terms
9  and conditions.
10     Q.   What is the change?
11     A.   The -- I believe in one of
12 the -- it had to do with the click the
13 button to accept.
14     Q.   What was changed about that?
15     A.   We made it clear -- or not
16 clear. We made it where if you're setting
17 up a new account, you had the button click
18 option. And if you were looking at the
19 overall terms and conditions, you did not
20 have the button click option.
21     Q.   I'm sorry. Say that again.
22 I just missed the answer. I'm sorry. I
23 can ask her to read it back if you want me

Page 152

1  to.
2      A.   If you're setting up a new
3  account or web site, I believe today as a
4  requirement that you have to click the I
5  accept for the services, terms and
6  conditions. If you look at the services
7  and -- services, terms and conditions, it
8  does not require the button click today.
9  It doesn't have that legend on it today.
10     Q.   If you're actually --
11     A.   I guess that's right.
12     Q.   If you're actually going to
13 create an account, you have to click the
14 acceptance button?
15     A.   If you're creating a new
16 account online.
17     Q.   If you're just going to look
18 at it, though, the button is not on there,
19 is it?
20     A.   It doesn't have the legend
21 about clicking the button.
22     Q.   Is there some way to indicate
23 now that you intend to go the next step

38 (Pages 149 to 152)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 153

1 and create an account which brings up that
2 legend?
3      A.   I believe it goes in the
4 other order.  I think if you want to set
5 up an account, it brings up the terms and
6 conditions with that preface or whatever
7 you want to call it, that lead on it.  And
8 it also gives you a button to push.
9      Q.   Was that not required before
10 this lawsuit was filed?
11      A.   What was not required?
12      Q.   Clicking the button in order
13 to create a conferencing account via the
14 internet?
15      A.   That was required prior to
16 this litigation.
17      Q.   And I may be misunderstanding
18 you.  I'm not following you as to what is
19 different now on the terms and conditions
20 on the web site that was put in because of
21 this lawsuit.
22      A.   If you looked at the web site
23 prior to this lawsuit and you looked at

Page 154

1 services, terms and conditions, there was
2 an introductory paragraph which had in
3 that -- and I don't remember the exact
4 words -- indicating your acceptance by
5 clicking I accept or something like that.
6 It was a request that someone do that.  It
7 worked properly if you had first gone to
8 the I'd like to set up a new account page
9 of our web site.  You were then provided
10 these services, terms and conditions and
11 that was the appropriate introductory
12 paragraph because on that there was a
13 button to click that says I accept as part
14 of submitting this application for a new
15 account.
16      Q.   Why was the change made
17 because of this lawsuit?
18      A.   Well, I was told that some
19 response you gentlemen had filed -- and I
20 don't know exactly which one it was -- had
21 some reference to the button clicking.
22 And I believe it -- it was prefaced in the
23 interrogatories.  I'm not sure exactly.

Page 155

1 You asked the question.  You probably know
2 better than I where it came from.  But it
3 had to do where we had any place for them
4 to click the button or I guess if they had
5 clicked the button and the answer was no.
6      Q.   And you're correct.  It's in
7 the interrogatories and the answers to
8 those interrogatories.
9      A.   Uh-huh.
10      Q.   Are you saying that exchange
11 of written discovery is what prompted the
12 change in the web site terms and
13 conditions?
14      A.   I think that was the
15 origination for our counsel recommending
16 that change.
17      Q.   Who hosts your web site?
18      A.   We do.
19      Q.   Has that always been the
20 case?
21      A.   Yes.
22      Q.   Look at Exhibit A, please,
23 which is the web site terms and conditions

Page 156

1 under paragraph 1B which is entitled user
2 policies.
3      A.   Where am I now?
4      Q.   Here.
5      A.   Oh, okay.
6      Q.   It says, You will use the
7 events in accordance with these terms and
8 conditions and our written instructions
9 and policies provided or accessible to you
10 from time to time on our web site.  Then
11 in parenthesis it says the user policies.
12      A.   Uh-huh.
13      Q.   My question is what written
14 instructions and policies are being
15 referred to in that sentence that I just
16 read to you?
17      A.   I don't know all of them, but
18 I believe it includes use of the web site
19 I believe is one of the policies that is
20 shown or one of the terms that's shown.
21 Privacy I believe is another.  But I'm not
22 sure of all of them.  I remember, I
23 believe, those two.

