# EXHIBIT "6"

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CONFERENCE AMERICA, INC.,    )
                             )
          Plaintiff,         )
                             )
     vs.                     )    No. 2:05CV1088-F
                             )
CONEXANT SYSTEMS, INC.,      )
                             )
          Defendants.        )
_____ )

DEPOSITION OF PAUL EDGE
Newport Beach, California
Thursday, May 18, 2006

Reported by:
CARI A. FOLSOM
CSR No. 9822
JOB No. 634341B

---

**Page 3**

1  APPEARANCES:
2
3  For Plaintiff:
4     TROUTMAN SANDERS LLP
      BY:  THOMAS E. BORTON, IV
5     Attorney at Law
      600 Peachtree Street, N.E., Suite 5200
6     Atlanta, Georgia 30308-2216
      (404) 885-3275
7
8  For Defendant:
9     STARNES & ATCHISON LLP
      BY:  JOSEPH S. MILLER
      Attorney at Law
10    Seventh Floor, 100 Brookwood Place
      P.O. Box 598512
11    Birmingham, Alabama 35259-8512
      (205) 868-6000
12
13  Also Present:
14    KAREN HERMANN
15
16
17
18
19
20
21
22
23
24
25

---

**Page 2**

1      IN THE UNITED STATES DISTRICT COURT FOR THE
              MIDDLE DISTRICT OF ALABAMA
2                 NORTHERN DIVISION
3
4  CONFERENCE AMERICA, INC.,    )
                                )
5           Plaintiff,          )
                                )
6      vs.                      )    No. 2:05CV1088-F
                                )
7  CONEXANT SYSTEMS, INC.,      )
                                )
8           Defendants.         )
   _____ )
9
10
11
12
13
14
15       Deposition of PAUL EDGE, taken on behalf
16  of Plaintiff, at 4000 MacArthur Boulevard,
17  10th Floor, Newport Beach, California,
18  beginning at 1:40 p.m. and ending at 4:07 p.m.
19  on Thursday, May 18, 2006, before CARI A. FOLSOM,
20  Certified Shorthand Reporter No. 9822.
21
22
23
24
25

---

**Page 4**

1  INDEX
2  WITNESS                           EXAMINATION
3  PAUL EDGE
4       BY MR. BORTON                     6
5       BY MR. MILLER                     82
6
7
                    EXHIBITS
8
   PLAINTIFF                         PAGE
9
   6  Various e-mails produced by defense counsel;    6
10     6 pages
11
              EXHIBITS FOR REFERENCE
12
   PLAINTIFF                         PAGE
13
   *1  Verified complaint and exhibit binder      19
14
   2  E-mail from Paul Edge to Chip Polich,        26
15     dated 6/29/05; Bates No. S&A 284
16  3  E-mail from Paul Edge to Lewis Brewster,     29
       dated 6/29/05; Bates No. S&A 335
17
   4  E-mail from Paul Edge to Chris Gorciak,      34
18     dated 6/29/05; Bates No. S&A 336
19  5  E-mail from Paul Edge to Admin              35
       Professionals, dated 7/12/05; Bates No.
20     S&A 338
21
22
23
24
25  *  Retained by counsel for Plaintiff

---

Esquire Deposition Services
800-888-6949



EXHIBIT
"6"

| | |
|---|---|
| 1  Newport Beach, California, Thursday, May 18, 2006 | 1  BY MR. BORTON: |
| 2  1:40 p.m. - 4:07 p.m. | 2  Q  And I wanted to let you know or see if you |
| 3 | 3  understand that if you do make any changes to that |
| 4  PAUL EDGE, | 4  transcript, I will have an opportunity to comment on |
| 5  having been first duly sworn, was examined and testified | 5  those changes at trial.  Do you understand that? |
| 6  as follows: | 6  A  Yes. |
| 7 | 7  Q  Okay.  Have you had your deposition taken |
| 8  MR. MILLER:  Same stipulations as Tom Noonan's | 8  before today? |
| 9  deposition.  We would like to read and sign.  And send | 9  A  No. |
| 10  it to me and I will send it to the witness. | 10  Q  This is your first deposition ever, then? |
| 11  And Tom Borton, I am going to produce some | 11  A  Yes. |
| 12  documents to you in response to the request for | 12  Q  Okay.  I don't want to know anything you said |
| 13  production which accompanied the deposition notice.  But | 13  to your lawyer, but did you meet with your lawyer before |
| 14  first, I wanted to give you, and, frankly, I meant to | 14  coming to this deposition? |
| 15  give these to you earlier, our Bates number 339 through | 15  A  Yes. |
| 16  342.  These are copies of e-mails you already have. | 16  Q  Do you understand, generally, what the |
| 17  They are just a clean copy rather than the ones I | 17  procedures for deposition are, then? |
| 18  produced to you where Paul Edge flipped them to me on | 18  A  As much as I've been briefed. |
| 19  e-mail that I think I wrote to you about either an | 19  Q  Okay.  I'll just go over them real quick, then. |
| 20  e-mail or letter, and so you already have those e-mails, | 20  You understand that you've just taken an oath to tell |
| 21  but I wanted to give you the completely clean, printed | 21  the truth, right? |
| 22  off that does not include the here-it-is language from | 22  A  Yes. |
| 23  Paul Edge to me. | 23  Q  And you understand that even though we're in an |
| 24  After we got the deposition notice, I impressed | 24  informal setting, you are bound to tell the truth just |
| 25  upon Tom and Paul the need to make sure they had | 25  as if you were testifying in court, right? |
| Page 5 | Page 7 |

| | |
|---|---|
| 1  searched and gotten everything and Paul was able to find | 1  A  Yes. |
| 2  three additional e-mails that we are producing now in | 2  Q  I'm going to ask you a series of questions and |
| 3  response to the request for production that accompanied | 3  this lady is going to type down my questions and your |
| 4  his deposition notice; one from Tuesday, February 15, | 4  answers, so what we need to do is be real careful.  We |
| 5  2005; one from Friday, March 11, 2005; and one other one | 5  can't converse the way we normally would where we shake |
| 6  from Friday, March 11, 2005. | 6  our head or go "uh-huh" or "huh-uh" or use any kind of |
| 7  Why don't you keep the copy that I handed you | 7  body language because she can't type that down.  So if |
| 8  and I will mark a copy of them as Exhibit Number 1, just | 8  you'll just verbalize your answers for me, you know, |
| 9  so we have a record of them formally being produced to | 9  speak them out in language. |
| 10  you and it consists of six total pages. | 10  A  Okay. |
| 11  (Discussion off the record.) | 11  Q  If you don't understand any question that I |
| 12  (Plaintiff Exhibit 6 was marked for | 12  ask, will you tell me? |
| 13  identification by the court reporter.) | 13  A  Yes. |
| 14 | 14  Q  Okay.  If you don't hear any part of any |
| 15  EXAMINATION | 15  question that I ask, will you tell me that? |
| 16  BY MR. BORTON: | 16  A  Yes. |
| 17  Q  Could you state your full name. | 17  Q  If you realize during this deposition that an |
| 18  A  Alvin Paul Edge, Jr. | 18  earlier answer that you gave was incorrect or incomplete |
| 19  Q  And earlier your attorney talked about reading | 19  or inaccurate, will you let me know? |
| 20  and signing of the deposition transcript.  Did you | 20  A  Yes. |
| 21  follow any of that? | 21  Q  And I've got to ask this, not implying |
| 22  A  I'm not sure I understand what you're asking. | 22  anything, but have you taken any substances, |
| 23  MR. MILLER:  I explained to him that Cari would | 23  prescription or nonprescription, that might possibly |
| 24  type it up and that he would have an opportunity to | 24  prevent your ability to tell the full, complete truth |
| 25  review it and correct any typographical errors. | 25  today? |
| Page 6 | Page 8 |

2 (Pages 5 to 8)

Page 9

1    A  No.
2    Q  Is there anything that would prevent you from
3  telling the absolute complete truth today?
4    A  No.
5    Q  I plan on taking regular breaks.  If you want a
6  break, please just let me know, okay?
7    A  Okay.
8    Q  You understand that Conference America has
9  named Conexant as a defendant in this lawsuit, right?
10   A  Yes.
11   Q  I'm going to use some terms in this deposition
12  and I want to hammer out what they mean in advance.  I'm
13  going to refer to Conexant Systems, Inc. as Conexant,
14  okay?
15   A  Okay.
16   Q  You know who I'm talking about when I say
17  Conexant?
18   A  Yes.
19   Q  And the same thing with Conference America,
20  it's Conference America, Inc., but I'm going to call it
21  Conference America, and you'll understand that I'm
22  talking about Conference America, Inc., right?
23   A  Right.
24   Q  There's some contracts at issue in this case or
25  involved in this case.  One of them is a June 10th, 2002

Page 10

1  data conferencing services contract.  I'm going to refer
2  to that as the data contract.  Do you understand?
3    A  You're going to refer to that as the data
4  contract or the WebEx contract?
5    Q  I'll call it the data or WebEx contract.  I'll
6  use those interchangeably.  But I'm talking about the
7  June 10th, 2002 data conferencing services contract.
8    A  So the data contract is the WebEx contract,
9  correct?
10   Q  Yes.
11   A  Okay.
12   Q  Do you understand that?
13   A  Yes, I do.
14   Q  There's another contract, a September 1, 1999
15  audio conferencing contract and all amendments thereto
16  I'm going to refer to that as the audio conferencing
17  contract, okay?
18   A  Okay.
19   Q  And you're familiar with that September 1, 1999
20  contract?
21   A  Yes.
22   Q  Okay.  Have you reviewed anything to prepare
23  for this deposition?
24   A  Yes.
25   Q  Okay.  What have you reviewed?

Page 11

1    A  I reviewed Conference America's complaint, and
2  I reviewed the data that was presented by Conexant, and
3  I have reviewed Mr. Pirnie's deposition.
4    Q  Okay.
5    MR. MILLER:  And the exhibits to the complaint,
6  too.
7    THE WITNESS:  Right, and the exhibits, if
8  that's what they're called.
9  BY MR. BORTON:
10   Q  Do you have any nicknames or aliases besides
11  your name that you gave me?
12   A  I go by Paul.
13   Q  Okay.  Can you tell me what your address is.
14   A  15628 Obsidian, O-b-s-i-d-i-a-n, Court, Chino
15  Hills, California 91709.
16   Q  What county is Chino Hills in?
17   A  San Bernardino County.
18   Q  That's the county you live in?
19   A  Yes.
20   Q  Okay.  Can you tell me what your date of birth
21  is.
22   A  February 28, 1970.
23   Q  Do you have any relatives, friends or
24  acquaintances in Alabama?
25   A  No, I do not.

Page 12

1    Q  Are you married?
2    A  Yes.
3    Q  Can you tell me your wife's name.
4    A  Sylvia.
5    Q  Sylvia Edge?
6    A  Sylvia Edge.
7    Q  Have you ever been divorced?
8    A  No.
9    Q  Do you have any children?
10   A  Yes.
11   Q  Can you tell me their names?
12   A  Madison, Devan, Juliana.
13   Q  And all the last names are Edge?
14   A  Yes.
15   Q  Have you ever filed for bankruptcy?
16   A  No.
17   Q  Have you ever been charged with any kind of
18  crime?
19   A  No.
20   Q  So you've never been convicted of a crime
21  either?
22   A  Convicted of a crime?
23   Q  Yes.
24   A  Convicted?
25   Q  Yes.

3 (Pages 9 to 12)

1   A  No.
2   Q  And never charged, correct?
3   A  No.
4   Q  Okay.  Have you ever been involved in any prior
5   lawsuits?
6   A  No.
7   Q  Have you ever had to testify in court?
8   A  Not that I remember.
9   Q  Who is your supervisor?
10  A  Jeff Reid.
11  Q  Jeff Reid.  Okay.  Have you discussed this
12  lawsuit with him?
13  A  I did not discuss the lawsuit.  I did brief
14  Jeff Reid, as my management, that there was a lawsuit
15  pending between Conexant and Conference America.
16  Q  Okay.  Did you tell him anything in addition to
17  that?
18  A  I'm not sure I follow you.
19  Q  Besides telling Jeff Reid that there was a
20  lawsuit between Conexant and Conference America, did you
21  tell him anything else?
22  A  I explained to him what the situations were and
23  what the -- you know, where the issues were in terms of
24  the overall dispute.
25  Q  Okay.  What issues are those that you're

Page 13

1   Q  Okay.  How long were you in the army?
2   A  I was in the army -- active army for four years
3   and in the national guard for approximately two years.
4   Q  Did you get an honorable discharge?
5   A  Honorable discharge, yes.
6   Q  From the army and national guard?
7   A  National guard was a general discharge and army
8   was honorable.
9   Q  How many different kinds of discharges are
10  there?
11  A  There's bad, and then there's honorable and
12  then there's general.
13  Q  What's the difference between general and
14  honorable discharge?
15  A  Honorable discharge is that you fulfill your
16  obligation and your four-year requirement.  And in the
17  regular army, you can only do honorable or dishonorable,
18  because you have to fulfill that commitment.  Whereas in
19  the national guard you can fulfill the commitment or
20  decide to voluntarily not fulfill it, so you don't --
21  you don't pursue the complete term.
22  Q  Okay.  And that's why you got a general
23  discharge, because you didn't pursue the complete term?
24  A  I decided to leave the national guard after two
25  years, that's correct.

Page 15

1   referring to?
2   A  The fact that Conference America has charged us
3   a certain amount that we have not agreed to pay.
4   Q  Okay.  Has anybody at Conexant ever indicated
5   to you that your career will suffer or may be in
6   jeopardy if this lawsuit goes badly for Conexant or
7   Conexant has to pay money as a result of this lawsuit?
8   A  Absolutely not.
9   Q  You haven't been reprimanded in any way in
10  connection with this lawsuit over Conference America,
11  have you?
12  A  Absolutely not.
13  Q  Let's talk about your education first.  Can you
14  take me -- tell me about your education from high school
15  on forward to the present.
16  A  I graduated high school.
17  Q  Which high school?
18  A  Newton County High School --
19  Q  Okay.
20  A  -- in 1989.  I then attended Central Texas
21  College and served four years in the United States Army
22  and then continuing to pursue my degree at University of
23  California Irvine.
24  Q  What are you studying?
25  A  It's an extension degree in telecommunications.

Page 14

1   Q  So you didn't get a general discharge as a
2   result of any disciplinary problems or any failures in
3   job performance or anything?
4   A  Absolutely not.
5   Q  Okay.  Now, after you got done with the army,
6   active duty in the army, where did you work?
7   A  At the time my wife was still in the army, so I
8   took a part-time job working for a landscaper in the
9   local Texas area and became a full-time student at the
10  Central Texas College.  And my wife then got out of the
11  army and we moved to California.
12  Q  When was that?
13  A  When did I move to California or when did we
14  get out of the army?
15  Q  Both.
16  A  Okay.  I got out of the army in February of
17  1997, and my wife got out, I believe, sometime around
18  June or July of '97.  And that's an approximate.  I
19  don't know the exact date.  And we both moved to
20  California right after that.  So sometime between, I
21  would say, May of '97 and July of '97 we moved to
22  California.
23  Q  Okay.  Following your landscaping job, just
24  take me through your employment history up to Conexant.
25  A  Up to from what part?

Page 16

4 (Pages 13 to 16)

1    Q   Okay.  You were landscaping in Texas, correct?
2    A   I took a part-time job to landscape in Texas
3    while I was -- while I was, in theory, a full-time
4    student at Central Texas College.
5    Q   Okay.  After that -- from that time, take me
6    through the jobs you've had up until the time you took a
7    job in --
8    A   Okay.  So we relocated in California, and I
9    went to work for a company called Cable, Incorporated,
10   which was a subcontractor to Siemens, S-i-e-m-e-n-s.
11   And there I was working in the telecommunications
12   industry for cable plant infrastructure.  I worked there
13   for approximately -- I don't remember the full extent,
14   but it was approximately anywhere between nine months to
15   a year.
16       During that time, I was put on a project to
17   install a new telephany system in Rockwell
18   International's headquarters.  And based on the work
19   that I had done for Rockwell, they wanted to hire me as
20   a full-time employee.  And I've -- and that was February
21   of 1998.  And then I went to work for Rockwell
22   International and worked there for approximately almost
23   two years.
24       And then Rockwell International decided to take
25   its company and break it off into many different

Page 17

1    telecommunications -- the global telecommunications and
2    networking manager about a year ago.
3    Q   Have you ever been reprimanded by anyone since
4    you've been here?
5    A   Absolutely not.
6    Q   Have you had your pay decreased or docked or
7    anything like that?
8    A   No, I have not.
9    Q   We'll go through some documents here.
10   Exhibit 1 to your deposition is the verified complaint
11   with all the attached exhibits.
12       Let's go off the record a minute.
13       (Discussion off the record.)
14       (Plaintiff Exhibit 1 previously marked
15       for identification by the court
16       reporter.)
17       MR. MILLER:  By agreement, I have relabeled
18   what I previously described as Exhibit 1 to Exhibit 6,
19   which is the three e-mails consisting of six pages that
20   I produced today in response to the request for
21   production that accompanied the deposition notice.
22       MR. BORTON:  That works.
23   Q   Since you've been at Conexant, have you spent a
24   great deal of time examining and working with contracts,
25   Mr. Edge?

