## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CONFERENCE AMERICA, INC., )
)
Plaintiff, )
)
vs. ) No. 2:05CV1088-F
)
CONEXANT SYSTEMS, INC., )
)
Defendants. )
_____ )

DEPOSITION OF THOMAS NOONAN
Newport Beach, California
Thursday, May 18, 2006

Reported by:
CARI A. FOLSOM
CSR No. 9822
JOB No. 634341A

Page 1

## Page 2

1   IN THE UNITED STATES DISTRICT COURT FOR THE
      MIDDLE DISTRICT OF ALABAMA
2              NORTHERN DIVISION
3
4   CONFERENCE AMERICA, INC., )
                                )
5          Plaintiff, )
                                )
6   vs.          ) No. 2:05CV1088-F
                                )
7   CONEXANT SYSTEMS, INC., )
                                )
8          Defendants. )
                          _____ )
9
10
11
12
13
14
15      Deposition of THOMAS NOONAN, taken on
16   behalf of Plaintiff, at 4000 MacArthur
17   Boulevard, 10th Floor, Newport Beach,
18   California, beginning at 8:58 a.m. and
19   ending at 1:02 p.m. on Thursday, May 18, 2006,
20   before CARI A. FOLSOM, Certified Shorthand
21   Reporter No. 9822.
22
23
24
25

Page 2

## Page 3

1   APPEARANCES:
2
3   For Plaintiff:
4      TROUTMAN SANDERS LLP
          BY: THOMAS E. BORTON, IV
5      Attorney at Law
        600 Peachtree Street, N.E., Suite 5200
6      Atlanta, Georgia 30308-2216
        (404) 885-3275
7
8   For Defendant:
9      STARNES & ATCHISON LLP
          BY: JOSEPH S. MILLER
          Attorney at Law
10      Seventh Floor, 100 Brookwood Place
        P.O. Box 598512
11      Birmingham, Alabama 35259-8512
        (205) 868-6000
12
13   Also Present:
14      KAREN HERMANN
15
16
17
18
19
20
21
22
23
24
25

Page 3

## Page 4

1   INDEX
2   WITNESS                    EXAMINATION
3   THOMAS NOONAN
4      BY MR. BORTON                    5
5
6
7                    EXHIBITS
8   PLAINTIFF                         PAGE
9   *1  Verified complaint and exhibit binder        6
10   2  E-mail from Paul Edge to Chip Polich,       63
          dated 6/29/05; Bates No. S&A 284
11   3  E-mail from Paul Edge to Lewis Brewster,    67
          dated 6/29/05; Bates No. S&A 335
12
13   4  E-mail from Paul Edge to Chris Gorciak,     72
          dated 6/29/05; Bates No. S&A 336
14   5  E-mail from Paul Edge to Admin             73
          Professionals, dated 7/12/05; Bates No.
15      S&A 338
16
17
18
19
20
21
22
23
24
25   *  Retained by counsel for Plaintiff

Page 4

1    Newport Beach, California, Thursday, May 18, 2006
2        8:58 a.m. - 1:02 p.m.
3
4        THOMAS NOONAN,
5    having been first duly sworn, was examined and testified
6    as follows:
7
8        MR. MILLER:  May I interject on this to make
9    sure the record is clear, that we're under the usual
10   stipulations as we were in the depositions in
11   Montgomery.
12       MR. BORTON:  That's right.
13       MR. MILLER:  And we would like to read and sign
14   the deposition, if you'll send it to me, I will send it
15   to Mr. Noonan.
16
17       EXAMINATION
18   BY MR. BORTON:
19   Q   Mr. Noonan, do you understand that if you make
20   any changes to the transcript, I will have an
21   opportunity to comment on those changes at trial?
22   A   I do now.
23   Q   Okay.  Excellent.
24       And Joe, just to clarify, we're going to handle
25   exhibits the same way.  I'll represent to you that this

Page 5

1    this deposition today?
2    A   Yes.
3    Q   I'm sure he described the deposition process to
4    you, and it sounds like you may know it, so I'll just
5    ask you, generally, do you understand what the
6    procedures for a deposition are?
7    A   Yes.
8    Q   You understand that you're under oath and sworn
9    to tell the whole truth just like you were in court?
10   A   Yes.
11   Q   Okay.  If you don't understand any question I
12   ask, will you tell me?
13   A   Yes.
14   Q   If you don't hear a part of any question I ask,
15   will you tell me?
16   A   Yes.
17   Q   If you don't tell me otherwise, then I'm going
18   to assume you understood and heard the question.  Is
19   that fair?
20   A   Yes.
21   Q   If you realize during this deposition that one
22   of your answers given earlier was inaccurate or
23   incomplete, will you tell me?  If during the course of
24   this deposition you realize that an answer you gave me
25   at some point during the deposition was inaccurate or

Page 7

1    is the verified complaint and all attached exhibits, and
2    to the extent that something is messed up or doesn't gel
3    with it, we'll defer to what was filed with the court.
4        MR. MILLER:  Agreed.  And why don't we just
5    mark it as Exhibit 1 that you will retain, as I marked
6    an exhibit to the depositions of your clients and I
7    retained that, and that will make it simple, I believe.
8        MR. BORTON:  Okay.  Let me go ahead and mark
9    this.
10       (Plaintiff Exhibit 1 was marked for
11       identification by the court reporter.)
12   BY MR. BORTON:
13   Q   Mr. Noonan, have you ever had your deposition
14   taken before?
15   A   Yes.
16   Q   Okay.  How many times?
17   A   Once.
18   Q   Can you tell me generally the nature of the
19   case?
20   A   It was a personal case.  It was an auto
21   accident.
22   Q   Okay.  You never had your deposition taken in
23   relation to any of your work at Conexant?
24   A   No.
25   Q   Did you meet with your lawyer before coming to

Page 6

1    incomplete, will you tell me?
2    A   Okay.  Yes.
3    Q   Okay.  Basically, you understand that she is
4    recording everything we say so that we can't talk like
5    we normally would, we can't use head shakes or say
6    uh-huh or huh-uh; do you understand that?
7    A   Yes.
8    Q   Have you taken any substances, prescription or
9    nonprescription, that would impair your ability to tell
10   the truth today?
11   A   Just coffee.
12   Q   Will that impair your ability --
13   A   No.  No.  Sorry.
14   Q   Is there any reason at all why you can't tell
15   the truth?
16   A   No.
17   Q   If you want a break, just let me know.
18   A   Okay.
19   Q   You understand that Conference America has
20   named Conexant as an defendant in this lawsuit, correct?
21   A   Yes.
22   Q   In this deposition, I'm going to refer to
23   Conference America, Inc. just as Conference America.
24   You'll understand who I'm talking about, correct?
25   A   Yes.

Page 8

2 (Pages 5 to 8)

1    Q  I'm going to refer to Conexant Systems, Inc.
2  as Conexant.  You understand that?
3    A  Yes.
4    Q  There are some contract issues in this case,
5  one was a September 1, 1999 audio conferencing contract
6  that was attached to the verified complaint.  Do you
7  know what I'm referring to?
8    A  Yes, I do.
9    Q  I'm just going to call that the audio contract
10  or the audio conferencing contract.  Do you understand
11  that?
12    A  Yes.
13    Q  Okay.  There was another contract, I think
14  dated June 10th, 2002, called the data conferencing
15  services contract.  Sometimes it's been referred to as
16  the WebEx contract.  I'm just going to call that the
17  data contract or the WebEx contract.  Do you understand
18  that?
19    A  Yes.
20    Q  Okay.  Did you do anything to prepare for this
21  deposition?  And I don't want to know conversations you
22  had -- the particulars of conversations you had with
23  your lawyer, but other than the particulars of those
24  discussions, if you had them, did you do anything to
25  prepare for this deposition?

Page 9

1    A  Yes.
2    Q  Okay.  Would you tell me what that was.
3    A  I've seen the binder with the lawsuit or
4  whatever the --
5    MR. MILLER:  He's reviewed the exhibits to the
6  complaint and the documents that we produced.
7    MR. BORTON:  Okay.
8    Q  Can you give me any nicknames or aliases that
9  you have, if you have them?
10    A  No.  Just Tom.
11    Q  All right.  Can you tell me your address,
12  please.
13    A  ████████████████████, California.
14    Q  What county is that in?
15    A  Orange.
16    Q  Are you married?
17    A  Yes.
18    Q  Could you tell me your wife's name?
19    A  ███████████
20    Q  Any children?
21    A  Yes.
22    Q  Tell me their names.
23    A  ████and████
24    Q  And all their last names are Noonan, correct?
25    A  Correct.

Page 10

1    Q  Do you have any relatives, friends or
2  acquaintances in Alabama?
3    A  No.  I did business with a company in Alabama,
4  my previous position.  I don't even remember the
5  people's names there, though, honestly.
6    Q  Can you tell me what company it was?
7    A  I can't even remember the name of the company,
8  but I did a site visit there once.
9    Q  Date of birth?
10    A  ███████
11    Q  Did you ever file for bankruptcy?
12    A  No.
13    Q  And, you know, I have to ask these questions,
14  just background.  Did you ever commit a crime or were
15  you ever convicted of a crime?
16    A  No.
17    Q  Have you ever been charged with a crime?
18    A  No.
19    Q  Do you remember, in the course of this case,
20  that Conference America served written interrogatories
21  on your client -- or your company, Conexant?  Are you
22  familiar with that?
23    A  I'm sorry, I'm not sure I understand.
24    Q  Conference America, during discover in this
25  case, served on your attorney a series of written

Page 11

1  questions that had to be answered.  Are you familiar
2  with that?
3    A  No.
4    Q  No?
5    A  I'm not sure whether --
6    MR. MILLER:  I think Paul signed those on
7  behalf of the company.
8    THE WITNESS:  Oh, okay.
9  BY MR. BORTON:
10    Q  Do you remember -- and I don't want to know any
11  specifics that you talked about with your attorneys.  Do
12  you remember participating in answering any
13  interrogatories in this case?
14    A  I --
15    MR. MILLER:  Let me just object because, and I
16  don't mind telling you, I discussed the matters with
17  Tom.  And without looking at them right now, some of his
18  information may have ended up in those answers signed by
19  Paul.  And I don't want to get into particulars, but he
20  might not have even known that the information was going
21  to be put into the interrogatory answer, but --
22    MR. BORTON:  Okay.
23    Q  Who is your supervisor at Conexant?
24    A  Karla Carichner.  Karla, K-a-r-l-a.  Carichner
25  is C-a-r-i-c-h-n-e-r.

Page 12

3 (Pages 9 to 12)

1   Q  Have you ever discussed this lawsuit with
2  Karla?
3   A  No, not other than to the extent that she knows
4  I'm involved.
5   Q  Have you ever discussed this lawsuit with
6  anybody at Conexant that is ranked above you?
7   A  Just for informational purposes so that they
8  know that I'm involved.
9   Q  Okay.  No one has never indicated -- no one at
10 Conexant has ever indicated to you that your career at
11 Conexant may suffer in some way if this lawsuit results
12 badly for Conexant?
13   A  No.
14   Q  Have you ever been reprimanded in any way
15 that's related to the allegations contained in the
16 verified complaint?
17   A  No.
18   Q  Let's go through your work history real
19 quickly, just if you could give that to me.
20   A  From --
21   Q  Let's say from college on.
22   A  Okay.  Let's see, my first job was with a
23 company in Chicago, Batchelder-Beilin.  And after that I
24 went to a company called Riley & Geehr, G-e-e-h-r.  From
25 there I went to a company, Schwinn Bicycle.  And then --

Page 13

1   A  From college.
2   Q  Okay.  Any education subsequent to that?
3   A  Yes.  I received my MBA from Loyola University
4  of Chicago.
5   Q  Okay.  Anything else?
6   A  No.
7   Q  Okay.  When did you begin here at Conexant?
8   A  January of 2001.
9   Q  Have you ever been fired from any job you've
10 had since college?
11   A  No.
12   Q  Have you ever been reprimanded or disciplined
13 from any job since college?
14   A  I'm not sure how you're defining that.  I mean,
15 no, not generally.  I mean, no.
16   Q  Have you ever been demoted --
17   A  No.
18   Q  -- or had your pay cut or anything like that?
19   A  No.
20   Q  Have you ever been reprimanded or disciplined
21 for anything at Conexant?
22   A  No.
23   Q  Okay.  Would you tell me -- I want to go
24 through your Conexant employment, starting with your
25 position and work when you got here and then work up to

Page 15

1  well, it was Quest Diagnostics, but the name was
2  different when I joined there.
3   Q  Do you know what the name was when you joined
4  there?
5   A  That's what I'm trying to remember, what --
6  because we had several name changes.  Metpath,
7  M-e-t-p-a-t-h.
8   Q  Did you give those to me in chronological order
9  leading up to your employment with Conexant?
10   A  Yes.
11   Q  When did you begin work with Conexant?
12   A  January 2001.
13   Q  Do you have any military experience?
14   A  No.
15   Q  Can you tell me basically what your education
16 is starting from high school coming to the present?
17   A  High school, I graduated high school,
18 Birmingham, Michigan, from Wylie Groves High School.  I
19 attended and graduated from Michigan State with a degree
20 in materials logistics management with an emphasis in
21 purchasing.
22   Q  When was that?
23   A  That was immediately following high school.  So
24 I graduated March of '83.
25   Q  From high school or college?

Page 14

1  the present.
2   A  Okay.
3   Q  Could you just take me through that?
4   A  Sure.  I started in January 2001, as I stated
5  earlier, as a manager of strategic sourcing.  And last
6  year, it was about this time, I don't remember the exact
7  date, but I changed positions.  I maintained that
8  responsibility, adding the additional responsibility of
9  taking on the title of director of sourcing and
10 logistics.
11   Q  Will you generally describe what your job
12 responsibilities are in that position.
13   A  Currently?
14   Q  Yes.
15   A  Handle -- to handle all the indirect sourcing
16 as well as global logistics for our core product.
17   Q  Okay.  What does that involve?  Is that a lot
18 of contract negotiations?
19   A  Yes.
20   Q  Okay.  Would it be fair to say that most of
21 your day consists of contract negotiations or
22 contract-related issues?
23   A  No.
24   Q  Okay.  Just take me through a typical day,
25 then.

Page 16

4 (Pages 13 to 16)

1    A    Typical day is -- I'm not sure there is a
2    typical day.
3    Q    Okay.
4    A    It's everything from dealing with some
5    negotiations, although I have two strategic sourcing
6    managers that handle a lot of the negotiation. So I do
7    some of that. I manage the team. I deal with the
8    logistics side of things as well and looking at new
9    processes and procedures.
10    Q    You have never checked Conference America's Web
11    site to review its terms and conditions there, have you?
12    MR. MILLER: You mean ever?
13    MR. BORTON: Yes, ever.
14    MR. MILLER: Including up to the present time?
15    MR. BORTON: Yes.
16    THE WITNESS: Could you restate the question.
17    BY MR. BORTON:
18    Q    You've never, at any time, checked Conference
19    America's Web site to review its terms and conditions
20    there, have you, terms and conditions and prices, have
21    you?
22    A    When you say "review," how are you defining
23    "review"? I mean, I have seen the Web site.
24    Q    Okay. When was the first time you saw
25    Conference America's Web site?

Page 17

1    A    I don't recall. I believe -- I believe it was
2    around the first week of September.
3    Q    Of 2005?
4    A    Yes. Yeah.
5    Q    Okay. That was the first time you ever went to
6    their Web site?
7    A    I believe so. I believe so.
8    Q    I'm going to -- you know, you and I have
9    basically the same thing in front of us. This is
10    Exhibit 1. And I want to turn to Tab A, which is
11    Conference America's services terms and conditions.
12    Have you ever reviewed this document or a document that
13    says Conference America services terms and conditions?
14    A    I don't believe so. Not in its entirety, no.
15    Q    Have you ever reviewed portions of it?
16    A    Yes.
17    Q    When did you first review any portion of this
18    document?
19    A    I believe it was the first week of September.
20    Q    Okay. Would you agree with me that Conexant
21    has used Conference America services since July 10th,
22    2005?
23    A    Yes.
24    Q    I'm going to take you to Tab E of Exhibit 1.
25    This is a price protection program agreement for data

Page 18

1    conferencing services dated June 10th, 2002. Have you
2    ever seen this before?
3    A    Yes.
4    Q    Have you read this document?
5    A    Yes.
6    Q    Okay. Can you tell me who Delores Sylvester
7    is?
8    A    She's a -- well, she's actually the manager of
9    strategic sourcing, reports to me.
10    Q    Looking through that, does that appear to be a
11    true and correct copy of this document?
12    A    I believe so.
13    Q    Okay. I want to take you to Tab H, which is an
14    e-mail from Rob Pirnie to you dated June 10th, 2005. Do
15    you remember receiving this e-mail?
16    A    Yes.
17    Q    Does that appear to be a true and correct copy
18    of it?
19    A    I believe so.
20    Q    Turn to Tab I. It looks like an e-mail that
21    you sent to Rob Pirnie on June 14th, 2005. Do you
22    remember sending this?
23    A    Yes.
24    Q    Does that appear to be a true and correct copy
25    of an e-mail that you sent to Rob Pirnie on that date?

Page 19

1    A    Yes.
2    Q    Turn to Tab J. Again, that's an e-mail from
3    Rob Pirnie to you dated June 24th, 2005. Do you
4    remember receiving this?
5    A    Yes, I believe I do.
6    Q    Okay. Does it appear to be a true and correct
7    copy of an e-mail you received?
8    A    I believe so.
9    Q    Okay. Going to Tab F, Mr. Noonan --
10    A    I'm sorry, Tab --
11    Q    F. I apologize. This looks to be a May 9th,
12    2005 letter that you wrote to Bob or Robert Pirnie at
13    Conference America.
14    A    Yes.
15    Q    Do you remember writing this letter?
16    A    Yes.
17    Q    Do you remember sending it?
18    A    Yes.
19    Q    Appears to be a true and correct copy of the
20    letter you sent?
21    A    I believe so.
22    Q    Okay. By this language, Conexant -- in the
23    second paragraph, Conexant terminated the data contract,
24    correct?
25    A    It had run its full course and, yes, then we

Page 20

5 (Pages 17 to 20)

Esquire Deposition Services
800-888-6949

1    terminated the end of the initial term.
2        Q   Okay.  So Conexant terminated the data
3    contract, correct?
4        A   Correct.
5        Q   Okay.  Now, why did you also extend the data
6    contract by this letter?
7        A   Actually, it was not extended.  And that's -- I
8    think the tabs that we just looked at was that Rob came
9    back and said it could not be extended.
10        Q   Okay.  And in this letter, though, had you
11    sought to possibly extend it?  Is that fair to say?
12        A   Yes.
13        Q   Okay.  I want to turn to Tab B of Exhibit 1.
14    Have you ever read this document?
15        A   Yes.
16        Q   Okay.  This is the audio conferencing contract
17    we talked about earlier in this deposition, running from
18    September 1, 1999 to September 1, 2002.  Do you see
19    that?
20        A   Yes.
21        Q   Would you flip through here real quick and let
22    me know if this appears to be a true and correct copy of
23    the contract.
24        A   I believe so, without comparing it to the one I
25    have.  But I believe it is.

1        A   I believe so.
2        Q   Okay.  Is this your signature here on the third
3    page?
4        A   Yes.
5        Q   Okay.  I want to turn your attention to page 1,
6    paragraph 3, where it says, "Conexant will establish
7    Conference America as its preferred vendor."  Do you see
8    that.
9        A   Yes.
10        Q   Okay.  Why did Conexant make Conference America
11    its preferred vendor in this document?
12        A   They were a preferred vendor for our conference
13    services.
14        Q   What does that mean, if you could tell me?
15        A   That they would be a supplier -- a preferred
16    supplier of this service; that we have a contract with
17    them and utilize them for those services.
18        Q   Okay.  I want to turn your attention to
19    paragraph 4.  It says "Termination."  Do you see that?
20        A   Yes.
21        Q   Okay.  Do you see the last sentence where it
22    says, "Either party with or without cause may terminate
23    this agreement at any time upon 15 days' notice to the
24    other party pursuant to Section 10 in this amendment"?
25        A   Yes.

1        Q   Who is Flora Fuller?
2        A   She was a purchasing manager here at Conexant.
3        Q   She no longer works with Conexant?
4        A   Correct.
5        Q   Do you know what circumstances she left under?
6        A   It was a spin, so she is with one of the spin
7    companies.
8        Q   Which company is that?
9        A   Mindspeed.
10        Q   Okay.  Let's turn to Tab C, which appears to be
11    a July 23rd, 2001 amendment to the audio conferencing
12    contract.  Have you ever seen this document before?
13        A   Yes, I have.
14        Q   And if you could tell me real quick whether
15    this appears to be a true and correct copy of the July
16    23rd, 2001 amendment.
17        A   I believe so.
18        Q   Let's go to Tab D.  This is an amendment to the
19    audio conferencing contract effective December 1, 2003.
20    Would you agree?
21        A   Yes.
22        Q   And you've seen this document before?
23        A   Yes.
24        Q   Okay.  Does this appear to be a true and
25    correct copy of the December 1, 2003 amendment?

1        Q   Is there anywhere on this amendment that says
2    you have to terminate -- you can terminate upon 15
3    business days?
4        A   Not to my knowledge.  I see 15 days.  It's not
5    defined.
6        Q   Okay.  Turning over to paragraph 10, the second
7    page there, it starts with "Notice."  Do you see where
8    it says, I think -- well, it says, basically, notices
9    and other communications -- basically, just do you see
10    where it says "notice will be effective when delivered
11    here"?
12        A   Yes.
13        Q   Okay.  I want you to flip for me to page A-3 of
14    this tab.  It's Tab D, page A-3.  Just keep going,
15    you'll get there.
16        A   Oh, I see.
17        Q   Actually, let's go back to attachment A.  Do
18    you see where it says "Special discounted prices," and
19    lists conferencing services there?
20        A   Yes.
21        Q   Page A-3, there's a paragraph entitled
22    "Additional Services."  Do you see that?
23        A   Yes.
24        Q   Okay.  And it says, "Additional services are
25    available at Conference America's standard prices

1  effective at the time services are rendered," correct?
2      MR. MILLER:  Are you asking him if that's what
3  it says?
4      MR. BORTON:  Yes.
5      THE WITNESS:  That is what it says.
6  BY MR. BORTON:
7      Q  Okay.  Did you ever make any inquiries to
8  Conference America to find out what their standard
9  prices were?
10     A  No, because all of the services that we were
11 utilizing were negotiated pricing.
12     Q  But the answer is no, correct?
13     MR. MILLER:  Hold on.  Don't argue with him.
14 The answer is what he just said.  I mean, his answer is
15 his answer.
16     MR. BORTON:  Right.  I didn't ask him to
17 qualify it.
18     Q  But the answer is -- okay.  Well, I'll ask, you
19 never contacted Conference America by -- or you never
20 inquired of Conference America to learn its standard
21 prices, correct?
22     MR. MILLER:  Object to the form, asked and
23 answered.
24 BY MR. BORTON:
25     Q  It's okay, you can answer.

Page 25

1      A  I've contacted Conference America to discuss
2  pricing and negotiated pricing.
3      Q  Did you ever write them a letter asking what
4  their standard prices were?
5      A  No.
6      Q  Did you ever send them an e-mail asking what
7  their standard prices were?
8      A  No.
9      Q  Okay.  And looking at this document, does it
10 say anywhere in this Tab D, this amendment, that
11 Conference America has to deal with or negotiate with
12 Conexant on the phone or in person?
13     A  Could you rephrase that or ask it again?
14     Q  Okay.  Looking through this document, does it
15 tell you anywhere in this document that Conference
16 America has to deal with Conexant on the phone or in
17 person?
18     A  Do you mean stipulating that it either be
19 written or verbal?
20     Q  Is there a clause in this amendment or in any
21 of the contracts we've talked about so far in this
22 deposition that says Conference America has to conduct
23 any negotiations, business negotiations, in person or on
24 the phone?
25     A  Well, the negotiations always include some

Page 26

1  verbal part, but there's always a written agreement that
2  drives the agreement or relationship.
3      Q  Okay.  Let me -- I'll ask it another way.  Does
4  anything in these contracts we looked at so far prohibit
5  Conference America from dealing only with Conexant in
6  writing?  That was a bad question.  Is there anything in
7  the contracts we've discussed so far that prohibit
8  Conference America from dealing with Conexant only in
9  writing?
10     A  No.
11     Q  Okay.  Let's turn to Tab K.  Tab K is a June 24
12 letter from R.M. Pirnie at Conference America to you.
13 Do you remember receiving this?
14     A  Yes.
15     Q  Okay.  Do you remember when you received this?
16     A  I received it -- well, actually, I did not
17 receive it directly.  It was sent overnight delivery and
18 I got a phone call that it had arrived.
19     Q  Who gave you the phone call that it arrived?
20     A  Delores Sylvester.
21     Q  Did you read this after you received that phone
22 call?
23     A  I read it sometime after I received the phone
24 call.
25     Q  Can you tell me when you read it?

Page 27

1      A  I don't recall the date.  She read me the
2  content over the phone.
3      Q  Okay.  Why did Delores Sylvester get this
4  letter, to the best of your knowledge?
5      A  I was on vacation, she saw the overnight
6  envelope from under my door and figured it was something
7  important and she had better open it since I was away.
8      Q  Okay.  Did she call you as soon as she opened
9  it, do you know?
10     A  I don't know what the time length was, but I
11 believe so.
12     Q  Does this right here appear to be a true and
13 correct copy of the letter you received from Bob Pirnie
14 on the 24th -- or that Bob Pirnie sent you on the 24th
15 of June?
16     A  I believe so.
17     Q  By this letter, Conference America terminated
18 the audio conferencing contract, correct?
19     A  Correct.
20     Q  And in this letter, in the second paragraph,
21 Bob Pirnie wrote to you that any services used or
22 requested by Conexant after termination will be made
23 available only on and subject to Conference America's
24 standard terms, conditions and prices effective at the
25 time the services are rendered, correct?

