IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CONFERENCE AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| | ) | FILE NO: |
| v. | ) | 2:05cv1088-WKW |
| | ) | |
| CONEXANT SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## CONFERENCE AMERICA'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Conference America, Inc. ("Conference America") respectfully moves for summary judgment against Conexant Systems, Inc. ("Conexant") for the reasons discussed below.

## I.    INTRODUCTION

This is a breach of contract case arising from Conexant's refusal to pay for conference calling services provided to it by Conference America. Conexant's breach of unilateral contracts between the parties has damaged Conference America in the amount of $195,979.79 in unpaid charges for services rendered from July 11-31, 2005, plus interest, attorney's fees, and expenses incurred in collecting that amount. Based on the undisputed facts of record, Conference

America is therefore entitled as a matter of law to recover these amounts from Conexant.

## II.    ISSUES

In deciding this motion, the Court need only address the following two issues:

1. Following termination of the parties' Price Protection Agreement, was Conexant obligated to pay Conference America's standard pricing for services requested by Conexant and furnished by Conference America?

2. By failing to pay Conference America's invoice for such post-termination services when due, did Conexant become liable to Conference America for the amount of such invoice, plus interest, cost of suit, and attorney's fees?

The answer to both questions is yes.  A unilateral contract arises when one party makes an offer, and another party accepts by performing an act.  Performance constitutes both acceptance of that offer and consideration.  Following termination of special pricing provided by a "Price Protection Agreement," the parties entered into unilateral contracts for various post-termination services, with the prices for such services being explicitly set at Conference America's standard terms in effect at the time each service was performed.  Once Conexant used each service, it became obligated to pay for it at the applicable standard price.  By failing to pay for such services when billed, Conexant also became liable pursuant to Conference America's standard terms for interest, cost of suit, and attorney's fees.

### III.    UNDISPUTED FACTS

**A.    Conference America**

Conference America provides telephonic and internet-based teleconferencing services.[1]  Such services are normally provided pursuant to Conference America's standard terms and conditions, which are posted on its website, http://www.yourcall.com, under the link "Services Terms & Conditions."[2]  Prices for some services are posted on the website; other prices are available by contacting Conference America directly.[3]

Under normal circumstances, a customer wishing to use Conference America's services simply contacts Conference America, uses the services, and pays for them according to the website terms and prices.[4]  For certain customers, particularly high-volume users of teleconferencing services, Conference America will discount its standard pricing through individualized Price Protection Agreements.[5]  These Price Protection Agreements are drafted to override the standard terms and prices to the extent they specify different terms or prices.[6]  Price Protection Agreements are usually made effective for a fixed period, and are

---

[1] (Verified Complaint ¶ 14.)
[2] (See Conference Am. Inc., "Services Terms and Conditions" ¶ 5a, printed from its website, http://www.yourcall.com, July 25, 2005, a true and correct copy of which is attached to the Verified Complaint as Ex. A.)
[3] (Id. ¶ 5a.)
[4] (Verified Complaint ¶ 15; see Ex. A to the Verified Complaint.)
[5] (Verified Complaint ¶ 16.)
[6] (See id.; Aug. 1, 1999 Price Protection Program, a true and correct copy of which is attached to the Verified Complaint as Ex. B.)

usually subject to termination upon notice.[7]  Upon expiration or termination, terms and prices revert to the standard terms and prices.[8]  Even where a Price Protection Agreement is in place, it usually provides that services not given a special price therein will be provided at Conference America's standard prices existing at the time each service was rendered.[9]

## B.    The Conexant Price Protection Agreement

Conexant has been a high-volume user of Conference America's conferencing services, ultimately having approximately 1,778 separate "leader accounts" with Conference America for Conexant's officers, managers, and other employees around the world.[10]  Conexant and Conference America entered into a Price Protection Agreement on August 1, 1999, that allowed Conexant to purchase Conference America's services for prices lower than Conference America's standard prices.[11]  Either party had the right to terminate the Price Protection Agreement at any time, with or without cause, with the termination effective on 15 days' notice.[12]  The parties amended the Price Protection Agreement twice,

---

[7] (See id. at 1.)
[8] (See id.; see also Verified Complaint ¶ 15.)
[9] (See Dec. 1, 2003 Amendment to Aug. 1, 1999 Price Protection Program Agreement, a true and correct copy of which is attached to the Verified Complaint as Ex. D, at Attach. A-3.)
[10] (See Deactivation Fee Detail, a true and correct copy of which is attached to the Verified Complaint as Ex. DD.)
[11] (See Ex. B.; compare Ex. A to the Verified Complaint ¶ 5a with Ex. B to the Verified Complaint, Attach. A.)
[12] (Ex. B to the Verified Complaint, at 1.)

