IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CONFERENCE AMERICA, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| ) | FILE NO: |
| v. ) | 2:05cv1088-WKW |
| ) | |
| CONEXANT SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |

## CONFERENCE AMERICA'S RESPONSE IN OPPOSITION TO CONEXANT'S MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

As Conexant correctly notes, this is a simple breach of contract case. The case is well-suited for summary judgment, there being no dispute as to the material facts. These facts are set out in Conference America's brief in support of its own Motion for Summary Judgment, and may be summarized as follows:

- Conference America and Conexant were parties to a Price Protection Agreement that allowed Conexant to purchase certain types of conferencing services from Conference America at a discount.[1]

- Conference America terminated the Price Protection Agreement effective July 10, 2005.[2]

---

[1] (Exs. B, C, and D to the Verified Complaint.)
[2] (Exs. K, O, U to the Verified Complaint; see also Def.'s Mot. for Summ. J. at 2, 15, 17 (agreeing that Conference America terminated the Price Protection Agreement through its June

- The Price Protection Agreement specifically stated that its discounted price terms applied only "[d]uring the term of this Agreement."[3]

- Conference America told Conexant in writing on several occasions both before and after July 10, 2005, that it would continue to provide Conexant with conferencing services, but only at Conference America's standard terms, conditions, and prices, as shown on its website.[4]

- Conexant continued to use Conference America's services after the July 10 termination until July 31, 2005, when all of Conexant's conferencing accounts were deactivated pursuant to Conexant's prior written request.[5]

- Conexant's internal and external correspondence shows that Conexant knew that its post-termination usage would be at higher prices than those under the terminated Price Protection Agreement.[6]

- The termination letter, the website terms, and for that matter the Price Protection Agreement itself, clearly state that the applicable price was the price in effect at the time the service was rendered. The prices billed to Conexant, which Conexant has refused to pay, were in fact Conference America's Standard Prices in effect at the time each post-termination service was rendered.[7]

- Conexant did not communicate any disagreement whatsoever regarding Conference America's Standard Prices until August 1, 2005–the day after all services had been rendered and all accounts deactivated.[8]

---

24, 2005 letter, attached to the Verified Complaint as Ex. K); Def.'s Resp. to Pl.'s First Req. for Admis. No. 1, attached to this Response as Ex. 1.)

[3] (Ex. D to the Verified Complaint ¶ 3.)

[4] (See Exs. K, O, U, and GG to the Verified Complaint; Def.'s Resp. to Pl.'s First Req. for Admis. No. 2, attached to this Response as Ex. 1.)

[5] (See Exs. M, Q, R, S, T, Z, and DD to the Verified Complaint; Deposition of Paul Edge, Program Manager, IT Ops, Conexant Sys., Inc., attached to Conexant's Mot. for Summ. J. as Ex. 6, at 43.)

[6] (See Exs. N and P to the Verified Complaint; Deposition of Thomas Noonan, Director, Strategic Sourcing, Conexant Sys., Inc., attached to Conexant's Mot. for Summ. J. as Ex. 5, at Exs. 3-4.)

[7] (Exs. A ¶ 5a, D (at Attach. A, p. A-3), and K to the Verified Complaint.)

[8] (See Exs. V, Z, and DD to the Verified Complaint; see also Def.'s Resp. to Pl.'s Third Req. for Produc. of Docs., attached to this Response as Ex. 2 (demonstrating that Conexant did not send its July 28 letter indicating that it did not agree to new service terms and conditions until July 29,

Conexant's Motion for Summary Judgment rests on the proposition that a "merger clause" in the terminated Price Protection Agreement somehow not only survived termination, but also (1) caused the price terms to survive, and (2) precluded the parties from entering into new post-termination unilateral contracts. This argument is contradicted by the language of the Price Protection Agreement itself, by applicable law, and even by Conexant's own internal and external correspondence. Conexant also makes an ancillary argument based on an alleged lack of mutuality of assent, which is contrary to the well-established law of unilateral contracts and is also belied by the undisputed facts.

