EXHIBIT 3

# FREEDOM COURT REPORTING

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5   CIVIL ACTION NO. 2:05-cv-1088-WKW
6
7   CONFERENCE AMERICA, INC.,
8      PLAINTIFF(S),
9   VS.
10  CONEXANT SYSTEMS, INC.,
11     DEFENDANT(S).
12
13       DEPOSITION OF
14       PAINE BONE
15       June 14, 2006
16
17    S T I P U L A T I O N
18    IT IS STIPULATED AND AGREED, by and
19  between the parties through their
20  respective counsel, that the deposition of
21  PAINE BONE may be taken before Kerry K.
22  Thames, Commissioner, at 201 Monroe Street,
23  Suite 1650, Montgomery, Alabama, on June

Page 2

1   14, 2006, commencing at 2:08 P.M.
2     IT IS FURTHER STIPULATED AND AGREED
3   that the signature to and reading of the
4   deposition by the witness is waived, said
5   deposition to have the same force and
6   effect as if full compliance had been had
7   with all laws and rules of court relating
8   to the taking of depositions.
9     IT IS FURTHER STIPULATED AND AGREED
10  that it shall not be necessary for any
11  objections to be made by counsel to any
12  questions except as to form or leading
13  questions, and that counsel for the parties
14  may make objections and assign grounds at
15  the time of the trial, or at the time said
16  deposition is offered in evidence, or prior
17  thereto.
18    IT IS FURTHER STIPULATED AND AGREED
19  that notice of filing of deposition by
20  commissioner is waived.
21
22
23

Page 3

1          INDEX
2
3   EXAMINATION BY:          PAGE NO.
4
5   Mr. Miller              5
6
7
8
9         EXHIBITS
10
11  Defendant's Exhibit:
12  No. 1              11
13  No. 2              14
14  No. 3              40
15
16
17
18
19
20
21
22
23

Page 4

1        APPEARANCES
2
3   FOR THE PLAINTIFF(S):
4   Mr. Thomas Ernest Borton, IV
5   TROUTMAN SANDERS, L.L.P.
6   600 Peachtree Street, NE
7   5200 Bank of America Plaza
8   Atlanta, Georgia 30308
9
10  FOR THE DEFENDANT(S):
11  Mr. Joseph S. Miller
12  STARNES & ATCHISON
13  7th Floor, 100 Brookwood Place
14  Birmingham, Alabama 35209
15
16
17
18
19
20
21
22
23

1  (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1    I, Kerry K. Thames, acting as
2 Commissioner, certify that on this date as
3 provided by the Federal Rules of Civil
4 Procedure, and the foregoing stipulation of
5 counsel, there came before me PAINE BONE,
6 witness in the above cause, for oral
7 examination, whereupon the following
8 proceedings were had:
9
10    PAINE BONE,
11 being first duly sworn, was examined and
12 testified as follows:
13
14    THE COURT REPORTER:  Usual
15 stipulations?
16    MR. BORTON:  Yeah, that's fine.
17
18 EXAMINATION BY MR. MILLER:
19    Q.  Tell me your full name and your
20 residence address.
21    A.  Winstead Paine Bone, IV.  I'm
22 at 9272 Whispine Court, Montgomery,
23 Alabama, 36117.

Page 6

1    Q.  Does anyone live there with
2 you?
3    A.  Yes.
4    Q.  Who?
5    A.  My wife and my two sons.
6    Q.  What's your wife's name?
7    A.  Maria.
8    Q.  Does she work?
9    A.  Yes.
10    Q.  Where does she work?
11    A.  Bell Road YMCA.
12    Q.  Your two sons are school age, I
13 assume?
14    A.  One of them is in kindergarten
15 and one of them is in preschool.
16    Q.  Where do they go to
17 kindergarten and preschool?
18    A.  Kindergartner goes to
19 Montgomery Academy, the preschooler goes to
20 Taylor Road Baptist.
21    Q.  I'm asking these questions for
22 purposes of striking a jury in case
23 somebody who knows your children or has

Page 7

1 children in the same school may turn up on
2 the jury panel, so don't take offense to
3 any of these questions.
4    A.  Okay.
5    Q.  Do you or your wife have family
6 in Montgomery County or the surrounding
7 counties?
8    A.  My sister lives in Montgomery.
9    Q.  What's her name?
10    A.  Mary Kelly Bone.
11    Q.  Is she married?
12    A.  No.
13    Q.  Does she have any children?
14    A.  No.
15    Q.  That's the only relative you
16 have in the area?
17    A.  Yes.
18    Q.  What about your wife, does she
19 have any family in the area?
20    A.  No.
21    Q.  Tell me a little bit about your
22 educational background.
23    A.  Went to Castle Heights Military

Page 8

1 Academy for high school in Lebanon,
2 Tennessee.  And I went to the University of
3 Mississippi for college.  That's it.
4    Q.  Graduate from Ole Miss?
5    A.  No.
6    Q.  When did you last go to school
7 at Ole Miss?
8    A.  '91.
9    Q.  You are presently employed by
10 Conference America?
11    A.  Yes.
12    Q.  How long have you been employed
13 by Conference America?
14    A.  It's seven years and four
15 months.
16    Q.  So you became employed at
17 Conference America in 1999?
18    A.  Correct.
19    Q.  Did you work in Montgomery from
20 1991 until you took the job with Conference
21 America in 1999?
22    A.  No.
23    Q.  When did you come to

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1 Montgomery?
2     A.   1999.
3     Q.   Did the Conference America job
4 bring you to Montgomery?
5     A.   Yes.
6     Q.   How did that come about?  Were
7 you recruited?
8     A.   I was recruited.
9     Q.   Where were you working at the
10 time?
11     A.   I was at Cumberland University
12 in Lebanon, Tennessee.
13     Q.   What were you doing there?
14     A.   I was the director of
15 information technology.
16     Q.   And what is your title at
17 Conference America?
18     A.   Network administrator.
19     Q.   Has your title been network
20 administrator since you went to work for
21 Conference America in 1999?
22     A.   Yes.
23     Q.   Have you generally had the same

Page 10

1 responsibilities at Conference America from
2 1999 to the present?
3     A.   Yes.
4     Q.   Describe to me generally what
5 your job responsibilities are.
6     A.   Generally, I manage the entire
7 network, which includes all of the network
8 devices and operating systems.
9     Q.   What is your responsibility
10 relative to Conference America's web site?
11     A.   I -- I maintain the web site,
12 the public web site.
13     Q.   You maintain the public web
14 site?
15     A.   Correct.
16     Q.   Is there a private or internal
17 web site?
18     A.   There are web pages internally.
19     Q.   I know lots of law firms have
20 an intrafirm web site.  Is there something
21 similar like that at Conference America?
22     A.   Yes.
23     Q.   You realize there's litigation

Page 11

1 pending between Conference America and my
2 client, Conexant?
3     A.   Yes.
4     Q.   Are you aware that you have
5 been produced today as the Conference
6 America representative to testify about
7 creation of and maintenance of Conference
8 America's web site?
9     A.   Yes.
10     Q.   And have you actually seen the
11 deposition notice, which I'm going to mark
12 as Defendant's Exhibit Number 1, which
13 designates the topics that I wanted to ask
14 someone about?
15
16         (Whereupon, Defendant's Exhibit
17 Number 1 was marked for identification and
18 copy of same is attached hereto).
19
20     Q.   (BY MR. MILLER) Have you seen
21 that?
22     A.   Yes.
23     Q.   And it indicated that I wanted

Page 12

1 to speak with someone at Conference America
2 about, number one, creation of and
3 maintenance of Conference America's web
4 site, number two, creation of and
5 alterations to the terms and conditions,
6 language, contained in Conference America's
7 web site, including the initial insertion
8 of the language contained in paragraph five
9 entitled Fees and Expenses, and, three, any
10 documentation regarding the above.  Here's
11 what I want to ask:  Have you satisfied
12 yourself that you're the best person at
13 Conference America to answer questions in
14 behalf of Conference America about those
15 topics?
16     A.   Yes.
17     Q.   Is there anyone that you would
18 think is in a better position to answer
19 questions about Conference America's web
20 site than yourself?
21         MR. BORTON:  Object to the
22 form.
23     A.   Pardon?

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1    MR. BORTON:  You can answer.
2  That's fine.  I'm just making an objection.
3  You can go ahead and answer.  That's fine.
4    A.  Would you repeat that?  I'm
5  sorry.
6    Q.  (BY MR. MILLER)  Is there
7  anyone who, in your mind, would be in a
8  better position than yourself to answer
9  questions about the topics that I read to
10  you a minute ago concerning Conference
11  America's web site?
12    MR. BORTON:  Same objection.
13  You can go ahead and answer.
14    A.  No.
15    Q.  (BY MR. MILLER)  Did you see
16  the request for production aspect of this
17  deposition notice as well?
18    A.  Yes.
19    Q.  Did you bring any documents to
20  produce in response to that request?
21    A.  Yes.
22    Q.  What are they?
23    A.  It's the archive.org web site.

Page 15

1    A.  Correct.
2    Q.  Had you ever consulted with
3  www.archive.org before you attempted to
4  learn this information about Conference
5  America's web site?
6    A.  I had seen it before.
7    Q.  Had you ever used it yourself
8  to try to determine the historical
9  background of any web site before you did
10  it for this case?
11    A.  Yes.
12    Q.  How many times?
13    A.  I don't know.
14    Q.  For what reasons had you gone
15  to this web site before to seek out
16  information concerning the history of other
17  web sites?
18    A.  Entertainment.
19    Q.  Were you just -- you had just
20  been on some web site and you wanted to
21  know the history of it, something like
22  that?
23    A.  Correct.

Page 14

1
2    (Whereupon, Defendant's Exhibit
3  Number 2 was marked for identification and
4  copy of same is attached hereto).
5
6    Q.  (BY MR. MILLER)  Let me mark as
7  Defendant's Exhibit Number 2 the documents
8  which you have provided to me which consist
9  of four pages, and what I would like for
10  you to do is describe to me what those
11  documents are and how you went about
12  generating them.
13    A.  Okay, this is a web site that
14  keeps a record of historical pages on other
15  web sites throughout the Internet, and I
16  found them through Google, I believe.  I
17  was able to search our web site,
18  www.yourcall.com, and find the history and
19  produce a web page, which is, according to
20  them, a history -- a historical
21  representation of our web site.
22    Q.  And this is a web site entitled
23  www.archive.org?

Page 16

1    Q.  Would this time that you went
2  to find out information about Conference
3  America's web site be the only time that
4  you have gone to www.archive.org for
5  professional reasons?
6    A.  Yes.
7    Q.  Did you see any documents on
8  that web site relative to Conference
9  America's web site other than these four
10  pages that you have produced?
11    A.  I don't know.
12    Q.  What I'm trying to find out is,
13  were there any other pages that were on the
14  web site that you either may or may not
15  have printed out relative to Conference
16  America's web site that you have not given
17  to me today?
18    A.  No.
19    Q.  Did you go to this web site and
20  then when they asked the web site you
21  wanted to investigate, you just typed in
22  www.yourcall.com?
23    A.  That's correct.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 17

1    Q.  And these four pages are what
2  came up?
3    A.  Well, page two is what came up,
4  and from there I selected the most recent
5  date.
6    Q.  What do you mean by that?  You
7  can show me if you need to.
8    A.  When I searched for
9  www.yourcall.com, page two is the actual
10  result page.  On that page I chose March
11  6th, 2005, and that is the remaining two
12  pages, the result of that selection.
13    Q.  Let me make sure I'm
14  understanding.  You picked March 6th, 2005,
15  as the last date that you were going to
16  inquire about?
17    A.  No.  This is the -- this page
18  two is the entire result set when I
19  searched for yourcall.com.
20    Q.  When you searched for
21  yourcall.com, March 6th, 2005, is the last
22  date that came up on this search?
23    A.  That is correct.

