IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CONFERENCE AMERICA, INC.,      )
                               )
        Plaintiff,             )
                               )
                               )
vs.                            )
                               )      CASE NO. 2:05 cv 1088-WKW
                               )
CONEXANT SYSTEMS, INC.,        )
                               )
        Defendant.             )
                               )

**REPLY OF DEFENDANT CONEXANT SYSTEMS, INC.
TO PLAINTIFF'S RESPONSE IN OPPOSITION
TO CONEXANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the defendant, **CONEXANT SYSTEMS, INC. (hereinafter
"Conexant")**, who replies to the plaintiff Conference America, Inc.'s Response in
Opposition to Conexant's Motion for Summary Judgment, as follows:

I.      **Introduction.**

Conexant reiterates that it has made a *prima facie* showing, in its Motion for
Summary Judgment, that there was no mutuality of assent, as required by Alabama law.
Conexant also reiterates that the written agreements, which were the "entire" agreements
between the parties, represent the totality of mutuality of assent, and were completely
silent as to any deactivation fee or any new pricing terms. Conference America attempts
in its Response in Opposition to the Motion for Summary Judgment to create issues of
material fact, but it has completely failed to reference any evidence, much less the
substantial evidence required by Alabama Code § 12-21-12, that Conexant in any way
somehow assented to approximately $146,000.00 in deactivation fees (or new pricing

{B0614185}

terms for the contemplated services). Nothing in Conference America's Response creates a genuine issue of material fact, particularly in reference to the $146,000.00 in deactivation fees, to overcome Conexant's Motion for Summary Judgment.

## II.    Citations to the Written Agreement and Amendments.

Conference America points to several clauses that are indeed contained in the written agreement between the parties, and amendments thereto. For instance, on p. 5 of its Response, Conference America addresses a clause concerning "Confidentiality Obligations," which is in one of the Attachments to the written agreement in question. This clause has absolutely no application here. That was obviously a negotiated and bargained for term which would survive termination of the written agreement, and was contemplated as such by both parties. That is completely different than the deactivation fees here, which were never negotiated and bargained for, or even mentioned, in the written agreements between the parties. To the contrary, as pointed out in Conexant's Motion for Summary Judgment, the deactivation fees came "out of the blue." (See Exhibit "AA" to Complaint).

Along these lines, Conference America also references a "Services and Pricing" clause. (See p. 6 of Conference America's Response). Conference America states, in reference to this clause, that "[t]his affirmative limitation on the pricing directly contradicts Conexant's theory that the discounts would somehow apply after termination." A cursory review of this particular clause, however, reveals that it simply states that Conference America would provide the services that are indeed listed in the written agreement between the parties, and at the negotiated prices. Conexant does not

dispute that it agreed to the services that are specifically enumerated in the written agreement between the parties, and at the negotiated and bargained for prices. The point here is that this clause, and in fact the entirety of all the written agreements and amendments, says absolutely <u>nothing</u> about deactivation fees. Conference America has not and cannot reference a **<u>single</u>** passage in any of the written agreements between the parties where the deactivation fee is specifically enumerated, despite citing numerous clauses in its Response.

Conference America does make the valid point, on p. 8 of its Response, that the reason the written contract in question (Price Protection Program Agreement) was reached in the first place "was to provide discounted prices for certain services for a fixed period of time." This is indeed correct. The agreement was negotiated so **<u>both</u>** sides would know what to expect regarding the accounts created pursuant to the agreement, **<u>including all applicable pricing</u>**. Again, the written agreement enumerated certain services and certain prices. It says absolutely nothing about a deactivation fee. This written agreement was the <u>only</u> agreement between the parties which contained the necessary mutual assent to support a breach of contract action regarding what <u>was</u> agreed to.

