# EXHIBIT "A"

# FREEDOM COURT REPORTING

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3   NORTHERN DIVISION
4
5   CIVIL ACTION NO. 2:05-cv-1088-WKW
6
7   CONFERENCE AMERICA, INC.,
8   PLAINTIFF(S),
9   VS.
10  CONEXANT SYSTEMS, INC.,
11  DEFENDANT(S).
12
13          DEPOSITION OF
14          JASON SHANKS
15          June 14, 2006
16
17      S T I P U L A T I O N
18      IT IS STIPULATED AND AGREED, by and
19  between the parties through their
20  respective counsel, that the deposition of
21  JASON SHANKS may be taken before Kerry K.
22  Thames, Commissioner, at 201 Monroe Street,
23  Suite 1650, Montgomery, Alabama, on June

**Page 2**

1   14, 2006, commencing at 3:40 P.M.
2       IT IS FURTHER STIPULATED AND AGREED
3   that the signature to and reading of the
4   deposition by the witness is waived, said
5   deposition to have the same force and
6   effect as if full compliance had been had
7   with all laws and rules of court relating
8   to the taking of depositions.
9       IT IS FURTHER STIPULATED AND AGREED
10  that it shall not be necessary for any
11  objections to be made by counsel to any
12  questions except as to form or leading
13  questions, and that counsel for the parties
14  may make objections and assign grounds at
15  the time of the trial, or at the time said
16  deposition is offered in evidence, or prior
17  thereto.
18      IT IS FURTHER STIPULATED AND AGREED
19  that notice of filing of deposition by
20  commissioner is waived.
21
22
23

**Page 3**

1           INDEX
2
3   EXAMINATION BY:              PAGE NO.
4
5   Mr. Borton            5
6   Mr. Miller            146
7   Mr. Borton            148
8   Mr. Miller            154
9
10
11          EXHIBITS
12
13  Plaintiff's Exhibit:
14  No. 1               19
15
16
17
18
19
20
21
22
23

**Page 4**

1           APPEARANCES
2
3   FOR THE PLAINTIFF(S):
4   Mr. Thomas Ernest Borton, IV
5   TROUTMAN SANDERS, L.L.P.
6   600 Peachtree Street, NE
7   5200 Bank of America Plaza
8   Atlanta, Georgia 30308
9
10  FOR THE DEFENDANT(S):
11  Mr. Joseph S. Miller
12  STARNES & ATCHISON
13  7th Floor, 100 Brookwood Place
14  Birmingham, Alabama 35209
15
16  ALSO PRESENT:
17  Mr. Thomas H. Claunch
18  Mr. Rob Pirnie
19
20
21
22
23

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

EXHIBIT "A"

# FREEDOM COURT REPORTING

Page 5

1 I, Kerry K. Thames, acting as
2 Commissioner, certify that on this date as
3 provided by the Federal Rules of Civil
4 Procedure, and the foregoing stipulation of
5 counsel, there came before me JASON SHANKS,
6 witness in the above cause, for oral
7 examination, whereupon the following
8 proceedings were had:
9
10 JASON SHANKS,
11 being first duly sworn, was examined and
12 testified as follows:
13
14 THE COURT REPORTER: Usual
15 stipulations?
16 MR. BORTON: Yeah.
17
18 EXAMINATION BY MR. BORTON:
19 Q. Okay. Would you give us your
20 full name, Jason?
21 A. Jason Frederick Shanks.
22 Q. Okay. As just an initial
23 matter, you brought some documents with you

Page 6

1 today in response to my subpoena, correct?
2 A. Right.
3 Q. Are these all the documents in
4 your possession, custody, or control that
5 are responsive to that subpoena?
6 A. They are.
7 Q. Okay. Have you had your
8 deposition taken before?
9 A. I have.
10 Q. Okay, could you tell me about
11 the times you've had your deposition taken?
12 A. I had it taken once before, I
13 think it was either 2000 or 2001. It was
14 Conference America with another litigation
15 with another organization, and I had to be
16 deposed on behalf of Conference America.
17 Q. Was that the TCN case?
18 A. Yes.
19 Q. Okay. And that's the only
20 deposition then?
21 A. Yes.
22 Q. All right. Now you're
23 represented by Counsel today, correct?

Page 7

1 A. Yes.
2 Q. And that's Mr. Claunch sitting
3 next to you?
4 A. That's right.
5 Q. Sounds like you're familiar
6 with the deposition process, correct?
7 A. Yes.
8 Q. Okay, and you understand that
9 you're under oath, correct?
10 A. I do.
11 Q. Okay. And I'll just go over it
12 very quickly, but you understand this man
13 is taking down our testimony, this court
14 reporter is, right?
15 A. I do.
16 Q. Okay, I'm going to ask you
17 questions, and you can answer them, and,
18 obviously, it's important that you
19 verbalize your answers. We can't, like,
20 shake our head or say uh-huh or uh-uh like
21 we would if we were talking on the street,
22 we've got to say everything clearly so that
23 this man can take it down, do you

Page 8

1 understand?
2 A. I do.
3 Q. If you don't hear part of the
4 question, will you just ask me and I'll
5 repeat it?
6 A. I will.
7 Q. Okay. And if you don't tell
8 me otherwise, I'll assume that you have
9 heard and understood my questions, is that
10 okay?
11 A. That's okay.
12 Q. All right. If you realize
13 during this deposition that an answer that
14 you've given or some of your testimony is
15 inaccurate or incorrect, will you tell me?
16 A. Yes.
17 Q. Okay, and I will give you a
18 chance to address that, all right?
19 A. Okay.
20 Q. And I have to ask this, no
21 offense, but have you taken any substances,
22 whether prescription or nonprescription,
23 that could impair your ability to tell the

2 (Pages 5 to 8)

## FREEDOM COURT REPORTING

Page 9

1  truth today at this deposition?
2      A.  No.
3      Q.  Is there any reason why you
4  can't tell the whole complete truth today?
5      A.  No.
6      Q.  Okay.  If you need a break,
7  just let me know.
8      A.  Okay.
9      Q.  You understand that there's a
10  lawsuit going on between Conference America
11  and Conexant, correct?
12      A.  I do.
13      Q.  All right.  Have you reviewed
14  the complaint for that lawsuit?
15      A.  I have not.
16      Q.  You have not.  Okay.  Have you
17  reviewed any of the deposition transcripts
18  related to that lawsuit?
19      A.  I have.
20      Q.  Okay.  Which ones have you
21  reviewed?
22      A.  I reviewed the transcripts for
23  Rob Pirnie, Bob Pirnie, Greg Folkes, and

Page 10

1  Zach Vogelgesang.
2      Q.  Okay, and how did you get those
3  transcripts?
4      A.  My Counsel provided me with the
5  transcripts.
6      Q.  Okay, and do you know how he
7  got those transcripts?
8      A.  I do not.
9      Q.  And you've read all of those
10  transcripts in full?
11      A.  Yes.
12      Q.  Off the top of your head right
13  now, can you think of anything, any of the
14  testimony in those transcripts that you
15  disagree with or you feel is inaccurate or
16  dishonest?
17      A.  Yes.
18      Q.  Okay.  Will you tell me about
19  that?  And let's talk about it transcript
20  by transcript if we have to.
21      A.  Okay.  I can't think of
22  anything in either Zach Vogelgesang or Greg
23  Folkes' transcripts right off the top of my

Page 11

1  head that I would disagree with.  However,
2  there are several things in Rob Pirnie's
3  transcript and Bob Pirnie's transcript that
4  I would disagree with.
5      Q.  Okay, besides those two, any
6  other transcripts that you disagree with?
7      A.  None that I can recall, no.
8      Q.  Okay.  And just to be straight,
9  you read Zach's, Reid's, Bob's, Rob's;
10  anybody else's?
11      A.  No.
12      Q.  Okay.
13          MR. CLAUNCH:  Did you say you
14  read Reid's --
15      Q.  (BY MR. BORTON) Did you say
16  you read Greg Folkes'?
17      A.  I didn't say that I read
18  Reid's, but I have read -- I did read Reid
19  Carle's as well.
20      Q.  Okay, just to be straight,
21  you've read Reid Carle's, Greg Folkes',
22  Zach Vogelgesang, Rob Pirnie's, and Bob
23  Pirnie's deposition transcripts?

Page 12

1      A.  Yes, that's correct.
2      Q.  All right, let's start with Rob
3  Pirnie and go through his deposition
4  transcript.  I would like you to tell me
5  everything that you feel was either
6  inaccurate or dishonest or untruthful that
7  you saw in that deposition transcript?
8      A.  One of the first things that
9  comes to mind is Rob making the comment
10  that he was not aware that Bob Montour was
11  no longer with Conexant.
12      Q.  Okay.  What about that is
13  inaccurate?
14      A.  He was very much aware that he
15  was no longer with Conexant.
16      Q.  You're saying that Rob was
17  aware that Bob Montour was no longer with
18  Conexant?
19      A.  Yes.
20      Q.  At what point in time?
21      A.  This was at least two years ago
22  or a year and a half ago when Bob Montour's
23  disability became the issue for him leaving

3  (Pages  9  to  12)

## FREEDOM COURT REPORTING

### Page 13

1 the Conexant organization.
2    Q.   Okay.  And how do you know that
3 Rob was aware?
4    A.   Bob Montour spent almost a week
5 at Conference America in and out, fishing
6 down at the China Grove location, visiting
7 with the various people that worked with
8 Conexant accounts.  So it was pretty well
9 known that he was no longer with Conexant.
10    Q.   Okay.  And you -- can you tell
11 me what specific facts besides that lead
12 you to believe that Rob was aware Montour
13 was still employed with Conexant?
14    A.   There was some e-mail that I
15 was a recipient of that came from Bob
16 Pirnie, and I assume that -- Rob may not
17 have been a recipient on that, but I was
18 definitely a recipient on it, that was
19 basically giving us some background
20 information about Bob Montour, the illness
21 he was going through, the troubles he was
22 having regarding Conexant, and, you know,
23 whether or not it was going to be a medical

### Page 14

1 disability that they were going to -- a
2 medical retirement, or if he was going to
3 be phased out of his job, you know, that
4 sort of thing.  So --
5    Q.   Okay.  Are you aware that Rob
6 was a recipient of any of those e-mails?
7    A.   I don't know that for a fact.
8 I don't recall that for a fact --
9    Q.   Okay.
10    A.   -- but I do -- I was a
11 participant (sic) of it, so that may not
12 apply directly to Rob Pirnie.
13    Q.   Okay.  Any other facts that
14 lead you to believe that Rob Pirnie knew
15 that Bob Montour was still employed with
16 Conexant?
17    A.   Those are the main facts that I
18 can think of at this time.
19    Q.   Okay, and can you tell me at
20 what point in time this was again?
21    A.   I would -- and I'm guessing
22 here, it's probably around 2003.
23    Q.   2003.  Okay.  Can you give me

### Page 15

1 your best guess as to why Rob Pirnie would
2 say that he wasn't aware Bob Montour was
3 still employed with Conexant in 2003?
4    A.   I have no idea.
5    Q.   No idea.  Okay.  And, in fact,
6 other than the facts we've just discussed,
7 you have no knowledge or facts indicating
8 that Rob Pirnie was so aware, do you?
9    A.   No, other than that Bob Montour
10 was there at Conexant in their -- or,
11 excuse me, Bob Montour was there at
12 Conference America for that period of time,
13 and if I knew, I assumed that Rob knew as
14 well.
15    Q.   Okay, so you're making an
16 assumption, correct?
17    A.   In -- in the fact that Bob
18 Montour was there, no.
19    Q.   Okay, you're making an
20 assumption about something that Rob knew,
21 correct?
22    A.   It's my belief that he knew.
23    Q.   Okay, backed up by the facts

### Page 16

1 that we just discussed, correct?
2    A.   That's right.
3    Q.   Okay, did Rob and you ever
4 discuss Bob Montour?
5    A.   Oh, yeah, we've talked about
6 him on periodic occasions.  I don't know if
7 we ever discussed his leaving Conexant
8 specifically, but I -- I know that we
9 talked about him on occasion because I
10 worked very closely with the account.
11    Q.   Okay.  Did you have discussions
12 with Rob about Bob Montour in 2003?
13    A.   I don't recall any specific
14 ones, but I'm sure we did.
15    Q.   Okay.  Now, what time in 2003
16 was Montour in the office?
17    A.   It was during the summer
18 because we all went down on a deep sea
19 fishing trip out of Orange Beach.  Bob
20 Montour was there as kind of a reference,
21 if you will, for a customer that Conference
22 America was trying to gain at the time.
23 And it's my belief at that time Bob Montour

4  (Pages 13 to 16)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  was not employed with Conexant, or was at
2  least going through his departure, which,
3  from what I understood, took a few months.
4      Q.  Okay.  Who all went on this
5  fishing trip?
6      A.  Myself, Mr. Pirnie, Gwen, Bob
7  Montour, Kevin Lee, Rob Pirnie, Jeff
8  Matson, and Randy -- I can't remember his
9  -- Randy's last name, from Kelly Services
10  out of Michigan.
11      Q.  Did you ever hear any
12  conversations between Rob Pirnie and Bob
13  Montour in the summer of 2003?
14      A.  None that I can recall.
15      Q.  Okay.  Are you aware of any
16  conversations between Rob Pirnie and anyone
17  concerning Bob Montour in the summer of
18  2003?
19      A.  None that I can specifically
20  recall.
21      Q.  Okay.  So just to make
22  absolutely sure, other than the facts we
23  have discussed, there are no other facts

Page 18

1  which lead you to believe that Rob Pirnie's
2  testimony was inaccurate in the regard that
3  we've been talking about, correct?
4      A.  That's correct.
5      Q.  Okay.  What other inaccuracies
6  are in Rob's deposition transcript, in your
7  opinion?
8      A.  One of which is going to be the
9  main things -- reason why I'm here today
10  was the -- the questions that Mr. Miller
11  asked regarding changing of dates on
12  documents that were pertinent to Conexant's
13  terms and conditions.
14      Q.  Okay.  What documents do you
15  claim that you have been asked to change
16  the dates on that relate to Conexant in any
17  way?
18      A.  The service terms and
19  conditions on Conference America's web
20  site.
21      Q.  Okay.  Are there any other
22  documents besides the service terms and
23  conditions on Conference America's web site

Page 19

1  that you're claiming you've been asked by
2  anybody to change?
3      A.  That's the only one that I can
4  recall.
5      Q.  Okay.  So it's just that one
6  document, correct?
7      A.  That's correct.
8      Q.  Okay.
9
10      (Whereupon, Plaintiff's Exhibit
11  Number 1 was marked for identification and
12  copy of same is attached hereto).
13
14      Q.  (BY MR. BORTON)  I'm going to
15  mark this as Exhibit 1.  I'm going to put
16  in front of you, Jason, what I'm going to
17  represent -- this is Plaintiff's Exhibit 1
18  to your deposition, a document that says
19  Conference America's Service Terms and
20  Conditions, it's got a date of 7-25-05 at
21  the bottom.  Is this the document you're
22  testifying you were asked to change?
23      A.  Yes.

Page 20

1      Q.  Okay, and just to be clear,
2  that is the only document you were ever
3  asked to change or modify or alter,
4  correct?
5      A.  Other than the standard
6  documents that we would send out to their
7  participants -- their conferencing
8  profiles, that sort of thing, you know,
9  conferencing cards, obviously we changed
10  those on a daily basis as we needed to.
11  But this is the only document -- this is
12  the document that gave me such concern
13  throughout the whole thing.
14      Q.  Okay, and that's the only one,
15  correct?
16      A.  That's correct, yes.
17      Q.  Okay.  All right.  Let's get
18  some background.  Could you give me your
19  address, please?
20      A.  1849 Norman Bridge Road.
21      Q.  Okay, and I'm going to ask you
22  some background questions, just so you
23  know, about your wife, your family, and

5  (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 21

1  your children because we may have to strike
2  a jury in this case, and the jury will be
3  drawn from the Montgomery area --
4      A.  Okay.
5      Q.  -- Montgomery County and maybe
6  surrounding counties, so I'm not trying to
7  pry into your personal life or anything --
8      A.  Okay.
9      Q.  -- but I have to ask some
10  semi-personal questions.  Are you married?
11      A.  No, I am not.
12      Q.  Okay.  Have you ever been
13  married?
14      A.  I have.
15      Q.  How many times?
16      A.  Twice.
17      Q.  Twice, okay.  Can you tell me
18  who your first wife was?
19      A.  First wife and second wife were
20  the same person.
21      Q.  Okay, so you've been married to
22  the same woman twice?
23      A.  That's correct.

Page 22

1      Q.  Does she live in the Montgomery
2  area?
3      A.  She does.
4      Q.  What's her name?
5      A.  Christina T. Shanks.
6      Q.  Okay.  Do you know which county
7  she happens to live in?
8      A.  Montgomery.
9      Q.  Montgomery County, okay.  Where
10  were the divorce papers filed?
11      A.  Montgomery, Montgomery County.
12      Q.  Okay, both times?
13      A.  Yes.
14      Q.  Okay.  And did the marriage --
15  did both marriages take place in Montgomery
16  County?
17      A.  They did not.
18      Q.  Okay.
19      A.  The first marriage took place
20  in Montgomery County.  The second marriage
21  took place in Harford County, Maryland.
22      Q.  Harford County, Maryland?
23      A.  Yes.

Page 23

1      Q.  Okay.  How long were you
2  married the first time?
3      A.  Almost two years.
4      Q.  And what year were you married?
5      A.  1990.
6      Q.  Okay.  When did you get your
7  divorce, 1992?
8      A.  The original, yes, 1992.
9      Q.  Okay.  How long thereafter did
10  you get remarried to her?
11      A.  Six months, maybe a year.
12      Q.  Do you know if you got
13  remarried again in '92 or '93?
14      A.  I believe it was late '92.
15      Q.  Okay.  Do you have any
16  children?
17      A.  I do.  I have three.
18      Q.  Okay.  Can you tell me their
19  names and if they go to school where they
20  go to school?
21      A.  Yes.  Craig Allen Shanks.  He
22  goes to school at Bayer Elementary here in
23  Montgomery.  Emily Claire Shanks.  She also

Page 24

1  goes to school at Bayer Elementary.  And
2  Ashleigh Morgan Shanks, and she goes to
3  school at Bayer as well.
4      Q.  Okay.  Do you have any other
5  relatives besides those children and your
6  ex-wife in the Montgomery area?
7      A.  I do.
8      Q.  Can you tell me who they are?
9      A.  My parents, Thomas R. Shanks,
10  and Bonnie M. Shanks, live in Montgomery
11  County as well.  My aunts, both aunts, both
12  uncles on both sides, extended family
13  through stepsisters -- I mean, I can give
14  you all of them if you need them.
15      Q.  Yeah, and when I'm talking
16  about the Montgomery area, I mean
17  Montgomery County and any surrounding
18  counties --
19      A.  Okay.
20      Q.  -- anybody that's anywhere in
21  this part of the state, really, would be
22  helpful.
23      A.  Okay.  Uncle and aunt on my

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

|  | Page 25 |
|---|---|

1 mother's side --
2     Q.  Okay, and tell me their
3 names.
4     A.  -- Kenny and Dale Collier.
5 They reside in Montgomery County.  They
6 also have a daughter, Lindsey, who resides
7 in Montgomery County.  Aunt and uncle,
8 again, in Montgomery County, Bill and
9 Chauncey Miller -- excuse me, her actual
10 full name is Harriet Miller.  They have
11 three children, Clay Miller, Kelly Miller,
12 Andy Miller, all of whom live in Montgomery
13 County.  Clay Miller has two children and
14 an ex-wife -- do I need to -- I mean, how
15 -- just --
16     Q.  Yeah --
17     A.  Okay.
18     Q.  -- any information --
19     A.  Two children, Taylor and Stone,
20 both of whom live in Montgomery County.
21 His ex-wife, Kathy Azar, lives in
22 Montgomery County.  My other cousin, Andy,
23 lives in Millbrook.  He has a wife named

|  | Page 26 |
|---|---|

1 Emily, so her name would be Emily Miller.
2 They have a brand new son, and I honestly
3 don't remember his name at this point.
4 He's a month or two old.
5     I have a stepsister, Theresa
6 Shanks, who lives in Franklin, that's
7 outside of Montgomery County, but it's the
8 next county over.  She's married.  I'm
9 trying to remember her husband -- her
10 husband's name is Michael.  I can't
11 remember his last name.  She also has two
12 children.  Their names are Hannah and
13 Jamie.
14     My brother lives in -- I guess
15 it's Elmore County, it's off of Dexter Road
16 up by Santuck.  He's also married, has an
17 ex-wife.  His ex-wife's name is -- was
18 Charlotte Shanks, she's remarried now, I
19 couldn't tell you what her new married name
20 is.  She lives on Pike Road.  My brother's
21 daughter's name is Chandler Shanks.  She
22 lives also on Pike Road.  My brother's wife
23 is Rhonda Shanks, and she lives with him in

|  | Page 27 |
|---|---|

1 Elmore County.  That should be -- should be
2 everyone.
3     Q.  Thank you very much.  Can you
4 tell me what your ex-wife's address is?
5     A.  Yes, it's 1137 Hillman Street,
6 Montgomery, 36109.
7     Q.  Okay.  Did I ask you if she was
8 remarried?
9     A.  No, she's not.
10     Q.  She's not remarried.  Okay.
11 Does she have any other children besides
12 the two children you've named --
13     A.  No.
14     Q.  -- or did you name three
15 children?
16     A.  Three children.
17     Q.  The three children you've
18 named?
19     A.  No.
20     Q.  Okay.  Can you tell me where
21 you were born, please?
22     A.  I was born in Montgomery,
23 Alabama.

|  | Page 28 |
|---|---|

1     Q.  Okay.  Who are your five best
2 friends in the Montgomery County area?
3     A.  Shannon Williford is my fiance.
4 She lives here in Montgomery as well.  Zach
5 Vogelgesang is a good friend.  I don't
6 really have very many friends,
7 unfortunately, but if --
8     Q.  I understand, it's just a
9 question that's used for --
10     A.  I have many acquaintances, but
11 if I had to classify it as best friends, it
12 would be just those few.
13     Q.  Okay.  Your wife's family, your
14 ex-wife's family, where are they from?
15     A.  They're also from Montgomery.
16     Q.  Okay.  Did you name them when
17 you were --
18     A.  I did not.
19     Q.  Okay.  Would you tell me, to
20 the best of your knowledge, who they are,
21 what their addresses are?
22     A.  Her parents are Wayne and
23 Carolyn Doolittle.  They live at 310 Croy

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 29

1  Street, I guess, here in Montgomery. She
2  also has a sister who lives -- it's over in
3  a trailer park off the northern bypass. I
4  couldn't -- I don't know what the actual
5  street address is, but she lives in
6  Montgomery also. Her name is Sarah
7  Thompson.
8      She has an aunt, they call her
9  Ruby, I couldn't tell you her full name,
10  but she also lives in Montgomery. She has
11  a grandmother and another aunt that live in
12  a trailer park off of Troy Highway, that
13  live in Montgomery as well. Her
14  grandmother's first name is Frances, last
15  name is Yarborough. And her other aunt's
16  name is Quinny, Yarborough as well.
17      Q.  Okay. And this is a standard
18  question, no offense, but have you ever
19  been convicted of a crime?
20      A.  No.
21      Q.  Have you ever been charged with
22  a crime?
23      A.  No.

Page 30

1      Q.  Okay. Have you ever
2  voluntarily filed for bankruptcy?
3      A.  I have.
4      Q.  Okay. When did you do that?
5      A.  I did that in November of last
6  year, November of 2005.
7      Q.  Okay. Has that been resolved?
8      A.  It has.
9      Q.  Okay. And how did it come out?
10      A.  Chapter 7 bankruptcy. It went
11  through the courts, everything, and the
12  final documents were released, I think, in
13  February of 2006.
14      Q.  Okay. Have you ever been
15  forced into bankruptcy?
16      A.  No.
17      Q.  Okay. Have you ever been
18  involved -- besides the deposition you told
19  me about in the TCN case, that bankruptcy,
20  and -- well, besides that, have you been
21  involved in any legal proceedings?
22      A.  Just my two divorces.
23      Q.  Okay, did those go to trial?

Page 31

1      A.  No, they did not.
2      Q.  Okay. You resolved those
3  without going to court?
4      A.  That's correct.
5      Q.  Okay.
6      A.  Also, I was a part of the TCN
7  case, the actual trial, so it wasn't just
8  the deposition there. I had to be a
9  witness at the trial as well.
10      Q.  Okay, and those are the only
11  previous legal claims or lawsuits that
12  you've been a party to?
13      A.  Yes, that's correct.
14      Q.  Okay. Let's do your work
15  history. If you could just take me through
16  maybe where you went to high school, and
17  then take me through your educational and
18  work history just in chronological order up
19  to the present.
20      A.  Okay, I went to high school at
21  Sidney Lanier High School here in
22  Montgomery, Alabama. When I graduated high
23  school, I worked with Pepsi-Cola out on Air

Page 32

1  Base Boulevard for almost two years. I
2  then went into the United States Army,
3  served for seven years in various
4  locations, San Antonio, Baltimore,
5  Maryland, overseas in Germany.
6      After exiting the Army, I
7  worked for a short period of time with a
8  company here in Montgomery called American
9  Family Care, and I then started my work
10  history with Conference America. I worked
11  with Conference America for a little over
12  six years.
13      After leaving Conference
14  America, I basically worked for myself for
15  a couple of months trying to make ends meet
16  until I could find another position. So I
17  guess you could say self-employed for those
18  two months, three months. I then began
19  working with a cattle company, Parkman
20  Cattle Company, which is in Troy -- down
21  Troy Highway just outside of Montgomery
22  County, and recently started working with
23  Regions Bank in April of this year.

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 33

1    Q.  Okay.  What years did you work
2  with Conference America?
3    A.  I started Conference America
4  around June of 1999 and left at the end of
5  August of 2005.
6    Q.  Okay.  Have you ever been fired
7  from any place you ever worked?
8    A.  I have not.
9    Q.  Have you ever had pressure from
10  your superiors to leave any place you've
11  ever worked?
12    A.  I have not.
13    Q.  Okay.  Were you honorably
14  discharged from the Army?
15    A.  I was.
16    Q.  Okay, what rank did you rise
17  to?
18    A.  Sergeant.
19    Q.  Sergeant.
20    A.  E5.
21    Q.  Okay, what was your job in the
22  Army?
23    A.  I was a medical laboratory

Page 34

1  technician.
2    Q.  Throughout the term of your
3  service, that was your job duties?
4    A.  That's correct.
5    Q.  And you're currently employed
6  at Regions Bank?
7    A.  That's correct.
8    Q.  Okay, and how long have you
9  worked there?
10    A.  Since April 17th, a little over
11  a month.
12    Q.  Okay.
13    A.  Almost two months.
14    Q.  And which branch of Regions
15  Bank do you work at?
16    A.  I travel back and forth
17  between the Regions Bank here in Montgomery
18  and the operations center in Birmingham.
19    Q.  Okay.
20    A.  I spend about half of each week
21  in each place.
22    Q.  What are your job duties there?
23    A.  I'm a data analytics developer.

