729 So.2d 336, Ex parte Amoco Fabrics and Fiber Co., (Ala. 1998)                                       Page 1

\*336 729 So.2d 336

14 IER Cases 1163

Supreme Court of Alabama.

**Ex parte AMOCO FABRICS AND FIBERS COMPANY.**
(In re Danny STOKES and Phillip Williams
v.
AMOCO FABRICS AND FIBERS COMPANY, INC.).

1970497.

Dec. 18, 1998.

Rehearing Denied Jan. 15, 1999.

Two former industrial mechanics sued fabric manufacturing company for breach of employment contract. The Circuit Court, Covington County, No. CV-92-253, Jerry E. Stokes, J., granted summary judgment for manufacturer, and mechanics appealed. The Court of Civil Appeals, 729 So.2d 330, reversed and remanded, and manufacturer appealed. The Supreme Court, Lyons, J., held: (1) provisions contained in employee handbook pertaining to layoff/ reduction in workforce created unilateral contract which modified employees' at-will status, and (2) employer's disclaimer in its employee manuals did not alter terms of implied employment contract arising out of use of employee manual.

Affirmed.

Hooper, C.J., and Maddox, J., dissented and filed opinions.

Cook and See, JJ., dissented.

West Headnotes

[1]   Evidence ⚖597

157 ----
    157XIV Weight and Sufficiency
    157k597 Sufficiency to Support Verdict or Finding.

Evidence is "substantial" if it is of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.

[2]   Appeal and Error ⚖934(1)

30 ----
    30XVI Review
    30XVI(G) Presumptions
    30k934 Judgment
    30k934(1) In General.

Appellate court reviewing summary judgment must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant.

[3]   Labor and Employment ⚖40(2)

231H ----
    231HI In General
    231Hk37 Term, Duration, and Termination
    231Hk40 Definite or Indefinite Term; Employment At-Will
    231Hk40(2) Termination; Cause or Reason in General.

(Formerly 255k30(1.5) Master and Servant)

When employment is terminable at-will, employee may be discharged for any reason, good or bad, or even for no reason at all.

[4]   Labor and Employment ⚖51

231H ----
    231HI In General
    231Hk49 Manuals, Handbooks, and Policy Statements
    231Hk51 Particular Cases.

(Formerly 255k7 Master and Servant)

Provisions contained in employee handbook, which pertained to layoff/reduction in workforce, and employees continuing their employment after they became generally aware of handbook provisions, created unilateral contract which modified employees' at-will status; handbook specifically stated layoffs would be based on seniority policy, such policy was communicated to employees either by issuance of handbook or otherwise, previous layoffs were based on seniority policy, and employees continued their employment after employer informed them of layoff policy.

[5]   Labor and Employment ⚖50

231H ----

© 2006 Thomson/West. No claim to original U.S. Govt. works.

EXHIBIT "A"

729 So.2d 336, Ex parte Amoco Fabrics and Fiber Co., (Ala. 1998)                          Page 2

    231HI In General
    231Hk49 Manuals, Handbooks, and Policy Statements
    231Hk50 In General.

(Formerly 255k2.1 Master and Servant)

To become a binding promise, the language used in employee handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy.

[6]  Contracts ☞18

95 ----
    95I Requisites and Validity
    95I(B) Parties, Proposals, and Acceptance
    95k18 Making and Communication of Offer.

Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, rather than by their uncommunicated beliefs.

[7]  Labor and Employment ☞51

231H ----
    231HI In General
    231Hk49 Manuals, Handbooks, and Policy Statements
    231Hk51 Particular Cases.

(Formerly 255k7 Master and Servant)

Employer's disclaimer in its employee manuals, which stated that no part of its manuals constituted a binding contract, but which was placed in manuals after employees had accepted employer's layoff policy originally stated in manuals by continuing their employment, did not alter terms of implied employment contract arising out of use of employee manual, as all parties did not mutually assent to manual's modification, and therefore employer could not unilaterally rely on that disclaimer as altering terms of contract.

[8]  Contracts ☞236

95 ----
    95III Modification and Merger
    95k236 Contracts Subject to Modification.

