**IN UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CONFERENCE AMERICA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.  2:05-cv-01088-WKW** |
| | ) | **[wo]** |
| **CONEXANT SYSTEMS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on a Motion for Summary Judgment (Doc. # 20) filed by

Defendant Conexant Systems, Inc. ("Conexant"), and a Motion for Summary Judgment (Doc. # 21)

filed by Plaintiff Conference America, Inc. ("Conference America").  The parties stipulated in open

court that there are no material facts in dispute.  For reasons to be discussed,  Conexant's summary

judgment motion is due to be denied, and Conference America's summary judgment motion is due

to be granted.

## I.  FACTS AND PROCEDURAL HISTORY

*A.*     *Background*

Conference America is an Alabama corporation that provides a variety of telephonic and

internet-based conference and communications services for companies and individuals.  In short, it

arranges and manages conference calls, among other services.  "Under normal circumstances, a

customer wishing to use Conference America's services simply contacts Conference America, uses

the services, and pays for them according to the website terms and prices."  (Conf. Am.'s Br. at 3.)

For high-volume users of teleconferencing services, however, Conference America will discount its

standard pricing through price protection agreements, which offer reduced rates.  (Compl. ¶ 16.)

Because Conexant was one of Conference America's high volume, preferred customers, the parties entered into price protection agreements that allowed Conexant to purchase Conference America's services at below-standard rates.

Conexant is a Delaware corporation with its principal place of business in Newport Beach, California. Conexant provides "semiconductor solutions for broadband communications, enterprise networks and the digital home" as well as "a complete line of central office (CO) solutions, which are utilized by service providers worldwide to deliver broadband data, voice, and video over copper telephone lines." (Compl. ¶ 5.) Suffice it to say that Conexant officers, managers, and other employees around the world participate in a large volume of conference calls. Under the relevant agreements, Conference America administered Conexant's conference calls, which were connected through Conference America's operators and bridging facilities in Montgomery, Alabama, irrespective of the physical location of the call participants. Conference America initially trained Conexant personnel in the use of the conferencing system and thereafter provided support and training to new and existing Conexant users. Conexant eventually established 1,778 accounts, referred to as "leader accounts," with Conference America for Conexant's officers, managers, and other employees around the world. (Conf. Am.'s Br. at 4.)

This action stems from a dispute about the fees claimed by Conference America for services rendered to Conexant during an approximate three-week period *after* the termination of a price protection agreement.[1] There is no dispute that the agreement was terminated by Conference America, and Conference America makes no claim under the agreement. The primary thrust of this

---

[1] The parties' August 1, 1999 "Price Protection Agreement" (Compl. Ex. B), amended December 1, 2003 (Compl. Ex. D), will sometimes be referred to as the "agreement." The parties had other agreements that are not directly relevant to the issues between them in this case.

suit is the contest over deactivation fees charged by Conference America for deactivation of Conexant's 1,778 leader accounts as the parties were attempting to disentangle themselves after termination of the agreement. Conexant contends that the terminated agreement governs the dispute. There is also a dispute over charges incurred by Conexant for conferencing services during the same three-week period.

**B.**     *The Written Price Protection Agreement*

A summary of the relevant provisions of the agreement, which is governed by California law (Compl. Ex. D ¶ 12), is necessary for a proper understanding of the facts and the arguments of the parties. Consistent with the 1999 iteration of the agreement, the 2003 version contains a termination clause allowing either party to terminate the agreement, with or without cause, "at any time upon fifteen (15) days notice to the other party pursuant to Section 10 of this Amendment." (*Id*. ¶ 4.) Paragraph 10 provides a mechanism for notice between the parties, including notice by email. (*Id.* ¶ 10.) The agreement also has an integration clause confirming that the agreement and all attachments "contain the entire agreement and understanding concerning the subject matter hereof between the Parties hereto." (*Id.* ¶ 15.) Paragraph 3 states, "During the term of this Agreement . . . Conference America will provide the services described in Attachment A ('Services') at the pricing set forth in Attachment A." (*Id.*¶ 3.) Attachment A contains an unnumbered "Additional Services" provision: "Additional services are available at Conference America's Standard Prices effective at the time services are rendered." (*Id.* Ex. D, Attach. A, at 3.) The parties do not dispute that the contract contains no language directly addressing a fee for deactivation of accounts. Finally, the contract contains a 1.5% late fee provision but not a provision for attorney fees or costs of collection (*Id.*)

3

C.      *The Website Terms and Conditions*

Conference America has provided its website terms and conditions available on-line as of

