# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CONFERENCE AMERICA, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| ) | FILE NO: |
| v. ) | 2:05cv1088-WKW |
| ) | |
| CONEXANT SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |

**ROBERT P. WILLIAMS, II'S VERIFIED STATEMENT OF CONFERENCE AMERICA, INC.'S REASONABLE EXPENSES AND LEGAL FEES**

Personally appeared before me, the undersigned officer, duly authorized by law to administer oaths, Robert P. Williams, II, who, being duly sworn, stated as follows:

1.

I, Robert P. Williams, II, am over the age of 21, suffer from no legal disabilities, and give this affidavit from personal knowledge for use in the above-styled civil action and for all other purposes allowed by law. I am an active member in good standing of the State Bar of Georgia and am engaged in private practice in the Atlanta, Georgia office of the law firm Troutman Sanders LLP.

2.

I am lead counsel for Plaintiff Conference America, Inc. in the above-styled case. Set forth below is a description of the legal background and experience that I employed as counsel in this case as well as a description of the legal services that my law firm, Troutman Sanders LLP, provided to Conference America, Inc., our charges for those services, and my statement as to the necessity and reasonableness of those services.

3.

I am a 1984 graduate of The University of Georgia School of Law. I began practice with Troutman Sanders in 1984 and have been a partner there since 1993. I am admitted to practice in all Georgia federal and state courts, various other federal courts, and the United States Supreme Court. I have an AV rating by Martindale-Hubbell. My law practice at Troutman Sanders has involved regulatory law, business transactions, and litigation in numerous jurisdictions throughout the nation, including Alabama.

4.

I have served as Conference America's outside general counsel since 2004 and have become very familiar with its business activities, operations, and personnel. I and the attorneys at my firm have advised Conference America on a variety of matters, including regulatory matters, contract litigation, contract formation, corporate and tax matters, employee benefits matters, and labor and employment matters.

5.

In particular, I drafted or supervised the drafting of most of the contract documents at issue in this case, including Conference America's website terms and conditions and the Price Protection Agreement. I also advised Conference America in connection with its pre-litigation settlement efforts, including much of the correspondence relating to the disputed payments.

6.

Tom Borton, an associate at Troutman Sanders who performed many of the day-to-day litigation tasks in this matter (legal research, drafting pleadings, written discovery, depositions, brief-writing, attendance at hearings, etc.), is a 2001 graduate of The University of Alabama School of Law. Mr. Borton is admitted to practice in Georgia and Alabama. Mr. Borton has

litigated cases in Alabama and in other jurisdictions across the country. Mr. Borton was in his fourth year of practice when this case was filed, and is currently beginning his seventh year.

7.

Conference America retained my firm to represent it in this litigation in Montgomery because of our longstanding relationship with Conference America and my familiarity with its business operations and the subject matter of this dispute. Conference America determined, and I agreed, that it would be more efficient to use our firm to pursue the claim against Conexant than to engage local counsel who would not have been familiar with the parties, the conferencing business, the contracts and the evidence.

8.

I and the attorneys at Troutman Sanders have performed in the past and are currently performing significant legal services for a variety of individuals and entities in Alabama and throughout the Southeast. It is common for Troutman Sanders to represent clients in Birmingham, Montgomery, Mobile, and other areas of Alabama. These clients pay Troutman Sanders's legal fees at our standard hourly rates.

9.

In my experience, and as evidenced by surveys conducted by such publications as the *Of Counsel 700* and the *National Law Journal*, Troutman Sanders's hourly billing rates are typically in the middle of the range of hourly billing rates for firms of comparable size performing similar work in the Southeast.

10.

Attached to this affidavit as Exhibit "1" and incorporated by reference herein are the monthly statements for professional services and expenses furnished to Conference America for Troutman Sanders's legal work in this case. This work involved a total of 646.4 hours of

attorney, paralegal and law clerk time, and total expenses and legal fees of $199,900.71, all of which have been paid by Conference America. Most of this work was performed by Mr. Borton and me, including 131.6 hours of my own time at an average rate of approximately $498, and 436.3 hours of Mr. Borton's time at an average rate of approximately $260.[1] Ben Young, a junior associate, worked a total of 51.3 hours on research, drafting and related tasks at an average rate of approximately $195. We also used paralegals and summer law clerks for specific tasks, as appropriate, at substantially lower rates.