39 (Pages 153 to 156)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 157 | Page 159 |
|---|---|
| 1     Q.   Where are they? | 1    specifically put there for new accounts. |
| 2     A.   They're on the web site. | 2    Conexant was not a new account. |
| 3     Q.   That's a separate section you | 3     Q.   But you referred them to the |
| 4   can go to on the web site? | 4   web site? |
| 5     A.   I believe so. Yes. I know | 5     A.   For the overall terms and |
| 6   privacy is, and I think the web site use | 6   conditions under which we continued |
| 7   is also on there. I have that | 7   providing services. |
| 8   recollection. | 8     Q.   Was there any part of the |
| 9     Q.   Because I don't recall those | 9   terms and conditions on the web site that |
| 10   documents being provided. Do you have | 10   you told them they didn't need to refer |
| 11   access to those at your office now? | 11   to? |
| 12     A.   I'm sure we do or you have | 12     A.   No. |
| 13   them. You can get them online. | 13     Q.   Did you intend for them to |
| 14     Q.   What is required for someone | 14   review the entirety of the terms and |
| 15   to use your services via the internet and | 15   conditions on the web site at that time |
| 16   in compliance with these terms and | 16   and understand the entirety of it? |
| 17   conditions before this recent change that | 17     A.   Well, I hoped they would read |
| 18   was prompted by this lawsuit? | 18   it. |
| 19      MR. BORTON: Object to the form. | 19     Q.   The entire thing? |
| 20     A.   I'm sorry. I don't know what | 20     A.   Yeah. I hoped they read the |
| 21   you -- what you want. | 21   whole thing. |
| 22     Q.   Before this recent change in | 22     Q.   But the accounts that were |
| 23   the web site that was prompted by this | 23   already in existence when the contract was |

| Page 158 | Page 160 |
|---|---|
| 1   lawsuit -- are you with me -- | 1   terminated were not created pursuant to |
| 2     A.   Yes. | 2   the web site itself using the web site as |
| 3     Q.   -- what would have been | 3   the creation vehicle, correct? |
| 4   required and what was required for | 4     A.   There's only one account in |
| 5   somebody to go to the web site and be | 5   terms of the web site creation. That's an |
| 6   allowed to have an account created and to | 6   overall account for the entity. The |
| 7   use your services? | 7   accounts -- the account for Conexant |
| 8     A.   As I remember, you have to | 8   predated that. It came from Rockwell. |
| 9   fill out an account application form. And | 9   And the agreement under which we were |
| 10   then I believe you have to click this I | 10   working was terminated by my letter in |
| 11   accept these terms and conditions to | 11   June. I don't remember the date, but it |
| 12   submit that application form. | 12   was in June. |
| 13     Q.   As has been answered in the | 13     Q.   That's what I'm seeking some |
| 14   interrogatory answers, you don't have any | 14   clarification on. The account with |
| 15   evidence to suggest or indicate that | 15   Conexant was not created by somebody going |
| 16   anyone at Conexant clicked on the I agree | 16   to that web site and clicking I agree and |
| 17   button, correct? | 17   proceeding, correct? |
| 18     A.   Yeah. We've already said we | 18     A.   That's accurate, yes. |
| 19   don't have any indication of that. | 19     Q.   But your reference to |
| 20     Q.   How could someone have been | 20   Conexant that we discussed earlier was a |
| 21   allowed to use the web site and have an | 21   reference to the terms and conditions on |
| 22   account created if they didn't do that? | 22   the web site? |
| 23     A.   Well, the button is | 23     A.   In my letters, yes. |

40 (Pages 157 to 160)

# FREEDOM COURT REPORTING

Page 161

1    Q.    But none of the accounts for
2   which the deactivations are being imposed
3   upon were created through that web site,
4   correct?
5    A.    Those are not accounts that
6   would be created through the web site.
7   There's only one account that would be
8   created through the web site, and that is
9   an overall account for the entire entity.
10    Q.    But that account was not
11   created through the web site, correct?
12    A.    That's correct.  It pre-dates
13   the web site.
14    Q.    And all one thousand seven
15   hundred and seventy-eight of the accounts
16   or whatever you want to call them that
17   you're seeking to apply the deactivation
18   fee to likewise were not created through
19   the web site, correct?
20    A.    It's a misnomer to call those
21   accounts.  Those are leader profiles.  I
22   think we talked about that earlier.
23    Q.    Well, the terms and