Page 19

1    elements, and it has spun off, Rockwell Semiconductors,
2    which is now known as Conexant.  I then transferred from
3    Rockwell International over to Conexant in 1999,
4    December of 1999.  And I have been here ever since.
5    Q   Since high school, have you ever been fired
6    from any job that you've had?
7    A   No, I have not.
8    Q   Take me through your Conexant employment from
9    when Rockwell spun off and became the semiconductor
10   company.  What did you call it again?
11   A   Conexant, which is where you are today.
12   Q   Take me through just the various positions
13   you've held at Conexant up through the present.
14   A   At Conexant?
15   Q   Yes.
16   A   Okay.  At Conexant I was hired as a
17   telecommunications analyst who was basically in charge
18   of maintaining the telecommunications infrastructure and
19   systems in place for Newport Beach and all of its remote
20   locations.  I worked in that position for a couple of
21   years.  Then I was promoted to a program manager
22   position, where I was working in the mergers,
23   acquisitions and divestiture side for I.T. at the time.
24   And worked as a program manager's position for a couple
25   of years.  And then was promoted to the

Page 18

1    A   Contracts?
2    Q   Yes.
3    A   No.
4    Q   Okay.  What are your -- just kind of give me
5    basically, as best you can, a summary of what your
6    day-to-day activities have been like since you've been
7    here.  I know it changes with job position over time,
8    but generally, what do you do in a day?
9    A   Today or over a period of six years?
10   Q   Let's say since you achieved your most recent
11   position, what do you do typically?
12   A   Okay.  So I manage the telecommunications and
13   networking for Conexant.  My job, I have five
14   individuals that work for me, and we are basically in
15   charge of all connectivity on the data networking side
16   via the wide area network or local area network
17   connectivity worldwide, cells and design offices
18   worldwide.
19       Also in charge of all telecommunications-type
20   infrastructure, the daily maintenance, operations,
21   making sure everything is running for telephone systems,
22   videoconference systems, collaboration tools like WebEx,
23   conferencing services, mobile phones, PDAs, any -- just
24   about anything that an individual or an employee would
25   use to communicate with flows through my department,

Page 20

5 (Pages 17 to 20)

1  whether that's on the data network or on the
2  telecommunications network.
3       I also am responsible for the day-to-day
4  approvals and review of paying all the company's
5  telecommunications bills.
6     Q  Okay.  And based on what you've just told me,
7  those responsibilities are how you came to be involved
8  with Conference America and the paying of Conference
9  America bills, correct?
10    A  That's correct.
11    Q  Okay.
12    A  That's correct.
13    Q  We're going to pull out previously marked
14 Exhibit 1, and I want to turn to Tab E.  And Tab E is a
15 price protection program for data conferencing services
16 only dated June 10th, 2002.  Do you see that, Mr. Edge?
17    A  I see that.
18    Q  Okay.  This is what I'm going to refer to as
19 the data contract.  Have you ever seen this contract
20 before?
21    A  Yes, I have.
22    Q  Have you ever reviewed this contract or read it
23 before?
24    A  Yes, I have.
25    Q  Okay.  I'd like you to flip through here and

1  just tell me if that appears to be a true and correct
2  copy of the data contract.
3       MR. MILLER:  Tom, I can tell you, if you want
4  to save some time on this, you don't need to ask us
5  questions, we agree that all this is a true and correct
6  copy.
7       MR. BORTON:  You do?
8       MR. MILLER:  Yes.  I'm not going to dispute
9  about what is what I don't think.
10      MR. BORTON:  Okay.
11      THE WITNESS:  I agree.
12      MR. BORTON:  All right.  Then we can move
13 along.
14    Q  Exhibit B -- Tab B in previously marked
15 Exhibit 1, are you familiar with this document?  This is
16 what I'm going to refer to as the audio conferencing
17 contract.
18    A  Yes, I am familiar with this document.
19    Q  Okay.  Let's turn to Exhibit -- or, excuse me,
20 Tab C previously marked in Exhibit 1.  This is an
21 amendment to the audio conferencing contract.  Have you
22 ever seen this before?
23    A  Yes, I have.
24    Q  I want you to turn to Tab D.  This is an
25 amendment to the audio conferencing contract effective

1  as of December 1, 2003.  Are you familiar with this
2  contract?
3     A  This one is prior to December 1, 2003?
4     Q  Or it's effective as of December 1, 2003.
5     A  Yes, I am familiar with that.
6     Q  Okay.  Have you read this document?
7     A  In its entirety, no.  But yes, I have read some
8  of the document.
9     Q  Read some of it, okay.  I wanted to direct your
10 attention to paragraph 4 on the first page of Exhibit D.
11 You see where it says, in the last sentence, paragraph
12 4, "Either party with or without cause may terminate
13 this agreement at any time upon 15 days' notice to the
14 other party pursuant to Section 10 of this amendment"?
15    A  I see that.
16    Q  Okay.  Do you see anywhere in that paragraph
17 where it makes a reference to 15 business days' notice?
18    A  I see that.
19    Q  Where it says 15 business days?
20    A  No, I do not see 15 business days.
21    Q  Okay.  I'm going to show you previously marked
22 Exhibits 2, 3, 4 and 5.  We're going to talk about them
23 in turn.
24    A  Top to the bottom?
25    Q  Yes.  Let's talk about the first one.  It's

1  Bates-stamped S&A 284.  This looks to be an e-mail from
2  you to Chip Polich.  Do you remember sending this
3  e-mail?
4     A  Yes, I do.
5     Q  Okay.  What prompted you to send this e-mail on
6  June 29th?
7     A  The termination of Conference America's
8  contract.
9     Q  How did you come to know that Conference
10 America's contract had been terminated?  And we're
11 talking about the audio conferencing contract, correct?
12    A  That is correct.
13    Q  How did you know the audio contract had come to
14 be terminated?
15    A  I was on vacation, and I received an e-mail
16 that Delores Sylvester, an employee of Conexant, had
17 received in an overnight letter from Conference America,
18 Bob Pirnie, addressed to Tom Noonan that had terminated
19 the contract.
20    Q  Let me be clear.  Did Ms. Sylvester scan that
21 document and send it to you in an e-mail?
22    A  No.  Ms. Sylvester just sent us an e-mail
23 stating that she received the letter.
24    Q  Okay.  How did you know that, as you wrote,
25 "Conference America"..."has executed a clause in their

1  contract to no longer provide services to Conexant at
2  our current rates"?
3      A   When I returned from vacation, I got a copy of
4  the letter.
5      Q   Okay.  Now, let's --
6      MR. MILLER:  And I should say this, too, I
7  think we've just not been able to find the e-mail
8  from -- who was it that sent it to you?
9      MR. BORTON:  Delores.
10     MR. MILLER:  Yes.  We have not been able to
11 find it to produce it because it's not in the stuff that
12 we've been able to get.
13     MR. BORTON:  Okay.
14     Q   Turn to Tab K, Mr. Edge.  This is a June 24
15 letter from Bob Pirnie to Tom Noonan.  Is this the
16 letter you were referring to a second ago that you
17 received after you got back from vacation?
18     A   Yes, it is.
19     Q   Okay.  Do you know what date would fall 15 days
20 after the termination of this contract?  Let me strike
21 that.
22        Based on this letter, when did you believe the
23 contract was terminated?  What date?
24     A   Without a calendar in front of me right now,
25 I'm not sure I can give you the exact date.  But to my

Page 25

1  best recollection, it would be 15 business days from
2  receipt of the letter.
3      Q   Okay.  Why do you say "15 business days"?
4      A   Because that's normal practice in any type of
5  termination clauses.  There is usually a holiday or a
6  weekend does not count as a day because business isn't
7  transacted on those days.
8      Q   Okay.  So even if the contract, as Exhibit D,
9  doesn't mention business days, you interpret that as
10 being 15 business days?
11     A   I do.
12     Q   Okay.  I want to go back to Exhibit 2,
13 previously marked Exhibit 2.  You've got it there.  On
14 your second sentence you say, "we have an agreement with
15 Intercall already at competitive rates."  When was that
16 agreement finalized?
17        (Plaintiff Exhibit 2 previously marked
18        for identification by the court
19        reporter.)
20        THE WITNESS:  I don't have the exact date, but
21 it was finalized sometime in May of 2005.
22 BY MR. BORTON:
23     Q   So sometime in May 2005, Conexant had
24 determined that it was going to use Intercall for
25 conferencing services?

Page 26

1      A   No.
2      Q   Okay.  What had been finalized in May 2005?
3      A   A WebEx contract.
4      Q   Okay.  When did Conexant determine that it was
5  going to use Intercall for conferencing services?
6      A   After we received the termination from
7  Conference America.
8      Q   Okay.  When was an agreement between Conexant
9  and Intercall for conferencing services finalized?
10     A   The agreement that Intercall executed to
11 Conexant in mid May included audio conferencing in that
12 agreement, but the agreement was explicitly put in place
13 for WebEx transition.  But in that contract, they had
14 already offered us audio conferencing services.
15     Q   And you had already accepted those services?
16     A   We had not accepted those services at that
17 time.
18     Q   Okay.  Do you know when you accepted those
19 services on behalf of Conexant?  Strike that.
20        Do you know when Conexant accepted those
21 services, those conferencing services?
22     A   I'm not sure I understand your question.
23     Q   Okay.
24     A   Are you asking me when did we begin using
25 Intercall as a service provider?

Page 27

1      Q   Tell you what, when did Conexant decide that it
2  was going to use Intercall as a conferencing service
3  provider?
4      MR. MILLER:  Objection, asked and answered
5  already.
6  BY MR. BORTON:
7      Q   You can answer.
8      A   We decided to start using Intercall as a
9  service provider after Conference America had terminated
10 our contract --
11     Q   Okay.
12     A   -- from audio.
13     Q   Okay.  And do you believe that was after June
14 24th, 2005?
15     A   Absolutely.
16     Q   So prior to June 24th, 2005, Conexant had not
17 determined whether or not it was going to use
18 conferencing services from Intercall?
19     A   I'm sorry, I didn't hear you.
20     Q   Okay.  Prior to June 24, 2005, Conexant had not
21 decided whether or not it was going to use Intercall's
22 conferencing services, right?
23     A   That's correct.
24     Q   Okay.  Did anybody direct you to write the
25 e-mail previously marked as Exhibit 2, this e-mail right

Page 28

7 (Pages 25 to 28)

1  here?
2      A  No.
3      Q  Okay.  You made a decision to write that on
4  your own?
5      A  Yes.
6      Q  Did you discuss writing this e-mail with
7  anybody before you wrote it or sent it?
8      A  No, I did not.
9      Q  Did anybody want to discuss this e-mail with
10  you after you sent it?
11     A  Not that I recall, no.
12     Q  Okay.  Let's go to previously marked Exhibit 3.
13  Do you remember sending this e-mail to these people on
14  June 29th, 2005?
15         (Plaintiff Exhibit 3 previously marked
16          for identification by the court
17          reporter.)
18         THE WITNESS:  Yes, I do.
19  BY MR. BORTON:
20     Q  Did anybody direct you to send this e-mail?
21     A  No, no one directed me to send the e-mail.
22     Q  On the third line, you talk about a "15 day
23  notice."  Do you see that?
24     A  Yes, I see that.
25     Q  And you mean 15 business days by that?

Page 29

1      Q  Okay.  And you knew that because you got the
2  letter, a copy of the letter?
3      A  That is correct.
4      Q  Okay.  Do you believe that the audio
5  conferencing contract rates would continue to apply to
6  existing accounts even after it was terminated?
7      A  I'm sorry, can you say that again?
8      Q  Was it your understanding that the audio
9  conferencing contract rates, prices for services, were
10  going to continue to apply to accounts that existed
11  before the audio conferencing contract was terminated?
12     A  I'm still not following you.
13     Q  Okay.  You said earlier it was your
14  understanding that any new accounts created after
15  termination of the audio conferencing contract would
16  incur service charges at higher rates than Conexant had
17  been getting, correct?
18     A  Yes, I said that.
19     Q  I want to talk about the accounts that were
20  already existing.
21     A  Okay.
22         MR. MILLER:  That had been created pursuant to
23  the written agreement?
24         MR. BORTON:  That had been created prior to
25  termination of the written agreement.

Page 31

1      A  I interpret 15 business days, yes.
2      Q  In the second paragraph, do you see where
3  you -- the second sentence, beginning "If we do not
4  convert everyone in 15 days, Conference America will
5  continue to provide service but at a very high rate"?
6      A  Yes, I see that.
7      Q  Okay.  What was your assessment of the
8  situation -- strike that.
9         What was your assessment of how pricing would
10  be handled after the audio conferencing contract's
11  termination became effective?
12     A  What was my assessment?
13     Q  Uh-huh.
14     A  Or what was my understanding?
15     Q  Yes.
16     A  My understanding that any new account created
17  after the termination of the contract would be subject
18  to new rates.
19     Q  How did you come to that understanding?
20     A  How did I come to the understanding of that it
21  would be the new rates?
22     Q  Yes, that you just described to me, every new
23  account created would be under new rates?
24     A  Because they had already -- they had executed
25  the termination of the contract.

Page 30

1         THE WITNESS:  Okay.
2  BY MR. BORTON:
3      Q  Wouldn't those accounts incur service charges
4  at higher rates after the audio conferencing contract
5  was terminated?
6      A  No.
7      Q  Why not?
8      A  They would still be under the written and
9  agreed contract that Conference America and Conexant had
10  in place prior to the termination.
11     Q  Okay.  So you're saying -- and if you disagree
12  with me, tell me.  What it sounds like you're saying,
13  that even though the agreement was terminated, Conexant
14  would still get to use those rates in the agreement for
15  accounts that existed prior to termination of the
16  agreement?
17     A  Prior to the agreement, Conexant would have
18  access to those accounts at the standard rate it had
19  agreed upon in the existing contract between Conference
20  America and Conexant, yes.
21     Q  Okay.  So what I'm saying, that even though the
22  audio conferencing contract was terminated, accounts
23  that existed before termination, in your understanding,
24  would continue to pay for services at the rates in the
25  audio conferencing contract, right?

Page 32

8 (Pages 29 to 32)

Page 33

1    A   The rates that apply in the existing contract?
2    Q   Yes, would continue to apply to accounts that
3   already existed even though the contract was terminated;
4   is that --
5    A   The new rates or the existing rates?
6    Q   Okay.  Let me back up.  And I know it's
7   confusing because there's all kinds of stuff going on.
8   But is it your testimony that accounts that existed
9   before the audio contract was terminated would get new
10   and higher rates after it was terminated?
11       MR. MILLER:  Objection.  He's already answered
12   that.
13       MR. BORTON:  Well, I don't think so.  But let's
14   just walk through it.
15    Q   I mean, is that your understanding?
16    A   I'm still confused on --
17    Q   Let me ask it another way.  You're aware that
18   accounts existed before the termination of the audio
19   conferencing contract, correct?
20    A   Absolutely.
21    Q   What rates would they get after that contract
22   was terminated?
23    A   The existing rates?
24    Q   What rates did those accounts get?  They got
25   the existing rates?

Page 34

1    A   The accounts that existed prior to
2   termination --
3    Q   Yes.
4    A   -- should be deemed to the existing rate that
5   was in place between Conexant and Conference America
6   prior to the contract termination.
7    Q   Okay.  That's your position, correct?
8    A   That's my position.
9    Q   Okay.  What do you base that position on?
10    A   I base that position on because we never had an
11   agreement with Conference America on any new terms and
12   conditions.
13       MR. BORTON:  Okay.  Let's look at Exhibit 4.
14   It should be there.  And it's Bates-stamped 336.  And it
15   was previously marked as Exhibit 4 in Tom Noonan's
16   deposition.
17       (Plaintiff Exhibit 4 previously marked
18        for identification by the court
19        reporter.)
20   BY MR. BORTON:
21    Q   You remember sending this e-mail out to these
22   people on June 29th?
23    A   I do.
24       MR. BORTON:  Okay.  And let's flip to
25   Exhibit 5, which is a July 12th e-mail.

Page 35

1        (Plaintiff Exhibit 5 previously marked
2        for identification by the court
3        reporter.)
4   BY MR. BORTON:
5    Q   Do you remember sending this e-mail out?
6    A   I do.
7    Q   In the third paragraph of this e-mail, you
8   reference new codes.  Are you talking about new codes
9   with Intercall?
10    A   Yes, the new codes are Intercall's account.
11    Q   This is July 12th.  Do you have any idea that
12   as of what date everybody at Conexant had Intercall
13   codes?
14    A   Based on my e-mail, I would say that the users
15   received the codes sometime in mid-July.
16    Q   Okay.  And I want to just put previously marked
17   Exhibits 2, 3, 4 and 5 in front of you and ask you this
18   question.  Did anybody direct you to send any of these
19   e-mails out or was it basically your decision to send
20   all these e-mails out?
21    A   It was my decision.
22    Q   Let's go to Tab N in previously marked
23   Exhibit 1.  Who is Melissa Spence?
24    A   Melissa Spence is -- she works for Cass Info
25   Systems, which is the company I use to outsource my

Page 36

1   telecommunications billing.  And she does all of my
2   daily -- basically my account manager, daily processing
3   of my accounts.
4    Q   By this e-mail, you instructed Melissa Spence
5   not to pay Conference America's bills, correct?
6    A   I instructed Melissa Spence to put the bill in
7   dispute.
8    Q   Is that the equivalent of telling her not to
9   pay the Conference America bills?
10    A   That is equivalent to telling her to hold the
11   bill until the dispute is satisfied.
12    Q   Okay.  In the second sentence you say -- I'm
13   sorry, third sentence in Tab N you say, "In an effort to
14   get this resolved and understand what the pricing is now
15   and when it was effective, I need to place all
16   Conference America bills in dispute."  As of July 19th,
17   did you not know what the pricing was?
18    A   I was still pretty confused on the situation.
19    Q   Okay.  What were you confused about?
20    A   We were confused about the terms and
21   conditions, and we were confused about what the actual
22   new rate was and how all that was taking place.
23    Q   Now, you weren't confused about the rates for
24   accounts that existed prior to the termination of the
25   audio conferencing contract, were you?

9 (Pages 33 to 36)

1    A  The accounts that were existing on the existing
2  contract, no.
3    Q  You believe that those were going to be under
4  the rates in that contract?
5    A  If they were prior to termination, yes.
6    Q  Okay.  So what you were confused about was new
7  accounts created posttermination, correct?
8    A  Correct.
9    Q  Let's turn to Tab O.  Do you remember receiving
10  this July 19th e-mail from Rob Pirnie?
11    A  Absolutely.
12    Q  Okay.  As of July 19th, had you ever gone on to
13  Conference America's Web site?
14    A  Prior to July 19th?
15    Q  Yes.
16    A  Yes.
17    Q  When?
18    A  Can you be more specific in your question?
19    Q  Okay.  Let's do it like this.  When was the
20  first time that you ever went to Conference America's
21  Web site?
22    A  I can't remember, but it would probably be
23  sometime in 2001.
24    Q  Have you ever gone to Conference America's Web
25  sites and looked at their terms, conditions and

Page 37

1    A  I never reviewed the terms and conditions.  I
2  went and looked up what the new rate was.
3    Q  Okay.  When did you do that, when you got this
4  June 24 letter?
5    A  Yes, it was sometime -- I don't recall the
6  exact date, but it was sometime after I reviewed the
7  letter.
8    Q  Okay.  When did you get back from vacation?
9    A  I don't remember the exact date, but it was
10  sometime between June 27th, June 29th.
11    Q  Was it before the first -- was it around June
12  27th to 29th, then?
13    A  I don't remember.
14    Q  The only reason I ask is that seems to be flush
15  with these e-mails in previously marked Exhibits 2
16  through 5.  I don't know if that refreshes your
17  recollection about when you got back from vacation and
18  got the letter or not.  Does it?
19    A  It states I must have been back prior to June
20  29th, yes.
21    Q  Okay.  So is it fair to say that before the
22  first of July, you went to Conference America's Web site
23  and reviewed their prices?
24    A  I went to Conference America's Web site and I
25  reviewed the rate.

Page 39

1  services?
2      MR. MILLER:  Ever, up to today?
3      MR. BORTON:  Yes.
4      THE WITNESS:  You mean --
5  BY MR. BORTON:
6    Q  Ever your whole life.
7    A  Yes.
8    Q  How many times have you done that?
9    A  Once.
10    Q  When was that time?
11    A  When we received the termination contract that
12  stated that we were subject to new terms and conditions,
13  I went to find what the rate would be.
14    Q  Okay.  And was that termination contract you
15  just referred to this June 24, 2005 letter from Bob
16  Pirnie at Tab K that you received after you got back
17  from vacation?
18    A  Yes, that's the letter.
19    Q  So you got this letter on June 24th -- or you
20  got this letter when you got back from vacation and went
21  to Conference America's Web site and reviewed their
22  terms and conditions at that point?
23    A  No.
24    Q  Okay.  When did you go and review their terms
25  and conditions?

Page 38

1    Q  Did you do that before July 1st, 2005?
2    A  Yes.
3    Q  Do you remember what you saw when you went and
4  reviewed the rates?
5    A  At the time, when I reviewed the rates, I
6  remember seeing -- I don't recall exactly, but I
7  remember seeing a rate in the 40-some-odd cents per
8  minute.
9    Q  I want you to flip to Tab A.  Does that look
10  like what you saw?  And Tab A, just so you'll know, is
11  four pages long.  Is this basically what you pulled up
12  when you went to look at the rates around June 29th,
13  2005?
14    A  Are you asking --
15      MR. MILLER:  Word for word or --
16      THE WITNESS:  -- word for word or are you
17  asking --
18  BY MR. BORTON:
19    Q  When you went to pull the rate up, did you see
20  a document that looks like this, Tab A?  And I'll
21  represent to you that paragraph 5 talks about fees and
22  expenses.
23      MR. MILLER:  Let me object to the question
24  because it's very general.
25      But if you can answer it, go ahead.