Page 28

7 (Pages 25 to 28)

1    A  It states that, yes.
2    Q  Would you agree with me that if Conexant asked
3  for and received services from Conference America after
4  the audio conferencing contract terminated, that it
5  would have to pay for those services?
6    A  Can you say that again, please?
7    Q  Would you agree with me that Conexant would
8  have to pay for any services from Conference America
9  that Conexant asked for, even after the audio
10  conferencing contract terminated?
11    A  Yes.
12    Q  Okay.  At the time that you became aware of the
13  contents of this letter, how did you think Conference
14  America's pricing was going to work after the audio
15  conferencing contract terminated?
16    MR. MILLER:  Pricing for what?
17    MR. BORTON:  Pricing for services, any
18  services.
19    MR. MILLER:  Object to the form because
20  "services" is not defined.
21    But you can answer.
22    THE WITNESS:  I'm sorry, can you restate the
23  question again?
24  BY MR. BORTON:
25    Q  Okay.  After you received this letter, how did

1  you believe pricing was going to work for any services
2  that Conference America provided to Conexant after the
3  termination of the audio conferencing contract?
4    MR. MILLER:  Object to the form.
5    You can answer.
6    THE WITNESS:  When you say how the pricing
7  worked, how -- what is your definition of how the
8  pricing would work?
9  BY MR. BORTON:
10    Q  Okay.  That's a good -- after receiving this
11  letter, did you believe that the prices set forth in the
12  amendment, the 2003 amendment, were still going to apply
13  after the audio conferencing contract terminated?
14    A  Yes.
15    Q  Okay.  Why did you believe that?
16    A  Because the accounts had been set up under that
17  agreement.
18    Q  Okay.
19    A  And that is the only document covering those
20  services that had been agreed upon.
21    Q  Do you disagree with the fact that as of the
22  date of this letter, Conference America had a right to
23  terminate the audio conferencing contract?
24    A  No.
25    Q  Let's turn to Tab L, and there are two e-mails

1  on this tab.  I want to look at the one on the bottom.
2  This looks like an e-mail to Zack Bogelgesang sent to
3  you on Thursday, July 7th.  Do you remember receiving
4  this e-mail?
5    A  Yes.
6    Q  Does that look like a true and correct copy of
7  the e-mail that he sent you?
8    A  I believe so.
9    Q  Okay.  Let's turn to Tab M.  This looks like a
10  July 15th, 2005 letter from you to Robert Pirnie.  Do
11  you remember writing this letter?
12    A  Yes.
13    Q  Do you remember sending it?
14    A  Yes.
15    Q  Does it appear to be a true and correct copy of
16  the letter you sent?
17    A  I believe so.
18    Q  In the first paragraph, you acknowledged Bob
19  Pirnie's June 24th letter, you acknowledge receiving
20  that letter, correct?
21    A  Correct.
22    Q  And you acknowledge that Conference America had
23  a contractual right to cancel the contract with 15 days'
24  notice, correct?
25    A  Yes.

1    Q  And you knew that following this termination,
2  you would have to pay Conference America for all of its
3  service in accordance with the standard terms, prices
4  and conditions, correct?
5    MR. MILLER:  Object to the form.  "Services" is
6  undefined.
7  BY MR. BORTON:
8    Q  Okay.  Let's use services -- let's go back to
9  Tab K.  In the second paragraph, Pirnie used the word
10  "services."  What did you think it meant?
11    A  Services, because he is canceling or
12  terminating this agreement, it's the services that are
13  covered by that agreement.
14    Q  Okay.  And when you say "agreement," you mean
15  Tab D, correct, that is the 2003 amendment?
16    A  Yes.
17    Q  Okay.  And on A-3 of Tab D, page A-3 of Tab D,
18  you see where it says "additional services," and there's
19  some language under there, correct?
20    A  Yes.
21    Q  Okay.  I'm going to use services --
22    Joe, I'm going to try to define it just so we
23  can avoid the objection.
24    MR. MILLER:  Let me tell you the basis of the
25  objection.  The term "services" is not as you're using

1   it. It is undefined as are we talking about services as
2   to accounts that are already in existence or something
3   new that would be created or requested after July 10,
4   2005? That's why I'm objecting.
5         MR. BORTON: I understand. I'm going to say
6   services is any task Conference America performed for
7   Conexant. That's pretty broad. Is that fair?
8         MR. MILLER: I may still object, but you can
9   use the term if you want to. And he'll tell you if he
10  doesn't agree with it or doesn't know what you're
11  talking about.
12  BY MR. BORTON:
13      Q   That's what I'm talking about, Mr. Noonan, any
14  task that Conference America performed for Conexant.
15        MR. MILLER: I'm necessarily going to have to
16  object because it's necessarily compound because
17  multiple services could be requested creating a new
18  accounts, canceling old accounts.
19  BY MR. BORTON:
20      Q   Okay. Why did you use the term "15 business
21  days" in the first paragraph of Tab M?
22      A   Why did I use it?
23      Q   Yes.
24      A   I was getting clarification of the date.
25      Q   Which date?

Page 33

1       Q   Mr. Noonan, last thing we talked about was this
2   July 15th, 2005 letter attached as Exhibit M. Second
3   paragraph of this letter you advise Conference America
4   that you wanted to cancel your accounts as of July 31st,
5   correct?
6       A   Yes.
7       Q   You said that by Monday, August 1st, 2005,
8   Conexant would not take any responsibility, financial or
9   otherwise, for services provided on or after this date,
10  correct?
11      A   I stated that.
12      Q   What services were you talking about?
13      A   I was talking about the services that were
14  provided under the written contract.
15      Q   That would be this third amendment attached,
16  Tab D, correct?
17      A   Yes.
18      Q   And at this point, those services were the only
19  services that you were familiar with, correct, the only
20  Conference America services that you were familiar with?
21      A   When you say -- I'm not sure what you mean by
22  the only services that I'm familiar with.
23      Q   Okay. Were you aware that Conference America
24  provided any other services besides the services listed
25  in the amendment at Tab D?

Page 35

1       A   The date at which the contract -- was supposed
2   to be the date that Conference America was canceling the
3   contract.
4       Q   Okay. And you believed, or tell me, did you
5   believe that it was 15 business days and not 15 days?
6       A   The contract didn't state business days or
7   calendar days. I assumed it was business days, and sent
8   a letter to Rob or -- yeah, it was Rob in this case.
9       Q   And are you saying you were trying to get
10  clarification from Rob by using that terminology,
11  business days, then?
12      A   I assumed it was business days, because of the
13  work involved and the transition, that it would be -- 15
14  business days would be fair. And was -- stated that in
15  the letter to try to clarify the date.
16      Q   Now, why did you wait until July 15th to send
17  this letter?
18      A   I had tried to have several -- on several
19  occasions tried to have a conversation with the Pirnies
20  and never received a return call, and I had to put it in
21  writing.
22        MR. MILLER: I need a bathroom break.
23        MR. BORTON: We can take one now.
24        (Recess.)
25        MR. BORTON: Back on the record.

Page 34

1       Q   Are you looking at A-1?
2       Q   A-1, A-2.
3       A   I guess, when we're talking about services, I
4   think this covers -- I'm a little bit confused when you
5   say "services."
6       Q   Well, it's a word you used in your letter
7   attached as Exhibit M, and we've had some vagueness
8   about the definition of the term, so I want to know what
9   you were talking about when you used it.
10      A   Services, this was for any services that were
11  provided for the accounts that we had set up under that
12  contract.
13      Q   Under the audio conferencing contract?
14      A   Correct.
15      Q   Okay.
16      A   That were the existing accounts that had been
17  set up.
18      Q   Okay. And when you say "any services," those
19  would include the services on A-1 and A-2 of Exhibit D
20  and any additional services as discussed on page A-3?
21      A   Yes, for the accounts that had been set up
22  previously under that signed agreement.
23      Q   Okay. Let's turn to Tab N. This looks like to
24  be a July 19th e-mail from Paul Edge to a variety of
25  people, one of which was you. Do you remember receiving

Page 36

9 (Pages 33 to 36)

1  this e-mail?
2    A  Yes.
3    Q  Okay.  Did you read this e-mail when you
4  received it?
5    A  I believe so.
6    Q  Does this appear to be a true and correct copy?
7    A  I believe so.
8    Q  In the first letter, Paul writes, "Conference
9  America has exercised a clause in our contract which by
10  default raises prices."  Do you have any idea what he
11  was talking about there?
12    A  Yes.
13    Q  Okay.  Could you tell me?
14    A  Paul is referring to the clause that Conference
15  America chose to exercise which terminated the audio
16  agreement.
17    Q  Okay.  What does he mean by "which by default
18  raises prices," if you know?
19      MR. MILLER:  If you know what he meant, you can
20  tell him.  But if you don't, tell him you don't know.
21      THE WITNESS:  Can you restate or --
22  BY MR. BORTON:
23    Q  I'll tell you what, do you know what Paul meant
24  by the phrase "which by default raises prices"?
25    A  No.  At that point, I don't think I did.  I

Page 37

1  don't recall.  I don't -- can you say the question
2  again, I'm sorry?
3    Q  Okay.  Do you know what Paul Edge meant in this
4  e-mail when he was talking about "a clause in our
5  contract which by default raises prices"?
6    A  No.
7    Q  Okay.  Did you ever call him after you received
8  this e-mail and ask him?
9    A  I don't recall.
10    Q  Do you recall asking him at all, through any
11  median?
12    A  I know that at some point in time, Paul and I
13  had a conversation, and I believe Paul knew that there
14  was different pricing that Conference America was
15  requesting.
16    Q  Do you know what basis Paul -- on what basis
17  Paul placed all Conference America bills in dispute?
18    A  I'm sorry, say that again.
19    Q  Well, this e-mail says, "In an effort to get
20  this resolved and understand what the pricing is now and
21  when it was effective, I need to place all Conference
22  America bills in dispute."  Do you know the basis for
23  that action, the placing of all the bills in dispute?
24    A  I know that bills were placed in dispute
25  because of confusion over what was actually going to be

Page 38

1  on those bills in making sure that it was at the pricing
2  that was appropriate, that we agreed to.
3    Q  How did you know there was some confusion?
4    A  On -- confusion on what?
5    Q  Well, you just talked about confusion over what
6  the prices would be.  Did you have discussion --
7    A  I'm sure I had --
8    Q  -- about that?
9    A  -- discussion with Paul, yes.
10    Q  Do you know when this discussion was?
11    A  I do not.  I know that as soon as I received
12  that letter, Paul knew of the termination by Conference
13  America as well, and we had started talking right away.
14    Q  Right away after this June 24th letter that we
15  talked about or right away after this July 19th e-mail?
16    A  What tabs are you looking at?
17    Q  Okay.  The June 24th letter is Tab K.
18    A  It was shortly after this letter that Paul and
19  I had a conversation about the termination of the
20  services.
21    Q  In this letter, on the second paragraph, Pirnie
22  writes to you that "any services used or requested after
23  termination will be made available only subject to
24  Conference America's standard terms, conditions and
25  prices."  When you read that, at any time after you read

Page 39

1  that, did you go check to see what those standard terms,
2  conditions and prices were?
3    A  At some point in time.  Not at this point in
4  time, I did not.
5    Q  Do you know when you might have?
6    A  I -- as I had said earlier, I think it was
7  around the end -- beginning of September.
8    Q  Okay.  But nevertheless, in this letter, he did
9  tell you that services will be made available subject to
10  standard terms, conditions and prices after this audio
11  conferencing contract was terminated, correct?
12    A  He states that here, yes.
13    Q  And he told you in this letter where to go to
14  view those services terms and conditions, did he not?
15    A  He states that here, yes.
16    Q  Okay.  Let's go back to Tab N.  Did you direct
17  Paul Edge to place Conference America's bills in
18  dispute?
19    A  No.
20    Q  Is Paul Edge a subordinate of yours?
21    A  No.
22    Q  Who does Paul Edge report to, if you know?
23    A  Jeff Reid.
24    Q  Okay.  Did you ever have a discussion with Paul
25  Edge about placing Conference America's bills in dispute

Page 40

10 (Pages 37 to 40)

1  prior to this July 19th e-mail?
2      A  I believe I did.
3      Q  When was that discussion?
4      A  I don't recall the date.
5      Q  Okay.  Is it fair to say that discussion took
6  place between June 24th and July 19th?
7      A  Yes.
8      Q  Okay.  Tell me, to the best of your knowledge,
9  everything that was said in that discussion.
10     A  I don't recall everything that was said.
11     Q  Okay.  Just as best as you recall.
12     A  That we needed to fully understand what we were
13  being invoiced for to make sure that it was what had
14  been agreed to; and that, you know, according to the
15  contract, also we had the ability to hold any invoices
16  that were in dispute until they were clearly stated and
17  agreed to.
18     Q  Okay.  Anything else you can remember?
19     A  Not that I recall right now, anyway.
20     Q  Now, is it true that you guys owed Conference
21  America money for services that Conference America
22  rendered to Conexant in June 2005?
23     A  Yes, I believe so.
24     Q  Okay.  When Edge says in this July 19th e-mail
25  "I need to place all Conference America bills in

Page 41

1      Q  Okay.  Do you know what Edge intended to do to
2  understand what the pricing was as of July 19th and when
3  it was effective?
4      A  I know that we both tried to have calls with
5  various folks at Conference America, in particular, the
6  Pirnies.  I'm not sure I answered your question.  Could
7  you restate that again?
8      Q  Do you know what Edge intended to do to
9  understand what the pricing was as of July 19th and when
10  it was effective?
11     A  Well, we understood that they canceled the
12  contract and so new services would be under the -- if
13  agreed to, would be under the standard terms and
14  conditions.  But we needed to find out what was -- that
15  the invoices were correctly stated for the services that
16  we were being billed for at that time which were all
17  accounts that had been set up under the signed
18  agreement.
19     Q  So if someone from Conexant called up
20  Conference America to get a conference call handled
21  after the termination of the audio conferencing
22  contract, they were going to pay according to the
23  standard terms, conditions and prices, correct?
24     A  No.
25     Q  Okay.  What were they going to pay according to

Page 43

1  then?  What price would they get?
2      A  The contract that we had agreed to.
3      Q  Okay.
4      A  Because those were accounts that were set up
5  under the signed agreement.
6      Q  And I'm talking about posttermination of that
7  agreement.
8      A  Correct.
9      Q  Okay.  Your answer is that even after
10  termination of that contract, Conexant was still going
11  to get the prices set forth in that contract?
12         MR. MILLER:  For the accounts that are already
13  in place, that's what --
14         THE WITNESS:  Correct.
15  BY MR. BORTON:
16     Q  So are you saying that -- I just want to
17  understand your position.  Your position is that the
18  accounts that were already in place prior to the
19  termination of the audio conferencing contract were
20  under the audio conferencing contract in perpetuity,
21  then?
22     A  Yes, that pricing would still apply.
23     Q  Okay.  Can you show me in any of the contracts
24  we looked at today a clause that says something to that
25  effect or addresses your view.  And for your reference,

Page 44

1  dispute," he's referring to the June bill as well,
2  correct?
3      A  Yes.  My understanding is that those bills
4  overlapped months.
5      Q  The June bill would have fallen under pre-audio
6  conferencing contract termination, correct?  Let me
7  restate that.
8         The price for services appearing in the June
9  bill would have fallen under pre-audio conferencing
10  contract termination pricing, correct?
11     A  Yes.  Those were all services that were set up,
12  or those lines, you know, were set up prior to
13  termination.
14     Q  So why was the June bill placed in dispute?
15     A  Because it was unclear as to what Conference
16  America was going to charge, what they -- what was
17  stated on the invoice.
18     Q  By this date, were you aware that the audio
19  conferencing contract had been terminated?
20     A  Yes.
21         MR. MILLER:  You mean -- you're referring to
22  July 19th?
23         MR. BORTON:  By July 19th.
24     Q  Yes?
25     A  Yes.

Page 42

11 (Pages 41 to 44)

1  the audio conferencing contracting is at B; and the
2  first amendment is, I think, C and D; third amendment,
3  the most recent one, is at D.
4      A  Can you restate the question, please.
5      MR. BORTON: Can you just read it back.
6      (Record read.)
7      THE WITNESS: And you're referring to my view
8  as --
9      (Record read.)
10     THE WITNESS: Well, page -- under Tab B, page
11 13 of 13, that -- it says, basically, this is the entire
12 agreement.  This agreement shall not be amended or
13 modified except by a written, signed -- I'm sorry,
14 except by a right -- well, it's misstated there, I
15 guess.  But this agreement shall not be amended or
16 modified except by a writing signed by Conference
17 America and the customer.
18 BY MR. BORTON:
19     Q  Okay.  That's the clause you rely on?
20     A  Yes.
21     Q  Okay.  Let's go to Exhibit O.  Before we talk
22 about that, do you know if Paul Edge ever looked at
23 Conference America's standard terms, conditions and
24 prices?
25     A  Yes, he did.

Page 45

1  of the e-mail that you received?
2      A  I believe so.
3      Q  Do you disagree with anything written in this
4  e-mail?
5      A  Yes.
6      Q  Okay.  Would you tell me everything in this
7  e-mail that you disagree with.
8      A  I disagree with Rob's statement in paragraph 1
9  that we were attempting to use this in bad faith or deny
10 payment or unlawful purposes, for one.
11     Q  Okay.  Tell me anything else in this e-mail
12 that you disagree with.
13     A  Sentence 2, he talks about "moreover we have
14 made" -- that sentence 2, he doesn't define that is
15 for services set up after -- new services set up after
16 the termination date.
17     Q  Is there anything else in this e-mail that you
18 disagree with?
19     A  I disagree with his last sentence that we were
20 well aware that the termination date was effective July
21 10th, because he never stated that in his termination
22 letter.  I disagree with the next statement that says we
23 have no good faith basis for refusing to pay for the
24 services.  We planned on paying for the services.  We
25 wanted to make sure that it was at the agreed-upon

Page 47

1  Q  Do you know when he did it?
2      A  I know that we looked at them together.  I
3  believe that was the time I stated before, that it was
4  early September.
5      Q  To the best of your knowledge, that's the first
6  time Paul Edge looked at the standard terms, conditions
7  and prices?
8      A  I don't believe so.
9      Q  To the best of your knowledge, when was the
10 first time he looked at the standard terms, conditions
11 and prices?
12     A  I don't know.
13     Q  But you think that he had looked at them prior
14 to September 2005?
15     A  Yes.
16     Q  Okay.
17     A  I'm sorry -- oh, September, yes.
18     Q  Okay.  Exhibit O appears to be an e-mail from
19 Rob Pirnie to Paul Edge and a number of recipients,
20 including yourself, dated July 19th, 2005.  Have you
21 ever seen this e-mail before?
22     A  Yes.
23     Q  Do you remember receiving this?
24     A  Yes.
25     Q  Does this appear to be a true and correct copy

Page 46

1  price.
2      Q  Will you agree with me -- go ahead, I'm sorry.
3      A  I also disagree with his last statement that we
4  in any way had threatened them with unlawful --
5  unethical or unlawful practices.
6      Q  Is that it?
7      A  I believe so.
8      Q  Earlier we talked -- and I just want to make
9  sure of something here.  We talked about your view that
10 the accounts that had been created prior to termination
11 of the audio conferencing contract would stay under
12 those contract terms in perpetuity, correct?
13     A  Yes.
14     Q  And you said that the contract clause you were
15 relying on for that view was this entire agreement
16 clause on the last page of Tab B; is that correct?
17     A  Can you state that again?
18     Q  The clause you relied on for the view we
19 discussed was this entire agreement clause on the last
20 page of Tab B; is that correct?
21     A  Yes.
22     Q  Are there any other contract clauses that
23 support that view in any of the contracts that we've
24 looked at?
25     A  When you say "any of the contracts," are you

Page 48

12 (Pages 45 to 48)

1 talking --
2    Q   Are you relying on any other clauses besides
3 that entire agreement clause we just looked at for your
4 view?
5    A   And you're talking specifically to the audio --
6    Q   Any contract we've looked at today.
7    A   Tab D, page 3, it says 4 of 12 at the top,
8 section 15, it says, "This agreement and amendment
9 including attachments A, B, D and E, contain the entire
10 agreement and understanding concerning the subject
11 matter hereof between the parties hereto."
12    Q   Okay.  Any other contract clauses you relied on
13 for your view?
14    A   Tab E, page 8 of 12, section 13-A --
15    Q   We're on Tab E.
16    A   Correct.
17    Q   Page 8 of --
18    A   -- 12.
19       MR. MILLER:  He's referring to the numbers that
20 were filed in district court, I believe.
21       THE WITNESS:  Yes.
22 BY MR. BORTON:
23    Q   Section 13-A?
24    A   Correct.  The last sentence, "No amendment or
25 modification of this agreement will be binding unless in

1 our Web site," correct?
2    A   It states that, yes.
3    Q   You see a couple of sentences after that, where
4 he says, "If you have a specific question about the
5 price applicable to any service not shown on our Web
6 site and would submit that in writing, we would, of
7 course, respond," right?
8    A   It states that, yes.
9    Q   So in this e-mail, Conference America gave
10 Conexant an opportunity to ask specific pricing
11 questions in writing, correct?
12    A   Yes, pricing for newly established services.
13    Q   Really, he writes a specific question about the
14 price applicable to any service not shown on Conference
15 America's Web site, right?
16       MR. MILLER:  Object to the form.  It says what
17 it says.
18       If you understand, you can answer.  I was just
19 objecting because the document says what it says.
20       If you're asking him what did Rob mean about
21 it --
22       MR. BORTON:  No.
23       MR. MILLER:  Okay.
24       THE WITNESS:  I'm not sure I understand your
25 question.

1 writing and signed by a duly authorized representative
2 of both parties."
3    Q   And the clause you referred to just
4 before this one was Tab D, page 3, section 15, correct?
5       MR. MILLER:  Page 4 of 12.
6       MR. BORTON:  Yeah, I'm sorry, I'm looking at
7 the bottom.
8    Q   Page 4 of 12, section 15 of Tab D, right?
9    A   Yes.
10    Q   Okay.  Besides those clauses, are there any
11 others you're relying on?
12    A   I believe that's all of them.
13    Q   Over the course of your professional life,
14 you've analyzed hundreds of contracts, haven't you?
15    A   I don't know how many.
16    Q   Would you say it's more than 50?
17    A   Yes.
18    Q   It's dozens, right?
19    A   Yes.
20    Q   Let's go back to Exhibit O.  I direct your
21 attention to the second paragraph.  You would agree with
22 me that Rob Pirnie writes here that "the permanent
23 pricing applicable to both operated, assisted and
24 automated conferencing services following termination of
25 the price protection program agreement is set forth on

1 BY MR. BORTON:
2    Q   In this e-mail, Conference America said "a
3 specific question about the price applicable to any
4 service not shown on our Web site," or said that if you
5 have a specific question about any price applicable to
6 any service not shown on our Web site, that you could
7 submit that in writing and receive a response, correct?
8       MR. MILLER:  Actually, you said "any," but it
9 says "the."
10       THE WITNESS:  Yes, I could ask him.
11 BY MR. BORTON:
12    Q   Okay.  Did you ever send a written question to
13 Conference America about any sort of pricing?
14    A   I have letters that are included within this
15 binder that try to clarify what our pricing was.
16    Q   Okay.  Any letters that we've looked at so far?
17    A   Yes.
18    Q   Okay.  Let's go to that.  I think you wrote a
19 letter that appears in Tab F and you wrote a letter that
20 appears in Tab M that we talked about so far.
21    A   In F, my letter was to get agreement to extend
22 the data conferencing contract, which did not happen.
23 And my letter in M does not address pricing.
24    Q   Okay.  Can you remember -- besides these
25 letters, then, where you haven't asked any pricing

1  questions, can you remember -- and you don't have to --
2  we'll go through the letters, obviously. But can you
3  remember, off the top of your head, any other written
4  requests or questions about pricing that you ever sent
5  to Conference America via mail or e-mail, whatever?
6      A  I believe they are all in this binder.
7      Q  Okay. But you can't remember any specifically
8  right here? I mean, we'll get into those and --
9      A  Okay.
10     Q  And I'll tell you what, when we go through
11 these, if you see where you've asked a specific question
12 about pricing, if you'll let me know.
13     A  Okay.
14     Q  Obviously nothing ever prevented you from
15 sending a written request to Conference America to
16 answer any questions about pricing, correct?
17     A  Correct.
18     Q  Let's go to Tab P. This is a July 20th, 2005
19 e-mail from Paul Edge to a variety of people, including
20 you. Do you remember receiving this?
21     A  Yes.
22     Q  Does this appear to be a true and correct copy
23 of the e-mail you received?
24     A  I believe so.
25     Q  Was anything that Paul wrote in this e-mail

Page 53

1      Q  Okay. Let's flip to Tab Q. This looks to be
2  an e-mail that Paul Edge sent to a number of people on
3  July 20th, 2005. And then Tab R, on top is an e-mail
4  that Paul Edge sent to you on July 20th, 2005. Do you
5  remember receiving the e-mail in Tab R?
6      A  Yes.
7      Q  Okay. Does this look to be a true and correct
8  copy of the e-mail that you received?
9      A  I believe so.
10     Q  And when you received this, did you read the
11 e-mail below that Paul said he forgot to copy you on?
12     A  Yes.
13     Q  Does that look to be a true and correct copy of
14 the e-mail you received?
15     A  I believe so.
16     Q  And then Tab S looks to be an e-mail from Paul
17 Edge to a variety of people, including you, dated July
18 20th correcting a date that he had in the previous
19 e-mails. Do you remember receiving this e-mail --
20     A  Yes.
21     Q  -- at Tab S?
22        Does this look to be a true and correct copy of
23 the e-mails you received?
24     A  I believe so.
25     Q  It looks like Paul changed the date from

Page 55

1  incorrect, to the best of your knowledge?
2      A  I don't believe so.
3      Q  Do you disagree with anything that Paul wrote
4  in this July 20 e-mail?
5      A  It says, "You can now take the bills out of
6  dispute." I'm not sure which bills he's referring to
7  there.
8      Q  Anything else you may disagree with?
9      A  I don't believe so.
10     Q  Did you instruct Paul to write this e-mail?
11     A  No.
12     Q  Did you discuss anything Paul said in this
13 e-mail with Paul before the e-mail was sent?
14     A  I don't recall.
15     Q  Did you discuss this e-mail with Paul after he
16 sent it?
17     A  I'm sure we had discussions around that topic.
18 I don't know that it was specific to this e-mail.
19     Q  Did you have a discussion with Paul Edge where
20 you said, "Hey, you shouldn't have written anything in
21 this e-mail"?
22     A  I don't believe so.
23     Q  Do you know what question Paul was referring to
24 in the first sentence of that e-mail?
25     A  I'm not sure.