ultimately extending it until November 1, 2005.[13]  The second amendment

reaffirmed the 15-day, no-cause-required termination provision.[14]

## C.    Conference America Terminates The Price Protection Agreement.

On June 24, 2005, Conference America terminated the Price Protection

Agreement by letter delivered by confirmed overnight delivery on June 25, 2005.[15]

Pursuant to Section 4 of the Price Protection Agreement, termination was effective

on July 10, 2005, 15 days following Conexant's June 25 receipt of the letter.[16]

In its June 24 letter, Conference America informed Conexant that "[a]ny

services used or requested by Conexant after termination will be made available

only on and subject to Conference America's standard terms, conditions and prices

effective at the time the services are rendered.  Conference America's Services

Terms & Conditions is available at www.yourcall.com."[17]  These standard prices

were higher than the prices in the Price Protection Agreement.[18]  Conference

America continued to perform services under the Price Protection Agreement until

the agreement terminated on July 10, 2005, and thereafter provided service under

---

[13] (See July 23, 2001 Amendment, a true and correct copy of which is attached to the Verified Complaint as Ex. C; Ex. D.)

[14] (See id. ¶ 4.)

[15] (Letter from Bob Pirnie to Tom Noonan (June 24, 2005), a true and correct copy of which is attached to the Verified Complaint as Ex. K.)

[16] (See id.; Ex. D to the Verified Complaint ¶ 4.)

[17] (Ex. K to the Verified Complaint.)

[18] (Compare Ex. A to the Verified Complaint ¶ 5a, with Ex. D to the Verified Complaint, Attach. A.)

the standard terms and prices without interruption.[19]  All post-termination services

were performed at the specific request of Conexant by means of the initiation of

conference calls and other usage of services by Conexant's officers, managers, and

other employees.[20]

## D.    Conexant Makes Internal Decisions About The New Pricing.

In a series of emails sent on June 29, 2005, Conexant personnel

communicated with each other about the impact of termination on pricing, and on

the timing of the new price increase.[21]  These emails show that Conexant was well

aware that termination would be effective 15 days after notice, and that the

discounted rates under the Price Protection Agreement would no longer apply.[22]

---

[19] (See Ex. K; E-mail from Zach Vogelgesang, Sales Administrator, Conference Am., Inc., to Tom Noonan (July 7, 2005, 5:59 p.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. L; Email from Rob Pirnie to Paul Edge, Melissa Spence, Brigette McNair, Jason Shanks, Tom Noonan, Bob Pirnie, and Robert P. Williams II, Counsel for Conference Am., Inc. (July 19, 2005, 5:51 p.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. O; Email from Paul Edge to Rob Pirnie, Melissa Spence, Brigette McNair, Jason Shanks, Tom Noonan, Bob Pirnie, and Robert P. Williams II, Esq., (July 20, 2005, 12:20 a.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. P; Letter from Bob Pirnie to Paul Edge and Tom Noonan (July 26, 2005), a true and correct copy of which is attached to the Verified Complaint as Ex. U; Invoice No. 119266A Detailed Billing Spreadsheet, Calls Under Contractual Terms July 1-10, 2005, a true and correct copy of which is attached to the Verified Complaint as Ex. Y; Invoice No. 119266B Detailed Billing Spreadsheet, Calls Under "Website Events Terms & Conditions," July 11-31, 2005, a true and correct copy of which is attached to the Verified Complaint as Ex. Z; Letter from Bob Pirnie to Tom Noonan (Oct. 21, 2005), a true and correct copy of which is attached to the Verified Complaint as Ex. GG; Deposition of Tom Noonan, at Exs. 2-3, attached to this Brief as Ex. 1.)

[20] (See Ex. Z to the Verified Complaint; Ex. DD to the Verified Complaint; Ex. GG to the Verified Complaint; Letter from Tom Noonan to Bob Pirnie (Nov. 3, 2005), a true and correct copy of which is attached to the Verified Complaint as Ex. HH; Noonan Dep., attached to this Brief as Ex. 1, at Ex. 3.)

[21] (Id. at Exs. 2-4.)

[22] (See id.)