Under applicable law, the discounted pricing under the Price Protection Agreement ended when the Agreement terminated. Binding unilateral contracts were then formed between Conexant and Conference America for post-termination services. The terms of those unilateral contracts were Conference America's standard terms as found on its website. Because Conexant has not paid in accordance with such terms, it is in breach of contract and is liable to Conference America for the price of the services rendered, interest on that amount, and attorney's fees incurred in collecting that amount. The Court should therefore

---

and that that letter did not arrive until August 1, after Conference America had performed all services for Conexant that are currently in dispute).)

deny Conexant's Motion for Summary Judgment and grant Conference America's Motion for Summary Judgment.

## II. ARGUMENT

**A. The Merger Clause In The Price Protection Agreement Has No Relevance To Post-Termination Pricing.**

Conexant's primary argument relies on the notion that the Price Protection Agreement's merger clause caused the discounted prices under that Agreement to survive for as long as the accounts created under that Agreement remained in existence. In other words, Conexant argues that the merger clause somehow caused the discounted prices to survive and govern indefinitely, regardless of termination or expiration of the rest of the Price Protection Agreement, until the accounts themselves were deactivated. This is indeed a novel argument. The problem is that it has no support in the contract language or in applicable law.

The Price Protection Agreement says absolutely nothing about any price term surviving termination. The merger clause itself, as it appeared in the original 1999 Agreement, simply states:

> This Agreement constitutes the entire agreement of the parties hereto concerning the subject matter hereof and supersedes any prior oral or written agreements pertaining to the subject matter of this Agreement. This Agreement shall not be amended or modified except by a writing signed by Conference America and the Customer.[9]

---

[9] (Ex. B to the Verified Complaint at 13.)

When the Price Protection Agreement was amended in 2003, the parties included an "Integration" paragraph, which says only:

> This Agreement and Amendment, (including Attachments A, B, D and E), contain the entire agreement and understanding concerning the subject matter hereof between the Parties hereto.[10]

There is nothing in these merger clauses to suggest that the parties intended any term, including the discounted prices, to survive termination. Nor is there anything in this language to support any distinction between pre-termination accounts and post-termination accounts. Nor is there anything, for that matter, to suggest any intention to address anything whatsoever beyond the superseding of prior agreements and the requirement that future amendments be in writing. In short, Conexant's argument that the merger clause has anything to do with post-termination pricing is simply an invention.

It is significant that when the parties actually intended a right or obligation to survive termination, they knew how to say so, and did. The "Confidentiality Obligations" set forth in Attachment E to the 2003 amendment to the Price Protection Agreement contain explicit provisions regarding the survival of certain confidentiality obligations following termination.[11] Had the parties intended the discounted pricing to survive termination, they would certainly have said so.

---

[10] (Ex. D to the Verified Complaint ¶ 15.)
[11] (Id. at Attach. E ¶ 4; see also Ex. E to the Verified Complaint ¶ 5a (Ex. E is the parties' Data Services Agreement, which is not in issue in this lawsuit, but which, similarly to the Price

Instead, the language of the "Services and Pricing" clause actually states explicitly that the discounted pricing will apply only "[d]uring the term of this Agreement."[12] This affirmative limitation on the pricing directly contradicts Conexant's theory that the discounts would somehow apply after termination.

The undisputed evidence shows that Conexant was well aware that the discounted prices would no longer apply. Although, Conexant's brief does not mention it, Conexant's own internal and external correspondence shows that immediately upon receiving notice of termination, Conexant's managers discussed and analyzed the higher prices and made provision for paying them during the post-termination period while they transitioned to another conferencing vendor.[13] It was only on August 1, 2005, after all post-termination services had been completed and all accounts deactivated, that Conexant delivered notice of its new position that the discounted pricing should still apply.[14] Whether this new position was based on the merger clause theory is unclear: that theory did not actually

---

Protection Agreement, contained a detailed listing of those clauses intended to survive termination. Significantly, those surviving clauses did not include pricing.).)
[12] (Ex. D to the Verified Complaint ¶ 3.)
[13] (See Exs. N and P to the Verified Complaint; Noonan Dep., attached to Conexant's Mot. for Summ. J. as Ex. 5, at Exs. 3-4.)
[14] (See Ex. V to the Verified Complaint; see also Def.'s Resp. to Pl.'s Third Req. for Produc. of Docs., attached to this Response as Ex. 2 (demonstrating that Conexant did not send its July 28 letter indicating that it did not agree to new service terms and conditions until July 29, and that that letter did not arrive until August 1, after Conference America had performed all services for Conexant that are currently in dispute).)