Page 18

1    Q.  Then you mentioned something a
2  minute ago about these last two pages being
3  relative to March 6th, 2005.  I did not
4  follow you on that.
5    A.  The results of my search here,
6  I chose March 6, 2005, as the result item I
7  would like to see.  From there, I followed
8  the link, and those remaining two pages
9  came from that.
10    Q.  Did you do that relative to any
11  other dates on here, on page two?
12    A.  I did not.
13    Q.  Do you know where
14  www.archive.org is located?
15    A.  No.
16    Q.  What do you know about that web
17  site other than it purports to be able to
18  do historical searches on other web sites?
19    A.  That's it.  That's all I know
20  about it.
21    Q.  You cannot attest to the
22  reliability of the searches and the results
23  that www.archive.org produces, can you?

Page 19

1    A.  No.
2    Q.  What day did you do this search
3  on that web site?
4    A.  I don't know.
5    Q.  These documents were printed on
6  June 2nd, 2006.  Do you know if that's the
7  date that you did the search or not?
8    A.  Yes, that is the date that I
9  did the search on those documents, the same
10  day I printed them.
11    Q.  Have you discussed these
12  results from www.archive.org with anyone
13  other than Conference America's attorneys
14  or in their presence?
15    A.  I haven't discussed -- no.
16    Q.  Let me make sure we're on the
17  same page.  I assume you've discussed this
18  with Mr. Borton, and I'm not asking you
19  about that.  Have you discussed these
20  results with anyone else other than Mr.
21  Borton?
22    A.  I have not discussed them with
23  anyone else.

Page 20

1    Q.  And I'm not asking for any
2  communications that you have received from
3  Conference America's counsel, but did
4  anyone give you any instruction on how to
5  do this search on this particular web site,
6  archive.org?
7    A.  No.
8    Q.  Did you go to any other web
9  sites other than archive.org to attempt a
10  search like this?
11    A.  Yes.
12    Q.  What web sites?
13    A.  I don't know.  I don't know
14  what their names are.
15    Q.  How many did you go to other
16  than archive.org?
17    A.  I don't know.
18    Q.  Were those other web sites able
19  to produce any results relative to a search
20  for the history of www.yourcall.com?
21    A.  Yes.
22    Q.  Is there any reason you didn't
23  print those results out?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    A.  The other web sites had very
2 short-term, for example, maybe just a week
3 of history.
4    Q.  At least what you could tell on
5 those web sites, they didn't go back very
6 far?
7    A.  That is correct.
8    Q.  And I would assume that you
9 don't know for sure that for some reason
10 archive.org didn't just stop on March 6th,
11 2005, when there may have been other
12 changes after that?
13    MR. BORTON:  Object to the
14 form.  You can answer if you know.
15    A.  I don't know how they do that.
16    Q.  (BY MR. MILLER)  It's possible
17 that there have been additional changes to
18 Conference America's web site after March
19 6, 2005, that archive.org just don't have,
20 if you type in yourcall.com?
21    MR. BORTON:  Object to the
22 form.  You can answer it, if you know.
23    A.  I don't know how they keep --

Page 22

1 do their stuff.
2    Q.  (BY MR. MILLER)  And I don't
3 mean to belabor this, but you really don't
4 know how accurate this search result from
5 archive.org is, do you?
6    MR. BORTON:  Object to the
7 form.
8    A.  No.
9    Q.  (BY MR. MILLER)  Out of the web
10 sites that you did go to, is archive.org
11 the one that appeared to go back in time
12 the farthest?
13    A.  Yes.
14    Q.  I didn't see anything on this
15 top page specific to the search you did
16 except where it says yourcall.com.  Is
17 there anything on here other than that?
18    A.  Not to the best of my
19 knowledge.
20    Q.  Was this page just to show me
21 that's the search you did put in there?
22    A.  That's correct.
23    Q.  And page two is the search

Page 23

1 result that you printed out?
2    A.  That's correct.
3    Q.  And pages three and four are
4 relative to the March 6, 2005, date that
5 you specifically inquired about?
6    A.  That is correct.
7    Q.  Page four appears to be terms
8 and conditions sheet for Conference
9 America's web site.  Here's what I want to
10 ask you.  Do you know for sure that that is
11 an exact duplicate of the terms and
12 conditions that were on Conference
13 America's web site on March 6, 2005?
14    A.  I do not know that for sure.
15    Q.  Did you do anything internally
16 at Conference America trying to gain
17 information about the history of Conference
18 America's web site?
19    A.  Yes.
20    Q.  What did you do?
21    A.  I looked through my own
22 documents, as well as looked at the actual
23 documents on the web site for any clue as

Page 24

1 to when they were last updated.
2    Q.  Were you able to learn any
3 information that would tell you when the
4 web site was updated historically?
5    A.  No.
6    Q.  I think I'm understanding you,
7 but I want to make sure before I leave here
8 today.  I know you got this search we've
9 been talking about from archive.org, I'm
10 setting that aside.  Is it correct that you
11 were not able to learn any historical
12 information about Conference America's web
13 site and changes to it strictly by
14 searching within Conference America's
15 computer system and documents that may be
16 in existence?
17    MR. BORTON:  Object to form.
18 You can go ahead and answer.
19    A.  Could you say that one more
20 time?
21    Q.  (BY MR. MILLER)  And I didn't
22 mean it to be as long as it was.  What I'm
23 trying to find out is, when you restricted

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1  your search to the information at
2  Conference America, being Conference
3  America's own computer system and any hard
4  copy documents that may be at Conference
5  America, were you able to find any
6  information to tell you and me about when
7  changes were made to Conference America's
8  web site over the years?
9        MR. BORTON: Object to the
10 form.
11    A.  No.
12    Q.  (BY MR. MILLER)  To your
13 knowledge, has there ever been any way at
14 Conference America to go into the computer
15 system and find out when certain language
16 was first placed in the terms and
17 conditions on the web site?
18    A.  One more time.
19    Q.  To your knowledge, has there
20 ever been a way that anyone could go into
21 Conference America's computer system and
22 determine when certain language was placed
23 in the terms and conditions on the web site

Page 26

1  for the first time?
2        A.  Not to my knowledge.
3     Q.  You're not aware of any hard
4  copy paper file that would tell us when the
5  deactivation fee language first was
6  inserted into the terms and conditions on
7  the web site?
8     A.  I'm not aware of a document
9  like that.
10    Q.  And have you looked to see if
11 there is any documentation that would
12 answer that question for us?
13    A.  Yes.
14    Q.  And you could not find any?
15    A.  That is correct.
16    Q.  Is there any way to go into the
17 Conference America computer system to
18 determine when the deactivation fee
19 language was first inserted into the terms
20 and conditions section on the web site?
21    A.  Not to my knowledge.
22    Q.  And can you answer that
23 question for me today, when was the

Page 27

1  deactivation fee language first placed on
2  the terms and conditions section of
3  Conference America's web site?
4     A.  No, I cannot.
5     Q.  You cannot tell me that
6  question -- I mean, you cannot tell me the
7  answer to that question?
8     A.  No.
9     Q.  Do you know anyone who can
10 answer that question for me?
11    A.  No -- I -- I should say Mr.
12 Pirnie is the only other person who would
13 be aware of that.
14    Q.  And I've already asked him --
15 have you read any of the depositions that
16 have been taken in the case thus far?
17    A.  No.
18    Q.  But you cannot answer for me as
19 the representative to testify about the web
20 site when the deactivation fee language was
21 first inserted into the terms and
22 conditions on the web site, correct?
23       MR. BORTON: Object to the

Page 28

1  form.
2     A.  No.
3     Q.  (BY MR. MILLER)  I'm correct
4  about that?
5     A.  I'm sorry, repeat it one more
6  time.  I got --
7     Q.  We're getting a double
8  negative.  I just want to make sure we get
9  a question and answer without a double
10 negative.
11       Am I correct that you cannot
12 answer for me as the designated
13 representative of Conference America when
14 the deactivation fee language was first
15 placed in the terms and conditions section
16 of Conference America's web site?
17       MR. BORTON: Object to the
18 form.
19    Q.  (BY MR. MILLER)  Is that
20 correct?
21    A.  That's correct.
22    Q.  Okay.  When did you first
23 become aware that there was language in the

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 29

1  web site about a deactivation fee?
2      MR. BORTON:  Object to the
3  form.
4      A.  I don't know when I became
5  aware of it.
6      Q.  (BY MR. MILLER)  One of the
7  requests for a document that I made is for
8  you to bring a copy of the terms and
9  conditions that existed on the web site as
10 of July 15, 2005 and July 20, 2005.  You've
11 seen that request (Indicating)?
12     A.  Yes, I have.
13     Q.  Have you been able to produce
14 so you can give to me a copy of the terms
15 and conditions that existed on the web site
16 as of July 15 and July 20, 2005?
17     A.  No.
18     Q.  Do you personally know whether
19 the deactivation fee language was on the
20 terms and conditions section of Conference
21 America's web site on July 15 and July 20,
22 2005?
23     MR. BORTON:  Object to the

Page 30

1  form.
2      A.  I do not know.
3      Q.  (BY MR. MILLER)  Other than
4  Defendant's Exhibit 2, which is the four
5  sheets that you have produced and which we
6  have discussed, do you know of any
7  documentation that can be produced from any
8  source that would tell us when the terms
9  and conditions section of the web site was
10 altered or changed in any way during the
11 calendar year 2005?
12     A.  Could you repeat that?  I'm not
13 sure what you're looking for.
14     Q.  Other than these four pages,
15 Defendant's Exhibit Number 2, which you
16 have produced to me and which we have
17 already talked about, are you aware of any
18 other documentation from any source, either
19 within Conference America or outside of
20 Conference America, that would tell us when
21 and how the terms and conditions section of
22 the web site was changed in any way during
23 calendar year 2005?

Page 31

1      A.  I'm not aware of any
2  documentation that would tell us when it
3  was changed.
4      Q.  Do you know whether there is or
5  is not any reason that Conference America's
6  computer system doesn't keep up with that
7  information in a produceable fashion?
8      MR. BORTON:  Object to the
9  form.
10     A.  It would be highly unusual for
11 a computer system to keep track of it.
12     Q.  (BY MR. MILLER)  It would be
13 highly unusual for a computer system to
14 keep track of when and how a web site was
15 changed?
16     A.  Correct.
17     Q.  Why do you say that?
18     A.  You might have a last modified
19 date, but you would not have anything more
20 detailed than that, from a normal computer
21 system.
22     Q.  As I understand it, Conference
23 America hosts its own web site, is that

Page 32

1  correct?
2      A.  That is correct.
3      Q.  I may be wrong about this, and
4  so tell me if I am.  I was under the
5  impression that if a web site is hosted by
6  an independently contracted business who
7  does that, that that independent host could
8  tell somebody when and how a web site had
9  been changed; am I correct or not, if you
10 know?
11     MR. BORTON:  Object to the
12 form.
13     A.  That would be completely
14 dependent on the policy of the host.
15     Q.  (BY MR. MILLER)  To your
16 knowledge, are there some hosts who can do
17 that?
18     A.  I can't say in that detail that
19 there are.  I don't know.
20     Q.  And I tell you, I don't know a
21 lot about hosting web sites, but that's
22 what I've been told.  That's one reason I
23 wanted to ask you the question.  But what

8 (Pages 29 to 32)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1  I'm hearing from you is that Conference
2  America, as the host for its own web site,
3  cannot go in and historically say when and
4  how the web site was altered?
5      A.  When you say how, what do you
6  mean?
7      Q.  Let me just leave it on the
8  when, first, then.  Can Conference America,
9  as the host for its own web site, go into
10  its computer system and historically
11  determine when the web site was changed in
12  any way?
13      A.  As I said before, there is a
14  last modified date on most files on a
15  computer system.  That is the only
16  indicator that you would have that it had
17  been changed.  There is no log.
18      Q.  I'm not suggesting that there
19  is any log, I'm just trying to find out if
20  we can do it for Conference America's web
21  site.  Is there a last modified date on
22  Conference America's computer system that
23  would tell us when the web site was last

Page 34

1  changed in any way?
2      A.  Not with any accuracy.
3      Q.  Have you ever participated in
4  changing the web site for any reason?
5      A.  Yes.
6      Q.  And Mr. Pirnie told me that the
7  web site is a constantly evolving thing and
8  is changed frequently.  Give me some idea
9  of how it is changed when an instruction is
10  given for it to be changed in some way.
11      A.  Are you talking about the
12  general Conference America web site?
13      Q.  Let's talk about the terms and
14  conditions section.  If someone gave
15  another person an instruction to go in and
16  change some language in the terms and
17  conditions on the web site, how would that
18  be done?
19      A.  Usually Mr. Pirnie would bring
20  me a printed out copy of the terms marked
21  up in ink and pencil.
22      Q.  How it was to be changed?
23      A.  Correct.