### III.    <u>The merger Clause</u>.

On p. 7 of its Response, Conference America argues that, under California law, the merger clause "lived or died" with the contract that it appeared in, and therefore did not survive termination of the written agreement. This is an irrelevant point. The salient point is that there was no pre-termination agreement to any deactivation fees concerning

{B0614185}                                    3

the accounts in question, and there was no post-termination agreement regarding that either. It does not matter whether the merger clause "lived or died" with the contract. What matters is that the 1,778 accounts in question were in fact created pursuant to the written contract in question, which was completely silent as to any deactivation fee. Even if the Court were to accept Conference America's position that the "entire agreement" clause ceased to exist when the agreement terminated, it still must be given application regarding what the parties <u>did</u> agree to, and what they did <u>not</u> agree to as reflected in the "entire agreement." Merger clauses are used for a reason, i.e., so both sides will know exactly what has been agreed to, and what has not been agreed to, as reflected in the written agreement. Whether the "entire agreement" clause "lived or died" is irrelevant in analyzing whether there was any pre-termination or post-termination agreement to deactivation fees (or any pricing other than that reflected in the written agreement). There was not.

Conference America states that Conexant has suggested that the written agreement created a "special, perpetually-discounted status" for the 1,778 accounts in question. (See p. 8 of Conference America's Response). It is true that Conexant's position is that the written agreement governed the creation of and use of these accounts. Even after termination of the agreement, Conference America certainly could have *permitted* use of these accounts, at the agreed upon pricing, if it had so desired. Conexant's view of this, however, certainly does not <u>make</u> the accounts somehow available for "perpetual" use at the agreed upon pricing. Conference America affirmatively terminated the written agreement. Obviously it simply could have disallowed any further attempted use of these

accounts, thus rendering them unavailable since the written agreement had been terminated. Whether these accounts were actually used is really not the sticking point of the lawsuit. The sticking point of the lawsuit is $146,000.00 in deactivation fees. That, again, was simply never agreed to in any manner whatsoever, and Conference America has not pointed to any evidence, much less the required substantial evidence, that there was arguably any mutual assent to that.

### IV.    Lack of Mutual Assent.

Conference America attempts to create a genuine issue of material fact regarding the deactivation fees, but, as outlined above, it has no evidence that there was ever any mutual assent to these fees. Conference America correctly admits that it cannot provide any evidence as to when the deactivation fee first appeared on its website. Based on the evidence which has come to light, Conference America's statements on p. 14 of its Response are indeed understatements regarding this important issue. Before turning to the specifics of the evidence regarding the deactivation fee, and when it first appeared on the website, Conexant reiterates that, in order to maintain a breach of contract action for these deactivation fees, and survive summary judgment, Conference America obviously has to produce substantial evidence, as required by Alabama Code § 12-21-12, that the deactivation fee language was in fact on the website when Conexant sent its two written instructions for the accounts in question to be disconnected. This is adequately addressed in Conexant's Motion for Summary Judgment, and will not be reiterated here. What should be brought to light, however, is the evidence that has been discovered on this issue.

On page 15 of its Response, Conference America references some hearsay evidence produced by Mr. Paine Bone, its Rule 30(b)(6) representative regarding the website. Mr. Bone confirmed that Conference America cannot produce a copy of the Terms and Conditions that existed on the website as of July 15, 2005 and July 20, 2005, when Conexant's two instructions to cancel/disconnect the accounts were sent. He admitted that he does not know if the deactivation fee language was present on the website on those dates. (See Exhibit "A", deposition of Paine Bone, pp. 29.13-30.2). He confirmed that he <u>cannot</u> say when the deactivation fee language was first placed on the Conference America website. (See Exhibit "A", pp. 26.22-28.21). The Conference America computer system cannot provide this information. Conference America has no internal documents which indicate when the deactivation fee was first inserted into the Terms and Conditions section of the website. (See Exhibit "A", pp. 26.3-26.16). **In other words, Conference America cannot produce a copy of the piece of paper (i.e., page from the internet) that it argues is the "contract."**

What Mr. Bone <u>did</u> do is provide some hearsay documents that he obtained from an outside website called www.archive.org. These documents are the subject of a separate Motion to Strike, which has been contemporaneously filed by Conexant. These third party website pages are clearly inadmissible hearsay, and cannot be considered by this Court. Mr. Bone further admitted that he cannot attest to the reliability of the results produced by this website. All he knows about the website is that it purports to be able to perform historical searches regarding other websites. (See attached Exhibit "A", pp.