Page 35

1  My job is to create reports for the
2  organization.
3    Q.  Okay.  Did you attend any
4  higher education of any kind after high
5  school?
6    A.  I did.  I've had education at
7  a, I guess you could call it, a junior
8  college level, community college level, in
9  Bel Air, Maryland.
10    Q.  What is the name of that
11  institution?
12    A.  Harford County Community
13  College.  It was basics for a medical
14  laboratory technician degree.  I've also
15  attended Troy State University here in
16  Montgomery.  I've taken about three years'
17  worth of classes there in just the business
18  administration arena.  I have not finished
19  the degree with them yet.
20    Q.  Okay.  And you received a
21  degree from the college in Bel Air?
22    A.  I have not, no.
23    Q.  Okay, what years were you

Page 36

1  there --
2    A.  In Bel Air?
3    Q.  -- attending classes?
4    A.  That would have been 1993 to
5  1995 off and on as I could -- as my
6  schedule would permit me to take classes.
7    Q.  Okay.  And how about Troy?
8    A.  I started classes with Troy in
9  1999, maybe the fall of that year, and
10  again have taken classes off and on all the
11  way up until the winter quarter of 2005,
12  which ended December of 2005.
13    Q.  Okay.  Who is your supervisor
14  at Regions Bank?
15    A.  Paul McNeal.
16    Q.  Who was your supervisor at
17  Parkman?
18    A.  Brenda Parkman.
19    Q.  Okay, and who was your
20  supervisor at Conference America?
21    A.  Rob Pirnie.
22    Q.  Do you remember who your
23  supervisor was at the time you were

9  (Pages 33 to 36)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  honorably discharged from the Army?
2      A.  We know everybody by the last
3  name, so it's hard for me to -- I can't
4  even remember his first name,
5  unfortunately.  Major Frier was his -- I
6  mean, he was a rank -- his last name was --
7  Ron Frier.
8      Q.  Okay.
9      A.  He was a major.  Ron Frier.
10     Q.  Can you tell me your fiance's
11 address?
12     A.  Yes, she lives at 3203 Audubon
13 Road here in Montgomery.
14     Q.  And where is she employed?
15     A.  Conference America.
16     Q.  Okay.  How long has she been
17 employed at Conference America?
18     A.  She started before I did, so I
19 think she's been there probably seven years
20 or more.
21     Q.  Seven years or more, and that's
22 how you met her was at Conference America?
23     A.  That's correct, I did.

Page 38

1      Q.  Okay.  How long have you been
2  engaged to her?
3      A.  Since December of 2005.
4      Q.  How long did y'all date before
5  you were engaged?
6      A.  Maybe eight months or so, a
7  year.
8      Q.  When do you expect to be
9  married?
10     A.  November of this year.
11     Q.  How did you come to work at
12 Conference America?
13     A.  I had a mutual friend with Bob
14 Wilson who was acting as the HR director at
15 the time.  I was working with someone that
16 he knew very well, and they were looking
17 for someone in the sales administration
18 department, and I was referred to him and
19 went through the interview process.
20     Q.  Okay.  Have you reported -- did
21 you report to Rob Pirnie from day one of
22 your time at Conference America until the
23 day you resigned?

Page 39

1      A.  I did not.  In -- supervisor is
2  a little bit of a loose term in my
3  employment there at Conference America
4  because while I had a direct line
5  supervisor, we all responded to requests
6  from the top levels of the organization, be
7  it Gwen Brown, Bob Pirnie, at the time,
8  Mike Griswald, even, who was another person
9  involved with Conference America when I
10 first began.
11         My original front line
12 supervisor, if you will, when I first
13 started was Terry Steigelman.  He was the
14 national sales manager at the time.  Once
15 he left, there was a little period of time
16 where I basically reported directly to Bob
17 Pirnie, and then shortly after that Rob
18 moved out of the IT department, came over
19 into the sales side, and I began reporting
20 to him.  There's also an interim period
21 there where Wayne Brown served as vice
22 president of sales, so he was involved in
23 the supervision as well.

Page 40

1      Q.  Okay.  Did you ever have any
2  confrontations with anybody at Conference
3  America?
4      A.  Yes.
5      Q.  Okay.  Tell me about those,
6  please.
7      A.  There's a couple that come to
8  mind.  One confrontation in particular that
9  I wound up talking with Mr. Pirnie about
10 was with one of the salespeople.  It was
11 more of a -- just a personal
12 misunderstanding, if you will.  And I
13 reacted maybe a little harshly towards a
14 comment that was made in my direction, and
15 we just basically agreed to let bygones be
16 bygones, and that was the end of it.
17     Q.  Will you tell me about who it
18 was, the comment, the time, the
19 circumstances.
20     A.  I believe her name was Kris
21 Henderson.  It was probably five years ago,
22 and basically she had just started working
23 at the organization and was constantly

10  (Pages 37 to 40)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 41

1 complaining about the way things worked at
2 Conference America and thought all of our
3 policies and procedures were, quote,
4 unquote, stupid.
5     And, you know, over a period of
6 time I grew tired of hearing that, and
7 after asking me for guidance on how to do
8 something one -- at one particular time,
9 and I gave that guidance, the comments that
10 she gave back began in the essence of this
11 is stupid, or rolling her eyes or something
12 like that, caused my subsequent retort,
13 and then ended up with what I guess you
14 could call the incident.
15     Q.  What did she say was stupid?
16     A.  I don't remember exactly what
17 it was honestly.  It was something about
18 one of our procedures that we had in place
19 and had had in place for quite a while, at
20 least since I had worked at Conference
21 America.
22     Q.  What did you say to her?  What
23 was your retort?

Page 42

1     A.  Something to the essence of you
2 better not -- don't roll your eyes at me
3 or, you know, something like that.  The
4 reason why it became an incident was that I
5 said it loudly when I shouldn't have, and
6 probably should have either taken it
7 outside or taken it to the supervisor.
8 But, instead, I kind of called it out
9 across the sales organization, so . . .
10     Q.  And what did you say after
11 that?
12     A.  Well, that was kind of the end
13 of it.  When Mr. Pirnie kind of heard what
14 had happened, he pulled me in the office
15 and we talked about it.  And he basically
16 told me, you know, you can't be doing that,
17 you know, we don't -- we're not going to
18 have that type of thing in the --
19     Q.  Did you use foul language when
20 you were --
21     A.  Probably.  I don't recall the
22 specific foul language, but probably, yeah.
23     Q.  Okay.  And you screamed this at

Page 43

1 her from across the sales room, or the
2 sales floor?
3     A.  I wouldn't classify it as a
4 scream, but I was talking at an elevated
5 level.  Conference America is set up with
6 these half cubicles, so we all kind of get
7 used to talking in very slow -- or low
8 muted tones, and so -- we try not to
9 interrupt the other departments that are
10 around us.  And the level of volume in my
11 voice was definitely more than what it
12 should have been.
13     Q.  Okay.  Did she say anything
14 when you made your retort?
15     A.  I don't recall if she did or
16 not.  I don't think we honestly spoke much
17 to each other after that until she left.
18     Q.  Okay.  Besides what you told me
19 about your conversations with Bob Pirnie
20 about that incident, did you say anything
21 else during that conversation with him, or
22 is there anything else you recall being
23 said between you and him?

Page 44

1     A.  Other than him basically
2 guiding me and saying, you know, look, I
3 understand your frustration, but you can't
4 act as you did, no.
5     Q.  Any other confrontations?
6     A.  Yes, actually Bob Pirnie and I
7 had a confrontation shortly before I
8 resigned.
9     Q.  Excuse me, let's go back to --
10 Kris Henderson?
11     A.  I think that was her name, yes.
12     Q.  When was this, to the best of
13 your knowledge?
14     A.  It was probably 2000 -- late
15 2000, maybe early 2001.
16     Q.  Okay.  Let's go forward to your
17 subsequent confrontation with Bob Pirnie.
18     A.  Yes.
19     Q.  When was this?
20     A.  This would have been --
21     Q.  This is not a memory test, just
22 as best you --
23     A.  Yeah, it would have been

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 45

1  sometime around the end of July 2005, the
2  first of August 2005, more towards the
3  first of August, the first week or two in
4  August.
5      Q.  And I hate to keep going back,
6  I'm sorry.  There were witnesses to your
7  confrontation with Kris Henderson, correct?
8      A.  Yes, there was.
9      Q.  How many people?
10      A.  Whoever was in the sales
11  department that day.  Probably four or
12  five, at least.
13      Q.  Can you tell me their names,
14  the best you remember?
15      A.  I don't recall any specific
16  one, but I can tell you some of the people
17  that were working there at the time.  They
18  may have been present.  Digging back into
19  some names, I've got Joe Hodges, who might
20  have been there.  Shannon Carroll,
21  possibly.  There's been so many people that
22  have kind of come and gone, I can't
23  remember who else might have been present,

Page 46

1  but those two may have been there.
2      I think there was another
3  person there at the time, working right
4  about that time, named April Doran or
5  Dorrin or something like that.  She might
6  have been present as well.
7      Q.  Okay.  Now, your confrontation
8  with Bob Pirnie, will you just tell me just
9  generally what happened, everything you can
10  remember that was said, when, where, why,
11  all of the details, please?
12      A.  We had been going through a
13  process, I guess, for almost a week where
14  Mr. Pirnie was requiring us every fifteen
15  minutes to write down what we had done the
16  previous fifteen minutes throughout the
17  workday.  And it was my job to compile all
18  of this information not only for myself, but
19  but from the other two people who worked
20  for me, into kind of a summary report that
21  showed how we were spending our time on a
22  daily basis and whether or not we were
23  being what he considered to be productive

Page 47

1  or effective in our production.
2      This went on for several days.
3  All the while we were having to manage our
4  other requirements that come our way from
5  normal business practices.  I spent many
6  hours in Mr. Pirnie's office going over
7  this and trying to work through whatever it
8  was we were trying to work through.
9      It all came to a head about
10  5:00, it might have been a Thursday
11  afternoon, I don't think it was a Friday or
12  before the weekend, but I know it was late
13  in the afternoon, 5, 5:30, when Mr. Pirnie
14  approached us regarding this particular
15  activity that we had been going through and
16  basically said that the, quote, unquote,
17  excuses I was giving for not being able to
18  get the normal production work done weren't
19  good enough.  One of the responses that I
20  had had with him prior to that day was that
21  part of the reason why I couldn't get the
22  work done is I had spent many hours in his
23  office going over this one project alone,

Page 48

1  so those were all hours that the other ones
2  hadn't been touched.  All of this happened
3  right out in the middle of the sales floor
4  with Zach Vogelgesang and Chantel -- no,
5  Chantel probably wasn't there.  I know Zach
6  Vogelgesang was there.  He witnessed it as
7  well.
8      Q.  Who else besides that?
9      A.  Possibly Chantel Oakley, but
10  she probably had gone home by that time.
11  She usually left about 4:00.
12      Q.  Will you tell me her name again
13  just real slowly so I can --
14      A.  Oh, yeah, I'm sorry.  Chantel
15  Oakley.
16      Q.  Okay.  Is she still employed
17  with Conference America?  Do you know?
18      A.  I don't know.
19      Q.  All right.  Continue.
20      A.  Things started to get heated,
21  it kind of got to where we were going back
22  and forth.  There was no profanity
23  whatsoever, but I was very upset.  I was

12  (Pages 45 to 48)

## FREEDOM COURT REPORTING

Page 49

1  upset to the point where I told Mr. Pirnie
2  that the best thing I could do -- I started
3  packing my briefcase and told him that I
4  was leaving because that was the best thing
5  for me to do because I was that upset.
6          He then changed his demeanor a
7  little bit and kind of calmed the situation
8  down some, and after maybe twenty minutes
9  or so I did eventually leave. I came back
10 in to work the next day, and I guess it was
11 maybe a week or so later that I turned in
12 my resignation.
13      Q. Okay. And what project was it
14 that you had been in his office discussing?
15      A. I don't know if you could give
16 it a title, but basically we were required
17 to -- it started when Mr. Pirnie -- we had
18 a big board up in the sales department that
19 we kept all of our tasks written on, mainly
20 because there were three of us in the
21 department and it was a way for all three
22 of us to keep track of who was working on
23 what, so that I could visually look up and

Page 50

1  see, okay, here's where we are on all of
2  these things.
3          He came by one morning and had
4  mentioned there's a lot of stuff on the
5  board or something to that nature, and my
6  response was, yeah, we're a little behind,
7  but we're going to get -- we'll get it
8  taken care of by the end of the day.
9          That started this project where
10 we had to write down every fifteen minutes
11 what we had done for the previous fifteen
12 minutes. I had to create sheets for my
13 subordinates to fill out. I had to fill
14 them out, and then I had to compile all of
15 that into summary reports, which he then
16 tried to convert into man-hours, so on and
17 so forth, to determine our, I guess, rate
18 of effectiveness.
19      Q. Okay. Was Conexant, the
20 company, Conexant Systems, Inc., involved
21 in any way in this confrontation?
22      A. No.
23      Q. Okay. And did you leave

Page 51

1  Conference America as a result of this
2  confrontation?
3      A. No.
4      Q. This confrontation had nothing
5  to do with your reason for leaving?
6      A. No.
7      Q. Okay.
8      A. I had worked for Mr. Pirnie for
9  six years, I was very well aware of how
10 demanding he can be at times, and it's not
11 -- it's how demanding the business can be
12 at times. And so, yes, we had had an
13 altercation, but it was not what I felt to
14 be a career-ending altercation.
15      Q. Okay. Are these the only two
16 altercations you can remember during your
17 time at Conference America?
18      A. Yes, that's the only two I can
19 remember.
20      Q. Okay. Did you ever get a bad
21 performance evaluation or review from any
22 of your superiors at Conference America?
23      A. None that I can remember.

Page 52

1      Q. Okay.
2      A. As a matter of fact, I received
3  several bonuses for my performance.
4      Q. Okay. In 2000 did you have
5  some sort of personal crisis or personal
6  problem of some sort?
7      A. Can you be more specific?
8      Q. Well, I've seen some letters
9  that you've written to the Pirnies saying
10 thank you for helping me in your time of
11 need, that sort of thing, from around 2000.
12      A. There's one in particular that
13 happened, I don't remember if it was in
14 2000, but what had happened was my
15 ex-wife's employer had inadvertently
16 canceled their insurance. And so we found
17 out kind of, oh, by the way, and then, of
18 course, I had kids at the time, you guys
19 don't have any health insurance anymore.
20          So I approached Gwen, and then
21 Mr. Pirnie was in the office at the time,
22 and explained what was going on and asked,
23 you know, how soon can I enroll in

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  Conference America's insurance plan, that
2  sort of thing. And not only did they allow
3  me to enroll, they actually paid the first
4  month's premium because it was going to be
5  a pretty hefty amount. And I know that I
6  wrote a note or something like that in
7  regards to that, thanking them for their
8  kindness, because they didn't have to do
9  that, but they did.
10     Q. Other than what we've talked
11  about, were they pretty good to you?
12     A. Yeah, they were. As a matter
13  of fact, I'm using the experience that I
14  gained at Conference America in my job
15  today.
16     Q. Okay. Why did you leave
17  Conference America?
18     A. I had a real issue, a moral
19  issue, ethical dilemma if you want to call
20  it that, with the changing of the dates on
21  this document.
22     Q. Okay. Let's back up. While
23  you were employed with Conference America

Page 54

1  did you ever have occasion to work on
2  Conference America's dealings with
3  Conexant?
4     A. Yes.
5     Q. Okay. Tell me when you started
6  doing that.
7     A. My first visit with Conexant
8  was with Scott Hutcheson, it was probably
9  maybe late 1999 or early 2000. We went out
10  to Newport Beach, California. We visited a
11  facility in Thousand Oaks California, we
12  also went down to San Diego. And we were
13  there to do some training on some of the
14  services that Conference America offered
15  and teaching their users how to interact
16  with our automated conferencing system.
17     At that time my interaction was
18  probably not a whole lot for another year
19  or so, just kind of off and on as needed,
20  but once Scott left and some of the other
21  major account managers left, and we moved
22  out from an inside sales model to an
23  outside sales model, I became more of a

Page 55

1  liaison for them.
2     Q. Now, Scott Hutcheson worked for
3  Conference America?
4     A. He did.
5     Q. Okay.
6     A. He worked there from '99 to
7  probably 2001, maybe 2002.
8     Q. Okay. Tell me what you did
9  with respect to Conexant. What were your
10  job duties?
11     A. It was mostly liaison. You
12  know, I was never a decision-maker on the
13  account. I never had the authority to, you
14  know, set rate schedules or do anything of
15  that nature. It was more of if they had a
16  question, if one of their users needed some
17  assistance with something, they had me as a
18  primary point of contact so that they would
19  call me and I could make sure they were put
20  in touch with the right department,
21  enhanced services, or if I could take care
22  of it, I took care of it.
23     I also helped create some of

Page 56

1  the documents that were part of the several
2  amendments and things of that nature that
3  Conference America and Conexant had done to
4  their different conferencing contracts,
5  both Web-X and the audio.
6     Q. Okay. Who did you deal with at
7  Conexant? Just tell me the names of
8  everybody as best you can remember.
9     A. Several people. At first, of
10  course, I met Bob Montour and I worked with
11  him while he was there. And when he left,
12  Paul Edge kind of took over in Bob
13  Montour's capacity. So I worked closely
14  with Paul in Newport Beach.
15     I also worked with -- oh, some
16  of the names are Mindspeed, so I don't want
17  to mix the two of them together. Paul was
18  the main person at Newport Beach that we
19  dealt with. There was Jim Cass at one
20  point, but he left prior to Bob Montour.
21  There was another lady in training out
22  there that I can't remember her name today,
23  but she was our main liaison when we did

14 (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  our initial big training blitz back in
2  early 2000.
3       I also worked with Bridgette
4  McNair in the Red Bank location, and Rusty
5  -- I can't remember Rusty's last name, who
6  was in the Palm Bay location, which is in
7  Florida.
8       Q.  Did you ever work with Tom
9  Newnan or Thomas Newnan?
10      A.  We may have talked on occasion,
11  but he was never one of the primary
12  contacts.  Most of my contact with Newport
13  Beach was through Paul Edge.
14      Q.  Do you know who Thomas Newnan
15  is?
16      A.  I was aware of who he was, I --
17  the way I understood it, he was part of
18  finance or procurement, something like
19  that, but it was mostly recognition by
20  name, not by any specific dealings with
21  him.
22      Q.  When was the last time you
23  talked with anybody that you knew was

Page 58

1  employed by Conexant?
2       A.  That would have been mid July,
3  2005, when everything -- you know, that we
4  started getting requests to turn things off
5  and we were sending lists of active
6  accounts and things like that.  Probably --
7  definitely, the first of the month of 2000
8  -- or July of 2005, maybe towards the end.
9  There was a point in time, either mid or
10  late July, when we were instructed to not
11  talk to them anymore and to forward all
12  communications from Conexant up to Mr.
13  Pirnie's office.
14      Q.  Who gave you that instruction?
15      A.  I believe it came from Mr.
16  Pirnie.
17      Q.  Okay, and when was this?
18      A.  This would have been mid July,
19  2005.
20      Q.  Okay.
21      MR. BORTON:  Okay, let's take a
22  break.
23      THE WITNESS:  Okay.

Page 59

1       (Recess from 4:30 P.M. until
2       4:36 P.M.)
3       Q.  (BY MR. BORTON)  Jason, were
4  you aware that Conference America
5  terminated its audio conferencing contract
6  or price protection program agreements from
7  1999 with Conexant?
8       A.  I was.
9       Q.  Okay, when did you become aware
10  of that?
11      A.  I became aware of the actual
12  cancellation or the intent to cancel when I
13  had to Fed-Ex a letter to Tom Newnan and
14  Paul Edge, which would have been sometime
15  around the middle of July, I don't remember
16  the exact date.  But there had been talks
17  about doing it prior to that just because
18  Conference America was trying to decide
19  from a business standpoint what would be
20  the most appropriate thing to do.
21      We knew that they were
22  considering other vendors, you know, based
23  upon some of the -- some of the

Page 60

1  conversations, I guess, or just the overall
2  feel.  And so there were, you know, quite a
3  few discussions about what would be the
4  most appropriate thing to do.
5       Q.  Okay.  What's your understand-
6  ing of why Conference America ended up
7  terminating their agreement with Conexant?
8       A.  I think it was basically Mr.
9  Pirnie wanted a long-term agreement with
10  them as a customer, and I don't think that
11  that's what their position was anymore.  I
12  think that they were willing to maybe keep
13  Conference America for some of their
14  services, but it was obvious that they were
15  going to diversify as far as conferencing
16  was concerned.
17      And that wasn't typically the
18  business model that Conference America
19  pursued.  We liked to be the primary
20  provider, you know, in any and all of the
21  situations that we could be just because,
22  you know, if you -- you want a piece of it,
23  but you would sure love to have all of it

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 61

1    if you can.
2        Q.  Do you have any knowledge of
3    how Conference America's prices for
4    services rendered to Conexant may or may
5    not have changed after the price protection
6    program agreement that I've discussed from
7    1999 was terminated?
8        A.  They were moved up to the
9    standard pricing that was in effect at the
10   time.
11       Q.  Okay.  Okay, are you familiar
12   with a disconnection fee that Conference
13   America charges?
14       A.  I was not familiar with the
15   disconnection fee until the date in
16   question regarding that document.
17       Q.  Okay.
18       A.  I had never heard of it or seen
19   it billed in prior years with Conference
20   America.
21       Q.  Okay.  Were you aware that it
22   was a service that Conference America had
23   offered in the past?

Page 62

1        A.  I don't know if they offered it
2    in the past or not.
3        Q.  Okay.  Did you ever discuss the
4    disconnection fee with anybody at
5    Conference America?
6        A.  Not that I can recall
7    specifically, no.  I'm sure that it was
8    discussed, but I don't -- I can't recall a
9    specific conversation.
10       Q.  Okay.  Let's talk about this
11   document, Exhibit 1, in front of you, and
12   you said you were asked to change some
13   dates, is that correct?
14       A.  That's correct.
15       Q.  Just tell me basically, from
16   beginning to end, the whole incident.
17       A.  We -- we always tried to keep
18   files on our customers, and it was really
19   more for our records as much as anybody's,
20   so that we could make sure if we needed to
21   go back with a customer we would know what
22   we had done with them in the past.  And
23   there had been several changes to the terms

Page 63

1    and conditions prior to that, wording
2    changes that had come about, calling them
3    service terms and conditions instead of
4    user terms and conditions, or something of
5    that nature.  So we had, you know, been
6    working with several iterations of that in
7    months prior to this particular date in
8    question.  And --
9        Q.  You said changes to that.  You
10   meant prior to your incident where you were
11   asked to change a date --
12       A.  I wasn't asked to change
13   anything on this other than I know that
14   there were changes that were being made to
15   these terms and conditions prior to this
16   specific time, and those changes were
17   centered around the wording and things of
18   that nature that were in the terms and
19   conditions as it was being reviewed by
20   legal representation.
21       Q.  Okay.  Changes were being made
22   to the terms and conditions posted on
23   Conference America's web site?

Page 64

1        A.  That's correct.
2        Q.  Okay.  When did you first
3    become aware of any changes being made?
4        A.  It's hard to nail down a
5    specific date, but Conference America was
6    going through, in the spring of -- late
7    spring, early summer, of 2005, Conference
8    America went through a reorganization
9    process internally where they put the --
10   reorganized all of the cubicles and the
11   basic layout of the building.  And for a
12   period of time, maybe a few weeks, we,
13   meaning sales administration, were in a
14   little office over towards the side.
15   That's my first -- that's my first
16   recollection of being aware that there were
17   some changes that were coming with the
18   terms and conditions on the web site.
19       The reason why I was aware of
20   it was we had to make sure in the pricing
21   documents that sales administration was
22   issuing to new customers and the like that
23   we referenced the terms and conditions on

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  the web site with the same terminology that
2  was being applied to them on the site.
3      Q.  This was for all customers or
4  anyone who might view the web site terms
5  and conditions then?
6      A.  That's correct.
7      Q.  Okay.  Are you aware that any
8  web site -- that the web site terms and
9  conditions were changed for any reason
10  related to Conexant specifically?
11      A.  The only change I'm aware of
12  regarding Conexant specifically is the
13  change in question regarding the date.
14      Q.  Okay.  Who was making the
15  changes to the web site terms and
16  conditions?
17      A.  I don't know who was authoring
18  the actual changes themselves, and I'm -- I
19  don't know for sure who would have applied
20  the changes to the web site.  I imagine it
21  would have been someone in the IS
22  department, but in -- our knowledge of this
23  process going on mainly centered around the

Page 66

1  fact that we had to make sure the
2  terminology we used in the documents we
3  sent to customers and new customers
4  appropriately reflected the same
5  terminology that was being used on the web
6  site.
7      Q.  Okay.
8      A.  And so we had to make specific
9  changes to some of our documents.
10      Q.  Okay.  Have you told me
11  everything that you know about why the
12  terms and conditions were being changed up
13  to mid July 2005, then?
14      A.  Yes.
15      Q.  Okay.  Tell me about the
16  incident where you were asked to change
17  Exhibit 1.
18      A.  It was an afternoon sometime
19  around -- two dates stick out in my mind,
20  the 10th and the 12th of July.  Rob Pirnie
21  brought me -- or asked -- came out to my
22  desk and asked me to go in and backdate the
23  date on the terms and conditions document,

Page 67

1  print a copy of it, and put it in the
2  Conexant folder.
3      Q.  Okay, and this is July 11th or
4  12th?
5      A.  Somewhere around that time.  I
6  don't recall the exact date.
7      Q.  Would it have been much later
8  than July 12th -- I mean, can we say
9  safely, just, you know, just to the best of
10  your knowledge, would you be able to say it
11  was between July 10th and 15th?
12      A.  Again, I don't recall the
13  specific date, but it was in the -- around
14  the middle of July time frame.
15      Q.  Okay.  And Rob Pirnie came out
16  to your work station?
17      A.  That's correct.
18      Q.  Okay, and tell me exactly what
19  he said.
20      A.  He asked me to backdate the
21  document that was on the web site, print a
22  copy of it, making sure it had that date,
23  and then place that copy in the Conexant

Page 68

1  folder, or file, that we kept there in the
2  sales administration.
3      Q.  Okay, what do you mean when you
4  say backdate?
5      A.  We put -- I was told to put a
6  date on the document that was prior to the
7  date that I was -- that is in question.
8  So, in other words --
9      Q.  What date in question?  I'm
10  sorry, I don't mean to break you up, I'm
11  just trying --
12      A.  No, that's -- I was told to put
13  a date earlier than the current date that
14  we made the change -- that we printed the
15  document and put it in the folder.  I
16  believe that happened around the middle of
17  the month, so the date that I would have
18  put on the document would have been around
19  the first of the month, maybe around the
20  3rd or 4th of July, something like that.
21      Q.  Okay.  And looking at this
22  document, Exhibit 1, in front of you, where
23  were you asked to place the date?

17  (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 69

1    A.  Here in the corner
2  (Indicating).
3    Q.  In the lower right-hand corner?
4    A.  That's correct.
5    Q.  Okay, so somewhere around July
6  11th or 12th you were asked to place a date
7  from early July in the lower right-hand
8  corner of Conference America's web site
9  terms and conditions?
10    A.  That's correct.
11    Q.  Okay.  Were you asked to do
12  anything else with the document?
13    A.  Print the document and put it
14  in the file.
15    Q.  Okay.  Did you read the
16  document at this time?
17    A.  I did not.
18    Q.  Okay.
19    A.  I changed the date, printed it,
20  and put it in the file.
21    Q.  Okay.  And you put that in the
22  Conexant folder?
23    A.  That's correct.