One party cannot unilaterally alter the terms of a contract after the contract has been made; both parties must mutually assent to a modification.

*337 David J. Middlebrooks of Lehr, Middlebrooks, Price & Proctor, P.C., Birmingham, for petitioner.

Truman M. Hobbs, Jr., of Copeland, Franco, Screws & Gill, P.A., Montgomery, for respondents.

LYONS, Justice.

The defendant Amoco Fabrics and Fibers Company ("Amoco") petitioned this Court for a writ of certiorari to review whether the Court of Civil Appeals erred in reversing the summary judgment entered by the trial court in favor of Amoco and against the plaintiffs Danny Stokes and Phillip Williams. See *Stokes v. Amoco Fabrics & Fibers Co.,* 729 So.2d 330 (Ala.Civ.App.1997). We granted review. For the reasons discussed below, we affirm the judgment of the Court of Civil Appeals.

The issue is whether Stokes and Williams produced substantial evidence to support the finding that Amoco's policy-and-procedure manual created an employment contract between its employees Stokes and Williams on the one hand and Amoco on the other that prevented Amoco from "laying off" those employees in any order other than by seniority.

Amoco hired Stokes and Williams to work in its Andalusia Mills facility in 1985 and 1987, respectively. Stokes and Williams say that throughout their employment, until they were laid off, Amoco had operated under what they describe as a general seniority policy. They say that Amoco set out part of this policy in an employee handbook distributed to all Amoco employees. (FN1) Stokes and Williams also maintain that the other part of Amoco's general seniority policy appeared in Amoco's manual of policies and procedures, which contained the following specific policy and procedure for a "Layoff--Reduction in Work Force":

"Policy:

"The Company intends to provide maximum job security for employees with the greatest seniority in the event it becomes necessary to reduce the work force.

"Procedure:

"1. Whenever it is necessary to reduce the number of employees within a job classification the employee within that classification *338 with the

least job seniority will be reduced from that job...."

This "layoff/reduction-in-workforce policy" appeared only in Amoco's policy-and-procedure manual. Amoco's employee handbook did not contain this specific policy. Amoco's policy manual was issued only to supervisors and was not distributed to other Amoco employees.

However, employees were informed of Amoco's general corporate practices and were told that the manual was available for their reference. Furthermore, both Stokes and Williams maintain that Amoco communicated its policies to them and followed both its general seniority policy and the layoff/reduction-in-workforce policy throughout their tenure. They say that their supervisors briefed them on the layoff/reduction-in-workforce policy and told them how it worked. Neither of them actually saw the written policy until June 1992, when Stokes went to the plant's human resources department after hearing rumors of an impending layoff. In response to his question about what kind of seniority would control in a layoff, a human resources supervisor referred him to the layoff/reduction-in-workforce policy in the manual.

On September 25, 1992, Amoco sold its Andalusia facility to Shaw Industries. When the sale became effective at midnight on the night of September 25, all employment with Amoco at the plant was terminated, with the exception of that of a few managers who were transferred to other Amoco facilities. Stokes and Williams contend that, on the afternoon of September 25, before the sale became effective, they were part of a group of seven industrial mechanics whose positions were terminated in an effort to reduce the industrial-mechanic department to meet Shaw's requirements. This decision--made by Cary Baker, the Amoco plant manager, who became a Shaw employee when the sale became effective--did not take into account the length of service of the employees. Stokes and Williams were offered lower-paying, entry-level positions with Shaw as "creel hands," but they refused these job offers.

Stokes and Williams then sued Amoco, alleging in part that Amoco's layoff/reduction-in-workforce policy formed the basis of an employment contract and that Amoco had breached that contract by terminating them without regard to their seniority. (FN2) In entering the summary judgment for Amoco, the trial court stated, in pertinent part:

"The court notes, in particular, its opinion that there is no genuine dispute as to:

"(1) The fact that [Stokes and Williams] were at-will employees. [Stokes and Williams] or Amoco [was] free to terminate the employment agreement at any time.

"(2) The fact that Amoco sold the Andalusia Mills facility, effective midnight September 25, 1992.