July 25, 2005.[2]  It begins with the following paragraph:

> READ THESE TERMS AND CONDITIONS CAREFULLY BEFORE
> SUBMITTING YOUR ACCOUNT APPLICATION.  THEY WILL COVER ALL
> OF YOUR USES OF AND PARTICIPATION IN THE SERVICES (EVENTS)
> OFFERED BY CONFERENCE AMERICA. IF YOU DO NOT AGREE TO THESE
> TERMS AND CONDITIONS, YOU MAY NOT ACCESS OR OTHERWISE USE
> THESE EVENTS.  YOUR CLICKING ON THE BUTTON MARKED "I AGREE"
> OR YOUR EXECUTION OF THE ACCOUNT APPLICATION OR CREDIT
> CARD AUTHORIZATION FORM AND AGREEMENT AND YOUR
> CONTINUED USE OF AND PARTICIPATION IN THE EVENTS INDICATES
> YOUR ACKNOWLEDGMENT THAT YOU HAVE READ AND ACCEPTED
> THESE TERMS AND CONDITIONS.

(Compl. Ex. A.)  In paragraph 5, styled "Fees and Expenses," standard pricing is established for

services, including " . . . Activate/Deactivate Maintenance Fee $74.95 per leader account . . . ."  (*Id.*

¶ 5.a.)  The July 25 website terms and conditions also contain a 1.5 %  late fee provision (*Id.* at ¶

5.b.) and an indemnification clause charging damages, costs, and expenses, including legal fees,

arising from or related to "your breach of the Agreement."  (*Id.* at ¶ 9.)

D.      *The Termination Timeline*

Conference America, through its President, Robert Pirnie ("Pirnie"), terminated the

agreement by letter dated June 24, 2005, which Conexant received  on June 25, 2005.  Conference

America included the following language in the termination letter:  "Any services used or requested

by Conexant after termination will be made available only on and subject to Conference America's

---

[2]  This will be referred to as the "July 25 website terms and conditions."  Conexant questions this version of
the website and asserts that prior versions of the website did not contain a deactivation fee provision.  (*See*
Conexant's Mot. to Strike.)  As will be seen, the content of any version prior to July 25, 2005, is irrelevant.
Therefore the court has not considered the archived website records which were the subject of Conexant's motions to
strike (Docs. # 34 and 39.)

standard terms, conditions, and prices effective at the time the services are rendered. Conference America's Services Terms & Conditions is available at www.yourcall.com ." (Compl. Ex. K.) The termination would become effective on July 10, 2005, fifteen days after notice of termination. Apparently, termination was prompted by Conexant's negotiations with Conference America and others for a changed or new conferencing agreement. In an e-mail to Conexant, dated July 7, 2005, Zack Vogelgesang ("Vogelgesang"), an employee of Conference America, confirmed that "there will be absolutely no interruption in services for Conexant. All of your leaders' accounts will remain active and new leader accounts will be established as requested. I'll check on the termination date of the contract but it may take a while." (Compl. Ex. L.) On July 15, 2007, Conexant's Director of Strategic Sourcing, Tom Noonan ("Noonan"), responded to Conference America's termination notice by letter requesting that no new accounts be created for Conexant and "advis[ing]" that Conexant "is canceling all accounts as of Sunday, July 31, 2005[,] and all services for these accounts are to be made inactive/unavailable on that date." (Compl. Ex. M.)

In an e-mail dated July 19, 2005, Conexant's program manager for IT operations, Paul Edge ("Edge"), copied Pirnie on an internal e-mail, stating that Conexant would dispute Conference America's bills "[i]n an effort to . . . understand what the pricing is now and when it was effective." (Compl. Ex. O .) Pirnie, on behalf of Conference America, responded that day by threatening legal action, confirming the termination date, restating that the terms and conditions could be found on the website, and requesting that any questions about terms not stated on the website be submitted in writing. (*Id.*)

On July 20, 2005, Edge e-mailed Conference America "requesting that all Conexant conferencing accounts be disconnected" by July 31, 2005. (Compl. Ex. S.) Pirnie responded via

letter on July 26, 2005: "In view of your instructions to de-activate all Conexant conferencing accounts effective August 1, 2005, I want to confirm that this is a service we offer and we will comply with your instructions." (Compl. Ex. U.)  Pirnie also stated that if Conference America received requests from Conexant personnel to set up new accounts, Conference America would "assume they have the authority to make such requests and will set-up these accounts." (*Id.*)