11.

I personally reviewed each of the invoices attached as Exhibit 1 before they were sent to Conference America, Inc. I am personally familiar with all of the work done, as reflected on the invoices.

12.

These invoices were generated by our billing system after time recorded by the lawyer working on the matter was electronically entered into the system. I am personally familiar with this time-keeping process and billing system. Once these invoices were generated by the billing system, I personally maintained copies of the invoices that were sent to Conference America, Inc.

13.

In connection with drafting the instant Verified Statement of Conference America, Inc.'s Reasonable Expenses and Legal Fees, I personally reviewed each of the attached invoices in order to determine the amount of time spent working on this matter.

---

[1] In 2005, my billable rate was $475 per hour; in 2006 it was $500 per hour; and in 2007 it was $520 per hour, for an average of approximately $498 per hour throughout this case. In 2005, Mr. Borton's billable rate was $230 per hour; in 2006 it was $260 per hour; and in 2007 it was $290 per hour, for an average of $260 per hour throughout this case. Since the bulk of the work for this case was performed in 2005 and 2006, the actual average billing rates were somewhat lower than $498 and $260.

- 4 -

14.

In my opinion, the expenses and litigation costs that Conference America paid to Troutman Sanders to litigate this case resulted entirely from Conexant's unreasonable refusal to settle this matter and to pay the amounts that it owed to Conference America under the website terms and conditions. Prior to filing this action, Conference America made several efforts to provide Conexant with all information necessary to satisfy itself that the amounts invoiced were correct. Immediately after filing the action, I personally initiated efforts to settle for only the amount of the invoices, without interest or legal fees, but those efforts were rejected by Conexant. Subsequent efforts to settle for less than the full amount due were similarly rejected by Conexant. More specifically:

(a) On or about November 23, 2005, I contacted the office of Conexant's General Counsel by telephone on Conference America's behalf and offered to settle the matter for the contract amount of $195,979.79, which this Court ultimately awarded, and to waive any claim for attorney fees or interest. I explained that the amount of attorney fees and interest accrued by that time was already substantial and that this waiver was a significant concession.

(b) On November 28, 2005, Mr. Borton sent a letter to Karen Herman, internal counsel for Conexant, agreeing to a two-week extension of the deadline for Conexant to answer Conference America's Verified Complaint and reiterating the oral settlement offer:

> I would also like you to know that Conference America is not interested in needless litigation with your company. As Mr. Williams has discussed with you, although Conference America has asked for—and is contractually entitled to—attorney's fees and interest on the money that it seeks from Conexant, Conference America will waive these particular damages if Conexant remits the $195,979.79 principal to Conference America, pursuant to an appropriate written settlement agreement, by December 20.

(Letter from Tom Borton, counsel for Conference Am., Inc., to Karen Herman, counsel for Conexant Sys., Inc. (Nov. 28, 2005) (a true and correct copy of which is attached as Ex. 2).) Conexant did not respond to this settlement offer.

      (c)    On or about January 3 and 9, 2006, Mr. Borton again, by telephone, approached outside counsel for Conexant about settlement. Conexant again did not respond, but instead simply served written discovery—interrogatories and requests for production—on Conference America on February 8. On February 15, Mr. Borton wrote a letter to Conexant's attorney stating the following:

> We last discussed settlement of this case over a month ago. At that point, you informed me that you intended to review any available information supporting Conexant's contention that Conference America charged it a deactivation fee for more accounts than actually existed, and that you would then get back with me concerning settlement prospects.
>
> I recently received Conexant's interrogatories and requests for production. I am, frankly, surprised that Conexant decided to send written discovery in lieu of a follow-up on our settlement discussions.
>
> I still believe that this matter can and should be settled without running up additional interest, attorneys' fees, and costs, which Conference America fully expects to recover from Conexant. Based on your silence regarding settlement and your pursuit of discovery, I infer that Conexant has decided it wishes to litigate rather than settle, and we will proceed accordingly.