Page 162

1   conditions on the web site calls them
2   leader accounts, correct?
3    A.    I don't know.  We can read
4   it.  But I believe you if you say it's in
5   here, but I don't know.
6    Q.    Do you know as we sit here
7   right now whether it says leader profiles
8   or leader accounts?
9    A.    Not without reading it.
10    Q.    Would it be more accurate if
11   it said leader profiles?
12    A.    I think it would be clearer.
13    Q.    I agree with you.  And do you
14   think it would have been clearer to
15   Conexant if it had been communicated to
16   them that Conference America considered
17   one thousand seven hundred seventy-eight
18   leader profiles to qualify as subjects for
19   the deactivation fee?
20    MR. BORTON:  Object to the form.
21    Calls for speculation.
22    A.    May I hear it again?
23    Q.    Do you think it would have

Page 163

1   been clearer if it had been communicated
2   to Conexant that there was a single
3   account that was a leader account but
4   there were one thousand seven hundred and
5   seventy-eight leader profiles?
6    MR. BORTON:  Same objection.
7    A.    I disagree with the way
8   you've described it.
9    Q.    How so?
10    A.    It's not one leader account.
11   It's one company account.  And then there
12   are individual leader profiles for each of
13   the leaders and each of the services they
14   used.
15    Q.    But the language on the terms
16   and conditions of the web site is just not
17   that precise, is it?
18    A.    Do you want me to read it?  I
19   don't know where you're referencing.  If
20   you'll tell me where you're referencing,
21   I'll be glad to look at it with you.
22    Q.    I'm referencing your web site
23   where it addresses leader accounts.

Page 164

1    A.    Where?  Can you tell me where
2   that is?
3    Q.    Do you know where that is as
4   we sit here right now without me telling
5   you?
6    A.    I can read it and find it if
7   you want me to.
8    Q.    Do you know where it is
9   without me telling you where it is?
10    A.    Certainly not.
11    Q.    Any reason you don't know
12   that?  I mean, it's your web site.
13    MR. BORTON:  Object to the form.
14    A.    I don't know where a lot of
15   the detail is in our business, but I can
16   find it, much of it.
17    Q.    It's on the second page,
18   paragraph five midway down subparagraph A
19   under payment where it says activate slash
20   deactivate maintenance fee seventy-four
21   dollars and ninety-five cents per leader
22   account.
23    A.    Okay.  I see it.

41 (Pages 161 to 164)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 165

1   Q.   Would it be more precise if
2  it said leader profile?
3       MR. BORTON: Object to the form.
4       A.   I don't know that it would be
5  more precise. I think it would be -- in
6  retrospect, I might prefer that, but I
7  think it's clear that it's one per leader
8  or one per service per leader. I don't
9  think that's unclear.
10      Q.   And your position is that it
11  should have been clear to Conference
12  America that the seventy-four dollar and
13  ninety-five cents deactivate fee was going
14  to be applicable to any type of account or
15  profile that Conexant had with Conference
16  America at the time the instruction was
17  given to turn off the account?
18      MR. BORTON: Object to the form.
19      A.   It was clear to Conference
20  America.
21      Q.   How do you know that?
22      A.   Because I gave them the
23  instructions that we were going to

Page 166

1  deactivate each of the different leaders,
2  each of the profiles that they had. You
3  asked me if it were clear to Conference
4  America, to help you.
5       Q.   Where did you tell them it
6  was going to be applied to each profile
7  they had?
8       A.   Conference America. Excuse
9  me. That's what you asked me.
10      Q.   I'm sorry.
11      A.   Excuse me. I'm not trying
12  to --
13      Q.   I know. I appreciate it.
14  Where was your instruction to Conexant
15  that this deactivate fee was going to
16  apply to leader profiles?
17      A.   I believe that I sent a
18  letter to Conexant that says we're going
19  to provide the service. It's dated -- you
20  asked me about it earlier, but I don't
21  remember which one of these tabs it is.
22      Q.   Exhibit U.
23      A.   I think the last or the next

Page 167

1  to the last paragraph that begins in view
2  of your instructions on page one.
3       Q.   Is it your position that the
4  language on the web site that says
5  activate slash deactivate maintenance fee
6  seventy-four dollars and ninety-five cents
7  per leader account should have made it
8  clear to Conexant that the fee was going
9  to be applied to any account of any type
10  that Conexant had with Conference America
11  at the time the agreement ended and
12  Conexant wanted all the accounts turned
13  off?
14      MR. BORTON: Object to the form.
15      A.   I believe it's clear,
16  especially with my letter of July 26.
17      Q.   In reference to the
18  deactivation fee -- and it did
19  subsequently turn up on one of the
20  disputed invoices to Conexant, right?
21      A.   Yes. It is disputed. Yes.
22  It was on one of the invoices to Conexant.
23  It was disputed. Yes.