Page 40

10 (Pages 37 to 40)

1    There's lots of words on the pages, and I don't
2   know if you're asking him if all the words were there on
3   that day or if it generally looked like that or what.
4       THE WITNESS: Can you be more precise or
5   specific?
6   BY MR. BORTON:
7    Q   Have you ever seen Tab A before? And take your
8   time to review it.
9    A   I never reviewed the entire document, so I'm
10  not sure I can answer if I've -- if this document is the
11  same as what I was looking at now and prior.
12   Q   Okay. Let me ask you this way. When you went
13  to the Web site sometime in June 2005, what did you see?
14   A   I saw the -- I went straight to the area that
15  had the rate, and I saw -- I recall seeing a --
16  something that was in terms of a 40-cent-per-minute
17  rate.
18   Q   I want to direct you to paragraph 5 of Exhibit
19  A. Have you ever seen this paragraph before?
20   A   I don't recall if this was the exact paragraph,
21  but I did go on the Web site and review the actual rate.
22  I did go find the rate.
23   Q   And that's fine. Did you see a paragraph that
24  looks something like this?
25   A   I don't remember if it was exactly to this or

Page 41

1   if it was section 5 versus 6. I don't recall that.
2    Q   And I'm not asking you word for word. I won't
3   hold you to that. But what I'm asking is when, you
4   know, you clicked on the Web site and you went to the
5   rate, did you see something that looked like, generally,
6   this document? I'm not talking about specific rates or
7   anything, but the format that this is in.
8    A   I can't recall if it's the same format or not,
9   to be honest with you.
10   Q   Is that the one and only time you've gone to
11  Conference America's Web site and looked at the rates?
12   A   No.
13   Q   Tell me about the next time you went to
14  Conference America's Web site to check the rates.
15   A   After we received the -- I believe it was the
16  July bill in the month of August, we then went back to
17  look to make sure that -- or to ensure that what we were
18  seeing on the bill was on here.
19   Q   Was on the Web site rates and prices?
20   A   Correct.
21   Q   What did you determine when you did that?
22   A   What did I determine?
23   Q   Yes.
24   A   I didn't determine anything.
25   Q   Did you think that the rates were different

Page 42

1   between the two documents?
2    A   No.
3    Q   They were the same?
4    A   The same rate applied between the first time I
5   reviewed it in June to the time that I had reviewed it
6   after the bill, that approximately 40 cents a minute. I
7   don't recall if it was as it's stated in here, .425 or
8   .45 or whatever number that is.
9    Q   Okay. Let's go back to Tab O. Now, Conexant
10  used Conference America's services after July 10th,
11  2005, didn't it?
12   A   Yes.
13   Q   Do you know when the last time Conexant used
14  Conference America's services was?
15   A   Do I know when the last time a user used that?
16  No.
17   Q   Are you aware of anyone at Conexant using
18  Conference America's services in August of 2005?
19   A   No.
20   Q   Have you ever written a letter or an e-mail to
21  Conference America asking them what the price of a
22  service was, or services?
23   A   In the life of the contract?
24   Q   In your whole life.
25   A   I don't recall if it was an e-mail or a phone

Page 43

1   conversation, but if there were services that we needed,
2   we would always ask a price unless it was already
3   spelled out in our existing contract.
4    Q   Okay. Following this June 24 letter we've been
5   talking about that you got when you got back from
6   vacation attached to Tab K --
7    A   K?
8    Q   Yes.
9        -- can you remember ever sending a letter or an
10  e-mail to Conference America after June 24th, 2005
11  asking them what the price of a service or services was?
12   A   Can you repeat that?
13   Q   Okay. After this date of June 24th, 2005, do
14  you ever remember sending a letter or an e-mail to
15  Conference America asking Conference America what the
16  price of a particular service or services was?
17       THE WITNESS: Do you know what exhibit the
18  e-mail that I wrote to Rob Pirnie is?
19       MR. MILLER: Not off the top of my head.
20       MR. BORTON: Tab P is one of them.
21       THE WITNESS: This is not the e-mail. I'm
22  looking for another e-mail where I sent Rob Pirnie --
23       MR. BORTON: There are subsequent e-mails from
24  you to Rob Pirnie at Q, S and T.
25       THE WITNESS: Can you repeat that question

Page 44

11 (Pages 41 to 44)

1  again?
2      MR. BORTON: Can you just read it back to him.
3  (Record read.)
4      THE WITNESS: I don't remember doing that, no.
5  BY MR. BORTON:
6      Q  No? Okay. Nothing ever prevented you from
7  sending such a letter or e-mail, right?
8      A  Nothing prevented me, no.
9      MR. MILLER: When we get to a breaking point --
10     MR. BORTON: Yes, we can do it now.
11  (Recess.)
12     MR. BORTON: Back on the record.
13     Q  I want you to flip to Tab P in previously
14  marked Exhibit 1. This is an e-mail you sent to Rob
15  Pirnie and several other people, correct?
16     A  That's correct.
17     Q  In the first line it says, "It looks like Rob
18  has finally answered our question," comma. What
19  question had he answered?
20     A  Rob had answered the question that the June
21  bill was not part of the new -- or the new terms and
22  conditions that they had stated in their letter.
23     Q  Is that the only question you were referring
24  to?
25     A  Yes.

Page 45

1      Q  Do you know when the June bill was eventually
2  paid?
3      A  I don't remember, but I think it was sometime
4  in September, possibly.
5      Q  Turn to Tab II. It's the very last one. And
6  that's a check for $39,793.01, correct?
7      A  Correct.
8      Q  Do you know what that check is for?
9      A  Yes.
10     Q  What is it for?
11     A  It's for the June bill.
12     Q  Okay. My question to you is, back on July
13  20th, 2005 when you sent this e-mail attached as Tab P
14  and said that Rob had answered the question about the
15  June bill, that's on July 20th, why is the June bill not
16  getting paid until November of 2005?
17     A  Because we were still confused moving forward.
18  After we received the August bill, we weren't clear at
19  that point in time if any of this stuff was still meshed
20  together. But we were still, internally to Conexant,
21  trying to work all of that out.
22     Q  So you thought the August bill might have
23  included some services rendered in June or the June bill
24  might have included services rendered in August or --
25     A  An August bill is actually for services

Page 46

1  rendered in July and a July bill is services rendered in
2  June, because you have to use a service before you can
3  bill it.
4      Q  Right.
5      A  So the August bill, which was for July
6  services, there was still some confusion on my behalf
7  and was any of this still meshed together.
8      Q  Okay. Now, in this e-mail on July 20th, you
9  took the bill out of dispute. You say, "You can now
10  take the bills out of dispute," right?
11     A  Yes.
12     Q  What bill were you referring to, or bills,
13  actually? What bills were you talking about in that
14  sentence?
15     A  In this e-mail, I was talking about the June
16  bill.
17     Q  Okay. And it says, "You can now take the bills
18  out of dispute and pay according to the terms set forth
19  in the pricing agreement," right? Is that what it says?
20     A  That's what it says.
21     Q  Okay. Now, the June bill got paid, it looks
22  like, November 2005. So subsequent to July 20th, did
23  you put the June bill back in dispute at some point?
24     A  I never put it back in dispute.
25     Q  Then how come Melissa Spence didn't pay it?

Page 47

1      MR. MILLER: She did pay it.
2  BY MR. BORTON:
3      Q  Well, how come she didn't pay it until November
4  2005?
5      A  As I answered earlier, there was still some
6  confusion. Once we got our July bill in August, we
7  still were not sure that the stuff had all been meshed
8  together. Because there was so many letters going back
9  and forth, we were still confused about is this really,
10  truly a clean bill.
11     Q  Okay. So after July 20th, did you send another
12  e-mail to Melissa Spence or did you contact Melissa
13  Spence and say, "Hey, don't pay the June bill"?
14     A  I never contacted Melissa after that, no.
15     Q  Do you know why she didn't go ahead and pay the
16  June bill around the time that you sent this July 20th
17  e-mail in?
18     A  Melissa couldn't pay the bill until we
19  processed it. I didn't process it because there was
20  still the confusion around this June and July bill to
21  figure out if any of these items were meshed together.
22     Q  Okay. So the bill was out of dispute as of
23  July 20th but just not yet processed, correct?
24     A  Correct.
25     Q  Did you ever contact Conference America in any

Page 48

12 (Pages 45 to 48)

1   way and notify them that you weren't going to process
2   their bill until you had resolved the dispute you just
3   talked about?
4       A  Beyond the e-mails that you have, no.
5       Q  What do you mean in the last sentence of your
6   July 20th e-mail when you say, "We were simply auditing
7   rates against what we needed to pay"?
8       A  Same answer I gave you previously.  We were
9   trying to figure out if all of this stuff was meshed
10  together because it was still very confusing at the
11  time.
12      Q  Did anyone instruct you to write this e-mail?
13      A  No.
14      Q  Did anyone at Conexant call you after this
15  e-mail to discuss this e-mail with you?
16      A  Anyone in Conexant?
17      Q  Yes.
18      A  No.  Not that I remember, no.
19      Q  Did anyone at all ever call you subsequent to
20  the sending of this e-mail to discuss this e-mail with
21  you?
22      A  Can you be more precise?
23      Q  Did anybody contact -- it looks like you sent
24  this e-mail on July 20th, 2005 at 12:20 a.m.?
25      A  Right.

Page 49

1       A  We left a voicemail for Rob Pirnie and Bob
2   Pirnie numerous times, and, of course, you have the
3   documented e-mails here where we tried to discuss with
4   them.  They would not respond to anything.
5       Q  Did you send e-mails to Conference America
6   discussing the fact that the bills were not going to be
7   processed?
8       A  I did not.
9       Q  Okay.  That's all I was looking for.  I want to
10  direct your attention to Tab Q.  Did anybody direct you
11  to write and send that e-mail?
12      A  No.
13      Q  And then just going through Tabs R and S, these
14  are e-mails that you sent, right?
15      A  Yes, I sent these e-mails.
16      Q  And you sent the e-mail attached to Tab T too,
17  correct?
18      A  Yes.
19      Q  Do you remember what services -- which of
20  Conference America's services Conexant used after July
21  10th, 2005, or do you know?
22      A  What services we used after the termination?
23      Q  Yes.
24      A  Yes.
25      Q  Okay.  Can you tell me?

Page 51

1       Q  Did anyone contact you subsequent to that date
2   and time to discuss this e-mail with you?
3       A  Afterwards?
4       Q  Yeah.  Did they contact you in writing or by
5   phone or come up and talk with you?
6       A  From Conexant?
7       Q  From anywhere.
8       A  I don't think anyone responded or contacted me
9   specific to the e-mail.
10      Q  Okay.  Why didn't you tell Conference America
11  that you were not going to process their bill until you
12  worked out your billing confusion?
13      A  Can you ask that again?
14      MR. BORTON:  Just read it back.
15      (Record read.)
16      THE WITNESS:  We tried numerous times to
17  contact Conference America via e-mail, via phone,
18  through numerous parties in Conference America, via
19  their main line, via direct lines to Rob and Bob Pirnie,
20  and they would not respond.
21  BY MR. BORTON:
22      Q  Okay.  What e-mails did you send?  I'll tell
23  you what, when did you try to contact them by e-mail to
24  tell them about the fact that the bills were not going
25  to be processed?

Page 50

1       A  We had our standard usage for our always on,
2   which are just the standard audio conferencing calls
3   that were in place.
4       Q  Any other services that you can remember?
5       A  Not that I can remember.
6       Q  Let's go to Tab U.  Do you remember receiving
7   this?
8       A  Yes.
9       Q  And you see there in the second paragraph where
10  Bob Pirnie encourages you to review the services terms
11  and conditions on Conference America's Web site?
12      A  I see that.
13      Q  Do you see there in the third paragraph where
14  he informs you that Conexant would be financially
15  responsible for any services that it used?
16      A  I see that.
17      Q  Do you see the fourth paragraph where he
18  confirms that deactivation of accounts is a service that
19  Conference America offers?
20      A  Can you ask that question again?
21      Q  Sure.  Do you see in this fourth paragraph here
22  where Bob Pirnie confirms that deactivation of accounts
23  is a service Conexant offers, that Conference America
24  will perform that service?
25      MS. HERMAN:  I think you said Conexant instead

Page 52

13 (Pages 49 to 52)

1    of Conference America.
2    BY MR. BORTON:
3        Q   Do you see in this fourth paragraph where Bob
4    Pirnie confirms that deactivation of accounts is a
5    service that Conference America offers?
6        A   I see what's written in the letter, yes.
7        Q   Okay. All right. And you read this letter
8    when you got it?
9        A   Yes.
10       Q   Do you remember what date you received this
11   letter on?
12       A   According to the FedEx document, we got it July
13   27.
14       Q   Okay. Let's turn to Tab W -- excuse me, Tab V.
15   Do you see that second paragraph where Noonan writes
16   that "it wasn't until your July 26th letter that it was
17   made clear to Conexant that Conference America believes
18   that our agreement was terminated as of July 10th"?
19       A   I see that.
20       Q   Hadn't Conference America made this clear prior
21   to that July 26th letter he's referencing?
22       A   Can you ask that question in a -- more
23   specifically?
24       Q   Okay. Didn't you know, prior to July 26th,
25   that Conference America believed that the termination

Page 53

1    date of the audio conferencing contract was July 10th,
2    2005?
3        A   I believe we confirmed the termination date
4    based on the letter on July 26th.
5        Q   Didn't Rob Pirnie write you an e-mail attached
6    as Tab O where he stated Conference America's position,
7    termination was effective July 10th?
8        A   Yes, he wrote that e-mail.
9        Q   And you wrote an e-mail on July 20th saying
10   based on Rob Pirnie's July 19th e-mail, the price change
11   took effect on July 10th, right? That's Tab P.
12       A   I wrote that e-mail.
13       Q   And the third paragraph of Tab V, Noonan says,
14   "Conexant has not reviewed the terms and conditions
15   posted on your Web site and does not agree to any new
16   terms governing our relationship." Do you see that?
17       A   I see that.
18       Q   That doesn't gel with what you told me about
19   going and reviewing the prices on Conference America's
20   Web site back in June 2005, does it? Can you reconcile
21   those two statements for me?
22       A   The previous statement that we talked about on
23   the terms and conditions?
24       Q   Yes.
25       A   Absolutely.

Page 54

1        Q   Okay.
2        A   I explained to you earlier when you asked the
3    question did I go and review the terms and conditions,
4    and I told you no, I did not review the terms and
5    conditions, I went to that Web site precisely to find
6    the rate, the permanent rate.
7        Q   Okay.
8        A   That's what I explained to you earlier.
9        Q   Okay. And that's how you reconcile those two?
10       A   That's correct.
11       Q   We talked about several e-mails here, one of
12   which is from you to administrative professionals,
13   Conexant, all. Is this how you informed everybody at
14   Conexant that Conexant was no longer going to use
15   Conference America for conferencing services?
16       A   No, this is not how I informed everybody in
17   Conexant.
18       Q   Okay. How did you do that?
19       A   I informed everybody in Conexant by sending an
20   update of the transition through our communications
21   department.
22       Q   How did that -- how did you send that? Was
23   that an e-mail or a memo or a paper memo?
24       A   Yes, this e-mail here went to Chris Gorciak who
25   is our -- the person in charge of communications.

Page 55

1        Q   And did Chris, do you think, maybe send an
2    e-mail to everybody at Conexant?
3        A   Yes, Chris sent this e-mail here, S&A 337.
4        Q   S&A 337. Okay. Let's take a look at Tab W.
5    It says that a lady named Donna Rough, that's R-o-u-g-h,
6    from Cass Information Systems left a voicemail with a
7    lady named Audria Carr at Conference America saying that
8    you had disapproved two invoices. Do you remember
9    disapproving any invoices?
10       A   Absolutely.
11       Q   When did you do that?
12       A   When we received the August bill, we absolutely
13   disapproved the bill for the $201,346.32.
14       Q   And you also disapproved a bill for $39,793.01,
15   correct?
16       A   The $39,793.01 was the bill that you and I have
17   been discussing for the past couple of hours.
18       Q   Yes. Did you also disapprove that bill on or
19   around September 8th, 2005?
20       A   At this point in time, all the Conference
21   America billing, because of the confusion I explained to
22   you earlier, we were still trying to hash through, so we
23   had absolutely disapproved the $201,000, and we were
24   working through the confusion on the June bill to solve
25   that. And that's basically what we were working out

Page 56

14 (Pages 53 to 56)

1  between Conexant and Cass to ensure we pay the proper
2  amount.
3      Q   When did you start working out the confusion
4  with the June bill?
5      A   We started working out the confusion with the
6  June bill between the period of after we received the
7  August bill and September.  We started doing the
8  research to figure out what we truly owed Conference
9  America that was prior to the termination and then what
10  Conference America deemed we owed them after the
11  termination.
12      Q   How did you do research to determine the
13  pricing related to the June bill?
14      A   We had to scrub through various spreadsheets
15  and various billing copies that Conference America had
16  sent Cass Information Systems on behalf of Conexant.
17      Q   And the point of this was to ensure that you
18  were only going to pay this $39,793.01 sum for services
19  rendered in June of 2005, right?
20      A   No, that was not the point.
21      Q   Okay.  Tell me the point, then.
22      A   The point was, was that we wanted to ensure
23  that the June bill did not have any of the July, because
24  sometimes billing periods can mesh and bleed into other
25  months.  And the second was we wanted -- Conexant wanted

Page 57

1  it took you from July 20th, 2005 to September, 2005 to
2  determine the proper amount you should pay for the June
3  bill?
4      A   It took us from July 20th through the month of
5  September to ensure that we were paying the proper
6  amount for June and ensuring that we had collectively
7  come up with the amount that we felt we owed Conference
8  America for the service rendered in July.
9      Q   Do you have any idea when in September?
10      A   I don't recall the exact date in September.
11      Q   Do you know why the bill wasn't -- or the check
12  for the June bill wasn't sent to Conference America
13  until November, then?
14      A   Yes.
15      Q   Why was that?
16      A   Because all of the accounts that we do in
17  Conexant, we have to allocate across the user
18  population.  So based on the number of accounts, we have
19  to go in and do the allocation.  So because this bill,
20  we were in this period of trying to ensure that
21  everybody got allocated internally to all the
22  departments properly, it took a few weeks to get all of
23  that done.  And once we allocated, we push it through
24  our system, we get approval to pay.  And then, of
25  course, there are probably, you know, the U.S. mail and

Page 59

1  to pay for its rightful rate of the services that we
2  used in July.
3      Q   Okay.  And when did you complete your research
4  with respect to the June bill?
5      A   Can you point me to the checks for the --
6      Q   It's the last tab.  The last tab is the $39,000
7  check.  One would be in EE, and the other would be --
8  we'll get to those.  Is that going to help you remember?
9      A   I found them.
10      Q   Okay.
11      A   Can you repeat the question?
12      Q   Sure.  When was the research --
13          Actually, let's just read it back.
14          (Record read as follows:
15          "Q   And when did you complete your
16          research with respect to the June
17          bill?")
18      THE WITNESS:  Sometime in September.
19  BY MR. BORTON:
20      Q   So it took from around July 20th, 2005 to
21  September for you all to determine whether or not the
22  June bill should be paid -- strike that -- to determine
23  what the amount you should pay on the June bill was?
24      A   Can you restate the question?
25      Q   Sure.  I think I probably asked a bad one.  But

Page 58

1  the time that it took Cass to process it through their
2  bank and then their bank to cut the check and then mail
3  the check as well.
4      Q   Okay.  Let's take a look at Tab CC, and it says
5  invoice number "CONS 000117479."  Do you see that at the
6  top left corner?
7      A   I see that.
8      Q   And it says, "Billing month, June 2005."  Do
9  you see that?
10      A   I see that.
11      Q   Okay.  And it says, "Total, $34,011.01."  Do
12  you see that, at the very last page?
13      A   I see that.
14      Q   Okay.  Do you know why that total is different
15  than the $39,000 figure we've been discussing, the
16  amount of the check?  It's the very last tab.
17      A   Yes, I know that.
18      Q   Okay.  Can you tell me why?
19      A   According to this invoice, this was for audio
20  conferencing services, and it does not include WebEx
21  services.
22      Q   Okay.  Will you turn to Tab BB for me.  This is
23  an invoice -- this is the June invoice as well, number
24  117479.  Do you see that, the very first page?
25      A   I see that.