Page 54

1  7/22/05 to 7/31/05, correct?
2      A  Yes.
3      Q  Excepting that date change, do you agree with
4  everything Paul Edge wrote in these e-mails? I'm
5  talking about from Exhibit Q to Exhibit S?
6      A  Can you restate the question, do I agree
7  with --
8      Q  Do you disagree with anything Paul said in any
9  of these e-mails?
10     A  I did disagree at the time with Paul's e-mail
11 once I was copied on it as to his 7/22 date.
12     Q  Okay. Other than that, did you disagree with
13 anything?
14     A  I don't think so.
15     Q  Turn to Exhibit T for me.
16     A  T?
17     Q  Yes. It looks to be another July 20th e-mail
18 from Paul Edge to several people, including you. Do you
19 remember receiving this?
20     A  Yes.
21     Q  Does this look to be a true and correct copy of
22 the e-mail you received?
23     A  I believe so.
24     Q  Disagree with anything in this e-mail?
25     A  I don't believe so.

Page 56

14 (Pages 53 to 56)

1    Q   Okay.  Isn't it true that you guys had decided
2   to change conferencing vendors from Conference America
3   to a company called Intercall?
4        MR. MILLER:  At some point?
5   BY MR. BORTON:
6    Q   At some point.
7    A   Yes.
8    Q   Okay.  When did you make the decision to change
9   from Conference America to Intercall?
10   A   We made the decision to transfer to Intercall
11  upon their termination.
12   Q   Okay.  You never made that decision before --
13  when we're talking about "termination," you're talking
14  about when you received the June 24th letter attached at
15  Exhibit K -- Tab K, I mean?
16   A   Can you restate the question, please?
17   Q   Okay.  Did you make the decision to transfer to
18  Intercall when you received the June 24th letter from
19  Bob Pirnie attached at Tab K?
20   A   When you say make the decision to transition,
21  are you talking about --
22   Q   You said it was upon termination, and this
23  letter says Conference America hereby terminates, to
24  paraphrase, the audio conferencing contract.  Did you
25  make the decision to switch to Intercall before or after

Page 57

1   talked about Intercall?
2    A   I don't recall.  I don't know the date.
3    Q   Okay.  Do you think it would have been before
4   June 24th, 2005 or after?
5    A   Yes, before.
6    Q   Do you think it would have been sometime during
7   2005?
8    A   It was prior to that.
9    Q   Okay.  And what was that discussion?  Tell me
10  what was said in that discussion, to the best of your
11  knowledge.
12   A   In which discussion?
13   Q   The discussion prior to June 24th, 2005 where
14  you and Paul Edge talked about Intercall.  And if there
15  were more than one discussion, let's go through each.
16   A   Actually, there was a discussion back in 2003
17  with multiple suppliers to understand the market pricing
18  at that time.
19   Q   Okay.  That was between you and Paul Edge and
20  multiple suppliers?
21   A   Correct.
22   Q   Okay.
23   A   Actually, there were others involved as well.
24   Q   Okay.  Were there any discussions subsequent to
25  that and prior to June 24th, 2005?

Page 59

1   you received this letter?
2    A   We switched our services after receiving this
3   letter.
4    Q   Okay.  When did you make the decision to switch
5   your services, though?
6    A   We made the -- after receiving this letter, we
7   made the decision to switch our services as quickly as
8   possible.
9    Q   Okay.  So prior to June 24th, you had never --
10  you personally, on behalf of Conexant, had not decided
11  to switch conferencing services to Intercall, correct?
12       MR. MILLER:  Object to the form, it assumes he
13  had the authority to make that call.
14       But you can answer the question.
15       THE WITNESS:  There were no transition dates,
16  plans in place.
17  BY MR. BORTON:
18   Q   Okay.  Do you know who at Conexant made the
19  decision to switch conferencing vendors from Conference
20  America to Intercall?
21   A   That would be Paul and myself.
22   Q   Paul and yourself.  And it would be a joint
23  decision on behalf of Conexant, then?
24   A   Yes.
25   Q   Okay.  When was the first time you and Paul

Page 58

1    A   Yes.
2    Q   Okay.  When was the next one?
3    A   There were several at the time of 2003, because
4   it was looking at pricing, so there were multiple
5   discussions.  Then there was discussions regarding the
6   WebEx business with multiple suppliers as well.
7    Q   Okay.
8    A   Intercall was one of them.
9    Q   During one of these pre-June 24th, 2005
10  discussions, did you and Paul Edge jointly decide that
11  you were going to switch from Conference America to
12  Intercall?
13   A   A final decision had not been made.
14   Q   During one of these pre-June 24th, 2005
15  discussions, did you and Paul Edge discuss the
16  possibility of switching from Conference America to
17  Intercall?
18   A   Yes.
19   Q   Okay.  Was that in just one discussion or was
20  it many discussions?
21   A   It was multiple.
22   Q   Okay.  It was multiple.  So you're telling me
23  that the joint decision between you and Paul Edge to
24  switch to Intercall from Conference America was made
25  after receipt of this June 24th, 2005 letter attached as

Page 60

15 (Pages 57 to 60)

1  Exhibit K?
2      A  There were no transition plans, and Paul and I
3  had discussed it, and the plan was to complete this
4  agreement with Conference America.
5      Q  Okay. When did you and Paul Edge jointly
6  decide to switch to Intercall, was it before or after
7  June 24th, 2005?
8      A  There were several discussions as to what's
9  right for the business. The actual transition plan and
10 the setup with Intercall to make that happen was after
11 this June 24th letter.
12     Q  But the decision to make the switch to
13 Intercall was made by you and Paul prior to this June
14 24th letter, correct?
15     MR. MILLER:  Object to the form. That's not
16 what he said.
17     You can answer.
18     THE WITNESS:  There were discussions about
19 Intercall. We did transition the WebEx business over to
20 Intercall. There were discussions about conference
21 services with Intercall. There had been no plan --
22 transition plan put in place at that time.
23 BY MR. BORTON:
24     Q  Okay. Was the decision to make a transition to
25 Intercall made after June 24th, then, 2005?

Page 61

1  business.
2      Q  Okay. To the best of your knowledge, it was
3  after June 24th, 2005 that Conexant informed Conference
4  America -- or Conexant informed Intercall that Intercall
5  was going to be getting the conferencing business from
6  Conexant?
7      A  That there was a definite transition plan and
8  date, yes.
9      Q  Prior to June 24th, 2005, and to the best of
10 your knowledge, had Conexant informed Intercall that
11 Conexant was probably going to use Intercall for
12 conferencing services?
13     A  There was a possibility, yes.
14     MR. MILLER:  When you get to a break point.
15     MR. BORTON:  Okay. Let me finish up with this
16 line of questioning.
17     I want to mark this as Exhibit 2. This is an
18 e-mail disclosed by Conexant in discovery with a Bates
19 stamp S&A 284.
20     (Plaintiff Exhibit 2 was marked for
21 identification by the court reporter.)
22 BY MR. BORTON:
23     Q  This looks to be an e-mail dated June 29th,
24 2005 from Paul Edge to a number of people, including
25 you. Do you remember receiving this e-mail?

Page 63

1      MR. MILLER:  For conferencing services?
2      MR. BORTON:  For conferencing services.
3      THE WITNESS:  I believe so.
4  BY MR. BORTON:
5      Q  And that would have been a decision you and
6  Paul would have made jointly, correct?
7      A  Paul and I would have discussed that we would
8  definitely let, you know, somebody else know as well. I
9  mean, Paul and I would be the ones driving that.
10     Q  But you believe that decision was made after
11 June 24th, 2005?
12     A  There were discussions about that prior to. As
13 far as the actual transition plan and pulling the
14 trigger to switch the services, that was after June
15 24th.
16     Q  Okay. When was the first time that -- let me
17 make sure I phrase this correctly. To the best of your
18 knowledge, when did Conexant inform Intercall that
19 Conexant would be using Intercall for conferencing
20 services?
21     A  I don't recall the date.
22     Q  Do you believe it was before or after June
23 24th, 2005?
24     A  It was after that date that we had the
25 transition plan that they were actually getting the

Page 62

1      A  Yes.
2      Q  Does this appear to be a true and correct copy
3  of the e-mail that you received?
4      A  I believe so.
5      Q  Did you read this when you received it?
6      A  I believe so.
7      Q  Do you disagree with anything that Paul Edge
8  said in this e-mail?
9      A  I don't believe so.
10     Q  You don't believe so?
11     A  I don't believe I disagree with it, no.
12     Q  So you disagree pretty much with everything --
13 or you agree with everything in the e-mail, then?
14     MR. MILLER:  Start over. I think you had a
15 double negative that he disagreed with.
16     MR. BORTON:  Okay.
17     Q  Is there anything in this e-mail, then, that
18 you disagree with?
19     A  No.
20     Q  Do you know what Paul means when he says,
21 "Since we have an agreement with Intercall already at
22 competitive rates"?
23     A  Do I know what -- I'm not sure I understand
24 your question.
25     Q  Okay. I'll tell you what I'm getting at. It

Page 64

16 (Pages 61 to 64)

1    says in this e-mail -- Paul Edge says, "we have an
2    agreement with Intercall already at competitive rates."
3        A    Yes.
4        Q    Were you aware of that?
5        A    Yes.
6        Q    Okay. When was that agreement that he's
7    discussing formed, if you know?
8        A    I don't recall. I don't recall the exact date.
9        Q    Okay. Do you recall whether it was before or
10   after June 24th, 2005?
11       A    I believe it was -- I believe it was before.
12       Q    So then there was an agreement with Intercall
13   up and running prior to June 24th, 2005?
14       A    I would have to verify the date, but I believe
15   that's correct.
16       MR. BORTON: All right. We can take a break.
17       (Recess.)
18       MR. BORTON: Back on the record.
19       Q    Mr. Noonan, when would you say Conexant's
20   agreement with Intercall for conferencing services was
21   finalized?
22       A    There was an agreement finalized with Intercall
23   for the WebEx services, and that's who we transitioned
24   our WebEx services to. Within that agreement, Intercall
25   included conference pricing.

Page 65

1    Q    When was that finalized?
2        A    I don't know the date.
3        Q    Was it before or after June 24th, 2005?
4        A    I would have to look what the date was that the
5    WebEx services were transitioned, because it would have
6    been prior to that date.
7        Q    When was Conexant scheduled to begin using
8    Intercall's conferencing services?
9        A    Upon the termination of -- once Bob terminated,
10   it was to try to transition as quickly as possible.
11       Q    Okay. How long did that transition take?
12       A    I don't recall. Would be the date that
13   everybody was transitioned over.
14       Q    Paul Edge, on June 29th, 2005, was a Conexant
15   employee, correct?
16       A    Uh-huh. Yes.
17       Q    Still is a Conexant employee, correct?
18       A    Yes.
19       Q    Looking at the first sentence of this letter in
20   Exhibit 2, this e-mail in Exhibit 2, you'd agree with me
21   that someone at Conexant, as of June 29th, 2005, was
22   aware that Conference America had executed a clause in
23   the audio conferencing contract to no longer provide
24   services to Conexant at the current rates in the audio
25   conferencing contract, correct?

Page 66

1    A    When you say conference services, you're
2    talking about new conference services that are not
3    within the agreement, the written agreement, correct?
4        Q    No. I'm talking about service as Paul Edge
5    used in this e-mail. If you don't know what he's
6    talking about, you can tell me.
7        A    Well, Paul is referring to the clause that they
8    exercised in the agreement to terminate the contract.
9    And the second half, that they will "no longer provide
10   services to Conexant at our current rates," I interpret
11   that as any new -- new accounts set up.
12       Q    But you agree that that's not what it says,
13   correct?
14       MR. MILLER: Object to the form. It says what
15   it says.
16       THE WITNESS: That's my interpretation.
17       MR. BORTON: Okay. Let's mark this e-mail as
18   Exhibit 3.
19       (Plaintiff Exhibit 3 was marked for
20        identification by the court reporter.)
21       THE WITNESS: I should say that's my
22   interpretation as what I stated.
23       MR. MILLER: What's Exhibit 3, the Bates
24   number?
25       MR. BORTON: It's Bates number S&A 335.

Page 67

1    Q    This looks to be an e-mail dated June 29th,
2    2005 from Paul Edge to a variety of people, including
3    you. Do you remember receiving this e-mail?
4        A    I believe so.
5        Q    Did you read this when you received it?
6        A    Yes, I would have.
7        Q    Does this appear to be a true and correct copy
8    of the e-mail you received?
9        A    I believe so.
10       Q    Do you remember helping Paul Edge to write this
11   e-mail?
12       A    I don't believe so.
13       Q    Did you direct Paul Edge to write this e-mail?
14       A    Paul is not a direct report. I wouldn't have
15   directed him to write it, no.
16       Q    Okay. Did you ask him to write it?
17       A    No.
18       Q    Do you disagree with anything in this e-mail?
19   Let me rephrase. Do you disagree with anything Paul
20   wrote in this e-mail?
21       A    The first paragraph Paul gives his opinion as
22   to why Conference America canceled the contract. That's
23   an opinion of Paul's. I don't know why they canceled.
24       Q    Do you disagree with that statement of Paul's
25   or are you saying you don't know why they --

Page 68

17 (Pages 65 to 68)

1    A  I never knew why. I tried to have several
2  conversations with Bob Pirnie and was never told why.
3    Q  So you don't agree or disagree with that
4  statement, you just don't know?
5    A  It would be speculation. I don't know why they
6  canceled.
7    Q  Do you disagree with anything else Paul wrote
8  in this e-mail?
9    MR. MILLER: Let me object to the form. He
10  didn't say he disagreed with that.
11    MR. BORTON: Okay.
12    MR. MILLER: Your question said anything else.
13  BY MR. BORTON:
14    Q  Okay. Besides the sentence we just talked
15  about, excluding that, do you disagree with anything
16  written in this e-mail?
17    A  I guess on section -- excuse me, paragraph 2,
18  the last sentence, obviously, Conference America didn't
19  want to continue doing business with us, so they
20  canceled the contract, terminated the contract, but I
21  don't know that we needed to convert everyone in 15
22  days. I think it was in the best interest of both
23  parties.
24    Q  So do you disagree with the second sentence or
25  the -- you disagree with the contents of the second

Page 69

1  paragraph in this e-mail, then?
2    A  I don't disagree with it other than the 15
3  days. Conference America will continue to provide the
4  services and any -- the new services. If anybody, you
5  know, signed up for new services after that termination
6  was effective, it would have been at a higher rate.
7    Q  Doesn't that conflict with your view that we
8  discussed earlier that Conexant -- existing Conexant
9  accounts and the users would continue to receive the
10  same prices enumerated in the audio conferencing
11  contract and amendments despite the fact that the
12  contract was terminated?
13    A  No. That's what I'm restating, that that is
14  true. That's why I'm saying I'm not sure that everyone
15  needed to be converted within 15 days. However, I think
16  it's in the best interest of both parties. And it's
17  true that new services -- after the termination of the
18  contract, new services that would be set up would be at
19  a higher rate.
20    Q  Let's go back just so we're clear on what you
21  said earlier. The accounts that were established
22  pre-termination of the audio conferencing contract --
23    A  Correct.
24    Q  -- those accounts, in your view, could continue
25  to call the -- let's go back. Were the accounts

Page 70

1  assigned to specific people at Conexant?
2    A  Yes.
3    Q  Okay. So in your view, the people who had the
4  accounts at Conexant could continue to call Conference
5  America and receive conferencing services from
6  Conference America after the audio conferencing contract
7  terminated at the prices enumerated in the audio
8  conferencing contract, correct?
9    A  Correct.
10    Q  Okay. So do you or don't you disagree, then --
11  I want to make sure I know what you disagree with in
12  this second paragraph.
13    A  What I -- what I'm disagreeing with, it says if
14  we do not convert everyone within 15 days, I'm not sure
15  that we needed to convert everyone in 15 days. It was
16  just in the best interest of both parties because,
17  obviously, Conference America terminated the agreement,
18  so they weren't interested in doing business with us.
19    Q  So, then, do you disagree with Paul's statement
20  in the fifth paragraph that "we need to move quickly or
21  pay the higher rate"?
22    A  I don't disagree with that, because if we
23  didn't move quickly, any new accounts that would be set
24  up would be at a new rate, because they weren't
25  established under the existing contract.

Page 71

1    MR. BORTON: Okay. I'm going to mark -- this
2  will be Exhibit 4. And it is going to be an e-mail
3  Bates-stamped 336, S&A 336.
4    (Plaintiff Exhibit 4 was marked for
5    identification by the court reporter.)
6    (Discussion off the record.)
7    MR. BORTON: Back on the record.
8    Q  Mr. Noonan, this is a document -- Exhibit 4 is
9  Bates-stamped S&A 336, an e-mail from Paul Edge dated
10  June 29th to a variety of people, none of which is you.
11  Have you ever seen this e-mail before?
12    A  Yes.
13    Q  When did you see this e-mail for the first
14  time?
15    A  I honestly don't remember when I saw it for the
16  first time.
17    Q  Does this appear to be a true and correct copy
18  of the e-mail he sent on June 29th?
19    A  I guess so. Since I didn't receive it, I -- I
20  don't know.
21    Q  Did you read it when you received it?
22    A  I didn't receive it. Well, I know it was part
23  of documentation. I don't recall the first time I read
24  it.
25    Q  Okay. Did you read it in preparation for this

Page 72

1  deposition?
2      MR. MILLER:  I will say this, if what I
3  provided him is missing the page 2 out of my binder, I
4  don't know whether he did or not, because I don't know
5  whether it got copied or not.
6      MR. BORTON:  All right.
7      THE WITNESS:  I honestly -- I'm assuming I -- I
8  don't know.  I don't know whether I got this.
9  BY MR. BORTON:
10     Q  Okay.  Will you take a look at it, and take as
11  long as you like, and tell me if you disagree with
12  anything written in this e-mail.
13     A  Okay.  I don't believe I disagree with
14  anything.
15     MR. BORTON:  I'm going to mark this as
16  Exhibit 5.  It's Bates stamped S&A 338.
17     (Plaintiff Exhibit 5 was marked for
18     identification by the court reporter.)
19  BY MR. BORTON:
20     Q  Mr. Noonan, I'm going to show you Exhibit 5.
21  It looks to be a June 29th, 2005 e-mail from Paul Edge
22  to --
23     A  June 29th or --
24     Q  I'm sorry, July 12th e-mail from Paul Edge to
25  several different people, including yourself.  Do you

1  remember receiving this e-mail?
2      A  I'm sure I received it.
3      Q  Do you remember reading it?
4      A  Not specifically, but I'm sure I did.
5      Q  Does this look to be a true and correct copy of
6  the e-mail you received?
7      A  Yes, this -- I believe it's -- yes.
8      Q  Just looking down at the third paragraph, Edge
9  discusses receiving new codes.  Is he referring to
10  Intercall codes?
11     MR. MILLER:  Object to the form.
12     If you know.
13  BY MR. BORTON:
14     Q  If you know.
15     A  I believe he is.
16     Q  Okay.  Do you know when Conexant employees
17  received their Intercall codes?
18     A  I don't exactly, but I'm assuming it was --
19     MR. MILLER:  You don't assume.  Just if you
20  know, tell him.  If you don't --
21     THE WITNESS:  Okay.  I don't know.
22  BY MR. BORTON:
23     Q  Let's look at Tab U, which looks to be a letter
24  dated July 26th, 2005 from Bob Pirnie to you and Paul
25  Edge.  Do you remember receiving this letter?

1      A  Yes.
2      Q  Did you read it when you received it?
3      A  Yes.
4      Q  Does this look to be a true and correct copy?
5      A  I believe so.
6      Q  In the second paragraph, Pirnie discusses the
7  distinction between 15 days' notice and 15 business
8  days' notice?
9      A  Uh-huh.
10     Q  Does this clarify for you that the contract
11  could be terminated on 15 days' notice and not 15
12  business days' notice?
13     A  Well, he is stating his stance on that, that
14  it's -- he still doesn't say 15 calendar days, but he
15  actually does now state a termination date of July 10th.
16     Q  What was your belief after reading this letter
17  as to what the termination date of the audio
18  conferencing contract really was?
19     A  Actually, I'm not sure that it made a
20  difference at that point.  It was up for interpretation.
21  I interpreted it as business days.  Bob interpreted it
22  as calendar days.  And he's stating there, termination
23  was effective July 10th.  I believe this is the first
24  time that he actually states a date, which is 16 days
25  after what he's stating is the termination date.

1      Q  Is it your opinion or your interpretation,
2  then, that the contract terminated on July 15th?
3      A  I believe that we -- I don't know that it even
4  was really discussed much after that point.  Those were
5  the calls that we had placed to Bob earlier to try to
6  get clarification.  And there was never a conversation
7  other than what I had stated my belief was and he came
8  back and stated what his belief was.
9      Q  And just to do the question again, and I'm
10  just -- you know, you just tell me, when did you believe
11  the audio conferencing contract was terminated, as of
12  what date?
13     A  From my previous letter, I don't remember what
14  the date was, but I was assuming it was 15 business
15  days, which whatever date that would put it at, versus
16  15 days.
17     Q  Your previous letter, and it's at Tab M --
18     A  Right.
19     Q  -- you believe the audio conferencing contract
20  terminated on Friday July 15th, 2005; is that correct?
21     A  Correct.
22     Q  Going back to Tab U, do you see where Pirnie
23  writes in the second paragraph that "the termination was
24  effective July 10th, and any services Conexant may have
25  used from that date forward will be covered by our

1  services terms and conditions on our Web site
2  www.yourcall.com including price terms"?
3      A  I see it stated there, yes.
4      Q  Do you see in the second -- the sentence after
5  that where he encourages you to review the services
6  terms and conditions?
7      A  I see it stated there, yes.
8      Q  Please take a look at the third paragraph.
9  Basically in that paragraph, Pirnie offered you
10  Conference America's services if you wanted to use them,
11  correct?
12      MR. MILLER:  Object to the form.
13      THE WITNESS:  Can you ask the question again?
14      MR. BORTON:  Just read it back.
15      (Record read.)
16      MR. MILLER:  Object to the form.
17      THE WITNESS:  Yes, he states that "we," as in
18  Conference America, "of course, hope Conexant will
19  continue to use our services," which is somewhat
20  confusing since he terminated the contract.
21  BY MR. BORTON:
22      Q  Do you think he was talking about services that
23  came after the termination of the contract, whenever
24  that was?
25      A  I -- I don't know what he's referring to as far

Page 77

1  as services there.
2      Q  Okay.  Did he make it clear to you in the
3  second sentence that if Conexant did use Conference
4  America's services, it would be responsible for them
5  financially?
6      A  What was your question again, I'm sorry?
7      MR. BORTON:  Just read it back.
8      (Record read.)
9      THE WITNESS:  He states that, yes.
10  BY MR. BORTON:
11      Q  Okay.  Didn't he confirm for you in the next
12  paragraph that deactivation of Conexant conferencing
13  accounts was a service that Conference America offered?
14      A  Yes, he states that.
15      Q  And did he not tell you that he would -- or
16  Conference America would comply with Conexant's
17  instructions to deactivate all Conexant conferencing
18  accounts?
19      A  That he would comply with our instructions,
20  yes, that states that.
21      Q  That states what?
22      A  It does state that they will comply with our
23  instructions.
24      Q  To deactivate all Conexant conferencing
25  accounts?