They also show that Conexant planned to pay the increased prices as it transitioned from Conference America to its other conferencing vendor.[23]  For example, in the June 29 emails, Conexant's Program Manager, IT Operations, made the following statements:

> "Conference America has executed a clause in our contract basically, no longer offering the negotiated rates and increasing our costs 9x what it currently is?"[24]

> "We have a critical issue with our current conferencing vendor - (Conference America).  Due to our recent negotiations with them and other providers they have executed an out clause within there [sic] contract, giving Conexant a 15 day notice that they will no longer support Conexant at our current negotiated pricing."[25]

> "Tom and I have already finalized the contract with Intercall and can begin executing on a plan to transition over to them from Conference America but it will need to be done quickly since we only have 15 days.  If we do not convert everyone in 15 days, Conference America will continue to provide service but at a very high rate - .05 per minute to .45 a minute."[26]

> "I can get everything transitioned and we can allow some overflow at the premium rates if necessary to ease the transition."[27]

**E.    Conexant Acknowledges Termination, Asks Conference America To Deactivate All Accounts, And Disputes Conference America's Bills.**

In a July 15, 2005, letter, Conexant acknowledged Conference America's termination of the Price Protection Agreement in accordance with Conference

---

[23] (See id.)
[24] (Id. at Ex. 4.)
[25] (Id. at Ex. 3.)
[26] (Id.)
[27] (Id.)

America's contractual right to do so.[28]  Conexant stated that it expected

Conference America to "honor our pricing for 15 business days" until July 15,

2005, and instructed Conference America to make all Conexant accounts inactive

as of July 31, 2005.[29]  (Of course, in its June 29 internal correspondence, Conexant

indicated that it was well aware that the period was 15 days, not 15 <u>business</u>

days.[30])  Conexant also stated that as of August 1, 2005, it would no longer pay for

services provided on or after that date.[31]

On July 19, 2005, Conexant acknowledged by emails to Conference

America and others that Conference America had terminated the Price Protection

Agreement, thus raising the prices for Conference America's services.[32]  In

contrast to its June 29 internal correspondence, in which Conexant knew exactly

the timing and amount of the price increase, Conexant now feigned confusion

about the precise termination date and the new pricing, and refused to pay for any

---

[28] (Letter from Tom Noonan to Bob Pirnie (July 15, 2005), a true and correct copy of which is attached to the Verified Complaint as Ex. M.)

[29] (<u>Id.</u>)

[30] (Noonan Dep., attached to this Brief as Ex. 1, at Ex. 3.)

[31] (Ex. M to the Verified Complaint.)

[32] (<u>See</u> Email from Paul Edge, Program Manager, IT Ops, Conexant Sys., Inc., to Melissa Spence; Brigette McNair; Rob Pirnie; Jason Shanks, Sales Administrator, Conference Am., Inc.; Tom Noonan; and Bob Pirnie (July 19, 2005, 3:13 p.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. N.)

pre- or post-termination service until Conference America responded.[33]

Meanwhile, Conexant continued to use Conference America's services.[34]

**F.  Conference America Explains The Termination Provision, Again Refers Conexant To The Website, And Invites Conexant To Inquire About The Price Of Any Service.**

On that same day, July 19, 2005, Conference America reconfirmed to Conexant that the Price Protection Agreement had terminated effective July 10 (not July 15 as Conexant had suggested in its July 15 letter), and that the prices for Conference America's services provided to Conexant after that date could be found on Conference America's website.[35]  Conference America also informed Conexant that if Conexant had a specific question about the price for any service not shown on the website, it should submit the question in writing, and Conference America would respond.[36]

**G.  Conexant Acknowledges Termination, Takes Its Bills Out Of Dispute, And Again Asks Conference America To Disconnect All Accounts.**

On July 20, 2005, through a series of emails, Conexant acknowledged that: (1) Conference America had answered its pricing question; (2) Conexant would take its Conference America bills out of dispute and pay them; and (3) Conference

---

[33] (Ex. N to the Verified Complaint; compare Ex. N to the Verified Complaint with Noonan Dep., attached to this Brief as Ex. 1, at Ex. 3.)
[34] (See Ex. Z to the Verified Complaint.)
[35] (See Ex. O.)
[36] (Id.)

America's price increase had occurred on July 10.[37]  In addition, Conexant again

requested that all of Conexant's accounts be disconnected and terminated as of

July 31.[38]

**H.    Conference America Confirms That It Will Perform The Account-Deactivation Service, And Urges Conexant To Review The Standard Terms On The Website.**

In a July 26, 2005 letter, Conference America again confirmed to Conexant

that the Price Protection Agreement had been terminated according to its terms,

with the termination effective July 10.[39]  Conference America reminded Conexant

that any services that Conexant used after that date would be covered by the

Services Terms and Conditions, including price terms, on Conference America's

website.[40]  Conference America also reminded Conexant that, although Conexant

could stop using Conference America's services at any time, Conexant would still

be responsible for paying for any services it did use.[41]  Conference America further

confirmed that account deactivation was a service Conference America offered,

---

[37] (Ex. P; Email from Paul Edge to Rob Pirnie, Jason Shanks, Will McQueen, Bob Pirnie, Robert P. Williams II, Esq., Greg Folkes, Reed Karle, and Jeff Reid (July 20, 2005, 2:11 p.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. Q.)