come to light until a deposition on May 18, 2006.[15]  What is clear, and most significant, is that the Price Protection Agreement's language, Conexant's correspondence, and Conference America's position were all in harmony regarding the price increase until Conexant had obtained the post-termination services that it wanted.  Only when the work had already been done did Conexant's arguments about pricing begin.

    Yet another fundamental problem with Conexant's reliance on the merger clause is that, like the discounted pricing, the merger clause itself did not survive termination.  Under California law, which governs the Price Protection Agreement,[16] terminating a contract abrogates "so much of it as remains unperformed, thereby doing away with the existing agreement upon the terms and with the consequences agreed upon."[17]  A merger clause thus lives or dies with the contract that it appears in.  Like every other provision of the Price Protection Agreement that was not tied to a survival clause, the merger clause therefore ceased to exist when the Agreement terminated.  Conexant cites no authority or contract language that would cause the merger clause to survive termination.  Indeed, the merger clause cases that Conexant does cite, <u>Ex parte Conference</u>

---

[15] (Noonan Dep., attached to Conexant's Mot. for Summ. J. as Ex. 5, at 44-45, 48-50.)
[16] (Ex. D ¶ 12 to the Verified Complaint.)
[17] <u>Grant v. Aerodraulics Co.</u>, 204 P.2d 683, 687 (Cal. Ct. App. 1949).

America, Inc.[18] and Ex parte Palm Harbor Homes, Inc.,[19] are solely concerned with matters *preceding or occurring simultaneously with formation* of the contract containing the merger clause, not matters *following termination* of that contract and clause. Thus, neither case has any bearing on this case.

Finally, Conexant's suggestion that the Price Protection Agreement somehow created a special, perpetually-discounted status for Conexant's 1,778 accounts created with Conference America during the Agreement's term,[20] whether by virtue of the merger clause or otherwise, would turn the Agreement on its head. The whole purpose of the Price Protection Agreement was to provide discounted prices for certain services for a fixed period of time.[21] Nothing in the Agreement created rights based on when an account was created. In fact, "accounts," regardless of when created, were not even mentioned in the Agreement. Instead, the Agreement explicitly referred only to the prices of *services* that Conference America rendered to Conexant during the Agreement's term.[22] The Agreement contained no reference whatsoever to what prices would apply to services billed to any account, new or old, following termination.

Conexant's contention that Conference America's June 24 termination letter was "nothing more than a new offer for the future creation of accounts between the

---

[18] 713 So. 2d 953 (Ala. 1998).
[19] 798 So. 2d 656 (Ala. 2001).
[20] (Conexant's Mot. for Summ. J. at 6-8.)
[21] (See Ex. D to the Verified Complaint ¶ 3.)
[22] (Id.)

two parties"[23] is truly a twisted misreading of that letter. The letter refers to "services," not accounts.[24] Services are what Conference America provides. No distinction was ever made between pricing for services to existing, as opposed to new, accounts.[25] When Conexant accepted Conference America's offer of post-termination services by using those services,[26] it formed unilateral contracts to pay for those services at the offered prices: Conference America's Standard Prices.[27] Because Conexant did not pay those Standard Prices, it breached the parties' unilateral contracts and now owes Conference America $195,979.79 in damages, plus interest and attorney's fees.[28]

**B.     Conexant Assented To Conference America's Standard Prices.**

Conexant also argues that Conference America has not met its burden of proving mutuality of assent regarding the post-termination unilateral contracts. This argument appears to rely at least to some extent on Conexant's merger clause theory, which is refuted above. To the extent that Conexant's mutuality of assent