Page 35

1      Q.  And then would you sit down and
2  go into the system and make the changes?
3      A.  That is correct.
4      Q.  Could others other than
5  yourself also do that if they received an
6  instruction like that?
7      A.  I -- do you mean are others
8  capable?
9      Q.  Yes, that's what I mean.
10      MR. BORTON:  Object to the
11  form.
12      A.  Or do they have access?
13      Q.  (BY MR. MILLER)  I want it
14  answered both ways.  Let's take calendar
15  year 2005, who would have had access to
16  make a change to the terms and conditions
17  on the web site?
18      MR. BORTON:  Object to the
19  form.
20      A.  I'm not clear on that.  There
21  are so many ways you can describe access.
22      Q.  (BY MR. MILLER)  During the
23  calendar year 2005, did people other than

Page 36

1  yourself have the capability and the access
2  to go in and make some changes to the terms
3  and conditions on the web site if they got
4  the appropriate instruction to do so?
5      MR. BORTON:  Object to the
6  form.
7      A.  I can't say for sure that
8  someone would have access and capability
9  other than myself.
10      Q.  (BY MR. MILLER)  Was there any
11  kind of lockout system in place that was
12  set up so only Paine Bone could go in and
13  make changes to the web site?
14      MR. BORTON:  Object to the
15  form.
16      A.  There are security items like
17  that on the system.  I can't say that only
18  Paine Bone could access them at that --
19  throughout that whole year.
20      Q.  (BY MR. MILLER)  Are you the
21  person who is called upon to make the
22  regular changes to the web site from time
23  to time?

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1    MR. BORTON:  Object to the
2  form.
3    A.  Yes.
4    Q.  (BY MR. MILLER)  Have you ever
5  received any instruction to make any
6  changes to the fees and expenses section on
7  the terms and conditions sheet?
8    A.  I have been asked to change the
9  terms and conditions before, but I can't
10  speak to exactly which sections because I
11  don't read them.
12    Q.  Because you don't what?
13    A.  I didn't read them as they were
14  entered.
15    Q.  To get to the terms and
16  conditions section of the web site, what do
17  you have to do?
18    A.  Well, there are a couple of
19  ways to access it.  You could go to
20  www.yourcall.com, and I believe on almost
21  any page you could select services, terms
22  and conditions on the bottom of the page,
23  and you would get a pop-up window.  Other

Page 38

1  than that, you could actually type in
2  directly the URL for the terms and
3  conditions if you knew that.
4    Q.  In 2005, if you went to
5  www.yourcall.com, would the terms and
6  conditions sheet present itself unless you
7  clicked on that particular button wanting
8  to see it?
9    A.  I'm not sure what you mean.
10    Q.  Okay.  I know when you go to
11  the web site the initial page of the web
12  site comes up, right?
13    A.  Right.
14    Q.  Is the terms and conditions
15  sheet there apparent on the screen at that
16  time, or do you have to click a button for
17  it to come up?
18    A.  You have to click a link.
19    Q.  Was that the situation in 2005
20  as well?
21    A.  To the best of my knowledge.
22    Q.  Are you personally aware of any
23  changes to Conference America's web site

Page 39

1  that were made because of the situation
2  with Conexant?
3    MR. BORTON:  Object to the
4  form.
5    A.  What situation?  What do you
6  mean?
7    Q.  (BY MR. MILLER)  Are you aware
8  that during 2005, specifically on June 24,
9  2005, Mr. Pirnie sent a letter where he
10  terminated the price protection program
11  agreement that was in place between
12  Conference America and Conexant?  Are you
13  aware of that?
14    A.  I wasn't aware of that letter.
15    Q.  I assume you learned at some
16  point that there was a lawsuit that
17  emanated from the relationship, correct?
18    A.  That's correct.
19    Q.  Here's what I'm trying to learn
20  from you.  Since you were basically in
21  charge of the web site during the summer of
22  2005 after Mr. Pirnie sent that letter on
23  June 24, 2005, are you aware of any changes

Page 40

1  that were made to Conference America's web
2  site because of the then ending
3  relationship between Conference America and
4  Conexant?
5    A.  I'm not aware of the cause of
6  any of the changes to be honest with you.
7    Q.  Are you aware of any changes
8  that occurred to the web site for any
9  reason after June 24, 2005?
10    A.  We made changes to the web site
11  on a regular basis.  I can't speak to any
12  specific time that things were changed.
13    Q.  Let me ask it this way:  Are
14  you aware of any change that was made to
15  the web site after June 24, 2005, and that
16  change was made specifically in reference
17  to Conexant?
18    MR. BORTON:  Object to the
19  form.
20    A.  I'm not aware of that.
21
22    (Whereupon, Defendant's Exhibit
23  Number 3 was marked for identification and

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 41

1 copy of same is attached hereto).
2
3    Q.  (BY MR. MILLER)  Let me mark as
4 Defendant's Exhibit Number 3 a copy of
5 Exhibit A to the complaint which Conference
6 America filed with the Court, and I'll tell
7 you this is the terms and conditions, and
8 it's dated July 25, 2005.  Have you had a
9 chance to see that particular document?
10    A.  What do you mean, right now?
11    Q.  Before today.
12    A.  I've seen our terms and
13 conditions before.
14    Q.  Here's what I want to ask you
15 about that one.  It's got a date of July
16 25, 2005, at the bottom right-hand corner,
17 do you see that?
18    A.  I do.
19    Q.  Do you know what that date
20 signifies, if anything?
21    A.  That date signifies the date
22 that the web page was printed in most web
23 browsers.

Page 42

1    Q.  And I think you've already
2 answered this question, but let me ask it
3 again.  You cannot tell me when Conference
4 America's terms and conditions section of
5 the web site was last changed before July
6 25, 2005, correct?
7    A.  I cannot tell you the date when
8 it was last changed before that.
9    Q.  Nor can you tell me how it was
10 changed last before July 25, 2005, correct?
11    A.  I can tell you technically how
12 it was changed.
13    Q.  Substantively, you cannot tell
14 me how it was last changed before July 25,
15 2005?
16    A.  That's correct.
17    Q.  When you said technically I can
18 tell you how it was changed, what are you
19 talking about?
20    A.  I can tell you the technical
21 process of --
22    Q.  What we alluded to earlier,
23 where you would go into the system and make

Page 43

1 the changes?
2    A.  Correct.
3    Q.  But as to when any such change
4 may have occurred before July 25, 2005, and
5 what the particular changes in the language
6 may have been, you can't tell me that?
7    A.  Correct.
8    Q.  Have you discussed this lawsuit
9 between Conference America and Conexant
10 with anyone other than counsel for
11 Conference America?
12    A.  Yes.
13    Q.  Who?
14    A.  Mr. Pirnie.
15    Q.  Tell me about that discussion.
16    A.  The whole discussion was
17 related to this deposition.
18    Q.  What did he say?
19    A.  He told me to tell the truth
20 and to not let you put words in my mouth.
21    Q.  Did he tell you anything else?
22    A.  No.
23    Q.  I hope you haven't felt like

Page 44

1 I've been putting words in your mouth.
2    A.  No.
3    Q.  Did you and he discuss any of
4 the topics that I had indicated I wanted to
5 speak with someone about, those being
6 listed on the deposition notice, Exhibit
7 Number 1?
8    A.  Briefly.
9    Q.  What was said about that?
10    A.  To the best of my recollection,
11 I think he just told me to see what I could
12 find.
13    Q.  Any further discussion with Mr.
14 Pirnie?
15    A.  I don't think so.  I think I
16 did tell him about archive.org, but we
17 didn't discuss it in detail.
18    Q.  Did anybody instruct you to go
19 to these outside web sites, including
20 archive.org, or is that just something you
21 did on your own?
22    A.  I did that on my own.
23    Q.  Was that search before or after

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1 you had conducted the internal search to
2 see if there was any way to determine this
3 type of information within Conference
4 America's own computer system and
5 recordkeeping?
6    A.  I don't think it was before or
7 after.  I think I did it at the same time.
8 I did it as part of it.
9    Q.  How long did you spend trying
10 to get this requested information?
11    A.  I don't know exactly how long.
12 Maybe -- I don't know.
13    Q.  Are we talking hours, or thirty
14 minutes, or what?
15    MR. BORTON:  Object to the
16 form.
17    A.  It wasn't thirty minutes, but
18 I don't know exactly.  It was more than
19 that.
20    Q.  Did you do it at one session,
21 if you will?
22    A.  No.
23    Q.  How many days was this spread

Page 46

1 over?
2    A.  I'm not sure.
3    Q.  And I'm not going to badger you
4 about this, but are we talking one hour or
5 ten hours?  Can you put any time frame on
6 it for me?
7    MR. BORTON:  Object to the
8 form.
9    A.  I would be guessing.
10    Q.  (BY MR. MILLER)  Less than
11 five hours?
12    MR. BORTON:  Object to the
13 form.
14    A.  Yes.
15    Q.  (BY MR. MILLER)  And regardless
16 of exactly how long it took, you have
17 satisfied yourself that you've made a good
18 thorough diligent search to try to get the
19 requested information that we listed
20 earlier?
21    A.  That's correct.
22    Q.  Since we've been sitting here
23 in the deposition, is there any other place

Page 47

1 that you've thought of you could look or
2 method that you've thought of that you
3 could try to see if this information is
4 obtainable?
5    A.  Information being the dates?
6 What information --
7    Q.  (Indicating).
8    A.  Oh, this information.
9    Q.  The information listed on the
10 deposition notice and any dates about when
11 the web site was changed.  And I'm not
12 suggesting there is any other place, I just
13 am wanting to know if something has dawned
14 on you since we've been sitting here that
15 you haven't taken a look at?
16    A.  It has not.
17    Q.  Have you ever had any
18 authorship responsibilities as to the
19 content of the web site?
20    MR. BORTON:  Object to the
21 form.
22    A.  I'm not sure what you mean by
23 authorship responsibilities.

Page 48

1    Q.  (BY MR. MILLER)  You told me
2 earlier that you have been requested from
3 time to time to go in and make the changes.
4 What I'm asking is have you ever been
5 requested to actually author what the
6 wording needs to be in the web site, or
7 have you been provided that by someone
8 else?
9    MR. BORTON:  Object to the
10 form.
11    A.  I have never been asked to
12 author anything on the web site.
13    Q.  (BY MR. MILLER)  Other than the
14 discussions with Mr. Pirnie you told me
15 about a few minutes ago, have you discussed
16 this lawsuit with anybody else other than
17 the lawyers?
18    A.  No.
19    Q.  And I would assume that you
20 never had any personal contact with anyone
21 from Conexant concerning the subject matter
22 of this lawsuit?
23    A.  No, not concerning the lawsuit.