18.16-19.1).  He admitted that he does not know how accurate the search result from this particular website is.  (See attached Exhibit "A", pp. 22.2-22.8).

The unreliability of these hearsay documents is further borne out by the testimony of Mr. Jason Shanks, one of Conference America's former employees.  His deposition is attached hereto as Exhibit "B".  He offered testimony concerning an instruction he received from Mr. Rob Pirnie, Vice President of Conference America, to "back date" a Terms and Conditions sheet, and then place it in the "Conexant folder."  His personal belief is that the deactivation fee language was then inserted into the Terms and Conditions on the website.  He was privy to a conversation between Rob Pirnie, the Vice President of Conference America, and his father, Bob Pirnie, the President of Conference America, wherein it was stated that Conference America was going to "get" Conexant with the deactivation fee, and that Conexant would "regret" that they were looking for other telephone service providers.  He described the "gist" of the conversation as being one that Conexant was "going to get theirs when they see their bill."  Mr. Shanks testified that he needed the Conference America job, and that it paid him well, but that he simply could not be a party to what he believed had happened, which in his mind was fraudulent billing of a customer.  He therefore resigned from Conference America.  (See attached Exhibit "B", pp. 66-68, 72, 73-74, 77, 80-81, 95-96, 101-104).

Mr. Paul Edge, a Conexant employee, testified that, when Conference America terminated the contract, he reviewed the Terms and Conditions on the website, and the deactivation fee language was not there.  (See Exhibit "C", deposition of Paul Edge, pp. 82-83).  As such, not only has Conference America completely failed to offer the

required substantial evidence that the deactivation fee language was present on the website when Conexant gave the two instructions to deactivate the accounts, we have two involved witnesses who have cast serious doubt about the timing and origin of the deactivation fee language.  Conference America itself could not produce any internal documents to support its claim for deactivation fees on this important point.  Rather, its designated corporate representative had to get on the internet and go to a website he knew little about in order to obtain the hearsay documents which he produced at the deposition. All of this leads to the unavoidable conclusion that Conference America has completely failed to overcome, with substantial evidence, Conexant's *prima facie* showing that there was absolutely no mutuality of assent regarding these deactivation fees, partially due to the fact that the deactivation fee language may not have even been on the Conference America website at the time in question.  Even if it <u>was</u> on the website then, there was certainly no mutuality of assent regarding it.  This has been adequately addressed in Conexant's Motion for Summary Judgment.

On p. 16 of its Response, Conference America attempts to argue that a vague "additional services" term contained in the written agreement was somehow evidence of mutual assent regarding a deactivation fee.  That reference, in its entirety, states "additional services are available at Conference America's Standard Prices effective at the time services are rendered."  Conference America accuses Conexant of "overlooking" this provision.  No matter how many times this provision is looked at, or overlooked, it says absolutely nothing about any deactivation fees.  Conference America references an additional service that was apparently negotiated for by Conexant's CEO at the time.

Obviously that has no application to whether there was mutual assent regarding $146,000.00 in deactivation fees. Rather, that simply serves as an example of an additional service being specifically negotiated for and agreed upon, as would be expected if "additional services" outside the contract were desired. In stark contrast, there was absolutely no negotiation of, and agreement upon, $146,000.00 in deactivation fees here. Again, this is adequately addressed in Conexant's Motion for Summary Judgment.