Page 70

1    Q.  And the Conexant folder is the
2  Conexant file?
3    A.  Yes.
4    Q.  Okay.  Tell me about any of the
5  discussions you had with Rob about this
6  particular topic, backdating this document?
7    A.  There were no other.
8    Q.  Okay.  Did you ask him why he
9  wanted you to do it?
10    A.  Did not.
11    Q.  Okay.
12    A.  We --
13    Q.  Did you discuss this with
14  anybody else at the time you did it?
15    A.  No, I did not.
16    Q.  Okay.
17    A.  It didn't strike me as
18  something out of the ordinary.  We had
19  backdated documents prior to that,
20  particularly in the customer's favor.  For
21  instance, if a customer signed a contract
22  with us on the 3rd of June, we would
23  sometimes make their pricing go into effect

Page 71

1  the 1st of June so that they get, you know,
2  a couple of days' extra savings.  So the
3  idea of changing a date in that particular
4  regard didn't strike me as anything out of
5  the ordinary.
6    Q.  Did you put July 1st on the
7  document?
8    A.  I believe it was either the 3rd
9  or the 4th.
10    Q.  3rd or the 4th of July?
11    A.  (Nodding head).
12    Q.  Okay, and how did you go about
13  doing that?  If you can take me through the
14  process, did you go to the web site and
15  make a change, or did you -- how do you --
16    A.  No, if I remember correctly, I
17  pulled it off of the web site, put it into
18  a Microsoft Word document, made the change,
19  and then printed it off.
20    Q.  Is that what you were told to
21  do?
22    A.  Well, I wasn't told to
23  specifically use Microsoft Word, I was just

Page 72

1  told to change the date.  So I used the
2  tools that I had available to do so.
3    Q.  Okay, and I don't mean to harp
4  on details here, but can you tell me as
5  best you recall what the dialogue was, what
6  the request was?  Was it, Jason, change
7  this to July whatever, or what was said?
8    A.  As I recall, Rob came out to my
9  desk, and he asked me to get the terms and
10  conditions, change the date, print a copy
11  of it, and put it in the file.
12    Q.  Okay, did he ask to see it?
13    A.  I don't recall him asking to
14  see it, no.
15    Q.  Okay.  And that's everything
16  that was said between you and him with
17  regard to the backdating of this document?
18    A.  That's correct.
19    Q.  Okay.  Now, what led you -- was
20  this event that led you to resign from
21  Conference America?
22    A.  This was, but not at that
23  particular time.

18 (Pages 69 to 72)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 73

1  Q. Okay.

2  A. What happened is a week or two
3  later we were compiling the end of month
4  numbers for all of the customers, that was
5  part of sales administration's duties. We
6  provided the top one hundred reports, top
7  eighty reports, that sort of thing, to the
8  executive levels of the company. And as I
9  was assisting in compiling those documents
10 and reviewing those documents prior to them
11 going forward up the management change, I
12 noticed a huge increase in the billings for
13 Conexant Systems.

14      At that time I did a little
15 investigation on my own, I had the tools
16 and capabilities of doing so, and realized
17 what had happened. I then realized that
18 that had something to do with this document
19 that I was asked to change the date on.

20      Q. What had happened? What are
21 you referring to?

22      A. The extra billing that we had
23 seen -- one of the reports that we produced

## Page 74

1  was a six-month trend, and we see forty,
2  fifty, maybe sixty thousand dollars worth
3  of billing for the first four or five
4  months of that trend, and then on this last
5  month, August of 2005, you see a spike of
6  around a hundred and fifty -- a hundred and
7  thirty-five, a hundred and fifty thousand
8  dollars.

9      My first instinct was we must
10 have a problem on the report, so we go and
11 we start doing due diligence and research
12 to see if there's an error. And as part of
13 that, I realized that there was well over a
14 hundred thousand dollars worth of fees
15 applied to Conexant Systems regarding a
16 deactivation fee.

17      Q. Okay, and what date was this
18 that you realized this?

19      A. This would have been probably
20 around the 3rd or 4th of August.

21      Q. Okay.

22      A. We typically had those reports
23 done -- you know, we tried to have them

## Page 75

1  done by the fifth business day -- or the
2  fifth day of the month.

3      Q. Okay. Do you know when Bob
4  Pirnie terminated the 1999 price protection
5  agreement with Conexant?

6      A. The letter was sent out, I
7  believe, the Friday -- the third week of
8  July, that Friday. I may be mistaken on
9  that date, but it was around the third week
10 or so of the month of July.

11      Q. Okay. Are you aware of him --
12 you're not aware of anything he might have
13 done prior to that to terminate the price
14 protection program agreement?

15      A. No other communications that
16 I'm specifically aware of.

17      Q. Okay. I'm going to ask you to
18 give me your best guess on some things.
19 Assuming he had terminated it around the
20 first week of July, say around July -- by
21 July 10th, and Conference America had
22 charged its regular rates to Conexant after
23 that date, plus a deactivation fee, would

## Page 76

1  that also explain a large spike in money
2  due from Conexant?

3      MR. MILLER: Object to the
4  form. Assumes facts that are not in
5  evidence, and I object to you inviting him
6  to guess.

7      Q. (BY MR. BORTON) You can
8  answer.

9      A. Will you clarify what you mean
10 by its regular rates?

11      Q. Sure. The standard prices that
12 Conference America charged.

13      A. Okay, so you're saying if it
14 had been terminated around the first of
15 July and the standard rates plus the
16 deactivation fees would have been applied
17 to the July billing, would that have been
18 the cause for the increase?

19      Q. Sure.

20      A. Yes.

21      Q. Okay. So what do you think
22 happened? What do you think Conference
23 America -- do you think they were up to

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

|  | Page 77 |
|---|---|

1 something dishonest?
2      A.   In my opinion, and this is
3 based upon almost six years working with
4 the company, never having ever seen a
5 deactivation fee billed to anyone, also
6 based upon some of the conversations that I
7 had -- was a witness to, I believe what
8 happened is they changed the terms and
9 conditions to include this disconnect fee,
10 I was instructed to backdate the date to a
11 date prior to whatever day it was they
12 decided to act so that if this ever came to
13 where we're sitting today, Conference
14 America's records would show that on this
15 date they have a copy of the terms and
16 conditions in the Conexant file that
17 includes that fee.
18      Because of all of this, when I
19 realized all of this after seeing the
20 increase in the billing and what had been
21 done with the date changing of the
22 document, I had a serious issue with that
23 because in my mind that borderlines, if not

|  | Page 78 |
|---|---|

1 is, criminal activity.  So I contacted my
2 attorney that day and sought his guidance
3 on what was going on.
4      MR. CLAUNCH:  You don't have to
5 talk about what we discussed.
6      Q.   (BY MR. BORTON)  Yeah, don't
7 tell me anything you and your attorney --
8 that's okay.
9      Okay, I want you to tell me
10 every basis that you have for what you just
11 told me.
12      A.   Okay, I was very involved with
13 the billings of the company.  Part of my
14 job, again, was to provide billing reports
15 to the upper levels of management, and that
16 was Mr. Pirnie, Gwen, Rob, the sales
17 managers, the remote salespeople, all
18 aspects of the selling part of the
19 organization.  Part of my duties, a side
20 responsibility, if you will, because of the
21 capabilities I had developed in providing
22 these reports, was to assist the finance
23 department on a regular basis with making

|  | Page 79 |
|---|---|

1 sure that the numbers that we were
2 reporting in our sales reports were also
3 matching with the numbers on the general
4 ledger, that sort of thing.
5      And so I became skilled, if you
6 will, at going into the billing system and
7 finding these anomalies as they appeared
8 because they would show up every now and
9 then.  In all of that time, seeing -- and I
10 was even involved in projects where we were
11 updating the ledger system with all of our
12 products over, you know, all of the
13 different services and everything that we
14 had, classifying all of those things,
15 providing that output to Gwen Brown's
16 office so that they could update the system
17 with the appropriate product codes, you
18 know, so on and so forth, I never had seen
19 a deactivation fee actually billed to
20 anyone, never.  Now, again, that doesn't
21 mean that it wasn't ever billed.  I had
22 never seen it before.
23      Q.   Okay, so I want to go just one

|  | Page 80 |
|---|---|

1 by one, I want to make a list of all of the
2 bases you have for believing that
3 Conference America may have been engaging
4 in borderline criminal activity like you
5 said.  So we've got, and if you disagree
6 with the way I'm saying it, let me know,
7 but I'm just trying to get these one by
8 one, talk about them, and then move on,
9 okay?
10      A.   Okay.
11      Q.   So one of your bases is that
12 you saw a large spike in Conference
13 America's billing to Conexant in July,
14 correct?
15      A.   A large spike that the majority
16 of the dollars in question were directly
17 related to this deactivation fee.
18      Q.   Okay.  That's one.  Now, you
19 said you had been privy to conversations.
20 Can you tell me all the conversations
21 you've been privy to that aroused your
22 suspicions?
23      A.   Yes, I can remember several

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

| Page 81 | Page 83 |
|---|---|
| 1 conversations in Rob Pirnie's office with<br>2 Bob Pirnie as well as we were discussing<br>3 what should be done in terms of the<br>4 Conexant account several times that there<br>5 were comments that were made to the effect<br>6 of we're going to get them, or we're going<br>7 to get them with this fee, and they're<br>8 going to regret that they ever canceled the<br>9 -- that they, you know, ever were looking<br>10 for other providers, that sort of thing.<br>11     Q.  Okay, let's talk about those<br>12 conversations.  How many were there?<br>13     A.  I don't recall a specific<br>14 number, but I -- there were at least two or<br>15 three.<br>16     Q.  Okay.  And did all of them take<br>17 place in Rob Pirnie's office?<br>18     A.  I would say probably not, but<br>19 the ones that I remember mostly did.<br>20     Q.  Okay.  Are you aware of any<br>21 conversations about this taking place<br>22 anywhere else?<br>23     A.  None that I can remember being | 1 the end of June --<br>2     Q.  Okay.<br>3     A.  -- maybe -- again, I don't know<br>4 a specific date.<br>5     Q.  Okay, how about a third<br>6 conversation?<br>7     A.  That would have happened<br>8 probably sometime right around when we were<br>9 seriously recognizing that they were<br>10 canceling all of the accounts, we were dis<br>11 -- the pricing was actually going to<br>12 expire.  So, again, probably around the<br>13 middle of July.<br>14     Q.  Okay.  Was there one subsequent<br>15 to that that you can remember?<br>16     A.  None that I can remember after<br>17 the middle of July.<br>18     Q.  Okay, so you remember three<br>19 conversations, correct?<br>20     A.  Yes.<br>21     Q.  Okay, you don't remember a<br>22 fourth at any time, do you?<br>23     A.  No, that's correct. |
| **Page 82** | **Page 84** |
| 1 a part of, no.<br>2     Q.  Okay.  The ones that you can<br>3 remember being a part of, who was present?<br>4     A.  Rob Pirnie, Bob Pirnie, and<br>5 myself.<br>6     Q.  Okay.  Anybody else ever<br>7 present?<br>8     A.  No one that I can recall.<br>9     Q.  Okay.  Do you know -- are you<br>10 aware of anybody else having any knowledge<br>11 of these conversations?<br>12     A.  I'm not.<br>13     Q.  Okay.  Now, let's just go<br>14 through, starting with the first<br>15 conversation, do you have any idea when<br>16 that might have been, what date?<br>17     A.  This probably would have been<br>18 sometime in June, but I don't have a<br>19 specific date.<br>20     Q.  Okay.  Do you have any idea<br>21 when the second conversation would have<br>22 been?<br>23     A.  Again, maybe sometime towards | 1     Q.  Okay, let's go back to the<br>2 first one, sometime in June.  Tell me as<br>3 best you can remember everything that was<br>4 said.<br>5     A.  Well, I mean, there was some<br>6 aggravation on all sides, myself included,<br>7 with the fact that, you know, we had done a<br>8 lot of work for Conexant over the years and<br>9 we had done a lot of customizations on web<br>10 sites, we had done a lot of technological<br>11 creation, if you will, to try to meet their<br>12 conferencing needs, and had a history of<br>13 doing that, and we thought that that's what<br>14 the relationship was based upon.  And for<br>15 us to get some of the news that we were<br>16 getting from not only the Newport Beach<br>17 area, but also in the Red Bank area, which<br>18 was where the headquarters was for a little<br>19 while, was very disturbing, because, I<br>20 mean, it's -- you put your life's work into<br>21 something, and it's almost snatched away<br>22 from you.<br>23         So I can remember several |

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  conversations where, you know, we were
2  trying to figure out what was going on.
3  This first one that I remember specifically
4  around June, the middle of June, maybe, was
5  in that particular regard.  It was
6  regarding a service that Paul Edge was
7  asking for from India, a service that we
8  were told couldn't be done the way they
9  wanted it done.  And over a period of a
10 week or so of Rob and other people working
11 on it and finally determining, okay, here's
12 a way that we can offer it to them, we'll
13 send it to them at this price.  You know,
14 again, those conversations were geared
15 around, A, frustration of, hey, we might be
16 losing this account, and, B, working very
17 diligently towards trying to keep it.
18     Q.  Okay.  Anything else said
19 during that first conversation you can
20 remember?
21     A.  No, nothing -- nothing that I
22 can remember there.
23     Q.  Okay.  And that was between

Page 86

1  you, Rob, and Bob Pirnie?
2     A.  The majority of that, yes, Mr.
3  Pirnie was in the office for parts of that,
4  but not all of it.  There were times where
5  it was just Rob and I talking, and Mr.
6  Pirnie walked into the office after we had
7  been talking prior to that.
8     Q.  And you can't remember anything
9  else the three of y'all might have said
10 during that conversation, any of the three
11 of y'all?
12     A.  I don't remember any of the
13 real specifics other than I know we were
14 working on trying to find a solution for
15 this India question that Conexant had and,
16 again, just venting frustrations over the
17 fact that we had worked so hard over the
18 years on trying to maintain and keep this
19 account, and, you know, maybe we might be
20 losing it.
21     Q.  Is there anything you can think
22 of, any document or anything that might
23 refresh your recollection about what was

Page 87

1  said during that conversation?
2     A.  No, I can't think of any
3  specific document.
4     Q.  Okay.  Any document that might
5  refresh your recollection about when you
6  were asked to backdate Conference America's
7  web site terms and conditions?
8     A.  No, not that I can remember.
9     Q.  You can't think of anything
10 that might refresh you?
11     A.  No.
12     Q.  Okay, tell me everything you
13 remember about the second conversation,
14 what you said, and also took place --
15     A.  The second conversation was in
16 the afternoon, again it was in Rob's
17 office, and it had to do with this letter
18 and --
19     Q.  Which letter?
20     A.  The letter that was sent --
21 that I had to take to Fed-Ex, I believe it
22 was a Friday afternoon, and I think I said
23 earlier in the deposition that that would

Page 88

1  have been around the middle of June -- or,
2  excuse me, July, but it may actually have
3  been around the end of June, around the
4  25th of June, because I remember it because
5  I had to, A, I was the person that had to
6  take it to Fed-Ex and make sure it got
7  there, but, B, the gist of that
8  conversation had to do with the fact that
9  Tom Newnan and Paul Edge were going to be
10 on vacation.  And I believe that vacation
11 was going to be centered around the 4th of
12 July, and that we wanted to make sure that
13 that letter was sent Fed-Ex, overnight,
14 Saturday delivery, so that it would be
15 received by someone at Conexant and would
16 sit there a week before Thomas Newnan and
17 Paul Edge got back and realized that
18 effective I guess July 1st that the
19 services -- the contract had been
20 terminated.
21     Q.  Okay.  What else was said in
22 that conversation?
23     A.  That was the gist of it,

22 (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 89

1  really, just, you know, making sure that I
2  knew, okay, this has got to get to Fed-Ex
3  and this has got to be Saturday overnight
4  delivery.
5      Q.  What do you know about the
6  contents of that letter?
7      A.  I recall reading the letter.  I
8  can't recall verbatim what it said, but if
9  I remember correctly, it said something to
10 the extent of Conference America has
11 decided to exercise its authority or -- I
12 don't know what you would call it, but its
13 -- exercise a portion of the contract that
14 stated either party can cancel the contract
15 with fifteen days' notice.
16     Q.  Okay.  And if that letter
17 arrived on the 25th, then would that make
18 the contract canceled, at least as far as
19 that letter goes, on the 10th of July?
20     A.  I guess -- I believe so.
21 Again, I'm guessing on the date there.  I
22 don't know for sure.  But I'm sure there's
23 a Fed-Ex record or something somewhere that

Page 90

1  would show the exact date.
2      Q.  And what would be the effect of
3  the cancellation, if you know, as far as
4  pricing goes?
5      A.  Well, it would be huge.
6      Q.  Would the prices go up after
7  the cancellation, back to the standard
8  rates?
9      A.  They would, yes, and there
10 would be a huge increase in the rates.
11     Q.  Okay.  If Conference America
12 canceled the contract effective July 10th
13 and charged Conexant standard prices after
14 July 10th, do you see any moral problem
15 with that?
16     MR. CLAUNCH:  Object to --
17     MR. MILLER:  Object to the
18 form.  It omits whether they were existing
19 accounts or not.  Object to the form.
20     A.  I see Conference America was
21 exercising their right in that contract.
22 It was clearly stated in the contract that
23 either side, with or without notice --

Page 91

1  excuse me, either side, with the fifteen
2  days' notice, could cancel the contract for
3  any reason.
4      Q.  (BY MR. BORTON)  Okay, so do
5  you see any moral or ethical problem with
6  Conference America, assuming they canceled
7  on fifteen days notice, do you see any
8  moral or ethical problem with Conference
9  America charging its standard prices to
10 Conexant after the effective date of the
11 cancellation?
12     MR. MILLER:  Object to the
13 form.
14     A.  After the effective -- after
15 the fifteen days, no.
16     Q.  (BY MR. BORTON)  Okay.  So come
17 along with me here.  Assuming Conference
18 America sends that letter and it arrives on
19 June 25th, and assuming fifteen days from
20 June 25th is July 10th, you have no
21 problem, moral or ethical, with Conference
22 America charging standard prices to
23 Conexant after July 10th?

Page 92

1      MR. MILLER:  Object to the
2  form.
3      A.  The only issue that would even
4  come to hand is the fact that it was known
5  that the two main people who would be the
6  people to receive this type of
7  communication were not going to be in the
8  office the subsequent week.
9      Q.  (BY MR. BORTON)  Okay, but
10 back to my question.  Conexant receives the
11 termination on the 25th, effective fifteen
12 days later, which is the 10th, do you have
13 any -- do you think there's anything wrong
14 with Conference America charging its
15 standard prices after the July 10th date?
16     MR. MILLER:  Object to the
17 form.
18     A.  I think that you would have to
19 define Conexant receiving notice, and I
20 know that that's part of this litigation
21 here, the dispute over whether or not that
22 was considered notice.
23     Q.  (BY MR. BORTON)  Okay.  Well,

23  (Pages 89 to 92)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 93

1  say somebody at Conexant did receive
2  notice --
3      A.  Without dates in consideration,
4  I would say that it's -- whenever notice is
5  decided and Conexant knows that the
6  contract is being canceled, the fifteen
7  days should apply, and then after that,
8  yes, I think standard rates would be
9  appropriate.
10     Q.  You have no moral problem with
11 them charging standard rates after the
12 contract is effectively canceled then,
13 right?
14     MR. MILLER:  Object to the
15 form.  Omits necessary information.
16     A.  After Conexant receives notice
17 and they get their fifteen days, no.
18     Q.  (BY MR. BORTON)  Okay, no, you
19 don't have an ethical problem with that?
20     A.  After Conexant receives notice
21 and they have the fifteen-day period of
22 notice, I have no ethical or moral issue
23 with Conference America charging the

Page 94

1  standard rates from that point forward.
2      Q.  Okay.  Did you have an ethical
3  or moral issue with taking the letter to be
4  delivered by Fed-Ex after hearing, as you
5  say, that these guys were out of town?
6      A.  It wasn't enough to where it
7  prevented me from doing it, so, no.  I
8  mean, I might have been bothered by it a
9  little bit, but it wasn't a huge deal.
10     Q.  Okay.  Did you think Conexant
11 would have notice as of the time that
12 letter arrived?
13     A.  I honestly didn't think about
14 it because, you know, again, that was kind
15 of out of my box, if you will.  I was -- my
16 focus was making sure that letter was at
17 Fed-Ex and it was delivered overnight,
18 Saturday delivery.
19     Q.  Okay, did you have a moral or
20 ethical problem that you can remember with
21 anything in the letter itself?
22     A.  I don't recall the exact
23 specifics of the letter, but what I do

Page 95

1  recall, the points of the letter were
2  exactly the points in the contract.
3      Q.  Okay.  Tell me about this third
4  conversation that you referenced, just what
5  was said, where it took place, who was
6  present.
7      A.  The third conversation came up
8  after we were well into the process of
9  knowing that these -- they were going to be
10 canceled and that we were going to be
11 stopping all of the conferencing accounts
12 as of -- I believe it was the 31st of July.
13 You know, there was anger there, of course,
14 and, again, it was on all sides, myself
15 included, because we had worked hard.  I
16 had made many trips, even one trip
17 overnight, with no notice, to go out to
18 Conexant and, you know, meet their needs.
19 And, you know, again, we were just
20 distraught that the account was going to be
21 pulled.
22     But, I mean, the basic gist of
23 that conversation was that they're going to

Page 96

1  get theirs when they see their bill.  My
2  understanding at that particular point in
3  time was, they'll see the standard rates,
4  and that will be a pretty good increase in
5  their bill.  I did not realize at the time
6  that it included a deactivation fee.
7      Q.  Okay.  Do you have a moral or
8  ethical problem with a deactivation fee?
9      A.  I have an ethical problem with
10 they way I believe it was applied.
11     Q.  Tell me all about that.
12     A.  I believe, on a couple of
13 things, one, again, in six years with the
14 company, being very involved with the
15 various financial reports on a monthly
16 basis, really on a daily basis, having
17 never seen anything of this nature ever
18 before, having seen companies of similar
19 size and larger as Conexant leave
20 Conference America and terminate their
21 services, never seeing that happen ever
22 before.  Also being witness to -- and
23 being, myself, frustrated with what was

24  (Pages  93  to  96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 97

1  going on, knowing that we're losing this
2  big account, the ethical dilemma started
3  for me when I realized that there had been
4  a document that was backdated, it was my
5  belief that that deactivation fee had not
6  been in this document prior to that date,
7  and I believe that it was placed into the
8  document so that they could generate what
9  is, in essence, two or three more months
10  worth of billing for that particular
11  customer.
12      Q.  Okay, so we have this third
13  conversation.  Now, did you discuss
14  anything that was discussed in these three
15  conversations with anybody else at any
16  time?
17      A.  I may have discussed some
18  things with Zach Vogelgesang as he would
19  have needed to know, you know, because we
20  were involved in providing a lot of the
21  lists and doing a lot of the back-end work
22  of, you know, what was going to have to
23  done to get the accounts turned off.  But I

Page 98

1  don't recall divulging any specific
2  information, you know, that I would have
3  felt was management level only.
4      Q.  Okay.  Can you tell me just as
5  best you recall what discussions you had
6  with Zach?
7      A.  Zach knew that we were, you
8  know, going to be terminating the accounts
9  and that Conexant was leaving, again,
10  obviously, because we had to generate a lot
11  of the lists and see what the real impact
12  was going to be from a procedural
13  operational standpoint of how are we going
14  to accomplish this.  And, to my
15  recollection, that's what our conversations
16  were geared around.
17      Q.  Anything else you can recall
18  about those conversations?
19      A.  No, Zach had an idea of why I
20  was leaving, he knew that something had
21  happened that I was very uncomfortable
22  with, and he knew that I had already
23  started seeking other opportunities for

Page 99

1  employment prior to turning in my
2  resignation.  But he did not know the
3  specifics of exactly what was going on.
4      Q.  Did you ever discuss the
5  specifics of what was going on with Zach?
6      A.  After the fact, yes.  After my
7  employment with Conference America ended, I
8  did, as I recall.  He learned of the reason
9  for my leaving, it would have been probably
10  around early 2006, maybe February or so, or
11  April of this year, March.
12      Q.  Okay.  Besides Zach -- well,
13  tell me what happened in that conversation
14  with Zach.
15      A.  Well, again, as I mentioned
16  earlier, Zach and I are still friends.  We
17  do get together every now and then, have
18  dinner, something to that effect.  We
19  generally try to keep things away from
20  Conference America for obvious reasons, but
21  in this particular occasion it basically
22  came up, you know, the reasons why I
23  decided to resign from Conference America,

Page 100

1  and I basically told him.
2      Q.  What did you tell him?
3      A.  I told him what I believed had
4  occurred with the changing of the terms and
5  conditions and the backdating of the
6  documents and things of that nature, and
7  that it was what I thought at the very
8  least unethical behavior, even possibly
9  criminal behavior, and that I wanted no
10  part of that, and that's the reason why I
11  left.
12      Q.  Okay.  Have you -- is that the
13  only one conversation you've had with Zach
14  discussing any of this?
15      A.  Discussing this type of thing
16  in particular, yes.  That's the only
17  conversation.
18      Q.  Okay.  You've talked to him
19  since then, correct?
20      A.  Yes.  We, like -- again, we
21  have dinner every now and then, or we'll go
22  and have a beer or something like that.
23  But it's just generally let's leave work

25 (Pages 97 to 100)

## FREEDOM COURT REPORTING

Page 101

1  out of this and kind of catch up on how
2  things are going, that sort of thing.
3      Q.  So you haven't discussed any of
4  the things we've discussed today since that
5  one discussion you said you had with Zach,
6  right?
7      A.  That's correct.  We . . .
8      Q.  Okay.  And this is the only
9  reason that you left Conference America?
10     A.  Yes, this is really the reason
11 I left Conference America.  I had been, as
12 the other depositions have alluded, I had
13 some issues going on, I was divorced a year
14 prior to that, obviously that had a big
15 emphasis, you know, emphasis -- or a big
16 impact on my financial situation.  I needed
17 Conference America as a job.  They paid me
18 well, and it was something that I needed,
19 but I could not be a party of what I
20 believed happened, which was, in my mind,
21 criminal activity, fraudulently billing a
22 customer for charges that weren't there
23 prior to the time that I was asked to

Page 102

1  change the date.
2      Q.  How much alimony do you pay a
3  month?
4      A.  Two hundred and fifty dollars
5  alimony, nine hundred eighty-eight dollars
6  a month in child support.
7      Q.  Okay.  How long has that been
8  going on?
9      A.  Since November 2004.
10     MR. CLAUNCH:  Yeah.
11     A.  Actually it was more than that.
12 When I first worked at Conference America,
13 I paid eighteen hundred and thirty dollars
14 a month in child support and alimony.  When
15 I left Conference America and couldn't find
16 comparable employment, I had to go through
17 my attorney, refile with the State and have
18 everything reduced down to the level of
19 income that I was able to generate at that
20 point, which is roughly thirty-five
21 thousand dollars a year, a little over a
22 fifty percent pay cut.  And what I'm
23 currently paying now is based upon that.