"(3) The fact that [Baker] became an employee of Shaw Industries in a managerial capacity and was acting as such in determining who would be offered jobs by Shaw Industries.

"....

"There is evidence from which a jury might conclude that the decision made on behalf of Shaw Industries to ignore [the] seniority [of Stokes and Williams] at Amoco and [to] offer them employment as entry-level creel hands rather than [as] mechanics was arbitrary or unfair. Such conduct, however, does not rise to the level of an actionable, legal wrong."

In reversing the summary judgment, the Court of Civil Appeals held that the evidence could have supported a finding that Stokes and Williams were not at-will employees, and it concluded that a genuine issue of material fact existed as to whether the industrial mechanics were terminated by Amoco, in order to meet Shaw's demand for a reduction in the maintenance department.

*Standard for Review of a Summary Judgment*

[1] The principles of law applicable to the granting of a summary-judgment motion are well settled. To grant such a motion, the judge must determine that no genuine issue of material fact exists and that the movant is *339 entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions have been satisfied, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. *Bass v. SouthTrust Bank of Baldwin County*, 538 So.2d 794, 797-98 (Ala.1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *West v. Founders Life Assurance Co. of Florida*, 547 So.2d

© 2006 Thomson/West. No claim to original U.S. Govt. works.

729 So.2d 336, Ex parte Amoco Fabrics and Fiber Co., (Ala. 1998)                                                                                              Page 4

870, 871 (Ala.1989).

[2] In reviewing a summary judgment, we apply the same standards as did the trial court. *Ex parte Lumpkin,* 702 So.2d 462, 465 (Ala.1997). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. *Hanners v. Balfour Guthrie, Inc.,* 564 So.2d 412, 413 (Ala.1990).

*Analysis*

[3] The bedrock principle of Alabama employment law is that, in the absence of a contract providing otherwise, employment in this state is at-will, terminable at the will of either party. Under this doctrine, an employee may be discharged for any reason, good or bad, or even for no reason at all. See *Bell v. South Central Bell,* 564 So.2d 46 (Ala.1990). While at-will employment is indeed the traditional model, Alabama has, in the relatively recent past, imposed certain limits on an employer's right to discharge an employee. Among those limitations is an exception, recognized by this Court, for implied contracts arising out of the use of an employee handbook. In *Hoffman-La Roche, Inc. v. Campbell,* 512 So.2d 725 (Ala.1987), Alabama adopted the position, taken by a number of other jurisdictions, that the provisions of an employee handbook can become a binding unilateral contract, thereby altering an employment relationship's at-will status. Modeled on the leading case of *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983), *Hoffman-La Roche* represented a departure from the at-will employment doctrine, but it also recognized that not all employer communications would justify such treatment. Rather, only those employer communications meeting the traditional requirements for the formation of a unilateral contract--an offer, communication, acceptance, and consideration--will bind the parties.

[4][5][6] We must begin the *Hoffman-La Roche* analysis by determining whether the evidence in this case would support a finding that Amoco used the seniority provision in its manual as an offer of a unilateral contract fixing a term or condition of employment. "[To] become a binding promise, the language used in the handbook [i.e., the 'manual'] must be specific enough to constitute an actual offer rather than a mere general statement of policy." *Hoffman-La Roche,* 512 So.2d at 734, (citing *Pine River,* 333 N.W.2d at 626). Not only must we construe the language of the provision to be definite enough to form an offer, we must also determine whether the provision could have been meant to be an offer for a unilateral contract. "[W]hether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, rather than by their uncommunicated beliefs." *Id.;* see, also, *Amoco Fabrics & Fibers Co. v. Hilson,* 669 So.2d 832, 835 (Ala.1995); *Mayo v. Andress,* 373 So.2d 620 (Ala.1979). If the provision in the manual meets the contractual requirements for an offer, then we must determine whether the evidence indicates that the offer was communicated to the employees, either by issuance of the manual or otherwise. *Id.* Finally, we must determine whether the evidence indicates that the employees accepted the offer by continuing their employment after becoming aware of the offer. *Id.* By continuing their employment, the employees would supply the remaining elements of a unilateral contract, acceptance, and consideration. *Id.*