Finally, in a letter dated July 28, 2005, which was delivered by Conexant to Federal Express for shipping on July 29, 2005, and actually received by Conference America on August 1, 2005 (Conf. Am.'s Reply Br. Ex. 2), Conexant responded that "Conexant has not reviewed the terms and conditions posted on your web site and does not agree to any new terms governing our relationship. We continue to operate under the agreed upon terms and conditions in the contract dated August 1, 1999[,] and amended as of December 1, 2003[,] for the few additional days [on] which we continue to do business." (Compl. Ex. V.)  Noonan also informed Conference America "that no one has the authority to establish any new account(s) for Conexant." (*Id.*)

Conference America deactivated all 1,778 leader accounts and billed Conexant at the website rate of $74.95 for each account.  Conexant refused to pay the deactivation fee and certain conference charges incurred in July 2005 after termination of the agreement.  Conference America claims $195,979.79,[3] plus pre-judgment interest at the rate of 1.5 % per month, and reasonable attorneys' fees and costs incurred in this action.

---

[3]  This amount is comprised of $146,453.95 in deactivation fees and $49,525.83 for other services rendered by Conference America between July 11, 2005, and July 31, 2005.  (Compl. ¶¶ 46-47; Exs. Z & DD.)

## II.  JURISDICTION AND VENUE

Because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

## III.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The parties stipulated that there is no dispute as to any material fact and have submitted the case for decision on the summary judgment record.  However, "[t]he determination whether a genuine issue concerning a material fact exists is itself a question of law that must be decided by the court.  It does not depend upon what either or both of the parties may have thought about the matter." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1988).  The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment.  *See, e.g., Gerling Global Reins. Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001).  The Eleventh Circuit has held that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*,744 F.3d 1553, 1555 (11th Cir. 1984) (citation omitted).  However, it is also true that cross-motions may indicate the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts.  *Id.* at 1555-56.  In this case, the court has carefully reviewed the evidence and concludes, as do the parties, that there is no dispute as to any material fact, and that judgment may be entered on the record before it.

## IV.  DISCUSSION

The issue is whether the post-termination transactions of the parties were governed by the written price protection agreement, by a contract or series of contracts under the July 25 website terms and conditions, or by some other course of dealings resulting in a contract between the parties.

Conference America contends that it clearly and unequivocally terminated the written agreement, which it says is undisputed by Conexant.  Besides, the agreement contains no provision for deactivation of leader accounts and therefore cannot govern that service.  Having directly and repeatedly referred Conexant to its website for its standard terms and conditions after termination, Conference America claims a series of unilateral contracts exist with Conexant at the website rates for conferencing services and deactivation fees.  Moreover, because Conexant twice ordered deactivation of all leader accounts in writing, and because Conference America confirmed those orders in writing, Conexant expressly assented to those rates for those services.  Deactivation services were not included in the definition of "services" in the written agreement, but were referred to on the July 25 website terms and conditions as services that Conference America in fact offered to its customers.

Conexant agrees with Conference America that the dispute is a simple contract issue.  However, it claims the post-termination activities fall within the terms and conditions of the written price protection agreement  because all the leader accounts were set up under the written agreement (not under the website terms and conditions), the written agreement was the "entire agreement" with respect to leader  accounts, and post-termination transactions with respect to leader accounts should

be governed thereby.[4]  Because the written agreement did not reference deactivation fees, and in view of the fact that Conference America never charged deactivation fees for leader accounts that were shut down during the term of the written agreement, Conexant contends such fees were never contemplated by the parties and could not have been agreed to by Conexant.  Additionally, Conexant points to its July 28 letter to Conference America expressly denying any agreement to the website terms and conditions before the deactivation of accounts took place.  Conexant also argues that the terms and conditions of the website were never incorporated into any written agreement and that the website language produced by Conference America is either inaccurate or was modified after the dispute began to "get" Conexant with the deactivation fee.

### A.    Survival of Price Protection Agreement Terms

Conexant insists that the terms of the written price protection agreement govern the deactivation of the leader accounts.  While it does not dispute that Conference America properly terminated the agreement, it contends that the integration clause of the agreement causes the transactions surrounding the leader accounts, which were created under the terms of the agreement, to survive termination.  It argues that because the written agreement does not directly address account deactivation, and  because the integration clause says the agreement is "the entire agreement and understanding concerning the subject matter hereof . . . ," there can therefore be no deactivation fee.  Conexant fails to cite any authority for this view of the effect of termination of a contract.

---

[4]  Conexant acknowledges that any "new" leader accounts (set up after termination) would be governed by the standard rates of the website. (Conexant's Br. at 8.)