(Letter from Tom Borton, counsel for Conference Am., Inc., to Joe Miller, counsel for Conexant Sys., Inc. (Feb. 15, 2006) (a true and correct copy of which is attached as Ex. 3).)

      (d)    On April 21, 2006, in an effort to help Conexant understand that there was absolutely no reasonable basis for disputing payment, Mr. Borton voluntarily sent Conexant's counsel various spreadsheets indicating the number of accounts that Conexant had asked

- 6 -

Conference America to deactivate, and the total cost to Conexant for that service. (Letter from Tom Borton, counsel for Conference Am., Inc., to Joe Miller, counsel for Conexant Sys., Inc. (Apr. 21, 2006) (a true and correct copy of which is attached as Ex. 4).) The purpose of the spreadsheets was to "demonstrate that there [was] no question about the number of accounts that Conference America deactivated for Conexant." (*Id.*) Mr. Borton stated: "Hopefully, the spreadsheets will help . . . your client to realize that Conexant owes Conference America the amount demanded in the Verified Complaint, and that both further litigation and the generation of additional attorney's fees are pointless." (*Id.*) Mr. Borton's letter concluded:

> The enclosed spreadsheets demonstrate that there is no question about where Conference America got its totals. And the correspondence attached to the Verified Complaint makes clear that Conexant requested and received these services from Conference America after the termination of the Audio Contract, with full knowledge that Conference America was offering the services subject to its website terms, conditions, and prices. Conexant therefore owes Conference America for the services that it received.
>
> Please show this letter and the spreadsheets to your client; *they were sent in order to facilitate the resolution of this matter.* As I have stated earlier, *Conference America is seeking all attorney's fees that it incurs in the prosecution of this case. If we cannot resolve this matter shortly, these fees will become substantial.*

(*Id.* (emphases added)) Again, Conexant simply ignored the opportunity for settlement and instead pursued discovery. (Letter from Joe Miller, counsel for Conexant Sys., Inc., to Tom Borton, counsel for Conference Am., Inc. (Apr. 24, 2006) (a true and correct copy of which is attached as Ex. 5).)

(e) On June 14, 2006, the parties conducted a face-to-face settlement conference. At that conference, Conexant offered to settle the case only for the amount of money—$7,060.00—that it had attempted to pay to Conference America before the litigation began. This amount was less than five percent of the amount ($195,979.79) that this Court ultimately awarded to

- 7 -

Conference America in this case. (See Verified Compl. ¶¶ 35-36, 38.) Conference America rejected this settlement offer and Conexant made no other offer.

      (f)     On September 29, 2006, in accordance with the Court's recommendation at the pre-trial conference that the parties settle the case, I made a settlement offer by telephone on behalf of Conference America of $325,000. (Letter from Tom Borton, counsel for Conference Am., Inc., to Joe Miller, counsel for Conexant Sys., Inc. (Oct. 2, 2006) (a true and correct copy of which is attached as Ex. 6).) In making that offer, I explained that Conference America's actual accrued legal fees, expenses and interest were substantially in excess of that amount at that time. In-house counsel for Conexant, who participated in the call, did not question the accuracy or reasonableness of that figure, but stated that Conexant's own legal fees were "probably higher" than Conference America's. In an October 2, 2006 letter memorializing Conference America's settlement offer, Mr. Borton wrote:

> I am writing to memorialize Conference America's $325,000 settlement offer . . . . This offer was made pursuant to both the Court's recommendation that the parties attempt to settle this matter, *and to Conference America's desire to resolve this case without further litigation.*
>
> As you know, *litigation costs and daily interest on the amount that Conference America seeks in this case are continuing to accumulate. It would be in the best interest of both parties for Conexant to accept this offer.*
>
> If you wish to make a counteroffer, or to discuss this case further, please do not hesitate to contact me.