Page 168

1       Q.   Eventually this sort of came
2  to a head because it came out on a bill
3  that got sent to Conexant, right?
4       A.   That is correct.
5       Q.   That number which consisted
6  of the deactivation fee being applied to a
7  certain number of accounts, prior to the
8  time that that bill was sent, that was not
9  something that there had been a mutual
10  discourse about between Conexant and
11  Conference America, true?
12      A.   No.
13      Q.   How is that not true?
14      A.   They told us to turn them off
15  and we turned them off. And we told them
16  look at the web site, and I don't know
17  whether they did or did not.
18      Q.   Don't know whether they did
19  or did not what?
20      A.   Look at the web site. They
21  deny it in some of their correspondence,
22  but I don't know.
23      Q.   And you answered the

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 169

1  question, but I want to make sure I'm
2  understanding it right. What you would
3  say is their instruction to turn off the
4  accounts and your reference to the terms
5  and conditions on the web site qualifies
6  as actual mutual back and forth about the
7  deactivation fee?
8      MR. BORTON: Object to the form
9      of the question.
10     A.  I believe we told them the
11  basis under which we'd continue providing
12  services, referenced them repeatedly to
13  the services, terms and conditions. And
14  they told us to go to -- to turn
15  everything off, and we did. We did what
16  they asked, and we did it under the terms
17  and conditions that we had explained in
18  advance. So yes, that is what I believe
19  occurred.
20     Q.  What you're saying is that
21  serves as actual communication between
22  Conference America and Conexant about the
23  deactivation fee?

Page 170

1      MR. BORTON: Object to the form.
2      A.  I believe it does.
3      Q.  Because of the referral to
4  the web site?
5      A.  Well, my letter also says
6  we'll do the deactivation. It's a service
7  we provide or something like that in that
8  exhibit. What was it again?
9      Q.  U?
10     A.  If I remember it. It
11  confirms it's a service we offered, and
12  we'll do it.
13     Q.  I just want to make sure
14  before I leave this subject area. Your
15  reference to the web site, the language in
16  your letter of July 26, 2005 and the
17  instructions that were given by Conexant
18  to stop or cancel or whatever term you
19  want to use all the accounts, in your mind
20  that qualifies as meaningful communication
21  about the deactivation fee?
22     MR. BORTON: Object to the form.
23     A.  We relied upon their

Page 171

1  instructions and our reference to them
2  that this is the place to look for the
3  basis under which we were going to provide
4  additional services. I don't know whether
5  that's -- meaningful is a soft word, but I
6  think we did the right things. We told
7  them where to look, and they told us to do
8  it and we did it.
9      Q.  Go to Exhibit V which is Tom
10  Noonan's letter of July 28, 2005 back to
11  you in response from Exhibit U, your
12  letter of July 26, 2005. Take a minute to
13  read that.
14     A.  (Witness complies.) I've
15  read it.
16     Q.  Have you had a chance to read
17  that?
18     A.  Yes.
19     Q.  Do you remember receiving
20  that?
21     A.  Yes, I do.
22     Q.  What was your reaction after
23  you received that letter?

Page 172

1      A.  I think my initial reaction
2  was it's a pretty heavy handed attempt to
3  not pay their bills.
4      Q.  Did you have any other
5  reaction when you first received that
6  letter?
7      A.  I felt like it was already
8  after the fact when we were sending it.
9      Q.  What do you mean by that?
10     A.  We did not -- I mean, this is
11  done after everything is finished.
12     Q.  What do you mean finished?
13     A.  We were already turning off
14  the accounts as of July 31st, and this
15  thing was sent on the 28th.
16     Q.  When did you receive it?
17     A.  August 1.
18     Q.  How do you know that?
19     A.  Because it was written on the
20  copy I looked at. You can see my RP at
21  the top. The date was cut off.
22     Q.  Are you saying that the
23  original will say that you received this

43 (Pages 169 to 172)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**