Page 60

15 (Pages 57 to 60)

1    Q   And it says, "Grand total, $39,793.01," does it
2   not, on the very first page?
3    A   It says that.
4    Q   And Exhibit II is that check we've been talking
5   about that says it's for an amount of $39,793.01, right?
6    A   It's the same amount.
7    Q   So Conference America billed you $39,793.01 for
8   that month and you guys ended up paying that much,
9   right?
10   A   Yes, we did.
11   Q   Let's go to -- I'll tell you, looking at Tab
12  BB, did you receive this invoice?
13   A   I don't recall getting the specific invoice in
14  hand, but I do recall reviewing the invoice through my
15  normal process.
16   Q   Okay.  Is it part of your job to review
17  invoices like this?
18   A   Yes.
19   Q   Okay.  So you would see the invoices and bills
20  that Conference America sent to Conexant, then, right?
21   A   I wouldn't see the exact -- I wouldn't see the
22  actual paper.  All of my stuff is done through an
23  electronic process.  And if it's generally on a standard
24  run rate and there's nothing out of the ordinary, it
25  will go through.  And then the -- and so we would do it

Page 61

1   all electronically.  So I don't actually get paper
2   copies to review, no.
3    Q   Okay.  Who does?
4    A   Cass Info Systems gets the paper copies for
5   review and they do the auditing and they put it into a
6   process for me to do the second audit and the approval.
7    Q   Okay.  And you have final approval authority?
8    A   I have final approval authority, yes.
9    Q   You don't have to run it by anybody else?
10   A   For telecom bills, no.
11   Q   Exhibit BB puts the grand total of $39,793.01
12  down, the same as the check.  So would it be fair to say
13  that Conference America billed you for the right amount
14  of money for June 2005?
15   A   I would say that after our review in the month
16  of July, August and September, we determined that June
17  looked like a standard bill that we had normally got
18  from Conference America and we had approved that.
19   Q   Okay.  Let's turn to Tab X.  Have you ever seen
20  this document?
21   A   Yes.
22   Q   Okay.  Did someone actually send this paper
23  copy of this document to you or did Cass send it to you
24  through an electronic format or --
25   A   I requested this document.  I did see this

Page 62

1   document.
2    Q   And you reviewed this document?
3    A   Yes, I did.
4    Q   Okay.  Let's go to page 22 of 43, and I want
5   you to look at page 22, 23 and 24 and tell me if you
6   believe that these are Conexant employees.
7    A   Yes, I believe these are Conexant employees.
8    Q   Okay.  Why didn't Conexant pay Conference
9   America for the disconnection fees?
10   A   We've never paid Conference America a
11  deactivation fee.
12   Q   Would you agree that if it's a service that
13  costs money and Conexant requests a service, then they
14  are bound to pay for it if Conference America asks them
15  to?
16      MR. MILLER:  Object to the form.  It omits
17  whether there was an agreement to it.
18      THE WITNESS:  Can you restate that question?
19  BY MR. BORTON:
20   Q   Sure.  If Conexant asks Conference America --
21  let me back up.  If deactivation is a service
22  Conexant -- or Conference America offers for a fee and
23  Conexant asks Conference America to render that service,
24  Conference America does, shouldn't Conexant have to pay
25  Conference America?

Page 63

1    A   No.
2    Q   Okay.  Will you tell me why not?
3    A   Because Conexant had a predefined agreement
4   that all of these accounts had built on, and Conference
5   America had never charged a deactivation fee on any of
6   it, nor are there any deactivation fees stated anywhere
7   in our price protection agreement that Conexant and
8   Conference America entered into.  So all existing
9   accounts should not be deemed a deactivation fee.
10   Q   Okay.  If the audio conferencing contract had
11  provided for deactivation fees at $74.95 per deactivated
12  account, would Conexant have to pay for that service if
13  they asked for it?
14      MR. MILLER:  Object to the form because it
15  assumes facts that are not in evidence.
16      But you may answer it.
17  BY MR. BORTON:
18   Q   You may answer.
19   A   I'm sorry, I got confused when you --
20   Q   Okay.  Subject to Mr. Miller's objection, if
21  the contract had provided in some way for a $74.95
22  deactivation fee for deactivating the account and
23  Conexant asked for that service, do you believe Conexant
24  should have to pay?
25      MR. MILLER:  Object to the form.  It assumes

Page 64

16 (Pages 61 to 64)

1  facts that are not in evidence, and it's vague as to
2  what you mean by "in some way."
3      You may answer it if you understand.
4      THE WITNESS: I need a more specific question.
5  BY MR. BORTON:
6      Q  Okay. This is just -- you're familiar with the
7  audio conferencing contract? We've been over that,
8  right?
9      A  Absolutely.
10     Q  Okay. If it provided for a $74.95 deactivation
11  fee, and Conexant asked for that service, deactivation
12  service, and Conference America rendered that service,
13  do you think Conexant should have to pay that $74.95
14  charge?
15     MR. MILLER: Object to the form because it
16  assumes facts that are not in evidence because that's
17  not in the contract.
18     But you may answer the question.
19     THE WITNESS: What contract?
20  BY MR. BORTON:
21     Q  The audio conferencing contract.
22     A  The existing contract?
23     Q  Yes. If it had a provision.
24     MR. MILLER: Same objection.
25     THE WITNESS: If there was a price in the

Page 65

1      Q  Okay. So you disputed the deactivation fees,
2  correct?
3      A  Absolutely.
4      Q  Did you dispute any other fees besides the
5  deactivation fees?
6      A  We disputed the increase in rates.
7      Q  Okay. And that's for services rendered after
8  July 10th, correct?
9      A  That is correct.
10     MR. BORTON: Off the record.
11     (Recess.)
12     MR. BORTON: Back on the record.
13     Q  Can you turn to Tab Y, Mr. Edge. Have you ever
14  seen this document before?
15     A  Yes.
16     Q  When did you see this document?
17     A  This was part of the July billing document, so
18  I received that when we were doing the review of the
19  bills. And I also received that from the complaint that
20  I read here in this exhibit.
21     Q  So this came to you at the same time as Tab X
22  did, then?
23     A  I'm not sure if they came together, but I
24  received both of them.
25     Q  Okay. So you received Tab Z as well?

Page 67

1  contract that Conexant and Conference America agreed on
2  and there is a service rendered, sure.
3  BY MR. BORTON:
4      Q  Okay. Did you ever have discussions with Tom
5  Noonan about disapproving any bills from Conference
6  America?
7      A  Sure. Tom and myself, on occasions, were
8  reviewing -- as stated previously, we were going through
9  this review process to figure out what was correct and
10  what was wrong. So we were trying to understand what we
11  were doing. But Tom and I, me disapproving it versus
12  the reviewing it.
13     Q  How do you interact with Tom? What -- he is
14  not your supervisor, correct?
15     A  Correct.
16     Q  Okay. Why would you and Tom have occasion to
17  discuss the situation with Conference America?
18     A  Because Tom's role in Conexant is to ensure
19  that the company is -- he's director of strategic
20  sourcing, so he's in charge of pricing and terms and
21  conditions in any contract that comes through Conexant.
22  And then, of course, my job as a telecommunications
23  manager is to ensure that once those contracts are put
24  together, that I manage those contracts and the vendors
25  that are rendering those services.

Page 66

1      A  Yes, I received Tab Z as well.
2      Q  Okay. And you reviewed Tabs Y and Z, correct?
3      A  Yes, last year we reviewed them.
4      Q  Okay. Turn to Tab AA for me. Did you ever see
5  this letter from Tom Noonan to Bob Pirnie?
6      A  Yes, I saw the letter.
7      Q  And you agree with everything in it?
8      A  I agree with this letter.
9      Q  Okay. And we see attached to the back of this
10  letter a check for $5,366.53?
11     A  Yes, I see the check.
12     Q  What was that check for?
13     A  I believe this check was a check that we tried
14  to -- or we paid Conference America for services
15  rendered for the amount of minutes that we came up with
16  that we owed Conference America for a portion of the
17  deal based on the rates that were effective in the
18  previous -- or in the contract that was in place between
19  Conference America and Conexant prior to the
20  termination.
21     Q  Okay. You said earlier in this deposition that
22  you had gone on to Conference America's Web site in June
23  2005 and looked at their prices, right?
24     A  I said earlier in this deposition that I went
25  on to that Web site to look for the specific rate at

Page 68

17 (Pages 65 to 68)

1  that time.
2      Q  Specific rate for what?
3      A  I went to look to find out what rate they were
4  currently charging, okay, and to see if there were any
5  other services that they were charging Conexant at the
6  time.
7      Q  Okay.  In the third paragraph of this September
8  7th letter from Tom Noonan at Tab AA, he says he was
9  confused about how some of the charges Conference
10  America was charging Conexant for were calculated.  He
11  said, "They don't appear to be Conexant's rate of 5
12  cents that we have been paying and the deactivation fee
13  appears to be out of the blue."  When you read this
14  letter, did it occur to you that Conference America was
15  charging the prices that you had seen on their Web site?
16      A  When I read this letter -- restate the
17  question.
18      Q  Well, it just seems to me that Noonan appears
19  confused about how Conference America had been charging
20  him.
21      A  Right.  We have stated all along today that in
22  that period of time we were trying to work through that
23  confusion.
24      Q  Okay.  Did you understand at any time that
25  Conference America was trying to charge Conexant the

                    Page 69

1  rates that appeared on the Web site?
2          MR. MILLER:  Exclusive of the deactivation fee?
3          MR. BORTON:  We'll go with that for now.
4          THE WITNESS:  Did I understand that Conference
5  America was trying to charge Conexant?
6  BY MR. BORTON:
7      Q  Yes.
8      A  I understand that Conference America had
9  applied a new rate on the Web site, yes.
10      Q  Okay.  Did you ever talk with Tom Noonan about
11  this?
12      A  About the new rate or deactivation fee?
13      Q  About how the charges were calculated.
14      A  I'm sorry, can you get specific around those
15  charges?
16      Q  Yes.  Let's go to the third paragraph of this
17  letter.  And actually, let's go to the second paragraph.
18  He says, and tell me if you disagree with me, "We've
19  enclosed payment," and it would be this check for
20  $5,366.53, "for Conexant's actual usage of Conference
21  America's services through July 9th."  Do you see that?
22      A  I see that.
23      Q  And in the third paragraph, it seems to me, and
24  I want to see -- it seems to me that he's confused about
25  how subsequent charges were calculated.  Does it seem to

                    Page 70

1  you like he might be confused?
2      A  I stated through this entire deposition we were
3  all confused.
4      Q  Okay.  Why were you confused?
5      A  Well, once we received the July bill, of course
6  that July bill had a rate that Conexant had never agreed
7  upon.  It also had a deactivation fee that Conexant had
8  never paid prior for any deactivations or been charged
9  any deactivations prior in our existing contract.  And
10  so we were trying to figure out where did these
11  deactivation fees come from.  That clearly was out of
12  the blue.
13      Q  Were you confused about any of the other
14  charges?
15      A  Well, I think in the end we were not confused
16  about what we owed for the month of June.  And I don't
17  think we were confused about what we owed from the first
18  of July to the actual date that the contract terminated.
19  What was confusing is this was meshed into the bills and
20  we were trying to ensure that we were paying the
21  approximate rate of what was owed because the bill we
22  received was in excess of 200-and-some-odd thousand
23  dollars.  So that's why we were confused.
24      Q  Okay.  Any other reasons?
25      A  Outside of the not -- you know, never seeing

                    Page 71

1  the deactivation fee prior and not seeing the
2  deactivation fee on the Web site, I think that that was
3  the confusion.
4      Q  Okay.  Let's turn to Tab CC.  Strike that.
5          Go to Tab EE.  Do you remember receiving this
6  letter?
7      A  Absolutely.
8      Q  Okay.  Do you agree with everything that's said
9  in it?
10      A  I agree with the letter.
11      Q  Do you know who all worked with Noonan to
12  decipher the invoice?
13      A  Yes.
14      Q  Can you tell me who?
15      A  Myself and Karen Hermann.
16      Q  Okay.  Those are the only three people that
17  worked on it, to your knowledge?
18      A  Yes.  And it was primarily myself.
19      Q  How did you all come up with this $7,060.25
20  figure?
21      A  What we did is we took the contract rate in the
22  existing contract prior to the termination, which was 5
23  cents a minute per call, and we tried to take the number
24  of minutes that Conference America was billing, multiply
25  that to make a payment to them in good faith that we

                    Page 72

                18 (Pages 69 to 72)

1    were trying to fulfill our obligation.
2        Q   And you assumed in this analysis that all the
3    services that had been going by Conexant were those
4    services incurring a 5 cents a minute charge?
5        A   It wasn't an assumption.  Our contract stated
6    we paid 5 cents a minute per the account -- per the
7    usage.
8        Q   Weren't there other charges in the contract for
9    other kinds of services that were more than 5 cents a
10   minute?
11       A   At times they were.
12       Q   Did you go through, when you were doing your
13   analysis, and see if any of those services had been
14   used?
15       A   We tried to do our best, yes.
16       Q   Did you see that any of the other services had
17   been used?
18       A   Because the invoice was so confusing with the
19   deactivation fees and the increased rate, we couldn't
20   necessarily determine all that.
21       Q   Okay.  You couldn't determine what specific
22   services were being used?
23       A   Based on the confusion, we could not determine
24   what all services, so we tried to determine to our best
25   analysis based on existing run rates and the uses that

Page 73

1        A   Right?
2        Q   Right.
3        A   So as soon as we determined that these were the
4    checks that we were going to cut, the June bill and
5    trying to make our best guesstimate on the other
6    payments, then we decided to process those bills.  And
7    then that's how I explained to you that once we
8    processed them, it has to go through a processing cycle.
9    And basically, between October 7th and November, that
10   was the processing cycle that it took to pay the bill.
11       Q   At the time that Noonan sent this October 7th
12   e-mail, were all those bills being processed or were
13   they either processed or in the --
14       A   They were in the process of being taken care
15   of, yes.  As you can refer to the document, the -- some
16   of these checks were previous to that.
17       Q   Right.  And it's your -- or the June check for
18   $39,793.01 was being processed at this time?
19       A   That's correct.
20       Q   Okay.  Did you ever see a copy of Exhibit GG --
21   or Tab GG, excuse me?
22       A   I saw this letter, yes.
23       Q   Okay.  Do you know when this letter came to
24   you?
25       A   I don't recall when I actually received it at

Page 75

1    we had in the past, yes.
2        Q   Okay.  Let's turn to Tab FF, an e-mail from
3    Noonan to Bob Pirnie and you dated October 7th, 2005.
4    Do you know how Tom Noonan came to the understanding
5    that all invoices had been paid by October 7th, 2005?
6        A   Yes.
7        Q   How did he come to that understanding?
8        A   I believe, as we stated earlier in the
9    conversation, that we were working through the month of
10   July and August and September to work through all the
11   confusion that was in place with the billing, we had
12   decided that we were going to pay these amounts, three
13   checks that are on record.  And Tom, at the time, had
14   believed that those had been executed.
15       Q   Okay.  Even though they really hadn't been, as
16   this Tab II indicates?  And Tab II is that check for
17   $39,793.01 dated September 2nd, 2005.
18       A   Correct.
19       Q   So you don't think, to the best of your
20   knowledge -- well, did you know that June invoice hadn't
21   been paid yet?
22       A   We had discussed that earlier in the deposition
23   that we had not processed the invoice because we were
24   still working through the confusion.
25       Q   Okay.

Page 74

1    the time, but I did receive it.
2        Q   Okay.  Do you think, just ballpark, that you
3    read it around the time that it was written, October 21,
4    2005?
5        A   I don't want to speculate.  I don't recall when
6    I received it.
7        Q   Okay.  And you read it when you received it,
8    whenever that was, right?
9        A   Absolutely.
10       Q   There are a couple of things attached to this
11   letter.  One of them is Conference America's services
12   terms and conditions, the other is a list of
13   spreadsheets or -- not a list, but a bunch of
14   spreadsheets.  Do you see what I'm talking about?
15       A   I see the spreadsheets.
16       Q   Did you examine these ever?
17       A   I don't recall examining these.  I don't
18   remember.
19       Q   In the second paragraph of this October 21,
20   2005 letter, Bob Pirnie writes, "I enclosed a printout
21   of the Web page showing the prices in effect during the
22   period covered by the July bill.  I also enclosed a call
23   detail record showing the specific charges for each
24   service rendered to each of your accounts included in
25   the July bill.  Our July invoice was provided in the

Page 76

19 (Pages 73 to 76)

1   format Conexant had previously specified, which does not
2   include call detail." What format had Conexant
3   previously specified?
4     A  Where do you see that?
5     Q  I'm looking at the second paragraph of Exhibit
6   GG, and really just the last sentence.
7     A  Can you reask the question?
8     Q  Really I can break it down simpler than that.
9   What billing format had Conexant previously specified?
10    A  So the billing format that I believe Mr. Pirnie
11  is referring to is the fact that all of Conexant's
12  billing had to have a user name and a department code so
13  that we could do the charge back allocations.
14    Q  Okay.
15    A  But we didn't necessarily -- but we did not get
16  the bill -- the thousands of paper of usage.
17    Q  Okay. When he's talking about call detail, is
18  that what you mean, then; there was a bill that -- he
19  says this is call detail, and does that mean he's
20  showing what exactly was used by who and when for how
21  long, that kind of thing?
22    A  I'm not sure it's in those terms. But he's
23  basically -- call detail is the individual using the
24  conferencing with the parties that are a part of the
25  conference. And then the usage, that's attached to that

Page 77

1   conference on a permitted basis.
2     Q  Okay. And the billing format Conexant has
3  specified basically shows the user and what else?
4    A  The billing format states the user, a division
5  code, a department code, and a total so that when that
6  comes into Conexant for processing, that's allocated out
7  to the end user.
8    Q  Okay. Much simpler than the records of the
9  spreadsheets attached to Exhibit GG?
10    A  That's correct.
11    Q  Okay. Let's turn to Tab HH. Did you ever
12  receive a copy of this letter?
13    A  I did.
14    Q  Okay. Do you remember when?
15    A  I don't remember the exact date, but I received
16  this, of course -- actually, I received this prior. I'm
17  not sure what the exact date is, but I did get a copy
18  for review when Tom was going to send the letter out.
19    Q  Okay.
20    A  And then of course I got the -- a copy of the
21  signed agreement as well.
22    Q  Okay. Have you ever cursed at any Conference
23  America employees?
24    A  Cursed?
25    Q  Yes.

Page 78

1     A  I don't recall.
2    Q  Is it possible that you cursed at any
3  Conference America employees?
4    A  I don't understand your question.
5    Q  Last year, did you verbally abuse a Conference
6  America employee named Greg Folkes?
7    A  No.
8    Q  Did you ever verbally abuse a Conference
9  America employee named Reid Karle?
10    A  No.
11    Q  When was the last time you spoke with a
12  Conference America employee in person?
13    A  In person?
14    Q  Yes.
15    A  I had lunch with Rob Pirnie sometime in the
16  period of -- I think that was part of those e-mails I
17  gave you this morning. I'm not sure.
18    MR. MILLER: It is in the batch you handed me,
19  but I said it's already in the batch we produced. And
20  there is an e-mail somewhere about that.
21    MR. BORTON: Okay.
22    THE WITNESS: So I had lunch with Rob Pirnie.
23  BY MR. BORTON:
24    Q  Do you know, ballpark, when that was?
25    A  Sometime between the month of February and

Page 79

1   March. I do recall that --
2    Q  2005?
3    A  -- because I met with Rob Pirnie prior to my
4  trip to India. That's why it sticks in my head. And I
5  went to India the latter part of March.
6    Q  This was 2005, right?
7    A  This was a year ago, over a year ago.
8    Q  2005?
9    A  That's correct.
10    Q  When was the last time you spoke to a
11  Conference America employee on the phone, anybody that
12  works at Conference America on the phone?
13    A  A live conversation?
14    Q  Yes.
15    A  I don't remember.
16    Q  Okay. Have you spoken to someone at Conference
17  America on the phone since June 24th, 2005?
18    A  I don't remember.
19    Q  Okay. And it's not a trick question, I'm just
20  trying to get your last phone conversation with anybody
21  there that you do remember.
22    A  Outside of the e-mails that transacted between
23  myself and Rob and, of course, the e-mail that I sent to
24  Jason July 12th, I don't remember any verbal
25  conversation beyond that.

Page 80

20 (Pages 77 to 80)

Esquire Deposition Services
800-888-6949

1    Q   Okay.  Besides the e-mails we've talked about
2  that are attached to this verified complaint that we've
3  been through -- I have a better way to ask that.
4        I'm trying to get a feel when your last e-mail
5  to or from Conference America was.  Do you remember?
6    A   I tried to reach out to Jason, according to
7  this e-mail, on July 12th.
8    Q   And again, not a trick question, I know on Tab
9  P we got a July 20th e-mail.
10   A   I think after the July 20th e-mail -- it looks
11 to be July 20th, according to the e-mails that we
12 documented.
13   Q   Okay.  You can't remember any other e-mails?
14   A   Outside of what's in this exhibit, I don't
15 recall anything beyond the dates that are in here.
16   Q   Okay.  And that's a fair way to say it.  Other
17 than the e-mails or letters referenced in this exhibit
18 and any phone conversations we've just discussed, you
19 don't remember any other contact with Conference
20 America?
21   A   I do not remember.  I do not remember.  I don't
22 recall any other beyond that, no.
23       MR. BORTON:  Okay.  I think that's all I got.
24       MR. MILLER:  I just want to ask a very few
25 questions, Paul, to make sure something is clear.