Page 78

1      A  Yes.  He states that that service will be
2  offered to comply with our instructions.
3      Q  Okay.  Excepting the issue of what date the
4  audio conferencing contract terminated on, do you
5  disagree with anything that Bob Pirnie wrote in this
6  letter?
7      MR. MILLER:  Object to the form.  Accepting or
8  excepting.
9      MR. BORTON:  Exception, excepting, e-x.
10      MR. MILLER:  Object to the form.
11      You can answer it.
12      THE WITNESS:  Can you say the question again?
13  BY MR. BORTON:
14      Q  Okay.  Excepting any issue about when the audio
15  conferencing contract terminated, do you disagree with
16  anything else that Bob Pirnie wrote in this letter?
17      MR. MILLER:  Let me object to the form to the
18  extent that it necessarily calls for him to assume what
19  Bob Pirnie meant or didn't mean.
20      But you may answer the question.
21      THE WITNESS:  I'm sorry, I hate to do this, but
22  can you ask the question or read the --
23      (Record read.)
24      MR. MILLER:  Object to the form.  It
25  necessarily calls for him to speculate about what

Page 79

1  Mr. Pirnie meant or did not mean.  I sure don't mind him
2  answering his interpretation of that letter.
3      MR. BORTON:  Yes, I'm asking whether he
4  disagreed with anything he's read in this letter, not
5  what Pirnie meant.
6      MR. MILLER:  I still object to the question
7  because it -- the way you've phrased it requires for him
8  to speculate about what Mr. Pirnie meant or did not
9  mean.  I don't mind -- I'm not telling you what question
10  to ask, but I don't mind him telling you his
11  interpretation of the language in that letter.
12      MR. BORTON:  Okay.
13      THE WITNESS:  My interpretation of paragraph 4
14  of this letter is that Bob Pirnie will comply with our
15  instructions to deactivate accounts, which is what we
16  had done throughout the course of our relationship.
17  So --
18  BY MR. BORTON:
19      Q  Based on your interpretation of this letter,
20  did you disagree with anything else that Bob Pirnie
21  wrote?
22      MR. MILLER:  Let me lodge the same objection
23  that I stated a minute ago.  To the extent that the
24  question calls for him to speculate about what Bob
25  Pirnie meant or did not mean, I object to the question.

Page 80

20 (Pages 77 to 80)

1  I don't mind Mr. Noonan giving his interpretation of any
2  part of this letter which you may wish to ask about. So
3  I object to the form.
4      MR. BORTON:  Okay.
5      THE WITNESS:  I disagree in paragraph 1 where
6  it says our unwillingness to pay for services it uses.
7  We had attempted to get agreement. And I don't know
8  whether it was before or after this date, we had even
9  paid for services even though they had not returned
10 calls. And I don't know that in conjunction with the
11 date of this letter, though.
12     I disagree, in paragraph 1, also, where he says
13 that it threatens unlawful action, and some of it is
14 simply incomprehensible. I'm not sure what either of
15 those apply to. We've already talked about paragraph 2
16 where we had a different interpretation of 15 days. I
17 also disagree with paragraph 2 that any services
18 Conexant may have used from that date forward would be
19 covered by the services terms and conditions on our
20 Web site. For any new services established, but not for
21 services or accounts set up under the terms of the
22 agreement, the formerly signed agreement.
23     Again in paragraph 3, I don't know that I
24 disagree with it because I don't know what Bob is
25 thinking, but it's very confusing that they canceled the

Page 81

1  agreement and says, "We, of course, hope Conexant will
2  continue to use our services." Paragraph 5, he states
3  that if they receive requests, "I'll assume that whoever
4  signs up has the authority to make such requests," and I
5  would have to look at my letters, but in one of the
6  letters I did tell him that they would not be authorized
7  to.
8      Also in that paragraph he talks about policing
9  policy decisions. I wasn't asking him to police policy
10 decisions, I was just asking him to follow our request
11 to not set up new accounts after that date. I also
12 disagree with the last part of that saying that
13 Conexant -- that there was correspondence from Conexant
14 that contemplates that we weren't going to pay for
15 services that we had received, and again citing criminal
16 sanctions as well as civil liability, and I disagree
17 with that. I don't know what it's referring to because
18 I don't think we ever said that we weren't going to pay
19 for services that were rendered. We were trying to get
20 agreement on -- clarification of the invoices.
21 BY MR. BORTON:
22     Q  Anything else that you disagree with?
23     A  I believe that's all.
24     Q  Okay. Let's go to Tab V. It appears to be a
25 June 28th -- I'm sorry, July 28th 2005 letter that you

Page 82

1  sent to Robert M. Pirnie. Do you remember sending or do
2  you remember writing this letter?
3      A  Yes.
4      Q  And do you remember sending it to him?
5      A  Yes.
6      Q  Is it a true and correct copy of that letter?
7      A  I believe so.
8      Q  In the second paragraph, you say, "It wasn't
9  until your July 26th letter that it was made clear to
10 Conexant that Conference America believes that our
11 agreement was terminated as of July 10th," right?
12     A  Uh-huh. Yes.
13     Q  I'd like you to flip back to Tab O. In the
14 last sentence of that second paragraph, didn't Rob
15 Pirnie state Conference America's position that
16 termination was effective July 10th?
17     A  Yes, it states that there.
18     Q  Let's go to Tab P. In this e-mail from Paul
19 Edge, didn't he mention the price change took effect
20 July 10th, 2005?
21     A  Paul states that "based on the e-mail below,
22 the price change took effect on July 10th."
23     Q  What wasn't clear about the e-mail below? And
24 that's Rob Pirnie's e-mail to everyone on July 19th.
25     A  In reference to the entire e-mail?

Page 83

1      Q  Where he says termination was effective July
2  10th, what wasn't clear about that?
3      A  Just the interpretation of 15 days.
4      Q  Please explain that.
5      A  Well, here is -- I believe, and I'm not
6  positive, July 19th is the first -- July 19th e-mail is
7  the first that they actually state a date, I believe.
8      Q  Okay. How do you reconcile that with your
9  statement in your letter that "it wasn't until your July
10 26th letter that it was made clear to Conexant that
11 Conference America believes that our agreement was
12 terminated as of July 10th"?
13     A  I guess when I responded to Bob's letter, I
14 didn't realize or had forgotten that it was stated in
15 the previous e-mail, which he didn't make reference to
16 either.
17     Q  Okay. Let's look at the third paragraph of
18 this Tab V. It's a July 28th letter that you wrote.
19     A  Okay, I'm sorry, which paragraph?
20     Q  Third paragraph. You say "We" -- meaning
21 Conexant, right?
22     A  Yes.
23     Q  Okay. -- "continue to operate under the agreed
24 upon terms and conditions in the contract dated August
25 1, 1999 and amended as of December 1, 2003." And we

Page 84

21 (Pages 81 to 84)

1  talked about this before, but your basis for this
2  statement was those contractual provisions that we
3  discussed before that I asked you to point out to me; is
4  that right?
5      A  Yes.
6      Q  If those contractual terms -- or, excuse me, if
7  those contracts, the audio conferencing contract and
8  amendments provided for a $75 deactivation fee, then,
9  and you asked -- or Conexant asked Conference America to
10  deactivate those accounts, under your interpretation or
11  your view that you were still operating under the terms
12  in the audio conferencing contract, wouldn't Conexant be
13  liable for a 75 -- or $74.95 charge for deactivating
14  each account?
15      MR. MILLER:  Let me object to the form, because
16  that assumes facts not in evidence.
17      But you may answer.
18      THE WITNESS:  I would expect that or did expect
19  that there was no charge for termination, deactivation
20  of accounts, because that had been done previously under
21  the agreement.
22  BY MR. BORTON:
23      Q  What had been done previously under the
24  agreement?
25      A  Accounts were made inactive.

Page 85

1      Q  Okay.  And you would expect there was no
2  charge?
3      A  There had not been a charge.
4      Q  Okay.  We discussed Exhibits 2, 3, 4 and 5
5  earlier, and I'll just put those there for your
6  reference.
7      A  Okay.
8      Q  But are these e-mails the ways in which
9  Conexant informed its employees they no longer had
10  authority to request services from Conference America?
11      A  Communication -- I -- communication to the
12  employees was made on this one e-mail.  This was to the
13  administrative assistants.
14      Q  Would you just tell us which exhibit that
15  e-mail is.
16      A  It's Exhibit 5.  I don't recall whether
17  there -- I'm sure there were other communications about
18  the change in service as well or some sort of
19  communication to get people set up, I'm guessing.
20      Q  Okay.  What's the date of that e-mail?
21      A  July 12th, 2005.
22      Q  That's the only communication that you can
23  remember by which Conexant employees were told not to
24  use Conference America; is that correct?
25      A  I don't recall.  I don't recall what other

Page 86

1  communications there may have been.
2      Q  Okay.  Do you know if Conexant employees
3  continued to use Conference America's services after the
4  date of that e-mail?
5      A  After the date of July 12th?
6      Q  Yes.
7      A  Yes, I believe they did.
8      Q  Okay.  Do you have -- just to the best of your
9  knowledge, do you have any idea why?
10      A  They had accounts that were set up under the
11  prior contract, and this was during the transition time
12  frame.
13      Q  And that's why?
14      A  I -- I don't -- I mean, I can't speculate why
15  they would continue to use it if they had a code to
16  transition.
17      Q  Okay.  Okay.  Let's flip to Tab W.  This is a
18  September 8th e-mail from someone named Audria Carr to
19  Bob Pirnie.  And in this e-mail, it says Paul Edge -- or
20  Donna Rough from Cass Information Systems had contacted
21  Conference America, and I'm just paraphrasing, and Rob's
22  voicemail stated that Paul Edge disapproved both
23  invoices in the amounts of $39,793.01, and another
24  invoice in the amount of $201,346.32.  And I know this
25  doesn't reference you, it just references Paul Edge, but

Page 87

1  what I'd like to know is if you have any insight on why
2  he disapproved both invoices on or around September 8th,
3  2005.
4      A  I don't know specifically these invoices.  I
5  know that invoices had been put in dispute or had been
6  put on hold to clarify appropriate charges to make sure
7  that they were according to the agreed terms and
8  conditions.
9      Q  And just going back here, Exhibit N is an
10  e-mail from Paul Edge placing all Conference America
11  bills in dispute on July 19th, correct?
12      A  Yes.  Paul states, "I need to place all
13  Conference America bills in dispute."
14      Q  And if you'll flip to Tab P, it looks like he
15  took them out of dispute on July 20th, right?
16      A  I don't know which bills he's referring to.
17      Q  Okay.  Some Conference America bills, though,
18  correct?
19      A  It looks that way, yes.
20      Q  Okay.  And then are you aware that sometime
21  between July 20th, 2005 and September 8th, 2005 Paul
22  Edge put the bills back into dispute?
23      A  I know that there were still bills in dispute.
24      Q  Okay.  After July 20th, 2005, do you know that
25  there were still Conference America bills in dispute?

Page 88

22 (Pages 85 to 88)

1    A  Yes.
2    Q  Do you know which bills were still in dispute?
3    A  I believe -- I believe there was a bill, I
4  don't know the date, but for termination services. I
5  know there was a bill that included charges for
6  termination services that was in dispute.
7    Q  Okay.  Do you know when that bill went into
8  dispute?
9    A  I would assume upon receiving it.  I don't -- I
10  don't recall.
11    Q  Okay.  Do you know which bills Paul Edge took
12  out of dispute on July 20th, 2005?
13    A  I don't.
14    Q  Okay.  Let's look at Tab X.  This is a
15  Conference America invoice numbered 119266, dated August
16  2nd, 2005.  Did you ever receive this from Conference
17  America?
18    A  I -- I can't -- I believe so.  I can't -- I
19  don't receive these directly.
20    Q  Okay.  Who receives invoices for conferencing
21  services at Conexant, if you know?
22    A  I'm not sure.
23    Q  But as a matter of course, you don't receive
24  these?
25    A  I do not.

Page 89

1    Q  Okay.  What is the role of Cass Information
2  Systems?  What do they do for Conexant?
3    A  They are a third-party payment service.
4    Q  So when Conexant owes money to somebody, a
5  company or person out of Conexant, Cass pays that money?
6    A  Correct.
7    Q  Okay.  Do you know who Donna Rough is, or Ruth?
8    A  I do not.
9    Q  Let's look at page 22 of 43 of this invoice,
10  and going over to page 23 and then page 24, and I'd like
11  you to look down that list of people and tell me if they
12  are Conexant employees or if they were Conexant
13  employees on August 2nd, 2005.
14    A  I -- that, I don't know.  I do recognize some
15  of the names.  I know that they are Conexant employees.
16  I cannot verify the list, though.
17    Q  Now, Conexant disputes that it owes Conference
18  America disconnection fees, correct?
19    A  Yes.
20    Q  Does it dispute that it owes Conference America
21  any other fees for services rendered after July 10th, to
22  the best of your knowledge?
23    A  We don't dispute that -- well, actually, at
24  this point, I don't -- I'm not sure what is still in
25  dispute.  There were other services that were provided

Page 90

1  and we did not dispute that we owed for services
2  provided under the previous -- the agreement that was in
3  place for the services.  I know that the -- the
4  deactivation, or whatever you want to call it, was in
5  dispute because there was no basis for that, those
6  charges.
7    Q  What do you mean there was no basis for those
8  charges?
9    A  Well, we were acting on the agreement that had
10  been executed by both parties, and we had deactivated
11  accounts previously and there was never a charge.
12    Q  How much do you feel Conexant owed Conference
13  America for services rendered after July 10th, 2005?
14    MR. MILLER:  Let me object to the form.  I'm
15  not sure if it's a fair question, really, without
16  looking at every number on -- I think what he's already
17  told you, correct me if I'm wrong, is we agree that we
18  owe for services that were rendered pursuant to the
19  written agreement in place.
20    THE WITNESS:  Correct.
21    MR. MILLER:  And we dispute anything else
22  including the deactivation fees.  What those specific
23  numbers are, I don't know that he can answer for you
24  here.
25    MR. BORTON:  Well, he wrote letters to that

Page 91

1  effect.  We'll get into those.
2    Q  Let's look at Exhibit Y real quick.  It looks
3  to be an invoice with the number 119266A.  Have you ever
4  seen this document before?
5    A  I don't recall.
6    Q  You don't recall?  Okay.  Take a look at Tab Z.
7  This is invoice number 119266B for the billing month of
8  July 11th through 31.  Have you ever seen this before?
9    A  I don't recall.
10    Q  Okay.  Let's take a look at Tab AA.  It looks
11  to be a September 7th, 2005 letter from you to Robert M.
12  Pirnie, president of Conference America.  Do you
13  remember writing this letter?
14    A  Yes.
15    Q  Do you remember sending this letter?
16    A  Yes.
17    Q  Okay.  Is this a true and correct copy of the
18  letter that you sent to Bob Pirnie?
19    A  I believe so.
20    Q  Now, you said Conexant is in receipt of invoice
21  number 119266A, correct?
22    A  Correct, I stated that.
23    Q  Okay.  And we just looked through invoice B,
24  and then we looked through an invoice that is just
25  styled 119266, without a number.  Did you receive --

Page 92

23 (Pages 89 to 92)

1   those invoices -- just there is some confusion here.
2   You're talking about invoice A, and then we've got one
3   without an A or a B and one with a B on it. Does that
4   refresh your memory about whether you received --
5       A   Actually, that's not what I'm showing. I'm
6   sorry, what was your question?
7       Q   Okay. Looking through the invoices we looked
8   at at Tabs X, Y and Z, you'll see that Tab X is numbered
9   119266, Tab Y --
10      A   Correct.
11      Q   -- is numbered -- do you see that?
12      A   Yes.
13      Q   And Tab Y is numbered 119266A.
14      A   Correct.
15      Q   And then Z is 119266B.
16      A   Yes.
17      Q   And I'm wondering, after looking at this
18  letter, does that refresh your recollection on whether
19  you received Tabs X, Y and Z? I know you said you
20  cannot remember --
21      A   From looking at them, I couldn't remember
22  whether those were the ones. But now I see that the
23  numbers match, so we must have received those.
24      Q   Okay. And what are you referring to when you
25  say three different tabs in this spreadsheet? Are you

Page 93

1   referring to Exhibits X, Y and Z?
2       A   I don't recall. I'd have to go back and look
3   and see if the check that was enclosed was for Tab 1,
4   which would be 119266.
5       Q   Just to clarify, the number, I think, at the
6   bottom of A is $5,366.53. That would be Tab Y?
7       A   For A, yes.
8       Q   And it looks like you put a check in this -- or
9   enclosed a check with the September 7th letter for that
10  amount. All I'm trying to establish is that in this
11  letter you enclosed a check paying for invoice 119266A,
12  correct?
13      A   It says detailed in Tab 1 of the spreadsheet.
14  What I'm not sure is if this was Tab 1.
15      Q   Okay.
16      A   I would have to go back and look and see if it
17  was for the $5,366.53. Then I would assume this was Tab
18  1.
19      Q   Okay. The check you wrote here for $5,366.53
20  to pay for the services rendered by Conference America
21  to Conexant through July 1 through 10, 2005.
22      A   I believe that's correct.
23      Q   And you say in the third paragraph of Tab AA
24  that you cannot determine what fee structure any of the
25  other charges --

Page 94

1       MR. MILLER:  Look at the letter.
2   BY MR. BORTON:
3       Q   -- in the spreadsheet are based upon; is that
4   correct?
5       A   It states I cannot determine what fee structure
6   they are based upon, correct.
7       Q   Okay. Let's go to Tab BB. Do you remember --
8   have you ever seen this before? This is an invoice,
9   number 117479.
10      A   I don't recall.
11      Q   You don't recall?
12      A   I don't recall.
13      Q   Okay. How about Tab CC, have you ever seen
14  that before? It is invoice -- also invoice 117479.
15      A   Again, I may have, but I don't recall.
16      Q   Okay. Tab DD is a deactivation fee detail.
17  Have you ever seen that before?
18      A   I certainly remember discussing it.
19      Q   But have you seen it before?
20      A   I don't recall. I -- if these are the invoices
21  in dispute, I probably have seen them. I don't recall
22  this one, or any of them in particular.
23      Q   Tell me about any discussions you had about the
24  deactivation fee detail.
25      A   Basically, when we received this, it was a

Page 95

1   shock to get charged for the deactivation fees. It was
2   something that had been done in the past and had never
3   had a charge associated with it.
4       Q   Do you know who at Conexant received this?
5       A   Actually, I'm not sure whether this came
6   directly to Quest or whether it goes to the third-party
7   bill payment.
8       Q   What is Quest?
9       A   I'm sorry. Wow.
10      MR. MILLER:  Cass.
11      THE WITNESS:  Cass, the third-party bill
12  payment, or Conexant. Sorry.
13  BY MR. BORTON:
14      Q   Do you know who Cass would have sent it to once
15  they received it?
16      A   I believe Paul Edge. I'm not positive.
17      Q   Look at Tab EE. It looks to be an October 5th
18  letter from you to Bob Pirnie. Do you remember writing
19  this letter?
20      A   Yes.
21      Q   Do you remember sending it out to Bob Pirnie?
22      A   Yes.
23      Q   Did you enclose a check with this letter? And
24  I'll represent that there is one on the back of this, so
25  it's not a trick question.

Page 96

24 (Pages 93 to 96)

1    A   I was going to say, it says enclosed a check,
2  so I must have, yes.
3    Q   Does this appear to be a true and correct copy
4  of the letter you sent?
5    A   I believe so.
6    Q   Okay.  Looking at this letter today, do you
7  agree with everything that you wrote in it?
8    A   I believe so.
9    Q   Okay.  This check, do you remember if this
10  check you had enclosed with this letter went to pay
11  invoice number 119266A?
12    A   I believe that's correct.
13    Q   Going back to Tab Y where we have invoice
14  119266A, that was for billing for the month of July,
15  July 1 through 10, according to top left corner,
16  correct?
17    A   Yes.
18    Q   So as of October 5th, 2005, Conexant had not
19  paid Conference America for any services rendered after
20  July 10th, 2005, correct?
21    A   I know -- I believe there -- I'm not sure.
22    Q   You're not sure?
23    A   I'm not sure if there had been any other
24  payments made prior to that.
25    Q   Well, you made a payment of $5,366.53.

Page 97

1  with that figure.
2    Q   Okay.  Let's go back to Tab D, and I just want
3  to see what contractual rate you're discussing.  You're
4  talking about the contractual rate for always on,
5  operator assisted and 800 meet me operator answered
6  services?
7    A   Paul would have to answer.  But I believe that
8  the one that was mostly used was the always on.  I think
9  there were very few of the other two that were used.
10    Q   Okay.  So you got your I.T. department -- and
11  who did you work with in your I.T. department, by the
12  way?
13    A   Paul Edge.
14    Q   Just Paul Edge?
15    A   He was the one that I spoke to.  He had other
16  folks on his team that may have been involved.
17    Q   And you all assumed that services rendered
18  from or after the 10th of July fell into this point --
19  or this 5 cents per minute price range and then you just
20  multiplied by the total number of minutes?
21    A   Yes, because these had all been accounts that
22  had been established previously under the contract.
23    Q   Okay.  Did you check to see if there were any
24  international outbound toll surcharges incurred during
25  that period of time?

Page 99

1    A   Right, but I don't remember the date we were
2  just looking at.
3    Q   Let me see.  On September 7th.
4    A   Okay.  I would imagine that's correct, then.
5    Q   Okay.  So you made a $5,366.53 payment and a
6  $7,060 payment to Conference America to pay off invoice
7  119266A, correct?
8    A   No, that's not correct.
9    Q   Okay.
10    A   119266A appears to be paid in full with the
11  prior check of $5- -- it's hard to read this.
12    Q   -- -366.53.
13    A   Yes.
14    Q   Then tell me what the $7,060.25 check was for.
15    A   I believe it was for the remainder of that
16  invoice, which was one of the different tabs that I had
17  referred to in my previous letter.
18    Q   Was it for all service rendered by Conference
19  America after July 10th, 2005?
20    A   I believe so.
21    Q   But you're not sure?
22    A   I believe so, because that was what we were
23  trying to get clarification on that invoice, and that's
24  when we added up the number of minutes and multiplied by
25  the contractual rate of 5 cents per minute to come up

Page 98

1    A   I don't know that we did or not.
2    Q   Did you check to see if anybody had faxed
3  anything during that period of time?
4    A   I'm not sure I understand your question.
5    Q   Did you go down the list of services used to
6  see if anybody had faxed anything, any Conexant people
7  used Conference America to fax anything during or after
8  July 10th -- I'm sorry, after July 10th, 2005?
9    A   I did not.
10    Q   Okay.  So is it possible that you could have
11  shorted Conference America if it had rendered services
12  that cost more than 5 cents per minute after July 10th,
13  2005?
14    MR. MILLER:  Object to the form.
15    THE WITNESS:  We had been trying to get
16  clarification on this, and in our -- and in putting our
17  best foot forward to pay them for what we thought the
18  services were worth.
19  BY MR. BORTON:
20    Q   In the second paragraph of your October 5th
21  letter, you say, "This amount of $7,060.25, in
22  consideration of other factors, is also consistent with
23  Conexant's historical July usage charges."  What other
24  factors did you consider?
25    A   Just what it states here, that Paul had looked

Page 100

25 (Pages 97 to 100)

Page 101

1  and that amount was within a level that was consistent
2  with July usage.
3      Q   That's what you mean by "other factors"?
4      A   I think that the other factors are just that we
5  weren't able to discuss it with Conference America. Our
6  rate had been 5 cents a minute since, you know, that
7  written agreement had been put in place and looking at
8  the number of minutes and then comparing that to make
9  sure it was in line with what we had seen in other --
10 other July time frames.
11     Q   Was it apparent to you as of October 5th -- or
12 did you believe as of October 5th that Conference
13 America was seeking to impose service charges different
14 from those appearing in your audio conferencing
15 contract?
16     A   Yes.
17     Q   But you had no idea where those service charges
18 were coming from, correct?
19     A   Well, at this point, I mean, they kept
20 referring to their Web site, so I -- I -- the
21 deactivation fees, as I had stated here, were out of the
22 blue, because that was something we had done all along
23 and had never been charged for them.
24     Q   Okay. Let's turn to Tab FF.  It looks like an
25 e-mail from you to Bob Pirnie dated October 7th, 2005.

Page 102

1  Do you remember sending this e-mail?
2      A   Yes.
3      Q   Does it appear to be a true and correct copy of
4  the e-mail you sent?
5      A   I believe so.
6      Q   Can you tell me what voicemail -- could you
7  tell me about the voicemail message you received from
8  Bob Pirnie, what he said in that voicemail?
9      A   I don't recall what he said other than he was
10 inquiring about the June invoice.
11     Q   Okay. That's all you remember?
12     A   Yes.
13     Q   When was the last time you spoke in person with
14 Bob Pirnie?
15     MR. MILLER: You mean face to face?
16 BY MR. BORTON:
17     Q   On the phone or face to face or
18 videoconferencing.
19     A   I don't remember. I believe it was prior to --
20 I don't think I have spoken to either one of the Pirnies
21 since prior to this happening.
22     Q   Prior to the termination of the audio
23 conferencing contract?
24     A   Correct.
25     Q   Besides this voicemail message, had you

Page 103

1  received any other voicemail messages from the Pirnies
2  or anyone at Conference America since the termination of
3  the audio conferencing contract?
4      A   I don't believe so, no.
5      Q   Okay. And when I say "termination of the audio
6  conferencing contract," I mean --
7      A   As of his letter.
8      Q   -- as of his letter. You don't believe so?
9      A   No.
10     Q   Okay. Go to Tab GG. It appears to be a letter
11 from Bob Pirnie to you dated October 21, 2005. Did you
12 receive a copy of this letter?
13     A   Yes, I did.
14     Q   Did you read it when you received it?
15     A   Yes.
16     Q   Does this appear to be a true and correct copy
17 of the letter you received?
18     A   I believe so.
19     Q   Okay. Isn't it true that Conexant had informed
20 Conference America that it had taken Conference
21 America's bills out of dispute?
22     A   I am not sure. I know there is the one e-mail
23 that we had looked at earlier from Paul. But there
24 again, I don't know which those -- which bills we
25 were -- he was referring to at that point.

Page 104

1      Q   Okay.
2      A   And I believe there may have been some that
3  came in after that.
4      Q   Between July 20th, 2005 and October 21, 2005 --
5      A   I'm sorry, between --
6      Q   July 20th, 2005 and October 21, 2005, are you
7  aware of anyone at Conexant, including yourself, ever
8  informing Conference America in any way that any bills
9  were in dispute?
10     A   We had informed them bills were in dispute.
11 I'm not sure about the dates. July 20th, you said?
12     Q   Between July 20th and October 21, 2005.
13     A   There's an e-mail here from Audria Carr, that
14 we looked at earlier, on September 8th that refers to a
15 dispute. My letter of September 7th says that I am
16 questioning the invoices and the deactivation fees
17 appear to be out of the blue, and that we're willing to
18 pay for any actual usage pursuant to our agreement and
19 to please call for clarification, or to clarify the
20 charges. So yes, I would say there were.
21     Q   Any others besides the ones you just told me
22 about?
23     A   Again, on October 5th, my letter to Bob
24 Pirnie -- I'm sorry, you said after July 20th; is that
25 correct?