[38] (See Ex. Q.; email from Paul Edge to Tom Noonan and Rob Pirnie (July 20, 2005, 2:23 p.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. R; email from Paul Edge to himself, Rob Pirnie, Jason Shanks, Will McQueen, Bob Pirnie, Robert P. Williams II, Esq., Greg Folkes, Reed Karle, Jeff Reid, and Tom Noonan (July 20, 2005, 4:21 p.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. S; see also email from Paul Edge to Melissa Spence, Rob Pirnie, and Tom Noonan (July 20, 2005, 4:28 p.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. T.)

[39] (Ex. U.)

[40] (Id.)

[41] (Id.)

and agreed, per Conexant's requests, to deactivate all of Conexant's conferencing accounts effective August 1.[42]  Conference America also urged Conexant to review the website terms and prices.[43]  Conference America saved a printout of its website Services Terms and Conditions on July 25, 2005, which clearly shows the applicable deactivation fee of $74.95 per account and the prices for other services Conexant was using.[44]

## I.  Conexant Attempts To Change Its Story And The Prices Retroactively.

In a letter dated July 28, 2005—eighteen days after the Price Protection Agreement had already terminated—Conexant informed Conference America that it had not reviewed Conference America's website terms and conditions, and that it did not agree to "any new terms governing our relationship."[45]  Instead, Conexant stated that "we continue to operate under the [Price Protection Agreement]."[46]  Conexant did not cite any contractual basis for this position, and these statements were contradicted by Conexant's earlier written acknowledgements that the Price Protection Agreement had terminated July 10, resulting in price increases.[47]

---

[42] (Id.)
[43] (Id.)
[44] (Ex. A to the Verified Complaint (see lower right-hand corner on page 1, and ¶ 5a).)
[45] (Letter from Tom Noonan to Bob Pirnie (July 28, 2005), a true and correct copy of which is attached to the Verified Complaint as Ex. V.)
[46] (Id.)
[47] (Id.; compare Ex. V to the Verified Complaint with both Ex. P to the Verified Complaint, and Noonan Dep., attached to this Brief as Ex. 1, at Exs. 2-4.)

At no time did Conexant ever advise Conference America that Conexant did not want its accounts deactivated.[48]  At no time did Conexant inquire about the price for deactivation or any other specific service.[49]  At no time did Conexant inquire, as Conference America had invited it to do on July 19, about any price not shown on the website.[50]  Meanwhile, throughout the entire post-termination period of July 11-31, 2005, Conexant continued to request and use Conference America's services.[51]

**J.    All Accounts Deactivated; Conexant Refuses To Pay For Conference America's Services.**

Conference America deactivated all Conexant accounts, as requested, as of July 31, 2003.[52]  It submitted its bill for July services on August 2, 2005, in two parts totaling $201,346.32.[53]  Invoice No. 119266A covered pre-termination services for the period of July 1-10, totaling $5,366.53.[54]  Invoice No. 119266B covered post-termination services for the period of July 11-31, totaling $195,979.79, including conferencing services at standard rates and the standard fee, as listed on the website, of $74.95 per deactivated account.[55]  On August 16,

---

[48] (See Ex. V to the Verified Complaint.)
[49] (Id.)
[50] (Id.; Ex. O to the Verified Complaint.)
[51] (Ex. Z to the Verified Complaint.)
[52] (See Ex. DD.)
[53] (See Conference Am., Inc. Invoice No. 119266, Aug. 2, 2005, with detailed billing for July 2005, a true and correct copy of which is attached to the Verified Complaint as Ex. X.)
[54] (See Ex. Y to the Verified Complaint.)
[55] (See Exs. Z and DD to the Verified Complaint.)

2005, Conexant refused to pay Conference America's July invoice.[56]  (Conexant

actually refused to pay a previously submitted June invoice as well, but because

that invoice was finally paid in November, it is not part of this litigation.[57])

Subsequently, on September 7, 2005, Conexant did pay the pre-termination portion

of the bill (for July 1-10) in the amount of $5,366.53.[58]  The remainder, the

$195,979.79 for July 11-31 post-termination services, is the subject of this case.