---

[23] (Conexant's Mot. for Summ. J. at 15.)
[24] (Ex. K.)
[25] (See, e.g., Exs. D and K to the Verified Complaint.)
[26] (Exs. Z and DD to the Verified Complaint; Edge Dep., attached to Conexant's Mot. for Summ. J. as Ex. 6, at 43; see also, e.g., Conexant's Mot. for Summ J. at 2 (accepting deactivation services), 3 (admitting that it used various services).)
[27] See Crawford v. Talk Am., Inc., No. 05-CV-0180-DRH, 2005 U.S. Dist. LEXIS 23181, at *11-*15 (S.D. Ill. Oct. 6, 2005) (finding that plaintiff's use of cell phone service after becoming aware of cell phone company's service terms created unilateral contract controlled by the service terms.)
[28] (Exs. A ¶ 5 and Z to the Verified Complaint.)

argument is intended as a separate argument, it fails for the simple reason that the undisputed facts show there was indeed mutuality of assent.

A unilateral contract is formed when one party makes an offer, and the other party accepts by performing an act.[29] The elements are identical to those of a typical contract: offer, communication, acceptance, and consideration.[30] In a unilateral contract, "[o]nly one party makes an offer (or promise) which invites performance by another, and performance constitutes both acceptance of that offer and consideration."[31] A party can assent to unilateral contract terms—the prices of services offered to it, for example—by requesting those services.[32] In a unilateral contract, "performance supplies the element of mutuality necessary as a consideration to support the obligation."[33]

As discussed more fully in Conference America's brief supporting its own Motion for Summary Judgment, Conexant assented to unilateral contracts for the provision of Conference America's services after Conference America terminated the Price Protection Agreement. Conference America repeatedly informed Conexant that, after termination, its services would only be available to Conexant

---

[29] SouthTrust Bank v. Williams, 775 So. 2d 184, 188 (Ala. 2000).
[30] Brannan & Guy, P.C. v. City of Montgomery, 828 So. 2d 914, 922 (Ala. 2002).
[31] Williams, 775 So. 2d at 188 (quoting Johns v. Thomas H. Vaughn & Co., 38 So. 2d 19, 20 (1948)).
[32] See id. at 189.
[33] Miller v. Thomason, 156 So. 773, 774 (Ala. 1934).

under Conference America's standard terms, conditions, and prices.[34] Conference America also informed Conexant that the price of each service would be the price in effect "at the time the services are rendered."[35] Conexant's internal correspondence confirms that it was aware that the agreement was terminated, and that Conference America's post-termination pricing would apply to all post-termination services.[36] Conexant requested and received post-termination services, including deactivation services.[37] Under Alabama law, these facts are sufficient to show the requisite mutual assent for formation of unilateral contracts for post-termination services.[38]

Although correspondence between the parties furnishes a good record of the parties' mutual understanding, the presence or absence of written or signed documents is actually irrelevant to contract formation. While the "object of a signature on a contract is to show mutuality and assent, . . . mutuality and assent can be manifested in ways other than a signature."[39] "[A] contract does not have to be signed to be enforceable, so long as it is accepted and acted upon."[40] In the context of a unilateral contract, a party's performance of an act provides the

---

[34] (Exs. K, O, and U to the Verified Complaint.)
[35] (Ex. K to the Verified Complaint.)
[36] (Noonan Dep., attached to Conexant's Mot. for Summ. J. as Ex. 5, at Exs. 2-4.)
[37] (Exs. Z, DD, and EE to the Verified Complaint; Edge Dep., attached to Conexant's Mot. for Summ. J. as Ex. 6, at 43.)
[38] See Williams, 775 So. 2d at 188-89; Miller, 156 So. at 774.
[39] Merril Lynch, Pierce, Fenner & Smith, Inc. v. Kilgore, 751 So. 2d 8, 11 (Ala. 1999).
[40] Id.

requisite mutuality of assent.[41]  In so far as a unilateral contract is performed and acted upon, it becomes a binding obligation.[42]