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**



Page 49

1    Q. Have you had any contact with
2  anyone at Conexant concerning the subject
3  matter of the lawsuit?
4    A. No.
5      MR. MILLER: That's all I have.
6  Thank you.
7
8    FURTHER THE DEPONENT SAITH NOT
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 50

1    C E R T I F I C A T E
2
3  STATE OF ALABAMA:
4  JEFFERSON COUNTY:
5
6    I hereby certify that the above and
7  foregoing deposition was taken down by me
8  in stenotype, and the questions and answers
9  thereto were reduced to typewriting under
10  my supervision, and that the foregoing
11  represents a true and correct transcript of
12  the deposition given by said witness upon
13  said hearing.
14    I further certify that I am neither of
15  counsel nor kin to the parties to the
16  action, nor am I in any way interested in
17  the result of said cause.
18
19
20    KERRY K. THAMES - COMMISSIONER
21
22
23

13 (Pages 49 to 50)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## A

able 14:17 18:17 20:18 24:2,11 25:5 29:13
Academy 6:19 8:1
access 35:12,15 35:21 36:1,8 36:18 37:19
accuracy 34:2
accurate 22:4
acting 5:1
action 1:5 50:16
actual 17:9 23:22
additional 21:17
address 5:20
administrator 9:18,20
age 6:12
ago 13:10 18:2 48:15
AGREED 1:18 2:2,9,18
agreement 39:11
ahead 13:3,13 24:18
Alabama 1:2 1:23 4:14 5:23 50:3
alluded 42:22
alterations 12:5
altered 30:10 33:4
America 1:7 4:7 8:10,13 8:17,21 9:3 9:17,21 10:1 10:21 11:1,6

12:1,13,14 23:16 25:2,5 25:14 26:17 28:13 30:19 30:20 31:23 33:2,8 34:12 39:12 40:3 41:6 43:9,11
America's 10:10 11:8 12:3,6,19 13:11 15:5 16:3,9,16 19:13 20:3 21:18 23:9,13 23:18 24:12 24:14 25:3,7 25:21 27:3 28:16 29:21 31:5 33:20,22 38:23 40:1 42:4 45:4
answer 12:13 12:18 13:1,3 13:8,13 21:14 21:22 24:18 26:12,22 27:7 27:10,18 28:9 28:12
answered 35:14 42:2
answers 50:8
anybody 44:18 48:16
apparent 38:15
APPEARAN... 4:1
appeared 22:11
appears 23:7
appropriate 36:4
archive.org

13:23 20:6,9 20:16 21:10 21:19 22:5,10 24:9 44:16,20
area 7:16,19
aside 24:10
asked 16:20 27:14 37:8 48:11
asking 6:21 19:18 20:1 48:4
aspect 13:16
assign 2:14
assume 6:13 19:17 21:8 39:15 48:19
ATCHISON 4:12
Atlanta 4:8
attached 11:18 14:4 41:1
attempt 20:9
attempted 15:3
attest 18:21
attorneys 19:13
author 48:5,12
authorship 47:18,23
aware 11:4 26:3,8 27:13 28:23 29:5 30:17 31:1 38:22 39:7,13 39:14,23 40:5 40:7,14,20

## B

back 21:5 22:11
background 7:22 15:9
badger 46:3

Bank 4:7
Baptist 6:20
basically 39:20
basis 40:11
behalf 12:14
belabor 22:3
believe 14:16 37:20
Bell 6:11
best 12:12 22:18 38:21 44:10
better 12:18 13:8
Birmingham 4:14
bit 7:21
Bone 1:14,21 5:5,10,21 7:10 36:12,18
Borton 4:4 5:16 12:21 13:1,12 19:18 19:21 21:13 21:21 22:6 24:17 25:9 27:23 28:17 29:2,23 31:8 32:11 35:10 35:18 36:5,14 37:1 39:3 40:18 45:15 46:7,12 47:20 48:9
bottom 37:22 41:16
Briefly 44:8
bring 9:4 13:19 29:8 34:19
Brookwood 4:13
browsers 41:23

business 32:6
button 38:7,16

## C

C 50:1,1
calendar 30:11 30:23 35:14 35:23
called 36:21
capability 36:1 36:8
capable 35:8
case 6:22 15:10 27:16
Castle 7:23
cause 5:6 40:5 50:17
certain 25:15 25:22
certify 5:2 50:6 50:14
chance 41:9
change 34:16 35:16 37:8 40:14,16 43:3
changed 30:10 30:22 31:3,15 32:9 33:11,17 34:1,8,9,10 34:22 40:12 42:5,8,10,12 42:14,18 47:11
changes 21:12 21:17 24:13 25:7 35:2 36:2,13,22 37:6 38:23 39:23 40:6,7 40:10 43:1,5 48:3
changing 34:4
charge 39:21
children 6:23

# FREEDOM COURT REPORTING

7:1,13
chose 17:10
18:6
Civil 1:5 5:3
clear 35:20
click 38:16,18
clicked 38:7
client 11:2
clue 23:23
college 8:3
come 8:23 9:6
38:17
comes 38:12
commencing
2:1
commissioner
1:22 2:20 5:2
50:20
communicati...
20:2
complaint 41:5
completely
32:13
compliance 2:6
computer
24:15 25:3,14
25:21 26:17
31:6,11,13,20
33:10,15,22
45:4
concerning
13:10 15:16
48:21,23 49:2
conditions
12:5 23:8,12
25:17,23 26:6
26:20 27:2,22
28:15 29:9,15
29:20 30:9,21
34:14,17
35:16 36:3
37:7,9,16,22
38:3,6,14
41:7,13 42:4

conducted
45:1
Conexant 1:10
11:2 39:2,12
40:4,17 43:9
48:21 49:2
Conference
1:7 8:10,13
8:17,20 9:3
9:17,21 10:1
10:10,21 11:1
11:5,7 12:1,3
12:6,13,14,19
13:10 15:4
16:2,8,15
19:13 20:3
21:18 23:8,12
23:16,17
24:12,14 25:2
25:2,4,7,14
25:21 26:17
27:3 28:13,16
29:20 30:19
30:20 31:5,22
33:1,8,20,22
34:12 38:23
39:12 40:1,3
41:5 42:3
43:9,11 45:3
consist 14:8
constantly
34:7
consulted 15:2
contact 48:20
49:1
contained 12:6
12:8
content 47:19
contracted
32:6
copy 11:18
14:4 25:4
26:4 29:8,14
34:20 41:1,4

corner 41:16
correct 8:18
10:15 15:1,23
16:23 17:23
21:7 22:22
23:2,6 24:10
26:15 27:22
28:3,11,20,21
31:16 32:1,2
32:9 34:23
35:3 39:17,18
42:6,10,16
43:2,7 46:21
50:11
counsel 1:20
2:11,13 5:5
20:3 43:10
50:15
counties 7:7
County 7:6
50:4
couple 37:18
court 1:1 2:7
5:14,22 41:6
creation 11:7
12:2,4
Cumberland
9:11

___D___
date 5:2 17:5
17:15,22 19:7
19:8 23:4
31:19 33:14
33:21 41:15
41:19,21,21
42:7
dated 41:8
dates 18:11
47:5,10
dawned 47:13
day 19:2,10
days 45:23
deactivation

26:5,18 27:1
27:20 28:14
29:1,19
Defendant's
3:11 11:12,16
14:2,7 30:4
30:15 40:22
41:4
DEFENDAN...
1:11 4:10
dependent
32:14
DEPONENT
49:8
deposition
1:13,20 2:4,5
2:16,19 11:11
13:17 43:17
44:6 46:23
47:10 50:7,12
depositions 2:8
27:15
describe 10:4
14:10 35:21
designated
28:12
designates
11:13
detail 32:18
44:17
detailed 31:20
determine 15:8
25:22 26:18
33:11 45:2
devices 10:8
diligent 46:18
directly 38:2
director 9:14
discuss 44:3,17
discussed
19:11,15,17
19:19,22 30:6
43:8 48:15
discussion

43:15,16
44:13
discussions
48:14
DISTRICT 1:1
1:2
DIVISION 1:3
document 26:8
29:7 41:9
documentati...
12:10 26:11
30:7,18 31:2
documents
13:19 14:7,11
16:7 19:5,9
23:22,23
24:15 25:4
doing 9:13
double 28:7,9
duly 5:11
duplicate
23:11

___E___
E 50:1,1
earlier 42:22
46:20 48:2
educational
7:22
effect 2:6
either 16:14
30:18
emanated
39:17
employed 8:9
8:12,16
entered 37:14
Entertainment
15:18
entire 10:6
17:18
entitled 12:9
14:22
Ernest 4:4

# FREEDOM COURT REPORTING

evidence 2:16
evolving 34:7
exact 23:11
exactly 37:10
  45:11,18
  46:16
examination
  3:3 5:7,18
examined 5:11
example 21:2
Exhibit 3:11
  11:12,16 14:2
  14:7 30:4,15
  40:22 41:4,5
  44:6
EXHIBITS 3:9
existed 29:9,15
existence 24:16
expenses 12:9
  37:6

### F

F 50:1
family 7:5,19
far 21:6 27:16
farthest 22:12
fashion 31:7
Federal 5:3
fee 26:5,18
  27:1,20 28:14
  29:1,19
fees 12:9 37:6
felt 43:23
file 26:4
filed 41:6
files 33:14
filing 2:19
find 14:18 16:2
  16:12 24:23
  25:5,15 26:14
  33:19 44:12
fine 5:16 13:2
  13:3
firms 10:19

first 5:11 25:16
  26:1,5,19
  27:1,21 28:14
  28:22 33:8
five 12:8 46:11
Floor 4:13
follow 18:4
followed 18:7
following 5:7
follows 5:12
force 2:5
foregoing 5:4
  50:7,10
form 2:12
  12:22 21:14
  21:22 22:7
  24:17 25:10
  28:1,18 29:3
  30:1 31:9
  32:12 35:11
  35:19 36:6,15
  37:2 39:4
  40:19 45:16
  46:8,13 47:21
  48:10
found 14:16
four 8:14 14:9
  16:9 17:1
  23:3,7 30:4
  30:14
frame 46:5
frequently
  34:8
full 2:6 5:19
further 2:2,9
  2:18 44:13
  49:8 50:14

### G

gain 23:16
general 34:12
generally 9:23
  10:4,6
generating

14:12
Georgia 4:8
getting 28:7
give 20:4 29:14
  34:8
given 16:16
  34:10 50:12
go 6:16 8:6
  13:3,13 16:19
  20:8,15 21:5
  22:10,11
  24:18 25:14
  25:20 26:16
  33:3,9 34:15
  35:2 36:2,12
  37:19 38:10
  42:23 44:18
  48:3
goes 6:18,19
going 11:11
  17:15 46:3
good 46:17
Google 14:16
Graduate 8:4
grounds 2:14
guessing 46:9

### H

hard 25:3 26:3
hearing 33:1
  50:13
Heights 7:23
hereto 11:18
  14:4 41:1
high 8:1
highly 31:10
  31:13
historical
  14:14,20 15:8
  18:18 24:11
historically
  24:4 33:3,10
history 14:18
  14:20 15:16

15:21 20:20
  21:3 23:17
honest 40:6
hope 43:23
host 32:7,14
  33:2,9
hosted 32:5
hosting 32:21
hosts 31:23
  32:16
hour 46:4
hours 45:13
  46:5,11

### I

idea 34:8
identification
  11:17 14:3
  40:23
impression
  32:5
includes 10:7
including 12:7
  44:19
independent
  32:7
independently
  32:6
INDEX 3:1
indicated
  11:23 44:4
Indicating
  29:11 47:7
indicator
  33:16
information
  9:15 15:4,16
  16:2 23:17
  24:3,12 25:1
  25:6 31:7
  45:3,10 46:19
  47:3,5,6,8,9
initial 12:7
  38:11

ink 34:21
inquire 17:16
inquired 23:5
inserted 26:6
  26:19 27:21
insertion 12:7
instruct 44:18
instruction
  20:4 34:9,15
  35:6 36:4
  37:5
interested
  50:16
internal 10:16
  45:1
internally
  10:18 23:15
Internet 14:15
intrafirm
  10:20
investigate
  16:21
item 18:6
items 36:16
IV 4:4 5:21