In an effort to create an issue of material fact, Conference America states on p. 11 of its Response that Conexant was aware that the agreement had been terminated, and that Conference America's "post-termination pricing would apply to all post-termination services." This is partially correct. Obviously Conexant was indeed aware that the agreement in question had been terminated. Conexant very properly undertook steps to get a new provider for these services. Nothing Conference America points to in this regard, however, evidences any mutual assent regarding any new pricing or deactivation fees for the 1,778 accounts in question. None of the specific Conexant "internal correspondence" pointed to by Conference America references any agreement to deactivation fees whatsoever. Conference America makes a big point of Tom Noonan's letter of July 28, 2005, and argues that it was the first notice that Conexant did not agree to any new terms and conditions concerning the accounts in question. Conference America accuses Conexant of "waiting" to use this "after-the-fact defensive ploy." (See Conference America's Response, p. 12). Conexants point out, as Mr. Noonan and Mr.

Edge testified to in their depositions, that Conference America would never return any phone calls to answer questions about any of these issues.  Hence, the letter.

Conference America also points out on p. 6 of its Response that there was some analysis of all this at Conexant after termination of the contract.  Conference America states that the Conexant managers "discussed and analyzed the higher prices and made provision for paying them during the post-termination period while they transitioned to another conferencing vendor."  Conference America then states in its Response that, on August 1, 2005, Conexant "delivered notice of its *new* position that the discounted pricing should still apply."  (Emphasis added).  A review of one of these e-mails is useful in pointing out that this statement is not exactly accurate.  Exhibit "P" to the Complaint is an e-mail from Mr. Paul Edge dated July 20, 2005.  Several Conference America personnel, and even Conference America's attorney, were copied on the e-mail.  The e-mail clearly states that payment could be made "**according to the terms set forth in the Pricing Agreement**."  There was nothing "new" on August 1, 2005, as Conference America asserts.  Conexant simply never agreed to any new pricing regarding the 1,778 accounts in question, and certainly never agreed to $146,000.00 in deactivation fees.  Conference America has failed to produce substantial evidence to the contrary.

### V.    Conclusion.

Conference America has not provided, and cannot provide, the required substantial evidence that Conexant ever assented to the $146,000.00 in deactivation fees.  As pointed out in its Motion for Summary Judgment, Conexant has made a *prima facie* showing in this regard, and has shifted the burden of proof to Conference America, who has now

responded in an insufficient manner.  Conference America has attempted through hearsay documents obtained off the internet to argue that the deactivation fee language was in fact on the website during the pertinent period of time.  Those documents are due to be struck. There is indeed serious question about the motivation for and timing of the deactivation fee language on the website, as outlined above.  That only serves to emphasize that Conference America has failed to present substantial evidence that there was ever any mutual assent to the deactivation fees or any new pricing regarding the accounts in question.  The application of the "entire agreement" clauses in the written contract and its amendments, in conjunction with Conference America's failure to produce the required substantial evidence, require this Court to enter summary judgment in Conexant's favor, as there is no genuine issue of material fact regarding this alleged breach of contract.

WHEREFORE, PREMISES CONSIDERED, the defendant Conexant Systems, Inc. respectfully requests this Court to enter summary judgment in its favor regarding the single breach of contract count brought against it, and there is no genuine issue of material fact and it is entitled to judgment as a matter of law.

<div style="margin-left:50%">

**s/Joseph S. Miller**
Joseph S. Miller
Attorney for Defendant
ID #:  asb-4242-m60j
STARNES & ATCHISON, LLP
Post Office Box 598512
Birmingham, AL  35259-8512
Telephone:(205) 868-6049
Facsimile: (205)868-6099
E-mail:jsm@starneslaw.com

</div>

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on July 19th 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to he following:


Thomas Ernest Borton, IV, Esquire
TROUTMAN SANDERS, L.L.P.
600 Peachtree Street, NE
5200 Bank of America Plaza
Atlanta, GA  30308-2216


           Respectfully submitted,

           **s/Joseph S. Miller**
           Joseph S. Miller
           Attorney for Defendant
           ID #:  asb-4242-m60j
           STARNES & ATCHISON, LLP
           Post Office Box 598512
           Birmingham, AL  35259-8512
           Telephone:(205) 868-6049
           Facsimile: (205)868-6099
           E-mail:jsm@starneslaw.com