Page 103

1      Q.  Okay.  And we've talked about
2  it, and I'm not trying to belabor it, but
3  just so we can get sort of a crystalized
4  version of it, just so I can get my arms
5  around it, tell me exactly what you think
6  Conference America did wrong, just from
7  beginning to end.
8      A.  I believe --
9      Q.  Just lay it out in detail as
10 best you can.
11     A.  It's my belief that this
12 deactivation fee did not exist when the
13 cancellation -- when the contract was
14 originally canceled.  I believe it was an
15 afterthought, a way for the company to
16 generate another two or three months worth
17 of revenue to maybe find another customer
18 to replace them, whatever you want to say.
19 But my belief is that that fee did not
20 exist prior to that, it was put in as an
21 afterthought, which is why I was instructed
22 to change the date on the document so that
23 if it ever came into question there would

Page 104

1  be documentation to dissuade any
2  interrogation or any investigation into
3  whether or not this was a valid fee.
4      I came about that belief based
5  on the fact that I saw what the billing
6  increases were, and I saw the reason for
7  the billing increases, I then connected
8  that to being instructed to changing the
9  date and formulated my opinion as to what
10 happened.
11     Q.  Okay.  And tell me if I'm
12 mischaracterizing what you say, but I'm
13 just trying to get it down to a nutshell so
14 I can understand it.  You're saying
15 Conference America slipped this
16 deactivation fee into its web site terms
17 and conditions after they canceled the
18 Conexant price protection program agreement
19 so they could charge the disconnection fee
20 to Conexant?
21     A.  I'm saying I don't believe that
22 it was in their prior to it.
23     Q.  Right, and so you're saying the

26  (Pages 101 to 104)

## FREEDOM COURT REPORTING

Page 105

1  fraud came because Conference America
2  slipped this disconnection fee into the web
3  site terms and conditions after they
4  terminated the price protection program
5  agreement?
6       A.  I don't know if I would use the
7  word slipped.  All I'm saying is that it's
8  my belief that it was not there prior to
9  the time that the contract was canceled.
10      Q.  Okay, and their placing of
11  this -- and it's a $74.95 disconnection
12  fee, right?
13      A.  That's right.
14      Q.  Their placing of this $74.95
15  disconnection fee into the web site terms
16  and conditions after they sent a letter
17  terminating the contract, that's what
18  you're saying constitutes the unethical
19  behavior or the fraud or the dishonesty,
20  correct?
21      A.  That -- the act of placing that
22  fee into the terms and conditions after
23  canceling the contract does not constitute

Page 106

1  the whole thing.  Having me backdate the
2  document to reflect a date prior to that
3  does.
4       Q.  Okay.  And what do you believe
5  the backdating of the document accomplished
6  for Conference America?
7       A.  I believe it gave them a hard
8  copy document in the file for Conexant
9  Systems that predated the cancellation of
10 this document or the -- the acknowledgement
11 of Conexant that this fee existed, and the
12 purpose for that was so that if, again,
13 there was an investigation as to what
14 occurred, there would be a physical proof
15 document saying I don't know what you're
16 talking about, we've got it right here
17 dated this date, that it was there.
18      Q.  Okay, and I'm just trying to
19 walk through it so I can get my arms around
20 it again.  I'm not trying to contradict
21 what you said.  I want you to tell me if
22 I'm contradicting what you say.  The fraud
23 consisted of two components, then, the

Page 107

1  first one being Conference America putting
2  a $74.95 disconnection fee into its web
3  site terms and conditions after it canceled
4  the contract, and the second component
5  being where they asked you to backdate the
6  web site terms and conditions?
7       A.  I think I would clarify it a
8  little more in saying that adding the fee
9  after the cancellation of the document is
10 not so much a part of it as backdating the
11 document to reflect a date prior to the
12 cancellation, and then billing that fee.
13      Q.  Okay.
14      A.  The act of adding that fee
15 itself, had they never billed it, we
16 wouldn't be sitting here today.
17      Q.  Okay, but adding the fee
18 afterwards, and having billed it,
19 constitutes fraud in your eyes?
20      A.  In my mind, having me change a
21 date on a document to a date prior to what
22 was needed for the cancellation absolutely
23 is fraudulent activity.

Page 108

1       Q.  Okay.  Them asking you to
2  change a document to an earlier date in
3  July is the fraud, correct?
4       A.  I'm saying that the fraud is
5  backdating the document to an earlier date
6  and then billing a fee which I believe was
7  not there prior to that date.
8       Q.  Okay.  Do you know if they
9  billed -- what date they billed that fee
10 from?
11      A.  I don't.  I don't recall that.
12 I -- the fee, as I remember, was billed on
13 the number of accounts that were
14 deactivated.  I don't think it had
15 anything, necessarily, to do with a date
16 period or anything like that.  If I recall
17 correctly, there were seventeen or eighteen
18 hundred leader profiles that were
19 deactivated as part of this, and the fee
20 applied for those profiles.
21      Q.  Okay.  So asking you to
22 backdate the document to an earlier date in
23 July and then billing Conexant the

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  deactivation fee from the date that you
2  were asked to backdate the document, that
3  constitutes the fraud?
4      A.  Backdating the document, and
5  then billing the fee, when I believe the
6  fee wasn't there before I backdated the
7  document, is fraudulent in my eyes.
8      Q.  Okay.  Okay, now, if Conference
9  America had charged a $74.95 fee prior to
10  the time they terminated the contract,
11  would there be anything fraudulent about
12  that?
13      A.  Probably not -- well, I mean,
14  in my -- if Conference America had charged
15  this fee prior to the termination of the
16  contract and some of the things that I
17  overheard about the increase in billing and
18  things like that had not occurred, then I
19  don't think we would be sitting here today.
20      Q.  Okay, tell me everything you
21  heard about the increase in billing.
22      A.  Just that they would be
23  surprised when they saw the huge increase

Page 110

1  in their billing at the end of the month.
2      Q.  Okay, anything else?
3      A.  That was the gist of what I
4  heard.
5      Q.  Okay.  Anything -- now, going
6  back to Rob Pirnie's deposition transcript,
7  you said you read it and there were some
8  inaccuracies there?
9      A.  Uh-huh (Nodding head).
10      Q.  One inaccuracy was Bob
11  Montour's employment status, that was one
12  topic --
13      A.  Yes.
14      Q.  -- where you found his
15  testimony inaccurate?
16          What did you find inaccurate
17  about his testimony with regard -- you said
18  there was inaccurate testimony with regard
19  to changing the dates on the terms and
20  conditions?
21      A.  If I remember correctly, in the
22  deposition he said that's not a good
23  business practice, we wouldn't -- or, you

Page 111

1  know, we don't consider that good business.
2      Q.  Okay.
3      A.  My -- obviously, my disagree-
4  ment with that is he's the one that told me
5  to the change the date.
6      Q.  Okay.  Any other disagreement?
7      A.  No.  Beyond that, that's it.
8  He told me to change the date.
9      Q.  Okay.  Any other inaccuracies
10  in his testimony besides what we've talked
11  about?
12      A.  One that kind of struck me a
13  little bit was that there were some
14  comments made about the performance -- or
15  my specific job performance.  These were
16  issues that I was unaware of.  I had never
17  been adversely counseled as far as my
18  performance, whether written or any verbal
19  that I can remember.  As a matter of fact,
20  I was receiving regular bonuses for my
21  performance.  So I would disagree with the
22  statements that were made there as well.
23      Q.  Okay.  Any other statements

Page 112

1  concerning -- any other statements in his
2  deposition transcript that you disagree
3  with?
4      A.  Those are the ones that stick
5  out.  I don't remember anything else.
6      Q.  Okay, and you're saying you
7  were never reprimanded or counseled or
8  talked to about your job performance?
9      A.  No, I'm saying that I never
10  received any negative counseling,
11  documented negative counseling, nor do I
12  remember any documented -- or any verbal
13  negative counseling regarding my job
14  performance.  We did receive counseling on
15  job performance through yearly performance
16  reviews and things of that nature.  I also
17  have copies of letters where I, you know,
18  would periodically get a bonus saying thank
19  you for your contributions to the
20  organization, you know, that sort of thing
21  as well.
22      Q.  Did you ever receive any
23  undocumented negative comments on your job

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 113

1 performance from anyone at Conference
2 America?
3      A.  Not unless you want to classify
4 the project that Mr. Pirnie and I were
5 working on, as far as whether or not he was
6 determining the effectiveness of our
7 organization.
8      Q.  Okay.  And what did he say to
9 you?
10      A.  Well, it was just that he had
11 this project going on when we were having
12 to write down every fifteen minutes what we
13 did the previous fifteen minutes so he
14 could determine whether or not we were
15 operating at an effective rate or a
16 productive rate.
17      Q.  Is that all he said?
18      A.  That's all I can recall, yes.
19      Q.  Okay.  Beside the three things
20 we discussed, the Bob Montour situation,
21 the changing the date situation, and your
22 performance, any other inaccuracies in Rob
23 Pirnie's deposition testimony?

Page 114

1      A.  None that I can recall.
2      Q.  Okay.  Tell me about any
3 inaccuracies in Bob Pirnie's deposition
4 testimony.
5      A.  One inaccuracy in Bob Pirnie's
6 testimony as well that sticks out stems
7 around Bob Montour.  It was my
8 understanding in reading the deposition
9 that he stated that his conversations and
10 his dealings with Bob Montour around the
11 time of his departure from Conexant and
12 subsequently after were very minimal, they
13 weren't -- there wasn't a lot of it, when I
14 have personal knowledge that, like I said
15 earlier, that Bob Montour spent an entire
16 week in the Montgomery area, fishing down
17 at China Grove.  He also went on a deep sea
18 fishing trip with us as a recommended -- or
19 a recommendation to another customer, you
20 know, all of these things going on when he
21 was not employed by Conexant.  I knew it,
22 so my belief is that he knew it as well.
23      Q.  What are you basing your belief

Page 115

1 on what Bob Pirnie knew?
2      A.  Part of it's based on an e-mail
3 that I was part of, that I received, from
4 Bob Pirnie that was an update on his status at
5 Montour, what's going on with his status at
6 Conexant, that sort of thing.
7      Q.  Okay.  Anything else that leads
8 you to believe you knew what Bob Pirnie
9 knew or did not know?
10      A.  No, it's -- regarding Bob
11 Montour, that's the main dis -- the main
12 disagreement that I would have with his
13 statements.
14      Q.  Okay, and, again, you're making
15 an assumption about what Bob Pirnie knew
16 about Bob Montour based on an e-mail, and
17 anything else?
18      A.  Well, I wouldn't classify it as
19 an assumption, no.  I mean, there were many
20 witnesses that saw Bob Montour there at the
21 organization, so, I mean --
22      Q.  Tell me their names.
23      A.  Pick the roster of any day of

Page 116

1 the -- of that week that the guy was there.
2 I mean, there's been so many people that
3 worked at Conference America back and
4 forth, I couldn't tell you all the names,
5 but I can give you ten or fifteen who might
6 have been there.
7      Q.  Okay, could you give me those?
8      A.  Sure.  Tish Peavy, Shane
9 Gillis, Greg Folkes, Jeff Madsen, Kevin
10 Lee, Rob Pirnie, Bob Pirnie, Gwen Brown,
11 Paine Bone.  Let's see.  Obviously, myself.
12 Kurt Brown.  There's, you know, ten or
13 twelve at least.
14      Q.  Okay.  Did you discuss Bob
15 Montour's employment status with any of
16 those individuals?
17      A.  I don't recall having any
18 specific discussions with any of them.
19      Q.  Okay.  Did you discuss Bob
20 Montour's employment status with Bob Pirnie
21 ever?
22      A.  I don't recall ever having any
23 real discussions with him other than just

29  (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1 being privy to some of the communications
2 that were around that particular topic.
3      Q.  Can you think of any reason why
4 Bob or Rob Pirnie would make inaccurate
5 comments about Bob Montour's employment
6 status with Conexant?
7      A.  I don't know.
8      Q.  Okay.  Can you think of
9 anything they might gain by it?
10      A.  I don't know.
11      Q.  Reading the deposition
12 testimony, do you think it's possible they
13 may have been mistaken?
14      A.  It's possible.  I'm just
15 stating that I disagreed with what was in
16 the depositions.
17      Q.  Okay.  Anything else you
18 disagreed with that was in Bob Pirnie's
19 deposition?
20      A.  He made some instances (sic)
21 about performance too, and, again, stating
22 that my performance had suffered in the
23 months prior to my resignation, and also

Page 118

1 stating that it was an issue of being able
2 to separate my personal -- personal issues
3 that I was going through from work, and I
4 disagree with that because my divorce had
5 been almost eight months prior to that.  It
6 was very much over as far as that was
7 concerned.
8           I had not received any negative
9 feedback regarding my employment, so I had
10 no reason to believe that I wasn't doing a
11 good job.  They were sending me to some of
12 the most important customers that
13 Conference America has.  I flew to New
14 York, I flew to New Jersey, I flew to
15 Chicago.  I was meeting with top level
16 people at these organizations, and it's my
17 belief that you don't put someone who's
18 doing a poor job in that type of situation,
19 nor do you give them a two thousand dollar
20 bonus that's in the check prior to the
21 month they resign.
22      Q.  Okay.
23      A.  So I disagree with those

Page 119

1 statements.
2      Q.  Okay, what issues in your
3 personal life were going on at the time you
4 left Conference America?
5      A.  Well, there were none on my
6 personal life other than the issues
7 surrounding what I thought was or what I
8 believe is an ethical dilemma regarding
9 that particular situation (Indicating
10 document).
11      Q.  Okay, what other inaccuracies
12 in Bob Pirnie's deposition testimony were
13 there besides the Bob Montour issue and
14 your performance?
15      A.  You know, there were several
16 times where Mr. Miller would ask him who
17 might be responsible for this and who might
18 be responsible for that, and it's my belief
19 that he knows full well who is responsible
20 for those people, yet his answers were I
21 don't know.  So --
22      Q.  What -- responsible for what?
23      A.  Well, one question that sticks

Page 120

1 out in particular is who is responsible for
2 maintaining the web site.
3      Q.  Okay, and you think Bob knows
4 who is responsible for --
5      A.  Well, he later on in the
6 deposition said that he thought it might be
7 Paine Bone, and my belief is that he knows
8 it's Paine Bone.
9      Q.  Okay, why do you believe that?
10      A.  Because I knew it was Paine
11 Bone.
12      Q.  Okay, why does --
13      A.  Bob Pirnie is the president of
14 the company.  He pays his salary.  It's his
15 job to know it's Paine Bone.
16      Q.  Did you and him ever
17 discuss --
18      A.  No.
19      Q.  Okay, anybody else's responsi-
20 bilities Bob didn't know about that you
21 think he should have?
22      A.  That's the main one that sticks
23 out from reading over the deposition.

30  (Pages 117 to 120)

## FREEDOM COURT REPORTING

Page 121

1    Q.  Okay.  Any other inaccuracies
2  in his deposition testimony?
3    A.  I can't really think of
4  anything else off the top of my head.
5    Q.  Okay.  Do you keep diary?
6    A.  No.
7    Q.  Did you ever make any notes or
8  writings about Conference America or
9  Conexant?
10    A.  If I did, I left them there.
11  All of my files were left when I resigned
12  from Conference America.  I took nothing
13  with me.
14    Q.  Okay.  Did you ever send any
15  e-mails to anyone about Conference America
16  or Conexant --
17    A.  Other than sending them --
18    Q.  -- in 2005?
19    A.  I mean, there would have been
20  e-mails, of course, that were job-related.
21  I don't recall any e-mails or anything of
22  that nature that would have been outside of
23  my normal duties and responsibilities.

Page 122

1    Q.  Besides Zach Vogelgesang, have
2  you discussed the Conference America/
3  Conexant situation, which is what we've
4  been talking about, with anyone?
5    A.  Yes, I have.  I discussed it at
6  length with my attorney.
7    Q.  Okay.
8    A.  I discussed it at length with
9  my parents.  I also discussed it with my
10  fiance, because with us, you know, moving
11  the way we're moving, it affects her as
12  well for obvious reasons.  So, yeah, I've
13  talked about it with several key people in
14  my life that I value their opinion as -- to
15  get their advice as to what they thought I
16  should do.
17    Q.  Anybody else?
18    A.  Other than Zach, I can't think
19  of anyone else.
20    Q.  Okay.
21      MR. CLAUNCH:  Other than Mr.
22  Miller as well.
23    A.  Oh, yes, I'm sorry.  Mr.

Page 123

1  Miller.
2    Q.  (BY MR. BORTON)  Okay, let's
3  talk about that.  How did you first come in
4  contact with Mr. Miller?
5    A.  He actually called my ex-wife.
6  I don't know how he got that number, but he
7  called my ex-wife, and she called me and
8  told me lawyers were looking for me, and
9  that's always a good call to get from your
10  ex-wife.
11    Q.  Then what happened?
12    A.  I got his number, and she kind
13  of read off what the message was on the
14  answering machine.  And, so, given the
15  circumstances of what this was concerning,
16  I then contacted Mr. Claunch, who has
17  represented me in other matters, just to,
18  you know, seek his advice on what should
19  happen.  And then I -- what's the word --
20  I retained him to act as my liaison in
21  these matters.  I'm sorry about that.
22    Q.  What circumstances did Mr.
23  Miller lay out?

Page 124

1    A.  Just that their litigation
2  between Conexant Systems and Conference
3  America and that he represented Conexant
4  and wanted to talk to me about, you know,
5  my dealings with Conexant as part of my job
6  at Conference America.
7    Q.  Okay, so you got wind of this
8  from your ex-wife, you retained -- and did
9  Mr. Miller call you at that point or leave
10  a message?
11    A.  He did not.
12    Q.  So his only contact up to that
13  point was with your ex-wife, right?
14    A.  That's right.
15    Q.  And you retained Mr. Claunch?
16    A.  That's right.
17    Q.  And then what happened?
18    A.  Mr. Claunch acted as my liaison
19  between Mr. Miller -- he contacted him and,
20  you know, basically said that I had
21  retained him as a counselor for, you know,
22  or advisor in what was going on.  And Mr.
23  Miller said that he wanted to just talk

31  (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1 with me and find out what my duties and
2 responsibilities were in regards to
3 Conexant and, you know, just kind of get an
4 idea of what it was that I did with
5 Conexant while I was there.
6         And so we agreed to meet at Mr.
7 Claunch's office, I guess it was a week or
8 so later, in the evening, and basically sat
9 down and had a conversation. And I
10 described my duties and my interactions
11 with Conexant, and also informed him of
12 what I thought had happened regarding this
13 deactivation fee and the backdating of the
14 document.
15     Q. What exactly did you tell him?
16     A. I told him everything that
17 we've talked about today, that I believed
18 that the fee had not been in the terms and
19 conditions prior to that date, and I told
20 him that I was instructed by Rob Pirnie to
21 backdate the document to a date prior to
22 the time that the contract was terminated.
23     Q. Okay. When you backdated the

Page 126

1 document, did you review or revise the
2 contents of the document other than the
3 date?
4     A. No.
5     Q. Okay. What else did you and
6 Mr. Miller talk about?
7     A. That was really the gist of it.
8 The whole conversation lasted maybe forty,
9 forty-five minutes. You know, we -- he
10 asked some things about some of the
11 terminology that we used at Conference
12 America, you know, as far as leader
13 accounts and profiles. And we talked about
14 how many profiles had been deactivated, and
15 we even looked at some e-mails where I had
16 sent, you know, lists over to Paul Edge, I
17 think there were six hundred and some odd
18 names on that list.
19         And I explained to him that the
20 difference in the billing would have been
21 because the six hundred only included
22 automated profiles, it didn't include all
23 profiles, and, you know, things of that

Page 127

1 nature, so . . .
2     Q. And is that the best you can
3 remember everything that was discussed
4 between you and Mr. Miller?
5     A. Yeah.
6     Q. Have you had any subsequent
7 discussions with him?
8     A. No, I haven't talked to Mr.
9 Miller since.
10     Q. Okay. Are you aware of your
11 attorney talking to him since?
12     A. Other than setting up the
13 specifics for this deposition, no.
14     Q. Okay. When did you review the
15 deposition transcripts of the people we've
16 talked about?
17     A. I think Mr. Claunch sent them
18 to me, it would have been either early this
19 week or the end of last week. Either
20 Friday or Monday. And I looked over them
21 over the past, maybe, two or three days.
22     Q. Okay. What is your opinion of
23 Bob Pirnie?

Page 128

1     A. I liked him. I still like him.
2 I mean, I don't have any personal griefs
3 against him at all. Like I said before, he
4 was very good to me. You've seen my pay
5 stubs, they paid me very well. I worked
6 hard for them, and I felt that I was
7 rewarded for it, but -- well, I mean,
8 that's my opinion. I still feel that way
9 today.
10     Q. What is your opinion of Bob
11 Pirnie's credibility and character?
12     A. Well, I mean, other than -- I
13 can only base that upon what I've seen and
14 dealt with. The only mark that I would
15 have in my particular opinion of his
16 credibility or character would be regarding
17 this particular instance that we're talking
18 about today.
19     Q. Okay, and what do you think he
20 was trying to do in this particular
21 instance?
22     A. It's my belief that the goal
23 was to obtain an additional two or three

32 (Pages 125 to 128)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 129

1  months' worth of billing by applying this
2  fee that the company would not have
3  normally received.
4      Q.  Okay.  And you think he was
5  trying to do that outside of the company's
6  contract?
7      A.  It's my belief that this fee
8  did not exist when the contract was
9  canceled, and based upon that belief, there
10  might be an issue as far as the morality or
11  the ethical circumstances of what happened.
12      Q.  If the contract was canceled
13  and Conference America charged this fee to
14  Conexant after there was no longer a
15  contract between them, do you think that
16  would be unethical?
17      MR. MILLER:  Object to the
18  form.
19      A.  Had there not been any
20  backdating of documents, I don't think it
21  would have been unethical at all if the
22  contract had been canceled and the fee
23  existed when it was canceled.

Page 130

1      Q.  (BY MR. BORTON)  Okay, so the
2  problem is that the fee didn't exist when
3  the contract was canceled, in your mind?
4      A.  In my -- that is my belief,
5  that the fee did not exist when the
6  contract was canceled.
7      Q.  Okay.  Tell me this.  If the
8  contract was canceled and Conference
9  America informed Conexant that it would
10  perform services for Conexant after
11  cancellation for certain prices, including
12  the $74.95 price, and Conexant purchased
13  those services, is there anything ethically
14  wrong with that?
15      MR. MILLER:  Object to the
16  form.  Assumes facts not in evidence.
17      A.  You would have to further
18  clarify a couple of things for me.  One,
19  were the services in the terms and
20  conditions on the day that they were --
21  that the contract was canceled.  Two, were
22  adequate attempts made for Conexant or any
23  other customer, for that matter, to know

Page 131

1  and realize that, yes, this did actually
2  exist.
3      Q.  (BY MR. BORTON)  Okay.  And --
4  okay.
5      MR. BORTON:  Let's take a
6  break.
7      THE WITNESS:  Okay.
8      (Recess from 5:35 P.M. until
9      5:45 P.M.)
10      Q.  (BY MR. BORTON)  Jason, let's
11  go back.  When, to the best of your
12  knowledge, did you become suspicious about
13  Conference America's potential fraud with
14  regard to Conexant?
15      A.  It would have been around the
16  3rd, maybe the 4th or the 5th, of August
17  when we were compiling the reports.
18      Q.  Okay.  And at this point you
19  thought there might potentially even be
20  criminal activity going on then?
21      A.  Well, the criminal activity, I
22  was afraid, was on what I had been
23  instructed to do.  I wanted to make sure

Page 132

1  that I hadn't done anything criminal in
2  nature.  So . . .
3      Q.  Okay.  And when did you discuss
4  this with an attorney?
5      A.  The day I realized what
6  happened, I --
7      Q.  This is the 4th or 5th of
8  August?
9      A.  That's correct.  I walked out
10  into the parking lot at work and used my
11  cell phone to contact the attorney.
12      Q.  Okay.  Did you ever contact any
13  law enforcement personnel?
14      A.  No.
15      Q.  Okay.  What did your -- strike
16  that.
17      Are you satisfied as we sit
18  here today that you did not engage in any
19  criminal activity?
20      A.  I am.
21      Q.  Okay.
22      A.  I did what I was asked to do by
23  my employer.

33  (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 133

1   Q. Do you think it's possible that
2 Conference America engaged in criminal
3 activity?
4   A. I don't know if I would qualify
5 it or classify it as criminal, but it's
6 activity that I did not personally agree
7 with and that I felt was not a -- not the
8 right thing to do, did not want to be a
9 part of.
10   Q. When was your last day at
11 Conference America, as best you can
12 remember?
13   A. August 31st.
14   Q. Okay. How come you stayed at
15 Conference America for almost another month
16 after you came to this conclusion that
17 something unethical had occurred?
18   A. Almost three weeks of that was
19 me working out my notice.
20   Q. Okay.
21   A. I originally turned my notice
22 into the human resources manager, Kevin
23 Lee, on Friday afternoon. This would have

Page 134

1 been around the first -- that first week of
2 August.
3   Q. Okay.
4   A. I also turned that same notice
5 in to Rob Pirnie because I had already had
6 prescheduled vacation the second week, or
7 for a good part of that second week, and I
8 felt it wouldn't be right if I came back
9 off of vacation and said, hey, guess what,
10 guys, I'm leaving, here's your two weeks
11 and I'm gone. So I went ahead and told
12 them that Friday afternoon, and Rob
13 basically said, take your vacation, think
14 about it, you know, let's see if there's a
15 way we can keep this, you know, where you
16 can stay, you know, that sort of thing, and
17 then we'll talk about it when you get back.
18   Q. Okay. Was that all that was
19 said at that point?
20   A. Basically, yeah. I mean, Rob
21 was walking out the door, he had somewhere
22 to go, and I kind of hit him with it,
23 unfortunately, as he was leaving. And, you

Page 135

1 know, we took maybe five minutes to talk
2 about it, and that was it.
3   Q. Did you talk with him when you
4 got back?
5   A. I did, and told him that my --
6 I had still made my decision, and that's
7 what I wanted to do, and we then started
8 planning the transition for the next two
9 weeks, making sure that all of the
10 processes and procedures and everything
11 were adequately documented and that people
12 knew what to do, that sort of thing.
13   Q. When did you first start
14 looking for other jobs?
15   A. It would have been around the
16 first of August or so, right around that
17 same time when I realized what was going
18 on.
19   Q. Did you send out resumes at
20 that point?
21   A. I sure did, yeah. I went on
22 monster.com and created profiles and, you
23 know, did all of the things that you

Page 136

1 normally do when you're looking for a job.
2   Q. Which computer did you log on
3 to when you did that? Did you use a home
4 computer?
5   A. A personal computer at home,
6 yeah.
7   Q. Okay. Did you ever discuss
8 with Bob Pirnie or Rob Pirnie or anyone at
9 Conference America this situation, what you
10 perceived to be as alleged unethical
11 behavior?
12   A. I didn't, and the reason why is
13 because much of the advice that I had
14 received from those that are important to
15 me in my life was get out of there, get
16 away from it, and be done with it, and
17 that's what I did. I resigned, I tried to
18 walk away from it, but unfortunately we're
19 here today.
20   Q. You never asked anyone if, in
21 fact, unethical behavior was going on?
22   A. I did not. My mind -- I knew
23 what I believed, and that's all I needed,

34 (Pages 133 to 136)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1  so I acted --
2      Q.  Okay, is it fair to say you did
3  not know for sure whether unethical
4  behavior was going on or not?
5      A.  It's fair to say that I acted
6  on my belief --
7      Q.  Okay.
8      A.  -- as far as what happened with
9  the incident.
10     Q.  Okay, and this belief was based
11 upon you seeing this rise in billing rates
12 from July, right?
13     A.  That was part of it.
14     Q.  And conversations you've been
15 privy to that we've discussed today,
16 correct?
17     A.  That was part of it.
18     Q.  Okay.  Anything else?
19     A.  Yes.  It's also based mostly on
20 the fact that I had been asked to backdate
21 a document --
22     Q.  Right.
23     A.  -- that was pertinent to what

Page 138

1  had happened with the rising in the
2  billing.
3      Q.  Okay.  Anything else other than
4  that?
5      A.  Not that I can think of at this
6  point.
7      Q.  Anybody witness Rob Pirnie
8  allegedly asking you to backdate a
9  document?
10     A.  I don't know.  It's possible.
11 Maybe Zach Vogelgesang, but I don't know.
12     Q.  Okay.
13     A.  It was kind of in the midst of
14 business processes of, hey, let's get this
15 done, so --
16     Q.  And he came right out into the
17 main room there at Conference America and
18 just asked you?
19     A.  He came out of his office and
20 to -- over to my cubicle, which was maybe
21 six feet or so away from his office door,
22 and instructed me on what to do.
23     Q.  Okay, didn't call you in his