Stokes and Williams presented substantial evidence that could be taken to establish all elements of the *Hoffman-La Roche* test. First, they produced substantial evidence indicating that the language contained in the handbook and the policy-and-procedure manual is specific enough to constitute an offer. *340 The layoff/reduction-in-workforce policy specifically states that "[w]henever it is necessary to reduce the number of employees within a job classification the employee within that classification with the least job seniority will be reduced from that job." Furthermore, Stokes and Williams presented substantial evidence to support a finding that Amoco intended its seniority policy to be an offer. Both of them testified that Amoco communicated the policy to them as a benefit of employment, and Stokes testified that Amoco followed the seniority policy during his employment. This evidence of Amoco's "course of dealings" is exactly the same kind of evidence this Court found sufficient to create an offer in *Hilson,* supra. Accordingly, Stokes and Williams presented substantial evidence indicating that Amoco's manifestations created an offer. (FN3)

Second, Stokes and Williams produced substantial evidence to support a finding that Amoco communicated the offer to them either by the issuance of a handbook "or otherwise." While it is undisputed that Amoco did not distribute the policy-and-procedure manual to Stokes and Williams, they both testified in their depositions that their supervisors informed them of the layoff/reduction-in-workforce policy. Stokes also stated that Amoco had followed

© 2006 Thomson/West. No claim to original U.S. Govt. works.

the policy up until his termination. He said that "[w]hen Amoco Fabrics and Fibers, Andalusia Mills first came to Andalusia, things just didn't work out right and they had to lay off and it was by seniority." Again, this "course of dealings" evidence is exactly the same kind of evidence to which this Court gave weight in finding a unilateral contract in *Hilson,* supra.

Finally, it is undisputed that Stokes and Williams continued their employment after Amoco informed them of the layoff/reduction-in-workforce policy. They both worked until 1992, when they were fired, long after they had learned of the policy. Therefore, Stokes and Williams presented substantial evidence from which the factfinder could find all three elements of the *Hoffman-La Roche* test, and we agree with the Court of Civil Appeals that the summary judgment was improper insofar at it was based on a conclusion that the evidence would not support a finding that Stokes and Williams had an employment contract with Amoco.

[7][8] Amoco, however, argues that it had placed in its manuals a disclaimer stating that no part of its manuals constituted a binding contract, and it argues that, because of this disclaimer, the layoff policy could not be used to support a finding of a contract. This Court generally gives effect to disclaimers such as this one. See, e.g., *Abney v. Baptist Medical Centers,* 597 So.2d 682 (Ala.1992). However, it is undisputed that Amoco's disclaimer had no effect until October 1, 1990; this was several years *after* the time at which the evidence indicates that Amoco had communicated the layoff policy to Stokes and Williams and that they had accepted the policy by continuing their employment. (FN4) One party cannot unilaterally alter the terms of a contract after the contract has been made. See *Kinmon v. J.P. King Auction Co.,* 290 Ala. 323, 276 So.2d 569 (1973). Both parties must mutually assent to a modification. *Id.,* 290 Ala. at 325, 276 So.2d at 570. Because Amoco produced no evidence indicating that Stokes and Williams assented to the terms of the disclaimer, Amoco could not unilaterally rely on that disclaimer as altering the terms of the contract. Therefore, the original terms of the contract must be given effect.

*341 Furthermore, this Court held in *Hilson,* supra, that Amoco could not unilaterally "revoke [its] vacation pay policy" contained in its handbook "once the employees had performed." 669 So.2d at 835. Because it is undisputed that both Stokes and Williams continued their employment after the date at which the evidence suggests Amoco had made the policy known to them, Amoco could not, by inserting a disclaimer after the fact, revoke the layoff policy that had formed a binding contract between the parties. Also, in *Hilson,* it was clear that Amoco, through its course of dealing with its employees, had followed its vacation-pay policy. As noted above, Stokes testified that Amoco had followed its layoff policy before. Stokes and Williams's evidence would support a finding of the elements necessary for the layoff policy to constitute a contract; such a contract should be enforced.