Under California law, "terminate" means "the abrogation of so much of the contract as might remain executory at the time notice is given . . . ." *Grant v. Aerodraulics Co.,* 204 P.2d 683, 686 (Cal. Dist. Ct. App. 1949). This is in accord with general principles of contract law:

> When a contract is terminated, even wrongfully, there is no longer a contract, hence no duty to perform and no right to demand performance . . . . The parties to an agreement are relieved of their mutual obligations upon termination of the agreement, and neither party is liable after termination for further transactions thereunder. . . .
>
> Provisions for "at will" cancellation of an agreement, although sometimes harsh, are enforceable, as are stipulations in the contract as to the rights of the parties on termination.

17B C.J.S. *Contracts* § 448 (footnotes omitted). The court has carefully reviewed the agreement and finds no provision addressing rights of the parties with respect to the leader accounts upon termination.[5] Because there is no suggestion of survivability in the agreement as to the leader accounts and discounted pricing, Conexant could not rely on any of its provisions after the July 10, 2005 termination.

In an internal email dated June 29, 2005, Edge noted Conexant's position as a result of the termination by Conference America:

> We have a critical issue with our current conferencing vendor – (Conference America). Due to our recent negotiations with them and other providers they have executed an out clause within there [sic] contract, giving Conexant a 15 day notice that they will no longer support Conexant at our current negotiated pricing. Basically they are telling Conexant that they no longer want to provide us with services. There seems to be no rational reason behind this except that they are angry with us for reviewing our rates and services with other audio companies. We have not notified them that we are switching providers either. Tom Noonan and I have tried several times to contact them with no response since the notice.

---

[5] Attachment E of the agreement contains confidentiality provisions that "survive for two years after the expiration or termination of the Agreement." (Compl. Ex. D, Attach. E, ¶ 4.) Despite their ability to do so, the parties evidently chose not to make any other provision of the agreement survive termination.

Tom and I have already finalized the contract with intercall [sic] and can begin executing on a plan to transition over to them from Conference America but it will need to be done quickly since we only have 15 days. *If we do not convert everyone in 15 days, Conference America will continue to provide service but at a very high rate – .05 per minute to .45 a minute.*

. . . .

I can get everything transitioned and *we can allow some overflow at the premium rates if necessary to ease the transition*.

*We need to move quickly or pay the higher rate . . . .*

. . . .

I . . . would like to get the wheels moving quickly *to avoid the large increase in costs* [.]

(Noonan Dep. Ex. 3) (emphasis added). This correspondence evidences Conexant's knowledge, soon after the notice of termination, that it faced a new pricing paradigm with Conference America after July 10. As such, the court cannot credit Conexant's belated protest that portions of the contract survived termination.[6]

Conexant's position is also untenable in view of the express language of the agreement. The subject matter of the agreement is "services" provided to Conexant by Conference America. Those services are defined in Attachment A with great specificity, and they do not include a deactivation

---

[6] In fact, Conexant also acknowledged higher prices were coming at the end of the contract in its July 15 correspondence to Conference America (Compl. Ex. M), in its July 19 e-mail (*id*. Ex. N), and in its July 20 e-mail. (*Id*. Ex. P (". . . the price change took effect on July 10, 2005.").) Yet, Conexant persisted in asserting to Conference America that it was entitled to the discounted rates for conferencing services. It did so on July 28 (*id*. Ex. V) ("We continue to operate under the agreed upon terms and conditions in the contract . . . ."); on September 7 (id. Ex. AA) ("However, I am unable to pay any of the other charges at this time . . . . They don't appear to be Conexant's rate of $.05 . . . ."); and October 5. (*Id*. Ex. EE) ("From our analysis, we determined that Conexant's actual usage of Conference America's services was 141,205 minutes. This multiplied by Conexant's contractual rate of $.05 per minute equals $7,060.25.).) Conexant attempted to pay Conference America the amount that would have been owed under the agreement if it had not been terminated. (*Id*.) Conference America rejected the attempted payment, and Conexant has refused to pay the higher rate. Conexant does not argue in its briefing that it does not owe these higher conferencing service rates for July 2005.

fee.[7]   However, the agreement provides that "additional services are available at Conference America's Standard Prices effective at the time services are rendered." (Compl. Ex. D, Attach. A, at 3.) It is thus obvious that the parties contemplated that services other than those provided by the agreement would involve pricing other than the reduced rates guaranteed by the agreement. As will be seen below, according to the July 25 website terms and conditions, services are defined there to include deactivation fees. It follows that Conexant's assertion that deactivation fees were never incorporated into any written contract ignores the "additional services" provision of the agreement.