(*Id.* (emphases added))

      (g)     Conexant failed to respond to Conference America's $325,000 settlement offer in any way. On October 12, Conference America withdrew the offer, but reiterated that Conference America was still open to discussing settlement:

> Conference America hereby withdraws its $325,000 settlement offer made to Conexant via telephone on Friday, September 29. Our reasons for withdrawal are twofold. First, more than a week has passed without a response of any kind. Second, in that week, Conference America has incurred further legal expenses in responding to Conexant's supplement to its response to Conference America's Motion for Summary Judgment. *Please note that further legal expenses are imminent, and that interest on the principle amount demanded is accruing daily.*
>
> *I want to emphasize that Conference America is still open to the reasonable settlement of this matter, and that it would still like to engage in discussions to that end. We invite any settlement offers that Conexant wishes to make, and will be receptive to discussing the matter further if you wish.*

(Letter from Tom Borton, counsel for Conference Am., Inc., to Joe Miller, counsel for Conexant Sys., Inc. (Oct. 12, 2006) (a true and correct copy of which is attached as Ex. 7) (emphases added).)

(h)     Conexant never responded to this invitation to engage in settlement talks, and no further settlement discussions were held.

15.

Conexant's numerous, repeated refusals to respond to settlement offers or to engage in meaningful settlement discussions, and its insistence on fully litigating this matter, forced Conference America to incur expenses and legal fees that could easily have been avoided. Moreover, Conexant was well aware of the magnitude of those expenses and legal fees.

16.

Not only did Conexant decline reasonable settlement, but it also engaged in litigation tactics that unnecessarily expanded the scope and cost of litigation. These tactics included taking numerous, unnecessary depositions of Conference America personnel, filing a meritless motion to strike, forcing Conference America to take depositions of Conexant witnesses in California instead of Alabama, and raising meritless defenses, such as its "merger clause" and "course of

- 9 -

dealing" defenses, that had little or no legal foundation and were explicitly contradicted by the evidence. Conference America incurred substantial fees and expenses in dealing with these tactics.

17.

Based upon my knowledge, experience in the Southeastern legal market, and training, our fees for this litigation were reasonable and consistent with the customary range of fees for similar firms representing a client in a contested civil lawsuit suit; our staffing strategy in which the majority of tasks were performed by associates and paralegals was efficient and reasonable; and the work performed was limited to what was reasonable and necessary to respond to Conexant's litigation tactics. In sum, our attorney fees of $199,900.71 were reasonable considering the scope, complexity and quality of work performed, Conexant's litigious tactics, and the successful results achieved for our client. In addition to those fees, Conference America is also entitled to recover our legal fees for preparing this Verified Statement of Reasonable Expenses and Legal Fees, which I anticipate will be approximately $1,000. By my calculation, the total amount due Conference America is the $195,979.79 in damages, plus the $199,900.71 in expenses and legal fees incurred prior to the preparation of this Verified Statement, plus the $1,000 in legal fees expended in preparing this Verified Statement, plus 1.5% monthly interest on a principle amount of $195,979.79 from August 22, 2005, until payment is made ($73,394.41 as of September 10, 2007). If additional legal fees or expenses are required to obtain payment, Conference America would be entitled to recover those amounts as well.

18.

If called upon as a witness, I could and would competently testify to all the foregoing.

I declare under penalty of perjury that the foregoing is true and correct.

PERSONALLY APPEARED BEFORE ME the undersigned officer duly authorized to administer oaths, ROBERT P. WILLIAMS, II, being duly sworn, who deposes and states that the information contained in Plaintiff Conference America, Inc.'s Verified Statement of Reasonable Expenses and Legal Fees above is true and correct to the best of his personal knowledge, information, and belief.

This 19th day of September 2007.

_____
ROBERT P. WILLIAMS, II

Sworn to and
subscribed before me:

_____
NOTARY PUBLIC
My Commission expires 10/01/10.

[Notary Seal: ENRIQUE VELAZQUEZ, NOTARY PUBLIC, GEORGIA, DEKALB COUNTY, EXPIRES OCT. 1, 2010]