Page 81

1  contained in if it was contained in it?
2        MR. BORTON:  Object to the form.
3  BY MR. MILLER:
4    Q   You can answer.
5    A   Oh, can you restate that question?
6    Q   Sure.  If a deactivation fee of $74.95 per
7  leader account had been contained in the paragraph that
8  you read to determine the new rates, do you think you
9  would have noticed it?
10       MR. BORTON:  Object to the form.
11       THE WITNESS:  Absolutely.
12 BY MR. MILLER:
13   Q   Why would you have noticed it?
14   A   Because I stated to -- earlier in the
15 deposition, in the conversation, I specifically went to
16 this document to look up the rates that were in this
17 document.  And at that time, when I first looked it up,
18 I was looking at rates, and there were the rates, but
19 there were no deactivation fees at that time.
20       MR. MILLER:  Thank you.  That's all I have.
21       MR. BORTON:  No further questions.
22 //
23 //
24
25

Page 83

1        EXAMINATION
2  BY MR. MILLER:
3    Q   Do you remember when Mr. Borton was asking you
4  questions earlier about Exhibit A, which is the terms
5  and conditions sheet printed off from a Conference
6  America Web site which is dated July 25, 2005?
7    A   I remember him asking questions about that.
8    Q   And in case someone should misinterpret his
9  questions and your answers, I want to ask a very clear
10 and precise question about the deactivation fee.  Do you
11 see that in paragraph 5-A of Exhibit A to the verified
12 complaint?
13   A   I see that.
14   Q   And I'm specifically referring to the language
15 referencing a $74.95 deactivation fee.  Do you see that?
16   A   I see that.
17   Q   When you first looked at the Conference America
18 Web site in June 2005 to determine what the new rates
19 would be, was there any deactivation fee on the Web site
20 information that you looked at?
21   A   On the first time I went to review the rates?
22   Q   Yes.
23   A   There was no deactivation fee at that time, no.
24   Q   Is that something that you believe you would
25 have noticed if you read the paragraph that it was

Page 82

1
2
3
4
5
6
7
8
9        I, PAUL EDGE, do hereby declare under
10 penalty of perjury that I have read the foregoing
11 transcript; that I have made such corrections as noted
12 herein, in ink, initialed by me, or attached hereto;
13 that my testimony as contained herein, as corrected, is
14 true and correct.
15       EXECUTED this _____ day of _____,
16 2006, at _____, _____.
         (City)              (State)
17
18
19       _____
         PAUL EDGE
20
21
22
23
24
25

Page 84

21 (Pages 81 to 84)

```
 1
 2
 3
 4          I, the undersigned, a Certified Shorthand
 5   Reporter of the State of California, do hereby certify:
 6          That the foregoing proceedings were taken
 7   before me at the time and place herein set forth; that
 8   any witnesses in the foregoing proceedings, prior to
 9   testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14          I further certify that I am neither
15   financially interested in the action nor a relative or
16   employee of any attorney of any of the parties.
17          IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated: _____
21
22
           _____
23         CARI A. FOLSOM
           CSR No. 9822
24
25
                  Page 85
```

Esquire Deposition Services
800-888-6949

**A**

AA 68:4 69:8
ability 8:24
able 6:1 25:7,10,12
absolute 9:3
absolutely 14:8,12
  16:4 19:5 28:15
  33:20 37:11
  54:25 56:10,12
  56:23 65:9 67:3
  72:7 76:9 83:11
abuse 79:5,8
accepted 27:15,16
  27:18,20
access 32:18
accompanied 5:13
  6:3 19:21
account 30:16,23
  35:10 36:2 64:12
  64:22 73:6 83:7
accounts 31:6,10
  31:14,19 32:3,15
  32:18,22 33:2,8
  33:18,24 34:1
  36:3,24 37:1,7
  52:18,22 53:4
  59:16,18 64:4,9
  76:24
accurate 85:12
achieved 20:10
acquaintances
  11:24
acquisitions 18:23
action 85:15
active 15:2 16:6
activities 20:6
actual 36:21 41:21
  61:22 70:20
  71:18
addition 13:16
additional 6:2
address 11:13
addressed 24:18
Admin 4:19
administrative
  55:12
advance 9:12
ago 19:2 25:16
  80:7,7
agree 22:5,11
  54:15 63:12 68:7
  68:8 72:8,10
agreed 14:3 32:9
  32:19 66:1 71:6
agreement 19:17
  23:13 26:14,16
  27:8,10,12,12
  31:23,25 32:13

32:14,16,17
  34:11 47:19
  53:18 63:17 64:3
  64:7 78:21
ahead 40:25 48:15
Alabama 1:1 2:1
  3:11 11:24
aliases 11:10
allocate 59:17
allocated 59:21,23
  78:6
allocation 59:19
allocations 77:13
Alvin 6:18
amendment 22:21
  22:25 23:14
amendments 10:15
America 1:4 2:4
  9:8,19,20,21,22
  13:15,20 14:2,10
  21:8,9 24:17,25
  27:7 28:9 30:4
  32:9,20 34:5,11
  36:9,16 43:21
  44:10,15,15
  48:25 50:10,17
  50:18 51:5 52:19
  52:23 53:1,5,17
  53:20,25 55:15
  56:7,21 57:9,10
  57:15 59:8,12
  61:7,20 62:13,18
  63:9,10,14,20,22
  63:23,24,25 64:5
  64:8 65:12 66:1
  66:6,17 68:14,16
  68:19 69:10,14
  69:19,25 70:5,8
  72:24 78:23 79:3
  79:6,9,12 80:11
  80:12,17 81:5,20
  82:6,17
America's 11:1
  24:7,10 36:5
  37:13,20,24
  38:21 39:22,24
  42:11,14 43:10
  43:14,18 51:20
  52:11 54:6,19
  68:22 70:21
  76:11
amount 14:3 57:2
  58:23 59:2,6,7
  60:16 61:5,6
  62:13 68:15
amounts 74:12
analysis 73:2,13,25
analyst 18:17

answer 8:18 28:7
  51:10
answered 28:4
  33:11 45:18,19
  45:20 46:14 48:5
anybody 14:4
  28:24 29:7,9,20
  35:18 49:23
  51:10 62:9 80:11
  80:20
appear 69:11
APPEARANCES
  3:1
appeared 70:1
appears 22:1 69:13
  69:18
applied 43:4 70:9
apply 31:5,10 33:1
  33:2
approval 59:24
  62:6,7,8
approvals 21:4
approved 62:18
approximate 16:18
  71:21
approximately
  15:3 17:13,14,22
  43:6
area 16:9 20:16,16
  41:14
army 14:21 15:1,2
  15:2,6,7,17 16:5
  16:6,7,11,14,16
asked 28:4 55:2
  58:25 64:13,23
  65:11
asking 6:22 27:24
  40:14,17 41:2
  42:2,3 43:21
  44:11,15 82:3,7
asks 63:14,20,23
assessment 30:7,9
  30:12
assumed 73:2
assumes 64:15,25
  65:16
assumption 73:5
ATCHISON 3:8
Atlanta 3:6
attached 19:11
  44:6 46:13 51:16
  54:5 68:9 76:10
  77:25 78:9 81:2
  84:12
attended 14:20

answer 8:18 28:7
attention 23:10
  51:10
attorney 3:5,9 6:19
  85:16
audio 10:15,16
  22:16,21,25
  24:11,13 27:11
  27:14 28:12
  30:10 31:4,8,11
  31:15 32:4,22,25
  33:9,18 36:25
  52:2 54:1 60:19
  64:10 65:7,21
audit 62:6
auditing 49:6 62:5
Audria 56:7
August 42:16
  43:18 46:18,22
  46:24,25 47:5
  48:6 56:12 57:7
  62:16 74:10
authority 62:7,8
aware 33:17 43:17
a.m 49:24

**B**

B 22:14,14
back 25:17 26:12
  33:6 38:16,20
  39:8,17,19 42:16
  43:9 44:5 45:2
  45:12 46:12
  47:23,24 48:8
  50:14 54:20
  58:13 63:21
  67:12 68:9 77:13
bad 15:11 58:25
badly 14:6
ballpark 76:2
  79:24
bank 60:2,2
bankruptcy 12:15
base 34:9,10
based 17:18 21:6
  25:22 35:14 54:4
  54:10 59:18
  68:17 73:23,25
basically 18:17
  20:5,14 35:19
  36:2 40:11 56:25
  75:9 77:23 78:3
binder 4:13
Birmingham 3:11
birth 11:20
batch 79:18,19
Bates 4:15,16,18
  4:19 5:15
Bates-stamped
  24:1 34:14
BB 60:22 61:12

62:11
Beach 1:16 2:17
  5:1 18:19
beginning 2:18
  30:3
behalf 2:15 27:19
  47:6 57:16
believe 16:17 25:22
  28:13 31:4 37:3
  42:15 54:3 63:6
  63:7 64:23 68:13
  74:8 77:10 82:24
believed 53:25
  74:14
believes 53:17
Bernardino 11:17
best 20:5 26:1
  73:15,24 74:19
  75:5
better 81:3
beyond 49:4 80:25
  81:15,22
bill 36:6,11 42:16
  42:18 43:6 45:21
  46:1,11,15,15,18
  46:22,23,25 47:1
  47:3,5,9,12,16,21
  47:23 48:6,10,13
  48:16,18,20,22
  49:2 50:11 56:12
  56:13,14,16,18
  56:24 57:4,6,7
  57:13,23 58:4,17
  58:22,23 59:3,11
  59:12,19 62:17
  71:5,6,21 75:4
  75:10 76:22,25
  77:16,18
billed 61:7 62:13
billing 36:1 50:12
  56:21 57:15,24
  60:8 67:17 72:24
  74:11 77:9,10,12
  78:2,4
bills 21:5,9 36:5,9
  36:16 47:10,12
  47:13,17 50:24
  51:6 61:19 62:10
  66:5 67:19 71:19
  75:6,12
binder 4:13
Birmingham 3:11
birth 11:20
bleed 57:24
blue 69:13 71:12
Bob 24:18 25:15
  38:15 50:19 51:1
  52:10,22 53:3

68:5 74:3 76:20
body 8:7
Borton 3:4 4:4
  5:11 6:16 7:1
  11:9 19:22 22:7
  22:10,12 25:9,13
  26:22 28:6 29:19
  31:24 32:2 33:13
  34:13,20,24 35:4
  38:3,5 40:18
  41:6 44:20,23
  45:2,5,10,12
  48:2 50:14,21
  53:2 58:19 63:19
  64:17 65:5,20
  66:3 67:10,12
  70:3,6 79:21,23
  81:23 82:3 83:2
  83:10,21
bottom 23:24
Boulevard 2:16
bound 7:24 63:14
Box 3:10
break 9:6 17:25
  77:8
breaking 45:9
breaks 9:5
Brewster 4:16
brief 13:13
briefed 7:18
Brookwood 3:10
built 64:4
bunch 76:13
business 23:17,19
  23:20 26:1,3,6,9
  26:10 29:25 30:1

**C**

C 22:20
cable 17:9,12
calculated 69:10
  70:13,25
calendar 25:24
California 1:16
  2:17 5:1 11:15
  14:23 16:11,13
  16:20,22 17:8
  85:5
call 9:20 10:5
  18:10 49:14,19
  72:23 76:22 77:2
  77:17,19,23
called 11:8 17:9
calls 52:2
care 75:14
career 14:5
careful 8:4
Cari 1:22 2:19

6:23 85:23
Carr 56:7
case 9:24,25 82:8
Cass 35:24 56:6
57:1,16 60:1
62:4,23
cause 23:12
CC 60:4 72:4
cells 20:17
Central 14:20
16:10 17:4
cents 40:7 43:6
69:12 72:23 73:4
73:6,9
certain 14:3
Certified 2:20 85:4
certify 85:5,14
change 54:10
changes 7:3,5 20:7
charge 18:17 20:15
20:19 55:25
65:14 66:20
69:25 70:5 73:4
77:13
charged 12:17 13:2
14:2 64:5 71:8
charges 31:16 32:3
69:9 70:13,15,25
71:14 73:8 76:23
charging 69:4,5,10
69:15,19
check 42:14 46:6,8
58:7 59:11 60:2
60:3,16 61:4
62:12 68:10,11
68:12,13,13
70:19 74:16
75:17
checks 58:5 74:13
75:4,16
children 12:9
Chino 11:14,16
Chip 4:14 24:2
Chris 4:17 55:24
56:1,3
City 84:16
clause 24:25
clauses 26:5
clean 5:17,21
48:10
clear 24:20 46:18
53:17,20 81:25
82:9
clearly 71:11
clicked 42:4
code 77:12 78:5,5
codes 35:8,8,10,13
35:15

collaboration
20:22
collectively 59:6
College 14:21
16:10 17:4
come 24:9,13
30:19,20 47:25
48:3 50:5 59:7
71:11 72:19 74:7
comes 66:21 78:6
coming 7:14
comma 45:18
comment 7:4
commitment 15:18
15:19
communicate
20:25
communications
55:20,25
company 17:9,25
18:10 35:25
66:19
company's 21:4
competitive 26:15
complaint 4:13
11:1,5 19:10
67:19 81:2 82:12
complete 8:24 9:3
15:21,23 58:3,15
completely 5:21
conditions 34:12
36:21 37:25
38:12,22,25 39:1
45:22 52:11
54:14,23 55:3,5
66:21 76:12 82:5
Conexant 1:7 2:7
9:9,13,13,17
11:2 13:15,20
14:4,6,7 16:24
18:2,3,8,11,13,14
18:16 19:23
20:13 24:16 25:1
26:23 27:4,8,11
27:19,20 28:1,16
28:20 31:16 32:9
32:13,17,20 34:5
35:12 43:9,13,17
46:20 49:14,16
50:6 51:20 52:14
52:23,25 53:17
54:14 55:13,14
55:14,17,19 56:2
57:1,16,25 59:17
61:20 63:6,7,8
63:13,20,22,23
63:24 64:3,7,12
64:23,23 65:11

65:13 66:1,18,21
68:19 69:5,10,25
70:5 71:6,7 73:3
77:1,2,9 78:2,6
Conexant's 69:11
70:20 77:11
conference 1:4 2:4
9:8,19,20,21,22
11:1 13:15,20
14:2,10 21:8,8
24:7,9,17,25
27:7 28:9 30:4
32:9,19 34:5,11
36:5,9,16 37:13
37:20,24 38:21
39:22,24 42:11
42:14 43:10,14
44:15,15 48:25
50:10,17,18 51:5
51:20 52:11,19
52:23 53:1,5,17
53:20,25 54:6,19
55:15 56:7,20
57:8,10,15 59:7
59:12 61:7,20
62:13,18 63:8,10
63:14,20,22,23
63:24,25 64:4,8
65:12 66:1,5,17
68:14,16,19,22
69:9,14,19,25
70:4,8,20 72:24
76:11 77:25 78:1
78:22 79:3,5,8
79:12 80:11,12
80:16 81:5,19
82:5,17
conferencing 10:1
10:7,15,16 20:23
21:15 22:16,21
22:25 24:11
26:25 27:5,9,11
27:14,21 28:2,18
28:22 30:10 31:5
31:9,11,15 32:4
32:22,25 33:19
36:25 52:2 54:1
55:15 60:20
64:10 65:7,21
77:24
confirmed 54:3
confirms 52:18,22
53:4
confused 33:16
36:18,19,20,21
36:23 37:6 46:17
48:9 64:19 69:9

69:19 70:24 71:1
71:3,4,13,15,17
71:23
confusing 33:7
49:10 71:19
73:18
confusion 47:6
48:6,20 50:12
56:21,24 57:3,5
69:23 72:3 73:23
74:11,24
connection 14:10
connectivity 20:15
20:17
CONS 60:5
consisting 19:19
consists 6:10
contact 48:12,25
49:23 50:1,4,17
50:23 81:19
contacted 48:14
50:8
contained 83:1,1,7
84:13
continue 30:5 31:5
31:10 32:24 33:2
continuing 14:22
contract 10:1,2,4,4
10:5,7,8,8,14,15
10:17,20 21:19
21:19,22 22:2,17
22:21,25 23:2
24:8,10,11,13,19
25:1,20,23 26:8
27:3,13 28:10
30:17,25 31:5,9
31:11,15 32:4,9
32:19,22,25 33:1
33:3,9,19,21
34:6 36:25 37:2
37:4 38:11,14
43:23 44:3 54:1
64:10,21 65:7,17
65:19,21,22 66:1
66:21 68:18 71:9
71:18 72:21,22
73:5,8
contracts 9:24
19:24 20:1 66:23
66:24
contract's 30:10
conversation 44:1
74:9 80:13,20,25
83:15
conversations
81:18
converse 8:5
convert 30:4

convicted 12:20,22
12:24
copies 5:16 57:15
62:2,4
copy 5:17 6:7,8
22:2,6 25:3 31:2
62:23 75:20
78:12,17,20
corner 60:6
correct 6:25 10:9
13:2 15:25 17:1
21:9,10,12 22:1
22:5 24:11,12
28:23 31:3,17
33:19 34:7 36:5
37:7,8 42:20
45:15,16 46:6,7
48:23,24 51:17
55:10 56:15 66:9
66:14,15 67:2,8
67:9 68:2 74:18
75:19 78:10 80:9
84:14
corrected 84:13
corrections 84:11
costs 63:13
counsel 4:9,25
count 26:6
county 11:16,17,18
14:18
couple 18:20,24
56:17 76:10
course 51:2 59:25
66:22 71:5 78:16
78:20 80:23
court 1:1 2:1 6:13
7:25 11:14 13:7
19:15 26:18
29:16 34:18 35:2
covered 76:22
created 30:16,23
31:14,22,24 37:7
crime 12:18,20,22
CSR 1:23 85:23
current 25:2
currently 69:4
cursed 78:22,24
79:2
cut 60:2 75:4
cycle 75:8,10

D

D 22:24 23:10 26:8
daily 20:20 36:2,2
data 10:1,2,3,5,7,8
11:2 20:15 21:1
21:15,19 22:2
date 11:20 16:19

25:19,23,25
26:20 35:12 39:6
39:9 44:13 50:1
53:10 54:1,3
59:10 71:18
78:15,17 85:17
dated 4:15,16,18
4:19 21:16 74:3
74:17 82:6 85:20
dates 81:15
day 20:8 26:6
29:22 41:3 84:15
days 23:13,17,19
23:20 25:19 26:1
26:3,7,9,10
29:25 30:1,4
day-to-day 20:6
21:3
deactivated 64:11
deactivating 64:22
deactivation 52:18
52:22 53:4 63:11
63:21 64:5,6,9
64:11,22 65:10
65:11 67:1,5
69:12 70:2,12
71:7,11 72:1,2
73:19 82:10,15
82:19,23 83:6,19
deactivations 71:8
71:9
deal 19:24 68:17
December 18:4
23:1,3,4
decide 15:20 28:1
decided 15:24
17:24 28:8,21
74:12 75:6
decipher 72:12
decision 29:3 35:19
35:21
declare 84:9
decreased 19:6
deemed 34:4 57:10
64:9
defendant 3:7 9:9
Defendants 1:8 2:8
defense 4:9
degree 14:22,25
Delores 24:16 25:9
department 20:25
55:21 77:12 78:5
departments 59:22
deposition 1:15
2:15 5:9,13,24
6:4,20 7:7,10,14
7:17 8:17 9:11
10:23 11:3 19:10