26 (Pages 101 to 104)

1    Q   Yes.
2    A   Those are the only ones that come to mind at
3  this time.
4    Q   Do you see attached to the back of this October
5  21st letter are Conference America's services terms and
6  conditions?
7    A   I'm sorry, what tab?
8    Q   It's at Tab GG.
9    A   And I'm looking at what?
10   Q   Back of the letter here, there's Conference
11 America's services terms and conditions.  Do you
12 remember seeing these with the letter he sent on October
13 21?
14   A   I don't specifically recall, but I see in his
15 letter that he says he's enclosed a printout.
16   Q   Okay.  Do you remember examining the
17 spreadsheets placed in this letter or enclosed with this
18 letter?
19   A   Personally, I do not.  Not for analysis.  It
20 doesn't mean that I didn't see them.
21   Q   Okay.  In the second sentence of the -- I guess
22 the third sentence of the second paragraph of this
23 letter, Bob Pirnie says, "Our July invoice was provided
24 in the format Conexant had previously specified which
25 does not include call detail."  What format had Conexant

Page 105

1  previously specified?
2    A   I don't know.
3    Q   Would you agree that up until October 21,
4  Conference America had informed Conexant in writing
5  several times that termination or posttermination
6  pricing was going to be at standard terms, conditions
7  and prices or it was -- strike that.
8        Would you agree that Conference America had
9  informed Conexant several times in writing prior to
10 October 21 that the prices for its service following the
11 termination of the audio conferencing contract were
12 going to be its standard prices which were available on
13 its Web site?
14       MR. MILLER:  Object to the form.
15       You can answer.
16       THE WITNESS:  For new services.  For new
17 accounts set up.
18 BY MR. BORTON:
19   Q   In any of the documents we've gone over, did
20 Conference America make that distinction?  Did they ever
21 say "new accounts set up"?
22   A   They did not.
23   Q   Okay.  In this October 21 letter, in the last
24 paragraph, Conference America informed you that --
25   A   I'm sorry, where are you?

Page 106

1    Q   I'm sorry, second page of this October 21
2  letter, Tab GG, last paragraph, Conference America wrote
3  that interest was accruing on amounts that it believed
4  Conexant owed it.
5        MR. MILLER:  I'm sorry, what's the question?
6  BY MR. BORTON:
7    Q   Do you see that Conference America wrote that
8  interest was accruing on the amounts listed there?
9    A   I see that they state it in their letter.
10   Q   Okay.  Do you see in the last sentence where it
11 said -- where Conference America said, "Should
12 collection become necessary, you will also be
13 responsible for paying our attorney's fees and other
14 costs"?
15   A   I see that they stated that.
16   Q   Okay.  Let's look at Tab HH.  This looks to be
17 a November 3rd, 2005 letter that you wrote to Bob
18 Pirnie.  Do you remember writing this letter?
19   A   Yes.
20   Q   Do you remember sending it out to him?
21   A   Yes.
22   Q   Is this a true and correct copy of the letter
23 you wrote and sent?
24   A   I believe so.
25   Q   First paragraph, first sentence, you

Page 107

1  acknowledge that you received Conference America's
2  letters regarding termination of the contract, correct?
3    A   Yes.  I acknowledge receipt of the letters,
4  that's correct.
5    Q   Did Conexant use Conference America's services
6  in August 2005, to your knowledge?
7    A   I don't believe so.
8    Q   Second paragraph, first sentence, you used the
9  term "contract."  You're referring to the audio
10 conferencing contract, right?
11   A   Correct.
12   Q   Why did Conexant pay Conference America's June
13 invoice in October of 2005?
14   A   It was delayed due to billing dispute.
15   Q   Okay.  What was in dispute about the June
16 invoice?
17   A   I believe -- if I recall correctly, I believe
18 the confusion was over the months overlapped and not
19 knowing whether that invoice was affected or not.
20   Q   What do you mean "the months overlapped"?
21   A   I believe the billing cycles overlapped on the
22 months.  I don't think it went true months.  I'm not
23 positive on that.
24   Q   Okay.  So are you saying that the June invoice
25 may have contained charges for services that were

Page 108

27 (Pages 105 to 108)

1  rendered in some month other than June 2005?
2      A  Yes.
3      Q  Okay.  Do you know what months they might have
4  contained charges for services for?
5      A  I believe potentially July.
6      Q  Potentially July?
7      A  I'm not sure.
8      Q  Why did you believe that?  I guess I'm asking
9  did you see a document that led you to believe this?
10     A  No.  I believe that was in conversation.
11     Q  Conversation with who?
12     A  Paul Edge.
13     Q  Okay.  Can you tell me about that conversation,
14  what was said?
15     A  Not verbatim, but we wanted to make sure that
16  the invoices were correct.  And we had tried to get a
17  conversation with the folks at Conference America in
18  trying to get clarification on those invoices.  And
19  Paul, I believe, had told Cass at that time to hold the
20  invoices while we were getting clarification.
21     Q  Did Paul ever tell you that the June invoice
22  contained charges for services rendered in months other
23  than June 2005?
24     A  I don't recall.  That's where the conversation
25  came from, that I think there may have been an overlap

Page 109

1  in the invoices.
2      Q  Turn to Tab II and look in the second page.  It
3  looks like to be a check from Cass Information Systems
4  to Conference America for $39,793.01?
5      A  That's correct.
6      Q  Did you ever see this check?
7      A  I don't recall whether this came to me to mail
8  out or whether it went directly from Cass or Paul.  I
9  don't recall.
10     Q  You never sent a letter or an e-mail to
11  Conference America telling it not to disconnect all its
12  accounts with Conexant, did you?
13     A  Telling them not to disconnect, no.
14     Q  I don't want to know what you and your lawyers
15  talked about, but when did you first consult with legal
16  counsel, either at Conexant or outside of Conexant,
17  about Conference America?
18     A  I believe it was around the beginning of
19  September.  I believe that's --
20         MR. MILLER:  Don't say anything that was
21  discussed, just tell him when it was, to the best of
22  your recollection.
23         THE WITNESS:  Right.  Actually, I don't recall.
24  It may have been as early as late July or as late as
25  early September.  I don't remember.

Page 110

1          MR. MILLER:  Just tell him if you remember.
2          THE WITNESS:  I don't remember.
3  BY MR. BORTON:
4      Q  What prompted you to discuss Conference America
5  with legal counsel?
6      A  I believe it was a letter from Pirnie.
7      Q  Tab U, a letter dated July 26th, maybe?
8      A  I don't recall the date.  I don't recall.
9      Q  Do you recall what event prompted you to get
10  legal counsel involved?
11     A  Not off the top of my head.
12     Q  Besides the conversations or -- excuse me,
13  strike that.
14         Besides the documents we've discussed today and
15  the voicemail messages or the voicemail message that you
16  got from Bob Pirnie and the contact with Conference
17  America that you talked about prior to the June 24th
18  letter, is there any other contact with Conference
19  America that we haven't discussed today that you can
20  think of?
21     A  I don't believe so.  I think this is all the
22  letters and pertinent e-mails.  And there was very
23  little in -- well, there was no -- there was only, I
24  think, one conversation that I had -- no, I take that
25  back.  A couple of times, actually -- a few times,

Page 111

1  actually, I had live people.  So I had talked to
2  operators there, but not -- just trying to get in touch
3  with Bob Pirnie.  So it was just voicemails.
4      Q  How many times did you talk with an operator at
5  Conference America?
6      A  I don't know.  I called in several times after
7  the notification came out trying to get in touch with
8  Bob or Rob.
9      Q  Other than operators, is the last time you
10  actually talked in person to anybody at Conference
11  America prior to the June 24th letter, then?
12     A  And I know -- well, I spoke to Zack.  I don't
13  remember what day that was, because he responded in
14  e-mail, then, to me.
15     Q  Okay.
16     A  I forgot what tab that was on.
17     Q  It looks like Tab L.
18     A  Yes.
19     Q  What was said during that conversation with you
20  and Zack?
21     A  I don't remember the exact conversation, but my
22  purpose in calling was trying to clarify the termination
23  date, which he states here in the last sentence, "I'll
24  check on the termination date of the contract, but it
25  may take a while."  Which is interesting because it was

Page 112

28 (Pages 109 to 112)

1    sent on July 7th.
2        Q   Is that all that you can remember from that
3    conversation?
4        A   Yes.  I mean, once again, it was another
5    attempt to try to get in touch with one of the Pirnies.
6        Q   Besides talking to operators trying to get in
7    touch with anybody at Conference America and besides
8    this conversation with Zack, are there any other
9    conversations following July 7th, 2005 with anyone at
10   Conference America?
11       A   No.
12       Q   Okay.  Besides the voicemail message referenced
13   in Tab FF on October 7th, were there any other voicemail
14   messages from anyone at Conference America that you
15   remember?
16       A   No, not that I recall.
17       Q   Okay.  Do you remember having any
18   correspondence of any kind with anyone at Conference
19   America following your November 3rd, 2005 letter?
20       A   Which tab is that?
21       Q   That's Tab HH.
22       A   Not that I recall.
23       MR. BORTON:  Okay.  That's all I've got.
24       MR. MILLER:  All right.
25       THE REPORTER:  Mr. Miller, do you need a

Page 113

---

1    certified copy?
2        MR. MILLER:  Yes.
3    //
4    //
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 114

---

1
2
3
4
5
6
7
8        I, THOMAS NOONAN, do hereby declare under
9    penalty of perjury that I have read the foregoing
10   transcript; that I have made such corrections as noted
11   herein, in ink, initialed by me, or attached hereto;
12   that my testimony as contained herein, as corrected, is
13   true and correct.
14       EXECUTED this _____ day of _____,
15   2006, at _____, _____.
              (City)              (State)
16
17
18       _____
              THOMAS NOONAN
19
20
21
22
23
24
25

Page 115

---

1
2
3
4        I, the undersigned, a Certified Shorthand
5    Reporter of the State of California, do hereby certify:
6        That the foregoing proceedings were taken
7    before me at the time and place herein set forth; that
8    any witnesses in the foregoing proceedings, prior to
9    testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14       I further certify that I am neither
15   financially interested in the action nor a relative or
16   employee of any attorney of any of the parties.
17       IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated: _____
21
22
23       _____
              CARI A. FOLSOM
              CSR No. 9822
24
25

Page 116

---

29 (Pages 113 to 116)

# WORD INDEX

**A**

**AA** 92:10 94:23
**ability** 8:9,12
41:15
**able** 101:5
**Accepting** 79:7
**accident** 6:21
**account** 85:14
**accounts** 30:16
33:2,18,18 35:4
36:11,16,21
43:17 44:4,12,18
48:10 67:11 70:9
70:21,24,25 71:4
71:23 78:13,18
78:25 80:15
81:21 82:11
85:10,20,25
87:10 91:11
99:21 106:17,21
110:12
**accruing** 107:3,8
**accurate** 116:12
**acknowledge**
31:19,22 108:1,3
**acknowledged**
31:18
**acquaintances**
11:2
**acting** 91:9
**action** 38:23 81:13
116:15
**actual** 61:9 62:13
104:18
**added** 98:24
**adding** 16:8
**additional** 16:8
24:22,24 32:18
36:20
**address** 10:11
52:23
**addresses** 44:25
**Admin** 4:14
**administrative**
86:13
**advise** 35:3
**ago** 80:23
**agree** 18:20 22:20
29:2,7 33:10
48:2 50:21 56:3
56:6 64:13 66:20
67:12 69:3 91:17
97:7 106:3,8
**agreed** 6:4 30:20
39:2 41:14,17
43:13 44:2 84:23
88:7
**agreed-upon** 47:25

**agreement** 18:25
23:23 27:1,2
30:17 32:12,13
32:14 36:22
37:16 43:18 44:5
44:7 45:12,12,15
48:15,19 49:3,8
49:10,25 50:25
52:21 61:4 64:21
65:2,6,12,20,22
65:24 67:3,3,8
71:17 81:7,22,22
82:1,20 83:11
84:11 85:21,24
91:2,9,19 101:7
104:18
**ahead** 6:8 48:2
**Alabama** 1:1 2:1
3:11 11:2,3
**aliases** 10:8
**allegations** 13:15
**amended** 45:12,15
84:25
**amendment** 22:11
22:16,18,25
23:24 24:1 26:10
26:20 30:12,12
32:15 35:15,25
45:2,2 49:8,24
**amendments** 70:11
85:8
**America** 1:4 2:4
8:19,23,23 11:20
11:24 18:13,21
20:13 23:7,10
25:8,19,20 26:1
26:11,16,22 27:5
27:8,12 28:17
29:3,8 30:2,22
31:22 32:2 33:6
33:14 34:2 35:3
35:20,23 37:9,15
38:14,17,22
39:13 41:21,21
41:25 42:16 43:5
43:20 45:17 51:9
52:2,13 53:5,15
57:2,9,23 58:20
60:11,16,24 61:4
63:4 66:22 68:22
69:18 70:3 71:5
71:6,17 77:18
78:13,16 83:10
84:11 85:9 86:10
86:24 87:21
88:10,13,17,25
89:15,17 90:18
90:20 91:13

92:12 94:20
97:19 98:6,19
100:7,11 101:5
101:13 103:2,20
104:8 106:4,8,20
106:24 107:2,7
107:11 109:17
110:4,11,17
111:4,17,19
112:5,11 113:7
113:10,14,19
**America's** 17:10
17:19,25 18:11
24:25 28:23
29:14 39:24
40:17,25 45:23
51:15 77:10 78:4
83:15 87:3
103:21 105:5,11
108:1,5,12
**amount** 87:24
94:10 100:21
101:1
**amounts** 87:23
107:3,8
**analysis** 105:19
**analyzed** 50:14
**answer** 7:24 12:21
25:12,14,14,15
25:18,25 29:21
30:5 44:9 51:18
53:16 58:14
61:17 79:11,20
85:17 91:23 99:7
106:15
**answered** 12:1
25:23 43:6 99:5
**answering** 12:12
80:2
**answers** 7:22 12:18
**anybody** 13:6 70:4
100:2,6 112:10
113:7
**anyway** 41:19
**apologize** 20:11
**apparent** 101:11
**appear** 19:10,17
19:24 20:6 22:24
28:12 31:15 37:6
46:25 53:22 64:2
68:7 72:17 97:3
102:3 103:16
104:17
**APPEARANCES**
3:1
**appearing** 42:8
101:14
**appears** 20:19

21:22 22:10,15
46:18 52:19,20
82:24 98:10
103:10
**applicable** 50:23
51:5,14 52:3,5
**apply** 30:12 44:22
81:15
**appropriate** 39:2
88:6
**argue** 25:13
**arrived** 27:18,19
**asked** 25:22 29:2,9
52:25 53:11 85:3
85:9,9
**asking** 25:2 26:3,6
38:10 51:20 80:3
82:9,10 109:8
**assigned** 71:1
**assistants** 86:13
**assisted** 50:23 99:5
**associated** 96:3
**assume** 7:18 74:19
79:18 82:3 89:9
94:17
**assumed** 34:7,12
99:17
**assumes** 58:12
85:16
**assuming** 73:7
74:18 76:14
**ATCHISON** 3:8
**Atlanta** 3:6
**attached** 6:1 9:6
35:2,15 36:7
57:14,19 60:25
105:4 115:11
**attachment** 24:17
**attachments** 49:9
**attempt** 113:5
**attempted** 81:7
**attempting** 47:9
**attended** 14:19
**attention** 23:5,18
50:21
**attorney** 3:5,9
11:25 116:16
**attorneys** 12:11
**attorney's** 107:13
**audio** 9:5,9,10
21:16 22:11,19
28:18 29:4,9,14
30:3,13,23 36:13
37:15 40:10
42:18 43:21
44:19,20 45:1
48:11 49:5 57:24
66:23,24 70:10

70:22 71:6,7
75:17 76:11,19
79:4,14 85:7,12
101:14 102:22
103:3,5 106:11
108:7
**Audria** 87:18
104:13
**August** 35:7 84:24
89:15 90:13
108:6
**authority** 58:13
82:4 86:10
**authorized** 50:1
82:6
**auto** 6:20
**automated** 50:24
28:23 39:23 40:9
106:12
**avoid** 32:23
**aware** 29:12 35:23
42:18 47:20 65:4
66:22 88:20
104:7
**A-1** 36:1,2,19
**A-2** 36:2,19
**A-3** 24:13,14,21
32:17,17 36:20
**a.m** 2:18 5:2

**B**

**B** 21:13 45:1,10
48:16,20 49:9
92:23 93:3,3
**back** 21:9 24:17
32:8 34:25 40:16
45:5 50:20 59:16
65:18 70:20,25
72:7 76:8,22
77:14 78:7 83:13
88:9,22 94:2,16
96:24 97:13 99:2
105:4,10 111:23
**background** 11:14
**bad** 27:6 47:9
**badly** 13:12
**bankruptcy** 11:11
**based** 80:19 83:21
95:3,6
**basically** 8:3 14:15
18:9 24:8,9
45:11 77:9 95:25
**basis** 32:24 38:16
38:16,22 47:23
85:1 91:5,7
**Batchelder-Beilin**
13:23

**Bates** 4:10,11,13
4:14 63:18 67:23
67:25 73:16
**Bates-stamped**
72:3,9
**bathroom** 34:22
**BB** 95:7
**Beach** 1:16 2:17
5:1
**beginning** 2:18
40:7 110:18
**behalf** 2:16 12:7
58:10,23
**belief** 75:16 76:7,8
**believe** 6:7 18:1,1,7
18:7,14,19 19:12
19:19 20:5,8,21
21:24,25 22:17
23:1 28:11,16
30:1,11,15 31:8
31:17 34:5 37:5
37:7 38:13 41:2
41:23 46:3,8
47:2 48:7 49:20
50:12 53:6,24
54:2,9,22 55:9
55:15,24 56:23
56:25 62:3,10,22
64:4,6,9,10,11
65:11,11,14 68:4
68:9,12 73:13
74:7,15 75:5,23
76:3,10,19 82:23
83:7 84:5,7 87:7
89:3,3,18 92:19
94:22 96:16 97:5
97:8,12,21 98:15
98:20,22 99:7
101:12 102:5,19
103:4,8,18 104:2
107:24 108:7,17
108:17,21 109:5
109:8,9,10,19
110:18,19 111:6
111:21
**believed** 34:4
107:3
**believes** 83:10
84:11
**best** 28:4 41:8,11
46:5,9 54:1
59:10 62:17 63:2
63:9 69:22 70:16
71:16 87:8 90:22
100:17 110:21
**better** 28:7
**Bicycle** 13:25
**bill** 42:1,5,9,14

89:3,5,7 96:7,11
**billed** 43:16
**billing** 92:7 97:14
108:14,21
**bills** 38:17,22,23
38:24 39:1 40:17
40:25 41:25 42:3
54:5,6 88:11,13
88:16,17,22,23
88:25 89:2,11
103:21,24 104:8
104:10
**binder** 4:8 10:3
52:15 53:6 73:3
**binding** 49:25
**Birmingham** 3:11
14:18
**birth** 11:9
**bit** 36:4
**blue** 101:22 104:17
**Bob** 20:12 28:13
28:14,21 31:18
57:19 66:9 69:2
74:24 75:21 76:5
79:5,16,19 80:14
80:20,24 81:24
87:19 92:18
96:18,21 101:25
102:8,14 103:11
104:23 105:23
107:17 111:16
112:3,8
**Bob's** 84:13
**Bogelgesang** 31:2
**BORTON** 3:4 4:4
5:12,18 6:8,12
10:7 12:9,22
17:13,15,17 25:4
25:6,16,24 29:17
29:24 30:9 32:7
33:5,12,19 34:23
34:25 37:22
42:23 44:15 45:5
45:18 49:22 50:6
51:22 52:1,11
57:5 58:17 61:23
62:2,4 63:15,22
64:16 65:16,18
67:17,25 69:11
69:13 72:1,7
73:6,9,15,19
74:13,22 77:14
77:21 78:7,10
79:9,13 80:3,12
80:18 81:4 82:21
85:22 91:25 95:2
96:13 100:19
102:16 106:18

107:6 111:3
113:23
**bottom** 31:1 50:7
94:6
**Boulevard** 2:17
**Box** 3:10
**break** 8:17 34:22
63:14 65:16
**Brewster** 4:11
**broad** 33:7
**Brookwood** 3:10
**business** 11:3 24:3
26:23 33:20 34:5
34:6,7,11,12,14
60:6 61:9,19
63:1,5 69:19
71:18 75:7,12,21
76:14

-------- **C** --------

**C** 22:10 45:2
**calendar** 34:7
75:14,22
**California** 1:16
2:18 5:1 10:13
116:5
**call** 9:9,16 27:18
27:19,22,24 28:8
34:20 38:7 43:20
58:13 70:25 71:4
91:4 104:19
105:25
**called** 9:14 13:24
43:19 57:3 112:6
**calling** 112:22
**calls** 43:4 76:5
79:18,25 80:24
81:10
**cancel** 31:23 35:4
**canceled** 43:11
68:22,23 69:6,20
81:25
**canceling** 32:11
33:18 34:2
**career** 13:10
**CARI** 1:22 2:20
116:23
**Carichner** 12:24
12:24
**Carr** 87:18 104:13
**case** 6:19,20 9:4
11:19,25 12:13
34:8
**Cass** 87:20 90:1,5
96:10,11,14
109:19 110:3,8
**cause** 23:22
**CC** 95:13

**cents** 98:25 99:19
100:12 101:6
**certainly** 95:18
**certified** 2:20
114:1 116:4
**certify** 116:5,14
**change** 56:3 57:2,8
83:19,22 86:18
**changed** 16:7
55:25
**changes** 5:20,21
14:6
**charge** 42:16 85:13
85:19 86:2,3
91:11 96:3
**charged** 11:17 96:1
101:23
**charges** 88:6 89:5
91:6,8 94:25
100:23 101:13
101:17 104:20
108:25 109:4,22
**check** 40:1 94:3,8,9
94:11,19 96:23
97:1,9,10 98:11
98:14 99:23
100:2 110:3,6
112:24
**checked** 17:10,18
**Chicago** 13:23
15:4
**children** 10:20
**Chip** 4:9
**chose** 37:15
**Chris** 4:12
**chronological** 14:8
**circumstances**
22:5
**citing** 82:15
**City** 115:15
**civil** 82:16
**clarification** 33:24
34:10 76:6 82:20
98:23 100:16
104:19 109:18
109:20
**clarify** 5:24 34:15
52:15 75:10 88:6
94:5 104:19
112:22
**clause** 26:20 37:9
37:14 38:4 44:24
45:19 48:14,16
48:18,19 49:3
50:3 66:22 67:7
**clauses** 48:22 49:2
49:12 50:10
**clear** 5:9 70:20

78:2 83:9,23
84:2,10
**clearly** 41:16
**client** 11:21
**clients** 6:6
**code** 87:15
**codes** 74:9,10,17
**coffee** 8:11
**collection** 107:12
**college** 13:21 14:25
15:1,10,13
**come** 98:25 105:2
**coming** 6:25 14:16
101:18
**comment** 5:21
**commit** 11:14
**communication**
86:11,11,19,22
**communications**
24:9 86:17 87:1
**companies** 22:7
**company** 11:3,6,7
11:21 12:7 13:23
13:24,25 22:8
57:3 90:5
**comparing** 21:24
101:8
**competitive** 64:22
65:2
**complaint** 4:8 6:1
9:6 10:6 13:16
**complete** 61:3
**comply** 78:16,19
78:22 79:2 80:14
**compound** 33:16
**concerning** 49:10
**conditions** 17:11
17:19,20 18:11
18:13 28:24 32:4
39:24 40:2,10,14
43:14,23 45:23
46:6,10 77:1,6
81:19 84:24 88:8
105:6,11 106:6
**conduct** 26:22
**Conexant** 1:7 2:7
6:23 8:20 9:1,2
11:21 12:23 13:6
13:10,11,12 14:9
14:11 15:7,21,24
18:20 20:22,23
21:2 22:2,3 23:6
23:10 26:12,16
27:5,8 28:22
29:2,7,9 30:2
33:7,14 35:8
41:22 43:19
44:10 51:10

58:10,18,23
62:18,19 63:3,4
63:6,10,11,18
66:7,14,17,21,24
67:10 70:8,8
71:1,4 74:16
76:24 77:18 78:3
78:12,17,24
81:18 82:1,13,13
83:10 84:10,21
85:9,12 86:9,23
87:2 89:21 90:2
90:4,5,12,12,15
90:17 91:12
92:20 94:21 96:4
96:12 97:18
100:6 103:19
104:7 105:24,25
106:4,9 107:4
108:5,12 110:12
110:16,16
**Conexant's** 65:19
78:16 100:23
**conference** 1:4 2:4
8:19,23,23 11:20
11:24 17:10,18
17:25 18:11,13
18:21 20:13 23:7
23:10,12 24:25
25:8,19,20 26:1
26:11,15,22 27:5
27:8,12 28:17,23
29:3,8,13 30:2
30:22 31:22 32:2
33:6,14 34:2
35:3,20,23 37:8
37:14 38:14,17
38:21 39:12,24
40:17,25 41:20
41:21,25 42:15
43:5,20,20 45:16
45:23 51:9,14
52:2,13 53:5,15
57:2,9,23 58:19
60:11,16,24 61:4
61:20 63:3 65:25
66:22 67:1,2
68:22 69:18 70:3
71:4,6,17 77:10
77:18 78:3,13,16
83:10,15 84:11
85:9 86:10,24
87:3,21 88:10,13
88:17,25 89:15
89:16 90:17,20
91:12 92:12
94:20 97:19 98:6
98:18 100:7,11