**K.**    **Further Correspondence Proves Fruitless.**

In an October 5, 2005 letter, Conexant, sent Conference America a check for

$7,060.25, and included a notation on the check purporting to effect a full

release.[59]  Conexant's payment purported to be based on the Price Protection

Agreement rate for per-minute usage, notwithstanding that it was for post-

termination service, and included no payment at all for deactivation.[60]

On October 21, 2005, Conference America responded to Conexant's

October 5 letter, and demanded payment for its services and interest.[61]  Conference

America again reminded Conexant that, following the July 10 termination of the

Price Protection Agreement, Conexant's rates were no longer the discounted rates

---

[56] (See email from Audria Carr, Fin. Dep't, Conference Am., Inc., to Bob Pirnie (Sept. 8, 2005, 10:18 a.m.), a true and correct copy of which is attached to the Verified Complaint as Ex. W.)
[57] (See id.)
[58] (Letter from Tom Noonan to Bob Pirnie (Sept. 7, 2005), a true and correct copy of which is attached to the Verified Complaint as Ex. AA.)
[59] (See letter from Tom Noonan to Bob Pirnie (Oct. 5, 2005), a true and correct copy of which is attached to the Verified Complaint as Ex. EE.)
[60] (See id.)
[61] (Ex. GG to the Verified Complaint.)

appearing in the Price Protection Agreement, but were instead the standard rates appearing on Conference America's website.[62]  Conference America enclosed both a copy of the relevant webpage and a detailed spreadsheet showing the specific charges for each service rendered.[63]  Conference America also informed Conexant that it would not cash Conexant's $7,060.25 check unless Conexant first confirmed that the check was intended as a partial payment, and not as a release.[64]  (Conexant has never made the requested confirmation.[65])  Conference America further informed Conexant that Conexant owed Conference America interest on the outstanding amount, which was accruing at 1.5% per month.[66]  Finally, Conference America reminded Conexant of its obligation to pay Conference America's attorney's fees and costs in the event that collection by litigation became necessary.[67]

On November 3, 2005, Conexant again claimed that it had a right, even after the Price Protection Agreement terminated, to pay for conferencing services at the terminated rates.[68]  Again, Conexant cited no contractual basis for this position.[69]

---

[62] (Id.)
[63] (Id.)
[64] (Id.)
[65] (Verified Complaint ¶ 38.)
[66] (Ex. GG to the Verified Complaint.)
[67] (Id.; see also Ex. A to the Verified Complaint ¶ 5a.)
[68] (Ex. HH to the Verified Complaint.)
[69] (Id.)

To date, Conexant has not paid Conference America for the services that Conexant

used between July 11-31, 2005.[70]

## IV.    ARGUMENT

**A.    After Conference America Terminated The Price Protection Agreement, The Parties Entered Into Binding Unilateral Contracts To Pay Conference America's Standard Price For Each Service That Conexant Used After July 10, 2005.**

### 1.    *Termination*

The December 2003 Amendment to the Price Protection Agreement

explicitly stated that "[e]ither party, with or without cause, may terminate this

agreement at any time upon fifteen (15) days [written] notice."[71]  On June 24,

2005, Conference America notified Conexant in writing that it was terminating the

contract.[72]  Conexant received this notice of termination on June 25.[73]  The

Conexant executive that received the letter acknowledged at his deposition that,

through the letter, Conference America had terminated the Price Protection

Agreement.[74]  Conexant's correspondence at the time also acknowledged this,[75]

and further acknowledged that the effective date of termination was July 10,

2005.[76]

---

[70] (Verified Complaint ¶ 41.)
[71] (Ex. D to the Verified Complaint ¶¶ 4, 10.)
[72] (Ex. K to the Verified Complaint.)
[73] (Id. at 2; Noonan Dep., attached to this Brief as Ex. 1, at 27-28.)
[74] (Id. at 28.)
[75] (Ex. M to the Verified Complaint.)
[76] (Ex. P to the Verified Complaint; see also Exs. O and U to the Verified Complaint.)

Nothing in the Price Protection Agreement or its amendments provides that any part of the contract can survive termination.[77]  And Conference America informed Conexant several times that, following termination of the Price Protection Agreement, Conference America would make its services available to Conexant only under Conference America's standard prices, which could be ascertained by viewing Conference America's website or by submitting a written request for prices.[78]  Thus, both the unambiguous terms of the Price Protection Agreement and the notice of termination stated explicitly that, as of the date of termination, July 10, 2005, the Price Protection Agreement's prices for Conference America services were no longer available to Conexant, and all future services were subject to Conference America's standard prices.

**2.      *The Parties' Formation Of Unilateral Contracts To Pay Conference America's Standard Price For Each Service That Conexant Used After July 10, 2005***

Conference America offered to make its conferencing services available to Conexant, at its standard prices, after the Price Protection Agreement's July 10 termination.  Conexant's use of Conference America's services after that date constituted both acceptance and consideration.  Unilateral contracts were thus formed between the parties for each service rendered.

---

[77] (See Exs. B, C, and D to the Verified Complaint.)
[78] (See Exs. K, O, U, and GG to the Verified Complaint.)