Conexant argues that, through its July 28, 2005 letter, it informed Conference America that it did not agree to new terms concerning its relationship with Conference America.[43]  But Conexant actually waited until Friday, July 29, 2005, to send this letter, and sent it by Federal Express for delivery on Monday, August 1, 2005.[44]  In other words, despite the July 28 date on the letter, Conexant made sure it was delivered only after Conference America had performed all of the services at issue in this lawsuit.  At no point during the entire July 10-31 period when Conference America was performing post-termination services did Conexant ever object to Conference America's repeated statements that its Standard Prices would govern.  Had there been any lack of mutual assent, Conexant would certainly have said something or stopped using the services.  As Conference America emphasized at the time, "[i]f Conexant does not wish to continue to use our services, it is free to stop using them."[45]  Conexant's July 28 letter thus appears to have been simply an after-the-fact defensive ploy.  If it was actually a good faith effort to renegotiate price, Conexant's delay in delivering it until August 1

---

[41] See Miller, 156 So. at 774.
[42] Id.
[43] (Conexant's Mot. for Summ. J. at 2; see also Ex. V to the Verified Complaint.)
[44] (See Ex. V to the Verified Complaint; see also Def.'s Resp. to Pl.'s Third Req. for Produc. of Docs., attached to this Response as Ex. 2.)
[45] (Ex. U to the Verified Compliant.)

rendered it irrelevant. Conexant's reliance on even later letters taking similar positions is misplaced for the same reason.[46]

Conexant's argument that it did not assent to Conference America's Standard Prices because it did not click the "I agree" button on Conference America's website misstates the relevant language. The language that Conexant is referring to appears as a heading to the website terms, and clearly states that it is referring to applicants for new accounts: "READ THESE TERMS AND CONDITIONS CAREFULLY BEFORE SUBMITTING YOUR ACCOUNT APPLICATION. . . ."[47]

Unless Conexant was applying, via the Internet, to create a new account, which Conexant confirmed in its July 15, 2005 letter that it did not wish to do,[48] there would have been no reason for Conexant to click the "I agree" button at all. As it happened, according to Conexant's July 28 letter, its personnel never bothered to read the website terms anyway,[49] so Conexant's failure to click "I agree" could not in any event be taken as a lack of assent.

Finally, Conexant's mutual assent argument makes several references to the $74.95 deactivation fee, particularly with reference to the date the fee became

---

[46] (Conexant's Mot. for Summ. J. at 2-3, 11, 15; Exs. AA and HH to the Verified Complaint.)
[47] (Ex. A to the Verified Complaint, at 1 (top of page); see also Deposition of Robert M. Pirnie, III, President, Conference Am., Inc., attached to Conexant's Mot. for Summ. J. as Ex. 3, at 158-59.)
[48] (Ex. M. to the Verified Complaint.)
[49] (Ex. V to the Verified Complaint.)

effective. Conexant attempts to create something of a red herring with this issue: correctly noting that no one is quite sure when this fee went into effect, Conexant suggests that unless Conference America can prove when the fee became effective it cannot prove mutual assent regarding the fee. The problem with this argument is that the only date that matters for mutual assent is the date the deactivations were actually performed: July 31, 2005.[50] As clearly stated in the June 24, 2005 termination notice containing the offer to provide post-termination services, "[a]ny services used or requested by Conexant after termination will be made available only on and subject to Conference America's standard terms, conditions and prices *effective at the time the services are rendered.*"[51] Conference America attached to its Verified Complaint a printout of the website terms and conditions as of July 25 that clearly includes the $74.95 charge.[52] This is undisputed evidence that the $74.95 charge was on Conference America's website by at least July 25, several days before Conference America rendered the disconnection service to Conexant.

If Conexant failed or chose not to learn the price of the service it requested, that does not create a lack of mutual assent. Conference America expressly advised Conexant by email on July 19, 2005 that "[i]f you have a specific question about the price applicable to any service not shown on our website and would

---

[50] (Exs. A ¶ 5a, D (at Attach. A, p. A-3), and K to the Verified Complaint.)
[51] (Ex. K to the Verified Complaint.)
[52] (Ex. A ¶ 5a to the Verified Complaint, and page 1, lower right-hand corner.)

submit that in writing, we would of course respond."[53]  Conexant, a sophisticated, publicly held company, certainly could have checked the website or directed a written question to Conference America about the deactivation fee if it had chosen to do so.  Its failure to read the website (according to the July 28 letter)[54] or to ask any questions may have been lazy or willfully ignorant, but it does not constitute lack of assent.[55]