### J

JEFFERSON
  50:4
job 8:20 9:3
  10:5
Joseph 4:11
July 29:10,10
  29:16,16,21
  29:21 41:8,15
  42:5,10,14
  43:4
June 1:15,23
  19:6 39:8,23
  40:9,15
jury 6:22 7:2

### K

K 1:21 5:1
  50:20

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

keep 21:23
31:6,11,14
keeps 14:14
Kelly 7:10
Kerry 1:21 5:1
50:20
kin 50:15
kind 36:11
kindergarten
6:14,17
Kindergartner
6:18
knew 38:3
know 10:19
15:13,21
16:11 18:13
18:16,19 19:4
19:6 20:13,13
20:17 21:9,14
21:15,22,23
22:4 23:10,14
24:8 27:9
29:4,18 30:2
30:6 31:4
32:10,19,20
38:10 41:19
45:11,12,18
47:13
knowledge
22:19 25:13
25:19 26:2,21
32:16 38:21
knows 6:23

**L**

L 1:17
language 12:6
12:8 25:15,22
26:5,19 27:1
27:20 28:14
28:23 29:19
34:16 43:5
law 10:19
laws 2:7

lawsuit 39:16
43:8 48:16,22
48:23 49:3
lawyers 48:17
leading 2:12
learn 15:4 24:2
24:11 39:19
learned 39:15
leave 24:7 33:7
Lebanon 8:1
9:12
letter 39:9,14
39:22
Let's 34:13
35:14
link 18:8 38:18
listed 44:6
46:19 47:9
litigation 10:23
little 7:21
live 6:1
lives 7:8
located 18:14
lockout 36:11
log 33:17,19
long 8:12
24:22 45:9,11
46:16
look 47:1,15
looked 23:21
23:22 26:10
looking 30:13
lot 32:21
lots 10:19
L.L.P 4:5

**M**

maintain 10:11
10:13
maintenance
11:7 12:3
making 13:2
manage 10:6
March 17:10

17:14,21 18:3
18:6 21:10,18
23:4,13
Maria 6:7
mark 11:11
14:6 41:3
marked 11:17
14:3 34:20
40:23
married 7:11
Mary 7:10
matter 48:21
49:3
mean 17:6 22:3
24:22 27:6
33:6 35:7,9
38:9 39:6
41:10 47:22
mentioned
18:1
method 47:2
MIDDLE 1:2
Military 7:23
Miller 3:5 4:11
5:18 11:20
13:6,15 14:6
21:16 22:2,9
24:21 25:12
28:3,19 29:6
30:3 31:12
32:15 35:13
35:22 36:10
36:20 37:4
39:7 41:3
46:10,15 48:1
48:13 49:5
mind 13:7
minute 13:10
18:2
minutes 45:14
45:17 48:15
Mississippi 8:3
modified 31:18
33:14,21

Monroe 1:22
Montgomery
1:23 5:22
6:19 7:6,8
8:19 9:1,4
months 8:15
mouth 43:20
44:1

**N**

N 1:17
name 5:19 6:6
7:9
names 20:14
NE 4:6
necessary 2:10
need 17:7
needs 48:6
negative 28:8
28:10
neither 50:14
network 9:18
9:19 10:7,7
never 48:11,20
normal 31:20
NORTHERN
1:3
notice 2:19
11:11 13:17
44:6 47:10
number 11:12
11:17 12:2,4
14:3,7 30:15
40:23 41:4
44:7

**O**

O 1:17
Object 12:21
21:13,21 22:6
24:17 25:9
27:23 28:17
29:2,23 31:8
32:11 35:10
35:18 36:5,14

37:1 39:3
40:18 45:15
46:7,12 47:20
48:9
objection 13:2
13:12
objections 2:11
2:14
obtainable
47:4
occurred 40:8
43:4
offense 7:2
offered 2:16
Oh 47:8
Okay 7:4
14:13 28:22
38:10
Ole 8:4,7
operating 10:8
oral 5:6
outside 30:19
44:19

**P**

P 1:17
page 3:3 14:19
17:3,9,10,10
17:17 18:11
19:17 22:15
22:20,23 23:7
37:21,22
38:11 41:22
pages 10:18
14:9,14 16:10
16:13 17:1,12
18:2,8 23:3
30:14
Paine 1:14,21
5:5,10,21
36:12,18
panel 7:2
paper 26:4
paragraph

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 55

12:8
**Pardon** 12:23
**part** 45:8
**participated** 34:3
**particular** 20:5 38:7 41:9 43:5
**parties** 1:19 2:13 50:15
**Peachtree** 4:6
**pencil** 34:21
**pending** 11:1
**people** 35:23
**person** 12:12 27:12 34:15 36:21
**personal** 48:20
**personally** 29:18 38:22
**picked** 17:14
**Pirnie** 27:12 34:6,19 39:9 39:22 43:14 44:14 48:14
**place** 4:13 36:11 39:11 46:23 47:12
**placed** 25:16 25:22 27:1 28:15
**PLAINTIFF...** 1:8 4:3
**Plaza** 4:7
**point** 39:16
**policy** 32:14
**pop-up** 37:23
**position** 12:18 13:8
**possible** 21:16
**preschool** 6:15 6:17
**preschooler** 6:19

**presence** 19:14
**present** 10:2 38:6
**presently** 8:9
**price** 39:10
**print** 20:23
**printed** 16:15 19:5,10 23:1 34:20 41:22
**prior** 2:16
**private** 10:16
**Procedure** 5:4
**proceedings** 5:8
**process** 42:21
**produce** 13:20 14:19 20:19 29:13
**produceable** 31:7
**produced** 11:5 16:10 30:5,7 30:16
**produces** 18:23
**production** 13:16
**professional** 16:5
**program** 39:10
**protection** 39:10
**provided** 5:3 14:8 48:7
**public** 10:12 10:13
**purports** 18:17
**purposes** 6:22
**put** 22:21 43:20 46:5
**putting** 44:1
**P.M** 2:1

___
**Q**
___

**question** 26:12 26:23 27:6,7 27:10 28:9 32:23 42:2
**questions** 2:12 2:13 6:21 7:3 12:13,19 13:9 50:8

___
**R**
___

**R** 50:1
**read** 13:9 27:15 37:11 37:13
**reading** 2:3
**realize** 10:23
**really** 22:3
**reason** 20:22 21:9 31:5 32:22 34:4 40:9
**reasons** 15:14 16:5
**received** 20:2 35:5 37:5
**recollection** 44:10
**record** 14:14
**recordkeeping** 45:5
**recruited** 9:7,8
**reduced** 50:9
**reference** 40:16
**regarding** 12:10
**regardless** 46:15
**regular** 36:22 40:11
**related** 43:17
**relating** 2:7
**relationship** 39:17 40:3

**relative** 7:15 10:10 16:8,15 18:3,10 20:19 23:4
**reliability** 18:22
**remaining** 17:11 18:8
**repeat** 13:4 28:5 30:12
**REPORTER** 5:14
**representation** 14:21
**representative** 11:6 27:19 28:13
**represents** 50:11
**request** 13:16 13:20 29:11
**requested** 45:10 46:19 48:2,5
**requests** 29:7
**residence** 5:20
**respective** 1:20
**response** 13:20
**responsibilit...** 10:1,5 47:18 47:23
**responsibility** 10:9
**restricted** 24:23
**result** 17:10,12 17:18 18:6 22:4 23:1 50:17
**results** 18:5,22 19:12,20 20:19,23
**right** 38:12,13 41:10

**right-hand** 41:16
**Road** 6:11,20
**rules** 2:7 5:3

___
**S**
___

**S** 1:17 4:11
**SAITH** 49:8
**SANDERS** 4:5
**satisfied** 12:11 46:17
**says** 22:16
**school** 6:12 7:1 8:1,6
**screen** 38:15
**search** 14:17 17:22 18:5 19:2,7,9 20:5 20:10,19 22:4 22:15,21,23 24:8 25:1 44:23 45:1 46:18
**searched** 17:8 17:19,20
**searches** 18:18 18:22
**searching** 24:14
**section** 26:20 27:2 28:15 29:20 30:9,21 34:14 37:6,16 42:4
**sections** 37:10
**security** 36:16
**see** 13:15 16:7 18:7 22:14 26:10 38:8 41:9,17 44:11 45:2 47:3
**seek** 15:15
**seen** 11:10,20 15:6 29:11

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 41:12 | 33:21,23 34:4 | **Street** 1:22 4:6 | 45:13 46:4 | **think** 12:18 |
| **select** 37:21 | 34:7,12,17 | **strictly** 24:13 | **Taylor** 6:20 | 24:6 42:1 |
| **selected** 17:4 | 35:17 36:3,13 | **striking** 6:22 | **technical** 42:20 | 44:11,15,15 |
| **selection** 17:12 | 36:22 37:16 | **stuff** 22:1 | **technically** | 45:6,7 |
| **sent** 39:9,22 | 38:11,12,23 | **subject** 48:21 | 42:11,17 | **thirty** 45:13,17 |
| **services** 37:21 | 39:21 40:2,8 | 49:2 | **technology** | **Thomas** 4:4 |
| **session** 45:20 | 40:10,15 42:5 | **Substantively** | 9:15 | **thorough** |
| **set** 17:18 36:12 | 47:11,19 48:6 | 42:13 | **tell** 5:19 7:21 | 46:18 |
| **setting** 24:10 | 48:12 | **suggesting** | 21:4 24:3 | **thought** 47:1,2 |
| **seven** 8:14 | **sites** 14:15 | 33:18 47:12 | 25:6 26:4 | **three** 12:9 23:3 |
| **sheet** 23:8 37:7 | 15:17 18:18 | **Suite** 1:23 | 27:5,6 30:8 | **time** 2:15,15 |
| 38:6,15 | 20:9,12,18 | **summer** 39:21 | 30:20 31:2 | 9:10 16:1,3 |
| **sheets** 30:5 | 21:1,5 22:10 | **supervision** | 32:4,8,20 | 22:11 24:20 |
| **short-term** | 32:21 44:19 | 50:10 | 33:23 41:6 | 25:18 26:1 |
| 21:2 | **sitting** 46:22 | **sure** 17:13 | 42:3,7,9,11 | 28:6 36:22,23 |
| **show** 17:7 | 47:14 | 19:16 21:9 | 42:13,18,20 | 38:16 40:12 |
| 22:20 | **situation** 38:19 | 23:10,14 24:7 | 43:6,15,19,21 | 45:7 46:5 |
| **signature** 2:3 | 39:1,5 | 28:8 30:13 | 44:16 | 48:3,3 |
| **signifies** 41:20 | **somebody** 6:23 | 36:7 38:9 | **ten** 46:5 | **times** 15:12 |
| 41:21 | 32:8 | 46:2 47:22 | **Tennessee** 8:2 | **title** 9:16,19 |
| **similar** 10:21 | **sons** 6:5,12 | **surrounding** | 9:12 | **today** 11:5 |
| **sister** 7:8 | **sorry** 13:5 28:5 | 7:6 | **terminated** | 16:17 24:8 |
| **sit** 35:1 | **source** 30:8,18 | **sworn** 5:11 | 39:10 | 26:23 41:11 |
| **site** 10:10,11 | **speak** 12:1 | **system** 24:15 | **terms** 12:5 | **told** 32:22 34:6 |
| 10:12,14,17 | 37:10 40:11 | 25:3,15,21 | 23:7,11 25:16 | 43:19 44:11 |
| 10:20 11:8 | 44:5 | 26:17 31:6,11 | 25:23 26:6,19 | 48:1,14 |
| 12:4,7,20 | **specific** 22:15 | 31:13,21 | 27:2,21 28:15 | **top** 22:15 |
| 13:11,23 | 40:12 | 33:10,15,22 | 29:8,14,20 | **topics** 11:13 |
| 14:13,17,21 | **specifically** | 35:2 36:11,17 | 30:8,21 34:13 | 12:15 13:9 |
| 14:22 15:5,9 | 23:5 39:8 | 42:23 45:4 | 34:16,20 | 44:4 |
| 15:15,20 16:3 | 40:16 | **systems** 1:10 | 35:16 36:2 | **track** 31:11,14 |
| 16:8,9,14,16 | **spend** 45:9 | 10:8 | 37:7,9,15,21 | **transcript** |
| 16:19,20 | **spread** 45:23 | | 38:2,5,14 | 50:11 |
| 18:17 19:3 | **STARNES** | **T** | 41:7,12 42:4 | **trial** 2:15 |
| 20:5 21:18 | 4:12 | **T** 1:17,17 50:1 | **testified** 5:12 | **TROUTMAN** |
| 23:9,13,18,23 | **STATE** 50:3 | 50:1 | **testify** 11:6 | 4:5 |
| 24:4,13 25:8 | **STATES** 1:1 | **take** 7:2 35:14 | 27:19 | **true** 50:11 |
| 25:17,23 26:7 | **stenotype** 50:8 | **taken** 1:21 | **Thames** 1:22 | **truth** 43:19 |
| 26:20 27:3,20 | **STIPULAT...** | 27:16 47:15 | 5:1 50:20 | **try** 15:8 46:18 |
| 27:22 28:16 | 1:18 2:2,9,18 | 50:7 | **Thank** 49:6 | 47:3 |
| 29:1,9,15,21 | **stipulation** 5:4 | **talk** 34:13 | **thereto** 2:17 | **trying** 16:12 |
| 30:9,22 31:14 | **stipulations** | **talked** 30:17 | 50:9 | 23:16 24:23 |
| 31:23 32:5,8 | 5:15 | **talking** 24:9 | **thing** 34:7 | 33:19 39:19 |
| 33:2,4,9,11 | **stop** 21:10 | 34:11 42:19 | **things** 40:12 | 45:9 |