Page 139

1  office, didn't close the door or anything?
2      A.  No.
3      Q.  This wasn't in private?
4      A.  No, it was not.
5      Q.  Out in front of everybody,
6  potentially?
7      A.  I don't know who all was
8  around, but it was out at my desk, which
9  was in the open.
10     Q.  Out where others could hear,
11 correct?
12     A.  If they were around, yes.  I
13 don't know who was around.
14     Q.  Okay.  Who sat next to you at
15 work?
16     A.  Zach Vogelgesang sat across
17 from me to the left -- my cubicle was
18 pointing kind of towards the wall, so he
19 sat over to the left.  And Chantel Oakley
20 sat kind of catty-cornered from me, to his
21 right.
22     Q.  Did the folks at Conference
23 America ever give you a bonus in order to

Page 140

1  kind of gear toward helping you be able to
2  make your rent ever?
3      A.  Oh, I've received many a --
4  many bonuses from them, so they might be
5  for a variety of reasons.
6      Q.  Okay.  What's your opinion of
7  Rob Pirnie's character and truthfulness?
8      A.  I never had any issue with it
9  whatsoever until we found ourselves where
10 we are today.
11     Q.  Okay.  What is your opinion of
12 it now?
13     A.  Well, I mean, the fact that I
14 was instructed by him to change the date
15 obviously has an impact on what my opinion
16 of his character might be.
17     Q.  Do you think he's dishonest?
18     A.  Well, I think that -- well, I
19 do recognize the fact that it is possible
20 that maybe even he didn't know what was
21 going on, that he was instructed to change
22 the date and he just had me do it.  I don't
23 know.  So I would be hesitant to make any

35 (Pages 137 to 140)

## FREEDOM COURT REPORTING

Page 141

1  disparaging remarks because I don't -- I
2  just don't know. All I know is what I
3  believe had occurred, and I acted on my
4  belief.
5      Q.  So do you think he's dishonest
6  or not?
7          MR. MILLER:  Object to the
8  form. He just answered that.
9      A.  Again, I mean, in my dealings,
10  other than with this one specific incident,
11  I had no reason to believe he was
12  dishonest.
13      Q.  (BY MR. BORTON) Okay, in light
14  of this one specific incident, though, what
15  do you think?
16      A.  I think in this one specific
17  instance that there might have been some
18  dishonesty there. Now, whether that was on
19  Rob's part solely or not, I don't know.
20      Q.  Okay, do you think Bob Pirnie
21  is honest or dishonest in light of this
22  incident?
23      A.  In light of this incident,

Page 142

1  again, I would be hesitant to make a
2  judgment there because I don't know if he
3  knew what happened or not. It's possible
4  that he didn't know the date was changed.
5  I don't know.
6      Q.  Okay. Who at Conference
7  America do you think is responsible for
8  this date change, then?
9      A.  I don't know. I assume that it
10  was Bob Pirnie because he was very clear on
11  the fact that Conexant was his account and
12  he was the account manager of it. So I
13  would, again, I would think that the person
14  who, A, he's the president of the company,
15  B, he's the manager of the account, he
16  would know what's going on with the
17  account. So if this was told to be done,
18  then I would have guessed that it would
19  come from him. But I don't know that for a
20  fact.
21      Q.  Okay. So if asked at trial
22  whether you believe Rob Pirnie or Bob
23  Pirnie are honest or dishonest, your answer

Page 143

1  is going to be what you've just told me?
2      A.  That's correct.
3      Q.  Okay. Other than what we've
4  talked about today, are there any other
5  conversations or communications of any kind
6  between you and anyone else that have
7  anything to do with Conference America's
8  relationship with Conexant?
9      A.  None that I can recall.
10      Q.  Okay. You can't think of
11  anything else related to the facts of this
12  lawsuit -- or I tell you what, you can't
13  think of anything else related to
14  Conference America's billing of Conexant
15  that we haven't discussed that might bear
16  on this situation?
17      A.  Nothing -- nothing that I can
18  think of, no.
19      Q.  Okay. Were you ever asked to
20  do anything else you thought was immoral or
21  unethical by anyone at Conference America
22  besides what we've discussed today?
23      A.  Well, I mean, there were some

Page 144

1  times where -- no. The answer is no. I
2  mean, there were some things that I might
3  not have necessarily agreed with, but
4  that's normal. That's business.
5      Q.  The answer is no?
6      A.  The answer is no, that I don't
7  believe I was ever asked to do anything of
8  the magnitude of this date change.
9      Q.  Well, were you ever asked to do
10  anything else that was unethical or
11  untruthful?
12      A.  Well, I was asked to do things
13  that might have made me uncomfortable, but
14  that didn't necessarily make them
15  unethical or untruthful.
16      Q.  Let's discuss those.
17      A.  Well, I mean, again -- maybe I
18  had to be a little heavy-handed with a
19  customer because we weren't going to
20  provide them the service they wanted at the
21  price they wanted or something like that.
22  Those are personal things. I don't think
23  that had anything to do with Conference

36 (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 145

1 America or its business model. I think
2 that was just me being maybe uncomfortable
3 in the situation.
4     Q.   Okay.  Were you ever asked by
5 anybody at Conference America ever to do
6 anything that you felt was dishonest
7 besides this Conexant incident?
8     A.   Not that I can recall, no.
9     Q.   Okay.  Besides back-dating the
10 document, do you feel that you were ever
11 asked to do anything dishonest or
12 untruthful --
13     A.   Not that I can recall.
14     Q.   -- by anyone at Conference
15 America?  No?
16     A.   Not that I can recall, no.
17     Q.   Okay.  This Exhibit 1 to your
18 deposition is the only document you can
19 recall concerning Conference America or
20 Conexant that contained any inaccuracies
21 after you were asked to backdate it?
22     A.   Yes, that's correct.
23     Q.   Okay.  Have you ever told a

Page 146

1 lie?
2     A.   Sure.
3     Q.   When was the last time you told
4 a lie?
5     A.   Oh, I couldn't remember.  I
6 mean, I don't know.  I think we all tell
7 lies.  I can't tell you the last time I
8 told one.
9          MR. BORTON:  That's all I've
10 got for now.  I appreciate it, Jason.
11          THE WITNESS:  You're welcome.
12
13 EXAMINATION BY MR. MILLER:
14     Q.   All right, Mr. Shanks, this
15 case is set for trial here in Montgomery
16 the week of November 6, 2006.  Do you
17 anticipate being either in Montgomery or
18 perhaps living in the Birmingham area at
19 that time?
20     A.   That's -- I'm supposed to be
21 married November 4th, and the honeymoon is
22 actually, right now, scheduled to be in
23 London.

Page 147

1     Q.   I'm glad I asked.  As it stands
2 right now, your plans are to get married on
3 November 4th, 2006, and to, therefore, be
4 unavailable to testify at the trial of this
5 case the week of November 6, 2006?
6     A.   That's right.
7     Q.   Where will you be?
8     A.   The honeymoon is supposed to --
9 is in London, so we'll be there for a week.
10     Q.   When I met with you in the
11 presence of your attorney back on April 27,
12 2006, you were completely truthful and
13 candid with me?
14     A.   That's correct.
15     Q.   Just as you've been completely
16 truthful and candid with Mr. Borton here
17 today?
18     A.   That's correct.
19     Q.   And you've told him today the
20 same things you told me back on April 27,
21 2006?
22     A.   I have.
23          MR. MILLER:  Thank you.  That's

Page 148

1 all I have.
2          MR. BORTON:  Let me just talk
3 to him real quick, and we'll finish this
4 up.
5          (Brief recess.)
6
7 REEXAMINATION BY MR. BORTON:
8     Q.   That document in front of you,
9 Exhibit 1, says July 25th, correct --
10     A.   Uh-huh (Nodding head).
11     Q.   -- 2005?
12     A.   Yes, yes.
13     Q.   Okay.  Did you ever see a
14 document dated -- did you ever see this
15 document dated July 25th, 2005?
16     A.   It's possible.  I don't recall
17 that I ever saw this specific document.
18     Q.   Okay.
19     A.   I've seen many versions of
20 these terms and conditions with many
21 dates,.
22     Q.   Okay, and they all have a
23 different date printed out there on the

37  (Pages 145 to 148)

## FREEDOM COURT REPORTING

Page 149

1  corner depending on when they were printed
2  out?
3      A.  That's correct.
4      Q.  Okay.  What became of the
5  document you say you backdated?
6      A.  We put it in the Conexant file.
7      Q.  Okay.  Did you ever see it
8  again after that?
9      A.  I never went looking for it,
10  no.
11      Q.  You never looked for it again?
12      A.  No.
13      Q.  Okay.  Who's got access to the
14  Conexant file?
15      A.  Anyone in sales administration
16  would.  Rob would have access.  Mr. Pirnie
17  could access it if he wanted to.
18      Q.  And anybody else in sales
19  administration?
20      A.  That's correct.
21      Q.  Okay.  Did you go to the
22  Conference America's last Christmas party?
23      A.  I did.

Page 150

1      Q.  Okay.  When was that?
2      A.  I don't know the date.  Maybe
3  December 16th, I think, maybe.  I'm not
4  sure of the exact date.
5      Q.  Between the time you quit and
6  the time of that Christmas party, had you
7  been to Conference America any other time?
8      A.  No.
9      Q.  Had you seen anybody from
10  Conference America any other time?
11      A.  Yeah, I'm -- I was dating
12  Shannon Williford, who works there.
13      Q.  Okay, besides her or Zach
14  Vogelgesang, anybody else?
15      A.  Yeah, I had run into others,
16  you know, time to -- you know, here and
17  there.  Greg Folkes, I ran into him a
18  couple of times, that sort of thing.
19      Q.  Okay.  Why did you go to
20  Conference America's Christmas party?
21      A.  I was a guest of Shannon
22  Williford.
23      Q.  Okay, and I guess what I'm

Page 151

1  trying to get at, you obviously had an
2  ethical problem with something you claim
3  you were asked to do.  Why would you go to
4  the company's Christmas party afterwards?
5      A.  Because I left thinking that we
6  could leave all of this behind us, and I
7  really had tried to just avoid all of what
8  we're doing today.
9      Q.  Did you ever try to contact
10  anybody at Conexant and say, hey, I think
11  you've been a victim of potential fraud or
12  anything?
13      A.  No.
14      Q.  Never did, you were going to
15  just let them be the victim of something
16  potentially unethical?
17      A.  No, I just took the advice that
18  I was given and tried to make it go away.
19      Q.  Okay.
20      A.  I did not want to be where I am
21  now.  I was going through a lot of
22  financial turmoil and things of that
23  nature, and in light of me leaving my

Page 152

1  position, I felt the best thing I could do
2  was just move away from it and try to be
3  done with it.
4      Q.  Okay.  But you did go to the
5  Christmas party?
6      A.  Of course, yeah.
7      Q.  Okay.  Who did you talk to at
8  the Christmas party?
9      A.  Lots of different people.
10  Talked to Rob, talked to Mr. Pirnie, talked
11  to many other people who worked there.
12      Q.  Okay.  Did they honor you for
13  something at the Christmas party?
14      A.  He called me up front because I
15  was one of the original employees of the
16  year.
17      Q.  You went up there?
18      A.  I did.
19      Q.  Okay.  You didn't have an
20  ethical problem with that?
21      A.  No.
22      Q.  Okay.  When was -- have you had
23  any contact with Conference America,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 153

1  obviously other than the lawyers involved
2  in this case, between the Christmas party
3  and today, anybody there?
4      A.  With Conference America
5  employees, yes, I have.
6      Q.  Okay, besides your fiance, of
7  course?
8      A.  Greg Folkes, I've talked with
9  him several -- several times, you know, to
10  see how things are going with him.  I've
11  talked with Zach Vogelgesang, again, we've
12  met and had dinner, that sort of
13  thing.  Ran into Paine Bone one day in the
14  parking lot of the bank, talked to him for
15  a few minutes.
16      Q.  Okay.
17      A.  I don't know if I've seen
18  anybody else or talked with anybody else
19  since then.
20      Q.  Any of those conversations have
21  anything to do with Conexant --
22      A.  No, not at all.
23      Q.  -- or what we've discussed

Page 154

1  today?
2      A.  No.
3      Q.  Okay.  When will you be back
4  from London did you say?
5      A.  Right now the weekend of the
6  11th is when we're scheduled to come back,
7  so -- I'll let you know if it changes.
8  They haven't actually reserved the place
9  yet, so, you know, it might get kicked back
10  a week or two or might come forward a week
11  or two.
12      Q.  Okay.
13      MR. BORTON:  No more questions.
14  Thank you for coming in, I appreciate it.
15      THE WITNESS:  Thank you.
16
17  REEXAMINATION BY MR. MILLER:
18      Q.  Hold on, a very few more,
19  Jason.  Conference America treated you very
20  well and paid you very well?
21      A.  Yes, they did.
22      Q.  And the fact of the matter is
23  you were a very good employee for them?

Page 155

1      A.  I believe so, yes.
2      Q.  And worthy of being named one
3  of the employees of the year?
4      MR. BORTON:  Object to the
5  form.
6      A.  I believe so, yes.
7      Q.  (BY MR. MILLER)  And this
8  incident with backdating the document that
9  you have described today caused you so much
10  inner turmoil that you left that
11  well-paying good job because of it?
12      MR. BORTON:  Object to the
13  form.
14      A.  That's correct.
15      Q.  (BY MR. MILLER)  And it caused
16  you very substantial financial problems,
17  did it not?
18      MR. BORTON:  Object to the
19  form.
20      A.  Yes, it did.
21      Q.  (BY MR. MILLER)  And then
22  subsequently, in December of 2005, your
23  girlfriend or fiance or soon-to-become

Page 156

1  fiance asked you to attend the Christmas
2  party at Conference America?
3      A.  That's correct.
4      Q.  And, of course, you consented
5  to that and wanted to attend that with her?
6      A.  That's correct.
7      Q.  And Mr. Pirnie recognized you
8  at that time --
9      A.  He did.
10      Q.  -- as one of their former
11  employees who had been an employee of the
12  year?
13      A.  That's correct.
14      MR. MILLER:  Thanks.  That's
15  all I have.
16      MR. BORTON:  Appreciate it,
17  Jason.
18      THE WITNESS:  You're welcome.
19
20  FURTHER THE DEPONENT SAITH NOT
21
22
23