Amoco does not argue that the Court of Civil Appeals erred in concluding that a question of fact existed as to whether Amoco fired Stokes and Williams on September 25, 1992. Thus, we need not address that aspect of the Court of Civil Appeals' opinion.

The judgment of the Court of Civil Appeals is affirmed.

AFFIRMED.

ALMON, SHORES, HOUSTON, and KENNEDY, JJ., concur.

HOOPER, C.J., and MADDOX, COOK, and SEE, JJ., dissent.

HOOPER, Chief Justice (dissenting).

The purpose of this Court is not to undo the law that businesses have relied upon for years in preparing their contracts. A gradual erosion of a solid legal principle is different from a revolutionary overthrow in at least one key respect--the time it takes to accomplish the result. Judge Thompson's dissent predicts the alarming result this Court's opinion will have in the marketplace:

> "A finding that a policies and procedures manual extends a unilateral offer of a contract would effectively eradicate the concept of at-will employment for all companies large enough to require internal operating policies and procedures. Indeed, under such a broad interpretation of *Hoffman-La Roche,* every statement made by a supervisor to an employee regarding company policy could be construed as a unilateral offer of a contract."

*Stokes v. Amoco Fabrics & Fibers Co.,* 729 So.2d 330, 335 (Ala.Civ.App.1997) (Thompson, J., dissenting). I believe Judge Thompson's prediction is

© 2006 Thomson/West. No claim to original U.S. Govt. works.

accurate. It highlights the power of this Court to undermine a principle of contract law that is based on solid precedent. Perhaps there is another respect in which a gradual erosion of law differs from a revolutionary overthrow. It is more difficult for the people to perceive that the law has been altered if a court allows it to be slowly eroded.

I find the dispositive question in this case to be whether, based on the evidence, as it is stated in the main opinion, a factfinder could find that Amoco made a contract offer to its employees. We must evaluate the external and objective actions of Amoco to determine whether an employee reasonably could have believed that Amoco offered the employee the layoff/reduction-in-workforce policy and intended to be bound by its terms. It is undisputed that Amoco made its policy manual available to its employees, even though it was only distributed to supervisors. As illustrated by Stokes's testimony regarding his own experience, specific provisions of the policy manual were communicated to employees upon inquiry. However, I do not agree that these facts would be enough to create a reasonable belief that Amoco had offered the layoff/reduction-in-workforce policy to its employees.

Rather, I find that a reasonable employee would not have construed Amoco's activities as an offer for a unilateral contract. The evidence showed that Amoco did not actively disseminate its layoff/reduction-in-workforce policy, as contained in its policy manual, but disclosed it only sporadically in response to employees' questions. The fact that Amoco did not distribute its policy manual to all hourly employees severely undercuts the notion that Amoco intended to be bound by its contents. See, e.g. *Kuta v. Joint Dist. No. *342 50(J),* 799 P.2d 379 (Colo.1990) To view preceding link please click here (limited distribution of handbook showed there was no implied contract); *Lakeside v. Freightliner Corp.,* 612 F.Supp. 10 (D.Or.1984) (manual that was accessible to workers but that was distributed only to managers did not form an employment contract). Amoco did, however, distribute personal copies of its employee handbook to its employees as general guides to Amoco's policies. Yet, these handbooks did not contain the layoff/reduction-in-workforce policy at issue here. The omission of that specific policy should have alerted Stokes and Williams that Amoco was not promising them the protection of seniority in the event of a layoff. To show an offer of a company policy, more is required than has been shown here.

It is important to note that one of the cases underlying the decision in *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983), the basis for our analysis in this area--(see *Hoffman-La Roche, Inc. v. Campbell,* 512 So.2d 725 (Ala.1987))--specifically held that a personnel policy manual that was not distributed to employees could not become a part of the employment contract. See *Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 117 N.W.2d 213 (1962). The *Cederstrand* court noted that the plaintiff was the employer's personnel director and was certainly aware of the contents of the manual, but it wrote:

> "The fact that the dismissal provision was not included in the Employee's Manual, given to new employees explaining important personnel regulations, indicates that plaintiff did not consider it as a provision of her employment relationship.... The fact that it was not important enough to be included in the employee's handbook or employee's bulletins indicates forcefully that during its entire existence it was not regarded as a contractual offer to all employees, but merely as a policy guide for supervisory personnel."