Conexant's interpretation also ignores the provision of paragraph 3 that the pricing in the agreement is effective "[d]uring the term of this agreement . . . ." (Compl. Ex. D.) To the extent Conexant refuses to pay the increased conferencing charges, irrespective of the deactivation fees, it discards the plain language of the agreement that pricing at the lower rates existed only during the term of the agreement. Because the court finds that the agreement no longer existed fifteen days after the termination notice, the increased fees for conferencing services in the amount of $49,525.83 are due to be paid to Conference America.[8]

**B.      The Website and Deactivation Fees**

The court will now address the issue of whether deactivation fees were otherwise contracted for between the parties. In assessing the net legal effect of the copious correspondence between the parties after the agreement was terminated, the court is guided by some basic contract principles.[9]

---

[7]   They do include, interestingly, a "cancellation fee" (for which the price is "none"), which neither party addresses in briefing. In the context of the overall agreement, the court takes this reference to cancellation as cancellation of individual teleconferences. (Compl. Ex. D.)

[8]   Interest and attorney fees are addressed *infra*.

[9]   The parties do not dispute that Alabama law governs this aspect of the contract analysis. The July 25 website terms and conditions also establishes that Alabama law governs. (Compl. Ex. A.)

"A unilateral contract results from an exchange of a promise for an act, while a bilateral contract results from an exchange of promises."  Richard A. Lord, *Williston on Contracts* § 1:17 (4th ed.) "Ordinarily, in a unilateral contract, there is no bargaining process or exchange of promises by parties as in a bilateral contract. . . .  The performance . . . constitutes both acceptance of a promisor's offer and consideration.  Thus an essential distinction between a unilateral contract and a bilateral contract is the method of acceptance."  *Id*.  Using the term unilateral contract "should be reserved for cases in which a legal obligation has been created, but only one party has made a promise."  *Id.*  "While it is true, therefore, that in some cases a promise may not readily be characterized as clearly bilateral or clearly unilateral, either because it shares components of each or because it is subject to frailties of human language, it nevertheless remains worthwhile to classify contracts in accordance with what the promisor is seeking from the promisee when he or she makes his or her promise."  *Id*.

Alabama follows the general rule.  A unilateral contract is created when one party makes an offer and the other party accepts by performing an act.  *South Trust Bank v. Williams*, 775 So. 2d 184, 188 (Ala. 2000).  "Under Alabama law there is no requirement that a contract contain a signature to demonstrate assent; the existence of a contact may be inferred from external and objective manifestations of assent."  *Taylor v. First N. Am. Nat'l Bank*, 325 F. Supp. 2d 1304, 1313 (M.D. Ala. 2004).  The elements are identical to those of a typical contract: offer, communication, acceptance, and consideration.  *Ex parte Amoco Fabrics & Fibers Co.*, 729 So. 2d 336, 339 (Ala. 1998).  In a unilateral contract, "[o]nly one party makes an offer (or promise) which invites performance by another, and performance constitutes both acceptance of that offer and consideration."  *Williams*, 775 So. 2d at 188 (internal quotation marks and citation omitted).  A party can assent to unilateral contract

14

terms—the prices of services offered to it, for example—by requesting or using those services.[10]  By using the services of another, the user becomes the promisor who has created a binding unilateral obligation to pay for the service at the offered price.  "In such a case the performance supplies the element of mutuality necessary as a consideration to support the obligation."  *Miller v. Thomason,* 156 So. 773, 774 (Ala. 1934) (citations omitted).

Conference America contends that a series of unilateral contracts were created when Conexant twice requested that the leader accounts be terminated, when Conference America acknowledged the requests and confirmed that it "provided those services," and when Conference America in fact performed those services.  It argues that under Alabama law of express unilateral contracts, Conexant's request was an offer, which Conference America accepted by its performance.  A careful review of the timeline, the internal correspondence of Conexant, and the correspondence between the parties is required to test Conference America's contentions.

As demonstrated by Conexant's internal e-mail dated June 29, Conexant knew that it faced a "critical issue" when it received notice of termination.  (Noonan Dep. Ex. 3.)  The notice of termination was explicit: "Any services used or requested by Conexant after termination will be made available only on and subject to Conference America's standard terms, conditions and prices effective at the time the services are rendered.  Conference America's Services Terms & Conditions

---

[10]  An example of the latter circumstance is the use of credit cards:

When an issuer of a credit card . . . sends to the holder the card and the form describing the terms for its use, it makes an offer for the formation of a number of contracts by successive acceptances from time to time as the card is used . . . .  The credit card relationship, properly analyzed, should be viewed as an offer by the issuer to create the opportunity for a series of unilateral contracts which are actually formed when the holder uses the credit card to buy goods or services or to obtain cash.