19:21 34:16
68:21,24 71:2
74:22 83:15
**described** 19:18
30:22
**design** 20:17
**detail** 76:23 77:2
77:17,19,23
**determine** 27:4
42:21,22,24
57:12 58:21,22
59:2 73:20,21,23
73:24 82:18 83:8
**determined** 26:24
28:17 62:16 75:3
**Devan** 12:12
**difference** 15:13
**different** 15:9
17:25 42:25
60:14
**direct** 23:9 28:24
29:20 35:18
41:18 50:19
51:10,10
**directed** 29:21
**direction** 85:12
**director** 66:19
**disagree** 32:11
70:18
**disapprove** 56:18
**disapproved** 56:8
56:13,14,23
**disapproving** 56:9
66:5,11
**discharge** 15:4,5,7
15:14,15,23 16:1
**discharges** 15:9
**disciplinary** 16:2
**disconnection** 63:9
**discuss** 13:13 29:6
29:9 49:15,20
50:2 51:3 66:17
**discussed** 13:11
74:22 81:18
**discussing** 51:6
56:17 60:15
**Discussion** 6:11
19:13
**discussions** 66:4
**dishonorable**
15:17
**dispute** 13:24 22:8
36:7,11,16 47:9
47:10,18,23,24
48:22 49:2 67:4
**disputed** 67:1,6
**DISTRICT** 1:1,1
2:1,1

**divestiture** 18:23
**division** 1:2 2:2
78:4
**divorced** 12:7
**docked** 19:6
**document** 22:15,18
23:6,8 24:21
40:20 41:9,10
42:6 53:12 62:20
62:23,25 63:1,2
67:14,16,17
75:15 83:16,17
**documented** 51:3
81:12
**documents** 5:12
19:9 43:1
**doing** 45:4 57:7
66:11 67:18
73:12
**dollars** 71:23
**Donna** 56:5
**duly** 5:5
**duty** 16:6

**E**

**E** 3:4 21:14,14
**earlier** 5:15 6:19
8:18 31:13 48:5
55:2,8 56:22
68:21,24 74:8,22
82:4 83:14
**Edge** 1:15 2:15 4:3
4:14,16,17,19
5:4,18,23 6:18
12:5,6,13 19:25
21:16 25:14
67:13 84:9,19
**education** 14:13,14
**EE** 58:7 72:5
**effect** 54:11 76:21
**effective** 22:25
23:4 30:11 36:15
54:7 68:17
**effort** 36:13
**either** 5:19 12:21
23:12 75:13
**electronic** 61:23
62:24
**electronically** 62:1
**elements** 18:1
**employee** 17:20
20:24 24:16 79:6
79:9,12 80:11
85:16
**employees** 63:6,7
78:23 79:3
**employment** 16:24
18:8

**enclosed** 70:19
76:20,22
**encourages** 52:10
**ended** 61:8
**ensure** 42:17 57:1
57:17,22 59:5,20
66:18,23 71:20
**ensuring** 59:6
**entered** 64:8
**entire** 41:9 71:2
**entirety** 23:7
**equivalent** 36:8,10
**errors** 6:25
**eventually** 46:1
**everybody** 35:12
55:13,16,19 56:2
59:21
**evidence** 64:15
65:1,16
**exact** 16:19 25:25
26:20 39:6,9
41:20 59:10
61:21 78:15,17
**exactly** 40:6 41:25
77:20
**EXAMINATION**
4:2 6:15 82:1
**examine** 76:16
**examined** 5:5
**examining** 19:24
76:17
**excess** 71:22
**Exclusive** 70:2
**excuse** 22:19 53:14
75:21
**executed** 24:25
27:10 30:24
74:14 84:15
**exhibit** 4:13 6:8,12
19:10,14,18,18
21:14 22:14,15
22:19,20 23:10
26:8,12,13,17
28:25 29:12,15
34:13,15,17,25
35:1,23 41:18
44:17 45:14 61:4
62:11 67:20
75:20 77:5 78:9
81:14,17 82:4,11
**exhibits** 4:7,11
11:5,7 19:11
23:22 35:17
39:15
**existed** 31:10 32:15
32:23 33:3,8,18
34:1 36:24
**existing** 31:6,20

32:19 33:1,5,23
33:25 34:4 37:1
37:1 44:3 64:8
65:22 71:9 72:22
73:25
**expenses** 40:22
**explained** 6:23
13:22 55:2,8
56:21 75:7
**explicitly** 27:12
**extension** 14:25
**extent** 17:13
**e-mail** 4:14,16,17
4:19 5:19,20
24:1,3,5,15,21,22
25:7 28:25,25
29:6,9,13,20,21
34:21,25 35:5,7
35:14 36:4 37:10
43:20,25 44:10
44:14,18,21,22
45:7,14 46:13
47:8,15 48:12,17
49:6,12,15,15,20
49:20,24 50:2,9
50:17,23 51:11
51:16 54:5,8,9
54:10,12 55:23
55:24 56:2,3
74:2 75:12 79:20
80:23 81:4,7,9
81:10
**e-mails** 4:9 5:16,20
6:2 19:19 35:19
35:20 39:15
44:23 49:4 50:22
51:3,5,14,15
55:11 79:16
80:22 81:1,11,13
81:17

**F**

**fact** 14:2 50:24
51:6 77:11
**facts** 64:15 65:1,16
**failures** 16:2
**fair** 39:21 62:12
81:16
**faith** 72:25
**fall** 25:19
**familiar** 10:19
22:15,18 23:1,5
65:6
**February** 6:4
11:22 16:16
17:20 79:25
**FedEx** 53:12
**fee** 63:11,22 64:5,9

64:22 65:11
69:12 70:2,12
71:7 72:1,2
82:10,15,19,23
83:6
**feel** 81:4
**fees** 40:21 63:9
64:6,11 67:1,4,5
71:11 73:19
83:19
**felt** 59:7
**FF** 74:2
**figure** 48:21 49:9
57:8 60:15 66:9
71:10 72:20
**filed** 12:15
**final** 62:7,8
**finalized** 26:16,21
27:2,9
**finally** 45:18
**financially** 52:14
85:15
**find** 6:1 25:7,11
38:13 41:22 55:5
69:3
**fine** 41:23
**fired** 18:5
**first** 5:5,14 7:10
14:13 23:10,25
37:20 39:11,22
43:4 45:17 60:24
61:2 71:17 82:17
82:21 83:17
**five** 20:13
**flip** 21:25 34:24
40:9 45:13
**flipped** 5:18
**Floor** 2:17 3:10
**flows** 20:25
**flush** 39:14
**Folkes** 79:6
**follow** 6:21 13:18
**following** 16:23
31:12 44:4
**follows** 5:6 58:14
**FOLSOM** 1:22
2:19 85:23
**foregoing** 84:10
85:6,8,12
**form** 63:16 64:14
64:25 65:15 83:2
83:10
**formally** 6:9
**format** 42:7,8
62:24 77:1,2,9
77:10 78:2,4
**forth** 47:18 48:9
85:7

**forward** 14:15
46:17
**found** 58:9
**four** 14:21 15:2
40:11
**fourth** 52:17,21
53:3
**four-year** 15:16
**frankly** 5:14
**Friday** 5,6:6
**friends** 11:23
**front** 25:24 35:17
**fulfill** 15:15,18,19
15:20 73:1
**full** 6:17 8:24
17:13
**full-time** 16:9 17:3
17:20
**further** 83:21
85:12,14

**G**

**gel** 54:18
**general** 15:7,12,13
15:22 16:1 40:24
41:3 42:5 61:23
**generally** 7:16 20:8
41:3 42:5 61:23
**Georgia** 3:6
**getting** 31:17
46:16 61:13
**GG** 75:20,21 77:6
82:9
**give** 5:14,15,21
20:4 25:25
**global** 19:1
**go** 7:19 8:6 11:12
19:9,12 26:12
29:12 35:22
38:24 40:25
41:21,22 43:9
48:15 52:6 55:3
59:19 61:11,25
63:4 70:3,16,17
72:5 73:12 75:8
**goes** 14:6
**going** 5:11 8:2,3
9:11,13,20 10:1
10:3,16 21:13,18
22:8,16 23:21,22
26:24 27:5 28:2
28:17,21 31:10
33:7 37:3 48:8
49:1 50:11,24
51:6,13 54:19
55:14 57:18 58:8
66:8 74:12 75:4
78:18
**good** 72:25

**Gorciak** 4:17
  55:24
**gotten** 6:1
**governing** 54:16
**graduated** 14:16
**grand** 61:1 62:11
**great** 19:24
**Greg** 79:6
**guard** 15:3,6,7,19
  15:24
**guesstimate** 75:5
**guys** 61:8

**H**

**hammer** 9:12
**hand** 61:14
**handed** 6:7 79:18
**handled** 30:10
**hash** 56:22
**head** 8:6 44:19
  80:4
**headquarters**
  17:18
**hear** 8:14 28:19
**held** 18:13
**help** 58:8
**hereto** 84:12
**here-it-is** 5:22
**HERMAN** 52:25
**Hermann** 3:13
  72:15
**Hey** 48:13
**HH** 78:11
**high** 14:14,16,17
  14:18 18:5 30:5
**higher** 31:16 32:4
  33:10
**Hills** 11:15,16
**hire** 17:19
**hired** 18:16
**history** 16:24
**hold** 36:10 42:3
**holiday** 26:5
**honest** 42:9
**honorable** 15:4,5,8
  15:11,14,15,17
**hours** 56:17
**huh-uh** 8:6

**I**

**idea** 35:11 59:9
**identification** 6:13
  19:15 26:18
  29:16 34:18 35:2
**II** 46:5 61:4 74:16
  74:16
**implying** 8:21
**impressed** 5:24

**inaccurate** 8:19
**include** 5:22 60:20
  77:2
**included** 27:11
  46:23,24 76:24
**incomplete** 8:18
**Incorporated** 17:9
**incorrect** 8:18
**increase** 67:6
**increased** 73:19
**incur** 31:16 32:3
**incurring** 73:4
**INDEX** 4:1
**India** 80:4,5
**indicated** 14:4
**indicates** 74:16
**individual** 20:24
  77:23
**individuals** 20:14
**industry** 17:12
**Info** 35:24 62:4
**informal** 7:24
**information** 56:6
  57:16 82:20
**informed** 55:13,16
  55:19
**informs** 52:14
**infrastructure**
  17:12 18:18
  20:20
**initialed** 84:12
**ink** 84:12
**install** 17:17
**instruct** 49:12
**instructed** 36:4,6
**interact** 66:13
**Intercall** 26:15,24
  27:5,9,10,25
  28:2,8,18 35:9
  35:12
**Intercall's** 28:21
  35:10
**interchangeably**
  10:6
**interested** 85:15
**internally** 46:20
  59:21
**International**
  17:22,24 18:3
**International's**
  17:18
**interpret** 26:9 30:1
**invoice** 60:5,19,23
  60:23 61:12,13
  61:14 72:12
  73:18 74:20,23
  76:25
**invoices** 56:8,9

**61:17,19 74:5**
**involved** 9:25 13:4
  21:7
**Irvine** 14:23
**issue** 9:24
**issues** 13:23,25
**items** 48:21
**IV** 3:4
**I.T** 18:23

**J**

**Jason** 80:24 81:6
**Jeff** 13:10,11,14,19
**jeopardy** 14:6
**job** 1:24 16:3,8,23
  17:2,7 18:6 20:7
  20:13 61:16
**jobs** 17:6
**JOSEPH** 3:9
**Jr** 6:18
**Juliana** 12:12
**July** 16:18,21
  34:25 35:11
  36:16 37:10,12
  37:14 39:22 40:1
  42:16 43:10
  46:12,15 47:1,1
  47:5,8,22 48:6
  48:11,16,20,23
  49:6,24 51:20
  53:12,16,18,21
  54:10,11 57:23
  58:2,20 59:1,4,8
  62:16 67:8,17
  70:21 71:5,6,18
  74:10 76:22,25
  76:25 80:24 81:7
  81:9,10,11 82:6
**June** 9:25 10:7
  16:18 21:16 24:6
  25:14 28:13,16
  28:20 29:14
  34:22 38:15,19
  39:4,10,10,11,19
  40:12 41:13 43:5
  44:4,10,13 45:20
  46:1,11,15,15,23
  46:23 47:2,15,21
  47:23 48:13,16
  48:20 54:20
  56:24 57:4,6,13
  57:19,23 58:4,16
  58:22,23 59:2,6
  59:12 60:8,23
  62:14,16 68:22
  71:16 74:20 75:4

**75:17 80:17**
  82:18

**K**

**K** 25:14 38:16 44:6
  44:7
**Karen** 3:13 72:15
**Karle** 79:9
**keep** 6:7
**kind** 8:6 12:17
  20:4 77:21
**kinds** 15:9 33:7
  73:9
**knew** 31:1
**know** 7:2,12 8:8,19
  9:6,16 13:23
  16:19 20:7 24:9
  24:13,24 25:19
  27:18,20 33:6
  36:17 39:16
  40:10 41:2 42:4
  43:13,15 44:17
  46:1,8 48:15
  51:21 53:24
  59:11,25 60:14
  60:17 71:25
  72:11 74:4,20
  75:23 79:24 81:8
**knowledge** 72:17
  74:20
**known** 18:2

**L**

**lady** 8:3 56:5,7
**landscape** 17:2
**landscaper** 16:8
**landscaping** 16:23
  17:1
**language** 5:22 8:7
  8:9 82:14
**Law** 3:5,9
**lawsuit** 9:13 13:12
  13:13,14,20 14:6
  14:7,10
**lawsuits** 13:5
**lawyer** 7:13,13
**leader** 83:7
**leave** 15:24
**left** 51:1 56:6 60:6
**letter** 5:20 24:17
  24:23 25:4,15,16
  25:22 26:2 31:2
  31:2 38:15,18,19
  38:20 39:4,7,18
  43:20 44:9,9,14
  45:7,22 53:6,7
  53:11,16,21 54:4
  68:5,6,8,10 69:8

**69:14,16 70:17**
  72:6,10 75:22,23
  76:11,20 78:12
  78:18
**letters** 48:8 81:17
**let's** 14:13 19:12
  20:10 22:19
  23:25 25:5 29:12
  33:13 34:13,24
  35:22 37:9,19
  43:9 52:6 53:14
  56:4 58:13 60:4
  61:11 62:19 63:4
  70:16,17 72:4
  74:2 78:11
**Lewis** 4:16
**life** 38:6 43:23,24
**line** 29:22 45:17
  50:19
**lines** 50:19
**list** 76:12,13
**live** 11:18 80:13
**LLP** 3:4,8
**local** 16:9 20:16
**locations** 18:20
**long** 15:1 40:11
  77:21
**longer** 5:21 55:14
**look** 34:13 40:9,12
  42:17 56:4 60:4
  63:6 68:25 69:3
  83:16
**looked** 37:25 39:2
  41:3 42:5,11
  62:17 68:23
  82:17,20 83:17
**looking** 41:11
  44:22 51:9 61:11
  77:5 83:18
**looks** 24:1 40:20
  41:24 45:17
  47:21 49:23
  81:10
**lots** 41:1
**lunch** 79:15,22

**M**

**MacArthur** 2:16
**machine** 85:10
**Madison** 12:12
**mail** 59:25 60:2
**main** 50:19
**maintaining** 18:18
**maintenance** 20:20
**making** 20:21
**manage** 20:12
  66:24
**management** 13:14

**manager** 18:21
  19:2 36:2 66:23
**manager's** 18:24
**March** 6:5,6 80:1,5
**mark** 6:8
**marked** 6:12 19:14
  21:13 22:14,20
  23:21 26:13,17
  28:25 29:12,15
  34:15,17 35:1,16
  35:22 39:15
  45:14
**married** 12:1
**mean** 9:12 29:25
  33:15 38:4 49:5
  65:2 77:18,19
**meant** 5:14
**meet** 7:13
**Melissa** 35:23,24
  36:4,6 47:25
  48:12,12,14,18
**memo** 55:23,23
**mention** 26:9
**mergers** 18:22
**mesh** 57:24
**meshed** 46:19 47:7
  48:7,21 49:9
  71:19
**met** 80:3
**mid** 27:11
**MIDDLE** 1:1 2:1
**mid-July** 35:15
**MILLER** 3:9 4:5
  5:8 6:23 11:5
  19:17 22:3,8
  25:6,10 28:4
  31:22 33:11 38:2
  40:15,23 44:19
  45:9 48:1 63:16
  64:14,25 65:15
  65:24 70:2 79:18
  81:24 82:2 83:3
  83:12,20
**Miller's** 64:20
**minute** 19:12 40:8
  43:6 72:23 73:4
  73:6,10
**minutes** 68:15
  72:24
**misinterpret** 82:8
**mobile** 20:23
**money** 14:7 62:14
  63:13
**month** 42:16 59:4
  60:8 61:8 62:15
  71:16 74:9 79:25
**months** 17:14
  57:25

morning 79:17
move 16:13 22:12
moved 16:11,19,21
moving 46:17
multiply 72:24

**N**

N 35:22 36:13
name 6:17 11:11
　12:3 77:12 85:18
named 9:9 56:5,7
　79:6,9
names 12:11,13
national 15:3,6,7
　15:19,24
necessarily 73:20
　77:15
need 5:25 8:4 22:4
　36:15 65:4
needed 44:1 49:7
neither 85:14
network 20:16,16
　21:1,2
networking 19:2
　20:13,15
never 12:20 13:2
　34:10 39:1 41:9
　47:24 48:14
　63:10 64:5 71:6
　71:8,25
new 17:17 30:16
　30:18,21,22,23
　31:14 33:5,9
　34:11 35:8,8,10
　36:22 37:6 38:12
　39:2 45:21,21
　54:15 70:9,12
　82:18 83:8
Newport 1:16 2:17
　5:1 18:19
Newton 14:18
nicknames 11:10
nine 17:14
nonprescription
　8:23
Noonan 24:18
　25:15 53:15
　54:13 66:5 68:5
　69:8,18 70:10
　72:11 74:3,4
　75:11
Noonan's 5:8
　34:15
normal 26:4 61:15
normally 8:5 62:17
NORTHERN 1:2
　2:2
noted 84:11

notice 5:13,24 6:4
　19:21 23:13,17
　29:23
noticed 82:25 83:9
　83:13
notify 49:1
November 46:16
　47:22 48:3 59:13
　75:9
number 5:15 6:8
　43:8 59:18 60:5
　60:23 72:23
numerous 50:16
　50:18 51:2
N.E 3:5

**O**

O 37:9 43:9 54:6
oath 7:20 85:9
object 40:23 63:16
　64:14,25 65:15
　83:2,10
objection 28:4
　33:11 64:20
　65:24
obligation 15:16
　73:1
Obsidian 11:14
occasion 66:16
occasions 66:7
occur 69:14
October 74:3,5
　75:9,11 76:3,19
offered 27:14
offers 52:19,23
　53:5 63:22
offices 20:17
Oh 83:5
okay 7:7,12,19
　8:10,14 9:6,7,14
　9:15 10:11,17,18
　10:22,25 11:4,13
　11:20 13:4,11,16
　13:25 14:4,19
　15:1,22 16:5,16
　16:23 17:1,5,8
　18:16 20:4,12
　21:6,11,18,25
　22:10,19 23:6,9
　23:16,21 24:5,24
　25:5,13,19 26:3
　26:8,12 27:2,4,8
　27:18,23 28:11
　28:13,20,24 29:3
　29:12 30:7 31:1
　31:4,13,21 32:1
　32:11,21 33:6
　34:7,9,13,24

35:16 36:12,19
　37:6,12,19 38:14
　38:24 39:3,8,21
　41:12 43:9 44:4
　44:13 45:6 46:12
　47:8,17,21 48:11
　48:22 50:10,22
　51:9,25 53:7,14
　53:24 55:1,7,9
　55:18 56:4 57:21
　58:3,10 60:4,11
　60:14,18,22
　61:16,19 62:3,7
　62:19,22 63:4,8
　64:2,10,20 65:6
　65:10 66:4,16
　67:1,7,25 68:2,4
　68:9,21 69:4,7
　69:24 70:10 71:4
　71:24 72:4,8,16
　73:21 74:2,15,25
　75:20,23 76:2,7
　77:14,17 78:2,8
　78:11,14,19,22
　79:21 80:16,19
　81:1,13,16,23
omits 63:16
once 38:9 48:6
　59:23 66:23 71:5
　75:7
ones 5:17
operations 20:20
opportunity 6:24
　7:4
ordinary 61:24
Outside 71:25
　80:22 81:14
outsource 35:25
overall 13:24
overnight 24:17
owed 57:8,10 59:7
　68:16 71:16,17
　71:21
O-b-s-i-d-i-a-n
　11:14