101:5,12 103:2
103:20,20 104:8
105:5,10 106:4,8
106:20,24 107:2
107:7,11 108:1,5
108:12 109:17
110:4,11,17
111:4,16,18
112:5,10 113:7
113:10,14,18
**conferencing** 9:5
9:10,14 19:1
21:16 22:11,19
24:19 28:18 29:4
29:10,15 30:3,13
30:23 36:13
40:11 42:6,9,19
43:21 44:19,20
45:1 48:11 50:24
52:22 57:2,24
58:11,19 62:1,12
62:19 63:5,12
65:20 66:8,23,25
70:10,22 71:5,6
71:8 75:18 76:11
76:19 78:12,17
78:24 79:4,15
85:7,12 89:20
101:14 102:23
103:3,6 106:11
108:10
**confirm** 78:11
**conflict** 70:7
**confused** 36:4
**confusing** 77:20
81:25
**confusion** 38:25
39:3,4,5 93:1
108:18
**conjunction** 81:10
**consider** 100:24
**consideration**
100:22
**consistent** 100:22
101:1
**consists** 16:21
**consult** 110:15
**contact** 111:16,18
**contacted** 25:19
26:1 87:20
**contain** 49:9
**contained** 13:15
108:25 109:4,22
115:12
**contemplates**
82:14
**content** 28:2
**contents** 29:13

69:25
**continue** 69:19
  70:3,9,24 71:4
  77:19 82:2 84:23
  87:15
**continued** 87:3
**contract** 9:4,5,9,10
  9:13,15,16,17,17
  16:18,21 20:23
  21:3,6,16,23
  22:12,19 23:16
  28:18 29:4,10,15
  30:3,13,23 31:23
  34:1,3,6 35:14
  36:12,13 37:9
  38:5 40:11 41:15
  42:6,10,19 43:12
  43:22 44:2,10,11
  44:19,20 48:11
  48:12,14,22 49:6
  49:12 52:22
  57:24 66:23,25
  67:8 68:22 69:20
  69:20 70:11,12
  70:18,22 71:6,8
  71:25 75:10,18
  76:2,11,19 77:20
  77:23 79:4,15
  84:24 85:7,12
  87:11 99:22
  101:15 102:23
  103:3,6 106:11
  108:2,9,10
  112:24
**contracting** 45:1
**contracts** 26:21
  27:4,7 44:23
  48:23,25 50:14
  85:7
**contractual** 31:23
  85:2,6 98:25
  99:3,4
**contract-related**
  16:22
**conversation** 34:19
  38:13 39:19 76:6
  109:10,11,13,17
  109:24 111:24
  112:19,21 113:3
  113:8
**conversations** 9:21
  9:22 69:2 111:12
  113:9
**convert** 69:21
  71:14,15
**converted** 70:15
**convicted** 11:15
**copied** 56:11 73:5

**copy** 19:11,17,24
  20:7,19 21:22
  22:15,25 28:13
  31:6,15 37:6
  46:25 53:22 55:8
  55:11,13,22
  56:21 64:2 68:7
  72:17 74:5 75:4
  83:6 92:17 97:3
  102:3 103:12,16
  107:22 114:1
**core** 16:16
**corner** 97:15
**correct** 8:20,24
  10:24,25 19:11
  19:17,24 20:6,19
  20:24 21:3,4,22
  22:4,15,25 25:1
  25:12,21 28:13
  28:18,19,25 31:6
  31:15,20,21,24
  32:4,15,19 35:5
  35:10,16,19
  36:14 37:6 40:11
  42:2,6,10 43:23
  44:8,14 46:25
  48:12,16,20
  49:16,24 50:4
  51:1,11 52:7
  53:16,17,22 55:7
  55:13,22 56:1,21
  58:11 59:21
  61:14 62:6 64:2
  65:15 66:15,17
  66:25 67:3,13
  68:7 70:23 71:8
  71:9 72:17 74:5
  75:4 76:20,21
  77:11 83:6 86:24
  88:11,18 90:6,18
  91:17,20 92:17
  92:21,22 93:10
  93:14 94:12,22
  95:4,6 97:3,12
  97:16,20 98:4,7
  98:8 101:18
  102:3,24 103:16
  104:25 107:22
  108:2,4,11
  109:16 110:5
  115:13
**corrected** 115:12
**correcting** 55:18
**corrections** 115:10
**correctly** 43:15
  62:17 108:17
**correspondence**
  82:13 113:18

**cost** 100:12
**costs** 107:14
**counsel** 4:25
  110:16 111:5,10
**county** 10:14
**couple** 51:3 111:25
**course** 7:23 11:19
  20:25 50:13 51:7
  77:18 80:16 82:1
  89:23
**court** 1:1 2:1 6:3
  6:11 7:9 49:20
  63:21 67:20 72:5
  73:18
**covered** 32:13
  76:25 81:19
**covering** 30:19
**covers** 36:4
**created** 33:3 48:10
**creating** 33:17
**crime** 11:14,15,17
**criminal** 82:15
**CSR** 1:23 116:23
**current** 66:24
  67:10
**Currently** 16:13
**customer** 45:17
**cut** 15:18
**cycles** 108:21
**C-a-r-i-c-h-n-e-r**
  12:25

_____ **D** _____

**D** 22:18 24:14
  26:10 32:15,17
  32:17 35:16,25
  36:19 45:2,3
  49:7,9 50:4,8
  99:2
**data** 9:14,17 18:25
  20:23 21:2,5
  52:22
**date** 11:9 16:7
  19:25 28:1 30:22
  33:24,25 34:1,2
  34:15 35:9 41:4
  42:18 47:16,20
  55:18,25 56:3,11
  59:2 62:21,24
  63:8 65:8,14
  66:2,4,6,12
  75:15,17,24,25
  76:12,14,15,25
  79:3 81:8,11,18
  82:11 84:7 86:20
  87:4,5 89:4 98:1
  111:8 112:23,24
  116:17

**dated** 4:10,11,13
  4:14 9:14 19:1
  19:14 20:3 46:20
  55:17 63:23 68:1
  72:9 74:24 84:24
  89:15 101:25
  103:11 111:7
  116:20
**dates** 58:15 104:11
**day** 16:21,24 17:1
  17:2 112:13
  115:14
**days** 23:23 24:3,4
  31:23 33:21 34:5
  34:5,6,7,7,11,12
  34:14 69:22 70:3
  70:15 71:14,15
  75:7,8,11,12,14
  75:21,22,24
  76:15,16 81:16
  84:3
**DD** 95:16
**deactivate** 78:17
  78:24 80:15
  85:10
**deactivated** 91:10
**deactivating** 85:13
**deactivation** 78:12
  85:8,19 91:4,22
  95:16,24 96:1
  101:21 104:16
**deal** 17:7 26:11,16
**dealing** 17:4 27:5,8
**December** 22:19
  22:25 84:25
**decide** 60:10 61:6
**decided** 57:1 58:10
**decision** 57:8,10,12
  57:17,20,25 58:4
  58:7,19,23 60:13
  60:23 61:12,24
  62:5,10
**decisions** 82:9,10
**declare** 115:8
**default** 37:10,17
  37:24 38:5
**defendant** 3:7 8:20
**Defendants** 1:8 2:8
**defer** 6:3
**define** 32:22 47:14
**defined** 24:5 29:20
**defining** 15:14
  17:22
**definite** 63:7
**definitely** 62:8
**definition** 30:7
  36:8
**degree** 14:19

**delayed** 108:14
**delivered** 24:10
**delivery** 27:17
**Delores** 19:6 27:20
  28:3
**demoted** 15:16
**deny** 47:9
**department** 99:10
  99:11
**deposition** 1:15
  2:15 5:14 6:13
  6:22 7:1,3,6,21
  7:24,25 8:22
  9:21,25 21:17
  26:22 73:1
**depositions** 5:10
  6:6
**describe** 16:11
**described** 7:3
**despite** 70:11
**detail** 95:16,24
  105:25
**detailed** 94:13
**determine** 94:24
  95:5
**Diagnostics** 14:1
**difference** 75:20
**different** 14:2
  38:14 73:25
  81:16 93:25
  98:16 101:13
**direct** 40:16 50:20
  68:13,14
**directed** 68:15
**direction** 116:12
**directly** 27:17
  89:19 96:6 110:8
**director** 16:9
**disagree** 30:21
  47:3,7,8,12,18,19
  47:22 48:3 54:3
  54:8 56:8,10,12
  56:24 64:7,11,12
  64:18 68:18,19
  68:24 69:3,7,15
  69:24,25 70:2
  71:10,11,19,22
  73:11,13 79:5,15
  80:20 81:5,12,17
  81:24 82:12,16
  82:22
**disagreed** 64:15
  69:10 80:4
**disagreeing** 71:13
**disapproved** 87:22
  88:2
**disciplined** 15:12
  15:20

**disclosed** 63:18
**disconnect** 110:11
  110:13
**disconnection**
  90:18
**discounted** 24:18
**discover** 11:24
**discovery** 63:18
**discuss** 26:1 54:12
  54:15 60:15
  101:5 111:4
**discussed** 12:16
  13:1,5 27:7
  36:20 48:19 61:3
  62:7 70:8 76:4
  85:3 86:4 110:21
  111:14,19
**discusses** 74:9 75:6
**discussing** 65:7
  95:18 99:3
**discussion** 39:6,9
  39:10 40:24 41:3
  41:5,9 54:19
  59:9,10,12,13,15
  59:16 60:19 72:6
**discussions** 9:24
  54:17 59:24 60:5
  60:5,10,15,20
  61:8,18,20 62:12
  95:23
**dispute** 38:17,22
  38:23,24 40:18
  40:25 41:16 42:1
  42:14 54:6 88:5
  88:11,13,15,22
  88:23,25 89:2,6
  89:8,12 90:20,23
  90:25 91:1,5,21
  95:21 103:21
  104:9,10,15
  108:14,15
**disputes** 90:17
**distinction** 75:7
  106:20
**district** 1:1,1 2:1,1
  49:20
**DIVISION** 1:2 2:2
**document** 18:12,12
  18:18 19:4,11
  21:14 22:12,22
  23:11 26:9,14,15
  30:19 51:19 72:8
  92:4 109:9
**documentation**
  72:23
**documents** 10:6
  106:19 111:14
**doing** 69:19 71:18

Donna 87:20 90:7
door 28:6
double 64:15
dozens 50:18
drives 27:2
driving 62:9
due 108:14
duly 5:5 50:1

**E**

E 3:4 18:24 49:9
  49:14,15
earlier 7:22 16:5
  21:17 40:6 48:8
  70:8,21 76:5
  86:5 103:23
  104:14
early 46:4 110:24
  110:25
Edge 4:9,11,12,14
  36:24 38:3 40:17
  40:20,22,25
  41:24 43:1,8
  45:22 46:6,19
  53:19 54:19 55:2
  55:4,17 56:4,18
  59:14,19 60:10
  60:15,23 61:5
  63:24 64:7 65:1
  66:14 67:4 68:2
  68:10,13 72:9
  73:21,24 74:8,25
  83:19 87:19,22
  87:25 88:10,22
  89:11 96:16
  99:13,14 109:12
education 14:15
  15:2
EE 96:17
effect 44:25 83:19
  83:22 92:1
effective 22:19
  24:10 25:1 28:24
  38:21 43:3,10
  47:20 70:6 75:23
  76:24 83:16 84:1
effort 38:19
either 23:22 26:18
  81:14 84:16
  102:20 110:16
emphasis 14:20
employee 66:15,17
  116:16
employees 74:16
  86:9,12,23 87:2
  90:12,13,15
employment 14:9
  15:24

enclose 96:23
enclosed 94:3,9,11
  97:1,10 105:15
  105:17
encourages 77:5
ended 12:18
entire 45:11 48:15
  48:19 49:3,9
  83:25
entirety 18:14
entitled 24:21
enumerated 70:10
  71:7
envelope 28:6
establish 23:6
  94:10
established 51:12
  70:21 71:25
  81:20 99:22
event 111:9
everybody 66:13
evidence 85:16
exact 16:6 65:8
  112:21
exactly 74:18
EXAMINATION
  4:2 5:17
examined 5:5
examining 105:16
Excellent 5:23
excepting 56:3
  79:3,8,9,14
Exception 79:9
excluding 69:15
excuse 69:17 85:6
  111:12
executed 66:22
  91:10 115:14
exercise 37:15
exercised 37:9 67:8
exhibit 4:8 6:5,6,10
  18:10,24 21:13
  35:2 36:7,19
  45:21 46:18
  50:20 56:5,5,15
  57:15 61:1 63:17
  63:20 66:20,20
  67:18,19,23 72:2
  72:4,8 73:16,17
  73:20 86:14,16
  88:9 92:2
exhibits 4:6 5:25
  6:1 10:5 86:4
  94:1
existence 33:2
existing 36:16 70:8
  71:25
expect 85:18,18

86:1
experience 14:13
explain 84:4
extend 21:5,11
  52:21
extended 21:7,9
extent 6:2 13:3
  79:18 80:23
e-mail 4:9,11,12,14
  19:14,15,20,25
  20:2,7 26:6 31:2
  31:4,7 36:24
  37:1,3 38:4,8,19
  39:15 41:1,24
  46:18,21 47:1,4
  47:7,11,17 51:9
  52:2 53:5,19,23
  53:25 54:4,10,13
  54:13,15,18,21
  54:24 55:2,3,5,8
  55:11,14,16,19
  56:10,17,22,24
  63:18,23,25 64:3
  64:8,13,17 65:1
  66:20 67:5,17
  68:1,3,8,11,13,18
  68:20 69:8,16
  70:1 72:2,9,11
  72:13,18 73:12
  73:21,24 74:1,6
  83:18,21,23,24
  83:25 84:6,15
  86:12,15,20 87:4
  87:18,19 88:10
  101:25 102:1,4
  102:22 104:13
  110:10 112:14
e-mails 30:25
  55:19,23 56:4,9
  86:8 111:22
e-x 79:9

**F**

F 20:9,11 52:19,21
face 102:15,15,17
  102:17
fact 30:21 70:11
factors 100:22,24
  101:3,4
facts 85:16
fair 7:19 16:20
  21:11 33:7 34:14
  41:5 91:15
faith 47:9,23
fallen 42:5,9
familiar 11:22 12:1
  35:19,20,22
far 26:21 27:4,7

52:16,20 62:13
  77:25
fax 100:7
faxed 100:2,6
fee 85:8 94:24 95:5
  95:16,24
feel 91:12
fees 90:18,21 91:22
  96:1 101:21
  104:16 107:13
fell 99:18
FF 101:24 113:13
fifth 71:20
figure 99:1
figured 28:6
file 111:11
filed 6:3 49:20
final 60:13
finalized 65:21,22
  66:1
financial 35:8
financially 78:5
  116:15
find 25:8 43:14
finish 63:15
fired 15:9
first 5:5 13:22
  17:24 18:2,5,17
  18:19 31:18
  33:21 37:8 45:2
  46:5,10 54:24
  58:25 62:16
  66:19 68:21
  72:13,16,23
  75:23 84:6,7
  107:25,25 108:8
  110:15
flip 21:21 24:13
  55:1 83:13 87:17
  88:14
Floor 2:17 3:10
Flora 22:1
folks 43:5 99:16
  109:17
follow 82:10
following 14:23
  32:1 50:24
  106:10 113:9,19
follows 5:6
FOLSOM 1:22
  2:20 116:23
foot 100:17
foregoing 115:9
  116:6,8,12
forgot 55:11
  112:16
forgotten 84:14
form 25:22 29:19

52:16,20 62:13

30:4 32:5 51:16
  58:12 61:15
  67:14 69:9 74:11
  77:12,16 79:7,10
  79:17,24 81:3
  85:15 91:14
  100:14 106:14
format 105:24,25
formed 65:7
formerly 81:22
forth 30:11 44:11
  50:25 116:7
forward 75:24
  81:18 100:17
frame 87:12
frames 111:11
Friday 76:20
friends 11:1
front 18:9
full 20:25 98:10
Fuller 22:1
fully 41:12
further 116:12,14

**G**

Geehr 13:24
gel 6:2
generally 6:18 7:5
  15:15 16:11
Georgia 3:6
getting 33:24
  62:25 63:5 64:25
  109:20
GG 103:10 105:8
  107:2
give 10:8 13:19
  14:8
given 7:22
gives 68:21
giving 81:1
global 16:16
go 6:8 13:18 15:23
  22:18 24:17 32:8
  40:1,13,16 45:21
  48:2 50:20 52:18
  53:2,10,18 59:15
  70:20,25 82:24
  83:18 94:2,16
  95:7 99:2 100:5
  103:10
goes 96:6
going 5:24 7:17
  8:22 9:1,9,16
  12:20 18:8,24
  20:9 24:14 29:14
  30:1,12 32:21,22
  33:5,15 38:25
  42:16 43:22,25

44:10 60:11 63:5
  63:11 72:1,2
  73:15,20 76:22
  82:14,18 88:9
  90:10 97:1,13
  106:6,12
good 30:10 47:23
Gorciak 4:12
graduated 14:17
  14:19,24
Groves 14:18
guess 36:3 45:15
  69:17 72:19
  84:13 105:21
  109:8
guessing 86:19
guys 41:20 57:1
G-e-e-h-r 13:24

**H**

H 19:13
half 67:9
handle 5:24 16:15
  16:15 17:6
handled 43:20
happen 52:22
  61:10
happening 102:21
hard 98:11
hate 79:21
head 8:5 53:3
  111:11
hear 7:14
heard 7:18
helping 68:10
hereof 49:11
hereto 49:11
  115:11
HERMANN 3:13
Hey 54:20
he'll 33:9
HH 107:16 113:21
high 14:16,17,17
  14:18,23,25
higher 70:6,19
  71:21
historical 100:23
history 13:18
hold 25:13 41:15
  88:6 109:19
honestly 11:5
  72:15 73:7
hope 77:18 82:1
huh-uh 8:6
hundreds 50:14

**I**

idea 37:10 87:9

101:17
**identification** 6:11
  63:21 67:20 72:5
  73:18
**II** 110:2
**imagine** 98:4
**immediately** 14:23
**impair** 8:9,12
**important** 28:7
**impose** 101:13
**inaccurate** 7:22,25
**inactive** 85:25
**include** 26:25
  36:19 105:25
**included** 52:14
  65:25 89:5
**including** 17:14
  46:20 49:9 53:19
  55:17 56:18
  63:24 68:2 73:25
  77:2 91:22 104:7
**incomplete** 7:23
  8:1
**incomprehensible**
  81:14
**incorrect** 54:1
**incurred** 99:24
**INDEX** 4:1
**indicated** 13:9,10
**indirect** 16:15
**inform** 62:18
**information** 12:18
  12:20 87:20 90:1
  110:3
**informational** 13:7
**informed** 63:3,4,10
  86:9 103:19
  104:10 106:4,9
  106:24
**informing** 104:8
**initial** 21:1
**initialed** 115:11
**ink** 115:11
**inquired** 25:20
**inquiries** 25:7
**inquiring** 102:10
**insight** 88:1
**instruct** 54:10
**instructions** 78:17
  78:19,23 79:2
  80:15
**intended** 43:1,8
**Intercall** 57:3,9,10
  57:18,25 58:11
  58:20 59:1,14
  60:8,12,17,24
  61:6,10,13,19,20
  61:21,25 62:18

62:19 63:4,4,10
  63:11 64:21 65:2
  65:12,20,22,24
  74:10,17
**Intercall's** 66:8
**interest** 69:22
  70:16 71:16
  107:3,8
**interested** 71:18
  116:15
**interesting** 112:25
**interject** 5:8
**international**
  99:24
**interpret** 67:10
**interpretation**
  67:16,22 75:20
  76:1 80:2,11,13
  80:19 81:1,16
  84:3 85:10
**interpreted** 75:21
  75:21
**interrogatories**
  11:20 12:13
**interrogatory**
  12:21
**invoice** 42:17
  87:24 89:15 90:9
  92:3,7,20,23,24
  93:2 94:11 95:8
  95:14,14 97:11
  97:13 98:6,16,23
  102:10 105:23
  108:13,16,19,24
  109:21
**invoiced** 41:13
**invoices** 41:15
  43:15 82:20
  87:23 88:2,4,5
  89:20 93:1,7
  95:20 104:16
  109:16,18,20
  110:1
**involve** 16:17
**involved** 13:4,8
  34:13 59:23
  99:16 111:10
**issue** 79:3,14
**issues** 9:4 16:22
**IV** 3:4
**I.T** 99:10,11

---

**J**

**J** 20:2
**January** 14:12
  15:8 16:4
**Jeanne** 10:19
**Jeff** 40:23

**job** 1:24 13:22 15:9
  15:13 16:11
**Joe** 5:24 32:22
**joined** 14:2,3
**joint** 58:22 60:23
**jointly** 60:10 61:5
  62:6
**JOSEPH** 3:9
**July** 18:21 22:11
  22:15 31:3,10
  33:3 34:16 35:2
  35:4 36:24 39:15
  41:1,6,24 42:22
  42:23 43:2,9
  46:20 47:20
  53:18 54:4 55:3
  55:4,17 56:17
  73:24 74:24
  75:15,23 76:2,20
  76:24 82:25 83:9
  83:11,16,20,22
  83:24 84:1,6,6,9
  84:12,18 86:21
  87:5 88:11,15,21
  88:24 89:12
  90:21 91:13 92:8
  94:21 97:14,15
  97:20 98:19
  99:18 100:8,8,12
  100:23 101:2,10
  104:4,6,11,12,24
  105:23 109:5,6
  110:24 111:7
  113:1,9
**June** 9:14 19:1,14
  19:21 20:3 27:11
  28:15 31:19
  39:14,17 41:6,22
  42:1,5,8,14
  57:14,18 58:9
  59:4,13,25 60:25
  61:7,11,13,25
  62:11,14,22 63:3
  63:9,23 65:10,13
  66:3,14,21 68:1
  72:10,18 73:21
  73:23 82:25
  102:10 108:12
  108:15,24 109:1
  109:21,23
  111:17 112:11
**J-e-a-n-n-e** 10:19

---

**K**

**K** 27:11,11 32:9
  39:17 57:15,15
  57:19 61:1
**KAREN** 3:13

**Karla** 12:24,24
  13:2
**keep** 24:14
**kept** 101:19
**kind** 113:18
**knew** 32:1 38:13
  39:12 69:1
**know** 7:4 8:17 9:7
  9:21 11:13 12:10
  13:8 14:3 18:8
  21:22 22:5 28:9
  28:10 33:10 36:8
  37:18,19,20,23
  38:3,12,16,22,24
  39:3,10,11 40:5
  40:22 41:14
  42:12 43:1,4,8
  45:22 46:1,2,12
  50:15 53:12
  54:18,23 58:18
  59:2 62:8,8
  64:20,23 65:7
  66:2 67:5 68:23
  68:25 69:4,5,21
  70:5 71:11 72:20
  72:22 73:4,4,8,8
  74:12,14,16,20
  74:21 76:3,10
  77:25 81:7,10,23
  81:24 82:17 87:2
  87:24 88:1,4,5
  88:16,23,24 89:2
  89:4,5,7,11,21
  90:7,14,15 91:3
  91:23 93:19 96:4
  96:14 97:21
  100:1 101:6
  103:22,24 106:2
  109:3 110:14
  112:6,12
**knowing** 108:19
**knowledge** 24:4
  28:4 41:8 46:5,9
  54:1 59:11 62:18
  63:2,10 87:9
  90:22 108:6
**known** 12:20
**knows** 13:3
**K-a-r-l-a** 12:24

---

**L**

**L** 30:25 112:17
**language** 20:22
  32:19 80:11
**late** 110:24,24
**Law** 3:5,9
**lawsuit** 8:20 10:3
  13:1,5,11

**lawyer** 6:25 9:23
**lawyers** 110:14
**leading** 14:9
**learn** 25:20
**led** 109:9
**left** 22:5 97:15
**legal** 110:15 111:5
  111:10
**length** 28:10
**letter** 20:12,15,20
  21:6,10 26:3
  27:12 28:4,13,17
  28:20 29:13,25
  30:11,22 31:10
  31:11,16,19,20
  34:8,15,17 35:2
  35:3 36:6 37:8
  39:12,14,17,18
  39:21 40:8,13
  47:22 52:19,19
  52:21,23 57:14
  57:18,23 58:1,3
  58:6 60:25 61:11
  61:14 66:19
  74:23,25 75:16
  76:13,17 79:6,16
  80:2,4,11,14,19
  81:2,11 82:25
  83:2,6,9 84:9,10
  84:13,18 92:11
  92:13,15,18
  93:18 94:9,11
  95:1 96:18,19,23
  97:4,6,10 98:17
  100:21 103:7,8
  103:10,12,17
  104:15,23 105:5
  105:10,12,15,17
  105:18,23
  106:23 107:2,9
  107:17,18,22
  110:10 111:6,7
  111:18 112:11
  113:19
**letters** 52:14,16,25
  53:2 82:5,6
  91:25 108:2,3
  111:22
**let's** 13:18,21,22
  22:10,18 24:17
  27:11 30:25 31:9
  32:8,8 36:23
  40:16 45:21
  50:20 52:18
  53:18 55:1 59:15
  67:17 70:20,25
  74:23 82:24
  83:18 84:17