A unilateral contract is one where one party makes an offer, and the other party accepts by performing an act.[79]  The elements are identical to those of a typical contract:  offer, communication, acceptance, and consideration.[80]  In a unilateral contract, "[o]nly one party makes an offer (or promise) which invites performance by another, and performance constitutes both acceptance of that offer and consideration."[81]  A party can assent to unilateral contract terms—the prices of services offered to it, for example—by requesting those services.[82]

In Williams, the plaintiffs opened checking accounts with SouthTrust Bank by executing signature cards containing "change-in-terms" clauses, under which they agreed to be subject to SouthTrust's then-current or subsequently-adopted rules and regulations.[83]  SouthTrust subsequently amended its regulations to include an arbitration clause.[84]  Thereafter, the plaintiffs sued SouthTrust, asserting that it wrongfully generated overdraft charges by systematically honoring their largest checks prior to paying multiple smaller checks.[85]  SouthTrust moved to

---

[79] SouthTrust Bank v. Williams, 775 So. 2d 184, 188 (Ala. 2000).
[80] Brannan & Guy, P.C. v. City of Montgomery, 828 So. 2d 914, 922 (Ala. 2002).
[81] Williams, 775 So. 2d at 188 (quoting Johns v. Thomas H. Vaughn & Co., 38 So. 2d 19, 20 (1948)).
[82] See id. at 189.
[83] Id. at 185.
[84] Id. at 186.
[85] Id.

compel the plaintiffs to arbitration.[86]  After the trial court denied SouthTrust's

motion, it appealed.[87]

On appeal to the Supreme Court of Alabama, the plaintiffs argued that the

arbitration clause did not apply to them because they had not expressly assented to

it, and that "mere failure" to object to it could not be construed as an acceptance.[88]

The Supreme Court determined that the outcome of the case turned upon the legal

effect of the plaintiffs' continued use of the checking accounts after SouthTrust

amended its regulations to include the arbitration clause.[89]  Specifically, because

the plaintiffs "took no action that could be considered inconsistent with an assent

to the arbitration provision," but instead "continued the business relationship [with

SouthTrust] after the interposition of the arbitration provision . . . they implicitly

assented to the addition of the arbitration provision."[90]

Williams thus involved a party's assent to unilateral amendments to an

existing agreement by that party's continued use of the other party's services.

Although the unilateral contracts in this case arose only after the Price Protection

Agreement terminated, Williams nevertheless applies because it holds that a

party's continued use of another party's services after the other party makes those

---

[86] Id.
[87] Id.
[88] Id. at 187.
[89] Id. at 187-88 ("This case involves at-will, commercial relationships, based upon a series of unilateral transactions.").
[90] Id. at 189.

services available only under certain conditions constitutes assent to a binding unilateral contract—i.e., constitutes assent to receive those services pursuant to those conditions.

Another unilateral-contract case decided last year by the United States District Court for the Southern District of Illinois, <u>Crawford v. Talk America, Inc.</u>,[91] involved facts nearly identical to those of this case.  In <u>Talk America</u>, the plaintiff, Crawford, signed up for telephone service with Talk America, Inc.[92] During this process, Talk America informed Crawford that she could review the service terms and conditions of her Talk America account at Talk America's website, and that she was also free to call, email, or write to Talk America with any questions about her account.[93]  The service terms and conditions included an arbitration clause.[94]

Crawford subsequently sued Talk America, alleging that it had attempted to bill her for unreasonable rate overcharges.[95]  Relying on the arbitration clause in the service terms and conditions, Talk America moved to compel Crawford to

---

[91] No. 05-CV-0180-DRH, 2005 U.S. Dist. LEXIS 23181 (S.D. Ill. Oct. 6, 2005).
[92] <u>Id.</u> at *6.
[93] <u>Id.</u> at *9.
[94] <u>Id.</u> at *10.
[95] <u>Id.</u> at *2.

arbitrate her claims.[96]  Crawford opposed the motion, contending that she never received or was able to access Talk America's terms and conditions.[97]

The court found that a contract, subject to Talk America's terms and conditions, existed between the parties, and ordered Crawford to arbitration.[98]  It noted that Talk America's service was not "free or without restrictions."[99]  Instead, by using the service, Crawford had "indicated her willingness to contract" according to Talk America's terms and conditions.[100]  The terms and conditions "between Crawford and Talk America 'constituted an offer' and Crawford's continued use of Talk America's services constituted an acceptance" of the service terms and conditions.[101]  Consideration existed because, in exchange for Crawford's acceptance of the terms and conditions, Talk America agreed to provide continued services.[102]

Other courts have also recently determined that a unilateral contract can exist, subject to service terms and conditions, as a result of a party's continued use of another party's services.[103]  For instance, in Boomer v. AT&T Corp., AT&T