As a point of interest, although no one at Conference America knows the exact date on which the $74.95 charge appeared on the website,[56] Conference America provided evidence to Conexant in discovery that indicates that the $74.95 charge was on the website by at least March 2005, long before the termination. Conference America performed a search for its website, www.yourcall.com, on www.archive.org, a website that tracks changes to other websites.[57]  The search revealed two things:  (1) Conference America's website and its terms and conditions were shown as last updated on March 6, 2005; and (2) the $74.95 charge was shown on the copy of Conference America's website posted for that

---

[53] (Ex. O.)
[54] (Ex. V to the Verified Complaint.  Of course, Conexant never followed up or asked Conference America about its Standard Prices.)
[55] See Williams, 775 So. 2d at 188-89; Miller, 156 So. at 774.
[56] (Pirnie Dep., attached to Conexant's Mot. for Summ. J. as Ex. 3, at 117-18; Deposition of Paine Bone, Network Administrator, Conference America, attached to this Response as Ex. 3, at 26-27.)
[57] (See Bone Deposition, attached to this Response as Ex. 3, at 14-20, 22-23, Ex. 2.)

date.[58]  March 6, 2005 was nearly five months before Conference America performed the deactivation service at issue in this case.[59]  Although Conexant was aware of this evidence, it neglected to mention it in its brief.  Of course, while this evidence provides an interesting rebuttal to Conexant's red herring about the date the fee became effective, it really does not matter:  the important question is whether the fee was in effect when deactivation occurred on July 31, 2006.  The undisputed evidence shows it was.[60]

It is also interesting to note that, while Conexant's argument that the Price Protection Agreement continued to govern prices is incorrect, that argument would actually support collection of the deactivation fee.  Conexant apparently has overlooked the provision in the Price Protection Agreement that states that any service used by Conexant that was not listed in the agreement, *such as the deactivation service*, was "available at Conference America's Standard Prices effective at the time services are rendered."[61]  Ironically, Conexant made multiple uses of such unlisted, undiscounted services prior to termination.  In particular, Conexant's CEO, Armando Geday, used Conference America's "Meeting Control" service, which was not listed in the Price Protection Agreement.[62]  Conexant paid

---

[58] (Id.)
[59] (Ex. DD to the Verified Complaint.)
[60] (Ex. A to the Verified Complaint ¶ 5a.)
[61] (Ex. D, Attach. A, at A-3; Pirnie Dep., attached to Conexant's Mot. for Summ. J. as Ex. 3, at 116.)
[62] (Decl. of Robert M. Pirnie, attached to this Response as Ex. 4, ¶¶ 5-7, and Exs. 1-6 thereto.)

Conference America's Standard Price of $150.00 (twice that of the $74.95 deactivation service that it takes issue with) for this service.[63]

Substantial evidence thus demonstrates that, as a matter of law and based on the undisputed facts, Conexant assented to pay Conference America's Standard Prices for all of Conference America's post-termination services. Conexant's argument that it did not assent is contrary to law and to the undisputed facts.

### III.   CONCLUSION

For the forgoing reasons, Conference America respectfully requests that the Court deny Conexant's Motion for Summary Judgment and grant Conference America's Motion for Summary Judgment.

This 13th day of July 2006.

TROUTMAN SANDERS LLP

/s/ Thomas E. Borton IV
Thomas E. Borton IV (BOR011)

5200 Bank of America Plaza     Attorney for Plaintiff Conference
600 Peachtree Street, N.E.     America, Inc.
Atlanta, GA  30308-2216
(404) 885-3000 (telephone)
(404) 962-6664 (fax)

---

[63] (Id.)

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CONFERENCE AMERICA, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| ) | FILE NO: |
| v. ) | 2:05cv1088-WKW |
| ) | |
| CONEXANT SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2006, I caused a copy of the foregoing to be mailed to the following via efile:

Joseph S. Miller, Esq.
Alicia M. Harrison, Esq.
Starnes & Atchison LLP
Post Office Box 598512
Birmingham, AL 35259-8512


/s/ Thomas E. Borton IV
Thomas E. Borton IV (BOR011)