# FREEDOM COURT REPORTING

turn 7:1
two 6:5,12 12:4
  17:3,9,11,18
  18:2,8,11
  22:23
type 21:20
  38:1 45:3
typed 16:21
typewriting
  50:9

---

**U**

U 1:17
understand
  31:22
understanding
  17:14 24:6
UNITED 1:1
University 8:2
  9:11
unusual 31:10
  31:13
updated 24:1,4
URL 38:2
Usual 5:14
Usually 34:19

---

**V**

VS 1:9

---

**W**

waived 2:4,20
want 12:11
  23:9 24:7
  28:8 35:13
  41:14
wanted 11:13
  11:23 15:20
  16:21 32:23
  44:4
wanting 38:7
  47:13
wasn't 39:14
  45:17
way 25:13,20

26:16 30:10
30:22 33:12
34:1,10 40:13
45:2 50:16
ways 35:14,21
  37:19
web 10:10,11
  10:12,13,17
  10:18,20 11:8
  12:3,7,19
  13:11,23
  14:13,15,17
  14:19,21,22
  15:5,9,15,17
  15:20 16:3,8
  16:9,14,16,19
  16:20 18:16
  18:18 19:3
  20:5,8,12,18
  21:1,5,18
  22:9 23:9,13
  23:18,23 24:4
  24:12 25:8,17
  25:23 26:7,20
  27:3,19,22
  28:16 29:1,9
  29:15,21 30:9
  30:22 31:14
  31:23 32:5,8
  32:21 33:2,4
  33:9,11,20,23
  34:4,7,12,17
  35:17 36:3,13
  36:22 37:16
  38:11,11,23
  39:21 40:1,8
  40:10,15
  41:22,22 42:5
  44:19 47:11
  47:19 48:6,12
week 21:2
went 7:23 8:2
  9:20 14:11
  16:1 38:4

we're 19:16
  28:7
we've 24:8
  46:22 47:14
Whispine 5:22
wife 6:5 7:5,18
wife's 6:6
window 37:23
Winstead 5:21
witness 2:4 5:6
  50:12
wording 48:6
words 43:20
  44:1
work 6:8,10
  8:19 9:20
working 9:9
wrong 32:3
www.archiv...
  14:23 15:3
  16:4 18:14,23
  19:12
www.yourca...
  14:18 16:22
  17:9 20:20
  37:20 38:5

---

**Y**

Yeah 5:16
year 30:11,23
  35:15,23
  36:19
years 8:14 25:8
YMCA 6:11
yourcall.com
  17:19,21
  21:20 22:16

---

**1**

1 3:12 11:12,17
  44:7
100 4:13
11 3:12
14 1:15 2:1
  3:13

15 29:10,16,21
1650 1:23
1991 8:20
1999 8:17,21
  9:2,21 10:2

---

**2**

2 3:13 14:3,7
  30:4,15
2nd 19:6
2:05-cv-1088...
  1:5
2:08 2:1
20 29:10,16,21
2005 17:11,14
  17:21 18:3,6
  21:11,19 23:4
  23:13 29:10
  29:10,16,22
  30:11,23
  35:15,23 38:4
  38:19 39:8,9
  39:22,23 40:9
  40:15 41:8,16
  42:6,10,15
  43:4
2006 1:15 2:1
  19:6
201 1:22
24 39:8,23 40:9
  40:15
25 41:8,16 42:6
  42:10,14 43:4

---

**3**

3 3:14 40:23
  41:4
30308 4:8
35209 4:14
36117 5:23

---

**4**

40 3:14

---

**5**

5 3:5
5200 4:7

---

**6**

6 18:6 21:19
  23:4,13
6th 17:11,14
  17:21 18:3
  21:10
600 4:6

---

**7**

7th 4:13

---

**9**

91 8:8
9272 5:22

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**DEFENDANT'S EXHIBIT**

*1 - Bone*

CONFERENCE AMERICA, INC.,     )

     Plaintiff,            )

                         )

vs.                        )     CASE NO. 2:05 cv 1088-WKW

                         )

CONEXANT SYSTEMS, INC.,      )

     Defendant.           )

                         )

## <u>NOTICE OF 30(b)(6) DEPOSITION</u>

TO:    Thomas Ernest Borton, IV, Esquire
        TROUTMAN SANDERS, L.L.P.
        600 Peachtree Street, NE
        5200 Bank of America Plaza
        Atlanta, GA  30308-2216

      Please take notice that Defendant, pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, will take the deposition of that person or those persons who is/are

corporate representative of Plaintiff Conference America, Inc., before a duly authorized

court reporter, notary public or some other person authorized by law to administer oaths

and take depositions on **June 14, 2006 at 2:00 p.m. at the offices of  Maynard, Cooper**

**& Gale, P.C., The RSA Tower, 201 Monroe Street, Suite 1650, Montgomery, AL.**

Said deposition will continue from day to day thereafter until completed.  You are invited

to attend and cross-examine if you so desire.

      Pursuant to Rule 30 (b) (6) the Defendant requests that Plaintiff Conference

America, Inc. designate one  or  more  managing  agents  or  employees  who  are

knowledgeable in the below listed areas to testify as a representative of the Plaintiff. The relevant areas of inquiry are as follows:

1.    Creation of and maintenance of Conference America's website.

2.    Creation of and alterations to the Terms and Conditions language contained in Conference America's website, including the initial insertion of the language contained in paragraph 5 entitled "Fees and Expenses."

3.    Documentation regarding the above.

The deponent is requested to bring to the deposition the following:

## REQUEST FOR PRODUCTION

1.    Any and all documents of any sort, including computerized information, which indicates when and how the language regarding a deactivation fee was placed in the "Fees and Expenses" section of the Terms and Conditions on Conference America's website.

2.    A copy of the Terms and Conditions that existed on the website as of July 15, 2005 and July 20, 2005.

Joseph S. Miller
Attorney for Defendant

{B0601277}                          - 2 -

OF COUNSEL:
STARNES AND ATCHISON LLP
Seventh Floor, 100 Brookwood Place
P.O. Box 598512
Birmingham, Alabama 35259-8512
(205) 868-6000

## Certificate of Service

I hereby certify that I have this the _5th_ day of ~~May,~~ June 2006, served a copy of the foregoing on all counsel by mailing same to each by U.S. Mail, postage prepaid and properly addressed.

OF COUNSEL

cc:

Thomas Ernest Borton, IV, Esquire
TROUTMAN SANDERS, L.L.P.
600 Peachtree Street, NE
5200 Bank of America Plaza
Atlanta, GA 30308-2216

Freedom Court Reporting
367 Valley Avenue
Birmingham, AL 35209

23024

{B0601277}                         - 3 -

Internet Archive

Web | Moving Images | Texts | Audio | Software | Education | Patron Info | About IA

Forums | FAQs | Contributions | Jobs | Donate

Search: [_____] [All Media Types ▾] ⊙

Anonymous User (login or join in)

**Announcements** (more)

Site troubles

Bookmark explorer

Dead update

**Web**

WayBackMachine

$5 billion pages

http://www.yourcall.com

Take Me Back    Advanced Search

**Welcome to the Archive** [RSS]

The Internet Archive is building a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public.

---

**Moving Images** ⊙
35,682 movies

Browse (by keyword)
Upload your own movie

This Just In (more) [RSS]

9 Muhammad PBUH the...
26 minutes ago

Curator's Choice (more)



Spider-Man: The Peril of Doc Ock
A stop motion LEGO short by Spite Your Face Productions Ltd, commissioned by Sony Pictures/Marvel...

**Recent Reviews**

Pacific Sunset
Average rating: ☆☆☆☆☆

The Good Samaritan
Average rating: ☆☆☆☆☆

---

**Live Music Archive** ⊛
35,842 concerts

Browse (by band)
Upload your own concert

This Just In (more) [RSS]

Ween Live at Jam on The...
27 minutes ago

Curator's Choice (more)

**LIVE MUSIC ARCHIVE**

Keller Williams Live at Old Settler's Music...
Disc 1 01. Intro 02. Apparition 03. Freakshow* 04. Life is 05. Crater In The Backyard 06...

**Recent Reviews**

Grateful Dead Live at Delta Center on 1995-02-21
Average rating: ☆☆☆☆☆

Grateful Dead Live at Orpheum Theatre on 1976-07-18
Average rating: ☆☆☆☆☆

---

**Audio** ⊛
80,529 recordings

Browse (by keyword)
Upload your own recording

This Just In (more) [RSS]

Mother Jones Radio...
25 days ago

Curator's Choice (more)



Disastertron - Cereal Code
An insanely nutty 8-bit / IDM / Glitch collaboration album featuring Spamtron and Disasterpeace...

**Recent Reviews**

Big City Orchestra - Things Fall Down [LF064MP3]
Average rating: ☆☆☆☆☆

Chapters from my Autobiography
Average rating: ☆☆☆☆☆

---

**Texts** ⊙
29,128 texts

Browse (by keyword)
Upload your own text

This Just In (more) [RSS]

Peer Pressure
3 hours ago

Curator's Choice (more)

Open Source Books

The 9/11 Commission report [electronic resource]...
From the 9/11 Commission web site: The National Commission on Terrorist Attacks Upon the United...