39  (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

```
1        C E R T I F I C A T E
2
3   STATE OF ALABAMA:
4   JEFFERSON COUNTY:
5
6       I hereby certify that the above and
7   foregoing deposition was taken down by me
8   in stenotype, and the questions and answers
9   thereto were reduced to typewriting under
10  my supervision, and that the foregoing
11  represents a true and correct transcript of
12  the deposition given by said witness upon
13  said hearing.
14      I further certify that I am neither of
15  counsel nor kin to the parties to the
16  action, nor am I in any way interested in
17  the result of said cause.
18
19
20      KERRY K. THAMES - COMMISSIONER
21
22
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 158

**A**

ability 8:23
able 47:17
  67:10 102:19
  118:1 140:1
absolutely
  17:22 107:22
access 149:13
  149:16,17
accomplish
  98:14
accomplished
  106:5
account 16:10
  54:21 55:13
  81:4 85:16
  86:19 95:20
  97:2 142:11
  142:12,15,17
accounts 13:8
  58:6 83:10
  90:19 95:11
  97:23 98:8
  108:13
  126:13
acknowledge...
  106:10
acquaintances
  28:10
act 44:4 77:12
  105:21
  107:14
  123:20
acted 124:18
  137:1,5 141:3
acting 5:1
  38:14
action 1:5
  157:16
active 58:5
activity 47:15
  78:1 80:4
  101:21
  107:23

131:20,21
132:19 133:3
133:6
actual 25:9
  29:4 31:7
  59:11 65:18
adding 107:8
  107:14,17
additional
  128:23
address 8:18
  20:19 27:4
  29:5 37:11
addresses
  28:21
adequate
  130:22
adequately
  135:11
administrati...
  35:18 38:17
  64:13,21 68:2
  149:15,19
administrati...
  73:5
adversely
  111:17
advice 122:15
  123:18
  136:13
  151:17
advisor 124:22
afraid 131:22
afternoon
  47:11,13
  66:18 87:16
  87:22 133:23
  134:12
afterthought
  103:15,21
aggravation
  84:6
ago 12:21,22
  40:21

agree 133:6
agreed 1:18
  2:2,9,18
  40:15 125:6
  144:3
agreement
  60:7,9 61:6
  75:5,14
  104:18 105:5
agreements
  59:6
ahead 134:11
Air 31:23 35:9
  35:21 36:2
Alabama 1:2
  1:23 4:14
  27:23 31:22
  157:3
alimony 102:2
  102:5,14
alleged 136:10
allegedly 138:8
Allen 23:21
allow 53:2
alluded 101:12
alter 20:3
altercation
  51:13,14
altercations
  51:16
amendments
  56:2
America 1:7
  4:7 6:14,16
  9:10 13:5
  15:12 16:22
  32:10,11,14
  33:2,3 36:20
  37:15,17,22
  38:12,22 39:3
  39:9 40:3
  41:2,21 43:5
  48:17 51:1,17
  51:22 53:14

53:17,23
54:14 55:3
56:3 59:4,18
60:6,13,18
61:13,20,22
62:5 64:5,8
72:21 75:21
76:12,23 80:3
89:10 90:11
90:20 91:6,9
91:18,22
92:14 93:23
96:20 99:7,20
99:23 101:9
101:11,17
102:12,15
103:6 104:15
105:1 106:6
107:1 109:9
109:14 113:2
116:3 118:13
119:4 121:8
121:12,15
122:2 124:3,6
126:12
129:13 130:9
133:2,11,15
136:9 138:17
139:23 142:7
143:21 145:1
145:5,15,19
150:7,10
152:23 153:4
154:19 156:2
American 32:8
America's
  18:19,23
  19:19 53:1
  54:2 61:3
  63:23 69:8
  77:14 80:13
  87:6 131:13
  143:7,14
  149:22

150:20
amount 53:5
analytics 34:23
Andy 25:12,22
anger 95:13
anomalies 79:7
answer 7:17
  8:13 76:8
  142:23 144:1
  144:5,6
answered
  141:8
answering
  123:14
answers 7:19
  119:20 157:8
anticipate
  146:17
Antonio 32:4
anybody 11:10
  19:2 24:20
  40:2 57:23
  62:4 70:14
  82:6,10 97:15
  120:19
  122:17 138:7
  145:5 149:18
  150:9,14
  151:10 153:3
  153:18,18
anybody's
  62:19
anymore 52:19
  58:11 60:11
APPEARAN...
  4:1
appeared 79:7
applied 65:2
  65:19 74:15
  76:16 96:10
  108:20
apply 14:12
  93:7
applying 129:1

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

appreciate 146:10 154:14 156:16
approached 47:14 52:20
appropriate 59:20 60:4 79:17 93:9
appropriately 66:4
April 32:23 34:10 46:4 99:11 147:11 147:20
area 21:3 22:2 24:6,16 28:2 84:17,17 114:16 146:18
arena 35:18
arms 103:4 106:19
Army 32:2,6 33:14,22 37:1
aroused 80:21
arrived 89:17 94:12
arrives 91:18
Ashleigh 24:2
asked 18:11,15 19:1,22 20:3 52:22 62:12 63:11,12 66:16,21,22 67:20 68:23 69:6,11 72:9 73:19 87:6 101:23 107:5 109:2 126:10 132:22 136:20 137:20 138:18

142:21 143:19 144:7 144:9,12 145:4,11,21 147:1 151:3 156:1
asking 41:7 72:13 85:7 108:1,21 138:8
aspects 78:18
assign 2:14
assist 78:22
assistance 55:17
assisting 73:9
assume 8:8 13:16 142:9
assumed 15:13
Assumes 76:4 130:16
assuming 75:19 91:6,17 91:19
assumption 15:16,20 115:15,19
ATCHISON 4:12
Atlanta 4:8
attached 19:12
attempts 130:22
attend 35:3 156:1,5
attended 35:15
attending 36:3
attorney 78:2,7 102:17 122:6 127:11 132:4 132:11 147:11
audio 56:5 59:5

Audubon 37:12
August 33:5 45:2,3,4 74:5 74:20 131:16 132:8 133:13 134:2 135:16
aunt 24:23 25:7 29:8,11
aunts 24:11,11
aunt's 29:15
authoring 65:17
authority 55:13 89:11
automated 54:16 126:22
available 72:2
avoid 151:7
aware 12:10 12:14,17 13:3 13:12 14:5 15:2,8 17:15 51:9 57:16 59:4,9,11 61:21 64:3,16 64:19 65:7,11 75:11,12,16 81:20 82:10 127:10
Azar 25:21

_____
**B**
_____
B 85:16 88:7 142:15
back 34:16 41:10 44:9 45:5,18 48:21 49:9 53:22 57:1 62:21 84:1 88:17 90:7 92:10 110:6 116:3 131:11 134:8

134:17 135:4 147:11,20 154:3,6,9
backdate 66:22 67:20 68:4 77:10 87:6 106:1 107:5 108:22 109:2 125:21 137:20 138:8 145:21
backdated 70:19 97:4 109:6 125:23 149:5
backdating 70:6 72:17 100:5 106:5 107:10 108:5 109:4 125:13 129:20 155:8
backed 15:23
background 13:19 20:18 20:22
back-dating 145:9
back-end 97:21
bad 51:20
Baltimore 32:4
bank 4:7 32:23 34:6,15,17 36:14 57:4 84:17 153:14
bankruptcy 30:2,10,15,19
base 32:1 128:13
based 59:22 77:3,6 84:14 102:23 104:4 115:2,16 129:9 137:10

137:19
bases 80:2,11
basic 64:11 95:22
basically 13:19 32:14 39:16 40:15,22 42:15 44:1 47:16 49:16 60:8 62:15 99:21 100:1 124:20 125:8 134:13,20
basics 35:13
basing 114:23
basis 20:10 46:22 78:10 78:23 96:16 96:16
Bay 57:6
Bayer 23:22 24:1,3
Beach 16:19 54:10 56:14 56:18 57:13 84:16
bear 143:15
beer 100:22
began 32:18 39:10,19 41:10
beginning 62:16 103:7
behalf 6:16
behavior 100:8 100:9 105:19 136:11,21 137:4
Bel 35:9,21 36:2
belabor 103:2
belief 15:22 16:23 97:5 103:11,19

**FREEDOM COURT REPORTING**

104:4 105:8
114:22,23
118:17
119:18 120:7
128:22 129:7
129:9 130:4
137:6,10
141:4
**believe** 13:12
14:14 18:1
23:14 40:20
58:15 68:16
71:8 75:7
77:7 87:21
88:10 89:20
95:12 96:10
96:12 97:7
103:8,14
104:21 106:4
106:7 108:6
109:5 115:8
118:10 119:8
120:9 141:3
141:11
142:22 144:7
155:1,6
**believed** 100:3
101:20
125:17
136:23
**believing** 80:2
**best** 15:1 28:1
28:11,20
44:12,22
45:14 49:2,4
56:8 67:9
72:5 75:18
84:3 98:5
103:10 127:2
131:11
133:11 152:1
**better** 42:2
**Beyond** 111:7
**big** 49:18 57:1

97:2 101:14
101:15
**bilities** 120:20
**bill** 25:8 96:1,5
**billed** 61:19
77:5 79:19,21
107:15,18
108:9,9,12
**billing** 73:22
74:3 76:17
77:20 78:14
79:6 80:13
97:10 101:21
104:5,7
107:12 108:6
108:23 109:5
109:17,21
110:1 126:20
129:1 137:11
138:2 143:14
**billings** 73:12
78:13
**Birmingham**
4:14 34:18
146:18
**bit** 39:2 49:7
94:9 111:13
**blitz** 57:1
**board** 49:18 .
50:5
**Bob** 9:23 11:3
11:22 12:10
12:17,22 13:4
13:15,20
14:15 15:2,9
15:11,17 16:4
16:12,19,23
17:6,12,17
38:13 39:7,16
43:19 44:6,17
46:8 56:10,12
56:20 75:3
81:2 82:4
86:1 110:10

113:20 114:3
114:5,7,10,15
115:1,4,4,8
115:10,15,16
115:20
116:10,14,19
116:20 117:4
117:5,18
119:12,13
120:3,13,20
127:23
128:10 136:8
141:20
142:10,22
**Bob's** 11:9
**Bone** 116:11
120:7,8,11,15
153:13
**Bonnie** 24:10
**bonus** 112:18
118:20
139:23
**bonuses** 52:3
111:20 140:4
**borderline**
80:4
**borderlines**
77:23
**born** 27:21,22
**Borton** 3:5,7
4:4 5:16,18
11:15 19:14
58:21 59:3
76:7 78:6
91:4,16 92:9
92:23 93:18
123:2 130:1
131:3,5,10
141:13 146:9
147:16 148:2
148:7 154:13
155:4,12,18
156:16
**bothered** 94:8

**bottom** 19:21
**Boulevard**
32:1
**box** 94:15
**branch** 34:14
**brand** 26:2
**break** 9:6
58:22 68:10
131:6
**Brenda** 36:18
**Bridge** 20:20
**Bridgette** 57:3
**Brief** 148:5
**briefcase** 49:3
**Brookwood**
4:13
**brother** 26:14
**brother's**
26:20,22
**brought** 5:23
66:21
**Brown** 39:7,21
116:10,12
**Brown's** 79:15
**building** 64:11
**business** 35:17
47:5 51:11
59:19 60:18
75:1 110:23
111:1 138:14
144:4 145:1
**bygones** 40:15
40:16
**bypass** 29:3

——— **C** ———

**C** 157:1,1
**California**
54:10,11
**call** 29:8 35:7
41:14 53:19
55:19 89:12
123:9 124:9
138:23

**called** 32:8
42:8 123:5,7
123:7 152:14
**calling** 63:2
**calmed** 49:7
**cancel** 59:12
89:14 91:2
**canceled** 52:16
81:8 89:18
90:12 91:6
93:6,12 95:10
103:14
104:17 105:9
107:3 129:9
129:12,22,23
130:3,6,8,21
**canceling**
83:10 105:23
**cancellation**
59:12 90:3,7
91:11 103:13
106:9 107:9
107:12,22
130:11
**candid** 147:13
147:16
**capabilities**
73:16 78:21
**capacity** 56:13
**cards** 20:9
**care** 32:9 50:8
55:21,22
**career-ending**
51:14
**Carle's** 11:19
11:21
**Carolyn** 28:23
**Carroll** 45:20
**case** 6:17 21:2
30:19 31:7
146:15 147:5
153:2
**Cass** 56:19
**catch** 101:1

# FREEDOM COURT REPORTING

cattle 32:19,20
catty-cornered
139:20
cause 5:6
76:18 157:17
caused 41:12
155:9,15
cell 132:11
center 34:18
centered 63:17
65:23 88:11
certain 130:11
certify 5:2
157:6,14
chance 8:18
Chandler
26:21
change 18:15
19:2,22 20:3
62:12 63:11
63:12 65:11
65:13 66:16
68:14 71:15
71:18 72:1,6
72:10 73:11
73:19 102:1
103:22
107:20 108:2
111:5,8
140:14,21
142:8 144:8
changed 20:9
49:6 61:5
65:9 66:12
69:19 77:8
142:4
changes 62:23
63:2,9,14,16
63:21 64:3,17
65:15,18,20
66:9 154:7
changing
18:11 53:20
71:3 77:21

100:4 104:8
110:19
113:21
Chantel 48:4,5
48:9,14
139:19
Chapter 30:10
character
128:11,16
140:7,16
charge 104:19
charged 29:21
75:22 76:12
90:13 109:9
109:14
129:13
charges 61:13
101:22
charging 91:9
91:22 92:14
93:11,23
Charlotte
26:18
Chauncey 25:9
check 118:20
Chicago
118:15
child 102:6,14
children 21:1
23:16 24:5
25:11,13,19
26:12 27:11
27:12,15,16
27:17
China 13:6
114:17
Christina 22:5
Christmas
149:22 150:6
150:20 151:4
152:5,8,13
153:2 156:1
chronological
31:18

circumstances
40:19 123:15
123:22
129:11
Civil 1:5 5:3
claim 18:15
151:2
claiming 19:1
claims 31:11
Claire 23:23
clarify 76:9
107:7 130:18
classes 35:17
36:3,6,8,10
classify 28:11
43:3 113:3
115:18 133:5
classifying
79:14
Claunch 4:17
7:2 11:13
78:4 90:16
102:10
122:21
123:16
124:15,18
127:17
Claunch's
125:7
Clay 25:11,13
clear 20:1
142:10
clearly 7:22
90:22
close 139:1
closely 16:10
56:13
codes 79:17
college 35:8,8
35:13,21
Collier 25:4
come 30:9
38:11 40:7
45:22 47:4

63:2 91:16
92:4 123:3
133:14
142:19 154:6
154:10
comes 12:9
coming 64:17
154:14
commencing
2:1
comment 12:9
40:14,18
comments 41:9
81:5 111:14
112:23 117:5
commissioner
1:22 2:20 5:2
157:20
communicati...
92:7
communicati...
58:12 75:15
117:1 143:5
community
35:8,12
companies
96:18
company 32:8
32:19,20
50:20 73:8
77:4 78:13
96:14 103:15
120:14 129:2
142:14
company's
129:5 151:4
comparable
102:16
compile 46:17
50:14
compiling 73:3
73:9 131:17
complaining
41:1

complaint 9:14
complete 9:4
completely
147:12,15
compliance 2:6
component
107:4
components
106:23
computer
136:2,4,5
concern 20:12
concerned
60:16 118:7
concerning
17:17 112:1
123:15
145:19
conclusion
133:16
conditions
18:13,19,23
19:20 63:1,3
63:4,15,19,22
64:18,23 65:5
65:9,16 66:12
66:23 69:9
72:10 77:9,16
87:7 100:5
104:17 105:3
105:16,22
107:3,6
110:20
125:19
130:20
148:20
Conexant 1:10
9:11 12:11,15
12:18 13:1,8
13:9,13,22
14:16 15:3,10
16:7 17:1
18:16 50:19
50:20 54:3,7

# FREEDOM COURT REPORTING

Page 162

| | | | | |
|---|---|---|---|---|
| 55:9 56:3,7 | 37:15,17,22 | 154:19 156:2 | 126:2 | **convert** 50:16 |
| 58:1,12 59:7 | 38:12,22 39:3 | **conferencing** | **Continue** | **convicted** |
| 60:7 61:4 | 39:9 40:2 | 20:7,9 54:11 | 48:19 | 29:19 |
| 65:10,12 67:2 | 41:2,20 43:5 | 56:4 59:5 | **contract** 59:5 | **copies** 112:17 |
| 67:23 69:22 | 48:17 51:1,17 | 60:15 84:12 | 70:21 88:19 | **copy** 19:12 |
| 70:1,2 73:13 | 51:22 53:1,14 | 95:11 | 89:13,14,18 | 67:1,22,23 |
| 74:15 75:5,22 | 53:17,23 54:2 | **confrontation** | 90:12,21,22 | 72:10 77:15 |
| 76:2 77:16 | 54:14 55:3 | 40:8 44:7,17 | 91:2 93:6,12 | 106:8 |
| 80:13 81:4 | 56:3 59:4,18 | 45:7 46:7 | 95:2 103:13 | **corner** 69:1,3,8 |
| 84:8 86:15 | 60:6,13,18 | 50:21 51:2,4 | 105:9,17,23 | 149:1 |
| 88:15 90:13 | 61:3,12,19,22 | **confrontations** | 107:4 109:10 | **correct** 6:1,23 |
| 91:10,23 | 62:5 63:23 | 40:2 44:5 | 109:16 | 7:6,9 9:11 |
| 92:10,19 93:1 | 64:5,7 69:8 | **connected** | 125:22 129:6 | 12:1 15:16,21 |
| 93:5,16,20 | 72:21 75:21 | 104:7 | 129:8,12,15 | 16:1 18:3,4 |
| 94:10 95:18 | 76:12,22 | **consented** | 129:22 130:3 | 19:6,7 20:4 |
| 96:19 98:9 | 77:13 80:3,12 | 156:4 | 130:6,8,21 | 20:15,16 |
| 104:18,20 | 87:6 89:10 | **consider** 111:1 | **contracts** 56:4 | 21:23 31:4,13 |
| 106:8,11 | 90:11,20 91:6 | **consideration** | **contradict** | 34:4,7 37:23 |
| 108:23 | 91:8,17,21 | 93:3 | 106:20 | 45:7 62:13,14 |
| 114:11,21 | 92:14 93:23 | **considered** | **contradicting** | 64:1 65:6 |
| 115:6 117:6 | 96:20 99:7,20 | 46:23 92:22 | 106:22 | 67:17 69:4,10 |
| 121:9,16 | 99:23 101:9 | **considering** | **contributions** | 69:23 72:18 |
| 122:3 124:2,3 | 101:11,17 | 59:22 | 112:19 | 80:14 83:19 |
| 124:5 125:3,5 | 102:12,15 | **consisted** | **control** 6:4 | 83:23 100:19 |
| 125:11 | 103:6 104:15 | 106:23 | **conversation** | 101:7 105:20 |
| 129:14 130:9 | 105:1 106:6 | **constantly** | 43:21 62:9 | 108:3 132:9 |
| 130:10,12,22 | 107:1 109:8 | 40:23 | 82:15,21 83:6 | 137:16 |
| 131:14 | 109:14 113:1 | **constitute** | 85:19 86:10 | 139:11 143:2 |
| 142:11 143:8 | 116:3 118:13 | 105:23 | 87:1,13,15 | 145:22 |
| 143:14 145:7 | 119:4 121:8 | **constitutes** | 88:8,22 95:4 | 147:14,18 |
| 145:20 149:6 | 121:12,15 | 105:18 | 95:7,23 97:13 | 148:9 149:3 |
| 149:14 | 122:2 124:2,6 | 107:19 109:3 | 99:13 100:13 | 149:20 |
| 151:10 | 126:11 | **contact** 55:18 | 100:17 125:9 | 155:14 156:3 |
| 153:21 | 129:13 130:8 | 57:12 123:4 | 126:8 | 156:6,13 |
| **Conexant's** | 131:13 133:2 | 124:12 | **conversations** | 157:11 |
| 18:12 | 133:11,15 | 132:11,12 | 17:12,16 | **correctly** 71:16 |
| **Conference** | 136:9 138:17 | 151:9 152:23 | 43:19 60:1 | 89:9 108:17 |
| 1:7 6:14,16 | 139:22 142:6 | **contacted** 78:1 | 77:6 80:19,20 | 110:21 |
| 9:10 13:5 | 143:7,14,21 | 123:16 | 81:1,12,21 | **counsel** 1:20 |
| 15:12 16:21 | 144:23 145:5 | 124:19 | 82:11 83:19 | 2:11,13 5:5 |
| 18:19,23 | 145:14,19 | **contacts** 57:12 | 85:1,14 97:15 | 6:23 10:4 |
| 19:19 32:10 | 149:22 150:7 | **contained** | 98:15,18 | 157:15 |
| 32:11,13 33:2 | 150:10,20 | 145:20 | 114:9 137:14 | **counseled** |
| 33:3 36:20 | 152:23 153:4 | **contents** 89:6 | 143:5 153:20 | 111:17 112:7 |

# FREEDOM COURT REPORTING

counseling 112:10,11,13 112:14
counselor 124:21
counties 21:6 24:18
county 21:5 22:6,9,11,16 22:20,21,22 24:11,17 25:5 25:7,8,13,20 25:22 26:7,8 26:15 27:1 28:2 32:22 35:12 157:4
couple 32:15 40:7 71:2 96:12 130:18 150:18
course 52:18 56:10 95:13 121:20 152:6 153:7 156:4
court 1:1 2:7 5:14 7:13 31:3
courts 30:11
cousin 25:22
Craig 23:21
create 35:1 50:12 55:23
created 135:22
creation 84:11
credibility 128:11,16
crime 29:19,22
criminal 78:1 80:4 100:9 101:21 131:20,21 132:1,19 133:2,5
crisis 52:5

Croy 28:23
crystalized 103:3
cubicle 138:20 139:17
cubicles 43:6 64:10
current 68:13
currently 34:5 102:23
custody 6:4
customer 16:21 60:10 62:21 70:21 97:11 101:22 103:17 114:19 130:23 144:19
customers 62:18 64:22 65:3 66:3,3 73:4 118:12
customer's 70:20
customizatio... 84:9
cut 102:22

————————
**D**
daily 20:10 46:22 96:16
Dale 25:4
data 34:23
date 5:2 19:20 38:4 59:16 61:15 63:7,11 64:5 65:13 66:23 67:6,13 67:22 68:6,7 68:9,13,13,17 68:23 69:6,19 71:3 72:1,10 73:19 74:17

75:9,23 77:10 77:11,15,21 82:16,19 83:4 89:21 90:1 91:10 92:15 97:6 102:1 103:22 104:9 106:2,17 107:11,21,21 108:2,5,7,9 108:15,22 109:1 111:5,8 113:21 125:19,21 126:3 140:14 140:22 142:4 142:8 144:8 148:23 150:2 150:4
dated 106:17 148:14,15
dates 18:11,16 53:20 62:13 66:19 93:3 110:19 148:21
dating 150:11
daughter 25:6
daughter's 26:21
day 38:21,23 45:11 47:20 49:10 50:8 75:1,2 77:11 78:2 115:23 130:20 132:5 133:10 153:13
days 47:2 71:2 89:15 91:2,7 91:15,19 92:12 93:7,17 127:21
deactivated

108:14,19 126:14
deactivation 74:16 75:23 76:16 77:5 79:19 80:17 96:6,8 97:5 103:12 104:16 109:1 125:13
deal 56:6 94:9
dealings 54:2 57:20 114:10 124:5 141:9
dealt 56:19 128:14
December 36:12 38:3 150:3 155:22
decide 59:18
decided 77:12 89:11 93:5 99:23
decision 135:6
decision-ma... 55:12
deep 16:18 114:17
DEFENDAN... 1:11 4:10
define 92:19
definitely 13:18 43:11 58:7
degree 35:14 35:19,21
delivered 94:4 94:17
delivery 88:14 89:4 94:18
demanding 51:10,11
demeanor 49:6
department

38:18 39:18 45:11 49:18 49:21 55:20 65:22 78:23
departments 43:9
departure 17:2 114:11
depending 149:1
DEPONENT 156:20
deposed 6:16
deposition 1:13,20 2:4,5 2:16,19 6:8 6:11,20 7:6 8:13 9:1,17 11:23 12:3,7 18:6 19:18 30:18 31:8 87:23 110:6 110:22 112:2 113:23 114:3 114:8 117:11 117:19 119:12 120:6 120:23 121:2 127:13,15 145:18 157:7 157:12
depositions 2:8 101:12 117:16
described 125:10 155:9
desk 66:22 72:9 139:8
detail 103:9
details 46:11 72:4
determine 50:17 113:14
determining

# FREEDOM COURT REPORTING

85:11 113:6
developed 78:21
developer 34:23
Dexter 26:15
dialogue 72:5
diary 121:5
Diego 54:12
difference 126:20
different 56:4 79:13 148:23 152:9
Digging 45:18
dilemma 53:19 97:2 119:8
diligence 74:11
diligently 85:17
dinner 99:18 100:21 153:12
direct 39:4
direction 40:14
directly 14:12 39:16 80:16
director 38:14
dis 83:10 115:11
disability 12:23 14:1
disagree 10:15 11:1,4,6 80:5 111:3,21 112:2 118:4 118:23
disagreed 117:15,18
disagreement 111:6 115:12
discharged 33:14 37:1
disconnect

77:9
disconnection 61:12,15 62:4 104:19 105:2 105:11,15 107:2
discuss 16:4 62:3 70:13 97:13 99:4 116:14,19 120:17 132:3 136:7 144:16
discussed 15:6 16:1,7 17:23 61:6 62:8 78:5 97:14,17 101:3,4 113:20 122:2 122:5,8,9 127:3 137:15 143:15,22 153:23
discussing 49:14 81:2 100:14,15
discussion 101:5
discussions 16:11 60:3 70:5 98:5 116:18,23 127:7
dishonest 10:16 12:6 77:1 140:17 141:5,12,21 142:23 145:6 145:11
dishonesty 105:19 141:18
disparaging 141:1
dispute 92:21

dissuade 104:1
distraught 95:20
DISTRICT 1:1 1:2
disturbing 84:19
diversify 60:15
DIVISION 1:3
divorce 22:10 23:7 118:4
divorced 101:13
divorces 30:22
divulging 98:1
document 19:6 19:18,21 20:2 20:11,12 53:21 61:16 62:11 66:23 67:21 68:6,15 68:18,22 69:12,13,16 70:6 71:7,18 72:17 73:18 77:22 86:22 87:3,4 97:4,6 97:8 103:22 106:2,5,8,10 106:15 107:9 107:11,21 108:2,5,22 109:2,4,7 119:10 125:14,21 126:1,2 137:21 138:9 145:10,18 148:8,14,15 148:17 149:5 155:8
documentati... 104:1
documented

112:11,12 135:11
documents 5:23 6:3 18:12,14,22 20:6 30:12 56:1 64:21 66:2,9 70:19 73:9,10 100:6 129:20
doing 42:16 54:6 59:17 71:13 73:16 74:11 84:13 94:7 97:21 118:10,18 151:8
dollar 118:19
dollars 74:2,8 74:14 80:16 102:4,5,13,21
Doolittle 28:23
door 134:21 138:21 139:1
Doran 46:4
Dorrin 46:5
drawn 21:3
due 74:11 76:2
duly 5:11
duties 34:3,22 55:10 73:5 78:19 121:23 125:1,10

_____ E _____

E 157:1,1
earlier 68:13 87:23 99:16 108:2,5,22 114:15
early 44:15 54:9 57:2 64:7 69:7 99:10 127:18

Edge 56:12 57:13 59:14 85:6 88:9,17 126:16
education 35:4 35:6
educational 31:17
effect 2:6 61:9 70:23 81:5 90:2 99:18
effective 47:1 88:18 90:12 91:10,14 92:11 113:15
effectively 93:12
effectiveness 50:18 113:6
eight 38:6 118:5
eighteen 102:13 108:17
eighty 73:7
eighty-eight 102:5
either 6:13 10:22 12:5 42:6 58:9 71:8 89:14 90:23 91:1 127:18,19 146:17
Elementary 23:22 24:1
elevated 43:4
Elmore 26:15 27:1
else's 11:10 120:19
Emily 23:23 26:1,1
emphasis

**FREEDOM COURT REPORTING**

Page 165

employed
13:13 14:15
15:3 17:1
34:5 37:14,17
48:16 53:23
58:1 114:21
employee
154:23
156:11
employees
152:15 153:5
155:3 156:11
employer
52:15 132:23
employment
39:3 99:1,7
102:16
110:11
116:15,20
117:5 118:9
ended 36:12
41:13 60:6
99:7
ends 32:15
enforcement
132:13
engage 132:18
engaged 38:2,5
133:2
engaging 80:3
enhanced
55:21
enroll 52:23
53:3
entire 114:15
Ernest 4:4
error 74:12
essence 41:10
42:1 97:9
ethical 53:19
91:5,8,21
93:19,22 94:2
94:20 96:8,9
97:2 119:8

129:11 151:2
152:20
ethically
130:13
evaluation
51:21
evening 125:8
event 72:20
eventually
49:9
everybody
37:2 56:8
139:5
evidence 2:16
76:5 130:16
exact 59:16
67:6 90:1
94:22 150:4
exactly 41:16
67:18 95:2
99:3 103:5
125:15
examination
3:3 5:7,18
146:13
examined 5:11
excuse 15:11
25:9 44:9
88:2 91:1
excuses 47:17
executive 73:8
exercise 89:11
89:13
exercising
90:21
Exhibit 3:13
19:10,15,17
62:11 66:17
68:22 145:17
148:9
EXHIBITS
3:11
exist 103:12,20
129:8 130:2,5

131:2
existed 106:11
129:23
existing 90:18
exiting 32:6
expect 38:8
experience
53:13
expire 83:12
explain 76:1
explained
52:22 126:19
extended 24:12
extent 89:10
extra 71:2
73:22
ex-wife 24:6
25:14,21
26:17 123:5,7
123:10 124:8
124:13
ex-wife's 26:17
27:4 28:14
52:15
eyes 41:11 42:2
107:19 109:7
e-mail 13:14
115:2,16
e-mails 14:6
121:15,20,21
126:15
E5 33:20

_____
**F**
F 157:1
facility 54:11
fact 14:7,8
15:5,17 52:2
53:13 66:1
84:7 86:17
88:8 92:4
99:6 104:5
111:19
136:21

137:20
140:13,19
142:11,20
154:22
facts 13:11
14:13,17 15:6
15:7,23 17:22
17:23 76:4
130:16
143:11
fair 137:2,5
fall 36:9
familiar 7:5
61:11,14
family 20:23
24:12 28:13
28:14 32:9
far 60:15 89:18
90:3 111:17
113:5 118:6
126:12
129:10 137:8
favor 70:20
February
30:13 99:10
Federal 5:3
Fed-Ex 59:13
87:21 88:6,13
89:2,23 94:4
94:17
fee 61:12,15
62:4 74:16
75:23 77:5,9
77:17 79:19
80:17 81:7
96:6,8 97:5
103:12,19
104:3,16,19
105:2,12,15
105:22
106:11 107:2
107:8,12,14
107:17 108:6
108:9,12,19

109:1,5,6,9
109:15
125:13,18
129:2,7,13,22
130:2,5
feedback 118:9
feel 10:15 12:5
60:2 128:8
145:10
fees 74:14
76:16
feet 138:21
felt 51:13 98:3
128:6 133:7