*Cederstrand,* 263 Minn. at 534, 117 N.W.2d at 222. This analysis is especially analogous to our present case, considering the fact that Amoco did not disseminate the layoff policy and did not include it in the employee handbook.

In addition, the following disclaimer, printed in bold type and appearing in a separately outlined box at the beginning of the policy manual, clearly showed that Amoco did not intend to extend the policy manual as an offer for a unilateral contract:

> "Neither the policies contained herein nor any other communications made by a management representative, either written or oral, made at the time of hire or during the course of employment are intended in any way to create an employment contract or to alter the at-will status of employees."

This statement in the manual shows that today's main opinion is not one that follows the precedent of *Hoffman-La Roche;* it breaks the mold and creates an entirely new method for courts to expand their interference and regulation of legitimate businesses. When Alabama allowed employee handbooks to abrogate the at-will employment doctrine, in *Hoffman-La Roche,* this Court specifically stated: "[I]f the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so

state in the handbook." 512 So.2d at 734. This Court has repeatedly given effect to similar disclaimers. See *Dykes v. Lane Trucking, Inc.,* 652 So.2d 248 (Ala.1994); *Abney v. Baptist Medical Centers,* 597 So.2d 682 (Ala.1992); *Hanson v. New Technology, Inc.,* 594 So.2d 96 (Ala.1992); *Clark v. America's First Credit Union,* 585 So.2d 1367 (Ala.1991); *Stinson v. American Sterilizer Co.,* 570 So.2d 618 (Ala.1990).

The plaintiffs argue that this disclaimer should not be given effect because it was not directly communicated to them. However, the disclaimer was available to Amoco's employees on the same terms as the policies it disclaimed. It was prominently displayed in the manual and, if the employees had read it, it would have informed them that the policy manual was not intended as an offer of a unilateral contract. This displays the self-contradictory nature of the main opinion. Nondissemination of the policy obligates the employer, but publication of a disclaimer is ineffective. Such reasoning guts the ameliorative provision of *Hoffman-La Roche* that *343 seems to allow the employer to avoid having its manual interpreted as a contract.

Finally, I note that Stokes and Williams argue that the company's layoff policy had been communicated to them on numerous occasions before Stokes saw the policy in the human resources office. I cannot hold that they offered substantial evidence indicating that Amoco informed them of the specific layoff policy. Phillip Williams testified that he never saw the layoff policy until after his employment with Amoco had ended. The company had informed Williams of its general seniority policy, but not the layoff policy:

"Q.: Have you ever had [the layoff policy] reported to you verbally by anyone?

"A.: Yes, sir.

"Q.: By whom?

"A.: By every supervisor I worked with starting with Wyman Helms....

"Q.: How is the policy characterized verbally?

"A.: Well, you are told--*well, I'm not real sure about the part about the layoff part but you are told that any of the jobs it's always by job seniority, then department seniority and then plant seniority as far as job postings. And practically all plant business is carried on that way is what I was told."*

As Williams's testimony indicates, Amoco communicated to its employees its general seniority policy. However, I find no substantial evidence indicating that the specific layoff/reduction-in-workforce policy was orally communicated to Amoco employees by Amoco supervisors. Stokes's testimony further illustrates the lack of communication by Amoco regarding the specific layoff/reduction-in-workforce policy:

"Q.: Had somebody told you about [the layoff policy] before that?

"A.: Yes, sir.

"Q.: Who had done that?

"A.: Anytime--*not particularly the layoff policy* but anytime you apply for a job that's posted on the board or anything as far as promotion goes, whether you receive it or not, you are given that job or whatever by seniority and it's explained to you at that time. And I had applied for several jobs and had been awarded several promotions because of seniority and my abilities. So it's an ongoing thing. It's not I just saw it today for the first time. It was explained to me when I was hired in '85 that everything that was done there was done basically by seniority.