*Taylor*, 325 F. Supp. 2d at 1313 (citation omitted).  Other common forms of unilateral contracts are insurance policies, *see, e.g., Woodmen of the World v. Harris*, 740 So. 2d 362 (Ala. 1999), and employment-at-will contracts. *See Ex parte McNaughton*, 728 So. 2d 592 (Ala. 1998) (Cook, J., dissenting).

is available at www.yourcall.com ." (Compl. Ex. K.)[11]  Conexant had hundreds of leader accounts on the books that would need to be transitioned to a new conferencing provider on short notice to avoid a "very high rate" after July 10. (Noonan Dep. Ex. 3.)  Quickly contacting all those accounts, scattered all over the world, was no small endeavor.  Edge expressed this concern in the June 29 internal e-mail:  "What are your thoughts on this - Should we pay the premium and take some time to transition or should we move quickly and educate the users on what we are up against?"  (*Id.*) Conexant had not given Conference America an official reaction to the termination by July 7, when it received the following e-mail from Vogelgesang, Conference America's Sales Administrator: "I just wanted to confirm for you in writing that there will be absolutely no interruption in services for Conexant.  All of your leaders' accounts will remain active and new leader accounts will be established as requested." (Compl. Ex. L.)

---

[11]   The court has carefully considered the arguments of Conexant with respect to the circumstances surrounding the content of the website, and when it may or may not have included deactivation fees.  Of particular concern is the suggestion of Conexant that the website was altered at some relevant point to include deactivation fees that did not appear in versions of the website prior to July 25, 2005.  Conexant touts the testimony of Jason Shanks, a former Conference America employee, to support its claim of back-dating that section of the website.  (Conexant's Resp. Br., at 3.)  A thorough reading of Mr. Shanks's deposition testimony fails to support that assertion. Mr. Shanks testified that Mr. Pirnie asked him to backdate a version of the web page seven to nine days, back  to July third or fourth, and to put a copy in Conexant's file.  (Shanks Dep. at 68-72.)  Mr. Shanks could not say the website was otherwise altered in any way:

> Q.  . . . Are you aware . . . that the website terms and conditions were changed for any reason related to Conexant specifically?
> A.  The only change I'm aware of regarding Conexant specifically is the change in question regarding the date.

(*Id.* at 65.) He could not say whether deactivation fees were or were not on the copy on which he altered the date. (*Id.* at 62-65.)  He repeatedly testified that he "believed" it had been altered because he had never seen a deactivation fee on the website before.  (*Id.* at 77, 97, 101, 103-104, 106, 108, 127, 129, and 130.)

The court does not have to resolve Mr. Shanks's testimony, however.  No altered version of the website has been produced, and Conference America claims under the July 25, 2005 version, not any earlier version Mr. Shanks may have altered.  Conference America made it abundantly clear to Conexant that services would be priced as of the date rendered.  The services in question were rendered after July 25.

Conexant finally made its move in Noonan's July 15 letter to Pirnie. First insisting that fifteen days meant "15 business days" which would extend until July 15, Noonan then set Conexant's course to its current unfavorable clime: "*Conexant also advises Conference America that it is canceling all accounts as of Sunday, July 31, 2005 and all services for these accounts are to be made inactive/unavailable on that date.*" (Compl. Ex. M (emphasis added).) This was Conexant's first request to deactivate its leader accounts. In response to Edge's July 19 dispute of invoices,[12] Pirnie referenced other services: "[Pricing for conferencing services] following termination of [our] agreement is *set forth on our website. You are well aware of that pricing and have never inquired as to any other post-termination pricing for any other service.*" (Compl. Ex. O.) After Edge acknowledged the July 10 price change, (*id*. Ex. P), he made the second request on behalf of Conexant that all accounts be disconnected or terminated: "*Conexant is requesting that all Conexant conferencing accounts be disconnected* as of [July 31, 2005]." (*Id*. Ex. S.)