**P**

P 44:20 45:13
　46:13 54:11 81:9
page 4:8,12 23:10
　60:12,24 61:2
　63:4,5 76:21
pages 4:10 6:10
　19:19 40:11 41:1
paid 46:2,16 47:21
　58:22 63:10
　68:14 71:8 73:6
　74:5,21

paper 55:23 61:22
　62:1,4,22 77:16
paragraph 23:10
　23:11,16 30:2
　35:7 40:21 41:18
　41:19,20,23 52:9
　52:13,17,21 53:3
　53:15 54:13 69:7
　70:16,17,23
　76:19 77:5 82:11
　82:25 83:7
part 8:14 16:25
　45:21 61:16
　67:17 77:24
　79:16 80:5
particular 44:16
parties 50:18 77:24
　85:16
party 23:12,14
part-time 16:8
　17:2
Paul 1:15 2:15 4:3
　4:14,16,17,19
　5:4,18,23,25 6:1
　6:18 11:12 81:25
　84:9,19
pay 14:3,7 19:6
　32:24 36:5,9
　47:18,25 48:1,3
　48:13,15,18 49:7
　57:1,18 58:1,23
　59:2,24 63:8,14
　63:24 64:12,24
　65:13 74:12
　75:10
paying 21:4,8 59:5
　61:8 69:12 71:20
payment 70:19
　72:25
payments 75:6
PDAs 20:23
Peachtree 3:5
penalty 84:10
pending 13:15
people 29:13 34:22
　45:15 72:16
perform 52:24
performance 16:3
period 20:9 57:6
　59:20 69:22
　76:22 79:16
periods 57:24
perjury 84:10
permanent 55:6
permitted 78:1
person 55:25 79:12
　79:13
phone 43:25 50:5

50:17 80:11,12
　80:17,20 81:18
phones 20:23
Pirnie 24:18 25:15
　37:10 38:16
　44:18,22,24
　45:15 50:19 51:1
　51:2 52:10,22
　53:4 54:5 68:5
　74:3 76:20 77:10
　79:15,22 80:3
Pirnie's 11:3 54:10
place 3:10 18:19
　27:12 32:10 34:5
　36:15,22 52:3
　68:18 74:11 85:7
placed 85:9
Plaintiff 1:5 2:5,16
　3:3 4:8,12,25
　6:12 19:14 26:17
　29:15 34:17 35:1
plan 9:5
plant 17:12
please 9:6
point 38:22 45:9
　46:19 47:23
　56:20 57:17,20
　57:21,22 58:5
Polich 4:14 24:2
population 59:18
portion 68:16
position 18:20,22
　18:24 20:7,11
　34:7,8,9,10 54:6
positions 18:12
possible 79:2
possibly 8:23 46:4
posted 54:15
posttermination
　37:7
practice 26:4
precise 41:4 49:22
　82:10
precisely 55:5
predefined 64:3
prepare 10:22
prescription 8:23
present 3:12 14:15
　18:13
presented 11:2
pretty 36:18
prevent 8:24 9:2
prevented 45:6,8
previous 54:22
　68:18 75:16
previously 19:14
　19:18 21:13
　22:14,20 23:21

26:13,17 28:25
　29:12,15 34:15
　34:17 35:1,16,22
　39:15 45:13 49:8
　66:8 77:1,3,9
price 21:15 43:21
　44:2,11,16 54:10
　64:7 65:25
prices 31:9 39:23
　42:19 54:19
　68:23 69:15
　76:21
pricing 30:9 36:14
　36:17 47:19
　57:13 66:20
primarily 72:18
printed 5:21 82:5
printout 76:20
prior 13:4 23:3
　28:16,20 31:24
　32:10,15,17 34:1
　34:6 36:24 37:5
　37:14 39:19
　41:11 53:20,24
　57:9 68:19 71:8
　71:9 72:1,22
　78:16 80:3 85:8
probably 37:22
　58:25 59:25
problems 16:2
procedures 7:17
proceedings 85:6,8
　85:10
process 48:19 49:1
　50:11 60:1 61:15
　61:23 62:6 66:9
　75:6,14
processed 48:19,23
　50:25 51:7 74:23
　75:8,12,13,18
processing 36:2
　75:8,10 78:6
produce 5:11
　25:11
produced 4:9 5:18
　6:9 19:20 79:19
producing 6:2
production 5:13
　6:3 19:21
professionals 4:19
　55:12
program 18:21,24
　21:15
project 17:16
promoted 18:21,25
prompted 24:5
proper 57:1 59:2,5
properly 59:22

**protection** 21:15
64:7
**provide** 25:1 30:5
**provided** 64:11,21
65:10 76:25
**provider** 27:25
28:3,9
**provision** 65:23
**pull** 21:13 40:19
**pulled** 40:11
**pursuant** 23:14
31:22
**pursue** 14:22 15:21
15:23
**push** 59:23
**put** 17:16 27:12
35:16 36:6 47:23
47:24 62:5 66:23
**puts** 62:11
**p.m** 2:18,18 5:2,2
**P.O** 3:10

_____ **Q** _____

**question** 8:11,15
27:22 35:18
37:18 40:23
44:25 45:18,19
45:20,23 46:12
46:14 52:20
53:22 55:3 58:11
58:24 63:18 65:4
65:18 69:17 77:7
79:4 80:19 81:8
82:10 83:5
**questions** 8:2,3
22:5 81:25 82:4
82:7,9 83:21
**quick** 7:19

_____ **R** _____

**R** 51:13
**rate** 30:5 32:18
34:4 36:22 38:13
39:2,25 40:7,19
41:15,17,21,22
42:5 43:4 55:6,6
58:1 61:24 68:25
69:2,3,11 70:9
70:12 71:6,21
72:21 73:19
**rates** 25:2 26:15
30:18,21,23 31:5
31:9,16 32:4,14
32:24 33:1,5,5
33:10,21,23,24
33:25 36:23 37:4
40:4,5,12 42:6
42:11,14,19,25

49:7 67:6 68:17
70:1 73:25 82:18
82:21 83:8,16,18
83:18
**reach** 81:6
**read** 5:9 21:22
23:6,7,9 45:2,3
50:14,15 53:7
58:13,14 67:20
69:13,16 76:3,7
82:25 83:8 84:10
**reading** 6:19
**real** 7:19 8:4
**realize** 8:17
**really** 48:9 74:15
77:6,8
**reask** 77:7
**reason** 39:14
**reasons** 71:24
**recall** 29:11 39:5
40:6 41:15,20
42:1,8 43:7,25
59:10 61:13,14
75:25 76:5,17
79:1 80:1 81:15
81:22
**receipt** 26:2
**receive** 61:12 76:1
78:12
**received** 24:15,17
24:23 25:17 27:6
35:15 38:11,16
42:15 46:18
53:10 56:12 57:6
67:18,19,24,25
68:1 71:5,22
75:25 76:6,7
78:15,16
**receiving** 37:9 52:6
72:5
**Recess** 45:11 67:11
**recollection** 26:1
39:17
**reconcile** 54:20
55:9
**record** 6:9,11
19:12,13 45:3,12
50:15 58:14
67:10,12 74:13
76:23 85:10
**records** 78:8
**refer** 9:13 10:1,3
10:16 21:18
22:16 75:15
**reference** 4:11
23:17 35:8
**referenced** 81:17
**referencing** 53:21

82:15
**referred** 38:15
**referring** 14:1
25:16 45:23
47:12 77:11
82:14
**refreshes** 39:16
**regular** 9:5 15:17
**Reid** 13:10,11,14
13:19 79:9
**relabeled** 19:17
**related** 57:13
**relationship** 54:16
**relative** 85:15
**relatives** 11:23
**relocated** 17:8
**remember** 13:8
17:13 24:2 29:13
34:21 35:5 37:9
37:22 39:9,13
40:3,6,7 41:25
44:9,14 45:4
46:3 49:18 51:19
52:4,5,6 53:10
56:8 58:8 72:5
76:18 78:14,15
80:15,18,21,24
81:5,13,19,21,21
82:3,7
**remote** 18:19
**render** 63:23
**rendered** 46:23,24
47:1,1 57:19
59:8 65:12 66:2
67:7 68:15 76:24
**rendering** 66:25
**repeat** 44:12,25
58:11
**Reported** 1:21
**reporter** 2:20 6:13
19:16 26:19
29:17 34:19 35:3
85:5
**represent** 40:21
**reprimanded** 14:9
19:3
**request** 5:12 6:3
19:20
**requested** 62:25
**requests** 63:13
**requirement** 15:16
**research** 57:8,12
58:3,12,16
**resolved** 36:14
49:2
**respect** 58:4,16
**respond** 50:20 51:4
**responded** 50:8

**response** 5:12 6:3
19:20
**responsibilities**
21:7
**responsible** 21:3
52:15
**restate** 58:24 63:18
69:16 83:5
**result** 14:7 16:2
**Retained** 4:25
**returned** 25:3
**review** 6:25 21:4
38:24 41:8,21
52:10 55:3,4
61:16 62:2,5,15
66:9 67:18 78:18
82:21
**reviewed** 10:22,25
11:1,2,3 21:22
38:21 39:1,6,23
39:25 40:4,5
41:9 43:5,5
54:14 63:2 68:2
68:3
**reviewing** 54:19
61:14 66:8,12
**right** 7:21,25 9:9
9:22,23 11:7
16:20 22:12
25:24 28:22,25
32:25 45:7 47:4
47:10,19 49:25
51:14 53:7 54:11
57:19 61:5,9,20
62:13 65:8 68:23
69:21 75:1,2,17
76:8 80:6
**rightful** 58:1
**Rob** 37:10 44:18
44:22,24 45:14
45:17,20 46:14
50:19 51:1 54:5
54:10 79:15,22
80:3,23
**Rockwell** 17:17,19
17:21,24 18:1,3
18:9
**role** 66:18
**Rough** 56:5
**run** 61:24 62:9
73:25
**running** 20:21
**R-o-u-g-h** 56:5

_____ **S** _____

**S** 3:9 44:24 51:13
**San** 11:17
**SANDERS** 3:4

**satisfied** 36:11
**save** 22:4
**saw** 40:3,10 41:14
41:15 68:6 75:22
**saying** 32:11,12,21
54:9 56:7
**says** 23:11,19
45:17 47:17,19
47:20 54:13 56:5
60:4,8,11 61:1,3
61:5 69:8 70:18
77:19
**scan** 24:20
**school** 14:14,16,17
14:18 18:5
**scrub** 57:14
**searched** 6:1
**second** 25:16 26:14
30:2,3 36:12
52:9 53:15 57:25
62:6 70:17 76:19
77:5
**section** 23:14 42:1
**see** 7:2 21:16,17
23:11,15,16,18
23:20 29:23,24
30:2,6 40:19
41:13,23 42:5
52:9,12,13,16,17
52:21 53:3,6,15
53:19 54:16,17
60:5,7,9,10,12,13
60:24,25 61:19
61:21,21 62:25
67:16 68:4,9,11
69:4 70:21,22,24
73:13,16 75:20
76:14,15 77:4
82:11,13,15,16
**seeing** 40:6,7 41:15
42:18 71:25 72:1
**seen** 21:19 22:22
41:7,19 62:19
67:14 69:15
**semiconductor**
18:9
**Semiconductors**
18:1
**send** 5:9,10 24:5,21
29:20,21 35:18
35:19 48:11
50:22 51:5,11
55:22 56:1 62:22
62:23 78:18
**sending** 24:2 29:13
34:21 35:5 44:9
44:14 45:7 49:20
55:19

**sent** 24:22 25:8
29:7,10 44:22
45:14 46:13
48:16 49:23
51:14,15,16 56:3
57:16 59:12
61:20 75:11
80:23
**sentence** 23:11
26:14 30:3 36:12
36:13 47:14 49:5
77:6
**September** 10:14
10:19 46:4 56:19
57:7 58:18,21
59:1,5,9,10
62:16 69:7 74:10
74:17
**series** 8:2
**served** 14:21
**service** 27:25 28:2
28:9 30:5 31:16
32:3 43:22 44:11
44:16 47:2 52:18
52:23,24 53:5
59:8 63:12,13,21
63:23 64:12,23
65:11,12,12 66:2
76:24
**services** 10:1,7
20:23 21:15 25:1
26:25 27:5,9,14
27:15,16,19,21
27:21 28:18,22
31:9 32:24 38:1
43:10,14,18,22
44:1,11,16 46:23
46:24,25 47:1,6
51:19,20,22 52:4
52:10,15 55:15
57:18 58:1 60:20
60:21 66:25 67:7
68:14 69:5 70:21
73:3,4,9,13,16,22
73:24 76:11
**set** 47:18 85:7
**setting** 7:24
**Seventh** 3:10
**shake** 8:5
**sheet** 82:5
**shorthand** 2:20
85:4,11
**show** 23:21
**showing** 76:21,23
77:20
**shows** 78:3
**side** 18:23 20:15
**Siemens** 17:10

sign 5:9
signed 78:21
signing 6:20
simpler 77:8 78:8
simply 49:6
site 37:13,21 38:21
  39:22,24 41:13
  41:21 42:4,11,14
  42:19 52:11
  54:15,20 55:5
  68:22,25 69:15
  70:1,9 72:2 82:6
  82:18,19
sites 37:25
situation 30:8
  36:18 66:17
situations 13:22
six 6:10 19:19 20:9
solve 56:24
soon 75:3
sorry 28:19 31:7
  36:13 64:19
  70:14
sounds 32:12
sourcing 66:20
speak 8:9
specific 37:18 41:5
  42:6 50:9 61:13
  65:4 68:25 69:2
  70:14 73:21
  76:23
specifically 53:23
  82:14 83:15
specified 77:1,3,9
  78:3
speculate 76:5
spelled 44:3
Spence 35:23,24
  36:4,6 47:25
  48:12,13
spent 19:23
spoke 79:11 80:10
spoken 80:16
spreadsheets 57:14
  76:13,14,15 78:9
spun 18:1,9
standard 32:18
  52:1,2 61:23
  62:17
STARNES 3:8
start 28:8 57:3
started 57:5,7
state 6:17 84:16
  85:5
stated 38:12 43:7
  45:22 54:6 64:6
  66:8 69:21 71:2
  73:5 74:8 83:14

statement 54:22
statements 54:21
states 1:1 2:1 14:21
  39:19 78:4
stating 24:23
sticks 80:4
stipulations 5:8
straight 41:14
strategic 66:19
Street 3:5
strike 25:20 27:19
  30:8 58:22 72:4
student 16:9 17:4
studying 14:24
stuff 25:11 33:7
  46:19 48:7 49:9
  61:22
subcontractor
  17:10
subject 30:17
  38:12 64:20
subscribed 85:18
subsequent 44:23
  47:22 49:19 50:1
  70:25
substances 8:22
suffer 14:5
Suite 3:5
sum 57:18
summary 20:5
supervisor 13:9
  66:14
sure 5:25 6:22
  13:18 20:21
  25:25 27:22
  41:10 42:17 48:7
  52:21 58:12,25
  63:20 66:2,7
  67:23 77:22
  78:17 79:17
  81:25 83:6
sworn 5:5
Sylvester 24:16,20
  24:22
Sylvia 12:4,5,6
system 17:17 59:24
systems 1:7 2:7
  9:13 18:19 20:21
  20:22 35:25 56:6
  57:16 62:4
S&A 4:15,16,18,20
  24:1 56:3,4
S-i-e-m-e-n-s 17:10

35:22 36:13 37:9
  38:16 40:9,10,20
  41:7 43:9 44:6
  44:20 45:13 46:5
  46:13 51:10,16
  52:6 53:14,14
  54:6,11,13 56:4
  58:6,6 60:4,16
  60:22 61:11
  62:19 67:13,21
  67:25 68:1,4
  69:8 72:4,5 74:2
  74:16,16 75:21
  78:11 81:8
Tabs 51:13 68:2
take 14:14 16:24
  17:5,24 18:8,12
  41:7 41:10,17
  56:4 60:4 72:23
taken 2:15 7:7,20
  8:22 75:14 85:6
talk 14:13 23:22,25
  29:22 31:19 50:5
  70:10
talked 6:19 49:3
  54:22 55:11 81:1
talking 9:16,22
  10:6 24:11 35:8
  42:6 44:5 47:13
  47:15 61:4 76:14
  77:17
talks 40:21
telecom 62:10
telecommunicati...
  14:25 17:11
  18:17,18 19:1,1
  20:12 21:2,5
  36:1 66:22
telecommunicati...
  20:19
telephany 17:17
telephone 20:21
tell 7:20,24 8:12,15
  8:24 11:13,20
  12:3,11 13:16,21
  14:14 22:1,3
  28:1 32:12 42:13
  50:10,22,24
  51:25 57:21
  60:18 61:11 63:5
  64:2 70:18 72:14
telling 9:3 13:19
  36:8,10
term 15:21,23
terminate 23:12
terminated 24:10
  24:14,18 25:23
  28:9 31:6,11

32:5,13,22 33:3
  33:9,10,22 53:18
  71:18
termination 24:7
  25:20 26:5 27:6
  30:11,17,25
  31:15,25 32:10
  32:15,23 33:18
  34:2,6 36:24
  37:5 38:11,14
  51:22 53:25 54:3
  54:7 57:9,11
  68:20 72:22
terms 9:11 13:23
  34:11 36:20
  37:25 38:12,22
  38:24 39:1 41:16
  45:21 47:18
  52:10 54:14,16
  54:23 55:3,4
  66:20 76:12
  77:22 82:4
testified 5:5
testify 13:7
testifying 7:25 85:9
  84:13
Texas 14:20 16:9
  16:10 17:1,2,4
Thank 83:20
theory 17:3
thereof 85:13
thereto 10:15
thing 9:19 77:21
things 76:10
think 5:19 22:9
  25:7 33:13 42:25
  46:3 50:8 52:25
  56:1 58:25 65:13
  71:15,17 72:2
  74:19 76:2 79:16
  81:10,23 83:8
third 29:22 35:7
  36:13 52:13
  54:13 69:7 70:16
  70:23
THOMAS 3:4
thought 46:22
thousand 71:22
thousands 77:16
three 6:2 19:19
  72:16 74:12
Thursday 1:17
  2:19 5:1
time 16:7 17:5,6,16
  18:23 19:24 20:7
  22:4 23:13 27:17
  37:20 38:10 40:5

41:8 42:10,13
  43:4,5,13,15
  46:19 48:16
  49:11 50:2 56:20
  60:1 67:21 69:1
  69:6,22,24 74:13
  75:11,18 76:1,3
  79:11 80:10
  82:21,23 83:17
  83:19 85:7
times 38:8 50:16
  51:2 73:11
today 7:8 8:25 9:3
  18:11 19:20 20:9
  38:2 69:21
told 21:6 54:18
  55:4
Tom 5:8,11,25
  22:3 24:18 25:15
  34:15 66:4,7,11
  66:13,16 68:5
  69:8 70:10 74:4
  74:13 78:18
Tom's 66:18
tools 20:22
top 23:24 44:19
  60:6
total 6:10 60:11,14
  61:1 62:11 78:5
transacted 26:7
  80:22
transcribed 85:11
transcript 6:20 7:4
  84:11
transcription
  85:13
transferred 18:2
transition 27:13
  55:20
trial 7:5
trick 80:19 81:8
tried 50:16 51:3
  68:13 72:23
  73:15,24 81:6
trip 80:4
TROUTMAN 3:4
true 22:1,5 84:14
truly 48:10 57:8
truth 7:21,24 8:24
  9:3
try 50:23
trying 46:21 49:9
  56:22 59:20
  66:10 69:22,25
  70:5 71:10,20
  73:1 75:5 80:20
  81:4
Tuesday 6:4

turn 21:14 22:19
  22:24 23:23
  25:14 37:9 46:5
  53:14 60:22
  62:19 67:13 68:4
  72:4 74:2 78:11
two 15:3,24 17:23
  43:1 54:21 55:9
  56:8
type 6:24 8:3,7
  26:4
typically 20:11
typographical 6:25