87:17 89:14 90:9
  92:2,10 95:7
  99:2 101:24
  107:16
**level** 101:1
**Lewis** 4:11
**liability** 82:16
**liable** 85:13
**life** 50:13
**line** 63:16 101:9
**lines** 42:12
**list** 90:11,16 100:5
**listed** 35:24 107:8
**lists** 24:19
**little** 36:4 111:23
**live** 112:1
**LLP** 3:4,8
**lodge** 80:22
**logistics** 14:20
  16:10,16 17:8
**long** 66:11 73:11
**longer** 22:3 66:23
  67:9 86:9
**look** 31:1,6 55:7,13
  55:22 56:21 66:4
  73:10 74:5,23
  75:4 77:8 82:5
  84:17 89:14 90:9
  90:11 92:2,6,10
  94:2,16 95:1
  96:17 107:16
  110:2
**looked** 21:8 27:4
  44:24 45:22 46:2
  46:6,10,13 48:24
  49:3,6 52:16
  92:23,24 93:7
  100:25 103:23
  104:14
**looking** 12:17 17:8
  19:10 26:9,14
  36:1 39:16 50:6
  60:4 66:19 74:8
  91:16 93:7,17,21
  97:6 98:2 101:7
  105:9
**looks** 19:20 20:11
  31:2,9 36:23
  55:1,16,25 56:17
  63:23 68:1 73:21
  74:23 88:14,19
  92:2,10 94:8
  96:17 101:24
  112:17
**lot** 16:17 17:6
**Loyola** 15:3

**M**

M 31:9 33:21 35:2
  36:7 52:20,23
  76:17 83:1 92:11
MacArthur 2:16
machine 116:10
mail 53:5 110:7
maintained 16:7
making 39:1
manage 17:7
management 14:20
manager 16:5 19:8
  22:2
managers 17:6
March 14:24
mark 6:5,8 63:17
  67:17 72:1 73:15
marked 6:5,10
  63:20 67:19 72:4
  73:17
market 59:17
married 10:16
match 93:23
materials 14:20
matter 49:11 89:23
matters 12:16
MBA 15:3
mean 15:14,15
  17:12,23 23:14
  25:14 26:18
  32:14 35:21
  37:17 42:21
  51:20 53:8 57:15
  62:9 79:19 80:1
  80:9,25 87:14
  91:7 101:3,19
  102:15 103:6
  105:20 108:20
  113:4
meaning 84:20
means 64:20
meant 32:10 37:19
  37:23 38:3 79:19
  80:1,5,8,25
median 38:11
meet 6:25 99:5
memory 93:4
mention 83:19
message 102:7,25
  111:15 113:12
messages 103:1
  111:15 113:14
messed 6:2
Metpath 14:6
Michigan 14:18,19
MIDDLE 1:1 2:1
military 14:13
Miller 3:9 5:8,13

6:4 10:5 12:6,15
  17:12,14 25:2,13
  25:22 29:16,19
  30:4 32:5,24
  33:8,15 34:22
  37:19 42:21
  44:12 49:19 50:5
  51:16,23 52:8
  57:4 58:12 61:15
  62:1 63:14 64:14
  67:14,23 69:9,12
  73:2 74:11,19
  77:12,16 79:7,10
  79:17,24 80:6,22
  85:15 91:14,21
  95:1 96:10
  100:14 102:15
  106:14 107:5
  110:20 111:1
  113:24,25 114:2
mind 12:16 80:1,9
  80:10 81:1 105:2
Mindspeed 22:9
minute 80:23
  98:25 99:19
  100:12 101:6
minutes 98:24
  99:20 101:8
missing 73:3
Mission 10:13
misstated 45:14
modification 49:25
modified 45:13,16
Monday 35:7
money 41:21 90:4
  90:5
Montgomery 5:11
month 92:7 97:14
  109:1
months 42:4
  108:18,20,22,22
  109:3,22
move 71:20,23
multiple 33:17
  59:17,20 60:4,6
  60:21,22
multiplied 98:24
  99:20
M-e-t-p-a-t-h 14:7

**N**

N 36:23 40:16 88:9
name 10:18 11:7
  14:1,3,6 116:18
named 8:20 87:18
names 10:22,24
  11:5 90:15
nature 6:18

necessarily 33:15
  33:16 79:18,25
necessary 107:12
Neda 10:13
need 34:22 38:21
  41:25 71:20
  88:12 113:25
needed 41:12
  43:14 69:21
  70:15 71:15
negative 64:15
negotiate 26:11
negotiated 25:11
  26:2
negotiation 17:6
negotiations 16:18
  16:21 17:5 26:23
  26:23,25
neither 116:14
never 6:22 13:9
  17:10,18 25:19
  29:13 32:4,30
  47:21 57:12 58:9
  69:1,2 76:6
  91:11 96:2
  101:23 110:10
nevertheless 40:8
new 17:8 33:3,17
  43:12 47:15 67:2
  67:11,11 70:4,5
  70:17,18 71:23
  71:24 74:9 81:20
  82:11 106:16,16
  106:21
newly 51:12
Newport 1:16 2:17
  5:1
nicknames 10:8
Nicole 10:23
nonprescription
  8:9
Noonan 1:15 2:15
  4:3 5:4,15,19
  6:13 10:24 20:9
  33:13 35:1 65:19
  72:8 73:20 81:1
  115:8,18
normally 8:5
NORTHERN 1:2
  2:2
noted 115:10
notice 23:23 24:7
  24:10 31:24 75:7
  75:8,11,12
notices 24:8
notification 112:7
November 107:17
  113:19

number 46:19 55:2
  63:24 67:24,25
  91:16 92:3,7,21
  92:25 94:5 95:9
  97:11 98:24
  99:20 101:8
numbered 89:15
  93:8,11,13
numbers 49:19
  91:23 93:23
N-e-d-a 10:13
N.E 3:5

**O**

O 45:21 46:18
  50:20 83:13
oath 7:8 116:9
object 12:15 25:22
  29:19 30:4 32:5
  33:8,16 51:16
  58:12 61:15
  67:14 69:9 74:11
  77:12,16 79:7,10
  79:17,24 80:6,25
  81:3 85:15 91:14
  100:14 106:14
objecting 33:4
  51:19
objection 32:23,25
  80:22
obviously 53:2,14
  69:18 71:17
occasions 34:19
October 96:17
  97:18 100:20
  101:11,12,25
  103:11 104:4,6
  104:12,23 105:4
  105:12 106:3,10
  106:23 107:1
  108:13 113:13
offered 77:9 78:13
  79:2
oh 12:8 24:16
  46:17
okay 5:23 6:8,16
  6:22 7:11 8:2,3
  8:18 9:13,20
  10:2,7 12:8,22
  13:9,22 15:2,5,7
  15:23 16:2,17,20
  16:24 17:3,24
  18:5,20 19:6,13
  20:6,9,22 21:2,5
  21:10,13,16
  22:10,24 23:2,5
  23:10,18,21 24:6
  24:13,24 25:7,18

25:25 26:9,14
  27:3,11,15 28:3
  28:8 29:12,25
  30:10,15,18 31:9
  32:8,14,17,21
  33:20 34:4 35:23
  36:15,18,23 37:3
  37:13,17 38:3,7
  39:17 40:8,16,24
  41:5,8,11,18,24
  43:1,25 44:3,9
  44:23 45:19,21
  46:16,18 47:6,11
  49:12 50:3,10
  51:23 52:12,16
  52:18,24 53:7,9
  53:13 55:1,7
  56:12 57:1,8,12
  57:17 58:4,9,18
  58:25 59:3,9,19
  59:22,24 60:2,7
  60:19,22 61:5,24
  62:16 63:2,15
  64:16,25 65:6,9
  66:11 67:17
  68:16 69:11,14
  71:3,10 72:1,25
  73:10,13 74:16
  74:21 78:2,11
  79:3,14 80:12
  81:4 82:24 84:8
  84:17,19,23 86:1
  86:4,7,20 87:2,8
  87:17,17 88:17
  88:20,24 89:7,11
  89:14,20 90:1,7
  92:6,10,17,23
  93:7,24 94:15,19
  95:7,13,16 97:6
  97:9 98:4,5,9
  99:2,10,23
  100:10 101:24
  102:11 103:5,10
  103:19 104:1
  105:16,21
  106:23 107:10
  107:16 108:15
  108:24 109:3,13
  112:15 113:12
  113:17,23
old 33:18
once 6:17 11:8
  56:11 66:9 96:14
  113:4
ones 62:9 93:22
  104:21 105:2
open 28:7
opened 28:8

operate 84:23
operated 50:23
operating 85:11
operator 99:5,5
  112:4
operators 112:2,9
  113:6
opinion 68:21,23
  76:1
opportunity 5:21
  51:10
Orange 10:15
order 14:8
outbound 99:24
outside 110:16
overlap 109:25
overlapped 42:4
  108:18,20,21
overnight 27:17
  28:5
owe 91:18
owed 41:20 91:1
  91:12 107:4
owes 90:4,17,20

**P**

P 53:18 83:18
  88:14
page 4:7 23:3,5
  24:7,13,14,21
  32:17 36:20
  45:10,10 48:16
  48:20 49:7,14,17
  50:4,5,8 73:3
  90:9,10,10 107:1
  110:2
paid 81:9 97:19
  98:10
paragraph 20:23
  23:6,19 24:6,21
  28:20 31:18 32:9
  33:21 35:3 39:21
  47:8 50:21 68:21
  69:17 70:1 71:12
  71:20 74:8 75:6
  76:23 77:8,9
  78:12 80:13 81:5
  81:12,15,17,23
  82:2,8 83:8,14
  84:17,19,20
  94:23 100:20
  105:22 106:24
  107:2,25 108:8
paraphrase 57:24
paraphrasing
  87:21
part 7:14 27:1
  72:22 81:2 82:12

participating
  12:12
particular 43:5
  95:22
particulars 9:22,23
  12:19
parties 49:11 50:2
  69:23 70:16
  71:16 91:10
  116:16
party 23:22,24
Paul 4:9,11,12,14
  12:6,19 36:24
  37:8,14,23 38:3
  38:12,13,16,17
  39:9,12,18 40:17
  40:20,22,24
  45:22 46:6,19
  53:19,25 54:3,10
  54:12,13,15,19
  54:23 55:2,4,11
  55:16,25 56:4,8
  56:18 58:21,22
  58:25 59:14,19
  60:10,15,23 61:2
  61:5,13 62:6,7,9
  63:24 64:7,20
  65:1 66:14 67:4
  67:7 68:2,10,13
  68:14,19,21 69:7
  72:9 73:21,24
  74:24 83:18,21
  87:19,22,25
  88:10,12,21
  89:11 96:16 99:7
  99:13,14 100:25
  103:23 109:12
  109:19,21 110:8
Paul's 56:10 68:23
  68:24 71:19
pay 15:18 29:5,8
  32:2 43:22,25
  47:23 71:21 81:6
  82:14,18 94:20
  97:10 98:6
  100:17 104:18
  108:12
paying 47:24 94:11
  107:13
payment 47:10
  90:3 96:7,12
  97:25 98:5,6
payments 97:24
pays 90:5
Peachtree 3:5
penalty 115:9
people 36:25 53:19
  55:2,17 56:18

63:24 68:2 71:1
  71:3 72:10 73:25
  86:19 90:11
  100:6 112:1
people's 11:5
performed 33:6,14
period 99:25 100:3
perjury 115:9
permanent 50:22
perpetuity 44:20
  48:12
person 26:12,17,23
  90:5 102:13
  112:10
personal 6:20
personally 58:10
  105:19
pertinent 111:22
phone 26:12,16,24
  27:18,19,21,23
  28:2 102:17
phrase 37:24 62:17
phrased 80:7
Pirnie 19:14,21,25
  20:3,12 27:12
  28:13,14,21
  31:10 32:9 39:21
  46:19 50:22
  57:19 69:2 74:24
  75:6 76:22 77:9
  79:5,16,19 80:1
  80:5,8,14,20,25
  83:1,15 87:19
  92:12,18 96:18
  96:21 101:25
  102:8,14 103:11
  104:24 105:23
  107:18 111:6,16
  112:3
Pirnies 34:19 43:6
  102:20 103:1
  113:5
Pirnie's 31:19
  83:24
place 3:10 38:21
  40:17 41:6,25
  44:13,18 58:16
  61:22 88:12 91:3
  91:19 101:7
  116:7
placed 38:17,24
  42:14 76:5
  105:17 116:9
placing 38:23
  40:25 88:10
Plaintiff 1:5 2:5,16
  3:3 4:7,25 6:10
  63:20 67:19 72:4

73:17
plan 61:3,9,21,22
  62:13,25 63:7
planned 47:24
plans 58:16 61:2
please 10:12 29:6
  45:4 57:16 77:8
  84:4 104:19
point 7:25 35:18
  37:25 38:12 40:3
  40:3 57:4,6
  63:14 75:20 76:4
  85:3 90:24 99:18
  101:19 103:25
police 82:9
Polich 4:9
policing 82:8
policy 82:9,9
portion 18:17
portions 18:15
position 11:4 15:25
  16:12 44:17,17
  83:15
positions 16:7
positive 84:6 96:16
  108:23
possibility 60:16
  63:13
possible 58:8 66:10
  100:10
possibly 21:11
posttermination
  44:6 106:5
potentially 109:5,6
practices 48:5
preferred 23:7,11
  23:12,15
preparation 72:25
prepare 9:20,25
prescription 8:8
present 3:12 14:16
  16:1 17:14
president 92:12
pretty 33:7 64:12
prevented 53:14
previous 11:4
  55:18 76:13,17
  84:15 91:2 98:17
previously 36:22
  85:20,23 91:11
  99:22 105:24
  106:1
pre-audio 42:5,9
pre-June 60:9,14
pre-termination
  70:22
price 18:25 42:8
  44:1 48:1 50:25

51:5,14 52:3,5
  77:2 83:19,22
  99:19
prices 17:20 24:18
  24:25 25:9,21
  26:4,7 28:24
  30:11 32:3 37:10
  37:18,24 38:5
  39:6,25 40:2,10
  43:23 44:11
  45:24 46:7,11
  70:10 71:7 106:7
  106:10,12
pricing 25:11 26:2
  26:2 29:14,16,17
  30:1,6,8 38:14
  38:20 39:1 42:10
  43:2,9 44:22
  50:23 51:10,12
  52:13,15,23,25
  53:4,12,16 59:17
  60:4 65:25 106:6
printout 105:15
prior 41:1 42:12
  44:18 46:13
  48:10 58:9 59:8
  59:13,25 61:13
  62:12 63:9 65:13
  66:6 87:11 97:24
  98:11 102:19,21
  102:22 106:9
  111:17 112:11
  116:8
probably 63:11
  95:21
procedures 7:6
  17:9
proceedings 116:6
  116:8,10
process 7:3
processes 17:9
produced 10:6
product 16:16
professional 50:13
Professionals 4:14
program 18:25
  50:25
prohibit 27:4,7
prompted 111:4,9
protection 18:25
  50:25
provide 66:23 67:9
  70:3
provided 30:2 35:9
  35:14,24 36:11
  73:3 85:8 90:25
  91:2 105:23
provisions 85:2

pulling 62:13
purchasing 14:21
  22:2
purpose 112:22
purposes 13:7
  47:10
pursuant 23:24
  91:18 104:18
put 12:21 34:20
  61:22 76:15 86:5
  88:5,6,22 94:8
  101:7
putting 100:16
p.m 2:19 5:2
P.O 3:10

_____
Q
qualify 25:17
Quest 14:1 96:6,8
question 7:11,14
  7:18 17:16 27:6
  29:23 38:1 43:6
  45:4 51:4,13,25
  52:3,5,12 53:11
  54:23 56:6 57:16
  58:14 64:24
  69:12 76:9 77:13
  78:6 79:12,20,22
  80:6,9,24,25
  91:15 93:6 96:25
  100:4 107:5
questioning 63:16
  104:16
questions 11:13
  12:1 51:11 53:1
  53:4,16
quick 21:21 22:14
  92:2
quickly 13:19 58:7
  66:10 71:20,23

_____
R
R 55:3,5
raises 37:10,18,24
  38:5
range 99:19
ranked 13:6
rate 70:6,19 71:21
  71:24 98:25 99:3
  99:4 101:6
rates 64:22 65:2
  66:24 67:10
read 5:13 19:4
  21:14 27:21,23
  27:25 28:1 37:3
  39:25,25 45:5,6
  45:9 55:10 64:5
  68:5 72:21,23,25

75:2 77:14,15
  78:7,8 79:22,23
  80:4 98:11
  103:14 115:9
reading 74:3 75:16
  22:14 92:2
realize 7:21,24
  84:14
really 51:13 75:18
  76:4 91:15
reason 8:14
recall 18:1 28:1
  38:1,9,10 41:4
  41:10,11,19
  54:14 59:2 62:21
  65:8,8,9 66:12
  72:23 86:16,25
  86:25 89:10 92:5
  92:6,9 94:2
  95:10,11,12,15
  95:20,21 102:9
  105:14 108:17
  109:24 110:7,9
  110:23 111:8,8,9
  113:16,22
receipt 60:25 92:20
  108:3
receive 27:17 52:7
  70:9 71:5 72:19
  72:22 82:3 89:16
  89:19,23 92:25
  103:12
received 15:3 20:7
  27:15,16,21,23
  28:13 29:3,25
  34:20 37:4 38:7
  39:11 47:1 53:23
  55:8,10,14,23
  56:22 57:14,18
  58:1 64:3,5 68:5
  68:8 72:21 74:2
  74:6,17 75:2
  82:15 93:4,19,23
  95:25 96:4,15
  102:7 103:1,14
  103:17 108:1
receives 89:20
receiving 19:15
  20:4 27:13 30:10
  31:3,19 36:25
  46:23 53:20 55:5
  55:19 56:19 58:2
  58:6 63:25 68:3
  74:1,9,25 89:9
Recess 34:24 65:17
recipients 46:19
recognize 90:14

recollection 93:18
  110:22
reconcile 84:8
  ecord 5:9 34:25
    45:6,9 65:18
    72:6,7 77:15
    78:8 79:23
    116:10
recording 8:4
refer 8:22 9:1
reference 44:25
  83:25 84:15 86:6
  87:25
referenced 113:12
references 87:25
referred 9:15 50:3
  98:17
referring 9:7 37:14
  42:1,21 45:7
  49:19 54:6,23
  67:7 74:9 77:25
  82:17 88:16
  93:24 94:1
  101:20 103:25
  108:9
refers 104:14
refresh 93:4,18
refusing 47:23
regarding 60:5
  108:2
Reid 40:23
related 13:15
relation 6:23
relationship 27:2
  80:16
relative 116:15
relatives 11:1
relied 48:18 49:12
rely 45:19
relying 48:15 49:2
  50:11
remainder 98:15
remember 11:4,7
  11:19 12:10,12
  14:5 16:6 19:15
  19:22 20:4,15,17
  27:13,15 31:3,11
  31:13 36:25
  41:18 46:23
  52:24 53:1,3,7
  53:20 55:5,19
  56:19 63:25 68:3
  68:10 72:15 74:1
  74:3,25 76:13
  83:1,2,4 86:23
  92:13,15 93:20
  93:21 95:7,18
  96:18,21 97:9

98:1 102:1,11,19
  105:12,16
  107:18,20
  110:25 111:1,2
  112:13,21 113:2
  113:15,17
rendered 25:1
  28:25 41:22
  82:19 90:21
  91:13,18 94:20
  97:19 98:18
  99:17 100:11
  109:1,22
rephrase 26:13
  68:19
report 40:22 68:14
Reported 1:21
reporter 2:21 6:11
  63:21 67:20 72:5
  73:18 113:25
  116:5
reports 19:9
represent 5:25
  96:24
representative
  50:1
reprimanded
  13:14 15:12,20
request 53:15
  82:10 86:10
requested 28:22
  33:3,17 39:22
requesting 38:15
requests 53:4 82:3
  82:4
requires 80:7
resolved 38:20
respond 51:7
responded 84:13
  112:13
response 52:7
responsibilities
  16:12
responsibility 16:8
  16:8 35:8
responsible 78:4
  107:13
restate 17:16 29:22
  37:21 42:7 43:7
  45:4 56:6 57:16
restating 70:13
results 13:11
retain 6:5
retained 4:25 6:7
return 34:20
returned 81:9
review 17:11,19,22
  17:23 18:17 77:5

reviewed 10:5
  18:12,15
right 5:12 10:11
  12:17 25:16
  28:12 30:22
  31:23 39:13,14
  39:15 41:19
  45:14 50:8,18
  51:7,15 53:8
  61:9 65:16 73:6
  76:18 83:11
  84:21 85:4 88:15
  98:1 108:10
  110:23 113:24
Riley 13:24
Rob 19:14,21,25
  20:3 21:8 34:8,8
  34:10 46:19
  50:22 51:20
  83:14,24 112:8
Robert 20:12
  31:10 83:1 92:11
Rob's 47:8 87:21
role 90:1
Rough 87:20 90:7
run 20:25
running 21:17
  65:13
Ruth 90:7
Ryan 10:23
R.M 27:12

──────── S ────────
S 3:9 55:16,21 56:5
sanctions 82:16
SANDERS 3:4
saw 17:24 28:5
  72:15
saying 34:9 44:16
  68:25 70:14
  82:12 108:24
says 18:13 23:6,19
  23:22 24:1,8,8
  24:10,18,24 25:3
  25:5 26:22 32:18
  38:19 41:24
  44:24 45:11
  47:22 49:7,8
  51:4,16,17,19,19
  52:9 54:5 57:23
  64:20 65:1,1
  67:12,14,15
  71:13 81:6,12
  82:1 84:1 87:19
  94:13 97:1
  104:15 105:15
  105:23
scheduled 66:7

school 14:16,17,17
  14:18,23,25
Schwinn 13:25
second 20:23 24:6
  28:20 32:9 35:2
  39:21 50:21 67:9
  69:24,25 71:12
  75:6 76:23 77:4
  78:3 83:8,14
  100:20 105:21
  105:22 107:1
  108:8 110:2
section 23:24 49:8
  49:14,23 50:4,8
  69:17
see 13:22 21:18
  23:7,19,21 24:4
  24:7,9,16,18,22
  32:18 40:1 51:3
  53:11 72:13
  76:22 77:3,4,7
  93:8,11,22 94:3
  94:16 98:3 99:3
  99:23 100:2,6
  105:4,14,20
  107:7,9,10,15
  109:9 110:6
seeing 105:12
seeking 101:13
seen 10:3 17:23
  19:2 22:12,22
  46:21 72:11 92:4
  92:8 95:8,13,17
  95:19,21 101:9
send 5:14,14 26:6
  34:16 52:12
sending 19:22
  20:17 31:13
  53:15 83:1,4
  92:15 96:21
  102:1 107:20
sent 19:21,25
  20:20 27:17
  28:14 31:2,7,16
  34:7 53:4 54:13
  54:16 55:2,4
  72:18 83:1 92:18
  96:14 97:4 102:4
  105:12 107:23
  110:10 113:1
sentence 23:21
  47:13,14,19
  49:24 54:24
  66:19 69:14,18
  69:24 77:4 78:3
  83:14 105:21,22
  107:10,25 108:8
  112:23

sentences 51:3
September 9:5
  18:2,19 21:18,18
  40:7 46:4,14,17
  87:18 88:2,21
  92:11 94:9 98:3
  104:14,15
  110:19,25
series 11:25
served 11:20,25
service 23:16 32:3
  51:5,14 52:4,6
  67:4 78:13 79:1
  86:18 90:3 98:18
  101:13,17
  106:10
services 9:15 18:11
  18:13,21 19:1
  23:13,17 24:19
  24:22,24 25:1,10
  28:21,25 29:3,5
  29:8,17,18,20
  30:1,20 32:5,8
  32:10,11,12,18
  32:21,25 33:1,6
  33:17 35:9,12,13
  35:18,19,20,22
  35:24,24 36:3,5
  36:10,10,18,19
  36:20 39:20,22
  40:9,14 41:21
  42:8,11 43:12,15
  47:15,15,24,24
  50:24 51:12 58:2
  58:5,7,11 61:21
  62:1,2,14,20
  63:12 65:20,23
  65:24 66:5,8,24
  67:1,2,10 70:4,4
  70:5,17,18 71:5
  76:24 77:1,5,10
  77:19,22 78:1,4
  81:6,9,17,19,20
  81:21 82:2,15,19
  86:10 87:3 89:4
  89:6,21 90:21,25
  91:1,3,13,18
  94:20 97:19 99:6
  99:17 100:5,11
  100:18 105:5,11
  106:16 108:5,25
  109:4,22
set 30:11,16 36:11
  36:17,21 42:11
  42:12 43:17 44:4
  44:11 47:15,15
  50:25 67:11
  70:18 71:23

81:21 82:11
  86:19 87:10
  106:17,21 116:7
setup 61:10
Seventh 3:10
shakes 8:5
shock 96:1
shorted 100:11
shorthand 2:20
  116:4,11
shortly 39:18
show 44:23 73:20
showing 93:5
shown 51:5,14
  52:4,6
side 17:8
sign 5:13
signature 23:2
signed 12:6,18
  36:22 43:17 44:5
  45:13,16 50:1
  70:5 81:22
signs 82:4
simple 6:7
simply 81:14
site 11:8 17:11,19
  17:23,25 18:6
  51:1,6,15 52:4,6
  77:1 81:20
  101:20 106:13
somebody 62:8
  90:4
somewhat 77:19
soon 28:8 39:11
sorry 8:13 11:23
  20:10 29:22 38:2
  38:18 45:13
  46:17 48:2 50:6
  73:24 78:6 79:21
  82:25 84:19 93:6
  96:9,12 100:8
  104:5,24 105:7
  106:25 107:1,5
sort 52:13 86:18
sought 21:11
sounds 7:4
sourcing 16:5,9,15
  17:5 19:9
Special 24:18
specific 51:4,10,13
  52:3,5 53:11
  54:18 71:11 91:22
specifically 49:5
  53:7 74:4 88:4
  105:14
specifics 12:11
specified 105:24
  106:1