---

[96] Id. at *3-*5.
[97] Id. at *5.
[98] Id. at *11-*15.
[99] Id. at *13.
[100] Id. at *13-*14.
[101] Id. at *14.
[102] See id. at *12.
[103] Boomer v. AT&T Corp., 309 F.3d 404, 414-17 (7th Cir. 2002); Rivera v. AT&T Corp., 420 F. Supp. 2d 1312, 1320-21 (S.D. Fla. 2006) (finding that AT&T's service terms and conditions bound plaintiffs because of their continued use of AT&T's services after AT&T mailed the terms

sent the plaintiff a customer service agreement that included an arbitration clause.[104] The service agreement provided that it would take effect if the plaintiff used AT&T's services.[105] He did.[106] After the plaintiff sued AT&T for overcharging him for contributions to the federal Universal Services Fund, the Seventh Circuit compelled the plaintiff to arbitration because, it found, the service agreement was a valid contract, and the plaintiff's continued use of the services was an acceptance of that contract.[107]

The facts of this case dictate an identical result. Conference America repeatedly informed Conexant that, after the termination of the Price Protection Agreement, all post-July 10, 2005 services would be available to Conexant under Conference America's standard terms, conditions, and prices.[108] This was an offer.[109] Conference America also repeatedly informed Conexant where those

---

and conditions to them); Chandler v. AT&T Wireless Servs., Inc., 358 F. Supp. 2d 701, 704 (S.D. Ill. 2005) (finding that plaintiff's use of AT&T's phone services after receiving copy of terms and conditions constituted an acceptance of "the offered services and the terms and conditions under which they were offered."); Schultz v. AT&T Wireless Servs., Inc., 376 F. Supp. 2d 685, 691-92 (N.D. W. Va. 2005) (finding that, when plaintiff activated and continued to use his cellular phone, he accepted terms and conditions contained in a "Welcome Guide" that accompanied the phone, thus creating a binding unilateral contract subject to those terms and conditions); Briceno v. Sprint Spectrum, L.P., 911 So. 2d 176, 177-78, 180 (Fla. Dist. Ct. App. 2005) (compelling arbitration of plaintiff's claims against phone company in accordance with arbitration clause added to terms and conditions available on the defendant's website after the plaintiff purchased her phone).
[104] 309 F.3d at 409.
[105] Id.
[106] Id. at 410.
[107] Id. at 414-17.
[108] (Exs. K, O, and U to the Verified Complaint.)
[109] Crawford, 2005 U.S. Dist. LEXIS 23181, at *14.

terms and prices could be found (its website), and offered to answer any written questions concerning any price not shown on the website.[110]  Conexant accepted the offer and assented to Conference America's terms and prices by continuing to use Conference America's services after July 10.[111]  In fact, on several occasions Conexant expressly acknowledged that the Price Protection Agreement had been terminated and that prices after July 10 would increase.[112]

The only statements Conexant ever made during the July 11-31 period that were in any way inconsistent with the new price terms were not made until its July 28, 2005 letter, when it asserted (in contradiction to its numerous prior statements) that the only prices it had agreed to were those in the Price Protection Agreement.[113]  During his deposition, the author of this letter testified that Conexant's sole basis for this position was the "Entire Agreement" clause on page 13 of the Price Protection Agreement.[114]  This clause is a traditional merger clause that simply says the Price Protection Agreement supersedes prior agreements and can be modified only in writing.[115]  This clause pertains by its very terms only to the Price Protection Agreement and was terminated along with the rest of that

---

[110] (Exs. K, O, and U to the Verified Complaint.)
[111] Boomer v. AT&T Corp., 309 F.3d at 414-17; Crawford, 2005 U.S. Dist. LEXIS 23181, at *14.
[112] (Ex. P to the Verified Complaint; Noonan Dep., attached to this Brief as Ex. 1, at Exs. 3-4.)
[113] (Ex. V to the Verified Complaint.)
[114] (Noonan Dep., attached to this Brief as Ex. 1, at 44-45, 48-50, 84-85.)
[115] (See, e.g., Ex. D to the Verified Complaint ¶ 15.)

agreement as of July 10, 2005.  It did not purport to apply to any post-termination agreement of any kind.

Conexant's July 28 effort to apply the Price Protection Agreement to post-termination services was thus contradicted by Conexant's own prior statements and by the language of the Price Protection Agreement itself.  Moreover, the July 28 letter was sent after virtually all of Conexant's post-termination conference calls had already been completed by Conference America.[116]  Finally, even ignoring lack of factual or legal foundation, the July 28 letter, by its own terms, could not have affected the deactivation fee of $74.95 per account.  That fee was not one of the prices discounted by the Price Protection Agreement and therefore was expressly stated by the Price Protection Agreement to be subject to Conference America's "Standard Prices effective at the time services are rendered."[117]

A binding unilateral contract between the parties was therefore formed for each post-July 10 service rendered by Conference America, and the price terms were Conference America's standard rates.