**Recent Reviews**

Elements of Radio Servicing
Average rating: ☆☆☆☆☆

Memoirs Of Babar, Emperor Of India
Average rating: ☆☆☆☆☆

---

**Most recent posts** (write a post by going to a forum) more...

| Subject | Poster | Forum | Replies | Views | Date |
|---|---|---|---|---|---|
| Re: dead.net | liranta | GratefulDead | 0 | 3 | 15 minutes ago |
| The Grateful Dead | Max Chorak | GratefulDead | 0 | 8 | 16 minutes ago |
| Re: dead.net | orchdoctor | GratefulDead | 1 | 15 | 53 minutes ago |
| Re: what happened to my upload files | Diana Hamilton | etree | 0 | 3 | 1 hour ago |
| Re: dead.net | Diana Hamilton | GratefulDead | 0 | 15 | 1 hour ago |
| Re: New 'Populate' buttons on metadata screen | greenone | etree | 0 | 5 | 2 hours ago |
| Re: dead.net | profacfrock | GratefulDead | 1 | 11 | 2 hours ago |
| "Syringe" | max_von_mayerling | feature_films | 0 | 12 | 2 hours ago |
| Re: so... | painlessilugreen | etree | 0 | 12 | 2 hours ago |
| Re: so... | Brad Leplanc | etree | 0 | 12 | 3 hours ago |

---

**Institutional Support**

Alexa Internet                  National Science Foundation   Hewlett Foundation
HP Computer                     Library of Congress
The Kahle/Austin Foundation     LizardTech                     Individual contributors
Prelinger Archives              Sloan Foundation

---


DEFENDANT'S EXHIBIT

2 - BONE

CA-CON  00385

1 of 1

6/2-06 4:17



CA-CON  00386

Welcome to Conference America®



Home | Services | Savings | Contact |

**Meeting Center**

Start WebEcho
Join WebEcho
AT&T Audio Control
R.S.V.P.
Online Reservations

Audio Services

Web Services

My Services

Our only business is conference calling. We have to do it better.

Industry Leading
99.8%
Quality

Sign Up with Conference America
Click Here to become a customer

Copyright 2003 Conference America, Inc.
WebSite Terms & Conditions "User Policies"
Services Terms & Conditions | Privacy Policy

CA-CON  00387

Print Page | Close this Window

# CONFERENCE AMERICA SERVICES
## TERMS AND CONDITIONS

**1. Events.**

**a. Acceptance of Terms and Conditions.** These Terms and Conditions, your Account Application, Credit Card Authorization Form and Agreement and the User Policies (as defined below) (collectively, the "Agreement") govern your use of and participation in our current or future events, including, but not limited to, conference calls, replay, fax services, WebCabo, VGSN (the "Events") and all services associated with such Events. You acknowledge that you have read and unconditionally agree to these Terms and Conditions, as may be amended by us from time to time upon notice (via e-mail, web site posting or otherwise) to you. You warrant and represent that you are authorized to purchase and use our Events and that you are at least 18 years of age. You also warrant that all information you provide under this Agreement is true and complete and that you will promptly update such information to maintain its accuracy.

**b. User Policies.** You will use the Events in accordance with these Terms and Conditions and our policies and policies, provided or accessible to you from time to time on our web site (the "User Policies"). We may modify such User Policies from time to time upon notice (via e-mail, web site posting or otherwise) to you. You warrant and represent that you are authorized to purchase and use our Events and that you are at least 18 years of age. You also warrant that all information relating to the Events or web site.

**2. Account Security.** Depending on the Event, you may receive access telephone numbers, access codes or URLs upon completing the Event registration process. You are responsible for maintaining the confidentiality or security of, and are fully responsible for all activities that occur, to your access telephone numbers, passcodes, URLs and accounts, and your web site thereof. We cannot and will not be liable for any loss or damage arising from your failure to comply with this Section 2. You will be responsible for any and all amounts charged to your account regardless of prompt notification of unauthorized use or fraudulent use of your account, except to the extent such unauthorized use is caused by our gross negligence.

**3. Event Levels.** You acknowledge that information and loss of Events may occur as a result of maintenance or repairs to our Events or web site, unexpected outages or interruptions (including, but not limited to, a force majeure event under Section 15 below), or an act or omission to you or any third party. We will not incur any liability as a result of any such interruption or loss.

**4. Proprietary Rights.** We own and will retain all right and interests in and to our Events, web site and each component thereof, including, but not limited to, all copyrights, patents, trademarks, trade secrets and other proprietary rights. You will not have, acquire or assert any rights in our Events, web site or component, and will not, without our prior written consent, copy, reproduce or distribute in any manner any of the content, data or information available through our Events or web site.

**5. Fees and Expenses.**

**a. Payment.** You will pay for the Events in accordance with our standard list price and standard payment terms that are applicable to your use of or participation in the Events. For use of the Events, you or any and all authorized and unauthorized users accessing or using your account, you will pay us all amounts due (including, but not limited to amounts due for any Events and other fees and charges under this Agreement) in U.S. currency. Unauthorized users may include anyone that accesses or uses Events under your account without your express permission as a result of fraud or otherwise. We may, at our discretion, apply your payments to any outstanding amounts you owe us for the Events. You will pay all federal, state, and other taxes relating to the Agreement or your use of our Events, [illegible]... For specific fees or services: Operator Handled Calls $0.450 per participant minute; Dial Meet Me $0.405 per participant minute; Activate/Deactivate Maintenance Fee [illegible]... $0.435 per participant minute. If using an IntelliCall, AlwaysOn Calls $0.350 per participant minute. [illegible] per participant minute. You will herein be charged any fees for an Event, then you must notify us of such disputed fees within 60 days from the date of such Event and incurred the disputed fees. If you waive your right to dispute any amount due you apply your deposit toward any amount due as further described in Section 6. If any check, draft or similar instrument that you provide to us in payment of charges owing under this Agreement is returned or dishonored by a financial institution, then you shall pay us a fee of $25.00 or the maximum amount allowed by applicable law, whichever is greater.

**6. Credit Authorization and Deposits.** We may check your financial status and credit history from any sources, at any time, to determine creditworthiness. We may, in our sole discretion, require you to make a reasonable deposit to be held by us as a guarantee of the payment of amounts due under this Agreement. We may apply the deposit to any amounts you owe us under this Agreement and make an additional deposit. At the time the Agreement is terminated, we will credit the amount of the deposit to any amount due and owing by you to us, and any remaining amount of the deposit (less any amounts then due), if any, will be paid on all sums retained on deposit by us only.

**7. Warranty Disclaimer. EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT, WE PROVIDE OUR EVENTS AND WEB SITE ON AN "AS IS" AND "AS AVAILABLE BASIS" AND MAKE NO WARRANTY OR REPRESENTATION OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE EVENTS AND WEB SITE, AND WE HEREBY DISCLAIM ALL SUCH WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, DESCRIPTION AND FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT, WE MAKE NO WARRANTIES OR GUARANTEES THAT THE PERFORMANCE OF OUR EVENTS, WEB SITE OR CONTENT THEREON WILL BE UNINTERRUPTED, TIMELY OR FREE FROM ERRORS.**

**8. Liability Limitation. EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT, YOUR SOLE REMEDY, AND OUR ENTIRE OBLIGATION, WITH RESPECT TO ANY BREACH OF THE AGREEMENT OR FAILURE OR ERROR OF OUR EVENTS WILL BE FOR US TO USE COMMERCIALLY REASONABLE EFFORTS TO RESTORE OR CORRECT SUCH BREACH, FAILURE OR ERROR. IN NO EVENT WILL OUR LIABILITY UNDER ANY PART OF THE FEES ASSOCIATED WITH EVENT LOSS OR INTERRUPTION TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL WE BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES OF ANY KIND (INCLUDING, BUT NOT LIMITED TO, ANY THEORIES OF BREACH OF CONTRACT, TORT (INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE OR STRICT LIABILITY)) FOR ANY DAMAGES, WHETHER COMPENSATORY, DIRECT, SPECIAL, EXEMPLARY, OR LIABILITY THEREOF, EVEN IF WE KNEW OF THE POSSIBILITY OF SUCH DAMAGES. ANY LOST PROFITS, DATA OR BUSINESS, LOSS OF USE OR BUSINESS INTERRUPTION RELATING TO OUR EVENTS (OR ANY UNAVAILABILITY THEREOF), EVEN IF WE KNEW OF THE POSSIBILITY OF SUCH DAMAGES.**

**9. Indemnification.** You will indemnify, defend (at our election) and hereby release us, our directors, our officers and our employees from all losses, damages, penalties, costs and expenses (including, but not limited to, legal fees) caused by, arising from or relating to information provided by you or your use of or participation in our Events or web site or your breach of the Agreement.

**10. Termination of Events.** We may immediately terminate or suspend your account and use of our Events if you breach the Agreement or fail to pay any amounts due to your use of the Events may violate any applicable law or regulation or agreement or threaten our security of or damage to our information, data, software, hardware or facilities. Upon termination of your use or participation, all User Policies shall apply in accordance with respect to the Agreement. Notwithstanding anything to the contrary in the Agreement, Sections 4, 5, 7, 8, 9, 12, 13, 15, 16, and 17 shall survive termination of your account.

**11. Confidentiality.** Our "Confidential Information" means information, in any form, of or relating to us, our customers, users, vendors or licensors or the Events and that is not generally known to the public (including, but not limited to, our pricing terms). You will not, at any time, use, copy or disclose any Confidential Information except as necessary in connection with your use of our Events, and in addition to any other remedies that is expressly permitted in this Agreement. You may use our Events solely for your own internal purposes. You may only make copies of such Confidential Information to the extent reasonably necessary and necessary to protect the confidentiality of our Confidential Information. You will use best efforts to protect our Confidential Information from unauthorized disclosure and use. We may seek equitable relief. In addition to any other remedies available under Section 11, if your obligations under this Section 11 will continue (i) with respect to all Confidential Information that constitutes a trade secret under applicable law, and (ii) with respect to all other Confidential Information no longer is a trade secret under applicable law, for five years after the termination of this Agreement.

**12. Privacy.** For more information on our practices with respect to customer information collection, use and disclosure practices, please review our privacy policy that also governs your use of and participation in our Events. You may review our privacy policy by clicking the privacy policy icon on our web site at www.yourcall.com.

**13. Entire Agreement; Amendments.** These Terms and Conditions, the User Policies, Credit Card Authorization Form and Agreement and the Account Application are the entire agreement between the parties with respect to your use of the Events and supersede all prior agreements, understanding, discussions, warranties and representations, in any form, express or implied, between the parties prior to the Agreement and related to the Events. Except as otherwise provided in this Agreement, the Agreement may only be amended by a writing signed by each party.

**14. Assignment.** You will not assign the Agreement without our prior written consent.

**15. Force Majeure.** We will not be liable for any failure or delay in performance to the extent caused by any event beyond our reasonable control, including, but not limited to, an act of God: flood; riot; fire; explosion; judicial or governmental act; terrorism; military act; labor dispute; third party set or omission; failure of utility or telecommunications facilities; virus, worm, trojan horse or other code, command, file or program designed to interrupt, destroy or limit the functionality of any software, hardware or equipment; Internet slow-down or failure; or any weather condition or event.

**16. Governing Law.** The Agreement will be governed by and construed in accordance with the laws of the State of Alabama.

**17. Severability; Waiver.** All provisions of this Agreement are severable, and any provision of this Agreement (found by a court of competent jurisdiction to be invalid or unenforceable will not affect the validity or enforceability of any other provision of this Agreement. To the extent legally permissible, the parties will replace any illegal, invalid or unenforceable provision of this Agreement with a valid provision that will implement the intended purpose of the illegal, invalid or unenforceable provision.

**18. Notice.** Any notices under this Agreement will be in writing and delivered to the following address or facsimile number: Conference America, Inc., 7079 University Court, Montgomery, Alabama 36117, Facsimile: (334) 290-0707 (or at such other addresses or facsimile numbers as we may from time to time provide you.)