134:8 145:6
152:1
fiance 28:3
122:10 153:6
155:23 156:1
fiance's 37:10
fifteen 46:14
46:16 50:10
50:11 89:15
91:1,7,15,19
92:11 93:6,17
113:12,13
116:5
fifteen-day
93:21
fifth 75:1,2
fifty 74:2,6,7
102:4,22
figure 85:2
file 68:1 69:14
69:20 70:2
72:11 77:16
106:8 149:6
149:14
filed 22:10
30:2
files 62:18
121:11
filing 2:19
fill 50:13,13

# FREEDOM COURT REPORTING

Page 166

| | | | | |
|---|---|---|---|---|
| **final** 30:12 | 68:1,15 69:22 | 108:4 109:3 | **general** 79:3 | **goal** 128:22 |
| **finally** 85:11 | 70:1 | 131:13 | **generally** 46:9 | **goes** 23:22 |
| **finance** 57:18 | **Folkes** 9:23 | 151:11 | 99:19 100:23 | 24:1,2 89:19 |
| 78:22 | 10:23 11:16 | **fraudulent** | **generate** 97:8 | 90:4 |
| **financial** 96:15 | 11:21 116:9 | 107:23 109:7 | 98:10 102:19 | **going** 7:16 |
| 101:16 | 150:17 153:8 | 109:11 | 103:16 | 9:10 13:21,23 |
| 151:22 | **folks** 139:22 | **fraudulently** | **Georgia** 4:8 | 14:1,2 17:2 |
| 155:16 | **following** 5:7 | 101:21 | **Germany** 32:5 | 18:8 19:14,15 |
| **find** 32:16 | **follows** 5:12 | **Frederick** 5:21 | **getting** 58:4 | 19:16 20:21 |
| 86:14 102:15 | **force** 2:5 | **Friday** 47:11 | 84:16 | 31:3 42:17 |
| 103:17 | **forced** 30:15 | 75:7,8 87:22 | **Gillis** 116:9 | 45:5 46:12 |
| 110:16 125:1 | **foregoing** 5:4 | 127:20 | **girlfriend** | 47:6,15,23 |
| **finding** 79:7 | 157:7,10 | 133:23 | 155:23 | 48:21 50:7 |
| **finish** 148:3 | **form** 2:12 76:4 | 134:12 | **gist** 88:7,23 | 52:22 53:4 |
| **finished** 35:18 | 90:18,19 | **friend** 28:5 | 95:22 110:3 | 60:15 64:6 |
| **fired** 33:6 | 91:13 92:2,17 | 38:13 | 126:7 | 65:23 73:11 |
| **first** 5:11 12:8 | 93:15 129:18 | **friends** 28:2,6 | **give** 5:19 8:17 | 75:17 78:3 |
| 21:18,19 | 130:16 141:8 | 28:11 99:16 | 14:23 20:18 | 79:6 81:6,6,8 |
| 22:19 23:2 | 155:5,13,19 | **Frier** 37:5,7,9 | 24:13 49:15 | 83:11 85:2 |
| 29:14 37:4 | **former** 156:10 | **front** 19:16 | 75:18 116:5,7 | 88:9,11 92:7 |
| 39:10,12 45:2 | **formulated** | 39:11 62:11 | 118:19 | 95:9,10,20,23 |
| 45:3,3 53:3 | 104:9 | 68:22 139:5 | 139:23 | 97:1,22 98:8 |
| 54:7 56:9 | **forth** 34:16 | 148:8 152:14 | **given** 8:14 | 98:12,13 99:3 |
| 58:7 64:2,15 | 48:22 50:17 | **frustrated** | 123:14 | 99:5 101:2,13 |
| 64:15 68:19 | 79:18 116:4 | 96:23 | 151:18 | 102:8 110:5 |
| 74:3,9 75:20 | **forty** 74:1 | **frustration** | 157:12 | 113:11 |
| 76:14 82:14 | 126:8 | 44:3 85:15 | **giving** 13:19 | 114:20 115:5 |
| 84:2 85:3,19 | **forty-five** | **frustrations** | 47:17 | 118:3 119:3 |
| 102:12 107:1 | 126:9 | 86:16 | **glad** 147:1 | 124:22 |
| 123:3 134:1,1 | **forward** 44:16 | **full** 2:6 5:20 | **go** 7:11 12:3 | 131:20 |
| 135:13,16 | 58:11 73:11 | 10:10 25:10 | 23:19,20 | 135:17 |
| **fishing** 13:5 | 94:1 154:10 | 29:9 119:19 | 30:23 44:9,16 | 136:21 137:4 |
| 16:19 17:5 | **foul** 42:19,22 | **further** 2:2,9 | 62:21 66:22 | 140:21 |
| 114:16,18 | **found** 52:16 | 2:18 130:17 | 70:23 71:12 | 142:16 143:1 |
| **five** 28:1 40:21 | 110:14 140:9 | 156:20 | 71:14 74:10 | 144:19 |
| 45:12 74:3 | **four** 45:11 | 157:14 | 79:23 82:13 | 151:14,21 |
| 135:1 | 74:3 | | 84:1 90:6 | 153:10 |
| **flew** 118:13,14 | **fourth** 83:22 | —— **G** —— | 95:17 100:21 | **good** 28:5 |
| 118:14 | **frame** 67:14 | **gain** 16:22 | 102:16 | 47:19 53:11 |
| **floor** 4:13 43:2 | **Frances** 29:14 | 117:9 | 131:11 | 96:4 110:22 |
| 48:3 | **Franklin** 26:6 | **gained** 53:14 | 134:22 | 111:1 118:11 |
| **Florida** 57:7 | **fraud** 105:1,19 | **gear** 140:1 | 149:21 | 123:9 128:4 |
| **focus** 94:16 | 106:22 | **geared** 85:14 | 150:19 151:3 | 134:7 154:23 |
| **folder** 67:2 | 107:19 108:3 | 98:16 | 151:18 152:4 | 155:11 |

**FREEDOM COURT REPORTING**

graduated
31:22
grandmother
29:11
grandmothe...
29:14
Greg 9:23
10:22 11:16
11:21 116:9
150:17 153:8
grew 41:6
griefs 128:2
Griswald 39:8
grounds 2:14
Grove 13:6
114:17
guess 15:1
26:14 29:1
32:17 35:7
41:13 46:13
49:10 50:17
60:1 75:18
76:6 88:18
89:20 125:7
134:9 150:23
guessed 142:18
guessing 14:21
89:21
guest 150:21
guidance 41:7
41:9 78:2
guiding 44:2
guy 116:1
guys 52:18
94:5 134:10
Gwen 17:6
39:7 52:20
78:16 79:15
116:10

_____ **H** _____
H 4:17
half 12:22
34:20 43:6

hand 92:4
Hannah 26:12
happen 96:21
123:19
happened
42:14 46:9
48:2 52:13,14
68:16 73:2,17
73:20 76:22
77:8 83:7
98:21 99:13
101:20
104:10
123:11
124:17
125:12
129:11 132:6
137:8 138:1
142:3
happens 22:7
hard 37:3 64:4
86:17 95:15
106:7 128:6
Harford 22:21
22:22 35:12
harp 72:3
Harriet 25:10
harshly 40:13
hate 45:5
head 7:20
10:12 11:1
47:9 71:11
110:9 121:4
148:10
headquarters
84:18
health 52:19
hear 8:3 17:11
139:10
heard 8:9
42:13 61:18
109:21 110:4
hearing 41:6
94:4 157:13

heated 48:20
heavy-handed
144:18
hefty 53:5
helped 55:23
helpful 24:22
helping 52:10
140:1
Henderson
40:21 44:10
45:7
hereto 19:12
hesitant
140:23 142:1
hey 85:15
134:9 138:14
151:10
high 31:16,20
31:21,22 35:4
higher 35:4
Highway 29:12
32:21
Hillman 27:5
history 31:15
31:18 32:10
84:12
hit 134:22
Hodges 45:19
Hold 154:18
home 48:10
136:3,5
honest 141:21
142:23
honestly 26:2
41:17 43:16
94:13
honeymoon
146:21 147:8
honor 152:12
honorably
33:13 37:1
hours 47:6,22
48:1
HR 38:14

huge 73:12
90:5,10 94:9
109:23
human 133:22
hundred 73:6
74:6,6,7,14
102:4,5,13
108:18
126:17,21
husband 26:9
husband's
26:10
Hutcheson
54:8 55:2

_____ **I** _____
idea 15:4,5
71:3 82:15,20
98:19 125:4
identification
19:11
illness 13:20
imagine 65:20
immoral
143:20
impact 98:11
101:16
140:15
impair 8:23
important 7:18
118:12
136:14
inaccuracies
18:5 110:8
111:9 113:22
114:3 119:11
121:1 145:20
inaccuracy
110:10 114:5
inaccurate
8:15 10:15
12:6,13 18:2
110:15,16,18
117:4

inadvertently
52:15
incident 41:14
42:4 43:20
62:16 63:10
66:16 137:9
141:10,14,22
141:23 145:7
155:8
include 77:9
126:22
included 84:6
95:15 96:6
126:21
includes 77:17
including
130:11
income 102:19
incorrect 8:15
increase 73:12
76:18 77:20
90:10 96:4
109:17,21,23
increases
104:6,7
INDEX 3:1
India 85:7
86:15
indicating 15:7
69:2 119:9
individuals
116:16
information
13:20 25:18
46:18 93:15
98:2
informed
125:11 130:9
ing 60:6
initial 5:22
57:1
inner 155:10
inside 54:22
instance 70:21

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

128:17,21
141:17
instances
117:20
instinct 74:9
institution
35:11
instructed
58:10 77:10
103:21 104:8
125:20
131:23
138:22
140:14,21
instruction
58:14
insurance
52:16,19 53:1
intent 59:12
interact 54:15
interaction
54:17
interactions
125:10
interested
157:16
interim 39:20
internally 64:9
interrogation
104:2
interrupt 43:9
interview
38:19
investigation
73:15 104:2
106:13
inviting 76:5
involved 30:18
30:21 39:9,22
50:20 78:12
79:10 96:14
97:20 153:1
issue 12:23
53:18,19

77:22 92:3
93:22 94:3
118:1 119:13
129:10 140:8
issues 101:13
111:16 118:2
119:2,6
issuing 64:22
iterations 63:6
IV 4:4

_____ J _____

Jamie 26:13
Jason 1:14,21
5:5,10,20,21
19:16 59:3
72:6 131:10
146:10
154:19
156:17
Jeff 17:7 116:9
JEFFERSON
157:4
Jersey 118:14
Jim 56:19
job 14:3 33:21
34:3,22 35:1
46:17 53:14
55:10 78:14
101:17
111:15 112:8
112:13,15,23
118:11,18
120:15 124:5
136:1 155:11
jobs 135:14
job-related
121:20
Joe 45:19
Joseph 4:11
judgment
142:2
July 45:1 58:2
58:8,10,18

59:15 66:13
66:20 67:3,8
67:11,14
68:20 69:5,7
71:6,10 72:7
75:8,10,20,20
75:21 76:15
76:17 80:13
83:13,17 88:2
88:12,18
89:19 90:12
90:14 91:20
91:23 92:15
95:12 108:3
108:23
137:12 148:9
148:15
June 1:15,23
33:4 70:22
71:1 82:18
83:1 84:2
85:4,4 88:1,3
88:4 91:19,20
junior 35:7
jury 21:2,2

_____ K _____

K 1:21 5:1
157:20
Kathy 25:21
keep 45:5
49:22 60:12
62:17 85:17
86:18 99:19
121:5 134:15
Kelly 17:9
25:11
Kenny 25:4
kept 49:19
68:1
Kerry 1:21 5:1
157:20
Kevin 17:7
116:9 133:22

key 122:13
kicked 154:9
kids 52:18
kin 157:15
kind 16:20
35:4 42:8,12
42:13 43:6
45:22 46:20
48:21 49:7
52:17 54:19
56:12 94:14
101:1 111:12
123:12 125:3
134:22
138:13
139:18,20
140:1 143:5
kindness 53:8
knew 14:14
15:13,13,20
15:22 38:16
57:23 59:21
89:2 98:7,20
98:22 114:21
114:22 115:1
115:8,9,15
120:10
135:12
136:22 142:3
know 9:7 10:6
13:2,22 14:3
14:7 16:6,8
20:8,23 22:6
23:12 29:4
37:2 41:5
42:3,16,17
44:2 47:12
48:5,17,18
49:15 52:23
53:5 55:12,14
57:14 58:3
59:22 60:2,20
60:22 62:1,21
63:5,13 65:17

65:19 66:11
67:9 71:1
74:23 75:3
79:12,18 80:6
81:9 82:9
83:3 84:7
85:1,13 86:13
86:19 89:1,5
89:12,22 90:3
92:20 94:14
95:13,18,19
97:19,19,22
98:2,8 99:2
99:22 101:15
105:6 106:15
108:8 111:1
112:17,20
114:20 115:9
116:12 117:7
117:10
119:15,21
120:15,20
122:10 123:6
123:18 124:4
124:20,21
125:3 126:9
126:12,16,23
130:23 133:4
134:14,15,16
135:1,23
137:3 138:10
138:11 139:7
139:13
140:20,23
141:2,2,19
142:2,4,5,9
142:16,19
146:6 150:2
150:16,16
153:9,17
154:7,9
knowing 95:9
97:1
knowledge

# FREEDOM COURT REPORTING

15:7 28:20
44:13 61:2
65:22 67:10
82:10 114:14
131:12
**known** 13:9
92:4
**knows** 93:5
119:19 120:3
120:7
**Kris** 40:20
44:10 45:7
**Kurt** 116:12

### L

**L** 1:17
**laboratory**
33:23 35:14
**lady** 56:21
**language** 42:19
42:22
**Lanier** 31:21
**large** 76:1
80:12,15
**larger** 96:19
**lasted** 126:8
**late** 23:14
44:14 47:12
54:9 58:10
64:6
**law** 132:13
**laws** 2:7
**lawsuit** 9:10,14
9:18 143:12
**lawsuits** 31:11
**lawyers** 123:8
153:1
**lay** 103:9
123:23
**layout** 64:11
**lead** 13:11
14:14 18:1
**leader** 108:18
126:12

**leading** 2:12
**leads** 115:7
**learned** 99:8
**leave** 33:10
49:9 50:23
53:16 96:19
100:23 124:9
151:6
**leaving** 12:23
16:7 32:13
49:4 51:5
98:9,20 99:9
134:10,23
151:23
**led** 72:19,20
**ledger** 79:4,11
**Lee** 17:7
116:10
133:23
**left** 33:4 39:15
43:17 48:11
54:20,21
56:11,20
100:11 101:9
101:11
102:15 119:4
121:10,11
139:17,19
151:5 155:10
**legal** 30:21
31:11 63:20
**length** 122:6,8
**letter** 59:13
75:6 87:17,19
87:20 88:13
89:6,7,16,19
91:18 94:3,12
94:16,21,23
95:1 105:16
**letters** 52:8
112:17
**let's** 10:19 12:2
20:17 31:14
44:9,16 53:22

58:21 62:10
81:11 82:13
84:1 100:23
116:11 123:2
131:5,10
134:14
138:14
144:16
**level** 35:8,8
43:5,10 98:3
102:18
118:15
**levels** 39:6
73:8 78:15
**liaison** 55:1,11
56:23 123:20
124:18
**lie** 146:1,4
**lies** 146:7
**life** 21:7 119:3
119:6 122:14
136:15
**life's** 84:20
**light** 141:13,21
141:23
151:23
**liked** 60:19
128:1
**Lindsey** 25:6
**line** 39:4,11
123:8 135:14
136:1 149:9
**list** 80:1 126:18
**lists** 58:5 97:21
98:11 126:16
**litigation** 6:14
92:20 124:1
**little** 32:11
34:10 39:2,15
40:13 49:7
50:6 64:14
73:14 84:18
94:9 102:21
107:8 111:13
144:18
**live** 22:1,7

24:10 25:12
25:20 28:23
29:11,13
**lives** 25:21,23
26:6,14,20,22
26:23 28:4
29:2,5,10
37:12
**living** 146:18
**location** 13:6
57:4,6
**locations** 32:4
**log** 136:2
**London** 146:23
147:9 154:4
**long** 23:1,9
34:8 37:16
38:1,4 102:7
**longer** 12:11
12:15,17 13:9
129:14
**long-term** 60:9
**look** 44:2
49:23
**looked** 126:15
127:20
149:11
**looking** 38:16
68:21 81:9
123:8 151:9
**loose** 39:2
**losing** 85:16
86:20 97:1
**lot** 50:4 54:18
84:8,9,10
97:20,21
98:10 114:13
132:10
151:21
153:14
**Lots** 152:9
**loudly** 42:5
**love** 60:23

**low** 43:7
**lower** 69:3,7
**L.L.P** 4:5

### M

**M** 24:10
**machine**
123:14
**Madsen** 116:9
**magnitude**
144:8
**main** 14:17
18:9 56:18,23
92:5 115:11
115:11
120:22
138:17
**maintain** 86:18
**maintaining**
120:2
**major** 37:5,9
54:21
**majority** 80:15
86:2
**making** 12:9
15:15,19
65:14 67:22
78:23 89:1
94:16 115:14
135:9
**man** 7:12,23
**manage** 47:3
**management**
73:11 78:15
98:3
**manager** 39:14
133:22
142:12,15
**managers**
54:21 78:17
**man-hours**
50:16
**March** 99:11
**mark** 19:15

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 170

marked 19:11
marriage
22:14,19,20
marriages
22:15
married 21:10
21:13,21 23:2
23:4 26:8,16
26:19 38:9
146:21 147:2
Maryland
22:21,22 32:5
35:9
matching 79:3
Matson 17:8
matter 5:23
52:2 53:12
111:19
130:23
154:22
matters 123:17
123:21
McNair 57:4
McNeal 36:15
mean 24:13,16
25:14 37:6
67:8 68:3,10
72:3 76:9
79:21 84:5,20
94:8 95:22
109:13
115:19,21
116:2 121:19
128:2,7,12
134:20
140:13 141:9
143:23 144:2
144:17 146:6
meaning 64:13
meant 63:10
medical 13:23
14:2 33:23
35:13
meet 32:15

84:11 95:18
125:6
meeting
118:15
memory 44:21
ment 111:4
mentioned
50:4 99:15
message
123:13
124:10
met 37:22
56:10 147:10
153:12
Michael 26:10
Michigan
17:10
Microsoft
71:18,23
mid 58:2,9,18
66:13
middle 1:2
48:3 59:15
67:14 68:16
83:13,17 85:4
88:1
midst 138:13
Mike 39:8
Millbrook
25:23
Miller 3:6,8
4:11 18:10
25:9,10,11,11
25:12,13 26:1
76:3 90:17
91:12 92:1,16
93:14 119:16
122:22 123:1
123:4,23
124:9,19,23
126:6 127:4,9
129:17
130:15 141:7
146:13

147:23
154:17 155:7
155:15,21
156:14
mind 12:9 40:8
66:19 77:23
101:20
107:20 130:3
136:22
Mindspeed
56:16
minimal
114:12
minutes 46:15
46:16 49:8
50:10,12
113:12,13
126:9 135:1
153:15
mischaracte...
104:12
mistaken 75:8
117:13
misundersta...
40:12
mix 56:17
model 54:22,23
60:18 145:1
modify 20:3
Monday
127:20
money 76:1
Monroe 1:22
monster.com
135:22
Montgomery
1:23 21:3,5
22:1,8,9,11
22:11,15,20
23:23 24:6,10
24:16,17 25:5
25:7,8,12,20
25:22 26:7
27:6,22 28:2

28:4,15 29:1
29:6,10,13
31:22 32:8,21
34:17 35:16
37:13 114:16
146:15,17
month 26:4
34:11 58:7
68:17,19 73:3
74:5 75:2,10
102:3,6,14
110:1 118:21
133:15
monthly 96:15
months 17:3
23:11 32:15
32:18,18
34:13 38:6
63:7 74:4
97:9 103:16
117:23 118:5
129:1
month's 53:4
Montour 12:10
12:17 13:4,12
13:20 14:15
15:2,9,11,18
16:4,12,16,20
16:23 17:7,13
17:17 56:10
56:20 113:20
114:7,10,15
115:5,11,16
115:20
119:13
Montour's
12:22 56:13
110:11
116:15,20
117:5
moral 53:18
90:14 91:5,8
91:21 93:10
93:22 94:3,19

96:7
morality
129:10
Morgan 24:2
morning 50:3
mother's 25:1
move 80:8
152:2
moved 39:18
54:21 61:8
moving 122:10
122:11
muted 43:8
mutual 38:13

___

## N

N 1:17
nail 64:4
name 5:20 17:9
22:4 25:10
26:1,3,10,11
26:17,19,21
27:14 28:16
29:6,9,14,15
29:16 35:10
37:3,4,6
40:20 44:11
48:12 56:22
57:5,20
named 25:23
27:12,18 46:4
155:2
names 23:19
25:3 26:12
45:13,19 56:7
56:16 115:22
116:4 126:18
national 39:14
nature 50:5
55:15 56:2
63:5,18 96:17
100:6 112:16
121:22 127:1
132:2 151:23

# FREEDOM COURT REPORTING

**NE** 4:6
**necessarily**
108:15 144:3
144:14
**necessary** 2:10
93:15
**need** 9:6 24:14
25:14 52:11
**needed** 20:10
54:19 55:16
62:20 97:19
101:16,18
107:22
136:23
**needs** 84:12
95:18
**negative**
112:10,11,13
112:23 118:8
**neither** 157:14
**never** 55:12,13
57:11 61:18
77:4 79:18,20
79:22 96:17
96:21 107:15
111:16 112:7
112:9 136:20
140:8 149:9
149:11
151:14
**new** 26:2,19
64:22 66:3
118:13,14
**Newnan** 57:9,9
57:14 59:13
88:9,16
**Newport** 54:10
56:14,18
57:12 84:16
**news** 84:15
**nine** 102:5
**Nodding** 71:11
110:9 148:10
**nonprescript...**

8:22
**normal** 47:5,18
121:23 144:4
**normally**
129:3 136:1
**Norman** 20:20
**northern** 1:3
29:3
**note** 53:6
**notes** 121:7
**notice** 2:19
89:15 90:23
91:2,7 92:19
92:22 93:2,4
93:16,20,22
94:11 95:17
133:19,21
134:4
**noticed** 73:12
**November**
30:5,6 38:10
102:9 146:16
146:21 147:3
147:5
**number** 19:11
81:14 108:13
123:6,12
**numbers** 73:4
79:1,3
**nutshell**
104:13

**O**

**O** 1:17
**Oakley** 48:9,15
139:19
**Oaks** 54:11
**oath** 7:9
**object** 76:3,5
90:16,17,19
91:12 92:1,16
93:14 129:17
130:15 141:7
155:4,12,18

**objections** 2:11
2:14
**obtain** 128:23
**obvious** 60:14
99:20 122:12
**obviously** 7:18
20:9 98:10
101:14 111:3
116:11
140:15 151:1
153:1
**occasion** 16:9
54:1 57:10
99:21
**occasions** 16:6
**occurred** 100:4
106:14
109:18
133:17 141:3
**odd** 126:17
**offense** 8:21
29:18
**offer** 85:12
**offered** 2:16
54:14 61:23
62:1
**office** 16:16
42:14 47:6,23
49:14 52:21
58:13 64:14
79:16 81:1,17
86:3,6 87:17
92:8 125:7
138:19,21
139:1
**oh** 16:5 48:14
52:17 56:15
122:23 140:3
146:5
**okay** 5:19,22
6:7,10,19 7:8
7:11,16 8:7
8:10,11,17,19
9:6,8,16,20

10:2,6,18,21
11:5,8,12,20
12:12 13:2,10
14:5,9,13,19
14:23 15:5,15
15:19,23 16:3
16:11,15 17:4
17:15,21 18:5
18:14,21 19:5
19:8 20:1,14
20:17,21 21:4
21:8,12,17,21
22:6,9,12,14
22:18 23:1,6
23:9,15,18
24:4,19,23
25:2,17 27:7
27:10,20 28:1
28:13,16,19
29:17 30:1,4
30:7,9,14,17
30:23 31:2,5
31:10,14,20
33:1,6,13,16
33:21 34:8,12
34:19 35:3,20
35:23 36:7,13
36:19 37:8,16
38:1,20 40:1
40:5 42:23
43:13,18
44:16 46:7
48:16 49:13
50:1,19,23
51:7,15,20
52:1,4 53:16
53:22 54:5
55:5,8 56:6
58:17,20,21
58:23 59:9
60:5 61:11,11
61:17,21 62:3
62:10 63:21
64:2 65:7,14

66:7,10,15
67:3,15,18
68:3,21 69:5
69:11,15,18
69:21 70:4,8
70:11,16
71:12 72:3,12
72:15,19 73:1
74:17,21 75:3
75:11,17
76:13,21 78:8
78:9,12 79:23
80:9,10,18
81:11,16,20
82:2,6,9,13
82:20 83:2,5
83:14,18,21
84:1 85:11,18
85:23 87:4,12
88:21 89:2,16
90:11 91:4,16
92:9,23 93:18
94:2,10,19
95:3 96:7
97:12 98:4
99:12 100:12
100:18 101:8
102:7 103:1
104:11
105:10 106:4
106:18
107:13,17
108:1,8,21
109:8,8,20
110:2,5 111:2
111:6,9,23
112:6 113:8
113:19 114:2
115:7,14
116:7,14,19
117:8,17
118:22 119:2
119:11 120:3
120:9,12,19

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 121:1,5,14 | operations | packing 49:3 | 117:2 119:9 | 111:14,15,18 |
| 122:7,20 | 34:18 | PAGE 3:3 | 120:1 128:15 | 111:21 112:8 |
| 123:2 124:7 | opinion 18:7 | paid 53:3 | 128:17,20 | 112:14,15,15 |
| 125:23 126:5 | 77:2 104:9 | 101:17 | particularly | 113:1,22 |
| 127:10,14,22 | 122:14 | 102:13 128:5 | 70:20 | 117:21,22 |
| 128:19 129:4 | 127:22 128:8 | 154:20 | parties 1:19 | 119:14 |
| 130:1,7 131:3 | 128:10,15 | Paine 116:11 | 2:13 157:15 | period 15:12 |
| 131:4,7,18 | 140:6,11,15 | 120:7,8,10,15 | parts 86:3 | 32:7 39:15,20 |
| 132:3,12,15 | opportunities | 153:13 | party 31:12 | 41:5 64:12 |
| 132:21 | 98:23 | Palm 57:6 | 89:14 101:19 | 85:9 93:21 |
| 133:14,20 | oral 5:6 | papers 22:10 | 149:22 150:6 | 108:16 |
| 134:3,18 | Orange 16:19 | parents 24:9 | 150:20 151:4 | periodic 16:6 |
| 136:7 137:2,7 | order 31:18 | 28:22 122:9 | 152:5,8,13 | periodically |
| 137:10,18 | 139:23 | park 29:3,12 | 153:2 156:2 | 112:18 |
| 138:3,12,23 | ordinary 70:18 | parking | Paul 36:15 | permit 36:6 |
| 139:14 140:6 | 71:5 | 132:10 | 56:12,14,17 | person 21:20 |
| 140:11 | organization | 153:14 | 57:13 59:14 | 39:8 46:3 |
| 141:13,20 | 6:15 13:1 | Parkman | 85:6 88:9,17 | 56:18 88:5 |
| 142:6,21 | 35:2 39:6 | 32:19 36:17 | 126:16 | 142:13 |
| 143:3,10,19 | 40:23 42:9 | 36:18 | pay 102:2,22 | personal 21:7 |
| 145:4,9,17,23 | 78:19 112:20 | part 8:3 24:21 | 128:4 | 40:11 52:5,5 |
| 148:13,18,22 | 113:7 115:21 | 31:6 47:21 | paying 102:23 | 114:14 118:2 |
| 149:4,7,13,21 | organizations | 56:1 57:17 | pays 120:14 | 118:2 119:3,6 |
| 150:1,13,19 | 118:16 | 73:5 74:12 | Peachtree 4:6 | 128:2 136:5 |
| 150:23 | original 23:8 | 78:13,18,19 | Peavy 116:8 | 144:22 |
| 151:19 152:4 | 39:11 152:15 | 82:1,3 92:20 | people 13:7 | personally |
| 152:7,12,19 | originally | 100:10 | 45:9,16,21 | 133:6 |
| 152:22 153:6 | 103:14 | 107:10 | 46:19 56:9 | personnel |
| 153:16 154:3 | 133:21 | 108:19 115:2 | 85:10 92:5,6 | 132:13 |
| 154:12 | output 79:15 | 115:3 124:5 | 116:2 118:16 | pertinent |
| old 26:4 | outside 26:7 | 133:9 134:7 | 119:20 | 18:12 137:23 |
| omits 90:18 | 32:21 42:7 | 137:13,17 | 122:13 | phased 14:3 |
| 93:15 | 54:23 121:22 | 141:19 | 127:15 | phone 132:11 |
| once 6:12 | 129:5 | participant | 135:11 152:9 | physical |
| 39:14 54:20 | overall 60:1 | 14:11 | 152:11 | 106:14 |
| ones 9:20 | overheard | participants | Pepsi-Cola | Pick 115:23 |
| 16:14 48:1 | 109:17 | 20:7 | 31:23 | piece 60:22 |
| 81:19 82:2 | overnight | particular 40:8 | perceived | Pike 26:20,22 |
| 112:4 | 88:13 89:3 | 41:8 47:14 | 136:10 | Pirnie 4:18 |
| open 139:9 | 94:17 95:17 | 52:12 63:7 | percent 102:22 | 9:23,23 12:3 |
| operating | overseas 32:5 | 70:6 71:3 | perform | 13:16 14:12 |
| 113:15 | | 72:23 85:5 | 130:10 | 14:14 15:1,8 |
| operational | **P** | 96:2 97:10 | performance | 17:6,7,12,16 |
| 98:13 | P 1:17 | 99:21 100:16 | 51:21 52:3 | 36:21 38:21 |

# FREEDOM COURT REPORTING

39:7,17 40:9
42:13 43:19
44:6,17 46:8
46:14 47:13
49:1,17 51:8
52:21 58:16
60:9 66:20
67:15 75:4
78:16 81:2
82:4,4 86:1,3
86:6 113:4
115:1,4,8,15
116:10,10,20
117:4 120:13
125:20
127:23 134:5
136:8,8 138:7
141:20
142:10,22,23
149:16
152:10 156:7
**Pirnies** 52:9
**Pirnie's** 11:2,3
11:22,23 18:1
47:6 58:13
81:1,17 110:6
113:23 114:3
114:5 117:18
119:12
128:11 140:7
**place** 4:13
22:15,19,21
33:7,10 34:21
41:18,19
67:23 68:23
69:6 81:17,21
87:14 95:5
154:8
**placed** 97:7
**placing** 105:10
105:14,21
**Plaintiff's** 3:13
19:10,17
**PLAINTIFF...**

1:8 4:3
**plan** 53:1
**planning** 135:8
**plans** 147:2
**Plaza** 4:7
**please** 20:19
27:21 40:6
46:11
**plus** 75:23
76:15
**point** 12:20
14:20 26:3
49:1 55:18
56:20 58:9
94:1 96:2
102:20 124:9
124:13
131:18
134:19
135:20 138:6
**pointing**
139:18
**points** 95:1,2
**policies** 41:3
**poor** 118:18
**portion** 89:13
**position** 32:16
60:11 152:1
**possession** 6:4
**possible**
117:12,14
133:1 138:10
140:19 142:3
148:16
**possibly** 45:21
48:9 100:8
**posted** 63:22
**potential**
131:13
151:11
**potentially**
131:19 139:6
151:16
**practice**

110:23
**practices** 47:5
**predated** 106:9
**premium** 53:4
**prescheduled**
134:6
**prescription**
8:22
**presence**
147:11
**present** 4:16
31:19 45:18
45:23 46:6
82:3,7 95:6
**president**
39:22 120:13
142:14
**pressure** 33:9
**pretty** 13:8
53:5,11 96:4
**prevented** 94:7
**previous** 31:11
46:16 50:11
113:13
**price** 59:6 61:5
75:4,13 85:13
104:18 105:4
130:12
144:21
**prices** 61:3
76:11 90:6,13
91:9,22 92:15
130:11
**pricing** 61:9
64:20 70:23
83:11 90:4
**primary** 55:18
57:11 60:19
**print** 67:1,21
69:13 72:10
**printed** 68:14
69:19 71:19
148:23 149:1
**prior** 2:16

47:20 56:20