"Q.: That is promotions would be?

"A.: Promotions, layoffs."

Stokes and Williams rely on these statements as evidence indicating that Amoco communicated the layoff policy to its employees. I find that, while these statements clearly show that Amoco communicated its general seniority policy that was to be followed in most employment decisions, they do not constitute substantial evidence from which one could find that Amoco made to the employees an offer of a unilateral contract.

Stokes and Williams presented evidence of only general statements of policy on Amoco's part, general statements that do not rise to the level of an offer for a unilateral contract. If these statements are held to constitute such an offer, then every company that has standard operating policies could be considered to have offered a unilateral contract to its employees. This evidence would not support a finding of an offer on Amoco's part; therefore, Stokes and Williams had

© 2006 Thomson/West. No claim to original U.S. Govt. works.

no contract abrogating their at-will status. The trial court properly entered the summary judgment for the employer, and the Court of Civil Appeals erred in reversing it. Therefore, I respectfully dissent.

MADDOX, Justice (dissenting).

I must respectfully dissent. As a necessary step in reaching its conclusion, the majority relies upon this Court's decision in *Hoffman-La Roche, Inc. v. Campbell,* 512 So.2d 725 (Ala.1987). I dissented in *Hoffman-La Roche,* because I did not believe that the provisions stated in a personnel handbook constituted a contract. I must dissent today based on the same reasons. In short, I do not believe *Hoffman-La Roche* was correctly decided; therefore, I do not believe this Court should continue to follow it.

*344. I hasten to point out that I am aware of the argument that the *stare decisis* doctrine weighs in favor of following *Hoffman-La Roche.* While I would agree in the abstract that the *stare decisis* doctrine must be accorded great deference, I would note that, as I wrote in my *Hoffman-La Roche* dissent, the *stare decisis* doctrine "should never be used to perpetuate error." 512 So.2d at 752. In *Hoffman-La Roche,* the Court changed Alabama's employment-at-will doctrine and, therefore, usurped what I believe was rightfully the prerogative of the Legislature. I wrote then, and I still believe, "that the legislature is the appropriate body of government to address the policy considerations arising out of employer-employee relationships." *Id.*

Accordingly, I respectfully dissent.

(FN1.) The "seniority" section of Amoco's employee handbook stated:

"After successful completion of the sixty-day probationary period, you begin to accrue three types of seniority, retroactive to your first day of work.

"1. Company Seniority--This is the length of continuous service with Amoco Fabrics and Fibers Company. Company seniority will determine vacation pay, service awards, retirement benefits, and transfer right to a new plant.

"2. Departmental Seniority--Length of continuous service in a department of a specific plant. If you receive a transfer across departmental lines, you will retain your departmental seniority in the previous department six months.

"3. Job Seniority--Length of continuous service within a specific job classification. If you are promoted or transferred to another job classification, you will retain your job seniority in the previous job classification for six months."

(FN2.) Stokes and Williams also alleged fraud; the trial court entered a summary judgment on that claim as well. However, Stokes and Williams did not appeal that aspect of the judgment.

(FN3.) The Chief Justice's dissenting opinion states "that Amoco did not actively disseminate its layoff/reduction-in-workforce policy, as contained in its policy manual, but disclosed it only sporadically in response to employees' questions," and therefore, the dissent states, the policy was not an offer. 729 So.2d at 341. However, that dissenting opinion does not mention the fact that the evidence suggested that Stokes and Williams's supervisors often communicated the policy to them. It also does not recognize that when Stokes and Williams began their employment, Amoco told them that all layoffs were done according to seniority. Finally, it fails even to acknowledge the most compelling evidence, i.e., that Amoco followed the layoff/reduction-in-workforce policy during Stokes and Williams's tenure, at least until it terminated them.

(FN4.) The Chief Justice would give effect to this disclaimer, but his dissenting opinion ignores the fact that Amoco placed the disclaimer in the manual *after* the time at which Stokes and Williams could be found to have accepted Amoco's offer.

© 2006 Thomson/West. No claim to original U.S. Govt. works.