At this point, Conference America had two written requests from Conexant to disconnect all Conexant accounts. Conexant understandably wanted to avoid the increased pricing for conferencing services (from $.05 per minute to $.45 per minute), and a definitive disconnect, literally and legally, from Conference America was to its business advantage. Regardless of whether it had reviewed the website, Conexant requested services of Conference America. Under either unilateral contract or bilateral contract analysis, Conexant was at risk of Conference America accepting its offer, either through a promise or performance. Conexant ignored the website at its own risk in view of

---

[12]  Edge's July 19 position is inconsistent with his June 29 internal e-mail in which he clearly stated his understanding of the "critical issue" of increased prices from $.05 per minute to $.45 per minute, effective in fifteen days. "We need to move quickly or pay the higher rate." (Noonan Dep. Ex. 3.) It is also inconsistent with his own deposition testimony that he reviewed the pricing on the website when he received the termination letter: "I went and looked up what the new rate was." (Edge Dep. 39:1-2.)

17

Conference America's repeated stance that all future services would be at rates specified on the website.

Conference America delivered the contractual *coup de grace* to Conexant in the July 26 letter from Pirnie to Edge and Noonan:

> I have received considerable correspondence from each of you regarding *termination of Conexants's accounts with Conference America,* termination dates, pricing, and Conexant's apparent unwillingness to pay for services it uses . . . .
>
>  . . . . Termination [of the agreement] was effective July 10, and *any services* Conexant may have used from that date forward would be covered by our Services Terms and Conditions on our website, www.yourcall.com *including price terms.  I would encourage you again to review this document.*
>
> . . .
>
> *In view of your instructions to de-activate all Conexant conferencing accounts effective August 1, 2005, I wanted to confirm that this is a service we offer and we will comply with your instructions.*

(Compl. Ex. O (emphasis added).)   Conference America argues unilateral contracts, but this exchange resulted in a promise for a promise, *ergo*, a bilateral contract.  In effect, Conexant made an offer (*i.e.*, ordered a service for which it promised to pay), and Conference America accepted the offer (*i.e.*, " . . . we will comply . . . .").  *See Williams*, 775 So. 2d at 187 ("An agreement whereby one party proposes to sell and the other promises to buy a thing at a later time . . . is a bilateral promise of sale or contract to sell." (citation omitted)).  Pricing is resolved by the content of the website of Conference America.

In his July 28 response[13] to Pirnie, Noonan claimed that "Conexant has not reviewed the terms and conditions posted on your web site," stated that he did "not agree to any new terms governing our relationship [as] [w]e continue to operate under the [agreement] for the few additional days which we continue to do business." (Compl. Ex. V.)  Regarding Noonan's latter assertion, the written agreement between Conexant and Conference America no longer existed as of the date of this letter.  The termination of the contract was effective on July 10.  Try as it may, by invoking the terms of a dead contract, Conexant could not resuscitate any provision that may help it here.

Conexant's intentional refusal to review the terms and conditions of the website requires careful attention.  These facts call forth a meaningful distinction in bilateral and unilateral contracts.  This is because the July 25 website terms and conditions in fact contain standard pricing for "services," one of which is "Activate/Deactivate Maintenance fee $74.95 per leader account." (*Id*. Ex. A.)  Conexant argues that there was no assent to this provision, that it had never been charged such a fee during the term of the agreement and did not contemplate one on August 1, 2005.  Conexant also points to the fact  that the officers of Conference America could not confirm at their depositions that this pricing language was on the website on June 24, the date of the termination letter, or on July 15 or 20, the dates of Conexant's requests to deactivate the leader accounts.

These arguments are specious for two reasons.  First, the termination letter specifically stated that "[a]ny services used or requested by Conexant after termination will be made available only on and subject to Conference America's standard terms, conditions and prices *effective at the time the services are rendered*" and referred Conexant to the website.  (Compl. Ex. K (emphasis

---

[13]  Conference America argues, and indeed it appears, that this letter was not sent via Federal Express until Friday, July 29, for delivery on Monday, August 1, 2005, which was the day after Conference America completed deactivation of accounts.  (Conf. Am.'s Reply Br. Ex. 2.)

added).)[14]  Thus, it is irrelevant whether the pricing in question was on the website before July 26, the date Conference America accepted Conexant's deactivation order.  The web price was effective as of the date the service was rendered.  Second, it also does not matter that the information may not have been on the website before July 25, the date on the website exhibit, in view of the fact that Conexant said that it had not reviewed the terms and conditions on the website as of July 28.  After the valid termination of the written agreement, Conexant twice requested services from Conference America, and was twice referred to the website for the pricing of those services.  Conexant's persistence in insisting on the services without at least looking to see what Conference America intended to charge does not create on Conference America's part an obligation to clearly state the price for the service outside the website.[15]