U

U 52:6
uh-huh 8:6 30:13
undersigned 85:4
understand 6:22
  7:3,5,16,20,23
  8:11 9:8,21 10:2
  10:12 27:22
  36:14 65:3 66:10
  69:24 70:4,8
  79:4
understanding
  30:14,16,19,20
  31:8,14 32:23
  33:15 74:4,7
United 1:1 2:1
  14:21
University 14:22
update 55:20
usage 52:1 70:20
  73:7 77:16,25
use 8:6 9:11 10:6
  20:25 26:24 27:5
  28:2,17,21 32:14
  35:25 47:2 55:14
user 43:15 59:17
  77:12 78:3,4,7
users 35:14
uses 73:25
usually 26:5
U.S 59:25

V

V 53:14 54:13
vacation 24:15
  25:3,17 38:17,20
  39:8,17 44:6
vague 65:1
various 4:9 18:12
  57:14,15
vendors 66:20
verbal 80:24
verbalize 8:8
verbally 79:5,8

verbatim 85:9
verified 4:13 19:10
  81:2 82:11
versus 42:1 66:11
videoconference
  20:22
voicemail 51:1
  56:6
voluntarily 15:20
vs 1:6 2:6

**W**

W 53:14 56:4
walk 33:14
want 7:12 9:5,12
  21:14 22:3,24
  26:12 29:9 31:19
  35:16 40:9 41:18
  45:13 51:9 63:4
  70:24 76:5 81:24
  82:9
wanted 5:14,21 7:2
  17:19 23:9 57:22
  57:25,25
wasn't 53:16 59:11
  59:12 73:5
way 8:5 14:9 33:17
  41:12 49:1 64:21
  65:2 81:3,16
Web 37:13,21,24
  38:21 39:22,24
  41:13,21 42:4,11
  42:14,19 52:11
  54:15,20 55:5
  68:22,25 69:15
  70:1,9 72:2
  76:21 82:6,18,19
WebEx 10:4,5,8
  20:22 27:3,13
  60:20
weekend 26:6
weeks 59:22
went 17:9,21 37:20
  38:13,20 39:2,22
  39:24 40:3,12,19
  41:12,14 42:4,13
  42:16 55:5,24
  68:24 69:3 80:5
  82:21 83:15
weren't 36:23
  46:18 49:1 73:8
we'll 19:9 58:8
  70:3
we're 7:23 21:13
  23:22 24:10
we've 25:7,12 44:4
  60:15 61:4 63:10
  65:7 70:18 81:1

81:2,18
WHEREOF 85:17
wide 20:16
wife 16:7,10,17
wife's 12:3
witness 4:2 5:10
  11:7 22:11 26:20
  29:18 32:1 38:4
  40:16 41:4 44:17
  44:21,25 45:4
  50:16 58:18
  63:18 65:4,19,25
  70:4 79:22 83:11
  85:17
witnesses 85:8
word 40:15,15,16
  40:16 42:2,2
words 41:1,2
work 16:6 17:9,18
  17:21 20:14
  46:21 69:22
  74:10
worked 17:12,22
  18:20,24 50:12
  72:11,17
working 16:8
  17:11 18:22
  19:24 56:24,25
  57:3,5 74:9,24
works 19:22 35:24
  80:12
worldwide 20:17
  20:18
wouldn't 32:3
  61:21,21
write 28:24 29:3
  49:12 51:11 54:5
writes 53:15 76:20
writing 29:6 50:4
written 31:23,25
  32:8 43:20 53:6
  76:3
wrong 66:10
wrote 5:19 24:24
  29:7 44:18 54:8
  54:9,12

**X**

X 62:19 67:21

**Y**

Y 67:13 68:2
Yeah 50:4
year 17:15 19:2
  68:3 79:5 80:7,7
years 14:21 15:2,3
  15:25 17:23
  18:21,25 20:9

**Z**

Z 67:25 68:1,2

**$**

$201,000 56:23
$201,346.32 56:13
$34,011.01 60:11
$39,000 58:6 60:15
$39,793.01 46:6
  56:14,16 57:18
  61:1,5,7 62:11
  74:17 75:18
$5,366.53 68:10
  70:20
$7,060.25 72:19
$74.95 64:11,21
  65:10,13 82:15
  83:6

**0**

000117479 60:5

**1**

1 4:13 6:8 10:14,19
  19:10,14,18
  21:14 22:15,20
  23:1,3,4 35:23
  45:14
1st 40:1
1:40 2:18 5:2
10 23:14
10th 2:17 9:25 10:7
  21:16 43:10
  51:21 53:18 54:1
  54:7,11 67:8
100 3:10
11 6:5,6
117479 60:24
12th 34:25 35:11
  80:24 81:7
12:20 49:24
15 6:4 23:13,17,19
  23:20 25:19 26:1
  26:3,10 29:22,25
  30:1,4
15628 11:14
18 1:17 2:19 5:1
19 4:13
19th 36:16 37:10
  37:12,14 54:10
1970 11:22
1989 14:20
1997 16:17
1998 17:21
1999 10:14,19 18:3
  18:4

**2**

2 4:14 23:22 26:12
  26:13,17 28:25
  35:17 39:15
2nd 74:17
2:05CV1088-F 1:6
  2:6
20th 46:13,15 47:8
  47:22 48:11,16
  48:23 49:6,24
  54:9 58:20 59:1
  59:4 81:9,10,11
200-and-some-odd
  71:22
2001 37:23
2002 9:25 10:7
  21:16
2003 23:1,3,4
2005 6:5,5,6 26:21
  26:23 27:2 28:14
  28:16,20 29:14
  38:15 40:1,13
  41:13 43:11,18
  44:10,13 46:13
  46:16 47:22 48:4
  49:24 51:21 54:2
  54:20 56:19
  57:19 58:20 59:1
  59:1 60:8 62:11
  68:23 74:3,5,17
  76:4,20 80:2,6,8
  80:17 82:6,18
2006 1:17 2:19 5:1
  84:16
205 3:11
21 76:3,19
22 63:4,5
23 63:5
24 25:14 28:20
  38:15 39:4 44:4
  63:5
24th 28:14,16
  38:19 44:10,13
  80:17
25 82:6
26 4:14
26th 53:16,21,24
  54:4
27 53:13
27th 39:10,12
28 11:22
284 4:15 24:1
29 4:16
29th 24:6 29:14
  34:22 39:10,12
  39:20 40:12

**3**

3 4:16 23:22 29:12

29:15 35:17
30308-2216 3:6
335 4:16
336 4:18 34:14
337 56:3,4
338 4:20
339 5:15
34 4:17
342 5:16
35 4:19
35259-8512 3:11

**4**

4 4:17 23:10,12,22
  34:13,15,17
  35:17
4:07 2:18 5:2
40 43:6
40-cent-per-min...
  41:16
40-some-odd 40:7
4000 2:16
404 3:6
425 43:7
43 63:4
45 43:8

**5**

5 4:19 23:22 34:25
  35:1,17 39:16
  40:21 41:18 42:1
  69:11 72:22 73:4
  73:6,9
5-A 82:11
5200 3:5
598512 3:10

**6**

6 4:4,9,9,10 6:12
  19:18 42:1
6/29/05 4:15,16,18
600 3:5
634341B 1:24

**7**

7th 69:8 74:3,5
  75:9,11
7/12/05 4:19

**8**

8th 56:19
82 4:5
868-6000 3:11
885-3275 3:6

**9**

9th 70:21
91709 11:15

97 16:18,21,21
9822 1:23 2:20
  85:23

**Paul Edge**

| | |
|---|---|
| **From:** | Paul Edge [paul.edge@conexant.com] |
| **Sent:** | Tuesday, February 15, 2005 3:07 PM |
| **To:** | Jason Shanks |
| **Cc:** | Brigette McNair ; Paul Edge |
| **Subject:** | Re: Conference America - Proposed Passcode Notification Template |

Jason, I'll run this past our communications department and get there advice ?

Best Regards,



Paul Edge
Program Manager
IT Operations
Conexant
949-483-4114 (T)
949-483-1716 (F)
Paul.Edge@conexant.com
www.Conexant.com

Jason Shanks <jason.shanks@yourcall.com> wrote on 02/15/2005 02:43:29 PM:

> Paul/Brigette,
>
> The e-mail template that we'd like to use to notify the Conexant
> users about the upcoming passcode change is below:
>
>
> "Good Morning,
>
> Recently, we've become aware of potential security risks for
> conference leaders who use automated conferencing services and have
> a small number of digits in their leader passcode. The Conexant
> Telecommunications office and Conference America have determined
> that these risks warrant additional security measures to ensure your
> conferencing accounts are secure. Therefore, Conference America will
> be changing conferencing accounts to the AlwaysOn Conferencing
> platform on March 15, 2005. This platform will provide added
> security for your conferencing account while maintaining all of the
> functionality you currently enjoy with C2Kplus. As an added benefit,
> you'll enjoy a shortened call flow with the AlwaysOn Conferencing
> platform that will allow you and your participants faster access to
> your conference calls.
>
> Once Conference America updates your leader passcode on March 15th,
> your old leader passcode will no longer be active. Conference
> America will send your new passcode information via e-mail as soon
> as the change takes place. A welcome package and new wallet card
> will follow in the mail.
>
> If you have any questions about this upcoming change, please contact
> the Paul Edge or Brigette McNair in the Telecommunications office.
>
> Thank you,
>
> Conexant Telecommunications Office"

1

```
>
>
> Please feel free to change the template to better suit our audience.
> Once we have your approval on the template and note the date you
> want the initial notification to be sent, we'll notify your users via e-mail.
>
> Sincerely,
>
>
>
> Jason Shanks
> Sales Administrator
> jason.shanks@yourcall.com
> 1-800-925-8000
> Conference America, Inc.
```

## Paul Edge

**From:**     Paul Edge
**Sent:**     Tuesday, July 12, 2005 5:48 PM
**To:**       Jason Shanks
**Subject:** Are you there

Jason, Are you there, I haven't heard back from you in a few weeks ?

Best Regards,
Paul Edge
Program Manager, IT Ops
949-483-4114 T
949-483-5060 F
949-633-9768 C

**Paul Edge**

| | |
|---|---|
| **From:** | Paul Edge [paul.edge@conexant.com] |
| **Sent:** | Friday, March 11, 2005 10:39 AM |
| **To:** | Jason Shanks |
| **Cc:** | Paul Edge |
| **Subject:** | Re: Conference America - Custom Greeting |

Great, This will help alot -

Best Regards,

Paul Edge
Program Manager
IT Operations
Conexant
949-483-4114 (T)
949-483-1716 (F)
Paul.Edge@conexant.com
www.Conexant.com


Jason Shanks <jason.shanks@yourcall.com>

03/11/2005 09:06 AM

To      Paul Edge <paul.edge@conexant.com>

cc

Subject    Conference America - Custom Greeting


Paul,

I also found out this morning that the we'll be able to reinstate the custom greeting for your toll-free dial-in number when we make the move to the AlwaysOn platform on April 1st. This will automatically be put into place when we make the change. As of that date, your call leaders and participants will hear the Conexant greeting when they dial 1-877-233-4822.

Sincerely,


Jason Shanks
Sales Administrator
jason.shanks@yourcall.com
1-800-925-8000
Conference America, Inc.

1

**Paul Edge**

| | |
|---|---|
| **From:** | Paul Edge [paul.edge@conexant.com] |
| **Sent:** | Wednesday, March 09, 2005 10:10 AM |
| **To:** | Jason Shanks |
| **Cc:** | Paul Edge |
| **Subject:** | Re: ITFS Number |

JUst so you know this may cost you some business , This is a high demand for Conexant right now so I will be forced to look around just an FYI -

Best Regards,

Paul Edge
Program Manager
IT Operations
Conexant
949-483-4114 (T)
949-483-1716 (F)
Paul.Edge@conexant.com
www.Conexant.com

Jason Shanks <jason.shanks@yourcall.com> wrote on 03/09/2005 06:25:12 AM:

> Paul,
>
>     I talked with our Telecom Department again to see if we have any
> other options for getting an ITFS number from India and found that
> none of the carriers (AT&T, MCI, or Sprint) can get us one.  Telecom
> is continuously looking for other sources to obtain a number from
> India, since you guys and other customers have asked for the
> service.  The only option we have at this time is for us to dial out
> to India or have people in that location dial a domestic number.
> I'll continue to ask about the number and let you know as soon as I
> can if our options change.
>
> Sincerely,
>
> Jason Shanks
> Sales Administrator
> jason.shanks@yourcall.com
> 1-800-925-8000
> Conference America, Inc.

1

**Paul Edge**

**From:**       Paul Edge [paul.edge@conexant.com]
**Sent:**       Friday, March 11, 2005 9:44 AM
**To:**         Jason Shanks
**Subject:**    Re: Dialing Option for India


That is extremely. I have found a conference vendor that can do it at the price I need.
Conexant will be actively pursuing another vendor other than conference America due to our
international needs.
--------------------------
Paul Edge
949-483-4114
949-633-9768



----- Original Message -----
From: Jason Shanks [jason.shanks@yourcall.com]
Sent: 03/11/2005 08:58 AM
To: Paul Edge <paul.edge@conexant.com>
Subject: Dialing Option for India

Good Morning Paul,

     I talked with our Telecom Department again this morning and received confirmation that
the dialing solution we discussed yesterday will work as I described it.  The cost will be
in the area of $3.00 to $3.50 per minute.  Do you want us to proceed with things here or
would you rather look around to see what you find?

Sincerely,


Jason Shanks
Sales Administrator
jason.shanks@yourcall.com
1-800-925-8000
Conference America, Inc.

1

# PREVIOUSLY MARKED EXHIBITS

**Brigette McNair**

| | |
|---|---|
| **From:** | Paul Edge |
| **Sent:** | Wednesday, June 29, 2005 7:02 PM |
| **To:** | Polich, Chip |
| **Cc:** | Tom Noonan; Brigette McNair; Hoang Chung; Jeff Reid; Don Dykier; Surya Konala |
| **Subject:** | Conference America - Active Leader Lists |
| **Attachments:** | Conexant Active AlwaysOn Accounts 051605.xls; Conexant Active WebEx Accounts 051605.xls |


Conexant Active
AlwaysOn Accou...


Conexant Active
WebEx Accounts...

Chip,

Conference America our existing provider has executed a clause in there contract to no longer provide services to Conexant at our current rates. Since we have an agreement with Intercall already at competitive rates, I would like to execute getting the people attached reservationless accounts immediately. I will be working internally to get the communications out to the employees about the switch. I would like to have everyone there accounts by July 18 if possible.

Hoang Chung will be your point of contact next week while I am on vacation next week. Brigette - Prior to your vacation I need the spreadsheet above filled in with cost centers and addresses of each employee. This then needs to be sent to Chip Polich so we can set up allocations correctly. I have Chip's e-mail above......

Hoang can be reached at 949-483-5602, I will brief him tomorrow on what we are doing..Don Dykier will be his back-up he can be reached at 949-483-9555. Don is a networking guy but can handle his own so I will brief him as well. just in case.

Brigette will get cost centers etc so we can set-up the billing and allocations. I will be in touch shortly as well to discuss investor relation and all-hands types of calls.

Thanks,

Paul

1

DEPOSITION
EXHIBIT
2
Noonan 5/18/06

S&A284

**Brigette McNair**

From: Paul Edge
Sent: Wednesday, June 29, 2005 7:47 PM
To: Lewis Brewster
Cc: Jeff Reid; Brigette McNair; Hoang Chung; Tom Noonan; Dolores Sylvester
Subject: Conference America

Lewis,

We have a critical issue with our current conferencing vendor - ( Conference America ). Due to our recent negotiations with them and other providers they have executed an out clause within there contract, giving Conexant a 15 day notice that they will no longer support Conexant at our current negotiated pricing. Basically they are telling Conexant that they no longer want to provide us with services. There seems to be no rational reason behind this except that they are angry with us for reviewing our rates and services with other audio companies. We have not notified them that we are switching providers either. Tom Noonan and I have tried several times to contact them with no response since the notice.

Tom and I have already finalized the contract with intercall and can begin executing on a plan to transition over to them from Conference America but it will need to be done quickly since we only have 15 days. If we do not convert everyone in 15 days, Conference America will continue to provide service but at a very high rate - .05 per minute to .45 a minute.

The transition should be pretty painless because I had already qualified investor relations, all-hands, sales training and the on-demand conferencing. It is simply a convenience issue to the end-user.

I can get everything transitioned and we can allow some overflow at the premium rates if necessary to ease the transition.

We need to move quickly or pay the higher rate, I think we should begin a communication to the users that Conference America has decided to no longer support Conexant and we have selected a new provider at the same time we can introduce all the new features such as local numbers in all of Conexant's primary regions such as Europe, India, US, China, Taiwan etc.

What are your thoughts on this - Should we pay the premium and take some time to transition or should we move quickly and educate the users on what we are up against ?

I hate to throw this on you but I am on vacation next week and would like to get the wheels moving quickly to avoid the large increase in costs ?

The good news is that once we are completed all the echo issues, local numbers for international will be in place so we will have a much better service provider as an FYI - Please advise accordingly -

Best Regards,
Paul Edge
Program Manager, IT Ops
949-483-4114 T
949-483-5060 F
949-633-9768 C

4/12/2006



DEPOSITION
EXHIBIT
_3_
Noonan 5/18/06

S&A335

**Brigette McNair**

| | |
|---|---|
| **From:** | Paul Edge |
| **Sent:** | Wednesday, June 29, 2005 8:35 PM |
| **To:** | Chris Gorciak |
| **Cc:** | Jeff Reid; Hoang Chung; Brigette McNair |
| **Subject:** | Conferencing Transition |

Chirs, Per our conversation - Here is what has happened -

Conference America has executed a clause in our contract basically, no longer offering the negotiated rates and increasing our costs 9x what it currently is ? We believe this was done out of anger due to us signing a new agreement within our Webex application. ( You word this )

Based on the increase in pricing we are moving forward quickly to transition over to Intercall our new provider. Intercall is one of the world's largest conferencing providers and will enable us to perform conferencing on a global basis. This will also allow Conexant a substantial costs savings as well from our current rates and especially against the new rates that Conference America will be charging.

Intercall adds substantial value:

20% overall reduction in costs
Local Phone numbers for countries such as India, China, Europe, Korea, Taiwan, and Tokyo
International Bridges throughout Asia and Europe which enhances call quality and avoids echo and other issues when on transatlantic conferences.


Transitional Issues is that due to the timing this will be a hot-cut and not much time for transition so we need to ask users for there up most support and make them understand that this is being forced from the vendor and not it but the silver lining is all the things above -

Training will be provided via on-site and documentation.


Hopefully this will get you started -

Best Regards,
Paul Edge
Program Manager, IT Ops
949-483-4114 T
949-483-5060 F
949-633-9768 C

4/12/2006



S&A336

Page 1 of 1

**Brigette McNair**

| | |
|---|---|
| **From:** | Paul Edge |
| **Sent:** | Tuesday, July 12, 2005 8:46 PM |
| **To:** | Admin Professionals-CNXT ALL |
| **Cc:** | Jeff Reid; Veena Gowda; Tom Noonan; Brigette McNair; Hoang Chung |
| **Subject:** | Conferencing Provider Change |

Professional Admins-

I wanted to let you all know that we have provisioned the new conferencing accounts with our new provider Intercall. Upon receipt of these account you can begin using them immediately. All lines have been provisioned to allow 25 users on each conference call. If you host a conference with 25 or more people just let me know and I will get the ports increased immediately.

Many of you have already recieved notification from Intercall, Please disregard this first notice, They used a ten digit code when I had requested that everyone's code match there telephone number for ease of rememberance. You will recieve a new notification in the next 24 hours. This will have your toll-free number and conference code. The conference code will be your telephone number or the user's telephone number that you support.

Immediately upon recieving your new code or your bosses new code, Please discontinue any use with Conference America. Remember your new code can be used immediately upon receipt and Conference America should no longer be used.

Due to the sensitivity of cost here, We will issue the new codes first and training will be issued a few days later . Please let me know if you have any concerns and once again I do appreciate your paitience during this transition.

I will be in touch shortly with training dates and options -

Best Regards,
Paul Edge
Manager
Telecom and Networking
**949-483-4114 T**
**949-483-5060 F**
**949-633-9768 C**

4/12/2006

DEPOSITION
EXHIBIT
5
Nanen 5/18/06

S&A338