**speculate** 79:25
  80:8,24 87:14
**speculation** 69:5
**spin** 22:6,6
**spoke** 99:15 102:13
  112:12
**spoken** 102:20
**spreadsheet** 93:25
  94:13 95:3
**spreadsheets**
  105:17
**stamp** 63:19
**stamped** 73:16
**stance** 75:13
**standard** 24:25
  25:8,20 26:4,7
  28:24 32:3 39:24
  40:1,10 43:13,23
  45:23 46:6,10
  106:6,12
**STARNES** 3:8
**Start** 64:14
**started** 16:4 39:13
**starting** 14:16
  15:24
**starts** 24:7
**state** 14:19 34:6
  48:17 75:15
  78:22 83:15 84:7
  107:9 115:15
  116:5
**stated** 16:4 34:14
  35:11 41:16
  42:17 43:15 46:3
  47:21 67:22 76:7
  76:8 77:3,7
  80:23 84:14
  87:22 92:22
  101:21 107:15
**statement** 47:8,22
  48:3 68:24 69:4
  71:19 84:9 85:2
**states** 1:1 2:1 29:1
  40:12,15 51:2,8
  75:24 77:17 78:9
  78:14,20,21 79:1
  82:2 83:17,21
  88:12 95:5
  100:25 112:23
**stating** 75:13,22,25
**stay** 48:11
**stipulating** 26:18
**stipulations** 5:10
**strategic** 16:5 17:5
  19:9
**Street** 3:5
**strike** 106:7 111:13
**structure** 94:24

95:5
**styled** 92:25
**subject** 28:23
  39:23 40:9 49:10
**submit** 51:6 52:7
**subordinate** 40:20
**subscribed** 116:18
**subsequent** 15:2
  59:24
**substances** 8:8
**suffer** 13:11
**Suite** 3:5
**supervisor** 12:23
**supplier** 23:15,16
**suppliers** 59:17,20
  60:6
**support** 48:23
**supposed** 34:1
**surcharges** 99:24
**sure** 5:9 7:3 11:23
  12:5 15:14 16:4
  17:1 35:21 39:1
  39:7 41:13 43:6
  47:25 48:9 51:24
  54:6,17,25 62:17
  64:23 70:14
  71:11,14 74:2,4
  75:19 80:1 81:14
  86:17 88:6 89:22
  90:24 91:15
  94:14 96:5 97:21
  97:22,23 98:21
  100:4 101:9
  103:22 104:11
  109:7,15
**switch** 57:25 58:4
  58:7,11,19 60:11
  60:24 61:6,12
  62:14
**switched** 58:2
**switching** 60:16
**sworn** 5:5 7:8
**Sylvester** 19:6
  27:20 28:3
**Systems** 1:7 2:7 9:1
  87:20 90:2 110:3
**S&A** 4:10,11,13,15
  63:19 67:25 72:3
  72:9 73:16

**T**
**T** 56:15,16
**tab** 18:10,24 19:13
  19:20 20:2,9,10
  21:13 22:10,18
  24:14,14 26:10
  27:11,11 30:25
  31:1,9 32:9,15

32:17,17 33:21
  35:16,25 36:23
  39:17 40:16
  45:10 48:16,20
  49:7,14,15 50:4
  50:8 52:19,20
  53:18 55:1,3,5
  55:16,21 57:15
  57:19 74:23
  76:17,22 82:24
  83:13,18 84:18
  87:17 88:14
  89:14 92:6,10
  93:8,9,13 94:3,6
  94:13,14,17,23
  95:7,13,16 96:17
  97:13 99:2
  101:24 103:10
  105:7,8 107:2,16
  110:2 111:7
  112:16,17
  113:13,20,21
**tabs** 21:8 39:16
**take** 16:3,24 18:24
  19:13 34:23 35:8
  54:5 65:16 66:11
  73:10,10 77:8
  92:6,10 111:24
  112:25
**taken** 2:15 6:14,22
  8:8 103:20 116:6
**talk** 8:4 45:21
  112:4
**talked** 12:11 21:17
  26:21 35:1 39:5
  39:15 48:8,9
  52:20 59:1,14
  69:14 81:15 85:1
  110:15 111:17
  112:1,10
**talking** 8:24 33:1
  33:11,13 35:12
  35:13 36:3,9
  37:11 38:4 39:13
  44:6 49:1,5 56:5
  57:13,13,21 67:2
  67:4,6 77:22
  93:2 99:4 113:6
**talks** 47:13 82:8
**task** 33:6,14
**team** 17:7 99:16
**tell** 6:18 7:9,12,15
  7:17,23 8:1,9,14
  10:2,11,18,22
  11:6 14:15 15:23
  19:6 22:14 23:14
  26:15 27:25

32:24 33:9 34:4
  37:13,20,20,23
  40:9 41:8 47:6
  47:11 53:10 59:9
  64:25 67:6 73:11
  74:20 76:10
  78:15 82:6 86:14
  90:11 95:23
  98:14 102:6,7
  109:13,21
  110:21 111:1
**telling** 12:16 60:22
  80:9,10 110:11
  110:13
**term** 21:1 32:25
  33:9,20 36:8
  108:9
**terminate** 23:22
  24:2,2 30:23
  67:8
**terminated** 20:23
  21:1,2 28:17
  29:4,10,15 30:13
  37:15 40:11
  42:19 66:9 69:20
  70:12 71:7,17
  75:11 76:2,11,20
  77:20 79:4,15
  83:11 84:12
**terminates** 57:23
**terminating** 32:12
**termination** 23:19
  28:22 30:3 32:1
  39:12,19,23 42:6
  42:10,13 43:21
  44:10,19 47:16
  47:20,21 48:10
  50:24 57:11,13
  57:22 66:9 70:5
  70:17 75:15,17
  75:22,25 76:23
  77:23 83:16 84:1
  85:19 89:4,6
  102:22 103:2,5
  106:5,11 108:2
  112:22,24
**terminology** 34:10
**terms** 17:11,19,20
  18:11,13 28:24
  32:3 39:24 40:1
  40:10,14 43:13
  43:23 45:23 46:6
  46:10 48:12 77:1
  77:2,6 81:19,21
  84:24 85:6,11
  88:7 105:5,11
  106:6
**testified** 5:5

**testifying** 116:9
**testimony** 115:12
**thereof** 116:13
**thing** 18:9 35:1
**things** 17:8
**think** 9:13 12:6
  21:8 24:8 29:13
  32:10 36:4 37:25
  40:6 45:2 46:13
  52:18 56:14 59:3
  59:6 64:14 69:22
  70:15 77:22
  82:18 91:16 94:5
  99:8 101:4
  102:20 108:22
  109:25 111:20
  111:21,24
**thinking** 81:25
**third** 23:2 35:15
  45:2 74:8 77:8
  84:17,20 94:23
  105:22
**third-party** 90:3
  96:6,11
**THOMAS** 1:15
  2:15 3:4 4:3 5:4
  9:6,13 16:14
  25:1 28:10,25
  29:12 38:12
  39:25 40:3,4
  43:16 46:3,6,10
  56:10 58:25
  59:18 60:3 61:22
  62:16 72:14,16
  72:23 75:24
  87:11 99:25
  100:3 101:10
  102:13 105:3
  109:19 112:9
  116:7
**times** 6:16 106:5,9
  111:25,25 112:4
  112:6
**title** 16:9
**today** 7:1 8:10
  44:24 49:6 97:6
  111:14,19
**told** 40:13 69:2
  86:23 91:17
  104:21 109:19

**toll** 99:24
**Tom** 10:10 12:17
**top** 49:7 53:3 55:3
  97:15 111:11
**topic** 54:17
**total** 99:20
**touch** 112:2,7
  113:5,7
**transcribed** 116:11
**transcript** 5:20
  115:10
**transcription**
  116:13
**transfer** 57:10,17
**transition** 34:13
  57:20 58:15 61:2
  61:9,19,22,24
  62:13,25 63:7
  66:10,11 87:11
  87:16
**transitioned** 65:23
  66:5,13
**trial** 5:21
**trick** 96:25
**tried** 34:18,19 43:4
  69:1 109:16
**trigger** 62:14
**TROUTMAN** 3:4
**true** 19:11,17,24
  20:6,19 21:22
  22:15,24 28:12
  31:6,15 37:6
  41:20 46:25
  53:22 55:7,13,22
  56:21 57:1 64:2
  68:7 70:14,17
  72:17 74:5 75:4
  83:6 92:17 97:3
  102:3 103:16,19
  107:22 108:22
  115:13
**truth** 7:9 8:10,15
**try** 32:22 34:15
  52:15 66:10 76:5
  113:5
**trying** 14:5 34:9
  82:19 94:10
  98:23 100:15
  109:18 112:2,7
  112:22 113:6
**turn** 18:10 19:20
  20:2 21:13 22:10
  23:5,18 27:11
  30:25 31:9 36:23
  56:15 101:24
  110:2
**Turning** 24:6
**two** 17:5 30:25

99:9
**typical** 16:24 17:1
17:2

---
**U**
---

U 74:23 76:22
111:7
**uh-huh** 8:6 66:16
75:9 83:12
**unclear** 42:15
**undefined** 32:6
33:1
**undersigned** 116:4
**understand** 5:19
7:5,8,11 8:3,6,19
8:24 9:2,10,17
11:23 33:5 38:20
41:12 43:2,9
44:17 51:18,24
59:17 64:23
100:4
**understanding**
42:3 49:10
**understood** 7:18
43:11
**unethical** 48:5
**UNITED** 1:1 2:1
**University** 15:3
**unlawful** 47:10
48:4,5 81:13
**unwillingness** 81:6
**usage** 100:23 101:2
104:18
**use** 8:5 32:8,21
33:9,20,22 47:9
63:11 77:10,19
78:3 82:2 86:24
87:3,15 108:5
**users** 70:9
**uses** 81:6
**usual** 5:9
**utilize** 23:17
**utilizing** 25:11

---
**V**
---

V 82:24 84:18
**vacation** 28:5
**vagueness** 36:7
**variety** 36:24
53:19 55:17 68:2
72:10
**various** 43:5
**vendor** 23:7,11,12
**vendors** 57:2 58:19
**verbal** 26:19 27:1
**verbatim** 109:15
116:9
**verified** 4:8 6:1 9:6

13:16
**verify** 65:14 90:16
**versus** 76:15
**videoconferencing**
102:18
**Viejo** 10:13
**view** 40:14 44:25
45:7 48:9,15,18
48:23 49:4,13
70:7,24 71:3
85:11
**visit** 11:8
**voicemail** 87:22
102:6,7,8,25
103:1 111:15,15
113:12,13
**voicemails** 112:3
**vs** 1:6 2:6

---
**W**
---

W 87:17
**wait** 34:16
**want** 8:17 9:21
12:10,19 15:23
18:10 19:13
21:13 23:5,18
24:13 31:1 33:9
36:8 44:16 48:8
63:17 69:19
71:11 91:4 99:2
110:14
**wanted** 35:4 47:25
77:10 109:15
**wasn't** 82:9 83:8
83:23 84:2,9
**way** 5:25 13:11,14
27:3 48:4 80:7
88:19 99:12
104:8
**ways** 86:8
**Web** 17:10,19,23
17:25 18:6 51:1
51:5,15 52:4,6
77:1 81:20
101:20 106:13
**WebEx** 9:16,17
60:6 61:19 65:23
65:24 66:5
**week** 18:2,19
**went** 13:24,25 18:5
89:7 97:10
108:22 110:8
**weren't** 71:18,24
82:14,18 101:5
**we'll** 6:3 53:2,8
92:1
**we're** 5:9,24 36:3
49:15 57:13

70:20 104:17
**we've** 26:21 27:7
36:7 48:23 49:6
52:16 81:15 93:2
106:19 111:14
**WHEREOF**
116:17
**wife's** 10:18
**willing** 104:17
**wish** 81:2
**WITNESS** 4:2
12:8 17:16 25:5
29:22 30:6 37:21
44:14 45:7,10
49:21 51:24
52:10 58:15
61:18 62:3 67:16
67:21 73:7 74:21
77:13,17 78:9
79:12,21 80:13
81:5 85:18 91:20
96:11 100:15
106:16 110:23
111:2 116:17
**witnesses** 116:8
**wondering** 93:17
**word** 32:9 36:6
**work** 6:23 13:18
14:11 15:25,25
29:14 30:1,8
34:13 99:11
**worked** 30:7
**works** 22:3
**worth** 100:18
**wouldn't** 68:14
85:12
**Wow** 96:9
**write** 26:3 54:10
68:10,13,15,16
**writes** 37:8 39:22
50:22 51:13
76:23
**writing** 20:15 27:6
27:9 31:11 34:21
45:16 50:1 51:6
51:11 52:7 83:2
92:13 96:18
106:4,9 107:18
**written** 11:20,25
26:19 27:1 35:14
45:13 47:3 52:12
53:3,15 54:20
67:3 69:16 73:12
91:19 101:7
**wrong** 91:17
**wrote** 20:12 28:21
52:18,19 53:25
54:3 56:4 68:20

69:7 79:5,16
80:21 84:18
91:25 94:19 97:7
107:2,7,17,23
**www.yourcall.com**
77:2
**Wylie** 14:18

---
**X**
---

X 89:14 93:8,8,19
94:1

---
**Y**
---

Y 92:2 93:8,9,13
93:19 94:1,6
97:13
**yeah** 18:4 34:8
50:6
**year** 16:6

---
**Z**
---

Z 92:6 93:8,15,19
94:1
**Zack** 31:2 112:12
112:20 113:8

---
**$**
---

**$201,346.32** 87:24
**$39,793.01** 87:23
110:4
**$5** 98:11
**$5,366.53** 94:6,17
94:19 97:25 98:5
**$7,060** 98:6
**$7,060.25** 98:14
100:21
**$74.95** 85:13
**$75** 85:8

---
**1**
---

1 4:8 6:5,10 9:5
18:10,24 21:13
21:18,18 22:19
22:25 23:5 47:8
81:5,12 84:25,25
94:3,13,14,18,21
97:15
**1st** 35:7
**1:02** 2:19 5:2
**10** 23:24 24:6 33:3
94:21 97:15
**10th** 2:17 9:14
18:21 19:1,14
47:21 75:15,23
76:24 83:11,16
83:20,22 84:2,12
90:21 91:13
97:20 98:19

99:18 100:8,8,12
**100** 3:10
**11th** 92:8
**117479** 95:9,14
**119266** 89:15
92:25 93:9 94:4
**119266A** 92:3,21
93:13 94:11
97:11,14 98:7,10
**119266B** 92:7
93:15
**12** 49:7,14,18 50:5
50:8
**12th** 73:24 86:21
87:5
**13** 45:11,11
**13-A** 49:14,23
**14th** 19:21
**15** 23:23 24:2,4
31:23 33:20 34:5
34:5,13 49:8
50:4,8 69:21
70:2,15 71:14,15
75:7,7,11,11,14
76:14,16 81:16
84:3
**15th** 31:10 34:16
35:2 76:2,20
**16** 75:24
**18** 1:17 2:19 5:1
**19th** 36:24 39:15
41:1,6,24 42:22
42:23 43:2,9
46:20 83:24 84:6
84:6 88:11
**1999** 9:5 21:18
84:25

---
**2**
---

**2** 4:9 47:13,14
63:17,20 66:20
66:20 69:17 73:3
81:15,17 86:4
**2nd** 89:16 90:13
**2:05CV1088-F** 1:6
2:6
**20** 54:4
**20th** 53:18 55:3,4
55:18 56:17
88:15,21,24
89:12 104:4,6,11
104:12,24
**2001** 14:12 15:8
16:4 22:11,16
**2002** 9:14 19:1
21:18
**2003** 22:19,25
30:12 32:15

59:16 60:3 84:25
**2005** 18:3,22 19:14
19:21 20:3,12
31:10 33:4 35:2
35:7 41:22 46:14
46:20 53:18 55:3
55:4 59:4,7,13
59:25 60:9,14,25
61:7,25 62:11,23
63:3,9,24 65:10
65:13 66:3,14,21
68:2 73:21 74:24
76:20 82:25
83:20 86:21 88:3
88:21,21,24
89:12,16 90:13
91:13 92:11
94:21 97:18,20
98:19 100:8,13
101:25 103:11
104:4,4,6,6,12
107:17 108:6,13
109:1,23 113:9
113:19
**2006** 1:17 2:19 5:1
115:15
**205** 3:11
**21** 103:11 104:4,6
104:12 105:13
106:3,10,23
107:1
**21st** 105:5
**22** 90:9
**23** 90:10
**23rd** 22:11,16
**24** 27:11 90:10
**24th** 20:3 28:14,14
31:19 39:14,17
41:6 57:14,18
58:9 59:4,13,25
60:9,14,25 61:7
61:11,14,25
62:11,15,23 63:3
63:9 65:10,13
66:3 111:17
112:11
**26th** 74:24 83:9
84:10 111:7
**27211** 10:13
**28th** 82:25,25
84:18
**284** 4:10 63:19
**29th** 63:23 66:14
66:21 68:1 72:10
72:18 73:21,23

---
**3**
---

**3** 4:11 23:6 49:7

---

```
      50:4 67:18,19,23
      81:23 86:4
3rd 107:17 113:19
30308-2216 3:6
31 92:8
31st 35:4
335 4:11 67:25
336 4:13 72:3,3,9
338 4:15 73:16
35259-8512 3:11
366.53 98:12
```

_____
**4**

```
4 4:12 23:19 49:7
      50:5,8 72:2,4,8
      80:13 86:4
4/3/1960 11:10
4000 2:16
404 3:6
43 90:9
```

_____
**5**

```
5 4:4,14 73:16,17
      73:20 82:2 86:4
      86:16 98:25
      99:19 100:12
      101:6
5th 96:17 97:18
      100:20 101:11
      101:12 104:23
50 50:16
5200 3:5
598512 3:10
```

_____
**6**

```
6 4:8
6/29/05 4:10,11,13
600 3:5
63 4:9
634341A 1:24
67 4:11
```

_____
**7**

```
7th 31:3 92:11 94:9
      98:3 101:25
      104:15 113:1,9
      113:13
7/12/05 4:14
7/22 56:11
7/22/05 56:1
7/31/05 56:1
72 4:12
73 4:14
75 85:13
```

_____
**8**

```
8 49:14,17
8th 87:18 88:2,21
```

```
      104:14
8:58 2:18 5:2
800 99:5
83 14:24
868-6000 3:11
885-3275 3:6
```

_____
**9**

```
9th 20:11
9822 1:23 2:21
      116:23
```

# EXHIBIT 2

**Brigette McNair**

| | |
|---|---|
| **From:** | Paul Edge |
| **Sent:** | Wednesday, June 29, 2005 7:02 PM |
| **To:** | Polich, Chip |
| **Cc:** | Tom Noonan; Brigette McNair; Hoang Chung; Jeff Reid; Don Dykier; Surya Konala |
| **Subject:** | Conference America - Active Leader Lists |
| **Attachments:** | Conexant Active AlwaysOn Accounts 051605.xls; Conexant Active WebEx Accounts 051605.xls |


Conexant Active
AlwaysOn Accou...


Conexant Active
WebEx Accounts...

Chip,

Conference America our existing provider has executed a clause in there contract to no longer provide services to Conexant at our current rates. Since we have an agreement with Intercall already at competitive rates, I would like to execute getting the people attached reservationless accounts immediately. I will be working internally to get the communications out to the employees about the switch. I would like to have everyone there accounts by July 18 if possible.

Hoang Chung will be your point of contact next week while I am on vacation next week. Brigette - Prior to your vacation I need the spreadsheet above filled in with cost centers and addresses of each employee. This then needs to be sent to Chip Polich so we can set up allocations correctly. I have Chip's e-mail above......

Hoang can be reached at 949-483-5602, I will brief him tomorrow on what we are doing..Don Dykier will be his back-up he can be reached at 949-483-9555. Don is a networking guy but can handle his own so I will brief him as well. just in case.

Brigette will get cost centers etc so we can set-up the billing and allocations. I will be in touch shortly as well to discuss investor relation and all-hands types of calls.

Thanks,

Paul

1

**DEPOSITION
EXHIBIT**

2

Noonan 5/18/06

S&A284

# EXHIBIT 3

## Brigette McNair

| | |
|---|---|
| **From:** | Paul Edge |
| **Sent:** | Wednesday, June 29, 2005 7:47 PM |
| **To:** | Lewis Brewster |
| **Cc:** | Jeff Reid; Brigette McNair; Hoang Chung; Tom Noonan; Dolores Sylvester |
| **Subject:** | Conference America |

Lewis,

We have a critical issue with our current conferencing vendor - ( Conference America ). Due to our recent negotiations with them and other providers they have executed an out clause within there contract, giving Conexant a 15 day notice that they will no longer support Conexant at our current negotiated pricing. Basically they are telling Conexant that they no longer want to provide us with services. There seems to be no rational reason behind this except that they are angry with us for reviewing our rates and services with other audio companies. We have not notified them that we are switching providers either. Tom Noonan and I have tried several times to contact them with no response since the notice.

Tom and I have already finalized the contract with intercall and can begin executing on a plan to transition over to them from Conference America but it will need to be done quickly since we only have 15 days. If we do not convert everyone in 15 days, Conference America will continue to provide service but at a very high rate - .05 per minute to .45 a minute.

The transition should be pretty painless because I had already qualified investor relations, all-hands, sales training and the on-demand conferencing. It is simply a convenience issue to the end-user.

I can get everything transitioned and we can allow some overflow at the premium rates if necessary to ease the transition.

We need to move quickly or pay the higher rate, I think we should begin a communication to the users that Conference America has decided to no longer support Conexant and we have selected a new provider at the same time we can introduce all the new features such as local numbers in all of Conexant's primary regions such as Europe, India, US, China, Taiwan etc.

What are your thoughts on this - Should we pay the premium and take some time to transition or should we move quickly and educate the users on what we are up against ?

I hate to throw this on you but I am on vacation next week and would like to get the wheels moving quickly to avoid the large increase in costs ?

The good news is that once we are completed all the echo issues, local numbers for international will be in place so we will have a much better service provider as an FYI - Please advise accordingly -

Best Regards,
Paul Edge
Program Manager, IT Ops
949-483-4114 T
949-483-5060 F
949-633-9768 C

4/12/2006

DEPOSITION
EXHIBIT
3
Noonan 5/18/06

S&A335

# EXHIBIT 4

**Brigette McNair**

| | |
|---|---|
| **From:** | Paul Edge |
| **Sent:** | Wednesday, June 29, 2005 8:35 PM |
| **To:** | Chris Gorciak |
| **Cc:** | Jeff Reid; Hoang Chung; Brigette McNair |
| **Subject:** | Conferencing Transition |

Chirs, Per our conversation - Here is what has happened -

Conference America has executed a clause in our contract basically, no longer offering the negotiated rates and increasing our costs 9x what it currently is ? We believe this was done out of anger due to us signing a new agreement within our Webex application. ( You word this )

Based on the increase in pricing we are moving forward quickly to transition over to Intercall our new provider. Intercall is one of the world's largest conferencing providers and will enable us to perform conferencing on a global basis. This will also allow Conexant a substantial costs savings as well from our current rates and especially against the new rates that Conference America will be charging.

Intercall adds substantial value:

20% overall reduction in costs
Local Phone numbers for countries such as India, China, Europe, Korea, Taiwan, and Tokyo
International Bridges throughout Asia and Europe which enhances call quality and avoids echo and other issues when on transatlantic conferences.


Transitional Issues is that due to the timing this will be a hot-cut and not much time for  transition so we need to ask users for there up most support and make them understand that this is being forced from the vendor and not It but the silver lining is all the things above -

Training will be provided via on-site and documentation.


Hopefully this will get you started -

Best Regards,
Paul Edge
Program Manager, IT Ops
949-483-4114 T
949-483-5060 F
949-633-9768 C



DEPOSITION
EXHIBIT
4
Nonan 5/18/06

S&A336

# EXHIBIT 5

**Brigette McNair**

| | |
|---|---|
| **From:** | Paul Edge |
| **Sent:** | Tuesday, July 12, 2005 8:46 PM |
| **To:** | Admin Professionals-CNXT ALL |
| **Cc:** | Jeff Reid; Veena Gowda; Tom Noonan; Brigette McNair; Hoang Chung |
| **Subject:** | Conferencing Provider Change |

Professional Admins-

I wanted to let you all know that we have provisioned the new conferencing accounts with our new provider Intercall. Upon receipt of these account you can begin using them immediately. All lines have been provisioned to allow 25 users on each conference call. If you host a conference with 25 or more people just let me know and I will get the ports increased immediately.

Many of you have already recieved notification from Intercall, Please disregard this first notice, They used a ten digit code when I had requested that everyone's code match there telephone number for ease of rememberance. You will recieve a new notification in the next 24 hours. This will have your toll-free number and conference code. The conference code will be your telephone number or the user's telephone number that you support.

Immediately upon recieving your new code or your bosses new code, Please discontinue any use with Conference America. Remember your new code can be used immediately upon receipt and Conference America should no longer be used.

Due to the sensitivity of cost here, We will issue the new codes first and training will be issued a few days later . Please let me know if you have any concerns and once again I do appreciate your paitience during this transition.

I will be in touch shortly with training dates and options -

Best Regards,
Paul Edge
Manager
Telecom and Networking
949-483-4114 T
949-483-5060 F
949-633-9768 C

4/12/2006



DEPOSITION EXHIBIT
5
Noonan 5/18/06

S&A338