**B.    Conexant Breached The Parties' Unilateral Contracts For Post-July 10, 2005 Services By Using Those Services, But Refusing to Pay Conference America's Standard Prices For Them.**

The parties entered into a series of unilateral contracts for Conference America's post-July 10, 2005 rendition of services to Conexant.  Conference

---

[116] (See Ex. Z to the Verified Complaint.)
[117] (See Ex. D to the Verified Complaint, Attach. A, at A-1 to A-3.)

America offered to perform post-July 10 services at its standard prices. Conexant's voluntary use of those services after receiving explicit notice of this constituted an acceptance of the offer—i.e., Conexant agreed to pay for the services at the standard prices.

The total charge for Conference America's post-July 10 services was $195,979.79.[118]  Conexant has refused to pay this amount, thus damaging Conference America.[119]  Conexant is therefore in breach of contract.

**C.    Conexant Is Liable To Conference America For $195,979.79, Plus Interest, Attorney's Fees, And Costs.**

Conexant is liable to Conference America for $195,979.79 in unpaid service charges.  Because such amount is past due and Conference America has had to seek recovery through litigation, Conexant is also liable to Conference America for interest, attorney's fees, and costs.

Paragraph 5a of Conference America's Services Terms and Conditions informs users of Conference America's services, including Conexant, that "[y]ou will reimburse us for all expenses and legal fees incurred by us in enforcing our rights under the Agreement."[120]  To date, Conference America has incurred significant legal fees in enforcing its rights to be paid.  Pursuant to the terms of the unilateral contracts in effect between the parties, Conference America is thus

---

[118] (Exs. Z and DD to the Verified Complaint.)
[119] (Exs. W, EE, HH to the Verified Complaint.)
[120] (Ex. A to the Verified Complaint ¶ 5a.)

entitled to recover its expenses and legal fees in this case.  Conference America

will, at the Court's convenience, submit evidence of the total amount of the

attorney's fees and expenses that it seeks to recover.

Conference America is also entitled to collect interest from Conexant on past

due amounts.  Paragraph 5b of the Services Terms and Conditions informs users of

Conference America's services, including Conexant, that "[i]f you do not pay any

amount when due, then you will pay us interest of 1.5% per month on all such

overdue amounts until paid."[121]  Conexant's bill for Conference America's post-

July 10 services has been due since August 22, 2005.[122]  Conference America is

therefore entitled to recover interest on the past due amount and will, at the Court's

convenience, submit evidence of the total amount of interest due from Conexant.

## V.    CONCLUSION

The undisputed facts show, as a matter of law, that:

1. Conference America lawfully terminated the Price Protection Agreement, effective July 10, 2005; that Conexant used Conference America's services after July 10 with full knowledge that those services were subject to Conference America's standard terms, conditions and prices; and that the parties thus formed unilateral contracts under which Conference America would provide services at Conexant's request, and Conexant would pay Conference America's standard prices for each service; and

2. Despite its post-July 10 use of Conference America's services and its knowledge that those services would be subject to Conference America's

---

[121] (Id. ¶ 5b.)
[122] (Ex. GG to the Verified Complaint.)

standard prices, Conexant has refused to pay the appropriate prices, thus breaching the parties' unilateral contracts and causing damage to Conference America for which Conference America is entitled to recover $195,979.79 plus attorney's fees, expenses, and interest.

For these reasons, Conference America respectfully requests that the Court grant

Conference America's Motion for Summary Judgment.

      This 21st day of June 2006.

                            TROUTMAN SANDERS LLP


                            /s/ Thomas E. Borton IV
                            Thomas E. Borton IV (BOR011)

5200 Bank of America Plaza         Attorney for Plaintiff Conference
600 Peachtree Street, N.E.           America, Inc.
Atlanta, GA  30308-2216
(404) 885-3000 (telephone)
(404) 962-6664 (fax)

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CONFERENCE AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| | ) | FILE NO: |
| v. | ) | 2:05cv1088-WKW |
| | ) | |
| CONEXANT SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2006, I caused a copy of the foregoing to be

mailed to the following via efile:


W. Stancil Starnes, Esq.
Joseph S. Miller, Esq.
Alicia M. Harrison, Esq.
Starnes & Atchison LLP
Post Office Box 598512
Birmingham, AL 35259-8512


/s/ Thomas E. Borton IV
Thomas E. Borton IV (BOR011)