Print Page | Close this Window

CA-CON   00388



DEFENDANT'S EXHIBIT

3 - BONE

A

Print Page        Close this Window

# CONFERENCE AMERICA SERVICES
# TERMS AND CONDITIONS

READ THESE TERMS AND CONDITIONS CAREFULLY BEFORE SUBMITTING YOUR
ACCOUNT APPLICATION. THEY WILL COVER ALL OF YOUR USES OF AND
PARTICIPATION IN THE SERVICES (EVENTS) OFFERED BY CONFERENCE AMERICA. IF
YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, YOU MAY NOT ACCESS OR
OTHERWISE USE THESE EVENTS. YOUR CLICKING ON THE BUTTON MARKED "I AGREE"
OR YOUR EXECUTION OF THE ACCOUNT APPLICATION OR CREDIT CARD
AUTHORIZATION FORM AND AGREEMENT AND YOUR CONTINUED USE OF AND
PARTICIPATION IN THE EVENTS INDICATES YOUR ACKNOWLEDGEMENT THAT YOU
HAVE READ AND ACCEPTED THESE TERMS AND CONDITIONS.

1. Events.
a. Acceptance of Terms and Conditions. These Terms and Conditions, your Account Application, Credit
Card Authorization Form and Agreement and the User Policies (as defined below) (collectively, the
"Agreement") govern your use of and participation in our current or future events, including, but not
limited to, conference calls, replay, fax services, WebEcho and VOSN (the "Events"). You acknowledge
that you have read and unconditionally agree to these Terms and Conditions, as may be amended by us
from time to time upon notice (via e-mail, web site posting or otherwise) to you. You warrant and
represent that you are authorized to purchase and use our Events and that you are at least 18 years of
age. You also warrant that all information you provide under this Agreement is true and complete and
that you will promptly update such information to maintain its accuracy.
b. User Policies. You will use the Events in accordance with these Terms and Conditions and our written
instructions and policies, provided or accessible to you from time to time on our web site (the "User
Policies"). We may modify such User Policies from time to time upon notice (via e-mail, web site
posting or otherwise) to you. You warrant that your use of the Events will not violate any applicable
laws, rules or regulations. You will not, either indirectly or directly, interfere with, corrupt, damage or
disrupt our Events, web site, or hardware, software or facilities. You will not remove or modify any
copyright, trademarks, service marks, confidentiality or other proprietary notice or marking appearing
on any materials relating to the Events or web site.

2. Account Security. Depending on the Event, you may receive access telephone numbers, access codes
or URLs upon completing the Event registration process. You are responsible for maintaining the
confidentiality or security of, and are fully responsible for all activities that occur, to your access
telephone numbers, passcodes, URLs and accounts, and you agree to immediately notify us of any
unauthorized use thereof. We cannot and will not be liable for any loss or damage arising from your
failure to comply with this Section 2. You will be responsible for any and all amounts charged to your
account regardless of prompt notification of unauthorized use or fraudulent use of your account, except
to the extent such unauthorized use is caused by our gross negligence.

3. Event Levels. You acknowledge that interruptions and loss of Events may occur as a result of
maintenance or repairs to our Events or web site, unexpected outages or interruptions (including, but not
limited to, a force majeure event under Section 15 below), or an act or omission by you or any third
party. We will not incur any liability as a result of any such interruption or loss.

4. Proprietary Rights. We own and will retain all rights and interests in and to our Events, web site and
each component thereof, including, but not limited to, all copyrights, patents, trademarks, trade secrets

and other proprietary rights. You will not have, acquire or assert any rights in our Events, web site or components, and will not, without our prior written consent, copy, reproduce or distribute in any manner any of the content, data or information available through our Events or web site.

5. Fees and Expenses.
a. Payment. You will pay for the Events in accordance with our standard list price and standard payment terms that are applicable to you at the time of your participation in the Events. For use of the Events (by you or any and all authorized and unauthorized users accessing or using your account), you will pay us all amounts due including, but not limited to amounts due for any Events and other fees and charges under this Agreement in U.S. currency. Unauthorized users may include anyone that accesses or uses Events under your account without your express permission as a result of fraud or otherwise. We may, at our discretion, apply your payments to any outstanding amounts you owe us for the Events. You will pay all federal, state, and local taxes, surcharges and fees, including, but not limited to, federal excise tax, universal service fees, sales, use and other taxes relating to the Agreement or your use of our Event. You are responsible for all fees or charges assessed by your telecommunications or Internet provider that may be incurred as a result of your use of and participation in our Events. You will reimburse us for all expenses and legal fees incurred by us in enforcing our rights under the Agreement. Standard pricing for services: Operator Handled Calls $0.425 per participant minute; AlwaysOn Calls $0.300 per participant minute; Dial Meet Me $0.405 per participant minute; Activate/Deactivate Maintenance Fee $74.95 per leader account; Question & Answer $0.250 per participant minute; and Replay $0.425 per participant minute. For pricing on the other services contact Conference America, Inc. at 800-925-8000. We may modify all rates and pricing from time to time, with or without notice. If you believe you have been incorrectly charged any fees for an Event, then you must notify us of such disputed fees within 60 days from the date of such Event that incurred the disputed fees or waive your right to dispute those fees. We require written notification of all disputed fees and such notification must be delivered in accordance with Section 18. We may reimburse you, at our discretion, for all disputed fees.
b. Late Fees and Dishonored Check. If you do not pay any amount when due, then you will pay us interest of 1.5% per month on all such overdue amounts until paid and we may apply your deposit to any amount due as further described in Section 6. If any check, draft or similar instrument that you remit to us in payment of charges owing under this Agreement is not paid or dishonored by a financial institution, then you also will pay us a fee of $25.00 or the maximum amount allowed by applicable law, whichever is greater.

6. Credit Authorization and Deposits. We may check your financial status and credit history from any sources, at any time, to determine creditworthiness. We may, in our sole discretion, require you to make a reasonable deposit(s) to be held by us as a guarantee of the payment of amounts due under this Agreement. We may apply the deposit to any amounts you may owe under this Agreement and require you to make an additional deposit. At the time the Agreement is terminated, we will credit the amount of the deposit to any amount due and owing by you to us, and any remaining amount of the deposit will be refunded to you. Interest will be paid on all sums retained on deposit by us only to the extent required by law.

7. Warranty Disclaimer. EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT, WE PROVIDE OUR EVENTS AND WEB SITE ON AN "AS IS" AND "AS AVAILABLE BASIS" AND MAKE NO WARRANTY OR REPRESENTATION OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO OUR EVENTS AND WEB SITE, AND WE HEREBY DISCLAIM ALL SUCH WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, DESCRIPTION AND FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT, WE MAKE NO WARRANTIES OR GUARANTEES THAT THE PERFORMANCE OF OUR EVENTS, WEB SITE OR CONTENT THEREON WILL BE UNINTERRUPTED, TIMELY OR FREE FROM

ERRORS.

**8. Liability Limitation.** EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT, YOUR SOLE REMEDY, AND OUR SOLE OBLIGATION, WITH RESPECT TO ANY BREACH OF THE AGREEMENT OR FAILURE OR ERROR OF OUR EVENTS WILL BE FOR US TO USE COMMERCIALLY REASONABLE EFFORTS TO RESTORE OR CORRECT SUCH EVENTS EXCEPT THAT WE MAY AT OUR SOLE DISCRETION REFUND ALL OR PART OF THE FEES ASSOCIATED WITH EVENT LOSS OR INTERRUPTION. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WE WILL NOT BE LIABLE TO YOU OR ANY THIRD PARTY UNDER ANY CIRCUMSTANCES (INCLUDING, BUT NOT LIMITED TO, ANY THEORIES OF BREACH OF CONTRACT OR WARRANTY OR TORT (INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE OR STRICT LIABILITY)) FOR ANY DAMAGES, WHETHER COMPENSATORY, DIRECT, SPECIAL, EXEMPLARY, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, ANY COSTS TO PROCURE SUBSTITUTE EVENTS OR ANY LOST PROFITS, DATA OR BUSINESS, LOSS OF USE OR BUSINESS INTERRUPTION RELATING TO OUR EVENTS (OR ANY UNAVAILABILITY THEREOF), EVEN IF WE KNEW OF THE POSSIBILITY OF SUCH DAMAGES.

**9. Indemnification.** You will indemnify, defend (at our election) and hereby release us, our directors, our officers and our employees from all losses, damages, penalties, costs and expenses (including, but not limited to, legal fees) caused by, arising from or relating to information provided by you or your use of or participation in our Events or web site or your breach of the Agreement.

**10. Termination of Events.** We may immediately terminate or suspend your account and use of our Events if you breach the Agreement or if we reasonably believe that your use of the Events may violate any applicable law or regulation or agreement or threaten our security of or damage to our information, data, software, hardware or facilities. Upon termination of your use of the Events, you will promptly return to us all data, materials, Confidential Information (as defined below) and our other properties held by you with respect to the Agreement. Notwithstanding anything to the contrary in the Agreement, Sections 4, 5, 7, 8, 9, 10, 11, 13, 15, 16, and 17 of these Terms and Conditions will survive termination of your account.

**11. Confidentiality.** Our "Confidential Information" means information, in any form, of or relating to us, our customers, users, vendors or licensors or the Events and that is not generally known to the public (including, but not limited to, our pricing terms). You will not, and will cause anyone that uses your accounts to not, directly or indirectly, disclose or use our Confidential Information. You may use our Events solely for your own internal purposes. You may only make copies of such Confidential Information as is necessary in connection with your use of such information that is expressly permitted in this Section 11. You will use best efforts to protect our Confidential Information from unauthorized disclosure and use. We may seek equitable relief (in addition to any other remedies) to enforce this Section 11. Your obligations under this Section 11 will continue (i) with respect to Confidential Information that is a trade secret under applicable law, for the longer of five years after the term of the Agreement or until such Confidential Information no longer is a trade secret under applicable law, and (ii) with respect to all other Confidential Information, for five years after the termination of the Agreement.

**12. Privacy.** For more information on our practices with respect to customer information collection, use and disclosure practices, please review our privacy policy that also governs your use of and participation in our Events. You may review our privacy policy by clicking the privacy policy icon on our web site at www.yourcall.com.



13. Entire Agreement; Amendment. These Terms and Conditions, the User Policies, Credit Card Authorization Form and Agreement and the Account Application are the entire agreement between the parties with respect to your use of the Events and supersede all agreements, understandings, discussions, warranties and representations, in any form, express or implied, between the parties prior to the Agreement and related to the Events. Except as otherwise provided in this Agreement, the Agreement may only be amended by a writing signed by each party.

14. Assignment. You will not assign the Agreement without our prior written consent.

15. Force Majeure. We will not be liable for any failure or delay in performance to the extent caused by any event beyond our reasonable control, including, but not limited to, an act of God; flood; riot; fire; explosion; judicial or governmental act; terrorism; military act; labor dispute; third party act or omission; failure of utility or telecommunications facilities; virus, worm, trojan horse or other code, command, file or program designed to interrupt, destroy or limit the functionality of any software, hardware or equipment; Internet slow-down or failure; or any weather condition or event.

16. Governing Law. The Agreement will be governed by and construed in accordance with the laws of the State of Alabama.

17. Severability; Waiver. All provisions of this Agreement are severable, and any provision of this Agreement found by a court of competent jurisdiction to be invalid or unenforceable will not affect the validity or enforceability of any other provision of this Agreement. To the extent legally permissible, the parties will replace any illegal, invalid or unenforceable provision of this Agreement with a valid provision that will implement the intended purpose of the illegal, invalid or unenforceable provision.

18. Notice. Any notices under this Agreement will be in writing and delivered to the following address or facsimile number: Conference America, Inc., 7079 University Court, Montgomery, Alabama 36117, Facsimile: (334) 260-0707 (or at such other addresses or facsimile numbers as we may from time to time provide you.)



| Print Page | Close this Window |