59:17 61:19
63:1,7,10,15
68:6 70:19
73:10 75:13
77:11 86:7
97:6 99:1
101:14,23
103:20
104:22 105:8
106:2 107:11
107:21 108:7
109:9,15
117:23 118:5
118:20
125:19,21
**private** 139:3
**privy** 80:19,21
117:1 137:15
**probably**
14:22 37:19
40:21 42:6,21
42:22 44:14
45:11 48:5,10
54:8,18 55:7
58:6 74:19
81:18 82:17
83:8,12 99:9
109:13
**problem** 52:6
74:10 90:14
91:5,8,21
93:10,19
94:20 96:8,9
130:2 151:2
152:20
**problems**
155:16
**procedural**
98:12
**Procedure** 5:4
**procedures**
41:3,18
135:10

**proceedings**
5:8 30:21
**process** 7:6
38:19 46:13
64:9 65:23
71:14 95:8
**processes**
135:10
138:14
**procurement**
57:18
**produced**
73:23
**product** 79:17
**production**
47:1,18
**productive**
46:23 113:16
**products** 79:12
**profanity**
48:22
**profiles** 20:8
108:18,20
126:13,14,22
126:23
135:22
**program** 59:6
61:6 75:14
104:18 105:4
**project** 47:23
49:13 50:9
113:4,11
**projects** 79:10
**proof** 106:14
**protection**
59:6 61:5
75:4,14
104:18 105:4
**provide** 78:14
144:20
**provided** 5:3
10:4 73:6
**provider** 60:20
**providers**

# FREEDOM COURT REPORTING

81:10
providing
78:21 79:15
97:20
pry 21:7
pulled 42:14
71:17 95:21
purchased
130:12
purpose
106:12
pursued 60:19
put 19:15
55:19 64:9
67:1 68:5,5
68:12,15,18
69:13,20,21
71:6,17 72:11
84:20 103:20
118:17 149:6
putting 107:1
P.M 2:1 59:1,2
131:8,9

**Q**

qualify 133:4
quarter 36:11
question 8:4
28:9 29:18
55:16 61:16
63:8 65:13
68:7,9 80:16
86:15 92:10
103:23
119:23
questions 2:12
2:13 7:17 8:9
18:10 20:22
21:10 154:13
157:8
quick 148:3
quickly 7:12
Quinny 29:16
quit 150:5

quite 41:19
60:2
quote 41:3
47:16

**R**

R 24:9 157:1
ran 150:17
153:13
Randy 17:8
Randy's 17:9
rank 33:16
37:6
rate 50:17
55:14 113:15
113:16
rates 75:22
76:10,15 90:8
90:10 93:8,11
94:1 96:3
137:11
reacted 40:13
read 10:9 11:9
11:14,16,17
11:18,18,21
69:15 110:7
123:13
reading 2:3
89:7 114:8
117:11
120:23
real 48:13
53:18 86:13
98:11 116:23
148:3
realize 8:12
96:5 131:1
realized 73:16
73:17 74:13
74:18 77:19
88:17 97:3
132:5 135:17
really 24:21
28:6 62:18

89:1 96:16
101:10 121:3
126:7 151:7
reason 9:3
18:9 42:4
47:21 51:5
64:19 65:9
91:3 99:8
100:10 101:9
101:10 104:6
117:3 118:10
136:12
141:11
reasons 99:20
99:22 122:12
140:5
recall 11:7
14:8 16:13
17:14,20 19:4
42:21 43:15
43:22 45:15
62:6,8 67:6
67:12 72:5,8
72:13 81:13
82:8 89:7,8
94:22 95:1
98:1,5,17
99:8 108:11
108:16
113:18 114:1
116:17,22
121:21 143:9
145:8,13,16
145:19
148:16
receive 92:6
93:1 112:14
112:22
received 35:20
52:2 88:15
112:10 115:3
118:8 129:3
136:14 140:3
receives 92:10

93:16,20
receiving
92:19 111:20
recess 59:1
131:8 148:5
recipient 13:15
13:17,18 14:6
recognition
57:19
recognize
140:19
recognized
156:7
recognizing
83:9
recollection
64:16 86:23
87:5 98:15
recommenda...
114:19
recommended
114:18
record 89:23
records 62:19
77:14
Red 57:4 84:17
reduced
102:18 157:9
REEXAMIN...
148:7 154:17
reference
16:20
referenced
64:23 95:4
referred 38:18
referring
73:21
refile 102:17
reflect 106:2
107:11
reflected 66:4
refresh 86:23
87:5,10
regard 18:2

71:4 72:17
85:5 110:17
110:18
131:14
regarding
13:22 18:11
47:14 61:16
65:12,13
74:15 85:6
112:13
115:10 118:9
119:8 125:12
128:16
regards 53:7
125:2
Regions 32:23
34:6,14,17
36:14
regret 81:8
regular 75:22
76:10 78:23
111:20
Reid 11:18,21
Reid's 11:9,14
11:18
relate 18:16
related 9:18
65:10 80:17
143:11,13
relating 2:7
relationship
84:14 143:8
relatives 24:5
released 30:12
remarks 141:1
remarried
23:10,13
26:18 27:8,10
remember
17:8 26:3,9
26:11 36:22
37:4 41:16
45:14,23
46:10 51:16

**FREEDOM COURT REPORTING**

52:13 56:8,22
57:5 59:15
71:16 80:23
81:19,23 82:3
83:15,16,18
83:21 84:3,23
85:3,20,22
86:8,12 87:8
87:13 88:4
89:9 94:20
108:12
110:21
111:19 112:5
112:12 127:3
133:12 146:5
**remote** 78:17
**rendered** 61:4
**rent** 140:2
**reorganization**
64:8
**reorganized**
64:10
**repeat** 8:5
**replace** 103:18
**report** 38:21
46:20 74:10
**reported** 38:20
39:16
**reporter** 5:14
7:14
**reporting**
39:19 79:2
**reports** 35:1
50:15 73:6,7
73:23 74:22
78:14,22 79:2
96:15 131:17
**represent**
19:17
**representation**
63:20
**represented**
6:23 123:17
124:3

**represents**
157:11
**reprimanded**
112:7
**request** 72:6
**requests** 39:5
58:4
**required** 49:16
**requirements**
47:4
**requiring**
46:14
**research** 74:11
**reserved** 154:8
**reside** 25:5
**resides** 25:6
**resign** 72:20
99:23 118:21
**resignation**
49:12 99:2
117:23
**resigned** 38:23
44:8 121:11
136:17
**resolved** 30:7
31:2
**resources**
133:22
**respect** 55:9
**respective** 1:20
**responded**
39:5
**response** 6:1
50:6
**responses**
47:19
**responsi**
120:19
**responsibilit...**
121:23 125:2
**responsibility**
78:20
**responsible**
119:17,18,19

119:22 120:1
120:4 142:7
**responsive** 6:5
**result** 51:1
157:17
**resumes**
135:19
**retained**
123:20 124:8
124:15,21
**retirement**
14:2
**retort** 41:12,23
43:14
**revenue**
103:17
**review** 51:21
126:1 127:14
**reviewed** 9:13
9:17,21,22
63:19
**reviewing**
73:10
**reviews** 112:16
**revise** 126:1
**rewarded**
128:7
**Rhonda** 26:23
**right** 6:2,22
7:4,14 8:12
8:18 9:13
10:12,23 12:2
16:2 20:17
46:3 48:3,19
55:20 83:8
90:21 93:13
101:6 104:23
105:12,13
106:16
124:13,14,16
133:8 134:8
135:16
137:12,22
138:16

139:21
146:14,22
147:2,6 154:5
**right-hand**
69:3,7
**rise** 33:16
137:11
**rising** 138:1
**Road** 20:20
26:15,20,22
37:13
**Rob** 4:18 9:23
11:2,22 12:2
12:9,16 13:3
13:12,16 14:5
14:12,14 15:1
15:8,13,20
16:3,12 17:7
17:12,16 18:1
36:21 38:21
39:17 66:20
67:15 70:5
72:8 78:16
81:1,17 82:4
85:10 86:1,5
110:6 113:22
116:10 117:4
125:20 134:5
134:12,20
136:8 138:7
140:7 142:22
149:16
152:10
**Rob's** 11:9
18:6 87:16
141:19
**roll** 42:2
**rolling** 41:11
**Ron** 37:7,9
**room** 43:1
138:17
**roster** 115:23
**roughly** 102:20
**Ruby** 29:9

**rules** 2:7 5:3
**run** 150:15
**Rusty** 57:4
**Rusty's** 57:5

———— **S** ————
**S** 1:17 4:11
**safely** 67:9
**SAITH** 156:20
**salary** 120:14
**sales** 38:17
39:14,19,22
42:9 43:1,2
45:10 48:3
49:18 54:22
54:23 64:13
64:21 68:2
73:5 78:16
79:2 149:15
149:18
**salespeople**
40:10 78:17
**San** 32:4 54:12
**SANDERS** 4:5
**Santuck** 26:16
**Sarah** 29:6
**sat** 125:8
139:14,16,19
139:20
**satisfied**
132:17
**Saturday**
88:14 89:3
94:18
**savings** 71:2
**saw** 12:7 80:12
104:5,6
109:23
115:20
148:17
**saying** 12:16
44:2 52:9
76:13 80:6
104:14,21,23

# FREEDOM COURT REPORTING

105:7,18
106:15 107:8
108:4 112:6,9
112:18
says 19:18
148:9
schedule 36:6
scheduled
146:22 154:6
schedules
55:14
school 23:19
23:20,22 24:1
24:3 31:16,20
31:21,23 35:5
Scott 54:8,20
55:2
scream 43:4
screamed
42:23
sea 16:18
114:17
second 21:19
22:20 82:21
87:13,15
107:4 134:6,7
see 50:1 72:12
72:14 74:1,5
74:12 90:14
90:20 91:5,7
96:1,3 98:11
116:11
134:14
148:13,14
149:7 153:10
seeing 77:19
79:9 96:21
137:11
seek 123:18
seeking 98:23
seen 52:8
61:18 73:23
77:4 79:18,22
96:17,18

128:4,13
148:19 150:9
153:17
self-employed
32:17
selling 78:18
semi-personal
21:10
send 20:6
85:13 121:14
135:19
sending 58:5
118:11
121:17
sends 91:18
sent 66:3 75:6
87:20 88:13
105:16
126:16
127:17
separate 118:2
Sergeant 33:18
33:19
serious 77:22
seriously 83:9
served 32:3
39:21
service 18:18
18:22 19:19
34:3 61:22
63:3 85:6,7
144:20
services 17:9
54:14 55:21
60:14 61:4
79:13 88:19
96:21 130:10
130:13,19
set 43:5 55:14
146:15
setting 127:12
seven 32:3
37:19,21
seventeen

108:17
shake 7:20
Shane 116:8
Shanks 1:14
1:21 5:5,10
5:21 22:5
23:21,23 24:2
24:9,10 26:6
26:18,21,23
146:14
Shannon 28:3
45:20 150:12
150:21
sheets 50:12
short 32:7
shortly 39:17
44:7
show 77:14
79:8 90:1
showed 46:21
sic 14:11
117:20
side 25:1 39:19
64:14 78:19
90:23 91:1
sides 24:12
84:6 95:14
Sidney 31:21
signature 2:3
signed 70:21
similar 96:18
sister 29:2
sit 88:16
132:17
site 18:20,23
63:23 64:18
65:1,2,4,8,8
65:15,20 66:6
67:21 69:8
71:14,17 87:7
104:16 105:3
105:15 107:3
107:6 120:2
sites 84:10

sitting 7:2
77:13 107:16
109:19
situation 49:7
101:16
113:20,21
118:18 119:9
122:3 136:9
143:16 145:3
situations
60:21
six 23:11 32:12
51:9 77:3
96:13 126:17
126:21
138:21
sixty 74:2
six-month 74:1
size 96:19
skilled 79:5
slipped 104:15
105:2,7
slow 43:7
slowly 48:13
snatched 84:21
solely 141:19
solution 86:14
somebody 93:1
son 26:2
soon 52:23
soon-to-beco...
155:23
sorry 45:6
48:14 68:10
122:23
123:21
sort 14:4 20:8
52:5,6,11
53:2 73:7
79:4 81:10
101:2 103:3
112:20 115:6
134:16
135:12

150:18
153:12
sought 78:2
Sounds 7:5
specific 13:11
16:13 42:22
45:15 52:7
57:20 62:9
63:16 64:5
66:8 67:13
81:13 82:19
83:4 87:3
98:1 111:15
116:18
141:10,14,16
148:17
specifically
16:8 17:19
62:7 65:10,12
71:23 75:16
85:3
specifics 86:13
94:23 99:3,5
127:13
spend 34:20
spending 46:21
spent 13:4 47:5
47:22 114:15
spike 74:5 76:1
80:12,15
spoke 43:16
spring 64:6,7
standard 20:5
29:17 61:9
76:11,15 90:7
90:13 91:9,22
92:15 93:8,11
94:1 96:3
standpoint
59:19 98:13
stands 147:1
STARNES
4:12
start 12:2

# FREEDOM COURT REPORTING

74:11 135:13
started 32:9,22
33:3 36:8
37:18 39:13
40:22 48:20
49:2,17 50:9
54:5 58:4
97:2 98:23
135:7
starting 82:14
state 24:21
35:15 102:17
157:3
stated 89:14
90:22 114:9
statements
111:22,23
112:1 115:13
119:1
States 1:1 32:2
stating 117:15
117:21 118:1
station 67:16
status 110:11
115:5 116:15
116:20 117:6
stay 134:16
stayed 133:14
Steigelman
39:13
stems 114:6
stenotype
157:8
stepsister 26:5
stepsisters
24:13
stick 66:19
112:4
sticks 114:6
119:23
120:22
STIPULAT...
1:18 2:2,9,18
stipulation 5:4

stipulations
5:15
Stone 25:19
stopping 95:11
straight 11:8
11:20
street 1:22 4:6
7:21 27:5
29:1,5
strike 21:1
70:17 71:4
132:15
struck 111:12
stubs 128:5
stuff 50:4
stupid 41:4,11
41:15
subordinates
50:13
subpoena 6:1,5
subsequent
41:12 44:17
83:14 92:8
127:6
subsequently
114:12
155:22
substances
8:21
substantial
155:16
suffered
117:22
Suite 1:23
summary
46:20 50:15
summer 16:17
17:13,17 64:7
superiors
33:10 51:22
supervision
39:23 157:10
supervisor
36:13,16,20

36:23 39:1,5
39:12 42:7
support 102:6
102:14
supposed
146:20 147:8
sure 16:14
17:22 55:19
60:23 62:7,20
64:20 65:19
66:1 67:22
76:11,19 79:1
88:6,12 89:1
89:22,22
94:16 116:8
131:23 135:9
135:21 137:3
146:2 150:4
surprised
109:23
surrounding
21:6 24:17
119:7
suspicions
80:22
suspicious
131:12
sworn 5:11
system 54:16
79:6,11,16
Systems 1:10
50:20 73:13
74:15 106:9
124:2

### T

T 1:17,17 22:5
157:1,1
take 7:23
22:15 31:15
31:17 36:6
55:21 58:21
71:13 81:16
87:21 88:6

131:5 134:13
taken 1:21 6:8
6:11,12 8:21
35:16 36:10
42:6,7 50:8
157:7
talk 10:19
58:11 62:10
78:5 80:8
81:11 123:3
124:4,23
126:6 134:17
135:1,3 148:2
152:7
talked 16:5,9
42:15 53:10
57:10,23
100:18 103:1
111:10 112:8
122:13
125:17
126:13 127:8
127:16 143:4
152:10,10,10
153:8,11,14
153:18
talking 7:21
18:3 24:15
40:9 43:4,7
86:5,7 106:16
122:4 127:11
128:17
talks 59:16
tasks 49:19
Taylor 25:19
TCN 6:17
30:19 31:6
teaching 54:15
technician
34:1 35:14
technological
84:10
tell 6:10 8:7,15
8:23 9:4

10:18 12:4
13:10 14:19
21:17 23:18
24:8 25:2
26:19 27:4,20
28:19 29:9
37:10 40:5,17
45:13,16 46:8
48:12 54:5
55:8 56:7
62:15 66:15
67:18 70:4
72:4 78:7,9
80:20 84:2
87:12 95:3
96:11 98:4
99:13 100:2
103:5 104:11
106:21
109:20 114:2
115:22 116:4
125:15 130:7
143:12 146:6
146:7
ten 116:5,12
term 34:2 39:2
terminate
75:13 96:20
terminated
59:5 61:7
75:4,19 76:14
88:20 105:4
109:10
125:22
terminating
60:7 98:8
105:17
termination
92:11 109:15
terminology
65:1 66:2,5
126:11
terms 18:13,18
18:22 19:19

# FREEDOM COURT REPORTING

Page 178

| | | | | |
|---|---|---|---|---|
| 62:23 63:3,4 | 60:4 73:7 | 117:8,12 | 81:15 83:18 | **Tish** 116:8 |
| 63:15,18,22 | 79:4 81:10 | 120:3,21 | 86:9,10 97:9 | **title** 49:16 |
| 64:18,23 65:4 | 100:15 101:2 | 121:3 122:18 | 97:14 103:16 | **today** 6:1,23 |
| 65:8,15 66:12 | 106:1 112:20 | 126:17 | 113:19 | 9:1,4 18:9 |
| 66:23 69:9 | 115:6 133:8 | 127:17 | 127:21 | 53:15 56:22 |
| 72:9 77:8,15 | 134:16 | 128:19 129:4 | 128:23 | 77:13 101:4 |
| 81:3 87:7 | 135:12 | 129:15,20 | 133:18 | 107:16 |
| 100:4 104:16 | 150:18 152:1 | 133:1 134:13 | **Thursday** | 109:19 |
| 105:3,15,22 | 153:13 | 138:5 140:17 | 47:10 | 125:17 128:9 |
| 107:3,6 | **things** 11:2 | 140:18 141:5 | **time** 2:15,15 | 128:18 |
| 110:19 | 12:8 18:9 | 141:15,16,20 | 12:20 14:18 | 132:18 |
| 125:18 | 41:1 48:20 | 142:7,13 | 14:20 15:12 | 136:19 |
| 130:19 | 50:2 56:2 | 143:10,13,18 | 16:15,22,23 | 137:15 |
| 148:20 | 58:4,6 63:17 | 144:22 145:1 | 23:2 32:7 | 140:10 143:4 |
| **Terry** 39:13 | 75:18 79:14 | 146:6 150:3 | 36:23 38:15 | 143:22 |
| **test** 44:21 | 96:13 97:18 | 151:10 | 38:22 39:7,14 | 147:17,19 |
| **testified** 5:12 | 99:19 100:6 | **thinking** 151:5 | 39:15 40:18 | 151:8 153:3 |
| **testify** 147:4 | 101:2,4 | **third** 75:7,9 | 41:6,8 45:17 | 154:1 155:9 |
| **testifying** | 109:16,18 | 83:5 95:3,7 | 46:3,4,21 | **told** 30:18 |
| 19:22 | 112:16 | 97:12 | 48:10 51:17 | 42:16 43:18 |
| **testimony** 7:13 | 113:19 | **thirty** 102:13 | 52:10,18,21 | 49:1,3 66:10 |
| 8:14 10:14 | 114:20 | **thirty-five** 74:7 | 54:17 57:22 | 68:5,12 71:20 |
| 18:2 110:15 | 126:10,23 | 102:20 | 58:9 61:10 | 71:22 72:1 |
| 110:17,18 | 130:18 | **Thomas** 4:4,17 | 63:16 64:12 | 78:11 85:8 |
| 111:10 | 135:23 144:2 | 24:9 57:9,14 | 67:5,14 69:16 | 100:1,3 111:4 |
| 113:23 114:4 | 144:12,22 | 88:16 | 70:14 72:23 | 111:8 123:8 |
| 114:6 117:12 | 147:20 | **Thompson** | 73:14 79:9 | 125:16,19 |
| 119:12 121:2 | 151:22 | 29:7 | 83:22 94:11 | 134:11 135:5 |
| **Thames** 1:22 | 153:10 | **thought** 41:2 | 96:3,5 97:16 | 142:17 143:1 |
| 5:1 157:20 | **think** 6:13 | 84:13 100:7 | 101:23 105:9 | 145:23 146:3 |
| **thank** 27:3 | 10:13,21 | 119:7 120:6 | 109:10 | 146:8 147:19 |
| 52:10 112:18 | 14:18 30:12 | 122:15 | 114:11 119:3 | 147:20 |
| 147:23 | 37:19 43:16 | 125:12 | 125:22 | **Tom** 57:8 |
| 154:14,15 | 44:11 46:2 | 131:19 | 135:17 146:3 | 59:13 88:9 |
| **thanking** 53:7 | 47:11 60:8,10 | 143:20 | 146:7,19 | **tones** 43:8 |
| **Thanks** 156:14 | 60:12 76:21 | **thousand** | 150:5,6,7,10 | **tools** 72:2 |
| **theirs** 96:1 | 76:22,23 | 54:11 74:2,7 | 150:16 156:8 | 73:15 |
| **Theresa** 26:5 | 86:21 87:2,9 | 74:14 102:21 | **times** 6:11 | **top** 10:12,23 |
| **thereto** 2:17 | 87:22 92:13 | 118:19 | 21:15 22:12 | 39:6 73:6,6 |
| 157:9 | 92:18 93:8 | **three** 23:17 | 51:10,12 81:4 | 118:15 121:4 |
| **thing** 14:4 20:8 | 94:10,13 | 25:11 27:14 | 86:4 119:16 | **topic** 70:6 |
| 20:13 42:18 | 103:5 107:7 | 27:16,17 | 144:1 150:18 | 110:12 117:2 |
| 49:2,4 52:11 | 108:14 | 32:18 35:16 | 153:9 | **touch** 55:20 |
| 53:2 59:20 | 109:19 117:3 | 49:20,21 | **tired** 41:6 | **touched** 48:2 |

# FREEDOM COURT REPORTING

Page 179

| | | | | |
|---|---|---|---|---|
| town 94:5 | 99:19 151:9 | typewriting | University | view 65:4 |
| track 49:22 | 152:2 | 157:9 | 35:15 | visit 54:7 |
| trailer 29:3,12 | trying 16:22 | typically 60:17 | unquote 41:4 | visited 54:10 |
| training 54:13 | 21:6 26:9 | 74:22 | 47:16 | visiting 13:6 |
| 56:21 57:1 | 32:15 47:7,8 | | untruthful | visually 49:23 |
| transcript | 59:18 68:11 | **U** | 12:6 144:11 | Vogelgesang |
| 10:19,20 11:3 | 80:7 85:2,17 | U 1:17 | 144:15 | 10:1,22 11:22 |
| 11:3 12:4,7 | 86:14,18 | uh-huh 7:20 | 145:12 | 28:5 48:4,6 |
| 18:6 110:6 | 103:2 104:13 | 110:9 148:10 | update 79:16 | 97:18 122:1 |
| 112:2 157:11 | 106:18,20 | uh-uh 7:20 | 115:4 | 138:11 |
| transcripts | 128:20 129:5 | unavailable | updating 79:11 | 139:16 |
| 9:17,22 10:3 | 151:1 | 147:4 | upper 78:15 | 150:14 |
| 10:5,7,10,14 | turmoil 151:22 | unaware | upset 48:23 | 153:11 |
| 10:23 11:6,23 | 155:10 | 111:16 | 49:1,5 | voice 43:11 |
| 127:15 | turn 58:4 | uncle 24:23 | use 42:19 | volume 43:10 |
| transition | turned 49:11 | 25:7 | 71:23 105:6 | voluntarily |
| 135:8 | 97:23 133:21 | uncles 24:12 | 136:3 | 30:2 |
| travel 34:16 | 134:4 | uncomfortable | user 63:4 | VS 1:9 |
| treated 154:19 | turning 99:1 | 98:21 144:13 | users 54:15 | |
| trend 74:1,4 | twelve 116:13 | 145:2 | 55:16 | **W** |
| trial 2:15 | twenty 49:8 | understand | Usual 5:14 | waived 2:4,20 |
| 30:23 31:7,9 | twice 21:16,17 | 7:8,12 8:1 | usually 48:11 | walk 106:19 |
| 142:21 | 21:22 | 9:9 28:8 44:3 | | 136:18 |
| 146:15 147:4 | two 11:5 12:21 | 60:5 104:14 | **V** | walked 86:6 |
| tried 50:16 | 23:3 25:13,19 | understanding | vacation 88:10 | 132:9 |
| 62:17 74:23 | 26:4,11 27:12 | 96:2 114:8 | 88:10 134:6,9 | walking |
| 136:17 151:7 | 30:22 32:1,18 | understood 8:9 | 134:13 | 134:21 |
| 151:18 | 34:13 45:3 | 17:3 57:17 | valid 104:3 | wall 139:18 |
| trip 16:19 17:5 | 46:1,19 51:15 | undocument... | value 122:14 | want 53:19 |
| 95:16 114:18 | 51:18 56:17 | 112:23 | variety 140:5 | 56:16 60:22 |
| trips 95:16 | 66:19 73:2 | unethical | various 13:7 | 78:9 79:23 |
| troubles 13:21 | 81:14 92:5 | 100:8 105:18 | 32:3 96:15 | 80:1 103:18 |
| TROUTMAN | 97:9 102:4 | 129:16,21 | vendors 59:22 | 106:21 113:3 |
| 4:5 | 103:16 | 133:17 | venting 86:16 | 133:8 151:20 |
| Troy 29:12 | 106:23 | 136:10,21 | verbal 111:18 | wanted 60:9 |
| 32:20,21 | 118:19 | 137:3 143:21 | 112:12 | 70:9 85:9 |
| 35:15 36:7,8 | 127:21 | 144:10,15 | verbalize 7:19 | 88:12 100:9 |
| true 157:11 | 128:23 | 151:16 | verbatim 89:8 | 124:4,23 |
| truth 9:1,4 | 130:21 | unfortunately | version 103:4 | 131:23 135:7 |
| truthful | 134:10 135:8 | 28:7 37:5 | versions | 144:20,21 |
| 147:12,16 | 154:10,11 | 134:23 | 148:19 | 149:17 156:5 |
| truthfulness | type 42:18 | 136:18 | vice 39:21 | wasn't 15:2 |
| 140:7 | 92:6 100:15 | United 1:1 | victim 151:11 | 31:7 48:5 |
| try 43:8 84:11 | 118:18 | 32:2 | 151:15 | 60:17 63:12 |

# FREEDOM COURT REPORTING

71:22 79:21
94:6,9 109:6
114:13
118:10 139:3
way 18:17
36:11 41:1
47:4 49:21
50:21 52:17
57:17 80:6
85:8,12 96:10
103:15
122:11 128:8
134:15
157:16
Wayne 28:22
39:21
web 18:19,23
63:23 64:18
65:1,4,8,8,15
65:20 66:5
67:21 69:8
71:14,17 84:9
87:7 104:16
105:2,15
107:2,6 120:2
Web-X 56:5
week 13:4
34:20 45:3
46:13 49:11
73:2 75:7,9
75:20 85:10
88:16 92:8
114:16 116:1
125:7 127:19
127:19 134:1
134:6,7
146:16 147:5
147:9 154:10
154:10
weekend 47:12
154:5
weeks 64:12
133:18
134:10 135:9

welcome
146:11
156:18
well-paying
155:11
went 16:18
17:4 30:10
31:16,20 32:2
38:19 47:2
54:9,12 64:8
114:17
134:11
135:21 149:9
152:17
weren't 47:18
101:22
114:13
144:19
we'll 50:7
85:12 100:21
134:17 147:9
148:3
we're 42:17
50:6,7 77:13
81:6,6 97:1
122:11
128:17
136:18 151:8
154:6
we've 7:22
15:6 16:5
18:3 53:10
80:5 101:4
103:1 106:16
111:10 122:3
125:17
127:15
137:15 143:3
143:22
153:11,23
whatsoever
48:23 140:9
wife 20:23
21:18,19,19

25:23 26:22
wife's 28:13
Williford 28:3
150:12,22
willing 60:12
Wilson 38:14
wind 124:7
winter 36:11
witness 2:4 5:6
31:9 58:23
77:7 96:22
131:7 138:7
146:11
154:15
156:18
157:12
witnessed 48:6
witnesses 45:6
115:20
woman 21:22
word 71:18,23
105:7 123:19
wording 63:1
63:17
words 68:8
work 31:14,18
32:9 33:1
34:15 38:11
47:7,8,18,22
49:10 54:1
57:8 67:16
84:8,20 97:21
100:23 118:3
132:10
139:15
workday 46:17
worked 13:7
16:10 31:23
32:7,10,14
33:7,11 34:9
41:1,20 46:19
51:8 55:2,6
56:10,13,15
57:3 86:17

95:15 102:12
116:3 128:5
152:11
working 32:19
32:22 38:15
40:22 45:17
46:3 49:22
63:6 77:3
85:10,16
86:14 113:5
133:19
works 150:12
worth 35:17
74:2,14 97:10
103:16 129:1
worthy 155:2
wouldn't 43:3
107:16
110:23
115:18 134:8
wound 40:9
write 46:15
50:10 113:12
writings 121:8
written 49:19
52:9 111:18
wrong 92:13
103:6 130:14
wrote 53:6

**Y**

Yarborough
29:15,16
yeah 5:16 16:5
24:15 25:16
42:22 44:23
48:14 50:6
53:12 78:6
102:10
122:12 127:5
134:20
135:21 136:6
150:11,15
152:6

year 12:22
23:4,11 30:6
32:23 36:9
38:7,10 54:18
99:11 101:13
102:21
152:16 155:3
156:12
yearly 112:15
years 12:21
23:3 32:1,3
32:12 33:1
35:16,23
37:19,21
40:21 51:9
61:19 77:3
84:8 86:18
96:13
York 118:14
y'all 38:4 86:9
86:11

_____

**Z**

Zach 10:1,22
11:22 28:4
48:4,5 97:18
98:6,7,19
99:5,12,14,16
100:13 101:5
122:1,18
138:11
139:16
150:13
153:11
Zach's 11:9

_____

**$**

$74.95 105:11
105:14 107:2
109:9 130:12

_____

**1**

1 3:14 19:11,15
19:17 62:11
66:17 68:22

# FREEDOM COURT REPORTING

Page 181

145:17 148:9
**1st** 71:1,6
  88:18
**10th** 66:20
  67:11 75:21
  89:19 90:12
  90:14 91:20
  91:23 92:12
  92:15
**100** 4:13
**11th** 67:3 69:6
  154:6
**1137** 27:5
**12th** 66:20
  67:4,8 69:6
**14** 1:15 2:1
**146** 3:6
**148** 3:7
**15th** 67:11
**154** 3:8
**16th** 150:3
**1650** 1:23
**17th** 34:10
**1849** 20:20
**19** 3:14
**1990** 23:5
**1992** 23:7,8
**1993** 36:4
**1995** 36:5
**1999** 33:4 36:9
  54:9 59:7
  61:7 75:4

_____

**2**
**2:05-cv-1088...**
  1:5
**2000** 6:13
  44:14,15 52:4
  52:11,14 54:9
  57:2 58:7
**2001** 6:13
  44:15 55:7
**2002** 55:7
**2003** 14:22,23

15:3 16:12,15
  17:13,18
**2004** 102:9
**2005** 30:6 33:5
  36:11,12 38:3
  45:1,2 58:3,8
  58:19 64:7
  66:13 74:5
  121:18
  148:11,15
  155:22
**2006** 1:15 2:1
  30:13 99:10
  146:16 147:3
  147:5,12,21
**201** 1:22
**25th** 88:4
  89:17 91:19
  91:20 92:11
  148:9,15
**27** 147:11,20

_____

**3**
**3rd** 68:20
  70:22 71:8,10
  74:20 131:16
**3:40** 2:1
**30308** 4:8
**31st** 95:12
  133:13
**310** 28:23
**3203** 37:12
**35209** 4:14
**36109** 27:6

_____

**4**
**4th** 68:20 71:9
  71:10 74:20
  88:11 131:16
  132:7 146:21
  147:3
**4:00** 48:11
**4:30** 59:1
**4:36** 59:2

_____

**5**
**5** 3:5 47:13
**5th** 131:16
  132:7
**5:00** 47:10
**5:30** 47:13
**5:35** 131:8
**5:45** 131:9
**5200** 4:7

_____

**6**
**6** 146:16 147:5
**600** 4:6

_____

**7**
**7** 30:10
**7th** 4:13
**7-25-05** 19:20

_____

**9**
**92** 23:13,14
**93** 23:13
**99** 55:6

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**