It is at this point, however, that the difference in unilateral contracts and bilateral contracts becomes evident.  In the unilateral contract analysis, performance in response to an offer is counted as acceptance of the offer.  Hence, Conference America's performance of the deactivation services requested by Conexant would constitute a series of unilateral contracts, one for each leader account. There would be no contract before performance.  If Conexant informed Conference America that it "does not agree to any new terms governing our relationship" before Conference America performed the service, the notice by Conexant could be considered a revocation of its offer, and Conference

---

[14]  This is consistent with the provisions of the price protection agreement in which "additional services" would be priced "at the time services are rendered."  (Compl. Ex. D, Attach. A, at 3.)

[15]  Conference America pointed out Conexant's failure in this regard in its July 19 letter to Edge: "You . . . have never inquired as to any other post-termination pricing for any other service."  (Compl. Ex. O.)  This was after Conexant's first request to deactivate the leader accounts.  In fact, Edge *was* familiar with the website, though he tried to parse his familiarity with the following testimony in his deposition: "I never reviewed the terms and conditions.  I went and looked up what the new rate was." (Edge Dep. 39:1-2.)  Regardless of the veracity of this statement, "[h]e cannot close his eyes, and plead he does not see." *Oxford v. Estes*, 158 So. 534, 538 (Ala. 1934).

America would act at its peril in performing the service.  Except in a small minority of jurisdictions with contrary statutes, "it is universally settled that a revocation requires communication and that, therefore, an acceptance made prior to a communicated revocation will create a binding contract." Lord, *supra*, § 5:9.  Therefore,  because Conexant did not communicate its withdrawal until August 1, 2005, after the service had been performed, the unilateral contract analysis confirms a series of contracts between the parties.[16]

Under these facts, however, it is not necessary to rely upon unilateral contract analysis for there to be a binding contractual obligation between Conexant and Conference America.  When Conexant requested deactivation services, it made an offer to Conference America, which could ripen into a contract by performance or other acceptance.  Conference America's July 26 letter operated as an acceptance:  "[T]his is a service we offer and we will comply with your instructions." (Compl. Ex. U.)   At that point, a bilateral contract was formed.  Performance by Conference America was simply performance, not acceptance by performance.  In sum, under either unilateral or bilateral analysis, Conexant is contractually bound to pay for the services it requested.

Conexant also argues that it did not agree to be bound by the terms of the website because it did not click the "I agree" button as required by the preamble paragraph on the website.  However, that paragraph makes it clear that the "I agree" button is for new accounts, and none of Conexant's leader accounts were new accounts.  Moreover, Conference America referred to the website pricing repeatedly as a condition of its performing services after termination.  By requesting those services, Conexant agreed to be bound by the terms.  As a sophisticated business, its failure to read the "fine print" is a poor excuse, and a legally insufficient one.

---

[16]  The same is true under bilateral contract analysis – after performance, an offer cannot be revoked.

For these reasons, Conexant owes Conference America the deactivation fees in the sum of $146,453.95.  (*See* Compl. Exs. Z & DD.)

## C.    Interest, Legal Fees, and Expenses

Because Conference America's website terms and conditions form the basis of the contracts between the parties, the website terms and conditions related to interest, legal fees, and expenses also govern.  The terms and conditions contain the following language: "You will reimburse us for all expenses and legal fees incurred by us in enforcing our rights under the Agreement." (Compl. Ex. A ¶ 5.a.)  The terms and conditions further state , "If you do not pay any amount when due, then you will pay us interest of 1.5% per month on all such overdue amounts until paid . . . ." (*Id*. ¶ 5.b.)  Under the circumstances, Conference America is entitled to interest of 1.5 % per month on the sum of $195,979.79 since August 22, 2005, as well as to reimbursement for reasonable expenses and legal fees.

## V.  CONCLUSION

For the reasons set forth above, it is hereby ORDERED that:

1.  Conexant's Motion for Summary Judgment (Doc. # 20) is DENIED.

2.  Conference America's Motion for Summary Judgment (Doc. # 21) is GRANTED and judgment is entered in favor of Conference America and against Conexant in the sum of $195,979.79.

3.   Conference America shall file verified statements of its reasonable expenses and reasonable legal fees **on or before September 19, 2007.**  Conexant shall file a response **on or before September 26, 2007.**

4.   An appropriate final judgment will be entered when expenses and legal fees are established.

DONE this 10th day of September, 2007.

_____/s/  W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE